1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ALABAMA
2

3

4        WILLIAM HEATH HORNADY, et al.,*
                   Plaintiffs,        *   18-cv-317
5                                      *   February 17, 2021
         vs.                           *   Mobile, Alabama
6                                      *   2:16 p.m.
         OUTOKUMPU STAINLESS USA, LLC, *
7                  Defendant.          *
         *****************************
8

9                       TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
10                     UNITED STATES DISTRICT JUDGE

11

         FOR THE PLAINTIFFS:
12

         MR. IAN DAVID ROSENTHAL, ESQ.
13       Holston Vaughan & Rosenthal
         211 South Cedar Street
14       Mobile, AL 36602
         251-432-8883
15

16       MR. PATRICK H. SIMS, ESQ.
         Cabaniss, Johnston, Gardner
17       Dumas & O'Neal
         P O Box 2906
18       Mobile, AL 36652
         251-415-7300
19

20       FOR THE DEFENDANT:

21       MR. GAVIN S. APPLEBY, ESQ. (Via Teleconference)
         Littler Mendelson
22       3344 Peachtree Road N.E.
         Suite 1500
23       Atlanta, GA 30326
         404-233-0330
24

25

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

```
 1          MS. SINEAD DALY, ESQ. (Via Teleconference)
            Litler Mendelson
 2          3424 Peachtree Rd., N.E.
            Suite 1200
 3          Atlanta, GA 30326-1127
            404-760-3954
 4

 5          COURTROOM DEPUTY: MS. MELANIE PAULK

 6

 7          COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

 8     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
 9               produced by computerized stenotype.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **P R O C E E D I N G S**

2         (In open court.)

3              COURTROOM DEPUTY:  Case set for a motion hearing in

4    Civil Action 18-317, Hornady et al. vs. Outokumpu Stainless.

14:16:21   5         What says the plaintiff?

6              MR. ROSENTHAL:  This is Ian Rosenthal for the

7    plaintiffs.  We're ready.

8              MR. SIMS:  Patrick Sims for the plaintiffs.

9              COURTROOM DEPUTY:  What says the defendant?

14:16:33   10         MR. APPLEBY:  This is Gavin Appleby for the

11   defendant.

12             MS. DALY:  And Sinead Daly for the defendant.

13             THE COURT:  All right.  Thank y'all for coming and

14   joining today.  We set this down for all pending motions.  So

14:16:53   15   I don't know.  I feel like we're doing a little bit of

16   Pollock painting maybe, you know, in terms of put it all out

17   there.

18             Let's see.  Why don't we start first with kind of

19   where we all left off when we had that informal conference

14:17:19   20   call.

21             Do we have any luck on the discovery items,

22   Mr. Rosenthal, that you mentioned in your spreadsheet?

23             MR. ROSENTHAL:  So this morning, Ms. Daly emailed me

24   excel files for Jonathan Coleman who was one of the people

14:17:50   25   that we had listed out but we did not have any wage nor time

1  data for.  And she emailed me screenshots of -- OTK's

2  database shows an employee name, start date, termination date

3  among other stuff.  So she sent me screenshots for five of

4  the six people that we had just pointed out they had said

14:18:18  5  were not actually employed during the time frame which would

6  preclude needing any records from them because they wouldn't

7  exist.

8          THE COURT:  Okay.

9          MR. ROSENTHAL:  So I got that this morning from

14:18:30  10  Ms. Daly.

11          I have called two of those five folks to double

12  check whether their recollection that they provided to us of

13  when they were there might be wrong and both of the ones I

14  have talked to have said, well, if that's what OTK has got,

14:18:46  15  then we must have terminated before July of 2015.

16          I should point out all these are people who were on

17  OTK's list of employees after July 31, 2015 so they aren't

18  the only ones who were wrong.  But that's how far we've

19  gotten.  That's the update since last week.

14:19:04  20          THE COURT:  Okay.  All right.  And I know there was

21  a motion to strike filed for the additional information, Ian,

22  that you provided.  I'm not considering anything else outside

23  of the spreadsheet.  I mean, I appreciate your explanation of

24  all of that, but at this point, I'm really just looking for,

14:19:28  25  like, a straight-up list of what it is in 2021 in this -- I

1    don't know.  This is a 2018 case.  What it is that you're

2    missing this far down the road.  Because we need to fix that.

3            From the defense side, any luck with OTK's

4    contractor that handles the information that you subpoenaed?

14:20:02  5    Any luck with getting them to give you a response?

6            MS. DALY:  Gavin, can I go ahead and address that?

7            MR. APPLEBY:  Yeah.  We have pushed, Your Honor, and

8    Sinead can say it better than I can.

9            THE COURT:  Okay.

14:20:20  10           MS. DALY:  Yes, Your Honor.  We reached out to the

11   paralegal we had been working with on the subpoena and we did

12   mention that the case Your Honor cited to out of New Mexico

13   had some language that it showed that -- where they provided

14   excel records and so we asked them.  They addressed that

14:20:40  15   basically and explained whether -- and we inquired again as

16   to whether -- [disrupted video connection.]

17           THE COURT:  Hold on.  Let me stop you right there.

18   I'm having trouble hearing you.  And so I know we're having

19   trouble writing you.  So could you just -- I don't know if

14:21:02  20   it's a microphone issue.  If you can maybe just be closer to

21   the microphone.

22           MS. DALY:  Is this better?

23           MR. APPLEBY:  Let me say something because I'm

24   hearing both echo and off and on with Sinead as well.

14:21:33  25           THE COURT:  Ms. Daly, do you want to try again?

1      MS. DALY:  Sorry.  Are you talking to me, Your

2   Honor?

3      THE COURT:  Yeah.  Yeah.  I was having trouble

4   hearing you.  I don't know if it is a matter of you being

14:21:47   5   close enough to the microphone --

6      MS. DALY:  I am sorry.  I think I can hear echoing

7   as well.  So I'm not sure if it's the microphone.  Is that

8   any clearer?  I've tried to turn down the volume.

9      (Discussion off the record.)

14:22:17  10      THE COURT:  I'm just talking to my folks here now to

11   see if we can resolve something technically.

12      (Discussion off the record.)

13      THE COURT:  I don't need to see you sitting in your

14   office.  I mean, I know you're dressed appropriately and I

14:22:38  15   appreciate that.  But I want to make sure that I can hear you

16   and that we can get a good record of this hearing.  So why

17   don't we -- Melanie is going to give you some call-in

18   instruction and let's just see if we can do this by audio.

19   And if you would, please, not use a speakerphone doing it.

14:22:59  20   So if you got to do it the old-fashioned way and hold it up

21   to your head, that would be definitely better on our end.

22      MR. APPLEBY:  That's fine, Your Honor.

23      COURTROOM DEPUTY:  Okay.  Here is the call-in.  I'm

24   going to give you the call-in number.

14:23:13  25      MR. APPLEBY:  Okay.

1              COURTROOM DEPUTY:  Okay.  It's 1-877-336-1831.  Your

2      access code is 8597056.  Okay?

3              MS. DALY:  Okay.

4              COURTROOM DEPUTY:  All right.

14:23:36   5          MS. DALY:  Calling in now.

6              THE COURT:  Okay.

7              COURTROOM DEPUTY:  Ms. Daly, can you hear me?

8              MS. DALY:  Yes, I can.

9              THE COURT:  Mr. Appleby, are you there?

14:25:11  10          MR. APPLEBY:  Yes.  I am here.

11             COURTROOM DEPUTY:  All right.  Thank you.

12             THE COURT:  All right.  That -- on this end, that's

13     a lot better.  Can y'all -- y'all can hear us okay?

14             MR. APPLEBY:  Coming through okay.

14:25:25  15          MS. DALY:  Yes.

16             THE COURT:  Okay.  All right.  So, Ms. Daly, you

17     were going to tell me about your efforts with -- is it ADP?

18             MS. DALY:  Yes, Your Honor.

19             THE COURT:  All right.  Please go ahead.

14:25:40  20          MS. DALY:  I will just repeat to clarify on the

21     record since it was giving kickback previously.

22             We did reach out following -- due to the telephone

23     conference with Your Honor and we advised ADP that there was

24     a case out there that indicated that ADP -- [disrupted audio

14:26:05  25   connection] -- records in an excel format.  And we asked them

1    to readdress the issue of whether or not that is something

2    that can be done in our case given that there is caselaw out

3    there that suggests it, and we have not gotten a response

4    yet.  But we did raise that point, Your Honor.

14:26:23   5        And an additional comment on the ADP piece, I think

6    a lot of the reason why ADP originally got subpoenaed was,

7    given the inability to get clarification on the true-up

8    process, as testified to by Ms. Pledger.  At this point --

9            THE COURT:  Let me stop you for a second.

14:26:46  10          MS. DALY:  Sure.

11           THE COURT:  We're again having trouble understanding

12   you.  And my court reporter is looking at me, trying to

13   understand what you're saying.  You're talking about the

14   true-up process?

14:27:00  15          MS. DALY:  Yes, Your Honor.

16           And so in testimony of Ms. Pledger, which is a

17   payroll specialist for the defendant, she testified that

18   there is a process done.  And she referred to it informally

19   as a true-up process.  And that's T-R-U-E and then space U-P.

14:27:18  20   So true up.  And that was a point -- an issue of contention

21   in discovery between the parties because, after her

22   testimony, of course, plaintiffs' counsel asked about what

23   she meant by that.  And her description in her testimony was

24   that basically there was a payment done by the payroll

14:27:42  25   provider, in this case ADP, later down the road.  Like, she

1    thought it was a month later they performed some

2    calculations, but she couldn't really provide any specifics

3    as to the calculation that was done.  So that was one of the

4    issues kind of out there in plaintiffs' pending motions

14:27:59 5    related to discovery.

6         And so subsequent to the last hearing before the --

7    right after the Court's report and recommendations on it, she

8    was able to get clarification from someone at ADP as to how

9    that process was done.  And she was incorrect in her

14:28:20 10   testimony about it.

11        It's basically what she -- she was -- there were

12   these payments out there that are -- have not been produced,

13   and there are no later payments made.  ADP's process is done

14   every paycheck.  But we're still working through providing

14:28:37 15   those examples to clarify that issue.

16        And I know that's maybe a bit more than the Court

17   bargained for with this response.  So I apologize if that was

18   getting too into the nitty-gritty.

19        THE COURT:  Okay.  Well, I mean, it still doesn't

14:28:52 20   really help me understand why we don't have all of the

21   production.  I mean, these are records of your client that

22   we're here in 2021, two-and-a-half, three years after --

23   well, I guess it's more than two-and-a-half years after the

24   case was filed and we're still not having responses.

14:29:22 25        All right.  Well, so when we had the conference

1   call, I discussed that if ADP wasn't forthcoming to y'all, I

2   was going to be happy to help in that regard.  And so I feel

3   like that's what I need to do at this point.

4         And so I am going to be issuing a show cause order

14:29:47  5   to ADP to show cause, have a representative appear in this

6   court.  And they're going to appear personally and explain

7   why they should not be sanctioned for failing to follow the

8   Court's order.  I mean, they were served with a subpoena.

9   They didn't object to the subpoena.  And so, you know, Judge

14:30:12 10   Nelson recommended a different approach, but I'm not

11   satisfied and I'm not going to allow an entity to disregard

12   an order of the Court even if it's from their employer.

13         So I'm not sure how long -- this has been going on a

14   long time.  I'm thinking 14 days, 21 days?

14:30:52 15         MR. APPLEBY:  If I can jump in for a second, Your

16   Honor, I think there are a couple of pieces out there --

17         THE COURT:  Okay.

18         MR. APPLEBY:  -- that -- the true-up is something

19   that they have at least tried to explain, but it would be, I

14:31:05 20   think, helpful to hear their explanation to the Court.  But I

21   think there's also a piece -- we were trying to get some data

22   from them through excel use and they were having some

23   difficulty with that.  I don't think that they blew that off.

24   But I think there may be two pieces to this.

14:31:23 25         THE COURT:  Sure.  Well, I mean, you served them

1    with a subpoena.

2            MR. APPLEBY:  Yes.

3            THE COURT:  And they didn't file an objection to the

4    subpoena.  And they didn't file a response to the subpoena.

14:31:35  5    So, you know, it may be that suddenly faced with an order to

6    personally appear, they might magically become willing to

7    provide a response.

8            And I would say that if they were to file a -- to

9    actually respond to the discovery that they haven't objected

14:32:03 10    to so -- I will be satisfied with that.  Also, I don't think

11    we have a copy of the subpoena in the court record.  I mean,

12    I'm sure, obviously, the parties have it.

13            MR. ROSENTHAL:  I think I can find it in the court

14    record.

14:32:27 15            THE COURT:  Okay.  I don't need it right now.  But I

16    will issue an order for 14 days and hopefully that will evoke

17    a response.  I am happy to have a hearing about it, but I

18    would be happier if they would honor the order of this Court

19    and respond to the subpoena.

14:32:57 20            MR. APPLEBY:  And we did send a subpoena to them at

21    the time and I think we can tell them that you wouldn't have

22    to have a hearing if this pushes forward.  So we will see

23    what happens.

24            THE COURT:  Well, we will issue the order and we

14:33:14 25    will direct y'all to serve it on them.  And you can go ahead

1    and do that and hopefully that will just inspire the

2    response.

3              MR. APPLEBY:  Understood.

4              THE COURT:  We can do carrot or stick.  Either way.

14:33:31  5    Okay.

6              MR. APPLEBY:  Understood.  Thank you.

7              MR. ROSENTHAL:  Your Honor, could I point out one

8    thing about that?

9              THE COURT:  Sure.

14:33:39  10             MR. ROSENTHAL:  So what -- excuse me.  In the

11   context of our renewed motion for sanctions, OTK provided us

12   with the back and forth between them and ADP about this.  And

13   what they had told -- there are too many letters.  What they

14   had told ADP was that this would be the first of two

14:34:13  15   subpoenas because -- and it was sort of aimed at the 11

16   exemplar people before asking for everything for everybody

17   else.

18             All I'm saying sort of in the heads-up category is a

19   response to the subpoena that has been issued does not

14:34:32  20   actually cover everything that would have been dealt with by

21   the follow-up subpoena.  And I say all that so that we

22   shouldn't be under the illusion that two weeks from now if

23   they respond to the subpoena there isn't the same problem for

24   another 200-odd people.

14:34:50  25             THE COURT:  Okay.  Mr. Appleby, are you tracking

1    that?  Again, I haven't reviewed the actual subpoena.  I just

2    know that there is a subpoena.  So I'm assuming that it was

3    maybe more all encompassing than it is or was.

4         MR. APPLEBY:  It was fairly broad.  I don't think we

14:35:14  5  raised any issues with it.  I do think that -- we had a

6    little bit of a frustration in the sense of getting them to

7    fully understand what it is that we needed.  It's -- I think

8    what might be helpful if the Court and plaintiffs' counsel is

9    willing to do it is if he and I agreed to the clarification

14:35:37 10  language that either would be attached to what you're sending

11   out or -- I think you're going to ask us to send out which

12   I'm fine with.  It might be helpful if the two of us can put

13   together what we truly need so there's no question.

14        MS. DALY:  If I can just add on there, Your Honor,

14:35:58 15  to Ian's point, the initial subpoena limited to specific

16   individuals.  And then the intention was once we kind of

17   understood what ADP's records were that the -- but then we

18   hit the roadblock of only PDFs which is why it wasn't pursued

19   further.  But ADP is aware that the information that is

14:36:23 20  sought is sought for all those potential opt-ins.

21        So I understand, to Ian's point, that the initial

22   subpoena sent only addresses a limited number of opt-in

23   plaintiffs.  But in communications with ADP, they understand

24   it applies globally, but there was obviously -- once we hit

14:36:44 25  the roadblock of them only having a PDF, the second subpoena

1    was never dealt with, if that makes sense, because there was

2    no need to -- they didn't have what plaintiff counsel was

3    looking for in the native excel format.

4        THE COURT:  Okay.  Well, let me just say this

14:36:58  5    because it's 2021 and this is 2018 case.  This is all data

6    and responses that OTK owes to the plaintiff.  I mean,

7    ultimately, it's OTK's data, in my mind, anyway.  ADP or ADT,

8    whoever -- those three letters you're -- OTK's contractor --

9    how about if I just refer to them that way?  OTK may have

14:37:26 10    delegated handling this data to them, but that doesn't -- in

11    my mind, OTK is not delegating the responsibility of having

12    that data and responding to the plaintiff in this case.

13        And so I'm trying to find a way to, as quickly as

14    possible, get to a place where we're producing the discovery

14:37:55 15    that I'm scratching my head why it's not already produced

16    before.  And I have myself to blame, I think, for that.  But

17    I wish to be in a place where that is resolved because -- so

18    I guess the informal message I hope that y'all can pass on to

19    the contractor is that although I'm going to order a show

14:38:25 20    cause hearing for the subpoena that was issued to them,

21    ultimately, they're holding all of OTK's data.  And all of

22    that needs to be produced.  And that is ultimately OTK's

23    responsibility, but to the extent that you sought the

24    assistance of the Court by sending a subpoena to your

14:38:46 25    contractor, I am going to make sure that that is complied

1   with.  But OTK is next I guess is what I'm trying to say.

2           Are you tracking where I am with that?

3           MR. APPLEBY:  Yeah.  I understand.  I understand

4   what you're saying, yeah.  I do have a question on that.  And

14:39:06  5   it may well be for Ian, but my understanding is that they may

6   not be able to do the excel approach.  I don't know enough

7   about it to say yay or nay or right or wrong.  I do believe

8   that they can send the same data in a different format.  And

9   I don't know if that -- I know Ian definitely prefers the

14:39:32  10  excel piece.  But in realism time, it may well be that that

11  may be far more difficult than the other option.

12          THE COURT:  Well, since they haven't bothered to

13  respond at all to this point, at least formally, you know, I

14  don't really know what to say about that.  But, like I

14:39:57  15  pointed out to y'all when we spoke before -- I mean, I did

16  find that case where the Court ordered them to produce it in

17  excel format and they did.

18          MR. APPLEBY:  Right.

19          THE COURT:  So, I mean, that may be some sort of

14:40:11  20  software change or, you know, I don't know.  I don't know how

21  they do their business.  But this is routinely an issue that

22  we deal with.  And, you know, the manner in which it's

23  kept -- I suspect it is probably not kept in PDF format but

24  that's convenient to print and produce.  So I don't know.

14:40:33  25  Maybe you can find out in what manner they keep it because

1    that's ultimately what discovery requires for production, of

2    course.  So we'll cross that bridge when we come to it.

3         I'm going to shoot for compliance or at least

4    acknowledgment or something.  A response.  How about that

14:40:55  5    first?  And then we can fret over the quality of the

6    response.  But let's take a step and start there.

7         MR. APPLEBY:  Yeah.  I'm fine with that.  It's -- as

8    you probably can tell, it would be nice if we had the

9    information as well.  So it's --

14:41:15  10         THE COURT:  Yeah.  No.  Look.  I'm not specifically

11   fussing at you.  I guess I am, but -- technically.  But I

12   understand your frustration, but the plaintiff has

13   frustration in that, too.  And I have frustration with it

14   generally.  So I understand the problems that you have

14:41:38  15   working through it.  But ultimately, it's OTK's problem.  And

16   I would like it solved.  So --

17         MR. APPLEBY:  Understood.  Thank you.

18         THE COURT:  All right.  Well, so --

19         MR. ROSENTHAL:  Judge, I did find the cite.  Given

14:41:53  20   enough time, I found the page cite for the subpoena if you

21   need it.

22         THE COURT:  Yeah.  Why don't you speak it into the

23   record.

24         MR. ROSENTHAL:  It's at 244-11 beginning at Page ID

14:42:08  25   2906.

```
1              THE COURT:  Okay.  All right.  Good.  All right.

2         Well, let's move on, then.

3              Ian, why don't we work through your motion for

4    summary judgment?

5              MR. ROSENTHAL:  Okay.  Is there a particular subject

6    you would like to start with?

7              THE COURT:  Why don't we start with the workweek?

8              MR. ROSENTHAL:  Let me apologize in advance for what

9    is going to be a bunch of paper shuffling as I try to stay

10   organized.  And, therefore, on defense counsel's end, some

11   pregnant pauses while I put my hands on the right piece of

12   paper as we go along.

13             THE COURT:  Well, I tell you what.  Would it help

14   you -- do you want to just go through in order?

15             MR. ROSENTHAL:  No.  It doesn't matter in what order

16   we do it in.  I've still got my binders.  I'm still trying to

17   stay organized.  And I'm not that smart.  Okay.

18             I should also say that I would like to think on

19   something complicated I write more clearly than I speak.

20   Certainly if you factor in the mumbling.

21             THE COURT:  Okay.

22             MR. ROSENTHAL:  So we did try awfully hard to at

23   least put in writing our position as clearly as possible.

24             So the law is very, very clear that you have to

25   have -- that everything that matters in the FLSA is based on
```

a single workweek.  That doesn't mean that an employer can't
pay every two weeks or every month or whatever.  But when you
go to look at what folks are entitled to for overtime, you
count it up on a single workweek.  And all of this is
14:45:00   generalities.  I'm excusing things like firefighters that
have a different set of regulations.

THE COURT:  So let me ask you a question.

MR. ROSENTHAL:  Yes, sir.

THE COURT:  Bottom line, what's the workweek here?

14:45:16   MR. ROSENTHAL:  Sure.  Based on what OTK has told
this Court as well as what they put on thousands and
thousands of documents, the workweek begins --

THE COURT:  I'm asking you what -- not -- because
I'm going to ask them, too.

14:45:34   MR. ROSENTHAL:  Until January 27, 2019, the workweek
begins on Monday and it ends on Sunday.  Starting January 27,
2019, it begins on Sunday and ends on Saturday.  And January
27th is a Sunday and it overlaps.

THE COURT:  Okay.  So, Mr. Appleby, what's -- let me
14:46:00   ask you the same question.

MR. APPLEBY:  And we disagree.  The -- our
understanding and what we have in front of us from the
standpoint of evidence is that it is 6:00 a.m. to 6:00 a.m.
on Sunday and the -- there is a reason why there is confusion
14:46:24   before 2019, and that is because not in the workweek itself

but on pay data, there was an erroneous statement as to the
workweek.  That statement was modified in 2019, but the
workweek itself did not change.

THE COURT:  Okay.  So despite what was written on
the pay data, it's your position that the workweek as far as
OTK is concerned never changed?

MR. APPLEBY:  Correct.  And while there was an error
definitely in the pay data -- and when I say the pay data, I
mean, what the individuals would have received.  But at the
same time, in the offer letter and the handbook and other
places as well, including when people first started working
there, they were informed of the workweek.  And the workweek
is the one than hasn't changed.

THE COURT:  So what was the nature of the error on
the pay data?

MR. APPLEBY:  I'm not sure if we know all the
details other than somebody somewhere put down that workweek
and that it was not consistent with the actual workweek
itself and apparently never has been.  But obviously it did
cause some confusion which I can understand.

THE COURT:  Okay.

MS. DALY:  If I can piggyback on that, Your Honor,
to try to provide a little clarity as well.

THE COURT:  Sure.

MS. DALY:  The dates that show for the periods that

1   are paid in the pay statements is where -- as Mr. Rosenthal

2   said, it talks about a Monday to Sunday.  But the workweek

3   and the schedules of all the employees are set up in their

4   time and attendance system.

14:48:22   5          So all the employees were aware that their actual

6   work weeks, meaning seven days that if they worked over 40

7   hours they were entitled to overtime -- they were all aware

8   it was Sunday to Sunday, based on how their schedule was.

9          So the pay statements reflect a Monday to Saturday,

14:48:40  10   but a pay statement does not designate a workweek.

11          THE COURT:  Okay.  So I can understand, the system

12   that you're talking about, is that what -- is that something

13   that OTK manages or the third-party vendor manages?

14      [Cross-talking.]

14:48:59  15          MS. DALY:  Well -- sorry, Gavin.  There are two

16   different systems that are at play.

17          There is time and attendance which until 2017 --

18   until August of 2017 was -- the system used SAP and then in

19   20 -- I think it was August 13, 2017, the time and attendance

14:49:23  20   switched to ADP so that both -- ADP was handling both payroll

21   and time and attendance.

22          So to your question, it's an ADP system.  But who

23   exactly put in Monday through Saturday is unclear.

24          THE COURT:  Okay.

14:49:41  25          MS. DALY:  But it's just on the payroll side.  The

1    time and attendance has always been the proper workweek and

2    that's what designates their overtime.

3            MR. APPLEBY:  Yeah.

4            MS. DALY:  And what each employee testified to date

14:49:51  5    they were paid appropriately for.

6            MR. APPLEBY:  Yeah.  I was going to say I may have

7    this wrong, but I think every person that we took -- we took

8    four or five depositions.  And I believe that all said that

9    they knew what the workweek was and it was Sunday to Sunday.

14:50:05 10            THE COURT:  Okay.  Mr. Rosenthal?  Anything else you

11    want to say about that?

12            MR. ROSENTHAL:  Yes, sir.  The problem with the

13    defendant's position is that they are precluded and estopped

14    from the arguments their lawyers are making by what OTK's own

14:50:21 15    people have said and what they have already said.  If, as

16    laid out in our original narrative, beginning at Page ID

17    3077 -- here's what we rely on and they cannot, according to

18    the Eleventh Circuit at least, just make it up as they go

19    along and change their story as they go along.

14:50:51 20            Ms. Pledger, their payroll supervisor, was

21    designated by them to talk about various subjects about time

22    and pay practices.  She testified that the pay summaries

23    which are generated every two weeks, in her computer system

24    that she sees, until January of 2019 showed a paycheck -- a

14:51:18 25    pay period beginning on a Monday and ending on a Sunday every

1    single time.

2           Now, what the employees would get were pay

3    statements that just had an ending date on a Sunday.  But

4    what see saw every time was it began on a Monday.  Then she

14:51:37  5  testified that after this lawsuit was filed and because this

6    lawsuit was filed, she went into the system and she changed

7    it.  And I don't mean that in some sort of secretive, evil

8    way.  She says she changed it to correspond to what OTK's

9    calendars show.  And she changed it so it started on a Sunday

14:52:00 10  and ended on a Saturday.  And that's how it's been ever since

11   January 27, 2019.

12          Under the FLSA regulations, an employer is allowed

13   to change its workweek, and they did.  The workweek also has

14   to be -- and this is not any kind of surprise -- seven days

14:52:20 15  and 168 hours.  And it can't change over and over again.

16   It's regular; it's fixed; it's recurring.

17          In a request for production response served July 12,

18   2019 when we were seeking discovery about what all documents

19   might show what the workweek was, they said defendant

14:52:41 20  confirms that for the period of time covered by this case

21   back to July, 2015, the workweek consistently began on

22   Monday.

23          Then when we filed a motion to compel and they

24   opposed it, they made the exact same statement in their

14:52:58 25  pleading and response to the motion to compel that was filed

1    September 25, 2019.  That would be Document 148, Page 960.

2           Then when we deposed Ms. Pledger, she explained that

3    because of this lawsuit, she had gone in and changed the

4    system going forward so that ever since July 27, 2019, it

14:53:20  5    starts Sundays and ends Saturdays.  She explained -- I'm

6    sorry.

7           And then at least for 2019 and 2020, OTK has put out

8    calendars, which we have filed as an exhibit, and they show

9    the period beginning dates and they run Sunday to Saturday.

14:53:48  10   And, supposedly, that January, 2019 pay statement

11   modification was to, quote, correspond with the workweeks as

12   internally calendared.  Again that's in Paragraph 46 of our

13   narrative.

14          This story that it's Sunday 6:00 to Sunday 6:00,

14:54:09  15   which they are precluded from arguing given their own

16   30(b)(6) testimony and given what they have told the Court,

17   is also -- has two fatal flaws to it.  The first is when we

18   deposed Melissa Pledger and asked her, well, in substance --

19   and there were pages and pages of testimony that we included

14:54:38  20   and cited about this to give the Court the full picture of

21   it.  The question is how are you counting up 168 hours.  And

22   her story was we don't base overtime on any 168-hour period.

23   All we're doing is looking at the shifts.  And if -- even

24   according to her, if a shift runs past Sunday at 6:00

14:55:00  25   o'clock -- maybe because somebody is working until 10:00

1    a.m., maybe because they have a regular schedule that goes

2    from 7:00 p.m. to 7:00 a.m. -- they take all that time and

3    they move it so that it's combined in one shift and one

4    paycheck and one workweek.

14:55:16  5          So she freely admits they do not use a seven-day,

6    168-hour recurring period, which is what they have to use.

7    So if you cross that one out because they don't use it -- and

8    she admits they don't use it -- what you're left is what all

9    the documentation says and what they have said and what they

14:55:40  10    have told the Court which is Monday to Sunday and Sunday to

11    Saturday.

12          I'm sorry.  I lost track of a thought.  Oh.  Got it.

13    Sorry.

14          When Mr. Appleby tells you that the handbook says

14:55:59  15    Sunday 6:00 to Sunday 6:00, he's right except that the

16    handbook came out the day after they answered the complaint

17    in this case.  It's not anything but inadmissible hearsay,

18    and it's not accurate anyway.

19          And when they talk about offer letters that are

14:56:18  20    given to employees, the couple that are floating around are

21    not from 2015 forward.  They are sometimes from ThyssenKrupp

22    and all of them describe various other conditions which are

23    subject to change like your job, your pay rate, whatever.

24          As I think we have said hopefully concisely and

14:56:42  25    hopefully cleverly, the FLSA depends on what you do, not what

1    you say you're going to do.  So saying we're going to pay you

2    from Sunday 6:00 to Sunday 6:00 a.m. and not doing it means

3    saying it didn't mean anything.  Establishing a workweek and

4    not -- on paper and not following it doesn't mean anything.

14:57:05  5    And then you're back to okay.  What did they do?  They didn't

6    use any 168-hour period.

7            And they've told this Court and us in discovery that

8    the days begin on Mondays, which is the same thing that was

9    in their records.  And then January 27, 2019, they change to

14:57:29 10    Sunday to Saturday.  And we're okay with that.  I don't think

11    we can argue with it.

12            We are not trying, for example, to hang them up on,

13    well, they said in July of 2019 that all the way back to

14    2015, it's Monday to Sunday so that means that even after

14:57:43 15    they changed it Sunday to Saturday, that doesn't count --

16    we're just sticking with what Melissa Pledger says is on

17    every single pay statement.

18            THE COURT:  Okay.  Mr. Appleby?

19            MR. APPLEBY:  I will start, and it may well be that

14:58:08 20    Sinead is a little tight in these than what I am.  But what I

21    would say is that the letters, the handbook were picked --

22    the letters in particular were picked simply because they

23    were people in the case.  I think they were some of the named

24    plaintiffs if I remember correctly.  But the -- the handbook

14:58:29 25    I don't believe was changed.  I think we have a disagreement

1    on that.  I think that was known before that time.  I don't

2    have the date in front of me, so I don't want to mislead the

3    Court.

4         What I do know is that based upon what we have seen

14:58:45  5    in terms of pay is that the workweek is the workweek and

6    that, ultimately, while there was an error going on in the

7    terms of a document, I don't see anything different than how

8    it was being done and how it is now being done.

9         So we do have a disagreement.  It's -- I don't know

14:59:07  10   if I've ever had a workweek disagreement before, but it --

11   certainly the employer does have the right to choose the

12   workweek.  And to agree there was a miss in that document,

13   the fact is that I was unaware of that at the time we found

14   out about it.  Ultimately, the change took place and I don't

14:59:30  15   think there's anything wrong legally with any of that.

16        MS. DALY:  And, Your Honor, if I can add on to

17   Gavin's statements --

18        THE COURT:  Sure.

19        MS. DALY:  -- just for the record is that -- so a

14:59:44  20   few things about what plaintiffs' counsel is arguing.

21        His argument is that the pay period dictates the

22   workweek and that's simply not the case.  Melissa Pledger's

23   testimony did describe that she made a change in the --

24   ultimately in the pay system to -- not just to match internal

15:00:04  25   records.  She was matching the workweek that has been used

1   throughout the company's history.  It was the workweek that

2   has been established in their time and attendance and the

3   schedules and offer letters dating years before this

4   litigation came.

15:00:20   5        And, specifically, the -- each -- and to say the 168

6   hours -- the payroll specialists -- I don't think there's too

7   many people who work on a day-to-day job or a 40-hour week or

8   work as hourly employees -- while I understand the FLSA

9   designates -- has employers designate a workweek based on 168

15:00:44  10   hours, I think the more common thought process of it is that

11   overtime comes into effect when somebody works over 40 hours.

12        So to say that she didn't -- she has not designated

13   the workweek over 168 hours is just her not fully

14   understanding the ins and outs of the FLSA regulation.  But

15:01:07  15   Sunday 6:00 a.m. to the following Sunday 5:59 a.m. is, in

16   fact, 168 hours.  And I've counted it many a time because

17   plaintiffs continued to say it's not 168 hours, but it is, in

18   fact.  It's seven 24-hour periods.  And each of these

19   employees who testified in addition to the ones in our

15:01:29  20   response, of course, on Document 257 cites for Your Honor the

21   different testimony where they were told at orientation about

22   the workweek 6:00 to 6:00.

23        There's also an understanding of every single

24   employee that works in that mill that they work -- schedules

15:01:44  25   are one 48-hour week and then one 36-hour week.  That's how

their schedule are set before they get additional -- you
know, pick up overtime or anything outside of the schedule.

That schedule has been and has always been split in
one week -- the entire mill is split into, let's say, Teams
A, B, C, and D or Shifts A, B, C, and D.  The entire mill is
split between days and nights and schedules of Mondays -- and
just so I don't mess it up because it is a little bit
confusing, on Document 257, Page ID 3134, they work a
consistent schedule that says Monday, Tuesday they work.
Then they're off Wednesday, Thursday.  Then they work Friday,
Saturday, Sunday.  They're off Monday, Tuesday.  They work
Wednesday, Thursday.  Off Friday, Saturday, Sunday.  So
basically it works out that every week it is a four-shift
week, which is 48 hours.  The next week, they're working 36
hours.  Then that's their schedule before they pick up
overtime.

No matter what way you dice it, that must mean their
workweek starts and ends on Sunday because of how that
schedule lays out.  And I know it is probably a little bit
confusing.  We tried to lay it out on Page 3134.  Every
opt-in plaintiff who testified in this case said that has
been their schedule and that their understanding has always
been that they have a 48-hour and 36-hour shift.

So it's not some change, as plaintiff said happened,
which Melissa went in in 2019 and made a change.  The change

1    she made was simply so that the pay statements reflected the

2    appropriate days that the workweek have always been paid on.

3    And, again, the pay periods are not -- do not determine the

4    workweek.  And I don't believe plaintiffs' counsel has cited

15:03:39  5    any caselaw to suggest that workweeks are designated by pay

6    periods.

7            While we understand that the Monday to Sunday that's

8    referred to in the pay statements confuses the issue -- but

9    then it has clarified that prior to -- plaintiffs' counsel

15:03:55 10    pointed out a few early issues with the Sunday to -- Monday

11    to Sunday or Monday to Saturday confusion.

12            But since that time, the defendant has consistently

13    said that it's Sunday to Sunday 6:00 a.m. to 6:00 a.m.

14    Melissa Pledger testified to that.  David Scheid has

15:04:10 15    testified to that, who is a defendant, as well as Karrie

16    Walker.  And then, additionally, opt-in plaintiffs have also

17    testified to either the workweek -- knowing it came from

18    their orientation and applied throughout their employment

19    with defendant or also based on their schedule that has

15:04:27 20    remained consistent during the entire time.

21            THE COURT:  Okay.  Mr. Rosenthal, anything else you

22    want to add?

23            MR. ROSENTHAL:  Yes, sir.  A couple of things.  And

24    I will jump around a little bit to respond to what Ms. Daly

15:04:42 25    was saying.  I will be concise.

1        THE COURT:  Please.

2        MR. ROSENTHAL:  First of all, as I think you already

3   know, it's a 24/seven, 365 operation.  So it's not like they

4   are open two days for 12 hours and then three days the next

15:05:00  5   week for 12 hours and closed.  They are fully staffed around

6   the clock.  It is not complicated to figure out what 168

7   hours is or what seven days is.  And 29 CFR 778.105 says it

8   in the first sentence.  It begins:  An employee's workweek is

9   a fixed and regular recurring period of 168 hours, seven

15:05:35 10   consecutive 24-hour periods.  Exactly what anybody would

11   think 168 hours would be.

12        You heard Ms. Daly tell you all the plaintiffs say

13   it's Sunday to Sunday.  And there is a reason,

14   understandably, that this Court wants citations to record

15:06:02 15   evidence on summary judgment.  And so in our reply, what we

16   set out beginning at Page 3344 is what the individual

17   plaintiffs who were deposed -- and there were only four of

18   them -- actually said with the caveat that none of it matters

19   because none of them decide anything about what their

15:06:24 20   workweek is.  But Emily Belcher thought the workweek ended on

21   Saturday.  William Wicker thought the week started Sunday or

22   Monday and then was Sunday to Saturday.  Martin Stokes and

23   William Hornady thought it was Sunday to Saturday.

24        And the point, of course, is none of it matters

15:06:44 25   because they don't get to decide.  What matters is what OTK

said and what they told the Court.  And if they had come in

here and instead of in discovery said to us -- sorry.  If in

discovery in 2018 they had said, the workweek begins Sunday

at 6:00 a.m. and ends Sunday at 6:00 a.m., we would have

looked to see whether or not that was accurate.  And

eventually we would have found out from Ms. Pledger that

that's not actually how they pay people.  But then in that

counterfactual hypothetical, there would be an issue about

what the workweek should be.  Now, we would still be pointing

to the thousands of pay summaries over the years that are

different.  But, instead, they said, the workweek

consistently began on Monday.

And when Ms. Daly tells you now and Mr. Appleby

tells you now it's always been the same, they don't try to

reconcile for you why they told the Court and their client

told us it began on Mondays and how Melissa Pledger then said

she changed it to Sunday to Saturday.

Magistrate Judge Sims has reminded me that if I'm

going to talk about the Eleventh Circuit, it is a good idea

to perhaps provide a case name and case cite instead of just

saying.  As we put in our motion, the evidence case is

clearest that you don't get to jump around and make it up as

you go.  That's *Evans vs. Stephens* 407 F3.d 1272.  The page

cite we were pointed to is 1278.  And a case from this

district court which was *Kirksey*, K-I-R-K-S-E-Y, *vs.*

1    *Schindler Elevator*.  I've got a Westlaw cite included in our

2    reply submission of 2016 Westlaw 6462176.  It talks about the

3    power of judicial facts and then there are lots of cases

4    which we have submitted which talk about being bound by

15:09:05  5    30(b)(6) testimony.

6         Melissa Pledger wasn't just designated.  She didn't

7    just testify.  She came back and verified that -- her

8    deposition testimony without any changes.  And while I cannot

9    sit here today in 30 seconds and find my Post-it that has her

15:09:24  10   verification, if you give me five minutes, I can, because we

11   filed it with our summary judgment submission.  She doesn't

12   get to come in now and their lawyers don't get to come in now

13   and say, oh, yeah; she was wrong.  That's not how it works.

14        THE COURT:  Okay.  Let's -- yeah.  Ms. Daly, you

15:09:49  15   have something else?  Let me ask you to please speak slowly.

16        MS. DALY:  Okay.

17        THE COURT:  So that I can -- I'm hearing you from

18   the ceiling.  So I want to make sure that -- if you speak a

19   little slower, I think I will have an easier time.

15:10:07  20        MS. DALY:  Okay.  I apologize, Your Honor.

21        THE COURT:  No.  No problem.

22        MS. DALY:  Okay.  Just on a few points to respond,

23   plaintiffs' counsel -- there is -- I should have -- at the

24   outset of explaining the work weeks, I should have clarified

15:10:26  25   there is also a dayshift and nightshift.  So what caused a

little bit of confusion, for instance, in Emily Belcher who

Mr. Rosenthal mentioned testified that the workweek ended on

Saturday -- after going back and forth with Ms. Belcher, her

Saturday nightshift begins at 6:00 p.m. but ends Sunday

morning at 6:00 a.m.  So I think it's kind of half a dozen

eggs in one hand -- what's that saying -- or six in the

other.

        Her testimony that she thought her last shift of the

workweek was Saturday meant that if she worked a Saturday

6:00 p.m. shift, the Saturday nightshift, that meant her

workweek finished and her shift finished on Sunday 6:00 a.m.

so it is the same thing as saying the workweek ends on Sunday

6:00 a.m.

        Mr. Rosenthal also mentioned something about Martin

Stokes' definition of the workweek.  In defendant's response,

Document 257, Page ID 3134 and 3135, counsel -- defendants

laid out his testimony where he says, I recall that the week

begins on Sunday morning and ended Sunday -- I meant Saturday

night.

        So, again, the only discrepancy about the Saturday

end day is just that if it was a 6:00 p.m. nightshift,

they're finishing Sunday 6:00 a.m. in the morning.  So

regardless, their Saturday shift is their last shift for that

workweek.  The only different thing that if it is dayshift,

it ends 6:00 p.m. Saturday and if it is nightshift, it ends

1    6:00 a.m. Sunday morning.

2            Additionally, as far as Ms. Pledger's testimony,

3    counsel did lay out that in plaintiffs' continued -- excuse

4    me.  Defendant's position is -- misconstrues her testimony

15:12:32  5    because she clearly testified that the change she made was to

6    reflect the correct beginning and end date on the payroll

7    side.  And that is cited on Page ID 3136.  And there is a

8    citation to her testimony.

9            Additionally, in -- on Page ID 3136, defendants

15:12:55  10    again point out how plaintiff conveniently failed to mention

11    that the defendant's subsequent discovery responses which not

12    only corrected their earlier misstatement about the workweek

13    but was also a part of plaintiffs' own submission to the

14    Court for motion for summary judgment, which is at Document

15:13:12  15    189-9, Page ID 1818 -- and it is a supplemental response to

16    discovery where defendant distinguished the workweek and

17    period beginning date.

18            So in that -- and, again, I will just refer the

19    Court to 3136 which is the Page ID of Document 257 where

15:13:39  20    defendant addresses the area -- or I'm sorry.  The deficiency

21    in plaintiffs' arguments.  And, again, I reiterate that the

22    workweek has been fixed.  And the only change that was made

23    was on the payroll side and not actually changed how the

24    employees were being paid based on the workweek that was --

15:14:00  25    is 168 hours over seven consecutive 24-hour periods.

1          THE COURT:  Okay.  Why don't we -- Ian, why don't we

2     move on to rounding?

3          MR. ROSENTHAL:  Yes, sir.

4          The fundamentals of the FLSA, as neatly as we can

15:15:52  5     boil it down, are at Page 6 which is Page ID 3037 of our

6     motion for partial summary judgment.  And it comes down to

7     that there are reasons -- good reasons that you're supposed

8     to have for the FLSA overtime's requirement including

9     spreading employment basically by making an employer pay more

15:16:26  10    when folks work more than 40 hours.  And if you have to pay

11    enough, you hire somebody else and that is a good thing.

12         That is my paraphrase of the explanation that's in

13    the *Department of Labor vs. Fire and Safety* case cited in our

14    brief.  But it still comes down to this:  The employer is

15:16:49  15    supposed to total up all the hours worked by the employee and

16    pay overtime compensation for all that time.

17         Not surprisingly, OTK is not the first company to

18    use time clocks and it's not the first company to decide to

19    use rounding of those time clocks.  But they did it in a way

15:17:18  20    that either always -- virtually always results in time being

21    rounded in OTK's favor and not in the employee's favor.  They

22    have not controverted any of the factual submission we made

23    using the four initial plaintiffs in an excruciatingly

24    detailed assessment of how much they got paid for and how

15:17:47  25    long they were clocked in for day after day after day, year

1    after year after year.  And all of that was to ensure that

2    there could be no dispute of fact.  Because the way OTK set

3    up the system, it ensured that, in fact, time would be

4    rounded in employee -- sorry.  In the employer's favor.

15:18:12  5          Specifically, until May of 2018, OTK required, as

6    you would expect, employees to be clocked in before typically

7    their 6:00 o'clock shift started.  If it was a 7:00 o'clock

8    shift, they had to clock in before then.  If you clock in at

9    6:01, you get a point towards termination.  Similarly, if you

15:18:38  10   clock out early, you get a point toward termination.  And I

11   guess technically it's a half point, but it still adds up.

12          So to avoid getting a point towards termination, the

13   employees until May of 2018, had to clock in between 5:30 and

14   6:00 for a 6:00 o'clock shift.  And as long as they did that,

15:19:02  15   they weren't getting a point towards termination and they

16   also never got paid for it or virtually never got paid for it

17   because the system automatically rounded that time down and

18   started pay at 6:00 o'clock.  And on the back end, if you

19   stayed after 6:00, it rounded it back down to 6:00 o'clock.

15:19:26  20   And the upshot is that if you looked day after day after day,

21   employees are clocked in for something above 12 hours and

22   then they get paid for 12 hours.

23          In May of 2018, OTK changed their policy.  The email

24   is attached to our -- announcing that change is attached to

15:19:51  25   our submission.  And they made it a seven-minute maximum

round.  And then they required the employees to clock in

between 5:53 and 6:00 and then they added to their handbook

the threat of termination if you violated it.

So if you clocked in at any time that would be

rounded potentially in OTK's favor, their handbook explicitly

informed employees in August of 2018 they were subject to

termination.  Those are -- the timestamps are the only

records that OTK keeps about when employees are working.

Melissa Pledger as their 30(b)(6) representative

testified that OTK assumes that these folks are working from

the minute they clock in until the minute they clock out.

She also explained, as you would expect, that if you're not

doing what you're supposed to do on the job, you're subject

to discipline.  So if, in fact, people were wandering off

their jobs without permission early to clock out at 6:00 or

6:01, or 6:02, they would have been disciplined if it was

without permission, without acknowledgment.  The standards --

THE COURT:  I tell you what, Ian.  Let me ask you a

question.

I know in a lot of these cases, there's -- the

plaintiff calculates a percentage of time that rounding

errors fall in favor of the employer.  Did you do any kind of

calculation in this case?

MR. ROSENTHAL:  Yes.  As is described in our

narrative in the really boring part about the employees, 99.9

1    percent.

2              THE COURT:  No.  But seriously, did you -- is that

3    how it came out?

4              MR. ROSENTHAL:  Yes.

15:22:02  5              THE COURT:  Is that, like, just hyperbole?

6              MR. ROSENTHAL:  No.

7              THE COURT:  Like, I tell people, 99.9 percent of the

8    time -- that's a number that I use artfully but not

9    mathematically.

15:22:16  10              MR. ROSENTHAL:  I am 99.8 percent serious.  Let me

11    point you to what I'm talking about.

12              THE COURT:  Okay.

13              MR. ROSENTHAL:  In our narrative statement,

14    beginning at Page ID 3063 and continuing on until 3068, what

15:22:57  15    we go through based on the records OTK produced, which are

16    also attached, is taking every day that might possibly not

17    have been one where they were clocked in more than 12 hours

18    and it automatically round to 12 -- so that's the default.

19    If you're clocked in for more than 12 and it rounds to 12 --

15:23:24  20    and their testimony is that's the default way the system is

21    set up.  There were occasional days that you would see a

22    number of, like, 12.25 in OTK's records.  Which might mean

23    that, in fact, they were paid for 12-and-a-quarter hours.

24    And what we did was we took everyone of those dates -- and

15:23:48  25    there aren't very many of them -- and looked at whether or

not they were clocked in for more time than even the 12.25.

So to be a little bit clearer, if somebody was clocked in for 12 hours and 20 minutes and it said 12.25 -- that's only 12 hours and 15 minutes -- they were still working longer. As we set out with the numbers, if you just took all the days that were standard -- they got paid for 12 hours and they were clocked in more than 12, it's way more than any set of potential exceptions. But when you go through the exceptions one by one, what you see is that a whole bunch of them, they were definitely paid for less time than they worked. Then there's the ones where you can't tell one way or the other because of how OTK keeps track of information and what they produced.

Specifically, if they didn't give us records in red and green, you can't tell whether when it says 12.25 that time was actually approved for payment or not necessarily. And for everything before August of 2017, we don't have red or green records for anybody. Since August, 2017, they gave them to us for about nine people. So we worked our way through those. And --

MR. SIMS: Judge, you may not recall there is a requirement for management approval that's red or green. That's what he's talking about the codes.

MR. ROSENTHAL: I'm sorry. It's flags that somebody can go and say, yes; we can pay the guy for this time or no;

1    we're not.  And you don't know from the black and white

2    records they provided to us whether they did or didn't

3    because it's not red or green.

4         But what we also did in going through those item by

15:25:42  5    item was sometimes you could look at the number of hours in

6    the paychecks that were paid for over two weeks.  And so as

7    an example, if somebody's hour total was 84 and a quarter on

8    their paycheck details and on their time, there were seven

9    12-hour shifts and one that was 12 and a quarter, then we

15:26:13 10   knew that at least they got paid for those 15 minutes.  And

11   if it happened to be somebody who had, let's say, worked 12

12   hours and 11 minutes, we credited them those four minutes.

13   But the upshot of it was that there is not a single week that

14   anybody -- sorry.  For those four template people that

15:26:35 15   anybody was ever paid for more time than they worked because

16   every week they were paid for less.

17        There is one caveat to that.  When folks are called

18   in.  I think it sometimes happens on snow days or things like

19   that.  Someone will get called in and show up and work for

15:27:01 20   two-and-a-half hours.  They will get paid for four.  So it's

21   not a rounding issue, particularly, but they do get paid for

22   that extra hour and a half.

23        On a damages end, we would fully give them credit

24   for having paid for four hours.  240 minutes, whatever the

15:27:19 25   wages are.

1    But to your point, when I tell you it's 99.9
2    percent, it's because it is.  And the standard is does it
3    average out to be even, which it doesn't.  And it never could
4    because they have to clock in in the real world before 6:00
15:27:38  5    o'clock.  They can do it an unlimited number of times.  And
6    if they ever clock in late, after a couple of times, they're
7    going to get fired.  That's the math of it.

8    And the law of it, I would point you to in our
9    discussion of liquidated damages.  We took the advice than
15:28:01  10    management provided when they were asked about in the spring
11    of 2018 and used it.  And, honestly, if OTK had followed it,
12    they would not have this problem since May of 2018.  They
13    would just have it gone backwards.

14    Did I address your question?
15:28:18  15    THE COURT:  Yeah.  I think so.

16    So, Mr. Appleby and Ms. Daly, I'm not -- I don't
17    appreciate that the defendant really argues that this
18    rounding policy is neutral.  But I want to make sure that I'm
19    not appreciating that wrong.

15:28:40  20    MR. APPLEBY:  It's -- I guess -- sorry.  I've been
21    talking all day.  It's the rounding issue has been a problem
22    issue for employers for a long time.

23    THE COURT:  Sure.

24    MR. APPLEBY:  There is no easy way to do it.  And
15:29:00  25    ultimately, though, what I would say is I think there

1  probably is an imbalance.  And I'm not trying to testify.

2  But I recognize where there's issues and where there's not.

3  But what I would say is missing here in the discussion is

4  that the employees of any company get paid when they work.

15:29:25  5  And that's obviously very clear in the law and clear in the

6  regulations.

7      And the problem that I see here from the plaintiffs'

8  perspective is that no matter how you try to lay out the

9  rounding issue, someone comes in a half-hour earlier and they

15:29:43  10  clock half an hour early that they're hanging out for a

11  half-hour, they're not getting paid for that.  And the long

12  and short of it is that there are numerous circumstances here

13  where somebody may well have clocked in but wouldn't be paid

14  for a certain amount of that time period.

15:30:07  15      What plaintiffs have said time and time again in

16  their documents is that OTK considers employees to work from

17  the second they clock in.  And that's not necessarily

18  accurate.  It may have been accurate at one time way back.

19  I'm not sure what time periods.  But, ultimately, when you

15:30:26  20  look at some of the history here and up to the current

21  time -- and by the way, the -- this alleged threat of

22  termination is a little bit misleading from what's been said.

23  The reason that is in there -- and I'm not aware of anyone

24  having been fired for it.  And I am very close to this

15:30:45  25  client.

1        What I would say to you just to clarify that piece
2   and then I will talk about the other pieces is that it's in
3   there because people were coming in half an hour late and
4   they -- the time sheets were such that they were being paid
15:31:02  5   and -- even though they weren't working.

6        And so -- and I can tell you that I was part of this
7   discussion when we tried to figure out there's got to be a
8   better solution to this.  The first thing I told them was
9   move it from 30 to seven which they eventually did.  And,
15:31:19  10   ultimately, that at least knocks down the number some
11   reasonable degree.  But from the standpoint of people who
12   were coming in early for the purposes of getting more money,
13   that's what the concern was on the potential for termination;
14   that you really can't line this up.  You can't no longer
15:31:43  15   check in a half-hour early like you were doing a number of
16   years ago with the seven-minute period.  You've got to be
17   aware of that.

18        And if someone tries to get money because they're
19   going to go in and not work but they're going to go in before
15:31:57  20   the seven-moment period, that's not appropriate and that's
21   really what the issue was at the time.

22        So to suggest that somehow they're looking to fire
23   people just because they're a little off base is not what
24   happened.

15:32:08  25        THE COURT:  Well, and ultimately --

1          MR. APPLEBY:  That's not in front of you, to be

2     honest about it.  The issue of whether that is in front of

3     you or not, it's not in front of you.  But just to give you

4     perspective.

15:32:21  5          THE COURT:  Ultimately, OTK doesn't pay people past

6     their shift I suppose is sort of the answer.  I guess I just

7     have a concern whether you can explain to me how this

8     rounding policy ensures or how it doesn't result in a failure

9     to pay people for time that they worked.

15:32:48  10          And, in particular, I'm thinking of all I read about

11     the act of, quote, making relief.  You know, obviously, the

12     mill doesn't shut down when shifts change.  So there has to

13     be some overlap on the shifts.  And I know obviously there is

14     a -- you know, if we're carrot and stick at the end of the

15:33:16  15     shift, there's a stick if you clock out late.  So obviously

16     people aren't going to leave their duty stations in the mill

17     to make sure they clock out on time.  So the incoming shift

18     has got to be there ahead and do the coordination so that

19     they can make relief.  How does that --

15:33:41  20          MR. APPLEBY:  Yeah.  So what -- you're asking a good

21     question.

22          The way it generally works out there -- and there's

23     testimony that this wasn't really one of the bigger pieces

24     that were sitting out there, but people do come in roughly

15:34:00  25     about 15 minutes early.  And they can't clock in yet.  But

1    there is a bit of a carryover between the two.  Some parts of

2    the company if there is a need to -- say there is situation

3    that's arisen with this part over here that they would set up

4    a meeting, let people know about it, and they would be paid

15:34:26  5    to come in early for that meeting.

6             In situations where that doesn't occur where people

7    just come in to do the parting of the ways and someone else

8    is going to pick up your shift -- because you're right.  It

9    does continue to work.  That, ultimately, they typically come

15:34:41  10    in.  They do have about a 15-minute carryover period where

11    people are sometimes engaged.  Sometimes not engaged.  It all

12    depends.  Some days if they run smoothly, there's really

13    nothing to talk about.  On the days where there's been a real

14    foul-up, they may have to spend the whole 15 minutes.  But

15:35:03  15    what happens at the end of the shift is the same thing.

16             So, effectively, while there is a carryover and I

17    may be looking like I'm not paying -- I'm working an extra 15

18    minutes on the front side, I'm working less on the back side

19    because the carryover is from somebody else.

15:35:19  20             So bottom line is it doesn't really change anything

21    despite the fact it looks a little awkward.  It's not simply

22    I'm adding on 20 or 30 minutes every day just because there

23    is a security situation.  By working 15 minutes, it ends up

24    being basically the exact same time period I worked if we

15:35:39  25    didn't have that kind of situation going on.

1          THE COURT:  So does OTK have a system that

2     identifies an employee who has clocked in early voluntarily

3     versus someone who has clocked in early and is working?

4          MR. APPLEBY:  What happens with that is -- and Ian

15:35:58  5     mentioned this a while back but a different context.  He's

6     right about it and that is what happens in situations where

7     people come in or clock in early is that has to be run past

8     the manager.  The manager either approves or doesn't.

9          You may remember he was talking about a red or

15:36:16  10    green.  The red or green is to whether it was a legitimate

11    overtime because he actually was working or it wasn't.  And

12    it's up to the manager.  That's also one of the things

13    sometimes gets on the bonus piece -- when we get there -- is

14    because what happens is that it may not be approved until a

15:36:36  15    couple of days later after the manager has time to actually

16    look at the document and look at what was done.  But,

17    ultimately, it's for the manager to make that determination

18    based upon what the employee did when the employee came in.

19         So there's -- the system is basically we want people

15:36:54  20    to clock in at 7:00.  If we need them before then, we need

21    them to clock in and we will put that for overtime.  If

22    someone has to stay, we will look and give that, as well, if

23    it's an overtime situation at that point.

24         THE COURT:  So but -- so I understand the manager

15:37:14  25    approving and maybe sometime later but how does an employee

know before their shift that they have to clock in early and
work versus not?

MR. APPLEBY:  My understanding -- and I don't know
as much about that question as I do most of the other ones.
15:37:32  But my understanding is that there is a contact to the
employee to let them know they need to be in a little bit
early.  I don't know exactly how that works, to be honest,
but I know the system they're currently using is one that can
be hooked into one's cell phone.  But that's relatively
15:37:51  recent.  I'm not sure I can -- have the ability to tell you
how they did that before that time period.  I do know there
was some way to call people in, though.  I am aware of that.

THE COURT:  All right.  I guess I just have a little
bit of a concern about how, you know, if management approves
15:38:10  the early clock-in enough to tell the employee they need to
do it but doesn't approve in the system until later -- how
that is a system that ensures that people are paid for the
time that they're working.  But -- okay.

MR. APPLEBY:  To go a little bit deeper -- on the
15:38:37  other side of the rounding piece, going back in time for
about the first four years of which this case would cover,
they actually didn't work when they first got there.  And you
may already know this.

But, ultimately, you don't get paid if you don't
15:38:59  work.  And they -- it's a mammoth operation out there.  And

1   when people were back in that time period, they had to park a

2   fairly good way away from where their actual workstation was.

3   That's all changed now.  Changed around 2018 or 2019.  But

4   what people had to do at that point was they came in and they

15:39:25  5   then clocked in.

6        All this changed when I suggested they move the

7   clocks just a few years back.  But they then had to walk to

8   their station.  And what may look like work because it's

9   clocked in is not covered.  It's covered by the

15:39:46  10   Portal-To-Portal Act which says if you have to walk after you

11   clock in, you don't get paid for the walk.  You only get paid

12   for the pay period when you're actually doing work.

13        So this is something to be aware of.  There are

14   circumstances such as that.  Much more prominent in the early

15:40:04  15   days of what this case covered but, ultimately, to go back to

16   what I said at the beginning, you get paid to work.  And

17   ultimately, that isn't going to cover a number of things.

18   People -- a number of people do -- if you need to line up 15

19   minutes before the time is over for your particular time,

15:40:25  20   people will be lined up already getting weighed in because

21   they were connected up by the other person coming in at 15.

22        The walking now has been solved because they both

23   moved the places where you can park and they moved the

24   clocks.  But what I would tell you is the importance of did

15:40:44  25   work actually occur is a crucial piece of this case.  It's

1    not just simply about rounding.

2           THE COURT:  Okay.  Ian, anything else you want to

3    add?

4           MR. ROSENTHAL:  Well, the Supreme Court says that

5    defendant is wrong which is, as far as I'm concerned, pretty

6    good authority.  This would, of course, be the *Mt. Clemens*

7    case and all of the many, many cases applying it.  And what

8    it comes down to is this:  They only kept track of one thing.

9    When they clock in and when they clock out.  They don't get

10   to attack their own records by speculating about who

11   immediately started working and who didn't.  And there is no

12   evidence whatsoever about anything that Mr. Appleby just told

13   you about, well, years ago, which wouldn't matter, some of

14   them were walking from their cars or some of them are

15   clocking in regularly at 15 minutes.

16          There are, I believe, about 20 or so declarations

17   from folks at the very beginning saying, we clock in; we make

18   relief.  Every deponent that they asked said either I clock

19   in and I get right to work or several of them said that they

20   were instructed by supervisors to work before clocking in,

21   which is not time we are seeking to get paid for but would be

22   even further on the side.

23          And the suggestion that there is some sort of --

24   let's assume that you are a harder working employee of OTK

25   than I am so you were getting there and we are alternating

shifts.  So you were getting there at 5:31 because you are a

great team player and you're making relief and you're getting

started and I can't leave until 6:00 o'clock.  I may or may

not after we make relief be goofing off.  But if I'm goofing

off and my supervisor has a problem with it, I don't get

paid.  And I don't get to walk out the door until 6:00

o'clock.  I'm not there voluntarily because if I cut and run

earlier, I get a point towards termination.  But because I am

a slacker, I then show up at 5:58 to relieve you.  So you're

stuck there, waiting on me, saying ugly things about me.  I

get there at 5:58.  I clock in.  At 6:02, we make relief.

And you get out the door at 6:05.  You're not getting paid

for those five minutes either.  All of which, of course, lots

of companies deal with differently than OTK does.  Either by

allowing the rounding to really go in both directions or by

having folks work what would amount to 12-hour-and-15-minute

shifts or by having you clock in or keeping a record of when

you're actually starting work.

        And under *Mt. Clemens*, since they didn't keep track

of anything else, they're stuck and the employees don't have

to offer guesstimates or subject to a jury review of was I

really there on average at 5:41 and started work at 5:40?  We

can go by the time stamps especially because what Melissa

Pledger testified to -- the deposition pages are at 1268 and

1269 of the court record -- is that OTK assumes employees

1    work from the clock-in times until they clock out.

2          Now I should say that even if her testimony had been

3    we really have no idea when they start working, it would not

4    change my legal argument that they're stuck with the only

15:44:32  5    thing they kept track of.  But, in fact, that was her

6    testimony.  And I should add that even the suggestion that

7    was added in the August 2018 handbook just months after this

8    lawsuit was filed -- when I say just months.  It's, like, a

9    month and a half.  I'm not artfully saying just months to

15:44:59  10   mean 29 months.

11          THE COURT:  Fair.

12          MR. ROSENTHAL:  But it's also the day after the

13   answer was filed.  What they added was language about, well,

14   this is to account for travel time.  But as we cited in

15:45:16  15   Karrie Walker's deposition in our reply, she acknowledges --

16   and by travel time, it's not from your car to wherever you

17   start work; it's from the time clock to wherever you start

18   work.  And she acknowledges for some folks travel time is a

19   couple of seconds because I might clock in here and start

15:45:37  20   work where Mr. Sims is.  For some folks, it might be a minute

21   or two.  They don't keep track of any of it.  And under the

22   law, it means they can't contest it.

23          MR. SIMS:  Judge, can I offer just a couple of

24   things?

15:45:50  25          THE COURT:  Yes, sir.

1      MR. SIMS:  This is sort of civil procedural-based

2  argument here.

3      MR. APPLEBY:  Let me -- I'm sorry.

4      MR. SIMS:  OTK through its designated 30(b)(6)

15:46:04  5  witness made the statement that OTK considers each worker to

6  be at work from the minute he or she clocks in.

7      Now, counsel made a perfect argument to obfuscate

8  that admission by testifying to all kinds of stuff.  But if

9  OTK wanted to contest its designated witness' statement, it

15:46:42 10  had to file under Rule 56 or the local rules some factual

11  declaration in opposition to our summary judgment motion.  It

12  didn't do that.

13      All we've heard is observations from counsel about

14  his history in litigation, what happened at the plant years

15:47:12 15  ago, and that just doesn't fly under the rules of civil

16  procedure or the local rule on summary judgment.  And if this

17  case is ever going to be resolved, I think the rules have to

18  be applied.  Particularly here.  Thank you.

19      THE COURT:  Okay.  All right.

15:47:37 20      MS. DALY:  If I can respond, Your Honor.

21      THE COURT:  Yeah, Ms. Daly.  Sure.

22      MS. DALY:  Sure.  And I'll just refer the Court to

23  Document 257 and obviously the section that discusses

24  rounding that begins on, for the record, Page ID 3138.

15:47:59 25  Counsel -- plaintiffs' counsel referred to -- both, I think,

attorneys mentioned there is no evidence or that Rule 56
requires evidence to support these positions.  There is
testimony that was cited on Page ID 3141 from Plaintiff
William Heath Hornady who is a named plaintiff in this case,
15:48:24  one of the opt-in plaintiffs.  And he specifically discusses
how he would clock in and then walk nine-tenths of a mile to
get to his work location.

             So going back to the crux of the issue is whether --
there is a genuine issue of material fact, whether it's
15:48:49  for -- they're getting paid -- the rounding policy affects
whether the time is worked.

             Plaintiffs' own submission, which I know Your Honor
asked him about a 90 -- a percentage.  And I'm not sure in
Document 246 I ever really saw a percentage, but I might have
15:49:08  missed that.

             But, essentially, in his own submission in support
of the summary judgment that's claiming that there's no
genuine issue of material fact, he references multiple
potential material facts or issues and material facts in that
15:49:25  there are times when employees could get time rounded in
their favor and then, as discussed, these employees have
given what's evidence in the record is that they -- there are
times when they were clocked in that they were walking with
up to point nine or nine-tenths of a mile which, under the
15:49:48  Portal-To-Portal Act, defendant's position is that is not

1    paid time and that would obviously cut into the amount of

2    time that's actually worked.

3            And so looking to the rules, you know, Rule 56 or

4    evidence in the case, there is actual evidence that shows

15:50:08  5    it's disputed whether the rounding policy applies to time

6    worked in every sense.  And, actually, plaintiffs' counsel

7    mentioned how it can change based on shifts for every

8    employee which further proves there is issue of facts as to

9    the rounding issue.

15:50:24 10            THE COURT:  Okay.  All right.

11            Mr. Rosenthal, let's move on to the trueing up.  And

12    I know we kind of already talked about that a little bit as

13    regards to the data that you don't have.  But -- I tell you

14    what.  Before I hear from you, I noticed in OTK's -- some of

15:50:51 15    your filings there was reference that there was going to be a

16    supplemental declaration filed.  I didn't see that that ever

17    happened.  Did that happen and I missed it?

18            MS. DALY:  No, Your Honor.

19            THE COURT:  Okay.  And don't get me wrong.  I'm not

15:51:14 20    inviting one.  But I just want to make sure that that's not

21    something that's out there.  There are a lot of documents in

22    this file.  And within chambers, we have tried to look at all

23    of them.  But I want to make sure that I -- we didn't miss

24    something.

15:51:38 25            Okay.  Mr. Rosenthal.

1          MR. ROSENTHAL:  Sure.  And just to make sure that
2     you know you're talking about apples and apples, there was a
3     supplemental declaration by Dave Scheid that was filed.
4     You're, I think, referring to the suggestion that there be an
15:51:56  5     affidavit from Melissa Pledger that was not filed.

6          THE COURT:  Correct.

7          MR. ROSENTHAL:  Okay.  So on the trued-up payments,
8     the -- let me take a step back.

9          THE COURT:  Well, let me -- before I let you step in
15:52:30 10     any direction, as I see it, there's conflicting testimony to
11     some degree as to how, why, and when this all happened.

12          MR. ROSENTHAL:  The only testimony is Melissa
13     Pledger's.  The conflict is they now tell you through counsel
14     that she was wrong.  But all we relied on was her testimony.

15:52:56 15          THE COURT:  And this is sort of the issue that
16     Mr. Sims was talking about, the, like -- you know, this is
17     argument but trying to refute -- I don't know -- I guess
18     factual evidence with argument or something other than --

19          MR. ROSENTHAL:  Or binding admissions.

15:53:13 20          THE COURT:  Okay.

21          MR. ROSENTHAL:  So the step back I was going to take
22     was this:  Let's pretend we're not talking about trued-up
23     payments.  It's just you are my employer.  You pay me every
24     week.  And then if I work overtime, you pay me two weeks
15:53:41 25     later for that overtime.  Not as any kind of bonus.  That's

1      just when you get around to it.  Those late payments, under

2      the law as applied in the Eleventh Circuit, are -- entitle

3      the employee to liquidated damages in an equal amount.

4      Because in this hypothetical you're paying me my overtime.

15:54:07  5      You don't owe that anymore, but the penalty for it not being

6      paid with my regular pay is that it's the liquidated damages

7      penalty.

8           I have problems recreating my thought process from

9      yesterday let alone from a couple of years ago, but what I

15:54:31  10     think sent me down the road of knowing what to ask and

11     thinking that something was very, very screwed up in OTK's

12     pay records was when I started looking at actual earning

13     statements that employees actually got.  And the reason I

14     wanted to tell you what I saw is because it kind of informs

15:55:02  15     how we got this far down the rabbit hole.

16          And specifically what I saw -- I get the part where

17     it interests me more than it interests normal people.

18          THE COURT:  Well, you've thrown it out on the table

19     so it interests me now.

15:55:46  20     MR. ROSENTHAL:  What we attached as Document 244-10,

21     beginning at Page ID 2887 were earning statements that OTK

22     gave Colin Hartery.

23          THE COURT:  Gave who?

24          MR. ROSENTHAL:  Colin Hartery.  Hartery is

15:56:18  25     H-A-R-T-E-R-Y.  He was the first plaintiff that filed suit

1    and then it got consolidated with this one.

2           THE COURT:  Ian, if you can sit down and be closer

3    to the microphone or if you want to stand at the podium,

4    you're welcome to do that.

15:56:31  5           MR. ROSENTHAL:  But choose a place that's mic'd,

6    right?

7           THE COURT:  Right.  And I tell you what.  If you

8    stand at the podium, you can take off your mask as long as

9    you stay in the penalty box.

15:56:47  10           MR. SIMS:  I was wondering about using the Elmo for

11    that statement.

12           THE COURT:  You can do that.

13           MR. ROSENTHAL:  So it's not that complicated.  There

14    is a regular hourly rate shown of $31.74.  And then there's

15:57:23  15    an overtime rate of $48.06.  And before you start trying to

16    do the math to see if it's 1.5 times that or not, the next

17    page has the exact same regular rate.  And this time, the

18    overtime rate is $48.12.

19           The next one has two different regular rates.  One

15:58:06  20    is 31.24 and one is 31.74 with an overtime rate of 48.12.  I

21    will tell you that the 31.74 and 31.24 makes sense if you

22    work both nightshift and dayshift because you get an extra 50

23    cents.

24           The next one has a regular rate of 31.24 and an

15:58:36  25    overtime rate of $48.16.

1          And those sorts of variations were present for lots

2     of employees.  And either way, there was the simple part of

3     if you just do the math, something was screwy.

4          THE COURT:  Okay.

15:58:59  5          MR. ROSENTHAL:  I will now return to my penalty box.

6          MS. DALY:  Ian, can you repeat what document

7     citation that was?

8          MR. ROSENTHAL:  Of course.  Sinead, it's 244-10.

9     And the page IDs begin at 2887.

15:59:32  10          MS. DALY:  Okay.  Thank you.  Sorry.

11          MR. ROSENTHAL:  Oh, no problem.

12          So not just because of that, but when I start

13    deposing Ms. Pledger as their 30(b)(6) representative and as,

14    in fact, their payroll supervisor, trying to figure out how

16:00:00  15    they're calculating overtime rates and whatnot, going through

16    it.

17          And what Ms. Pledger testified to as their

18    representative and then verified is obviously -- we attached

19    the seven or eight or ten pages that matter.  But what she

16:00:23  20    told me was, in substance, no; we're not blending rates which

21    I thought might be some version of the explanation.  Even

22    though I couldn't make the math work.  What she said,

23    instead -- and I want to be clear about what she said she

24    didn't know and what she said she did know.

16:00:43  25          She said she did not know the exact calculation and

the exact formula, but that what she did know was that every

month for the first paycheck paid during the calendar

month -- so sometimes it might be the Third or the Fourth or

the Fifth or whatever, depending on when those two-week

16:01:06  periods fall as they move through the year -- she testified

that -- when I say they, I am consolidating OTK and ADP.

Someone is going back, according to her, identifying amounts

that should have been paid for a prior pay period; adding

them to the paycheck -- adding the amount to the paycheck for

16:01:34  the first -- that is the first paycheck of a calendar month;

and that the nature of the setup out there with folks working

work schedules that tend to go back and forth between three

shifts and four shifts of four shifts and five shifts and the

fact that there are nightshifts and dayshift rates and the

16:01:59  fact that there are step-up rates -- her testimony was that

these are catching up overtime payments -- that these

additional trued-up payments are catching up overtime that

they are late.

That has -- oh.  And she testified that she gets

16:02:25  records of how much those payments are although now it turns

out they don't -- OTK does not have them.  They have not

produced them.

I have no reason to think her testimony was

accurate.  It was verified.  It is worth recalling that the

16:02:59  recordkeeping requirements include any additions to pay.  And

1    I know that particularly exciting CFR section is cited

2    explicitly in our brief.  But my point is that is one of the

3    things that is supposed to be documented.  Additions to pay.

4    And what Melissa Pledger testified and what is definitely

16:03:25  5    true is that nothing the employees get shows how much these

6    trued-up payments are and that nothing she has shows how much

7    these payments are and that nothing they produced during the

8    case shows how much these payments are.

9         So there are a couple of things that flow from that.

16:03:54  10   The first one is from the get-go, their supposedly verified

11   responses to the Court's standard FLSA discovery that are

12   supposed to include all rates of pay didn't.

13        Oh.  I should add something.  Also she explained

14   that even those overtime rates of pay that are fluctuating or

16:04:22  15   changing that I went through aren't accurate.  As I

16   understand her testimony, maybe they take the total amount of

17   money, divide it by the hours worked in those two weeks, and

18   get a number, but it's not supposed to reflect the prior

19   hours and it's not an actual overtime rate.  It's -- they're

16:04:40  20   dividing the wrong two numbers is the way to put it.  And

21   they get a result that is nobody's overtime rate.

22        The second consequence is that if they could tell us

23   this guy got $23 in a trued-up payment on this paycheck and

24   then the next month he got $19 and the next month he got

16:05:02  25   $187, what we would know from that quantification is that is

1   how much was not included in the paychecks that should have

2   been included and the entitlement would simply be the

3   liquidated damages in the same amount.

4          The other problem it leads to is this:  In what I

16:05:27  5   would describe as a normal or at least a simple FLSA overtime

6   case where an employee established -- and to use round

7   numbers -- that they were making ten bucks an hour as their

8   regular rate, they actually worked 50 hours in a week so they

9   should have gotten paid for ten hours at $15 an hour or 150

16:05:52  10  bucks and they show employer paid me $80 in overtime.  Well,

11  the employee is entitled to 70 bucks.  And if the employer

12  came in and said, we really paid the guy $120, the employee

13  would be entitled to 30 bucks.

14         It's supposed to be the simplest of math problems.

16:06:20  15  I don't know if you need me to cite chapter and verse.  The

16  case I keep citing for the principle that you don't get to

17  credit payments from one pay period or even overpayments from

18  one period against another is the *Freixa* case which I am

19  probably pronouncing wrong.  But it reads like it should be

16:06:41  20  *Freixa* that Judge Pryor wrote on the Eleventh Circuit.  In

21  that case, he actually is -- and it applies to -- by analogy

22  to the bonuses but he was going through why paying bonuses --

23  commissions on the monthly basis that don't line up with

24  commissions that were earned from the prior month also

16:07:07  25  doesn't work.

1            But that is one of the cases that says you've got to
2      get it right and you don't get an offset -- I'm sorry.  You
3      don't get to credit overpayments against one period against
4      obligations in another.

16:07:19 5            So where that leaves us and it does tie absolutely
6      into the ADP issue is we know these earning statements are
7      wrong.  Not in terms of how much money the actual check was
8      for but where these rates are coming from.

9            We know what Melissa Pledger testified to about what
16:07:39 10     that explanation is.  But if you take my scenario where
11     someone is making ten bucks an hour and you ignore all the
12     math problems that turn into rates that are really $28.37
13     cents and all that, to subtract B from A to get C, you have
14     to know what B is.

16:08:06 15           If OTK had been able to tell us the formula, maybe
16     we could figure it out or maybe they could figure it out.  I
17     will not screech about the stipulated order from June that
18     also should have given us this information via 30(b)(6)
19     deposition that never happened that we stipulated to try to
16:08:31 20     get real answers in light of the fact that Melissa Pledger
21     didn't know this piece of it.  But by not screeching about
22     it, I'm not remotely ignoring it.

23           So for example, if the way we calculate the amount
24     of pay that Employee X is entitled to for a workweek,
16:08:56 25     whatever that workweek is, Sunday to Sunday, Sunday to

Saturday, if we come up with that when you count his rounded

time, when you count the bonuses as allocated, maybe the

person is entitled to $390.17 for that week.  We would like

to be able to subtract the amount of overtime pay that he or

she was really paid for for that week.  Like, in my example

where you know the person was paid 80 bucks or 120 bucks.

But we cannot take their records of overtime pay for

the first paycheck of every month and find that number

because if, for hypothetical, the paycheck that goes to that

two-week pay period shows an overtime number of $123, there

is no way to tell how much of that is really getting paid for

that week.

And the only people who ought to be -- the people

who should want to prove that number are OTK.  The reason

that number doesn't exist isn't just because Melissa Pledger

doesn't know how they come up with it and ADP supposedly

won't tell them.  It's because they ignored the FLSA

recordkeeping requirement to document how much the addition

to the paycheck was.

As you may know and, if nothing else, as you would

expect me to acknowledge, there isn't actually civil penalty

for blowing off the recordkeeping requirements under the

FLSA.  There are lots of states that have parallel

regulations and have explicit penalties.  There isn't one

here.

1          So the fact that nobody could come in and file a

2     claim, a lawsuit for damages to say we are getting

3     paychecks -- there are additions.  They just aren't putting

4     the number down.  So that's not the claim.  But the

16:11:16   5     evidentiary result here -- and it's their own fault in the

6     most basic four-year-old way -- is that they can't show how

7     much they paid for overtime for one week or two weeks that go

8     to that first paycheck.  And the only reason they can't do it

9     is because they broke the law.

16:11:38  10          And so as we have set out in our motion -- of

11     course, our motion was filed when a lot of this was still --

12     it's still out there, but it was already out there.  So we

13     ran the numbers both ways.  Assuming that that number is

14     zero -- because they can't prove a higher number -- and

16:11:57  15     comparing it to our calculations or taking at face value the

16     number that they put -- even though it includes some money

17     from other weeks -- and we would have done it a third way --

18     sorry.  That's not quite true.  We would have done it a

19     different way if we knew how much those trued-up payments

16:12:22  20     were.  The calculation we would have had is okay.  This is

21     how much they were and it's a late payment.  But we would

22     have fully credited whatever the number was minus the

23     trued-up payment.

24          I think I said that at least confusingly.  If there

16:12:39  25     was a 200-dollar payment listed and they were able to say $40

1      of this was trued-up, we would credit them for 160 and we

2      would say and the other 40 was late so you owe the guy 40

3      bucks.

4              But there is no question that what Melissa Pledger

16:12:59  5      testified to and verified and that remains undisputed as a

6      matter of record is illegal.  Not in the homicide sense but

7      in the late payment sense.

8              And here we are.  And the two consequences are the

9      ones I've described.  And I should point out that if we could

16:13:23 10      quantify the one consequence of exactly how much was late

11      paid, we wouldn't and couldn't seek both because then there

12      would actually be a double recovery.

13              Treating it as zero because that's what they can

14      prove in those first paychecks eliminates the double recovery

16:13:46 15      issue.

16              THE COURT:  Okay.  Mr. Appleby, Ms. Daly?

17              MR. APPLEBY:  Well, let me see if I can -- I'm not

18      sure I can limit it to 40 minutes, but let me give you a

19      couple of thoughts related to the whole trued-up situation,

16:14:03 20      make sure that everyone understands.

21              I know that plaintiffs' lawyers worked very hard at

22      it and they do understand part.  But I do have some concerns

23      with what they're saying.

24              So if I understand properly -- and I'll let Ms. Daly

16:14:21 25      jump in if I get any of this wrong because she's been working

1    with the ADP people more than me.  But my understanding is

2    that the quote, unquote true-up, which is simply Melissa

3    Pledger's term, is part of the ADP system.

4         I understand what everybody said before; that, yes,

16:14:40  5    they're part of us in the sense of this case so I'm not

6    trying to simply say that ends the analysis.  But my

7    understanding is that the process relates to primarily

8    overtime situations.  And it relates to circumstances in

9    which the overtime has not been approved.  And there may be

16:15:06  10   some reason to get more information and there may be some

11   other issues might have gotten in the way.

12        And what happens is that a fix basically applies at

13   sometime after the regular workweek.  And that fix is what

14   she's referring to as the true-up.

16:15:31  15        I also understand -- and I'm -- got this in the

16   regulations.  And the regulation in question is 778.106 which

17   talks about time and payment.  And I won't read the whole

18   thing to you.  But the first fairly lengthy sentence or two

19   sentences I think are as follows:  There is no requirement in

16:15:56  20   the act that -- sorry.  I'm getting some feedback here.  I

21   don't know who is -- there's -- I'm hearing a ton of noise.

22   I'm not sure if anyone can hear me or not.

23        THE COURT:  Yeah.  We can hear you.

24        MR. APPLEBY:  So what it says is there is no -- I'm

16:16:25  25   sorry.  It's coming in really loud here.

1          THE COURT:  Ian, can you stop turning pages or turn

2     off your microphone if you're going to turn pages?

3          Maybe that will be a little better, Mr. Appleby.

4          MR. APPLEBY:  Thank you.  I appreciate it.  It was

16:16:39  5     kind of hard to get out.

6          So what it says is, quote, unquote, there is no

7     requirement in the act that overtime compensation be paid

8     weekly.  The general rule is that overtime compensation

9     earned in a particular workweek must be paid on a regular

16:16:54 10     payday for the period at which such workweek ends.  When a

11     correct amount of overtime compensation cannot be determined

12     until some time after the regular pay period, however, the

13     requirements of the act will be satisfied if the employer

14     pays the excess overtime compensation as soon as after the

16:17:15 15     regular pay period as is practicable.

16          I don't see anything wrong with what ADP system is

17     doing, given that regulation.

18        [Cross-talking.]

19          THE COURT:  All right.  Well, I guess my concern is

16:17:28 20     I don't really know what ADP's system is doing based on the

21     testimony of your 30(b)(6) witness and the absence of

22     anything from ADP.  But -- okay.

23          Ms. Daly, I think I cut you off.  And I apologize.

24     So please.

16:17:47 25          MS. DALY:  That's okay, Your Honor.  I just wanted

1   to clarify that in -- and I apologize.

2          When Your Honor first asked about the declaration,

3   that came up in the context of the report and recommendation,

4   Document 261, by the judge in our response to those

16:18:06  5   objections because the information about how, quote, unquote,

6   true-up which is really the regular-rate-of-pay calculation

7   that's done came after that.

8          So I was -- we brought it up in the context of

9   discovery issues and so, unfortunately, it was not addressed

16:18:23 10   in this motion for summary judgment.  That declaration is

11   forthcoming.

12          The issue is that -- or to clarify what I understand

13   again depends on what is in the record report.  But what

14   defendant tried to explain in the response to the report and

16:18:44 15   recommendation was that after Ms. Pledger asked ADP to

16   further explain this formula that she didn't fully

17   understand, it was determined that the regular rate of pay is

18   done every paycheck.  So there is no late payment that's

19   happening, as she testified to subsequently.

16:19:06 20          And, interestingly, the records that Mr. Rosenthal

21   referred to which was in Document 244-10 -- I think he

22   started at 2887 Page ID -- and it goes on -- it refers to pay

23   statements from an individual.  And while I understand

24   there's some issues with the math, often it shows that the

16:19:30 25   overtime rate that's being paid is often higher than the

1      regular rate.

2            And so I guess as far as plaintiffs' counsel's

3      argument about what was -- being done is illegal, that shows

4      that they are potentially paying more than one and a half

16:19:49  5   times of overtime based on the regular rate.  Of course, that

6      would depend on whether it is the day rate or the night rate

7      which, as plaintiff counsel mentions, there is a 50-cent

8      discrepancy between the two.

9            But, essentially, plaintiffs' counsel's argument --

16:20:07 10  I'm not sure as far as in the context of a summary

11     judgment -- it sounds like it's more of a discovery-type

12     issue.  As far as a summary judgment, I'm not sure how

13     exactly what plaintiffs are looking for comes out on -- as,

14     like, a something that doesn't have -- I guess what cause of

16:20:33 15  action that relates to.  But I guess I demonstrated in our

16     response, which is Document 257, the plaintiffs have the

17     burden of proving that the defendant has paid the incorrect

18     overtime compensation.

19           So, essentially, here they're trying to shift the

16:20:57 20  burden to the defendant without citing short to support such

21     a shift.

22           And while we understand there's missing information

23     outstanding to get exactly how the overtime or the regular

24     pay was done, there's still no evidence to suggest that there

16:21:15 25  should be any shift or that they're being underpaid in any

1      way.

2                   THE COURT:  Okay.

3                   MS. DALY:  As far as in the context of summary

4      judgment.

16:21:25  5         THE COURT:  No.  That's fine.  I think I'm good on

6      the issue of the true-up.

7                   So let's -- you're still good?  Melanie, you good?

8                   COURTROOM DEPUTY:  Yes.

9                   THE COURT:  Let's proceed and take up the bonus

16:21:39  10    issue.  I know both sides filed summary judgment on this

11     issue.

12                  Mr. Rosenthal, we're not going to break with recent

13     tradition, and I will let you talk about yours first.

14                  MR. ROSENTHAL:  Slave to precedent.

16:22:34  15        First I will tell you, as we have briefed, that

16     these defenses were waived anyway.  I cannot add anything

17     about waiver to what we've already wrote other than to say we

18     brought it up in April or May in our first summary judgment

19     motion.

16:22:54  20        So without telling you, hey; go read some stuff, I

21     also don't think I should read aloud the paragraph or two I

22     wrote and I'll move on to the substance --

23                  THE COURT:  I agree.  That is a good course of

24     action.

16:23:04  25        MR. ROSENTHAL:  Okay.  It's basically a step one,

two, three process.  And there is nothing that they should be
able to controvert because our position is based on their
testimony and their representations to this Court.

I think about it as step one, two, and three.  You
start with 29 U.S.C. Section 207(e) which says all
remuneration must be added to the total compensation before
the regular hourly rate of pay is determined.  And then it
lists out, I think, eight exceptions currently.  And none of
those exceptions apply here.  And I don't think there's any
argument or dispute about that although, initially, in our
motion, we set out why the sort of incentive bonuses that
we're talking about here are not subject to any of those
eight exceptions anyway.  But it does not appear to be
anything they do contest and it certainly is nothing they
could contest.

Then you've got 29 CFR Section 778.209.  And it lays
out first of all the easy part which is that some -- this is
in 778.209 Subsection A, the general rule.  But it lays out
the easy part.  It acknowledges that sometimes there are
bonuses that cannot be ascertained until later.

THE COURT:  That's like what we're talking about in
this case.

MR. ROSENTHAL:  Yep.

THE COURT:  So let's skip the easy part.  Let's just
talk about what we're talking about here.

1          MR. ROSENTHAL:  All right.  When the amount of the

2     bonus can be ascertained, it must be apportioned back over

3     the workweek of the periods during which it may be said to

4     have been earned and then the employee gets paid.

16:25:42  5          They never do that.  Period.  Whether it's the

6     *Freixa* case or any of the other ones we've cited.  That's

7     what they're supposed to do unless they can find refuge in

8     some other safe harbor.  Subsection B, again within 778.209,

9     says that if it is impossible to allocate the bonus among the

16:26:12 10    workweeks of the period in proportion to the amount of the

11    bonus actually earned each week, then some other reasonable

12    and equitable method of allocation must be adopted.  And then

13    you go back through the same process of recalculating the

14    amount due.

16:26:31 15         As we laid out in our narrative, what they told

16    Judge Nelson over and over again when we were seeking

17    discovery about what they were looking at for time frames to

18    calculate a bonus was it's monthly.  They put it in

19    pleadings.  They put it in discovery responses.  They said it

16:26:59 20    is a calendar month.  And because of that, Judge Nelson

21    didn't let us have discovery.  And, frankly, we wouldn't need

22    discovery about well, let's look at the underlying numbers

23    did you really look at in monthly period, because that's what

24    they said.  And they're bound by it and they're stuck with it

16:27:17 25    notwithstanding their recent efforts to say it's more

1   complicated.

2            You can take any calendar month and for any -- I'm

3   sorry.  I should back up one step.

4            What they do every month and really ten days later,

16:27:37  5  approximately, because they look at these monthly criteria

6   and they figure out whether or not under those criteria a

7   bonus is going to be 25 percent or 20 percent or 18 percent

8   or zero percent -- and I will come in a second to percent of

9   what.  But they're looking at monthly criteria.

16:27:58  10           The employees see in realtime how they're doing for

11  some of these targets.  And in their response to motion to

12  compel filed in January of 2020, they included examples of

13  how they start these clocks at basically 0000, midnight of

14  the month.

16:28:26  15           So -- and all the employees get the same percentage

16  bonus.  Not the same total amount.  The same percent.  It's

17  mill wide.

18           THE COURT:  Sure.

19           MR. ROSENTHAL:  So if a workweek, whatever it is,

16:28:44  20  begins January 3rd and runs until the Ninth and the next one

21  is the Tenth to the 17th and the next one is the 18th through

22  the 24th and then -- so you've got three full weeks and then

23  you've got a partial week at the end and a partial week at

24  the beginning, it is no big deal mathematically.  It is not

16:29:06  25  impossible mathematically to take the bonus the employee is

1   entitled to and divide it out over three full weeks and two

2   partial weeks to reflect the allocation.  You could look at,

3   if you wanted to, the number of hours the employee worked

4   each week and do the same thing on a more granular level.

16:29:33   5   Although, to be frank, it is a mill-wide performance issue or

6   mill-wide performance basis.

7           So whether or not there would be any reason to look

8   at what any employee did in any particular hour, I don't

9   think so.  I think it's easy enough to say you can look at

16:29:50  10   the weeks and the partial weeks and allocate it that way.

11   It's not impossible.  It's not even hard.

12           THE COURT:  Well, it's challenging if you don't have

13   all the numbers.

14           MR. ROSENTHAL:  Well, but what they know is how many

16:30:04  15   days are in the month and they know how many partial weeks

16   there are.  And they know that in advance, frankly.  And then

17   if you know that you paid them a 15-hundred-dollar bonus and

18   it was three weeks and three days on one end and six days on

19   the other end, you've got four full weeks and two partial

16:30:23  20   weeks and it's four and two-sevenths divided by whatever

21   number I just said for the bonus.

22           Incidentally, there are lots and lots of easier ways

23   that lots and lots of companies come to do something similar.

24           THE COURT:  Well, but this is how OTK does it.

16:30:40  25           MR. ROSENTHAL:  I'm just saying it is not impossible

1    is the standard.  And the fact that it might be complicated

2    is because they chose it that way.

3          THE COURT:  Okay.  Let me ask Mr. Appleby or

4    Ms. Daly to talk about why it's impossible.

16:30:59   5          MR. APPLEBY:  I'm not sure exactly what to do with

6    the word impossible.

7          THE COURT:  I mean, it's not my word.  Congress put

8    it in the statute.  So we're kind of stuck with parsing it

9    and working through it.  So I feel your pain.

16:31:15  10          MR. APPLEBY:  Yeah.  I understand.  I can tell you

11   from past experience it's not what DOL does.  They're not

12   looking for impossible.  They're looking for when it's not

13   practical.  That's only based upon my discussions with them.

14   I can't testify to that.

16:31:34  15          The real problem -- and I think you already

16   understand it -- is some of the data that fits into this is

17   not going to be ready and found and available at the time

18   that the payment would be done if it was really stuck within

19   the month.

16:31:51  20          And I think that Ian is right.  There are some

21   aspects of it that are known but not all aspects that are

22   known.  And yes; this is complicated bonus and this isn't the

23   kind of bonus originally was thought would be applied.  This

24   is more incentive pay.  But incentive pay is a bonus under

16:32:12  25   the law.  We're not arguing about that issue.

1           But the real problem is when you create incentive

2    pay issues, you're doing a lot more than you're doing when

3    you're just giving someone a bonus at the end of the year.

4           So, ultimately, from a pay standpoint, it is correct

16:32:28  5    that it is supposed to be on a monthly basis but you just

6    flat out can't get it all and align it all at that time

7    period.  You would be totally guessing.  And it's, I think,

8    as Section 209 was intended to be is that ultimately, if you

9    can't figure it out by that period, then you have -- then you

16:32:51 10    are not required to figure it out by that period.

11          It's one of the more complicated incentive bonuses

12   that I've seen.  And I work in the industrial sector almost

13   entirely.  And I have to say that I think -- I mean, I'm not,

14   again, trying to testify, but it is a complicated system

16:33:11 15   relative to what most of them are.  And the employees are all

16   aware of that.  They're aware -- they can follow some things.

17   They can see how many pounds they put out.  What they can't

18   see, for example, are whether those pounds are all worthy.

19   They can't see what the issue might be with a customer.

16:33:28 20          So from the perspective of everything that's there,

21   I don't know how it would be possible to do by Ian's

22   suggestion that we must do.  And yeah; there probably are

23   easier ways to do it.  That's not what this case is about.

24          THE COURT:  Well, so -- no.  I agree.  And I'm

16:33:46 25   having enough trouble wrapping my head around the way that

1    OTK does that.  And I don't want to get distracted by, like,

2    other ways they could go.

3           So the percentage that's calculated later and

4    applied, what is it applied to?

16:34:09    5           MR. ROSENTHAL:  Sure.

6           MR. APPLEBY:  My -- go ahead.  I'm sorry.

7           THE COURT:  Well, let Mr. Appleby respond to it

8    first.

9           MR. ROSENTHAL:  That's fine.  This is legitimately

16:34:22   10    undisputed which is nice.

11           THE COURT:  That's fine.  I'm just trying to make

12    sure I'm understanding.

13           MR. APPLEBY:  Anyway, make it a long story, the

14    documents -- and I believe that plaintiffs' lawyer has the

16:34:35   15    document as to what is -- what the many parts are.

16    Ultimately, it's -- it is played out to -- if I understand

17    this right, it still is within the month.  But, ultimately,

18    it doesn't necessarily mean the month is going to be ready to

19    be paid at the end of the month.  It is for whatever time

16:34:59   20    period that it is applied.  And that it may not be the First

21    to the 31st.  It may be on a different basis relative to what

22    particular days are the beginning and ending.

23           But my understanding, if it's all done within that

24    particular time period and that it is dragged a little bit

16:35:20   25    because of the things that they have to wait to get to the

1   data -- and beyond just simply the amount of the data, they

2   literally have to go dig this up from every department they

3   have.  And you can just imagine that.  They've got to go to

4   the cold rolling department; they got to go to high rolling

16:35:41  5   department.  They've got to go to wherever else it is.  You

6   can't put that stuff together simply by the amount of pounds

7   or apples or whatever you're doing went out that month.

8            And that's why this part of the provision is in the

9   regulations is to not require someone to do a miracle and --

16:36:01  10  while I do think the word impossible is a foolish word here,

11  the reality is that if it's that difficult, how do you ever

12  get it so you can actually pay it at the end of the month?

13  It just doesn't make any sense.  And we are a very good

14  example for that.

16:36:19  15           THE COURT:  Well, and --

16           MS. DALY:  Your Honor, I apologize.

17           THE COURT:  Go ahead.

18           MS. DALY:  I miss -- I understood your question to

19  be a little bit different.  I thought your question was about

16:36:26  20  what percentage -- what the percentage is ultimately applied

21  to.

22           And if that is your question, it's applied to gross

23  earnings minus the prior month's bonus amount.  So it is

24  applied to overtime and straight earnings which is completely

16:36:46  25  permitted within the regulation 29 CFR Section 778.210.  And

1    that the entire purpose of this is to ensure -- one, that

2    section gives an alternative so that employers do not have to

3    recalculate because, once the percentage is applied to

4    straight and gross earnings, that means the bonus is taking

16:37:15   5    into account the overtime earnings.  And it is a mechanism to

6    avoid someone trying to skirt around paying on overtime.

7         But they are, in fact, applying the percentage to

8    gross earnings.  And like Ian said, that's undisputed.  I

9    don't think plaintiffs take issue that it's being paid to

16:37:29   10   straight time and overtime hours and earnings.

11        THE COURT:  For the period of the month.  Not pay

12   period.

13        MS. DALY:  It's applied to the pay period.  So the

14   discrepancy is over the time period.  Not what is actually

16:37:46   15   applied.  Section two -- 210 does not actually speak to the

16   pay period -- I'm sorry.  The time in which it's supposed to

17   be paid.  And plaintiffs' interpretation and the cases that

18   are cited don't actually specify that it has to be done

19   exactly when it was earned.

16:38:05   20        THE COURT:  Well, I'm trying to rationalize how that

21   works because OTK works and, like, we've talked about the

22   workweek.  We've talked about pay periods, and pay period is

23   basically two workweeks.  And that's the way straight

24   compensation and overtime compensation is paid.  But bonus is

16:38:27   25   calculated on monthly basis because of all the different

1   metrics that are taken into account and that the employees --

2   some of those variables the employees are able to monitor and

3   be aware of during the month that they're working.  But then

4   what you're telling me is that percentage is then applied to

16:38:45  5   pay periods rather than the monthly -- the month period for

6   which the bonus is calculated?

7         MS. DALY:  Yes.  It's paid on -- when they say

8   monthly, they -- like, the money earned by that employee

9   during that month.

16:39:02  10         THE COURT:  Okay.

11         MS. DALY:  So --

12         THE COURT:  Okay.  So the bonus, whatever

13   percentage, say, it's 25 percent, would be applied to the

14   gross income that that employee generated during that 30-,

16:39:18  15   31-, 28-day period?

16         MR. APPLEBY:  That's correct, yes.

17         THE COURT:  Mr. Rosenthal is shaking his head.  So

18   I'm going to get him to weigh in here.

19         MR. ROSENTHAL:  That is a thousand percent wrong.

16:39:34  20   And Melissa Pledger and will Dave Scheid explained exactly

21   how they do it.

22         Here's how it works:  Paydays are Friday.  It

23   doesn't matter whether the workweek ends Friday or Saturday

24   for the purposes of this discussion.  The payday itself is

16:39:56  25   four or five days later.  Okay?  So let's take January and

let's make it as easy as we can.  Okay?  They earn a

20-percent bonus for the work they did in January.  That

bonus is paid February 28th.  We do not have any problem with

the payment being on February 28th or being belated.

16:40:23    If the -- if they happen to get a paycheck on

January 1st because that happened to be the pay date, the pay

period they got paid for would be roughly December 12th to

December 26th.  And they get paid on January 1st.  Then they

get another paycheck on January 15th that covers December

16:40:46  27th to roughly January 10 or January 11.  And they get

another paycheck on January 29 that brings you up to

approximately January 25th.

When OTK says, congratulations for the work you did

from January 1st to January 31st; we're giving you a

16:41:05  20-percent bonus and we're going to pay you on January 28th,

what they take is the total amount of the paycheck on January

1st, 15th, and 29th, which covers a six-week pay period from

mid December until late January, and they pay the employee 20

percent of that number.

16:41:32    If -- now, that happens about once a year that there

are three pay periods.  Most months, the paycheck may be on

February 7th and then February 21st, covering mid January

through February 22nd or -- and it moves through the year

because -- as far as the dates of the month, as you keep

16:41:54  rotating 28 days through, it cycles through.

1          There is no question and no dispute that that's the

2     percentage not only because it's what matches their numbers

3     but because it's what Melissa Pledger and Dave Scheid

4     testified to as their 30(b)(6) representatives.  And it

16:42:13  5     happens to be true.  The upshot of it, though, to circle back

6     to the question you were asking Ms. Daly, is that they are

7     earning this bonus from January 1st to January 31st.  It's

8     getting paid on January 28th but what it's getting paid is a

9     percentage of the money they happen to have earned from mid

16:42:38  10     December until whenever.

11          And the problem they've got -- and while Mr. Appleby

12     would love the issue to be that they're making these bonus

13     payments late, that is not the claim and it never has been

14     the claim.  It's okay they're paying them late.  The problem

16:42:59  15     is they're not allocating that money back.

16          The percentage provision that is in 778.210, which

17     is clearly inspired by -- I think it's *Siomkin* case from the

18     mid 1940s and Judge Friendly [sic] -- is when you start

19     getting the mathematical fact.  Because what's supposed to

16:43:26  20     happen is if you do it right, it's not an exclusion; this is

21     just a recognition of mathematical fact.  If you pay somebody

22     a ten-percent bonus that was earned over two weeks and you

23     pay them ten percent of what you already paid them in

24     earnings for those two weeks, it automatically matches up if

16:43:59  25     the amount you have paid corresponds.  If you do anything

1    else, the math is not the same.  It might be higher; it might

2    be lower.  But for the purposes of what we're doing here and

3    the FLSA, all of this is an instruction.  A roadmap from the

4    department of labor through the CFR to employers.  If you

16:44:21   5    want to take a shortcut to do the math instead of the long

6    form of adding it back and getting the same number, you can

7    do it.

8         Here's how it works:  So if two pay periods January

9    1st through January 29th and if OTK said we're giving you a

16:44:48   10   ten-percent bonus because of your productivity over these

11   four weeks and we're going to pay it a couple of weeks down

12   the road and if they had then said it's ten percent and

13   here's how much we paid you for January 1st to January 29th,

14   they would be fine.  But what they do is totally different.

16:45:09   15        And there is not a single authority that never --

16   well, I should say it this way.  OTK has not cited any

17   authority and I'm not aware of any authority whether it's an

18   opinion letter, a CFR, a statute, a case where the Court says

19   A is not equal to B but that's okay.

16:45:35   20        Instead, every time they go through the math, what

21   they say is -- if they say the math is the same, it's because

22   the period is the same.  And I sort of went through every one

23   of the opinion letters that they cited and either said hey;

24   they got it wrong in reading it or when you look at the

16:45:54   25   numbers they've described, it's wrong.  And you get cases

1    where they say, well, okay.  You did it right for this

2    quarterly payment but you did it wrong for the annual

3    payment.

4         Because the only reason this exists is whatever

16:46:10  5    version of transitive properties we were all supposed to

6    learn in seventh and eighth and ninth grade and that if

7    you're not multiplying the right things by the right things,

8    you get different numbers.  And the point is that if you

9    can't -- this is only a math problem.  What they're supposed

16:46:28  10   to be doing is taking the money that can be allocated over

11   the workweeks and dividing it and adding it back to the

12   regular rate and then recalculating how much overtime pay is

13   due.

14        They can't hide behind 778.210 because the math is

16:46:49  15   always wrong and it has to be perfect -- has to be set up so

16   that it's exactly right.  They can't hide behind 778.209

17   because they haven't followed it.  And while Mr. Appleby is

18   trying to -- just like they're trying to gloss over what

19   period is covered and applied to, when he is telling you

16:47:12  20   about how -- well, it's hard to figure out what period the

21   bonus was earned, the question is whether or not it is

22   impossible to allocate the bonus among the workweeks of the

23   period.  And then even if it were impossible, what you would

24   have to get to is whether there is some other equitable way

16:47:46  25   to do it to get to the right number which they also haven't

1  done because they don't have it at all.

2       And the last -- hopefully the last thing I should

3  have to say about it is this -- and this is, among other

4  places, at Document 259-1, Page ID 3229.  This was -- this is

16:48:12  5  what they said April 15, 2020.

6       So after Ms. Pledger and Mr. Scheid had been deposed

7  as 30(b)(6) representatives, quote, as demonstrated in

8  documents produced by defendant, the time frame for the

9  incentive bonus is monthly, end quote.  And they italicized

16:48:37 10  monthly.

11       Then they talk about monthly bonus spreadsheets.

12  Quote, however other than stating the month, these

13  spreadsheets are not documents that explicitly show the start

14  and end time for the criteria, end quote.  Open quote, that

16:48:53 15  being said, defendant wishes to assure the Court of its

16  efforts to find documents that might provide such specific

17  information to determine whether responsive documents

18  existed.  Defendants and its counsel checked with each

19  department to discuss their process.  From the information

16:49:11 20  gathered, the time frame each department seeks to draw its

21  criteria from is the first day of the month to the last day

22  of the month.  And the systems used by the company inherently

23  use 0000 or 12:00 a.m. to begin a new day.  The start and end

24  times are not shown explicitly on any documents and, rather,

16:49:34 25  they are apparently just inherent in the nature of a day, end

1      quote.

2           We should not be sitting here ten months later

3      hearing counsel offer factual pseudo testimony about what all

4      is looked at that has the period in which the bonus is earned

16:50:00  5      and even if -- even if the bonuses turned out to be earned

6      over a month and a half or two months, which is what we are

7      seeking discovery about and were not allowed to have

8      discovery about because their answers eliminated the issue --

9      all it would mean is you would take that month-and-a-half

16:50:20  10     period or that two-month period and you would figure out,

11     hey; this is the bonus that got paid.  And it would really be

12     two bonuses that got paid that incorporated it and then you

13     add them up and you divide it back.  And the math would never

14     be the same, and we would have a different set of damages

16:50:36  15     numbers.

16          THE COURT:  Okay.  Mr. Appleby?  Ms. Daly?  I mean,

17     obviously, you have a summary judgment on this aspect of the

18     case as well.  So I want to hear anything you have to offer.

19          MR. APPLEBY:  Right.  I just add that's -- let me

16:51:00  20     put it this way:  That seems very, very overly complicated to

21     me.  What is -- seems clear -- and I don't know if

22     plaintiffs' counsel asked all the right questions in the

23     deposition or not.  And I'm not going to go into that.

24          What seems very clear is that if you were going to

16:51:25  25     do a bonus or incentive pay, you have got to come with the

idea that I've got to look at overtime pay and regular pay
and that I've got to apply it.  And that is what's being
done.  And I think it's as simple as that.  I don't think it
is to be that complication that we just went through.

16:51:48    Ultimately, the regulation basically says you got
two things you can do.  You can do it if it's a monthly
payment or yearly payment at the very end.  You can recompute
everything where you can pay as you go.  And we are clearly
paying as you go.  And it's taking into consideration all
16:52:07  pay.  And that's exactly what the regulations say that we
need to be doing.

    THE COURT:  Okay.  Well, I guess my concern with
that is -- I mean, I agree.  You appear to be paying as you
go and paying a percentage.  But it's, like -- almost like a
16:52:25  conversion question.  Your compensation is based on pay
periods.  The bonus is based on months.  They are not the
same.  So you have employees that are working and not being
able to see at least some of the metrics that go into that
bonus.  And that's to incentivize them to be more efficient
16:52:51  and better workers.

    I mean, I think it's -- I mean, strategically, it
makes a lot of sense to do it that way.  I guess my concern
is, though:  The more it looks like it's keyed to the actual
work of the workers is the more it would seem like it needs
16:53:10  to be applied to the period within which they're doing that

1    work.  And that's like a little bit of apples and oranges in

2    requiring some kind of conversion.

3         That's the concern I have just as I have read what

4    y'all have filed and after listening to you talk about it.

16:53:30  5    And I just say that because it's late in the day and I'm

6    thinking out loud.

7         MR. APPLEBY:  I understand.

8         MS. DALY:  And, Your Honor, if I may just point out

9    when we were talking generally, obviously, OTK does not pay

16:53:46  10   on a calendar month basis.  Meaning nobody is creating pay

11   records based on from the First of the day [sic] to the 31st.

12        So when, practically speaking, a company talks about

13   money being paid on the month, they just mean what money was

14   paid out on that month.  Because they don't actually

16:54:04  15   calculate pay based on the 1st to 31st.

16        And it's kind of a nit-picky thing.  Plaintiffs'

17   counsel used the example of three pay periods that ultimately

18   happens super rarely.  So when you actually pare down the

19   First to the 31st or the pay periods, there is really no

16:54:22  20   other -- there's -- while the three pay periods is an

21   extreme, there's other days where we're just talking about a

22   few missed days here and there.

23        And I think that goes -- rather than requiring a

24   company to reconfigure the way it does pay and find a way to

16:54:38  25   do it based on the workweek or based on the daily calendar

1  month -- and I just say from the First to the 31st to make it

2  clear when we're talking about calendar month -- I think this

3  is what is another reasonable and equitable method of

4  allocation.

16:54:55  5      And none of the authority -- to be honest, no --

6  well, no cases are binding that have been cited on this.  It

7  is kind of an unusual area because I don't think anyone has

8  really pinned down such a discrepancy between months and pay

9  periods because, at the end of the day, Outokumpu is paying

16:55:13 10  employees on their earnings earned.  They are never skipping

11  weeks or missing any pay that they're allocating payments to.

12      So I think the overall goal of this regulation is

13  being achieved because they're paying the percentage on the

14  total earnings and not skipping any overtime.

16:55:32 15      I just wanted to add those --

16      THE COURT:  Sure.  No.  Yeah.  I understand where

17  you're coming from there.  You know, and maybe this is -- I

18  mean, I know OTK is a European company.  Or OTK itself may be

19  an Alabama entity, but -- and maybe this is a type of

16:55:53 20  incentive system that is more common in European businesses.

21  I don't know.  It certainly makes a lot of sense which might

22  make me suspect that maybe it is.  But the question is --

23      [Unintelligible cross-talking.]

24      MR. APPLEBY:  . . . for what that's worth.  I live

16:56:16 25  in the steel industry.  Almost everyone does exactly the same

1    thing.

2              THE COURT:  Well, but coming into this hearing we've

3    looked for other cases that have dealt with the conversion of

4    time and how it's been addressed and, frankly, I didn't find

16:56:30  5    any.  So, you know, we're left with the regulation such as it

6    is and the facts that we have such as they are.  So we will

7    apply them and work through it.

8              Okay.  Well, I appreciate your time today.  I think

9    this has been helpful.  I sort of hoped we would talk about a

16:56:55 10    little bit more.  But I think this is a healthy cut for where

11    we are.

12              In short order, later today or early tomorrow, I

13    will issue that show cause order.  So, Mr. Appleby, Ms. Daly,

14    you can refer that to OTK's contractor and hopefully we can

16:57:19 15    get that process going so that we can help at least fill in

16    some of the blanks that are out there.  Okay.

17              MR. APPLEBY:  That's fine, Your Honor.  We will do

18    that.  We will connect up with them, let them know what's

19    coming.

16:57:37 20              THE COURT:  Okay.  Well, why don't we call it there,

21    then, and we will be back in touch.  All right.

22              MR. APPLEBY:  Okay.  We appreciate your time.  Thank

23    you.

24              THE COURT:  And I was going to ask if Ian had

16:57:49 25    anything, but he has something.  So --

MR. ROSENTHAL:  I would desperately love to call it

a day.  Like, there is a cold beer in my refrigerator and

then there is a second one.

The huge problem I've got is this:  I do not have

16:58:06  updated pay records for anybody but four or five people since

January, 2020, which we raised as the alternate motion to

compel part.  And I'm going to walk out of here no closer to

getting those with a trial that still looms in May.

THE COURT:  Sure.  Well, so Mr. Appleby and

16:58:29  Ms. Daly, what can we do to supplement the pay records --

MR. APPLEBY:  Just so everybody knows -- and this

kind of scares me to say.  I think Ian and I were thinking

about the same thing earlier today.  But we are -- we have

got the company working and -- to understand and we -- and I

16:58:57  relayed this to you.  I think the last thing that popped up

somewhere was September of last year.  I've been doing this

with another client situation on a quarterly basis.

I do think that we're owed that to you.  And we're

willing to put it together.  And we told the company that.

16:59:15  Is there a particular time period you want to hit right now?

Do you just want to hit to the end of the year?  What works?

Because we are pushing that for you.

THE COURT:  Ian, what do you --

MR. ROSENTHAL:  My operating assumption had been

16:59:31  that we were using September 13th of 2020 only because that

1    was the discovery cutoff.  I am perfectly happy to use

2    whatever the last paycheck in December, 2020 was as long as

3    we also pick up the bonuses that were paid in January, 2021.

4    That would enable us to run updated numbers for everybody

16:59:56 5    through the end of 2020.  The --

6              MR. APPLEBY:  We both need that for the settlement

7    conference coming up.  I have zero problem with sharing that

8    with you.

9              THE COURT:  Okay.

17:00:11 10              MR. APPLEBY:  So we will -- we've already brought it

11    up.  We will push it.

12              THE COURT:  I have learned it is not enough

13    typically to just be in agreement.  When can you have that

14    ready, Mr. Appleby?

17:00:28 15              MR. APPLEBY:  Yeah.  I don't know that -- it's

16    taking various time periods, depending on what else is going

17    with the company.  And they are a little short handed in that

18    area.  But -- when was the last time, Ian -- do you remember,

19    Sinead, the last time what it took to sort of fill up the

17:00:48 20    bucket?

21              MS. DALY:  Yeah.  Well, we had been asking about

22    this because, obviously, Ian had been asking and also we are

23    all trying to prepare for the settlement conference next

24    week.  As far as time records, I think Melissa was able to

17:01:03 25    run an undated report on the time.  And the only issue is I

think it was all hourly employees.  So we just need to pare
it down to the actual opt-in plaintiffs in this case.  So I
think the time portion I should be able to get to you by the
end of this week.  I'm still waiting on the pay.  But I think
it should be quicker than usually.

          I don't want to overcommit to something and under
deliver.  But I believe the goal with the client was to get
all that done before next Thursday's conference.  So --

          THE COURT:  Okay.  Well, think about it like you're
promising me and not Ian.  Okay?  Seriously, though.  I want
you to have a productive settlement conference.  And,
obviously, it's probably not going to go very well if Ian
can't do his math before you get to it.  So to the extent you
can produce those sooner than later, I think that would be
very helpful.  So what's the at-risk time for overpromising
and under delivering?

          MS. DALY:  I guess I'm more comfortable promising
the time since I think that is already -- we have it.  We
just have to pare down to the actual people.  I am less
comfortable saying the pay because we're still waiting on
that as far as the check detail and excel for the total.

          So either way, I will say by next Tuesday if that's
okay with Your Honor.

          MR. ROSENTHAL:  Judge, I can make it even easier
because I cannot do the math that's involved with taking the

1   data, converting the spreadsheets, running it through in 48

2   hours anyway.

3           MR. APPLEBY:  Right.

4           MR. ROSENTHAL:  My point is it's not going to matter

17:03:00  5   before or after the settlement conference.  We're going to

6   work off the time periods we have for the plaintiffs we have

7   and negotiate formulaically anyway.  So if they give it to us

8   next Tuesday, we couldn't do anything productive with it.

9   So -- and I'm trying to make it easy.  There's no reason for

17:03:20  10   Sinead to promise you something that I don't need or can't

11   use on Tuesday anyway.

12           THE COURT:  Well, is that -- does the pay data come

13   from ADP?  Or is that, like, an OTK thing?

14           MS. DALY:  They can run -- what we've been giving

17:03:37  15   Ian or what we have provided Ian is run through OTK.  We're

16   not waiting on ADP for that part.

17           THE COURT:  Oh.  I was hoping they would be more

18   motivated to be helpful in the near future.

19           Okay.  Well, then, I would just appreciate it if you

17:03:55  20   would, Ms. Daly, get to that production as quickly as you

21   can.  But with the understanding that it's not going to

22   really help or hurt the conference next week, then you don't

23   have to kill yourself trying to get it done before then.  But

24   I would urge you to just produce that as quickly as

17:04:20  25   reasonably possible.  Okay?

1              MS. DALY:  Absolutely.

2              MR. APPLEBY:  To add one piece for what it's

3      worth -- and I'm not suggesting this necessarily, but if

4      somehow it would help to do a couple of extra weeks in there

17:04:34  5    somewhere, I wouldn't be opposed to moving the date.  I'm

6      fine with what we have, too.  So --

7              THE COURT:  You mean moving the settlement

8      conference?

9              MR. APPLEBY:  Yes.

17:04:44 10             THE COURT:  Okay.  Well, that's a Judge Nelson --

11             MR. APPLEBY:  If it helps.  I'm just throwing that

12     out there just in case.

13             THE COURT:  No.  I'm not going to leave my lane and

14     enter Judge Nelson's lane.  She's got that set up.  And so if

17:05:00 15     you want to ask her, you're welcome to.  But I would suspect

16     that's probably not going to be super well received.  So --

17     okay.  All right.  Well, thank y'all very much.

18             MR. ROSENTHAL:  Thank you, Judge.

19             THE COURT:  If there's anything we can do between

17:05:19 20     now and your settlement conference to help, let us know.  And

21     we will see you later.

22             MR. ROSENTHAL:  Thank you.  Have a good night, Your

23     Honor.

24             MS. DALY:  Thank you, Your Honor.

17:05:33 25             MR. APPLEBY:  Thank you, Judge.

1          (The Proceedings were concluded at approximately

2     5:05 p.m. on February 17, 2021.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

C E R T I F I C A T E

     I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

     This is the 9th day of March of 2021.

_____

Cheryl K. Powell, CCR, RPR, FCRR

Federal Certified Realtime Reporter