```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ALABAMA
 2


 3
              WILLIAM HEATH HORNADY, et al.,*
 4                 Plaintiff,          *
                                       *
 5     vs.                             *
                                       *
 6     OUTOKUMPU STAINLESS USA, LLC,   *
                                       *
 7           Defendant,                *   18-cv-317
                                       *   March 12, 2021
 8     vs.                             *   Mobile, Alabama
                                       *   1:32 p.m.
 9     ADP, INC.,                      *
                                       *
10           Non-party.                *
       *****************************
11

12                TRANSCRIPT OF SHOW CAUSE HEARING
              BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
13                  UNITED STATES DISTRICT JUDGE

14
       FOR THE PLAINTIFFS:
15
       MR. IAN DAVID ROSENTHAL, ESQ.
16     Holston Vaughan & Rosenthal
       211 South Cedar Street
17     Mobile, AL 36602
       251-432-8883
18
       MR. PATRICK H. SIMS, ESQ.
19     Cabaniss, Johnston, Gardner
       Dumas & O'Neal
20     P O Box 2906
       Mobile, AL 36652
21     251-415-7300

22     FOR THE DEFENDANT:

23     MR. GAVIN S. APPLEBY, ESQ.
       Littler Mendelson
24     3344 Peachtree Road N.E.
       Suite 1500
25     Atlanta, GA 30326
       404-233-0330
```

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

```
 1        MS. JENNIFER F. SWAIN, ESQ.
          Littler Mendelson
 2        420 20th Street N
          Suite 2300
 3        Birmingham, AL 35203
          205-421-4704
 4
          FOR ADP:
 5
          MR. GARRETT ZOGHBY, ESQ.
 6        Adams & Reese
          11 North Water Street
 7        Suite 23200
          Mobile, AL 36602
 8        251-433-3234

 9        MR. MATTHEW RYAN JACKSON, ESQ.
          Adams & Reese
10        11 North Water Street
          Suite 23200
11        Mobile, AL 36602
          251-433-3234
12
          ALSO PRESENT VIA TELECONFERENCE:
13
          MR. JOEL TENNENBERG, ESQ.
14        MS. ROBIN RAINES
15
          COURTROOM DEPUTY: MR. JEFF REINERT
16
17        COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

18     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
19      and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.
20
21
22
23
24
25
```

CHERYL K. POWELL, CCR, RPR, FCRR
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

# P R O C E E D I N G S

(In open court.)

COURTROOM DEPUTY:  We are on the record for a show cause hearing in the matter of William Heath Hornady, et al. versus Outokumpu Stainless USA, L.L.C., Civil Action Number 18-317-JB.

What says the plaintiff?

MR. ROSENTHAL:  Ian Rosenthal for the plaintiffs. We're ready.

COURTROOM DEPUTY:  And the defendant?

MR. APPLEBY:  Gavin Appleby on behalf of Outokumpu and . . .

MS. SWAIN:  Jennifer Swain also on behalf of Outokumpu.

COURTROOM DEPUTY:  And ADP?

MR. JACKSON:  Matt Jackson and Garrett Zoghby on behalf of nonparty ADP.  We have with us here in person also Alice Quinn who works in the legal department of ADP.

THE COURT:  Okay.  And OTK has a client representative here as well?

MR. APPLEBY:  We do as well.  It is Melissa Pledger who is sitting back behind the tables.

THE COURT:  Okay.  Thank you, ma'am.

MR. APPLEBY:  She is -- we brought her for two reasons.  One, she is a high level manager but, two, she is

in charge of payroll.  If we have to get into discussion to clarify, she would be the right person.  But she's been authorized to deal with whatever we need to deal with.

THE COURT:  Okay.  These masks make it really hard. So as we're talking, my usual practice is to have lawyers sit anyway.  But with the pandemic, of course, and these masks, you need to just make sure you're close to the microphone.

If any of the lawyers at any time want to stand because you can't help yourselves or it is a habit, I understand it.  You're welcome to use the podium.  If you use the podium, our local custom is that you can actually remove your mask, too.  So, alternatively, if you want to take your mask off to talk, you're welcome to go to the podium.

Okay.  So we are here on the Court's second order to show cause to ADP.

Mr. Jackson, I've read your submission.  I've read the supplement that you filed earlier today.  Do you have anything you want to add at this point?

MR. JACKSON:  No, Your Honor, I don't.

THE COURT:  Okay.  All right.  Well, Mr. Appleby, do you have any factual issues with the matters that are relayed in that filing or those two filings?

MR. APPLEBY:  We do, Your Honor.  And we determined that it would be better to talk that out.

I saw the submission from yesterday for the first

1    time this morning because I was involved in another matter
2    yesterday.  So I have gone through it, have talked to the
3    client.  And there are definitely a few things that I would
4    like to spend a little time on if that's okay.

13:35:11  5            THE COURT:  I would like to hear you on that.

6            MR. APPLEBY:  Okay.  First, just to give it maybe
7    broader context for a minute, this is -- I know you
8    understand -- is really a part of trying to resolve and
9    complete discovery.  The information the plaintiffs have
13:35:31 10   sought that has been -- spent overtime trying to get
11   information, trying to deal with right information.  And,
12   frankly, I'm here to try to help that.  And I think I've
13   tried to be here to help that in other situations as well.
14   Ultimately, it seems like we need to get this moving and to
13:35:56 15   get this part of the case over.

16            What I would say is that based upon what ADP at
17   least -- I haven't seen the one that they filed today, but
18   the one they filed yesterday -- what I would say is it's
19   turned into a bit of a blame game at this point.  And,
13:36:17 20   frankly, I don't think that helps anybody solve this problem.
21   But that seems to be what we now have.  And I won't get into
22   this too deep, but I will try to give you a little bit of
23   information as we go through this.

24            As they mentioned in the first thing they filed
13:36:34 25   yesterday, we had a call with them.  And, during that call,

1      they accused me personally of, quote, throwing them under the

2      bus.  Having read what they filed yesterday, they have now

3      flipped that over and accused me of everything and throwing

4      me under the bus.  And I don't think it's helpful, frankly,

13:36:53  5      to the Court to have to deal with all that.

6           My take on this whole stuff is that we should try to

7      figure out where we are and get to where we need to go.  So

8      let me give you some context to that which I think is a

9      little friendly context.

13:37:08 10           Let me say this about ADP:  They have been helpful.

11      I think they have given the impression in the document that

12      they filed that I have accused them of totally not being

13      helpful, and that is not accurate.  We have worked with them

14      in a number of different ways.  We have received information.

13:37:25 15      And that has been over a period of time.  And, generally, we

16      have got most of what we need.

17           Now, understand what we need is going through us to

18      give to the plaintiffs.  That's where the discovery analysis

19      is.  But in terms of just trying to get the information,

13:37:47 20      basically let me give you the context of a conversation that

21      occurred after last Friday when, unfortunately, I couldn't be

22      here because it sounded like it was an unfortunate situation,

23      but I was in a court in Atlanta.

24           So since that time, what has transpired is that

13:38:09 25      afternoon, Sinead Daly, who you met, called upon Ian and --

1   if you don't mind me going by first names, it's easier.

2   Called Ian.  And they had a very good conversation.  And she

3   asked him if he would be willing to put together a list of

4   what he thinks he needs that ADP might be involved in.  He

13:38:35   5   was willing to do that and sent it to us in an email.

6   And since that period, we have had discussions with

7   ADP or more often with counsel for ADP.  And earlier this

8   week, Matt was willing to talk with us and we worked our way

9   through that document.

13:38:59   10   And since that time, ADP has offered some additional

11   help in the light of that document.  And I understand that

12   they are trying to put together stuff related to that.

13   In that conversation that we had with Matt -- and I

14   think others may have been involved.  I'm not sure.  I don't

13:39:22   15   remember for sure.  But to make a long story short, we were

16   able to, we believe, answer the questions that Ian had put

17   forward on behalf of the plaintiffs.  I think there were

18   seven or eight.  And then there was a question about the

19   excel and could it go past 2018 going backwards.  We provided

13:39:42   20   to Ian a -- basically a here's what we've got; here's what we

21   understand response.

22   He may have concerns about it.  He may see something

23   that I didn't see.  But, ultimately, we were trying to get

24   down to the point of what exists and what doesn't exist; what

13:40:07   25   ADP did, can do, and what it can't do.  It seems we have some

1  need to know if there are things we can't do, we can't do.

2  So, ultimately, that was provided.

3      And what I was asked to do then was to sign a

4  compliance notice that everything that was in the subpoena

13:40:28  5  has now been met.  And what I explained at the time was

6  that's not quite accurate.  What we have met -- and I'm very

7  thankful that ADP has helped us with this -- is -- what we

8  have met, we think at least, were the issues that Ian raised.

9  And that conversation went extremely well.

13:40:51  10      And, again, Ian may have some issues but,

11  ultimately, we did provide a response one way or another of

12  the ones of the list that we had.

13      What we didn't have at that point -- and I think

14  Matt is trying to do something about this, but there were

13:41:12  15  pieces in the subpoena that weren't covered.  In other words,

16  the list in the subpoena is longer than the list that Ian

17  gave us.  And just as an example, there was one in there

18  relative to some issues on time bills on -- basically on the

19  check you get when you come in and those -- that data was

13:41:40  20  included in there.  That wasn't specifically on the list that

21  Ian sent to Sinead.

22      So what I told ADP at that point through Matt is

23  that there's still stuff to do.  I was immediately blamed for

24  not telling them what that stuff was.  But all that stuff was

13:41:59  25  in the subpoena which is -- they had had for months.  And I'm

1    not here to blame ADP.  I really mean that.  But, ultimately,
2    what that really meant was there was other data they needed
3    to fulfill with the subpoena.
4         They've recommended that they should get another
13:42:17 5    week.  I am very much in favor of that because they do have a
6    team pulled together now that's trying to get that
7    information.  And I'm very appreciative of that.  When I say
8    that information, I mean the part that was in the subpoena
9    that wasn't in Ian's list.  And, frankly, if it can get done
13:42:33 10   and we can get this moving past this stuff in a week, I'm
11   very much in favor of doing that.
12         THE COURT:  Mr. Appleby, let me ask you a question.
13         When you say we can get this thing moving, when did
14   discovery end in this case?
13:42:47 15        MR. APPLEBY:  Oh, yeah.  Considerably long ago.
16         THE COURT:  Yes, sir.  I mean, what I just heard
17   from you is about six months late.
18         Okay.  Mr. Jackson, do you have anything you want to
19   say?
13:42:59 20        MR. JACKSON:  May I stand at the podium, Your Honor?
21         THE COURT:  Absolutely.
22         MR. JACKSON:  Like you noted, out of habit, I've got
23   to stand if that's okay.
24         THE COURT:  Sure.
13:43:14 25        MR. JACKSON:  And more importantly, I've got to take

1  this mask off.  I have a hard time breathing with it on.

2          So, Judge -- and I know this comes out in our

3  filing, but the reason that ADP is here today faced with a

4  show cause order is -- and I hate to -- this is -- I hate to

13:43:33  5  call it a blame game, but this is because of OTK's counsel.

6          As you saw in our brief, Littler Mendelson has a

7  significant attorney-client relationship with ADP.  ADP --

8  and let me say something about ADP.  I have never worked with

9  an in-house legal department that is as professional and on

13:43:56  10  the stick as ADP.

11          Ms. Quinn, if she were to testify, she would explain

12  to you that they handle over a thousand subpoenas a year and

13  a lot of those come from the federal government.  A lot of

14  them come from, I think she said, the FBI, Department of

13:44:10  15  Justice.  You know, there are a lot of investigations they

16  deal with.  So this isn't like a small company that just

17  shrugged off a subpoena.

18          When ADP got this subpoena in July of -- late July

19  of --

13:44:20  20          THE COURT:  Let me stop you for a second.

21          Jeff, are those people that are joining us or

22  departing?

23          COURTROOM DEPUTY:  That's a good question.  I do not

24  know.  I know Mr. Tennenberg -- I think he was coming in

13:44:34  25  later.

1          THE COURT:  I just want to have some sense of who is

2     on if you don't mind.

3          COURTROOM DEPUTY:  Could we identify anyone that has

4     joined our teleconference today?

13:44:48  5          MR. TENNENBERG:  Matt, it's Joel.  I'm here.

6          COURTROOM DEPUTY:  Okay.  And Ms. Raines?

7          MS. RAINES:  I am here.

8          COURTROOM DEPUTY:  Anyone else besides Cathi and

9     Jessica?

13:44:58 10     (No response.)

11          COURTROOM DEPUTY:  Thank you very much.

12          THE COURT:  Okay.  Thank you.  I'm sorry.

13          MR. JACKSON:  No problem.

14          When ADP received the subpoena on July 29th of 2020,

13:45:08 15     they immediately began conferring with counsel who issued the

16     subpoena.  That was Littler Mendelson.  Ms. Quinn knew

17     Littler Mendelson very well.  She is an in-house paralegal

18     with over 25 years of experience.  She had dealt with them.

19     I don't believe she had ever dealt with Mr. Appleby or

13:45:25 20     Sinead.  But when Ms. Quinn engaged in those discussions, she

21     knew she was speaking to attorneys that represented ADP.

22          In the courses of their conversations, it was

23     ultimately determined that to be responsive to the subpoena,

24     ADP would produce certain records in PDF format.  Ms. Quinn

13:45:45 25     provided a sample of those.  After defense counsel reviewed

1    those samples, they confirmed that those were the records

2    that would suffice.

3            So this is a situation where -- and this is very

4    routine where a party who receives a subpoena, they

13:45:58  5    negotiate -- not negotiate but confer with issuing counsel

6    and an agreement is reached as to what will be produced and

7    in what form to satisfy their obligation under the subpoena.

8            And so those records were produced, and they were

9    produced in August of 2020.  And apparently those records

13:46:14  10   have still, to today, I don't believe, ever been provided to

11   plaintiffs' counsel.

12           THE COURT:  And, typically, when a party responding

13   to a subpoena satisfies the party issuing the subpoena, I

14   mean, the Court has -- there's no further involvement of the

13:46:28  15   Court at that point.

16           MR. JACKSON:  Yes.

17           THE COURT:  Okay.

18           MR. JACKSON:  That's right, Your Honor.

19           And so ADP was of the belief that it had satisfied

13:46:36  20   what was required of it.  They didn't hear anything else from

21   defense counsel for a very long time.  I think there was some

22   follow-up.  They asked for some explanations about certain

23   things.  But in terms of documentation, nothing else was

24   requested from ADP until an email was sent to Ms. Quinn on

13:46:51  25   February 17th just two hours before a hearing with Your Honor

where they said, oh, can you give us a spreadsheet; Judge
Beaverstock found a case where ADP, you know, produced a
spreadsheet.  And Ms. Quinn, just a few hours later, said,
yes; we can.  Give us the fields you need.

13:47:09          As Your Honor noted probably in our brief, it was
several days -- 12 days or so -- until defense counsel came
back with those parameters.  And just two days later, ADP
provided it.  And Ms. Quinn -- and I don't mean to be
testifying for her, but what she would tell us is she was
13:47:24 very surprised when she got that request for the spreadsheet
but, nonetheless, she provided the spreadsheet.

          So we feel like it's totally unfair for ADP to have
been characterized the way that they have been in filings.  I
was surprised when Mr. Appleby said a moment ago that it's
13:47:41 not accurate -- his words were it wasn't accurate for ADP to
take the position that OTK had accused it of being unhelpful.
Those were their exact words in a brief.  They said, so far
ADP has not been helpful.

          They subsequently said in a brief that -- I'm trying
13:48:00 to think of the words they used.  They said that they were
frustrated with how ADP had handled its response to a
subpoena.

          And I don't think I have to explain that ADP is
beyond appalled that its own lawyers have thrown them under
13:48:16 the bus in this case.

1          Here Ms. Quinn has flown all the way from New Jersey

2     to be here to comply with Your Honor's order.  And we're very

3     sorry we weren't here last Friday.

4          But that is the position of ADP.  ADP has always

13:48:31  5     believed it has been in compliance with the subpoena.  I

6     guess the only regret is that we didn't somehow get

7     confirmation in writing that, hey, this is all you need;

8     we're in full compliance back at the time.  Because here we

9     are now and they're claiming that, oh, there's other things

13:48:45 10     in that subpoena that we need now.  And, by the way, that

11     wasn't brought to our attention until yesterday.

12          And so -- but, regardless, ADP does have a team

13     assembled.  They're working on all those additional requests

14     that were made yesterday.  And they've actually already

13:48:59 15     compiled the world of information that they believe is

16     responsive.  They're just reviewing it before they produce

17     it.

18          THE COURT:  So is that as to the 11 individuals that

19     were included in that subpoena or is that as to all 275?

13:49:14 20     Because I noted in the documentation that you attached as an

21     exhibit that, at least at some point, a paralegal from

22     Littler corresponded with Ms. Quinn and said, you know, this

23     subpoena is these 11 that we're doing now and there would be

24     a second one with the balance of the 270 or so plaintiffs in

13:49:36 25     this case.

1          MR. JACKSON:  I saw that, too, Your Honor.  I saw --
2     I recall that email, but I don't know that ADP has been
3     served with a subsequent subpoena.

4          THE COURT:  Well, and I don't believe there's been a
13:49:46  5     second subpoena.  I'm not entirely sure why a subpoena was
6     required in the first place, but I'm going to stay in my lane
7     and deal with what's in my lane and not what's outside of it.

8          But at the end of the day, although this case is
9     essentially in the 11th hour, there's still basic information
13:50:09 10     that is required that is -- doesn't -- hasn't been disclosed.
11     And apparently ADP may be the only entity that has it.  I'm
12     presuming that must be the case or it would have been
13     produced already.  And that's not really a question for you.
14     But I'm concerned with getting to the end of all of that
13:50:30 15     while I have you here.  So is that something that's in the
16     works at this point, too?

17          MR. JACKSON:  I think so, Your Honor.  And so the --
18     my understanding is that these additional requests that Gavin
19     and his group have made, that's going to be everything that's
13:50:47 20     been requested at least in that subpoena.

21          If we need to broaden it to address all 270, I mean,
22     ADP -- I mean, I know from working with them just in a week's
23     time, they will assemble a team to get it.  Whatever it is
24     they need to get, they will do everything they can to get it.
13:51:02 25          THE COURT:  Okay.  All right.  Anything else you

1    want to add?

2           MR. JACKSON:  Just one little clarification.

3           I just want to point out that ADP is not really in

4    the business -- they are not the records custodian for OTK.

13:51:15  5    They process payroll.  And so I've had a little frustration

6    expressed to me that OTK should have this already.  And

7    Ms. Quinn would tell you that OTK can run its own excel

8    reports.  And so there's this frustration from that

9    standpoint.

13:51:31 10           Like I said, ADP is here to help.  They're not here

11    to object or fight.  They have no dog in this fight they've

12    told me repeatedly.  They're willing to help in any way they

13    can.

14           THE COURT:  Let me hear from Mr. Appleby again on

13:51:43 15    that.

16           Honestly, I do have some questions about some of the

17    information that's included in your submission, but we will

18    see where we are when we get to that.

19           Mr. Appleby, anything you want to add?

13:51:54 20           MR. APPLEBY:  Just a few comments related to that.

21    I'll talk about the conflict issue for just a second.  Let's

22    talk about the more important stuff which are the documents.

23           And to -- to further explain, when they say that

24    they were done and they were done six months ago and they

13:52:14 25    were finished, there are two things that have occurred on

that.  One is Ian, on behalf of the plaintiffs, came to us
and said -- in fact, we talked about this in this court
before.  And that is came to us and said, we need this and we
need that and we need clarity on this.  There was this thing
called the ROPP [sic].  And nobody seemed to have clarity on
that.  Plaintiffs were frustrated and, frankly, we were
frustrated.  So there was still ongoing information.  And a
good part of that ongoing request was in the subpoena.  And
we now have most of that.  But we didn't have that six months
ago.

THE COURT:  Well, okay.  But you sent a subpoena to
your client's contractor -- I don't know what to refer to the
relationship as.  I know, from reading the correspondence,
ADP considers OTK to be a client.  So whatever we want to
call it.

MR. APPLEBY:  Sure.

THE COURT:  You sent a subpoena to them to get
information that -- I don't know -- that I gather from the
correspondence ADP thought OTK should have or be able to
provide itself.  When did you follow up with them after
August --

MR. APPLEBY:  So to give you --

THE COURT:  -- before March?

MR. APPLEBY:  To give you a feel what was happening
at the time is that Ms. Pledger -- and she certainly can talk

1   for herself if you would like to hear from her, but she was

2   in charge of the process of gathering the data.  She was

3   having some difficulty with aspects of that process.  And I

4   was not involved with ADP at all that I can remember.  I may

13:54:10  5   have been on one call.  Sinead was on several calls.  I do

6   know that.  She was talking to Alice, the paralegal.  But the

7   real stuff that was going on was that Ms. Pledger was engaged

8   with them to get a better understanding of what it is that

9   was being asked and how to fulfill that response.

13:54:31  10        So this mostly wasn't between counsel.  This was

11   between, if you want to call it, a customer or client or

12   contractor, but that's really what most of the discussion

13   was.  And at least what I was told and I think it was

14   certainly in good faith is, like, the RROP thing, we need

13:54:51  15   some more information.

16        I'm not blaming ADP for not doing anything.  What I

17   would say, though, is that when we issued the subpoena, there

18   was a number of things in there that related to the things

19   that she was looking for for assistance and that those hadn't

13:55:12  20   been given.  In fact, there are some things in there, like

21   you said, that we don't have.

22        So I don't think it's fair to say this was done a

23   long time ago and we were finished and somehow OTK has raised

24   this as a new thing.  It's not.  But it is certainly in the

13:55:28  25   works and it is certainly getting somewhere.

1          THE COURT:  So, Mr. Appleby, I have listened to the

2    hearings before Judge Nelson.  And we have had a hearing in

3    this court and, before that hearing, we had a conference call

4    where we talked specifically about this.  And what you told

13:55:46  5    me was that you were having trouble getting a response from

6    ADP.  And I believe what I told you was I needed you to come

7    to the hearing that I was going to set or that was already

8    set with a different answer because I wanted it being

9    resolved.

13:56:04  10          And, you know, you told me that that's a client of

11    your firm, as well, and they have a client-customer

12    relationship with OTK.  Frankly, that should be the kind of

13    situation that expedites response and production.

14          And I wouldn't have engaged in this exercise if at

13:56:26  15    any time you had told me that ADP was being responsive and,

16    you know, we pretty much have what we wanted or we got a

17    response from them back in August, which I know you did not

18    tell me.

19          Now I have required ADP to retain counsel in this

13:56:46  20    case and to have a representative travel from New Jersey to

21    Mobile to appear to show cause for something that, being

22    kind, is the result of a misrepresentation.  I am

23    concerned -- I am concerned about that.  I have -- I have

24    grave reservations about that.

13:57:09  25          MR. APPLEBY:  I hate to try to defend me or anybody

else, Your Honor.  I don't think anyone did a purposeful
misrepresentation.  The whole thing blew up through one
sentence in one brief.  And that was a sentence after we had
a meeting with you.  And I'm certainly not blaming you.
13:57:31   Please don't think that.  But during that meeting, we
talked -- you asked specifically:  Is ADP doing what they
need to be doing?  And my answer was:  To a degree, but there
is -- I said this in the brief -- that there is some response
that we can use more of.  I don't remember the exact words.
13:57:52   But it wasn't, you know, in your face stuff but it was we
were having some difficulty getting some stuff.

And best that I can tell you, that was a true
statement.  If I got it wrong, I certainly apologize.  But
that's what I had heard about the excel spreadsheet.

13:58:07   At one point, my understanding is they couldn't do
it.  Then my understanding was they could do it.  And then on
this ROOP [sic] stuff, I was still being told by Outokumpu
that there are still some information pieces we need to know.

So it certainly wasn't an attempt to lie to the
13:58:26   Court.  I don't do that.  But what I can tell you is that was
my understanding.  And it seemed to me at the time that that
was the only thing getting in the way to getting this over
with.

So, again, I apologize if I misunderstood, but it
13:58:38   certainly wasn't a purposeful misinterpretation.

1    THE COURT:  Okay.  So the data that ADP has, this is

2  not data that OTK has?

3    MR. APPLEBY:  The -- where we currently stand is

4  most everything -- and Ian should probably chip in on this

13:59:09  5  because it is his discovery.

6    I believe that we have now given him most everything

7  he needs.  By the way, I'm not sure Ian will ever think that

8  we're finally done.  No offense meant.  But, ultimately, the

9  list has got long and we're trying to wear away the list.

13:59:31  10  I'm not sure we're there yet, but my understanding is that

11  ADP -- and I understand that they are not the company that

12  does all the payroll.  They are the company who gave the

13  company the payroll process.

14    THE COURT:  Okay.  So, Mr. Appleby, my question for

13:59:46  15  you, sir, is:  Does OTK have that data that ADP -- that

16  you're trying to get from them?  Does OTK have it or should

17  OTK have it?

18    MR. APPLEBY:  OTK does not have all that

19  information.

14:00:04  20    THE COURT:  Okay.  And that's outside of what

21  they're required by the Fair Labor Standards Act to maintain?

22    MR. APPLEBY:  They're required to maintain and that

23  maintaining is -- and I realize that it's not what ADP is

24  there for, but in this particular situation --

14:00:24  25    THE COURT:  I'm talking about OTK.  I mean, ADP,

1    they -- at least it's all over their correspondence and it's

2    also in Ms. Quinn's declaration that ADP is not the records

3    custodian for OTK.

4         MR. APPLEBY:  Agreed.  Yeah.

14:00:40  5         THE COURT:  But you requested ADP to reconstitute,

6    recreate records going back as far as they could.  And I'm

7    putting air quotes around that.  As far as they could and

8    asked for costs to do that and I presume paid the costs to do

9    what ADP could, which was 2018, which was when the lawsuit

14:01:06  10   was filed.

11        MR. APPLEBY:  Correct.  And certainly OTK did not

12   have that data and needed to get it from ADP.

13        THE COURT:  I'm getting so far off of where I want

14   to be.

14:01:20  15        Did you issue litigation hold letters to OTK in 2018

16   when they were sued in this case?

17        MR. APPLEBY:  We did, yes.

18        THE COURT:  Did OTK not put a litigation hold on all

19   of that data that, you know, arguably would have been on hand

14:01:36  20   in 2018 that maybe they might not be required by time to have

21   in 2021?

22        MR. APPLEBY:  I don't think that we had any issues

23   with 2018 up.  I think the real issue is --

24        THE COURT:  Well, ADP provided that to you.

14:01:52  25        MR. APPLEBY:  Oh, I understand.  I understand.

1    Yeah.

2         THE COURT:  So is the answer that OTK didn't

3    preserve any of that --

4         MR. APPLEBY:  I don't think we're looking at what do

14:02:01  5    we have versus what do we have.  I really don't.  I think

6    we're looking if we can understand what we have versus what

7    we have.

8         THE COURT:  Well, discovery is closed.  You're the

9    lead counsel for the defendant.

14:02:12  10        MR. APPLEBY:  I fully understand that.  And my

11   discovery is closed, but we've obviously kept this ball

12   rolling.  And not just us.

13        THE COURT:  Because you didn't respond to the

14   discovery.  And in May of 2020, there's a stipulated

14:02:29  15   discovery order that you, and I presume Ian, put together and

16   submitted to Judge Nelson that was to take you through the

17   cutoff of discovery.

18        MR. APPLEBY:  I understand.  Well, and Ian and I

19   have had many discussions about what does X mean.  And --

14:02:49  20        THE COURT:  Okay.

21        MR. APPLEBY:  And that's really the issue.  It's not

22   a question of papers.  It a question of understanding.  And

23   we're using an ADP system.  What we're really asking for is

24   to understand within that system how does it work; how does

14:03:03  25   the ROOP [sic] actually get rated.  And that was a question

1    raised by Ian; not by me originally.

2              THE COURT:  Was OTK ever able to generate the

3    spreadsheets that ADP told them they could -- they were

4    capable of generating?

14:03:24  5              MR. APPLEBY:  I don't have an answer to that, but if

6    you can give me two minutes --

7              THE COURT:  Well, I mean, I think the emails at

8    least that I saw suggest that they never were able to.

9              MR. APPLEBY:  I saw that statement was that they

14:03:40 10    could.  I'm not sure I agree with that.  I don't want to

11    state that.  I don't know for sure.  If I can talk to

12    Ms. Pledger for a minute, I can get an answer to that

13    question.

14              THE COURT:  Okay.  Yeah.  You can do that.

14:03:51 15              MR. APPLEBY:  Okay.  I'm sorry.  I just don't know

16    off the top of my head.

17         (Discussion off the record.)

18              MR. APPLEBY:  Thank you, Your Honor.

19              What I am understanding is that OTK would be able to

14:04:51 20    run PDFs but they would not be able to run an excel to get

21    the information on that excel that was asked by the

22    plaintiffs.  They would not be able to do it on an excel

23    form.

24              THE COURT:  Okay.  Did OTK ever produce those

14:05:11 25    reports to the plaintiff?

1          MR. APPLEBY:  What happened at that point is that's

2     what we --

3          THE COURT:  That is a yes or no question.

4          MR. APPLEBY:  No.  I don't think they were.

14:05:21   5          THE COURT:  Okay.  All right.  I'm done talking

6     about that.

7          MR. APPLEBY:  Okay.

8          THE COURT:  So, Mr. Jackson, I'm curious about why

9     ADP believes that OTK should be able to generate those

14:05:35  10     spreadsheets.

11          Is that something that Ms. Quinn can provide?

12          MR. JACKSON:  Yes, Your Honor.  Either Ms. Quinn or

13     Robin Raines who is on the phone.

14        (Discussion off the record.)

14:05:47  15          MR. JACKSON:  Alice said that Ms. Raines would more

16     than likely be best to address that.

17          Robin, are you there?

18          MS. RAINES:  I am here.

19          MR. JACKSON:  Can you explain to the Court whether

14:06:02  20     or not OTK should be able to generate their own excel

21     spreadsheets?

22          MS. RAINES:  So, basically, as previously stated,

23     ADP is a processing -- we process the payroll.  All of the

24     information is turned over to the client.  So they have the

14:06:16  25     exact same output that we provide them.  And they should --

1    the client actually should be housing or storing that

2    information.  They do have the ADP software.  They do have

3    access to the reporting or the final reports that we turn

4    over to them.  They can be downloaded every payroll.  That

14:06:38 5    information is stored in the software.  And they should be

6    able to extract the information that they need in an excel

7    format or CVS [sic] format as well as, again, we provide the

8    PDF copies to them after final payroll and ultimately should

9    be housing their own data for X amount of years.

14:07:03 10         THE COURT:  And, ma'am, is there a limitation as to

11   the number of years that that data could be stored by OTK?

12         MS. RAINES:  I would have to reach out to our

13   technical team to confirm the exact amount of years.  I know

14   that ADP stores generally about three years worth of

14:07:26 15   information.  Sometimes longer, depending on the specific

16   document that we're storing.

17         THE COURT:  Okay.  And I guess I'm just wondering if

18   that's something that's limited by the software or the data

19   capability of whatever medium the client stores that

14:07:46 20   information.  Do you know?

21         MS. RAINES:  There is all kinds of information out

22   on the system.  I can reach out to someone really quick to

23   see if we can find out exactly how long it is stored.

24   However, in addition to that, they have the option while they

14:08:00 25   have it to download it and store that information outside of

1    the software on their own servers.

2              THE COURT:  So it certainly would be possible for a

3    client of ADP to download and store that information locally?

4              MS. RAINES:  That is correct.

14:08:17  5    THE COURT:  For whatever period they chose to do so?

6              MS. RAINES:  Correct.

7              THE COURT:  Okay.  All right.  Mr. Appleby, what's

8    OTK's document retention policy for these kind of documents?

9              MR. APPLEBY:  I don't know the answer to that, Your

14:08:35 10   Honor.  I would be guessing.

11             THE COURT:  Okay.  Okay.

12             MR. APPLEBY:  There is one last comment for what

13   it's worth.  And if you want to go on to someone from ADP,

14   that's fine.  My understanding was that the OORP [sic] -- at

14:09:00 15   least this is what OTK thought -- could not be done on excel

16   but could only be done on PDFs.  And that was one of the

17   reasons why we were reaching out to ADP.  I don't know if

18   that was right or wrong, but that was at least the internal

19   understanding at OTK.

14:09:18 20             THE COURT:  Okay.  Was that production made in PDF,

21   at a minimum, if that capability was what OTK believed it

22   had?

23             MR. APPLEBY:  Right.  But you got to remember one

24   thing.  And this is no offense directed to anybody but Ian.

14:09:35 25   He wanted it on excel.  He did not want it on PDF.

1          THE COURT:  All right.  That doesn't answer the

2    question I have though.  Irregardless of what Mr. Rosenthal

3    wanted -- and he is a plaintiff's lawyer, so, you know, I

4    expect him to be unreasonable.  I expect him to want what

14:09:54  5    cannot be had.  That's his job, frankly.

6          MR. APPLEBY:  I understand.

7          THE COURT:  And so my question is:  Despite what Ian

8    wanted, did you produce what you had, even though it wasn't

9    exactly what he wanted?

14:10:04 10          MR. APPLEBY:  Right.  We didn't.  But to give what I

11   can give to you in the context, at that point, we want -- we

12   were, frankly, trying to be friendly and we were trying to

13   move this forward on the settlement side.  And we

14   purposefully said, let's try to get the excel done if it can

14:10:22 15   be done.  I was in part of that conversation.  And the idea

16   is if that's what Ian wants, let's get it to him.

17          So no.  He wasn't given the other documents.  We

18   instead went and that's what started this whole thing is we

19   then went to ADP and asked about the excel.

14:10:40 20          THE COURT:  Right.  But then you stopped.  Like, so

21   you sent the subpoena to ADP at the end of July, 2020 in lieu

22   of Judge Nelson entering further sanctions against OTK

23   because she had already sanctioned OTK by striking

24   affirmative defenses.  And in lieu of further sanction,

14:10:59 25   because the plaintiff is asking for more sanctions against

OTK, she allowed you to send a subpoena to your contractor --
I'm sorry.  I just don't know how better to refer to ADP.
But to refer to -- to send a subpoena to an entity that OTK
has a relationship with to seek that information.  And you
14:11:24 sent it -- I mean, clearly, you sent it and you had an
exchange and ADP gave you a response.  And then radio silence
from the defendant.

Meanwhile, you're telling the Court that there's a
problem with what ADP is giving you.

14:11:50 MR. APPLEBY:  I'm not sure I want to fill in more of
the debate.

THE COURT:  Okay.  Well, and so I guess maybe that's
a rhetorical question by me because I'm trying to -- and
since this has come to me to resolve because I'm not in the
14:12:08 discovery dispute business --

MR. APPLEBY:  I understand.

THE COURT:  -- primarily before things go to
DEFCON 5.  I am trying to wrap my brain around how a case
involving a defendant as sophisticated as OTK ends up at a
14:12:26 place where, six months after discovery is closed, the
discovery is not complete and there's no real answer why.
Okay.

MR. APPLEBY:  What I can tell you and it's -- I know
it's just me speaking, but things obviously weren't done
14:12:45 perfectly.  I understand that.  And in many situations, you

1       look back and say, I wish I had said that a little

2       differently.  I mean, wouldn't have said that on the brief,

3       frankly, because this whole thing started with one sentence

4       in one brief.

14:12:59  5             But to put that into the right context and really

6       the serious context is yes; I understand that things could

7       have been done differently.  Yes; I understand maybe they

8       should have been done differently.  I can tell you that none

9       of that was done with the purpose of messing this case up or

14:13:16 10     keeping discovery out of someone's hands.  We've given

11      thousands of pages.  This isn't something -- and, frankly, we

12      need the information just as much as they do.

13             THE COURT:  Honestly, I feel like that makes it

14      worse; you telling me that.

14:13:28 15            MR. APPLEBY:  Well, maybe -- it certainly suggests

16      we didn't do it on purpose.

17             THE COURT:  So, look, I was a defense lawyer.  I

18      know how it works.  I think probably every case I ever

19      touched, when I got done I could look back and think of at

14:13:42 20     least one thing, probably a whole lot of things, I wish I had

21      done differently.

22             MR. APPLEBY:  Understood.

23             THE COURT:  But the problem is discovery is closed.

24      Your client has already been sanctioned.  The plaintiff is

14:13:56 25     asking for the ultimate sanction of a default judgment.  I'm

1      trying to decide what an appropriate sanction would be

2      because a sanction has to happen here.

3              This is -- and so I believe you when you tell me

4      that this was not for a strategic purpose because I cannot

14:14:21    5      imagine what strategy would lead to a case being in the

6      posture where this one is.  At the same time, I don't

7      understand how it's possible that a case could get to the

8      position where it is and we could find ourselves at a second

9      show cause hearing where you're here at the hearing telling

14:14:40   10      me that, yeah; well, they did kind of cooperate with us

11      and -- but I know that's not what you told me before.  And I

12      know that's not what was told to Judge Nelson.  So -- okay.

13              MR. APPLEBY:  Well, may I clarify that one last

14      piece if you don't mind?

14:14:57   15              THE COURT:  Okay.

16              MR. APPLEBY:  That's why I referred earlier when you

17      asked me to start the process of talking here -- what I

18      really meant on their work -- ADP is working with us -- what

19      I really frankly meant out of that is we've had these

14:15:11   20      discussions within the last week.  And they were stepping up

21      to say yes; we will help you.  I wasn't trying to refer to an

22      earlier time period.

23              In the early time period, I was not very involved.

24      And neither was Sinead.  What was going on is between the

14:15:27   25      two; mostly Robin, if I understand, and Melissa Pledger for

1    our person.  That's where we were getting some insecure

2    analysis on what ROOP [sic] meant.  That's what we were asked

3    about the excel sheet.

4         My understanding -- obviously I wasn't there so I

14:15:44  5    can't testify -- is that we were once told that it couldn't

6    be done in excel.  Then later we were told it could be on

7    excel.  There was a lot of back and forth.  And it wasn't on

8    the legal side.  It was really on the technical side to make

9    sure that everybody understood what actually happened, what

14:16:01  10    we needed for pay.  The ROOP [sic] turned out to be a pretty

11    important piece.  That has now been provided.  But those were

12    all things that were in play at that point.

13         THE COURT:  Okay.  Well, you know --

14         MR. APPLEBY:  By the way, I've never said that ADP

14:16:21  15    refused to do something.  I have never made a comment like

16    that.

17         THE COURT:  Okay.  Well, that's kind of along the

18    lines of where my recollection goes with it.  But if it was a

19    conversation between paralegals or a client representative, I

14:16:39  20    mean, Mr. Appleby, you're the lawyer here in court.

21         MR. APPLEBY:  I understand.

22         THE COURT:  You're responsible.  Your client is

23    ultimately responsible.

24         MR. APPLEBY:  I understand.

14:16:48  25         THE COURT:  Your client will be the receiver of the

1    judgment if that's where it goes.  The fact that -- give me a

2    second.  I mean, ultimately, Rule 37 addresses the attorney

3    and the client in terms of sanctions.  So, I mean, it's

4    something that you both need to be very concerned about.  And

14:17:39  5    like I said before, I have grave reservations about how we

6    find ourselves here where we are right now.

7                Okay.  Mr. Rosenthal, do you have anything you want

8    to add?  Have you received anything since our last -- since

9    we were last together last week?

14:17:58 10                MR. ROSENTHAL:  Yes.  I'm desperate to take this

11    mask off so I'm going to back up six feet.

12                THE COURT:  Okay.

13                MR. SIMS:  Closer to ten feet.

14                MR. ROSENTHAL:  I just think of how tall I am lying

14:18:16 15    down and pretend it's six.

16                THE COURT:  Okay.

17                MR. ROSENTHAL:  I can take a transcript of this

18    hearing today and I would be hard pressed to find a single

19    sentence that has been said by defense counsel that was

14:18:29 20    accurate.

21                I think we are all, in fact, defense lawyers here

22    most of the time.  And just like you said, Judge, I have

23    looked back on lots and lots of cases at the end and thought

24    about things I could have done better, things I could have

14:18:53 25    done differently.  Happily, the one thing I've never looked

1    back and thought was, you know, it would have been a better

2    idea to comply with a Court order than not to comply with a

3    Court order.  That's never happened.

4          We all steal from older and better lawyers to the

14:19:13  5    extent we can.  And I have watched Pat over the years once or

6    twice convincingly apologize in advance because he might get

7    mad and then he would make a presentation without getting

8    mad.  I can't steal that because I am prone to getting mad

9    and I am trying not to.

14:19:35  10         Your Honor's frustration with where we should have

11    been six months ago is overlooking where we were supposed to

12    be two-and-a-half years ago when they were supposed to

13    produce verified responses in response to the standard FLSA

14    scheduling order in this case.  There are supposed to be

14:19:56  15    verified summaries of hours worked, amounts paid backed by

16    their records.  And to pretend that we are here today because

17    of back and forth between them and ADP about their own

18    records over the last three or four months is beyond

19    disingenuous.

14:20:17  20         Your Honor brought up the obvious question of a

21    litigation hold which jumps off the page because even to come

22    to your point of what have we gotten in the last week, it's

23    from 2019 and 2020 because everything that we have been told

24    now is that the records from 2015, 2016, and 2017 are gone or

14:20:40  25    unavailable or they won't give them to us.

1              I'm jumping around a little bit.

2              There was discussion about the PDFs and the not PDFs

3       for which somehow I am supposedly to blame for asking for

4       records that they kept and presented to us.  And I am now

14:21:08  5    painfully familiar with all this because I think about it all

6       the time.

7              But here's the deal:  There are two or three

8       different pieces of information on the time stamp records.

9       There is the clock-in part and the clock-out part along with

14:21:27  10   the person's name and the date.  And then there is a number

11      which may or may not be indicated in green or in red for

12      whether or not they actually paid for the time.  And also

13      there are codes for step-up rates where folks got paid

14      higher.

14:21:52  15            Early on, what we were given were spreadsheets of

16      the clock-in-and-out times up through August of 2017.  Excel

17      spreadsheets.  And they were great because we could cut and

18      paste and because some of our more distinguished St. Paul's

19      graduates and high school students didn't have to retype in

14:22:17  20   the times and the dates.  But from August 13, 2017 forward,

21      they were giving us PDFs.  And I said, obviously, enough.

22      Typing them in is massively difficult and it guarantees

23      errors and then you've got to proofread them.

24             I say all that about the time stamps because among

14:22:39  25   the many inaccurate statements you've heard today, one of

them is inaccurate and it hurts them rather than helps the

accurate part which is this:  This week I have gotten two or

three massive spreadsheets.  I think one had, like, 35,000

rows of data and 250 columns of garbage but there were, like,

ten columns I needed.  I do not know who prepared those

spreadsheets.  I do not know where the information came from

other than Littler lawyers sent them to me.

The time records I got, I think, yesterday

afternoon, but I might be mixing it up with the production I

got Wednesday night are excel records for 20 -- the latter

half of 2019 and 2020 of the time stamps.  Exactly what

Mr. Appleby just told you they can only do in PDF but, in

fact, for some group of employees, this week they gave it to

us in excel.

I am not complaining.  I am having to tell you what

we really got because, between him and Ms. Pledger, they

couldn't get it together to tell you.

The other piece of the time stamps, though, is this:

There are those codes in green and red and that show whether

or not the time is actually paid that is authorized.  And

there is -- I'm sorry.  I said it wrong.  There are the codes

that show the pay rates and then there is the green and the

red to show whether time is authorized.  They do not show up

on excel files.  At least on any excel file that's been

provided to us.  I would assume that there is a data file

1   that reflects where it's going to be green and red and where

2   the codes are because there has to be because this is data

3   that is being transmitted from OTK to ADP in some sense.

4          We have ever since Melissa Pledger, their, as of

14:24:58   5   today, high level manager, testified basically exactly a year

6   ago -- she explained in that deposition as a 30(b)(6)

7   representative that the records that were in green and red

8   that she sees for the authorized time and the step-up rates

9   are in electronic data.

14:25:22   10          While it is all information we should have been

11   given in 2018 in response to the very first orders, that's

12   what led to, come May, us still hunting for this information.

13   And as best I can tell, at least as of this week, we still

14   don't have any of it for anybody up through 2018.  And I

14:25:46   15   don't know whether or not it exists for 2019 and 2020 still.

16          It matters for this reason -- besides accuracy,

17   honesty, integrity, all those things -- when they don't have

18   records of how much more somebody got paid when they worked

19   step-up rates and, instead, all they have are base rates,

14:26:12   20   these folks are entitled to more money than is documented.

21          Now, the part about whether the time is authorized

22   or not authorized, as we have said in our summary judgment

23   submissions and I think the sanctions submissions, ultimately

24   probably only affects the quantification of damages for hours

14:26:30   25   worked in weeks under 40 hours.

1          I say all that to respond to your question about

2     what did I get this week.

3          Also, they sent me a massive paycheck excel

4     spreadsheet of 2020 data and I think half of 2019, which is

14:26:48  5     the one that has hundreds of columns.  And I think you may

6     have seen in ADP's submission the back and forth between ADP

7     and OTK about that no one would want these which, of course,

8     echoes what I had said in hearings before which is I don't

9     need all this garbage.  Here are the columns I need.

14:27:10  10          One of the most disconcerting things about what has

11    been produced to us this week -- again, I don't know who

12    prepared it.  I don't know where it came from.  It's not

13    verified.  It's not signed.  It's not anything but an email

14    to me with files -- is first of all that the pay rates that

14:27:34  15    are now appearing in these spreadsheets are not the same as

16    the pay rates that we have gotten on other documents from

17    OTK.  They have been changed or they are different; however

18    you want to look at it.

19          And you will recall, perhaps, that there is an issue

14:27:53  20    about workweek triggered by what they've said was in real

21    time and that Melissa Pledger, as their 30(b)(6) rep and

22    today as their high level manager, explained that up until

23    January 2019 in the system it showed Monday to Sunday and

24    then she changed it to start showing Sunday to Saturday.

14:28:16  25          Well, the records, these spreadsheets that we got

this week all of a sudden have pay period beginning and pay

period ending columns.  And notwithstanding that we have

previously gotten records from ADP that have those Monday to

Sunday and then Sunday to Saturday beginning and ending

14:28:36   dates, these records that we got this week have different pay

period beginning and pay period ending dates.  And it's very

sloppily done.

You might have noticed in the affidavit of

Ms. Quinn -- I'm sorry.  I blanked on her name for a

14:28:57   second -- that she says affirmatively that their excel files

may not be accurate as well as -- and it sort of confused me

whose files they are and where they are.  But I went through

it Wednesday night when I got this thing at 10:00 and came

back to the office to start comparing them and to figure out

14:29:23   what was on this massive spreadsheet.  And the dates are

different versus what we have previously gotten from OTK for

the same time period, the same two-week period for the same

people and it says ADP across the top and it's got different

dates.

14:29:40   When Mr. Appleby tells you that he's trying to

resolve and complete discovery; that he's here to try and

help that and to get this part of the case moving and then we

talk about PDFs and excel sheets, that's what we did in the

fall of 2018.

14:30:06   He has repeatedly suggested that this RROP thing is

1    somehow just because of questions I asked.  And, of course,

2    part of my job would be to ask questions, particularly in a

3    deposition.  As you may or may not have picked up, RROP is an

4    abbreviation for regular rate of pay, but it does not mean

14:30:31  5    regular rate of pay.  It is an adjusted formulaic change.

6         The reason we were asking about it is because

7    Melissa Pledger in March went through all this testimony that

8    the reason that the numbers change and the overtime rates are

9    different from what they ought to be is because of these

14:30:49  10   adjustments to the formula that she said are trued up every

11   month.  That was her testimony that she later verified and

12   that, frankly, perhaps we could have made it simpler and

13   easier if I had just said then, you know what?  That is

14   absolutely binding.  We are not going to try to get a better

14:31:12  15   answer, a different answer.  Instead, I agreed, as reflected

16   in the stipulated order, that they could get additional

17   information and see if they could come up with a 30(b)(6)

18   witness.  And then they blew that off also.

19        I do not still today have any version of an

14:31:35  20   admissible description of what this RROP formula is.  I have

21   gotten what I perceive to be -- I'm sorry.  In what was filed

22   as communications back and forth between ADP and OTK I think

23   back in the fall, frankly, there are emails where they trade

24   formulas and Melissa Pledger says to this guy, Sid Johnson,

14:32:03  25   who works for ADP that his explanation isn't really

1      explaining what it is.

2            And you might remember or not because, frankly, it

3      is a ton to remember and you're not doing it every day and

4      I'm doing it lots of days, but back in November, I believe,

14:32:26  5      the defendant's objection to the report and recommendation

6      that Judge Nelson entered said that Melissa Pledger's

7      testimony from March was wrong and that they were working on

8      an affidavit and she was finding out what it was she was

9      going to say.

14:32:46 10            THE COURT:  I remember that.

11            MR. ROSENTHAL:  Yeah.  Me, too.  And you asked

12     either one or two hearings ago whether that affidavit had

13     ever been filed, and it hasn't.  And if you look at the

14     chronology that Ms. Quinn provided, there were no

14:33:04 15     communications at all for a four-month period encompassing --

16     I apologize for not knowing it by heart.  I think their

17     pleading was filed in November.  I think from November to

18     February there was radio silence.

19            Putting aside all the obvious problems with somebody

14:33:26 20     who has verified a deposition attempting to create an

21     affidavit based on what they are being told by somebody else

22     about what they did or didn't know, that apparently didn't

23     happen.

24            THE COURT:  Well, you seem to be aware of

14:33:40 25     communications between Ms. Pledger and Mr. Jackson.  And I

1    don't think any of that is reflected on the chronology.  So

2    perhaps there wasn't communication with Ms. Quinn, but, you

3    know, I don't know.  But at the end of the day, I'm not

4    making an evidentiary hearing or a decision today regarding

14:33:58  5    that.  But I understand what you're saying.

6             MR. ROSENTHAL:  Well, and the emails I was talking

7    about were filed in -- I believe in August.

8             THE COURT:  Okay.

9             MR. ROSENTHAL:  So several months beforehand.

14:34:08  10             THE COURT:  I may have forgotten them.  Sorry.

11             MR. ROSENTHAL:  It is sort of a long quote record.

12    And, you know, it's harder to remember what you read and all

13    that than if you just do it.

14             Let me make two other comments.  One is technical

14:34:24  15    and one I wrote down as the most important thing I thought I

16    should say today.

17             The technical one is that while there is back and

18    forth -- sorry.  In ADP's filing, it indicates that reports

19    were provided in connection with the subpoena to OTK's

14:34:42  20    lawyers in October -- I'm sorry.  In August.  I don't know

21    what those reports were and they weren't attached.  I don't

22    think I've ever seen them.  I don't think they were ever

23    given to me.

24             What I definitely did is I had served discovery in

14:35:02  25    the middle of August.  Did all the communications between OTK

1    and ADP's counsel about this.  Responses were provided to

2    that in the middle of September.  And when the subpoena was

3    issued, I emailed defense counsel and specifically asked,

4    one, I assume nobody is showing up live and in person in New

14:35:25   5    Jersey and, two, I would like copies of everything that is

6    produced.  And I was told there would be.  And if I

7    understood the chronology that ADP provided, it looks like

8    records were produced then that were also not provided to me.

9         At one point -- I didn't get it written down exactly

14:35:45  10    right, but there was some mention of -- by Mr. Appleby of

11    generally we have most of what we need for us to get to the

12    plaintiffs.  That's not how subpoena responses work.

13         And the last thing is this:  I am frustrated on a

14    job level.  I'm sure you are frustrated on a job level.  As

14:36:13  15    defense lawyers, lots of times when you're dealing with

16    individuals, there is the unhappy fact that a desperate

17    individual plaintiff is more likely to roll over.  That

18    doesn't really apply on a class basis.  But most of us here

19    grew up in either working class or middle class households

14:36:34  20    where no one is all that far from a problem really causing

21    major problems.

22         There are 275 plaintiffs.  I don't know their life

23    stories.  I know this:  In the last three weeks, I have

24    gotten calls from two different guys.  One of them is

14:36:53  25    fighting his way back from a stroke.  He is jammed up with

1    medical bills.  If this case had ended nine months ago or if

2    they had given honest responses two years ago about what they

3    did and didn't have and we had immediately filed for summary

4    judgment then, assuming that the plaintiffs prevailed,

14:37:15  5    whether it's a couple thousand bucks or 50,000 bucks, his

6    life would be so much better than it is today.

7         There's another guy who got out of ICU from a

8    six-day hospitalization at the end of January with people

9    literally dying on his right and on his left.  He has been

14:37:34 10    begging his doctors to let him go back to work

11    notwithstanding their concerns about his medical condition

12    because he is so jammed up financially.  That's the

13    difference that even a couple thousand bucks makes to people.

14         And when we talk about and when you look at

14:37:51 15    sanctions cases, the effect on trial schedules, I'm not

16    saying those things aren't important.  And I'm desperately

17    trying not to accidentally say that we know what matters.

18    But it really does actually affect people's lives.  And their

19    messing around for six months, nine months, two years has

14:38:14 20    made people's lives worse.  And I would prefer, frankly, that

21    the plaintiffs win on the merits across the board and, as

22    we've set out in our summary judgment motion, feel that they

23    ought to.  I think winning on sanctions is duplicative and

24    you can get to the same result the same way.

14:38:36 25         I appreciate you hearing me out.  I have heard

everybody else talk about how frustrated they are.  And me,
too.

THE COURT:  Okay.  Thanks, Mr. Rosenthal.

Mr. Appleby, any final words?  I will give you the
last word.

MR. APPLEBY:  The only thing I would say about
what's just been said is that -- and this really doesn't fit
to what I'm talking about.  I am talking about trying to
resolve this stuff.  But the data on somebody who may be
having a difficult life at this point is not even admissible
in this case and it doesn't need to be in front of you.  I'm
not saying you will be affected.  I'm just saying that --
that wouldn't even be able to come in in a real trial, not a
wage and hour trial.

THE COURT:  Okay.  Well, I am not saying I disagree
with you about that.  I do have a real problem with a wage
and hour trial that this far down the road we don't know what
the wages and hours are.

You know, there's something that I came across.  And
I don't even know which of Mr. Rosenthal's filings it was in,
but it was on Page ID 1037.  It's something that he said.  At
every step, plaintiffs have been pleasantly, professionally,
and civilly stonewalled.  I'm having a hard time seeing how
that's not the case.

Mr. Appleby, you seem like a nice gentleman.  I'm

left with, like, a real concern that you express a sincere
desire to try to get this case resolved, but this is a theme
that I've heard all the way along and we're just not there.
We're not even close.

14:40:32          So I'm going to take much of this under submission,
but there are a couple of things I'm going to rule on right
now.

          First, Mr. Jackson, I would like ADP to prepare a
bill of cost and fees associated with all of this activity
14:40:54 relating to the subpoena, relating to the show cause orders.
I would like to receive that.  I would like you to file it.

          Ms. Quinn, thank you for traveling down here.  I
feel like I should make you testify just so that, you know,
we maybe more appropriately justify your trip.  Sufficed to
14:41:18 say, if I knew all the facts that I know now when the issue
first came to me, we wouldn't be where we are in terms of two
different show cause orders.

          Mr. Appleby, I disagree with you about your memory
of what was said; my memory of what was said.  We don't have
14:41:40 a transcript of the informal conference call we had.  But,
you know, I know I told you at that point that that's
something that I try to do to help lawyers get to the issues
that I think are most important when we actually have a
hearing.  And I would not have told you that I would be happy
14:42:00 to enforce your subpoena if I knew that you had already had a

1    response to it.  And -- but we are where we are.

2          In terms of the additional information, ADP, I want

3    you to provide that.  You said you needed an additional week.

4    I want that to happen because I need that data.  And the

14:42:31  5    manner in which we go forward, I have yet to determine.  But

6    I need to know what that information is.  So I want that to

7    be completed as to all of the individuals that are involved

8    in this case.  And I do think that OTK is asking for that

9    now.  So -- but that's what I want.  So since we have you

14:42:52  10    here, I want you to understand that.

11          All right.  There's another issue that's raised in

12    the ADP response which is the conflict issue.  That's really

13    not something that's before me right now.  I think that there

14    are two clients of the Littler firm that are involved.  But

14:43:14  15    I'm concerned about that.  I mean, I understand it.  I

16    understand how things are where they are.  But I'm not

17    comfortable with it.  But that's a client and lawyer issue.

18          Mr. Appleby, you practice here on a pro hoc

19    admission.  I'm going to suspend that right now.  So, I mean,

14:43:39  20    OTK has retained you to represent them.  Ms. Swain is a

21    member of the bar of this Court.  I'm not comfortable with

22    what I think are -- with what I've heard from you today and

23    at the other hearings and throughout the course of this case.

24    I say I'm going to suspend your pro hoc admission.  We can

14:44:04  25    take that up and I might let Judge Nelson hear that so we

1    have an independent party or maybe even another magistrate

2    judge if you want to take it up.  But I do have concerns

3    about that.

4            Frankly, if Ms. Swain wasn't a member of this bar, I

14:44:18  5    would tell you that your client needs to retain local counsel

6    that I would expect would otherwise be appearing before me

7    that would have a real concern with being absolutely earnest

8    in everything they say and -- but that's where I am with

9    that.

14:44:42  10           Okay.  And, you know, frankly, from what I saw in

11   some of the correspondence, I have a little bit of concern

12   with Ms. Daly, as well, but I haven't heard from her today so

13   I'm not going to make that decision at this time with regard

14   to Ms. Daly.  But -- okay.

14:45:02  15           Are there any questions at this point from anyone?

16           MR. APPLEBY:  Your Honor, I just want to say one

17   thing.  And I don't want to upset you.  I understand what

18   you're saying.

19           In terms of the conflict of interest issue -- and

14:45:21  20   please don't take this the wrong way.  But, ultimately, when

21   we talked through that issue previously, you told me to do

22   that.  And I did.  And I didn't do it with a conflict issue;

23   I did it because a federal judge told me to do it.  That's

24   between a rock and a hard place.  I just want you to realize

14:45:40  25   that.

1            THE COURT:  Okay.  Well, so when we had that

2       conversation, you mentioned that you had -- that your firm

3       also represented ADP.  And I told you as a defense lawyer

4       that I had had experiences where I represented a client and

14:45:55  5       we needed to get information from another client of my firm.

6       And like I said here while we were in open court, that kind

7       of a relationship situation really should foster a freer flow

8       of information.

9            At the bottom line, if ADP had an issue with the

14:46:18  10      subpoena that you sent, whether your firm represents them or

11      not, they should have responded with an objection.  They made

12      no objection.  There was no filing by ADP in this case and

13      what you're telling me is that you weren't getting any kind

14      of response from them at all.  And I said, well, maybe I

14:46:34  15      would call someone and see if you could move that along.

16           But, Mr. Appleby, we would not be here now today on

17      a second order to show cause if at any time you said, oh,

18      yeah.  Well, they did send us information and, you know --

19      and we're good with it or it wasn't all we needed, but, you

14:46:56  20      know, I can't get them to do anything more.  What I've heard

21      from ADP since I compelled them to be here is 100 percent the

22      opposite.

23           So to the extent you feel like I put you between a

24      rock and a hard place -- and I'm trying to not be angry -- I

14:47:20  25      did not put you between a rock and a hard place, sir.

1          MR. APPLEBY:  I'm just telling you my perception.

2    It's not you.  And, really, I guess all I'm saying at this

3    point is that I'm not -- I'm really focused on the conflict,

4    and I know you said that's not something to resolve right

14:47:41  5    now.  That's where I was coming from.

6          THE COURT:  Sure.  Well --

7          MR. APPLEBY:  I'm not sure the conflict if the Court

8    tells me to do it.  And I guess -- I can do some digging on

9    that, frankly.  But that's what I meant between a rock and a

14:47:52  10    hard place.  Either you're in conflict or you're ticking off

11    a federal judge.  I don't want to do either one.

12          THE COURT:  Well, frankly, I think having a

13    conversation is certainly different.

14          MR. APPLEBY:  Sure.

14:48:04  15          THE COURT:  But you had already sent a subpoena to a

16    client of your firm before.  So, you know, like I said, I

17    don't think I was inviting you to go into any further

18    conflict.  But that's something that's been raised by ADP.

19    And that's something that is between you and them.

14:48:24  20          So what I'm saying is I'm not ruling on that.  I'm

21    not making a decision on that.  I'm not going to hear any

22    testimony on that.  That's an issue for you and your firm to

23    resolve.

24          But what I am saying is that Ms. Swain can be

14:48:43  25    counsel of record at this point and we will go forward and I

1    will rule on the remaining issues in due course.

2              Okay.  All right.  Thank you very much.

3        (The Proceedings were concluded at approximately

4    2:48 p.m. on March 12, 2021.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1

2                          C E R T I F I C A T E

3

4

5          I, the undersigned, hereby certify that the

6   foregoing pages contain a true and correct transcript of the

7   aforementioned proceedings as is hereinabove set out, as the

8   same was taken down by me in stenotype and later transcribed

9   utilizing computer-aided transcription.

10         This is the 16th day of March of 2021.

11

             *Cheryl K Powell*

13   _____

14              Cheryl K. Powell, CCR, RPR, FCRR

15           Federal Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov