```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ALABAMA
 2


 3
        WILLIAM HEATH HORNADY, et al.,*
 4           Plaintiff,          *  18-cv-317
                                 *  April 13, 2021
 5      vs.                      *  Mobile, Alabama
                                 *  9:37 a.m.
 6      OUTOKUMPU STAINLESS USA, LLC, *
             Defendant,          *
 7                               *
        vs.                      *
 8                               *
        ADP,INC.,                *
 9           Non-Party.          *
        *******************************
10

11           TRANSCRIPT OF PRETRIAL STATUS CONFERENCE
            BEFORE THE HONORABLE JEFFERY U. BEAVERSTOCK
12                 UNITED STATES DISTRICT JUDGE

13

        FOR THE PLAINTIFFS:
14
        MR. IAN DAVID ROSENTHAL, ESQ.
15      Holston Vaughan & Rosenthal
        211 South Cedar Street
16      Mobile, AL 36602
        251-432-8883
17
        MR. PATRICK H. SIMS, ESQ.
18      Cabaniss, Johnston, Gardner
        Dumas & O'Neal
19      P O Box 2906
        Mobile, AL 36652
20      251-415-7300

21      FOR THE DEFENDANT:

22      MR. CHARLES A. POWELL, IV, ESQ.
        Littler Mendelson, PC
23      420 20th Street North
        Suite 2300
24      Birmingham, AL 35203
        205-421-4703
25
```

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

```
 1        MS. JENNIFER F. SWAIN, ESQ.
          Littler Mendelson
 2        420 20th Street N
          Suite 2300
 3        Birmingham, AL 35203
          205-421-4704

 4
          FOR ADP:
 5
          MR. MATTHEW RYAN JACKSON
 6        Adams & Reese, LLP
          11 N. Water Street
 7        Suite 23200
          Mobile, AL 36602
 8        251-433-3234

 9        COURTROOM DEPUTY: MS. CATHI JENNINGS

10        COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

11     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
12        and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

    (In open court.)

       COURTROOM DEPUTY:  This matter is set for a hearing: Civil Case 18-317, William Hornady versus Outokumpu.

09:37:10       What says the plaintiff?

       MR. ROSENTHAL:  The plaintiffs are ready.

       COURTROOM DEPUTY:  What says the defendant?

       MR. POWELL:  Defendants are ready.

       THE COURT:  All right.  Well, good morning,

09:37:20 everybody.  Thanks for coming down.  This was originally set for a pretrial conference, of course.  We're not in a place where we can go to trial.  But we are in a place where we need to figure out where we are and how we're going to get where we need to be.  Okay.  So that's what we're going to

09:37:42 talk about today.

       Before we really get a whole lot farther down the road, would y'all kind of tell me where you are in terms of the production from ADP?  Ian?

       MR. ROSENTHAL:  Sure.

09:38:03       THE COURT:  And, yeah.  Yeah.  So here's the deal for -- in the courtroom since you're new -- welcome.

       MR. POWELL:  Thank you, Your Honor.

       THE COURT:  We require everybody wear a mask.  So sitting at the table, you're welcome to remain seated,

09:38:23 wearing your mask.  Just pull the microphone closer and speak

1    into it.  Or if you go stand at the podium, we let people

2    take their mask off at the podium.

3         MR. POWELL:  Thank you.

4         THE COURT:  Yeah.

09:38:36   5         MR. ROSENTHAL:  So here's where we are with ADP's

6    production:  First of all, I think we have gotten everything

7    they have in the formats that are most compatible with what

8    we need that they can provide.

9         In slightly more detail, they have given us excel

09:39:01  10    files for three different types of information.  The first is

11    a single pay file intended to cover all of the plaintiffs who

12    have been employed during 2018, 2019, and 2020.  Because

13    that's the period they have.  We -- they gave us a version of

14    that a week or two ago and they also gave us a set of 16

09:39:38  15    different quarterly excel sheets of time records.  Again,

16    intended to cover every plaintiff who happened to be employed

17    first quarter of 2018 or thereafter.

18         What I did at that point -- and the major caveat

19    here is there is virtually no chance I did it perfectly and

09:40:01  20    there is no chance ADP did it perfectly.  It's just

21    impossible.  There are too many people and there are too many

22    lines and too many people touching it.  Something will get

23    lost.  I'm not complaining; I'm just saying that's where we

24    are.

09:40:17  25         So I went through all of the quarterly time reports

1    and identified what I thought and think are all of the places

2    where people were missing who should have popped up.  And

3    ADP -- on I think this was late Friday afternoon -- sent a

4    set of -- revised set of reports intended to cover those

09:40:37  5    gaps.  And, again, those gaps were clearly inadvertent.  It

6    just happens.

7         And between Friday night and this morning, I have

8    not comprehensively gone through it to make sure, but a

9    lot -- there weren't a ton of gaps to begin with, and I know

09:40:55  10    they fixed most of them if not all of them.

11         The pay file, the single pay file is harder to

12    identify the gaps in because, for example, if there are two

13    John Smiths with different ID numbers and they got mixed

14    together, depending on how you sort it or don't, it doesn't

09:41:20  15    become readily apparent immediately.  And, similarly, just

16    because somebody with a much more unusual name than John

17    Smith has a gap of two months in pay records, it can be

18    because they're not getting paid wages.  Maybe they're out on

19    FMLA leave.  Whatever.  Maybe they left the company and came

09:41:41  20    back.  So identifying the gaps is not as easy as just

21    scrolling endlessly through it.

22         But, again, we identified some items the first time

23    around.  We addressed those questions to both the defendant

24    and ADP.  I think to the extent ADP has been able to fill

09:41:58  25    those gaps, they have.  And I think to the extent there were

1     specific questions that the defendant could provide us with

2     the information that either made it moot or explained it,

3     they have done that as well.

4          I am certain that, as we start using the data that

09:42:16  5     ADP gave us in this massive file, there will at least be

6     other questions that come up because it's inevitable.  But

7     they should be individual, idiosyncratic questions.  Are we

8     missing something here or is there some other reason it

9     didn't pop up in this discussion?  And what Matt tells me --

09:42:39 10     and I have no reason not to believe -- as we have those

11     questions, to the extent we can't -- I don't mean this in a

12     bad way.  It may be that some information is more easily

13     provided by the defendant to explain a gap.  And it may be

14     that ADP can be, like, we left out a month for some guy.

09:42:59 15     Either way, Matt says they will work with us on that.

16          The third thing they have given us are monthly audit

17     trails.  So there are 37 or 38 of those going back to late

18     2017.  We also had a conference call with ADP's folks --

19     myself, Mr. Powell, Matt, a couple other people -- to kind of

09:43:27 20     walk through what some of these endless columns do and don't

21     mean.  I don't know that those audit trails help a lot, but

22     it is entirely possible that some of those idiosyncratic,

23     individual daily questions that pop up about people will be

24     answered by those audit trails because you can go and look at

09:43:52 25     January 9 what happened to John Doe.

1            So that's what we have from ADP.  I can -- and so I

2    have no complaints whatsoever about what ADP has managed to

3    crank out in a matter of weeks and then reconcile with us in

4    a matter of even fewer weeks.  The information we do not have

09:44:20    5    is because ADP doesn't maintain it.  And I can deal with that

6    later if you want.  But that's where we are with ADP's

7    production as far as the plaintiffs are concerned.

8            THE COURT:  Mr. Powell, anything you want to add

9    about ADP and what they've --

09:44:35   10            MR. POWELL:  No, Your Honor.  They've been fully

11    cooperative in this process and have been responsive to

12    questions largely from Ian because he's been studying the

13    data a little more closely than I have at this point.  But

14    nothing substantive to add, Your Honor.

09:44:51   15            THE COURT:  Okay.  All right.  Well, that seems

16    extremely efficient as opposed to kind of where we've been

17    for a long time.

18            Okay.  Well, that leads us back around to try to

19    figure out where we go from here.  I mean, by my count, I

09:45:17   20    think I have possibly a record-setting nine motions that are

21    pending in your case.  So it's time to move towards resolving

22    them.

23            Ultimately, in my mind, I think this is -- what kind

24    of -- how am I going to address how we got here, why we're

09:45:46   25    here, the problems that we've had along the way.  And

1    considering that at least two of the pending -- I guess

2    they're not motions.  The report and recommendations from

3    Judge Nelson involve sanctions, plaintiffs motions for

4    sanctions, the various motions to compel.  Ultimately, I

09:46:08  5    think -- you know, I had asked plaintiffs to submit their

6    expense or their attorneys' fees, basically the hours they

7    had spent chasing evidence in this case, chasing the data.

8    But a financial sanction is not going to resolve where we are

9    and why we're here.

09:46:36  10        So although I am loath to enter a default as to

11    liability, I don't think that there is any other recourse

12    that I could take at this point in this case to address why

13    we're here.

14        And, Mr. Powell, I know you weren't driving the bus

09:47:02  15    for that.  But you're the one who has to drive it now.  So --

16    and then -- so I've struggled with how -- does that really

17    help us a whole lot because, ultimately, if I give you a

18    default as to liability, we have to reach a resolution on

19    damages, and a lot of the legal issues are still in play in

09:47:35  20    terms of how the law applies to the data that we have.  At

21    least now we have a portion of the data.  But we still don't

22    have it all.

23        We will talk about the rest of the story in a

24    minute.  But I say that to tell you the order that I intend

09:47:57  25    to enter.  Obviously, I haven't entered it yet.  And,

1    frankly, preparing an order that tracks all of the ups and

2    downs in discovery in this case is going to take a minute to

3    prepare.  But I don't want you to sit, waiting any longer for

4    me to enter an order as to where we go from here.

09:48:29  5          You can -- obviously you will be able to address it

6    later to the extent you want to take that issue up.  But I

7    want to allow things to move forward in advance of that order

8    coming out so you can make productive use of the time now

9    where we are.

09:48:50 10          So that's my intention is to enter an order of

11   default against OTK as to liability and then we have to

12   address the issue of damages.

13          Let's talk about the -- I don't know -- I guess

14   we'll call it the early years for this case, and that's 2015

09:49:16 15   to 2017.  Do you have any idea about documentation for that

16   period, Mr. Powell?

17          MR. POWELL:  I'll just do it from here, Your Honor.

18          THE COURT:  That's fine.

19          MR. POWELL:  Well, so here is what I believe -- so

09:49:34 20   since I got in the case, I don't know, three weeks ago --

21          THE COURT:  I recognize that.  And keep reminding

22   me --

23          MR. POWELL:  I got on the last stop before the

24   cliff.

09:49:47 25          THE COURT:  Yeah.

1          MR. POWELL:  So the answer to your question about
2    documentation, Your Honor, is in the payroll system, the
3    plaintiffs themselves have had access to their what I would
4    call pay stubs.  In ADP's world they're called earning
09:50:04  5    statements.  They can get them on line.
6          We have since -- since I got in the case, I have
7    located all of those.  We have produced them for what I would
8    call the exemplary plaintiffs.  There was a group of
9    plaintiffs.  Some were deposed.  Some were identified earlier
09:50:23 10    in the case between Mr. Appleby and Ian.  The pay stubs for
11    all of that group have already been produced.  The pay stubs
12    for the remainder of the opt-in plaintiffs are -- should be
13    produced before the end of the week if not by the end of the
14    day.
09:50:43 15          There is a set of data I know that is covered in the
16    plaintiffs' sanctions motions.  There's discussions about old
17    what are called SAP records.  So before ADP was the time
18    clock provider, it was SAP.
19          THE COURT:  Okay.
09:51:03 20          MR. POWELL:  Time punch records were produced
21    earlier in the case for the plaintiffs.  So the plaintiffs
22    know their clock-in and clock-out times.  There is other data
23    in those reports that I believe is covered and is discussed
24    in the plaintiffs' motions.  I believe we have located those
09:51:22 25    records.  They are in an unwieldy computer file format so we

are attempting to identify somebody with the technical skill
to get the data out of the system so the parties can then use
it in the case.  That is an ongoing process.  I can't commit
to exactly when.  My hope is relatively soon, but I think we
have identified the data.  But until I extract it and go
through all of the columns, I won't be able to know for
certain whether everything is there.

One of the issues in that data that I know the
plaintiffs have raised and you have probably seen in the
pleadings is some discussion of step-up rates.  Step-up rates
are as the name implies.  A plaintiff has a normal rate for
their regular job and then they -- I fill in for Ian at a
higher rate of pay.  That's called a step-up rate.  Those
rates are actually reflected on their pay stubs.

So if you look at a pay stub, it may have two
regular rates or two shift rates.  And that's simply the
difference between a dayshift pay rate and a night shift pay
rate.  But those are reflected on the pay stubs.  They should
also be in the SAP data.  When we can extract it.  They are
in the ADP time clock records as a unique identifier code.

The conference call that Mr. Rosenthal mentioned
earlier between ADP and the parties, they told us how to read
the code that's about this long.  And we only need to know
the little either one- or three-digit code in the middle of
the string.  That's how you tell.

1          THE COURT:  Kind of like reading the VIN number on a

2  car.

3          MR. POWELL:  Exactly.  So I think that covers.  So

4  plaintiffs already have, I think, compensation data; time

09:53:32 5  clock data; the missing SAP records should be soon.  They

6  will have all of their earning statements for the whole

7  group.  Should be this week.  And I think that fills the

8  gaps.

9          If there are any other missing pieces, I'm happy to

09:53:54 10  go look for them.

11          THE COURT:  Okay.

12          MR. POWELL:  So --

13          THE COURT:  Before I ask Mr. Rosenthal for his side

14  of that -- this is always a risky proposition.  I say that

09:54:15 15  with love, Ian.

16          MR. ROSENTHAL:  I thought it was true.

17          THE COURT:  I asked Mr. Appleby about, like, a --

18  you know, if he sent a litigation hold letter to OTK when

19  this lawsuit was filed in 2018.

09:54:30 20          MR. POWELL:  Yes, sir.

21          THE COURT:  Do you know anything about that?

22          MR. POWELL:  I know you asked.  I know what

23  Mr. Appleby's response was.  I will tell you I have not

24  gotten down that checklist.

09:54:40 25          THE COURT:  Okay.

1    MR. POWELL:  What I do know, though, Judge, is from

2    the standpoint of at least a wage-and-hour case where we have

3    time clock records and pay records, the time clock records I

4    believe -- time punch records, clock-in and clock-out have

09:54:55  5    all been produced.  So there's no issue of loss of data

6    there.

7         We have located all of the earning statements.  I

8    think the plaintiff should have had access to those,

9    personally, but we have located all of them.  So there's no

09:55:07  10    losses of data there.  So at least under the FLSA regulations

11    where the calculation of the regular rate is based on total

12    compensation divided by hours, the data is available.

13         THE COURT:  Okay.  Or soon will be.

14         MR. POWELL:  Or soon will be.

09:55:22  15         THE COURT:  Okay.  All right.  Mr. Rosenthal.

16         MR. ROSENTHAL:  So, first of all, a lot of that is

17    accurate.  And given how brief a time Mr. Powell has been in

18    the case and my own repeatedly demonstrated inability to get

19    the right abbreviations and the right letters or the right

09:55:55  20    companies right, saying a lot of it is accurate is not a

21    criticism of the things I quibble about at all.

22         The first thing that he is absolutely right about is

23    that the clock-in and clock-out time punches for the early

24    years have always been produced in, when we asked for it,

09:56:25  25    excel format.  And yeah.  There are isolated people for whom

there were gaps that we have raised.  I know the defendant
sent me information last couple of days that covered at least
some of them.  I do not know whether or not it covered all
the isolated people we asked about for the early years.  But
if it didn't, I feel comfortable saying we're working our way
through those isolated glitches.  And either way, for the
clock-in and clock-out stuff, the data files exist.

        As he told you, for the later years, when we take
ADP's time production and pick the right column and sort it
the right way, you can figure out where there is a step-up
rate by code.  And then we can compare the code based on the
year to a rate schedule and figure out what the rate on that
day was.  I have not -- and, again, I'm not criticizing.

        Mr. Powell has told you they have not produced that
data before but he is trying to get the data.  So I don't
know what it looks like is my point and I don't know whether
or not it will be daily or not.

        On the earning statements -- so this is what the
employee sees and it's done on a two-week basis -- that
mirrors data -- excel data file that OTK has provided to us
over time even back '18, '19, whatever.  What I don't know --
I'm not complaining.  I'm just saying I don't know whether it
is an exact -- what OTK's data is -- is whether it is an
exact mirror of ADP's data.  Obviously there are a lot of
numbers that are exactly the same, as you would expect, but I

don't really know whether they're truly the same or not.  And
frankly, at this point, I don't know whether I care.  I'm
just saying it's in there.  But it is on a two-week basis.

And so the problem I have is on the one hand, we are
trying to identify and quantify as close as we can to the
penny, it being a wage-and-hour case, on a weekly basis what
the pay rates are so we can run the rest of the numbers.  And
it is pretty easy when somebody has worked a step-up rate for
an entire two-week period to look at either the data files
and you can run a comparison of two numbers and divide them
and get that step-up rate or look at ADP's time files and see
a string of any fives, which is one of their codes over two
weeks, and know okay; this guy or this woman worked at this
rate for these two weeks and the earning statement, the
paycheck is going to show at least the right number, the
right amount.

Mr. Powell says that the step-up rates are shown on
the earning statements.  I say this in the most literal way:
That's not the way I remember it, but it is obviously either
true or not.  And you can look at an earning statement.  I
also have not looked at the earning statements particularly
to see what happens when there is a step-up rate for, let's
say, two days out of two weeks.  Okay?  So I'm not saying
he's wrong; I'm not saying he's right.  I just don't recall.

But to your main point, which is how do we get from

1    here to an end line and what do we have to work our way

2    through, so with regard to step-up rates, there are three

3    possible ways to do it:  One is with regard to the later

4    years, August 13, 2017 forward, we can literally take each

10:01:16  5    person who shows a step-up rate on any given day, plug in

6    that rate, plug in his base rate the next day if he didn't

7    work a step-up rate, calculate a weekly blended pay rate,

8    multiply 1.5 for an overtime rate.  And we can do that.  It

9    is tedious.  It is manual.  It is -- but it is doable.  It is

10:01:48  10   just a question of powering through it.

11          And to some extent, we can shortcut it when we know

12   that formulaically over a two-week period we run comparison

13   calculations and a step-up rate pops up over a two-week

14   period, then we don't have to do it day by day.  Before

10:02:14  15   August 13, 2017, if they have the data that shows exactly the

16   same thing, we can do exactly the same thing for however long

17   it takes.

18          The only example I have I think is for Chris Miller

19   who is one of the four guys for whom we moved for partial

10:02:36  20   summary judgment and for a couple of the people that they

21   specifically identified for specific discovery.  We did and

22   could take the step-up rate information that they did provide

23   us with and run through it day by day.

24          So I have a sense of what is involved in doing it

10:02:56  25   and then multiplying it by however many hundreds of times we

1    would have to do it.

2         The second thing that might work either in terms of

3    a sanction result to approximate our numbers or by

4    agreement -- and this is not a surprise; I've discussed it

10:03:23  5    generally with Mr. Powell -- is to take formulaic approaches

6    that do not require digging back into the day-by-day data,

7    take the two-week numbers that we have, and run a calculation

8    and agree on an approach to it.  Or if we didn't agree on it,

9    have it be ordered as a sanction approach for the information

10:03:48 10    we don't have.

11         And I don't -- I should say this:  Mr. Powell is

12    welcome to tell you, if he wants to, what I've suggested, but

13    it was sort of a brainstorming suggestion so I'm not going to

14    go through it as if it was anything other than spit balling.

10:04:09 15    But it is the other two ways to get to the same thing is

16    either if we don't have the minutia data to approximate it

17    formulaically which can be done faster or even if we do have

18    the minutia data to by agreement say okay; this is how it is

19    going to be done.  That's the step-up rate issue.

10:04:32 20         THE COURT:  Yeah.  And I realize there is a lot more

21    to it beyond just the step-up rate.  But just having this

22    discussion, in the spirit of spit balling, I'm not looking to

23    decide right now.  I'm looking to talk about options.  It

24    occurs to me that this might be a case to appoint a master

10:04:57 25    for to work through all of this specifically with all of

1    y'all.

2         Ian, you're welcome to stand there if Mr. Powell

3    doesn't want to take the podium.  You can sit down.  Whatever

4    you would like.  I'm pretty easy in that regard.

10:05:17  5         It just occurs to me there is a lot of moving pieces

6    with a lot of data and at the point where we have or where I

7    have decided which way I'm going to go sanction wise, and

8    that is liability, it's a matter of identifying the data and

9    then plugging it into a system where we can figure out -- I

10:05:45 10   mean, it may well be that the defense was right and there's

11   not any violation anywhere, you know, that's measurable

12   economically.  But we have to get to a point where we figure

13   all that out.

14        With the number of plaintiffs that there are in this

10:06:06 15   case, it seems like a master might be appropriate for it.

16   Someone who could give it a lot more attention than

17   magistrate judge or a district judge could in terms of

18   helping you get through and get to a place where we can

19   identify a number.

10:06:27 20        Do either of you have any thoughts about that?

21        MR. POWELL:  I have some questions I guess.

22        THE COURT:  Okay.

23        MR. POWELL:  So is the Court's intention as part of

24   the sanction to not try damages to a jury?

10:06:44 25        THE COURT:  Not at all.  And that's -- actually, I

1  have a list of things that I want to talk about with y'all.

2  And that's how does resolution of this -- what does it look

3  like.  How do we get to that point.  I guess --

4  MR. POWELL:  Not to interrupt, but sort of along

10:07:04  5  those same lines, Judge, a sanction of a liability finding,

6  is it a -- are you proposing as a sanction a general finding

7  that Outokumpu did not properly pay its employees or are you

8  envisioning specific rulings on specific underlying factual

9  issues that are necessary -- the jury, for example would need

10:07:39  10  to decide -- there is a liability question but also a damages

11  question.  The jury would have to determine whether or not

12  the plaintiffs, in fact, performed work for which they were

13  not compensated.

14  The plaintiffs' theory is they began work before

10:07:52  15  they began to be paid at 6:00 a.m., but the FLSA does not

16  require payment for time that is not work.  So even if, as

17  the plaintiffs argue, week one cannot offset week two within

18  week one, if an individual plaintiff started work early and

19  took lunch, there's no violation.  That is an individualized

10:08:19  20  per-plaintiff-per-workweek assessment.

21  The jury is going to have to decide time before

22  anybody -- magistrate or jury -- could try to do the math.

23  That is also true for what I believe is a legal issue which

24  is the application of the bonus program.

10:08:40  25  Assuming the Court decides the plaintiffs are

correct and the bonus should be applied over calendar days --

not the method that OTK currently uses -- you're going to

need a genius to figure out how to do the math.  That's --

but that's an element of the case.  Same thing on the

workweek question.  That is, I believe, a jury question, as

Judge Steele found in a prior case.

But if -- so the issue I guess is:  From a sanction

perspective, in order to try to offer constructive ideas for

your question, are you making specific findings on individual

liability issues or what do you envision the ultimate ruling

to be?  Because it will then knock over dominos in one of any

number of directions.

THE COURT:  Yeah.  Well, that's certainly, like, a

fair point.  And I guess the reason why I said when I was

trying to articulate my thought process is I decide that, as

a sanction, OTK is liable to the plaintiffs and we got to

determine what the damages are and that's not as simple as

just doing math; we have to decide specifically where there

is entitlement to damages.  Okay.  That's a fair point.

Mr. Rosenthal, do you have any countervailing

thought?

MR. ROSENTHAL:  Sure.  It is a fair point.  It is a

really fair point because it is the same point I made last

May in the sense that, sure; the math part of it depends on

which number of path lines you go to to get to a number.  If

1   you know your target, you can get there.  And we have been

2   merrily trying to calculate alternate approaches to damages

3   without knowing.  The -- so --

4          THE COURT:  Which I think is why Judge Nelson had

10:10:59  5   suggested the *Anderson* format which you said you could not

6   do, I believe.

7          MR. ROSENTHAL:  Well, let me either address what I

8   think you're saying or asking about or I could just ask you

9   to clarify what you think you're talking about.  Here's what

10:11:22  10   I think you're talking about.  In the *Storey* case -- I'm

11   sorry.  In the -- yeah.  *Storey* case, what they talk about is

12   that when the employer is supposed to have records and

13   doesn't have records, it has consequences.

14          Here, the plaintiffs' theory has always been we're

10:11:48  15   going by the employer's records.  The times they clocked in,

16   the time they clocked out, what they were paid, what weeks

17   they said the workweek was.  We are using their records.  The

18   argument that Mr. Powell has made, echoing arguments that

19   Mr. Appleby previously made orally is that, yeah.  Well,

10:12:13  20   maybe they weren't working.  Maybe they were eating lunch.

21   Whatever.

22          That is addressed in our summary judgment

23   submission.  And it is also overlappingly, to some extent,

24   addressed I think by the concept of *Storey* which is if they

10:12:35  25   didn't bother to keep track of when people are actually

starting work, they're stuck with it because the only
evidence, to echo Judge Nelson's comment in her report --
they don't have any evidence of when people started work.  We
have the timestamps.  They don't have any evidence when
people stopped work or started work.  We have Melissa
Pledger's testimony on their behalf that they are assumed to
have started work when they clocked in.  That's how they do
it.  Until they clock out.  To the minute.

          So I'm just echoing our summary judgment argument
which is different, of course, from Mr. Powell's question
about, well, what would a liability default look like.  So he
is right in the sense that if it is a factual issue which --
I'm sorry.  I left out one thing.

          And I think as we put in our summary judgment
submissions, there are 20-something affidavits from folks who
say in their declarations:  I started work immediately after
I clocked in.  We went through the people who were deposed
and had that same thing all of which is, we have said,
undisputed in any admissible way.

          But he's right in that if summary judgment is not
granted or if those facts are not deemed undisputed, then, in
theory, you've got 280 people marching in here to talk about
on any given day, on any given Sunday -- also Monday through
Saturday -- over a period of years when they might have
actually worked, presumably with their supervisors, who have

1   never provided any information in detail, then saying

2   something in response?

3           THE COURT:  Yes; no, you know.

4           MR. ROSENTHAL:  Or most likely, I got no idea.  It's

10:14:30  5   five years.  We don't track that information, which is the

6   key.  The answer is everyone is going to say all I know is

7   when I punched in and a guesstimate of what else I might do.

8   If that's not an issue, if that's not a factual issue either

9   based on summary judgment issue or as a sanction -- and it

10:14:52 10   is, I think, cleaner in summary judgment because we've always

11   had the clock-in times -- then that is not before a jury.

12           He's also right you have to know the amount of time

13   before you start running numbers for amounts of money.  The

14   bonus thing -- I'm not sure I see the potential jury issue.

10:15:11 15   There is no dispute about what they do or how they do it.

16   The evidence before the Court on summary judgment about what

17   they do and how they do it is all their own testimony and

18   their own documents.  So I'm not sure what the jury issue

19   would be.

10:15:38 20           It is absolutely true that to run any wage-and-hour

21   calculation, you have to know what the workweek is.  And as

22   reflected in our partial summary judgment motion, what we

23   have done for those folks is essentially prepare damages

24   calculations, recounting up or counting up the time over

10:16:09 25   168-hour periods, running Monday to Sunday and Sunday to

Saturday, depending on the time period.  But Mr. Powell's

point remains a legitimate one, which is if that is an issue

on which you are granting judgment as default, that is a

consequence.  Otherwise, it can be dealt with on summary

judgment or not.  But if that's the issue to try to a jury,

that's a really narrow factual issue.

So in terms of what is involved, I mean, literally,

it would take what day of the week is Sunday.  But I would

not want to run a ton of numbers for a ton of people assuming

it's Monday to Sunday and then Sunday to Saturday and then to

go back and do it again.  I can do it.  It's setting -- it's

putting different settings and different parameters in.

But those are the three things that when we talk

about, well, a judgment being entered, what does it really

mean and how does it affect what we try and then how does it

affect what numbers we're cranking out that matter.

And then the fourth thing is the deal with these

trued-up payments which I know Mr. Powell wants to address

and is prepared to address so I'm not going to paraphrase

what I think he's going to say.  The thing about it is this:

Whether it is viewed as -- this is the one where the

sanctions and the summary judgment motion most closely come

together as a Venn diagram with two circles that are almost

exactly the same.

Melissa Pledger described what she described.  We

1    took her deposition testimony.  We amended the complaint.  We

2    moved for summary judgment and then we did it again in a

3    followup summary judgment submission.  Her testimony remains

4    the only evidence on the issue.  Because of the timing of it

10:18:42  5    of when she testified back last March and then the

6    supplemental scheduling orders, that led to the stipulated

7    order that myself and defense counsel had agreed to that also

8    dealt with, but colloquially, what is she talking about?  How

9    does it work?  Who are they going to put up as a supplemental

10:19:06  10    30(b)(6) witness?  Where are they going to get this

11    information?  Which has led to nothing, ultimately.

12    So from an evidentiary standpoint or a procedural

13    summary judgment standpoint, we have set out in our pleadings

14    where we think that leaves us in terms of what they can't

10:19:29  15    show or what they are bound by.  It is essentially consistent

16    with Judge Nelson's report and recommendation, the generic

17    statement that I'm paraphrasing which is, well, if they

18    didn't give it to us in discovery, they can't do it.  They

19    can't offer evidence about it.

10:19:54  20    It is, frankly, more than a little bizarre that we

21    are three years into it trying to figure out what they do or

22    how do they do it and why the numbers don't match up, but it

23    is where we are.

24    There is this regular-rate-of-pay phrase abbreviated

10:20:18  25    RROP which no one means as the regular rate of pay.  It is an

adjusted number.  Right?  And if we had back before the
deadline to amend complaints the two different formulas that
ADP included not necessarily in its production last couple of
weeks but along the way in documents that we've gotten over
10:20:41  the last month or two, we would be amending the complaint to
say this reflects a different violation that encompasses
every pay period.  But it is now the middle of April, 2021
and we're not inclined to do that and start any new cycles of
discovery even if you let us.

10:21:07  THE COURT:  I'm not going to let you.

MR. ROSENTHAL:  I'm not asking for it.

THE COURT:  Well, I just want to -- you suggested
that there was an option and so I'm just telling you.

MR. ROSENTHAL:  I assumed that there was not an
10:21:18  option either but, you know -- but there is that that filters
through it and we don't even really know anything about that
other than what ADP has said in this informal exchange
process and what they put in their -- I want to say it's
either emails or correspondence with OTK about the subpoena.
10:21:39  And there are two different formulas.  And I can't make them
reconcile on a consistent basis, but I don't know that it
matters at this point.

But the issue of how are we figuring out what target
we're figuring out -- where we're aiming at for damages is a
10:21:55  huge one.  I don't see any -- that's not fair.  You could

come up with lots of different scenarios or lots of different
ways to try a case.  I get that.  I do not see any plausible
real world scenario where we ever have to or should or the
defendant could require us to have a jury attempt to quantify
damages, dollar damages for each of 280 people.

10:22:23

         And the reasons I think I put in a couple of
different written submissions is once you know the amount of
time you're using and once you know the rate, everything else
is literally just math.  In other words, an indisputable
fact.  And if a jury inevitably attempted to get 280 numbers
for 280 people, there's going to be some math errors and
there's going to be some clerical errors.  And if they're in
the plaintiff's favor, the defendant is going to move
properly for remittitur or the equivalent, say, hey, they got
the math wrong.  And we would do the opposite, meaning it is
a massive waste of time to go through an exercise for
something that is not a jury question because it is not a
factual issue.  That's where I am on that.

         THE COURT:  Okay.  Mr. Powell?

         MR. POWELL:  Yes, sir.  So I will try to take them
roughly in order.  So the -- so -- let me back up.

         *Anderson* proof, as I'm sure the Court is aware, is
based on an old United States Supreme Court case that says
where there are no records of time worked, the plaintiffs may
present evidence of work by just and reasonable inference.

What Mr. Rosenthal has just told the Court is, in fact, OTK has and has produced actual time records that the plaintiffs are relying on.  If their theory for damages is we are using the records from clock in to clock out, they are not entitled to *Anderson* proof and they are not entitled to proceed on that basis in this case.  And if that's the basis, magistrate judge's sanctions order on that basis is legally improper.

If the argument is that they were doing work for which they were not paid and they wish to use *Anderson* proof to do that, that is the only way they get to use *Anderson* proof in this case.  Doing that, they might be able to present some representative group of hourly employees to testify to their normal workday.

The plaintiffs did not, in fact, actually testify they all immediately started work.  I will use Mr. Hornady as an example.  In the early days, he clocked in nine-tenths of a mile from his workstation so that he would not be late for attendance purposes.  He walked seven to ten minutes to his workstation.  And at the end of the day, he had to make the same walk back.  Walking time is not compensable under the FLSA.  Lunch breaks are not compensable.

So there -- just using Mr. Hornady as the only example, if the plaintiffs' theory is clock in, clock out, then *Anderson* is not applicable.  And if their argument is we

1    actually worked from the minute we clocked in to the minute

2    we clocked out, Mr. Hornady's testimony contradicts that and

3    creates a material issue of fact.  Summary judgment or

4    sanctions.

10:25:37  5           The other plaintiffs who were deposed testified at

6    varying amounts of time from when they clocked in and when

7    they actually started working.  The jury question is going to

8    be what was that time and during the workday was there other

9    non work time for which they were paid that offsets the

10:25:59  10   alleged work time before the shift starts.

11           So there is no -- from a summary judgment

12   perspective, it is a disputed issue of fact whether they

13   worked without pay which is the only legal issue under the

14   FLSA.

10:26:14  15           THE COURT:  Well, so your client responded to the

16   plaintiffs' motion for summary judgment.  I don't recall what

17   you just laid out to me being in that response.  So, you

18   know --

19           MR. POWELL:  I understand, Your Honor.

10:26:29  20           THE COURT:  Okay.  So even if I'm not considering

21   default as a sanction, these are arguments that were made in

22   a summary judgment motion and responded to but not responded

23   to at that time.

24           MR. POWELL:  Whether it was work was raised in the

10:26:45  25   response.  It may have been inarticulate, but work was

1    challenged in the response.  The *Anderson* argument, Your

2    Honor, I will concede was not.

3              THE COURT:  Okay.

4              MR. POWELL:  Okay?  I will concede that was not.

10:26:58  5  That will also be -- that would also be a trial plan issue

6    for the pretrial order as to how we're going to try this

7    case.

8              THE COURT:  100 percent agree.

9              MR. POWELL:  So the work issue is disputed as to the

10:27:11 10  amount of time that arguably could be conceived -- could be

11   considered uncompensated work.  That's clearly a disputed

12   issue in the case.  If you choose to deal with it as a

13   sanction, that, in my view -- you're going to have to make a

14   specific finding as to time.  Otherwise, we're going to have

10:27:31 15  to go to a jury and they're going to have to decide that.

16             THE COURT:  Let me just test my recollection again,

17   too.  Because I think Ms. Pledger testified that Hornady was

18   deemed -- like, Hornady doesn't determine when his

19   compensable time starts and stops.  Am I getting that right?

10:27:56 20             MR. POWELL:  Well, in a weird sense, Your Honor,

21   Ms. Pledger testified it was the company's assumption he was

22   working.

23             THE COURT:  Okay.

24             MR. POWELL:  That's an assumption on the payroll

10:28:12 25  person's part.  The plaintiffs contradicted her testimony.  I

will have to admit, Your Honor, I have been doing this for 30

years.  I am about to make an argument I have never made in a

federal courtroom.  The plaintiff's testimony that he was not

working contradicts the testimony of the company witness.

10:28:27  That is a disputed issue of material fact that precludes

summary judgment on that issue.

THE COURT:  There's a first time for everything,

right?

MR. POWELL:  There is, Your Honor.

10:28:37  In addition, I believe at trial there will be

evidence that there was other time in the day where they were

not working that offsets the alleged time they were working.

Therefore, there's no violation of the law.  But the

underlying disputed issue of fact is clearly in the record.

10:28:55  So I point that out only to say Mr. Rosenthal said

there really was no dispute because they're relying on the

time clock records, and I am raising the arguments that go

with that.

The bonus issue -- he is struggling to figure out

10:29:10  how that relates to the jury.  The question of the bonus

itself I believe is a legal issue.  And we filed a motion for

reconsideration because we believe, in fact, the regulations

and the caselaw -- admittedly, there is in none in the

Eleventh Circuit to guide you.  I will admit that.  But the

10:29:31  cases that deal with it and the practical reality of the

situation, I believe OTK is paying correctly.  If the Court

disagrees, that's a legal issue.  We are -- we have preserved

it for the record.  The Court can choose to handle that

however it wants.

10:29:47  THE COURT:  Sure.

MR. POWELL:  But here's how it becomes a jury issue:

The plaintiffs' theory is the bonus should now be apportioned

back over by hours within the calendar month.  Okay.  So we

are now back to needing to know how much time did you work in

10:30:02  a calendar month because the bonus dollars will get decided

over the hours you worked, which the jury is going to have to

decide.  So you can't resolve the impact of the bonus unless

and until you know how many hours and what workweek so you

know if it's an overtime week or not an overtime week.

10:30:25  We will then have to look -- and this is where it's

going to get complicated because if it is an overtime week,

they've already been paid overtime.  If we are adjusting the

hours, we now have to adjust for the alleged additional work

time and the additional bonus dollars to reapportion them

10:30:46  over every calendar day of every week of every year in the

case.

So the bonus issue overlays what should be the jury

issue on the underlying question of work and the question of

the workweek.

10:31:02  THE COURT:  Okay.  But doesn't that run kind of

1    inconsistently with the argument that you made in your motion

2    to reconsider that it's, I think, a 209, impossible to

3    determine, versus 210?

4         MR. POWELL:  Well, what 210 allows is what OTK does

10:31:25  5    which is it identifies the amount of the bonus which cannot

6    be identified during a particular workweek or pay period.  It

7    is identified after the fact.  The company apportions it on a

8    total earnings percentage basis, which the regulations

9    expressly allow, to include overtime.  It means you don't

10:31:47  10   have to recalculate.

11        But if the Court concludes the bonus issue should be

12   the way the plaintiffs want it, then all of the underlying

13   factual questions will impact the damages computations from a

14   decision that the current bonus structure is improper.

10:32:06  15   That's how they intertwine with one another.

16        Okay.  The regular rate question that keeps coming

17   up, the regulations tell us how to calculate the regular

18   rate.  It's not complicated.  It is total earnings divided by

19   hours worked.  It's that simple.  The plaintiffs have had the

10:32:31  20   basic data to do that for a long time.  They don't like the

21   format.  It is complicated to read.  It is hard to use

22   because you have -- actually have to go line item by line

23   item through a pay stub and then go look at a time record.  I

24   will admit it is painful.  But it's not unlawful and it

10:32:56  25   doesn't mean that somehow OTK hid that ball from the

1   plaintiffs.

2          I admit my colleagues got off track and I think
3   unduly complicated the process.  But the data is in the
4   record.  Time and pay.  The balance of the pay I will admit
10:33:16  5   will be today, tomorrow, this week.  And we can do the math
6   if we know -- if the jury decides how much work time and what
7   workweek.  That's the big issue because it moves based on the
8   work schedule.  Does it add six hours or does it add 18 hours
9   to the workweek?  How does that affect who worked when?

10:33:43  10          So all of those are interrelated and they all
11   require underlying factual determinations before we can get
12   to any approximation of damages.

13          The true-up issue which is what I think was sort of
14   the source that got us to this challenge with ADP -- the
10:34:07  15   true-up discussion started with a question about holiday pay.
16   Holiday pay at Outokumpu, they pay at time and a half your
17   normal rate.  There is actually a specific FLSA regulation on
18   that that talks about whether you must include the increased
19   rate in the regular rate of pay computation.  That was the
10:34:34  20   underlying question because Mr. Rosenthal asked Ms. Pledger
21   if that was factored into the regular rate.

22          I will admit where Ms. Pledger went with that was
23   unfortunate and it was inaccurate.  It has created a host of
24   challenges.  The reality is the pay records and the time
10:34:57  25   records govern the outcome in this case.  Did Ms. Pledger get

1    it right?  No.  Is there a true up in the records?  I have

2    not gone through yet five years worth.  The ones I have

3    looked at, I can't find a true up because I don't think it

4    actually occurs.  Other than any -- the extra payments that

10:35:22  5    are made later are where individualized errors occur.  Say a

6    pay rate adjustment for somebody gets made late and they get

7    a retro pay.  The bonuses are paid at the end of the month on

8    the formula that the Court has seen briefed.

9            So the true-up issue to me is, quite frankly, a red

10:35:42 10    herring and a distraction because the underlying pay records

11    and the underlying time records tell us how they were paid

12    and the regular rate regulation tells us how to calculate the

13    rate which is the legal issue before the Court.

14            I think I have checked off all of his items.

10:36:05 15            THE COURT:  Okay.  I wish you had been involved in

16    this case earlier, Mr. Powell.

17            MR. POWELL:  I will refrain from comment, Judge.

18            THE COURT:  Well, no.  But I mean, so -- but you

19    weren't.

10:36:25 20            MR. POWELL:  I understand.

21            THE COURT:  And that's why we're here.

22            MR. POWELL:  I understand, Judge.

23            THE COURT:  And, Mr. Rosenthal, is there anything

24    else you would like to say on that?

10:36:35 25            MR. ROSENTHAL:  Yes.

1          THE COURT:  On the issues that Mr. Powell raised;

2     not my commentary about Mr. Powell.

3          MR. ROSENTHAL:  No.  I understand.  But the generic

4     point is in every case when things start going south, any

10:36:56 5     lawyer, whether they are reviewing their own work, the work

6     of prior counsel, the work of co-counsel, whatever, can

7     identify a whole bunch of things that they wish they could

8     have done differently or said differently.

9          Mr. Powell is not the first lawyer for OTK to

10:37:18 10     attempt to substitute what they would like the evidence to be

11     for what the evidence is and has been.  And that's sort of a

12     recurring comment I could make over and over again is what he

13     is telling you what he can figure out from the records and

14     what he can determine and what he can discern -- if it was

10:37:47 15     true -- even if it is true -- is the same thing that OTK is

16     supposed to have been telling us in verified statements at

17     the outset about pay rates or that Melissa Pledger or Dave

18     Scheid, their representatives, could have rattled off.

19          But there are a couple of specific things.  And I

10:38:07 20     would also say that to some extent what Mr. Powell is doing

21     is echoing arguments made in briefs, which is fine for

22     consistency standpoint, by OTK that we have already

23     addressed.

24          Melissa Pledger's detailed testimony was not some

10:38:26 25     throwaway comment because I asked her how July 4th was

handled.  As I think I talked about in some detail maybe in

our February hearing, what triggered at least the line of

questioning was the earning statements show overtime rates

that cannot possibly be right because they're not time and a

half the regular rates and when the regular rate doesn't

change, the overtime rates do change.

And that led me to ask Melissa Pledger a string of

questions to try to figure out what was going on.  And that

led to her talking about that she didn't know the formula;

ADP knew the formula, but there is a trued-up adjustment made

every month.  Not for every employee but they look to see

whether an adjustment is necessary for the first paycheck of

every month by looking back.  And that they are only looking

for underpayments of overtime.

And that -- she clearly testified that the reason on

those earning statements, those pay stubs, you see the

numbers vary is a reflection of this trued-up process,

whatever it is.

Mr. Powell is right that sometimes they screw up a

payment, like, somebody's rate of pay doesn't get picked up

or sometimes they miss -- one time, I think they

miscalculated all the bonuses for one month and they came

back four days later and people got an extra $19 or $23 or

whatever.

But the earning statement discrepancies that Melissa

1    Pledger testified indicate that this step-up rate is

2    happening happened over and over and over again.  And in our

3    summary judgment submission, we have included examples of

4    earning statements to show how frequently they're happening.

10:40:25  5         So it is not accurate and it is certainly not

6    reflected in the record that what is really going on is every

7    once in a while, they make a mistake about somebody and they

8    pay them more and that's the trued-up payment.

9         Going backwards to the bonuses, the bonuses are

10:40:52  10   supposed to be allocated to the weeks in which they were

11   earned unless it's impossible.  One of the things we talked

12   about in February hearing was, well, how would you do it.

13   And I said that there were a couple of ways to do it but one,

14   in particular, was count up how many days were in the month.

10:41:15  15   You look at which workweeks there are and you're going to end

16   up with a number of full workweeks and possibly partial

17   workweeks at either end and so you know it's four weeks and

18   three days.  And it's not that hard.

19        I would add that in the documents that OTK has been

10:41:37  20   producing in the last couple of weeks are earning statements

21   for the monthly bonuses.  And somewhere along the line what

22   they have started doing is putting the start date and the end

23   date for those monthly bonuses.  And maybe, to their credit,

24   the start date is the first date of the month; the end date

10:41:58  25   is the last day of the month.  That's when they say it begins

and ends.  I think it is just a formatting change to the

earning statements this is now explicitly included, but it

happens to be explicitly included.  And if we had had them

six months ago, we would have thrown them into our summary

10:42:16  judgment submission.

Once it is determined that the provisions of

Sections 209 and 210 have not been complied with, there is no

jury issue that requires the rest of it.  The reference to

hours and how we have done it, which I think is the right way

10:42:49  to do it -- but even if theoretically it's not the right way

to do it and a different formula is the legally-required way

to do it, that's a legal determination, not a factual one.

But what we have done formulaically -- and I'm going

to use round numbers for the obvious reasons.

10:43:12  THE COURT:  I won't take offense to that.

MR. ROSENTHAL:  I've only got so many fingers.

THE COURT:  Me being the most obvious reason.

MR. ROSENTHAL:  If somebody got paid a bonus of a

thousand dollars at the end of March for work performed in

10:43:30  February, you say okay.  February has got 28 days.  But --

and they don't actually -- but February has got 28 days.

Easy enough most of the time.  What you can't do is say,

well, this guy got his thousand dollars evenly split over 28

days because maybe he worked 17 days and maybe he worked 11

10:43:58  days and maybe he worked 23 days, none of which incidentally,

affects how much money he gets at the end of March.  You
could look at how many days he worked in each week and then
reallocate it back.

     What we have done because I think it is more
accurate and more precise and reflects the extent to which
money has been earned is we took the total number of hours in
the month that the guy works.  And if it's 200 hours, we said
all right.  He made a thousand bucks as a bonus for 200 hours
of work over 28 days.  It's five dollars an hour.  And then
use that as an adjustment to the -- his base rate of pay in
each week.  And that base rate of pay may go up and down
because of nightshift or dayshift.  It may go up or down
because of step-up rates, but we're tacking on five dollars
an hour to the base rate of pay that we're incorporating into
the rest of it, the result of which is that I think you've
got an exact allocation.  How much money did the guy get over
the course of a month for a bonus earned over the course of a
month divided by the number of hours he worked over the
month.

     You could, if you really wanted to, then take the
hours in each week and re-jigger the whole thing, but that
would be a legal determination about what the right formula
was to correct for it, not a factual one for a jury.  And,
incidentally, I think it would be inaccurate.  But I don't
see what a jury would ever decide about any of this with

1    regard to the bonuses.

2          And the last thing -- and this echoes a comment you

3    made -- or the last two things.  Switching to the time

4    rounded, they are intentionally mischaracterizing what we are

10:46:13   5    saying about *Anderson*.  What *Anderson* proof says is if the

6    defendant doesn't have the records that's required, then

7    there are these consequences.  The defendant does not have

8    the records they want to talk about about, hey, when did

9    these people start working?  Maybe a guy had a sandwich.

10:46:33   10   They do not have any records of that.  And so the *Anderson*

11   proof level is if that is nothing they keep track of, then

12   you have the *Anderson* consequences.

13         The second part of it is we do have -- rather than

14   it turning into a free for all where 280 guys come in and

10:46:55   15   women come in to talk about what they do and don't and when,

16   we have the actual timestamps that they really do have that

17   they really do use that we are using to establish when they

18   started working.  And we have their actual testimony that

19   they assume they are working for that period of time.

10:47:17   20         All the rest of it -- the one thing I would say

21   about Mr. Hornady is -- and we addressed in one of our reply

22   summary judgment submissions -- I could get you a better page

23   site if I was looking at all of it.  What Mr. Appleby and

24   Ms. Daly definitely asked Mr. Hornady about before he started

10:47:36   25   walking nine-tenths of a mile was way back in the beginning,

what were you doing.  And his reference was back in the
beginning.  And then it was eventually when -- he started
work, like, 2012.  So the hike to get to the workplace that
he's talking about was 2012.  Or '13.  Whatever.  Outside of
our time period.  And that's explicit.  And we included the
pages in our reply submissions.

What every single plaintiff, which makes it sound
like there are more people deposed than the four who really
were -- what they all said was we were either starting work
immediately upon clocking in and, again, Belcher said it is
two feet away.  I clock in and I start.  Or in Mr. Hornady's
case, that he was told to start working before he clocked in
which we have not made a claim for let alone a collective
claim for but doesn't help them any.

Back in May or June when they sought more time to
respond to our initial summary judgment submission and they
specifically said, well, we need two things.  We need to get
statements from our own witnesses who have already been
deposed and we want to depose some plaintiffs -- and the
point I made then was nothing these people can say, the
plaintiffs can say, will ever change anything that the
defendant has said and can do because they're not in charge.
And I said we're relying on what we've already gotten from
the defendant by way of testimony.  And five or six months
after that, we were in exactly the same boat.  They had asked

1    plaintiffs questions, gotten testimony that doesn't

2    ultimately mean anything, and we are where we are.

3          There has never been any discussion about, hey, we

4    should knock off an hour from their clocked-in time for lunch

10:49:57  5    breaks.  I would tell you the reason there's never been an

6    issue is because these guys get paid for those 12 hours

7    whether they are allowed to take a break or not.  They aren't

8    clocking out for lunch break or clocking back in as they

9    would be if it mattered.  And a lot of them -- it's not in

10:50:17  10   evidence because it is not an issue, but a lot of them say

11   yeah; we work straight through when we have to work straight

12   through.  Maybe you're allowed to get a Coke.  Maybe you're

13   not.  It depends on production.

14         To started back where I started, I wish in every

10:50:31  15   case at the end I could go back and redo everything I didn't

16   like along the way and hopefully make it better.

17   Traditionally, that is not what this Court -- not just you

18   but the judges of this court's scheduling orders allow for;

19   that we just start over again at the end.

10:50:50  20         THE COURT:  Well, I think, yeah.  And we're not

21   starting back over.  So don't go tell my colleagues that I'm

22   being soft or --

23         MR. SIMS:  Judge, in anticipation of my falling

24   asleep, may I add one thing?

10:51:14  25         THE COURT:  Yes, sir.

1        MR. SIMS:  I think -- and this is a very broad

2   comment meant to apply to several things like the master and

3   whatnot.

4        I think it was in 1950 that the Supreme Court issued

10:51:32   5   its decision in *Mt. Clemens Pottery* which applied to FLSA the

6   kind of common law rule that says that once the liability is

7   established, the burden of uncertainty or estimation in

8   proving damages falls on the defendant.  And I think that's

9   an important principle to keep in mind here because, you

10:52:10  10   know, when we were headed to today for a pretrial, Ian asked

11   me to prepare the motions in limine.  And one of the motions

12   I was working on was one that said defendant -- asked you to

13   instruct -- to enter an order saying, defendants cannot use

14   the words in jury argument or anything else any words like

10:52:40  15   uncertainty or estimate or approximation in describing the

16   plaintiffs' damage claims because *Mt. Clemens* and the

17   hundreds or thousands of cases that apply it say once FLSA

18   liability is established, the burden of uncertainty falls on

19   the defendant.

10:53:09  20        So I know that Ian and the computer guy are working

21   tirelessly to get the damages honed down as precisely as they

22   can despite two years or more of default by OTK.  But the

23   fact that we can't get it exactly is not our problem.  It's

24   their problem.  And that's my only point.

10:53:41  25        THE COURT:  Okay.

1           MR. POWELL:  If I may, Your Honor.

2           THE COURT:  Sure.

3           MR. POWELL:  Okay.  I just want to respond to

4   Mr. Sims' point about *Anderson*.  Case is *Anderson v. Mt.*

10:53:55  5   *Clemens Pottery*.

6           The proof is if we're operating on the assumption

7   that the records are inaccurate and that the plaintiffs

8   are -- would be permitted to establish by just and reasonable

9   inference the normal workweek -- that's what *Anderson*

10:54:12  10  allows -- that proof requires the plaintiffs -- and this is

11   the underlying fundamental issue covered by the Fair Labor

12   Standards Act.  It does not matter whether or not our records

13   are sloppy.  It does not matter whether we calculated it

14   wrong.  The regulations tell us how to calculate the regular

10:54:33  15  rate from which the overtime rate may be calculated.

16           The plaintiffs' *Anderson* proof is to establish at

17   trial to the jury the just and reasonable inference of a

18   typical workweek that may then be applied to the

19   similarly-situated group.  That testimony at trial to the

10:54:59  20  jury is going to be the plaintiffs and any counterevidence of

21   time not worked.  And the jury at the end will then decide

22   that the plaintiffs have proved in an average week an extra

23   nine minutes, an extra 29 minutes.  That number is then

24   applied to the whole group subject to, as Mr. Sims notes, the

10:55:27  25  defendant's ability to disprove the application of that to

1    any single member of the case.  That's where *Anderson* proof

2    model goes.  So even if Magistrate Judge Nelson's order that

3    they get *Anderson* proof and we're limited by documents

4    produced or evidence produced to that point, which would

10:55:50  5    include witnesses, we're still entitled to have the jury hear

6    the evidence and determine whether or not the plaintiffs have

7    proven any work for which they were not paid.  And that is

8    the underlying legal issue in the case.

9         Bad discovery efforts or not, that is the issue that

10:56:14  10    has to be decided.  And all the plaintiffs can do is say, we

11    started work early.  The jury then has to decide whether,

12    based on all of the evidence, that number is the whole clock

13    time or some number below the whole clock time.

14         If that occurs, then we can pick out individual

10:56:38  15    plaintiffs, if we think we have any evidence, to try to poke

16    holes in.  That's the second half of the process.  But the

17    initial proof process requires them to prove a violation of

18    the law.  And on the current record, that's a question mark.

19         THE COURT:  Okay.  Well, that question mark -- at

10:57:00  20    least the questions -- the fact questions to be resolved by a

21    factfinder or a sanction, if that's what I decide, I think

22    that's a fair point for me to ask the parties to list those

23    out.  What are the factual questions that have to be resolved

24    in order to put you in a position to determine damages?

10:57:32  25    Which I guess is where I was trying to go with my rather

1    naïve I'm going to enter a default on liability.  I think

2    that that needs to be more specific.  I've taken that from

3    what you've told me.  And I want to look at exactly what

4    those questions are before I decide.

10:57:53  5            So I'm going to ask plaintiffs, defendant to present

6    me a joint list of those -- I mean, this is, I guess, sort of

7    something we would be doing if we were having a trial and

8    this was a pretrial conference in your pretrial document.

9    But to the extent you disagree, just separate them out, those

10:58:16  10   that you don't agree on.  But I suspect that you can probably

11   agree on what most of the questions are.

12           How much time do you need to do that?  Week?  Two

13   weeks?

14           MR. POWELL:  Two weeks good with you?

10:58:34  15          MR. ROSENTHAL:  Sure.

16           THE COURT:  Okay.  Let's do that.  Because that will

17   help me do a better job of entering a sanction order in this

18   case.

19           MR. ROSENTHAL:  Judge, I skipped one question you

10:58:50  20   asked earlier which is what I think about a special master,

21   and the answer is I think that's fine.  I don't know who

22   locally has a bunch of wage-and-hour experience.  If we're

23   just picking retired judges, obviously, there are a bunch of

24   state court ones who are still active and out and about

10:59:08  25   including Lang Floyd and John Lockett and Rick Stout and

1    others.  But the general idea is okay with me.

2            THE COURT:  Okay.  Well, I don't want to just pick

3    somebody who wouldn't be helpful, frankly.  So let's -- and

4    just knowing that some people on the list that you've --

10:59:35 5    knowing them very well, they might not be helpful.

6            MR. ROSENTHAL:  Or happy about it.

7            THE COURT:  Or even happy about it.  So, you know,

8    and perhaps the -- we might need, like, a forensic

9    accountant.  That might be more helpful.  I don't know.  But

10:59:55 10   that's at least a step away from where I am right now.

11           So let's eat this elephant one bite at a time and

12   submit that to me.  Two weeks.  And then we will go from

13   there.  That will give me time to get the rest of my order

14   prepared.

11:00:12 15       Okay.  There's one order, Mr. Jackson since you're

16   here -- or at least there's one motion that I can make you

17   speak -- since you're here and probably going to send a bill

18   to somebody for your time here, I feel like I should make you

19   speak in court.

11:00:31 20       You had submitted a motion for fees.  I have read

21   OTK's response.  I understand that the Littler firm has

22   satisfied at least the fee request you had made and agreed to

23   address anything further.  But I understood from the OTK

24   response that you weren't willing to withdraw your motion.

11:00:57 25   So let's talk about it briefly.

1      What else are you looking for from the Court?

2      MR. JACKSON:  Your Honor, I think the message that

3  came from Littler was the response we gave to a proposal that

4  Littler had made.  They had offered to pay the fees and, in

11:01:16   5  return, we were to withdraw the motion.  And, of course, we

6  were happy to take the payment from them.  But ADP was not

7  willing to withdraw the motion as a condition.

8      I think -- I guess just putting it bluntly, I think

9  ADP was most interested in being vindicated in the same

11:01:39  10  manner it was, in its view, thrown under the bus.  And that

11  was through public filing.  I think they were looking for an

12  order from the Court.  But in any event, they weren't

13  willing to -- they viewed it as taking it back, you know, if

14  they withdraw their motion for fees.  They didn't want to be

11:01:57  15  viewed of taking back what they alleged.

16      In terms of the relief that's been requested in the

17  motion, I think that has been satisfied by what Littler has

18  done and agreed to do.

19      THE COURT:  Mr. Powell, unless you have some kind of

11:02:11  20  objection, I think I might be inclined to grant the motion

21  and note it has been satisfied.  Do you have any objection to

22  that?

23      MR. POWELL:  No objection from me, Your Honor.

24      THE COURT:  Okay.  Well, then, that's what I will

11:02:24  25  do.  And we will only have eight motions or filings pending.

So I feel like we've made progress.  I'm not sure I'll feel
like that when I sit down in the back to think further about
this case.

        I really do want to try to help this move to a
resolution in whatever way we can.  And I'm trying to be
cognizant of the fact that, Mr. Rosenthal, you filed another
case, a similar case I think.

        MR. ROSENTHAL:  Sure.  It is a guy who his claim, of
course, would go back just to whenever we recently filed it.
It's an individual one.  The way these things work, I would
expect to at some point be filing others because it keeps
going.  I don't mean that in a bad way.  It's just the way it
works and you can't keep tagging them into the current one.

        THE COURT:  Correct.  But, you know, those are new
cases that are filed afresh that OTK would be in the position
to address in a different way and so that's -- I'm trying not
to create some kind of -- I don't know -- res judicata on any
kind of issue where a lot of my decision is based on the
conduct of defense of prior counsel.  And if I'm doing things
as a sanction, I want to try to be cognizant of not binding
OTK based on what happened in this case in future cases if,
you know, they're not getting the full opportunity to go all
the way through with all of the claims.

        So there's part of my naïve approach to resolving
the issue as well.  Okay.  Fair enough.

1          Is there anything else that we can take up that you

2     want to talk about while we're here?

3          MR. POWELL:  Not unless you tell me I can talk you

4     out of it.

11:04:43  5          THE COURT:  I don't think that's going to happen.

6          MR. POWELL:  Otherwise, no.

7          THE COURT:  Okay.  Mr. Rosenthal?  This is always a

8     risky question.

9          MR. ROSENTHAL:  No.  No.  The question I had was if

11:04:54  10    there is anything left to try to a jury, do you know what the

11    next possible jury selection dates are?  And I ask for the

12    very selfish reason that I have a kid to get back and forth

13    to Arizona this summer and we're doing it by car.  So I'm

14    trying to calendar stuff.

11:05:14  15         THE COURT:  Sure.  Well, the next trial term would

16    be August -- would be the next trial term.  It used to be

17    that we could predict jury selection dates because we picked

18    all the juries for criminal cases on one day and all the

19    juries for civil cases on the next day.  We don't do that now

11:05:39  20    in the pandemic world.  So whatever date we would decide to

21    start the trial, we would pick a jury on that day and --

22         MR. ROSENTHAL:  Oh, okay.  That makes it really

23    easy.

24         THE COURT:  I think so.  But everyone here doesn't

11:05:58  25    share my view.  As a civil lawyer, I never liked the way that

1    it happens here.  But whatever.  That doesn't really matter.

2    In the corona era, we're picking juries and starting trials.

3    So that limits the times the jurors have to come to the

4    courthouse.  And it has been successful in allowing us to

11:06:25  5    have trials and move forward.

6            So August would be the next term.  It sounds like

7    there's been tremendous progress in terms of getting data.

8    That's super helpful.  And, like I said, I'm glad you're in

9    the case now, Mr. Powell.  I'm sorry we're talking about

11:06:47  10   sanctions and tying your hands behind your back to some

11   degree.  But I appreciate the progress that you have made.

12   And I thank you for it.

13           Okay.  All right.  Well, very well.

14           Mr. Jackson, we will enter that order shortly.

11:07:03  15           MR. JACKSON:  Thank you, Your Honor.

16           THE COURT:  All right.  Thank y'all for your time.

17       (The Proceedings were concluded at approximately

18   11:07 a.m. on April 13, 2021.)

19

20

21

22

23

24

25

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1

2

3                    C E R T I F I C A T E

4

5

6          I, the undersigned, hereby certify that the

7   foregoing pages contain a true and correct transcript of the

8   aforementioned proceedings as is hereinabove set out, as the

9   same was taken down by me in stenotype and later transcribed

10  utilizing computer-aided transcription.

11         This is the 14th day of April of 2021.

12

                    *Cheryl K Powell*

14   _____

15            Cheryl K. Powell, CCR, RPR, FCRR

16         Federal Certified Realtime Reporter

17

18

19

20

21

22

23

24

25