**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM HEATH HORNADY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 1:18-cv-00317-JB-N |
| | ) | |
| **v.** | ) | |
| | ) | |
| **OUTOKUMPU STAINLESS USA, LLC** | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT LIST SUBMITTED PER THE COURT'S ORDER (DOC. 323)**

As the Court instructed counsel at the April 13, 2021 conference[1] and in accordance with

the Court's April 22, 2021 Endorsed Order (Doc. 323), Plaintiffs William Heath Hornady, et al.

("Plaintiffs") and Defendant Outokumpu Stainless USA, LLC ("OTK"), appearing through the

undersigned counsel,[2] submit the following Joint List in order to assist the Court in its

deliberations:

**OTK's Preliminary Statement:**  OTK believes that the record in this case shows that,

while some facts are undisputed, many other fact questions remain to be resolved by the finder of

fact. By listing fact questions below and stating its position of each such question, OTK does not

---

[1] The parties' understanding is that the Court requested a list of decisions to be made for a complete adjudication. OTK's understanding is that this submission is to address "fact questions," but Plaintiffs' understanding is that the decision list is supposed to be comprehensive. Because of the various permutations of potential decisions, both parties ask the Court to treat this joint submission as non-binding in case, for good cause shown, either later believes that a ruling of the Court either eliminates an issue described here or leaves for resolution an issue not identified. The parties have, however, strived to make this submission comprehensive. They have also aimed to err on the side of over-inclusiveness with the expectation that it is easier for the Court to disregard what it might consider non-issues, or to evaluate different phrasings of issues, versus authoring new content that the parties did not include.

[2] OTK's counsel is e-filing this Joint List with Plaintiffs' counsel's authorization.

concede that any fact questions (or questions of law, for that matter) are appropriate for resolution through a "sanctions order." OTK has already asked for leave to brief the sanctions issues (Doc. 328), which leave the Court denied. (Doc. 329.) OTK reserves all argument regarding the sanctions issues and notes that the sanctions issues that the Court identified at the March 12, 2021 show-cause hearing have not been briefed by any party.[3]

**Plaintiffs' Preliminary Statement**:  Plaintiffs' position is that all of the issues presented in their summary judgment submission are properly resolved without further proceedings based on the absence of genuine issues of material fact and / or the application of previously cited authorities such as Cooper v. Meridian Yachts, Ltd. 575 F. 3d 1151, 1178 (11th Cir. 2009) Evans v. Stephens, 407 F. 3d 1272, 1278 (11th Cir. 2005),  Abrams v. Ciba Specialty Chemicals Corp., 663 F. Supp 2d 1259, 1266 *S.D. Ala. 2009) and similar authorities. (See Doc. 264 PageID.3336-3337)  To the extent that any of those issues are not resolved by summary judgment, the Court can and should enter an Order stating material facts that are not genuinely in dispute pursuant to Rule 56(g).  Somewhat redundantly, any issues that depend on the amounts of compensable time worked and / or authorized for pay, the amounts of weekly payments to Plaintiffs, and whether the bonuses were earned over a calendar month, can be resolved by specific application of the general sanctions provisions in the Magistrate Judge's October 26, 2020 Report and Recommendation  ("R & R 1") (Doc. 261 PageID.3270) and by applying the burden shifting approach described in that R & R. (Doc. 261 PageID.3276 discussing Anderson v. Mt. Clemens Pottery Co., 320 U.S. 680, 687 (1946); Allen v. Bd. Of Pub. Educ. For Bibb Cty., 495 F. 3d 1306, 1313-1316 (11th Cir. 2007)) The sanctions in R & R 1 pre-date the issue created by the communications between the

---

[3] The possible exception in terms briefing on sanctions following the March 12 hearing arise from the separate issues surrounding third-party ADP, Inc.'s claim for attorneys' fees, fees which OTK's former law firm has paid. (*See* Doc. 317.)

Defendant's former counsel and the Court concerning the ADP subpoena.  Finally, of course, a default judgment as to liability as a sanction would moot many of the issues Defendant identifies.

## PRELIMINARY QUESTION

1.    **OTK's Question**:  Have Plaintiffs shown sufficient facts to entitle them to the relief sought from the Court in paragraph C of Plaintiffs' "Prayer for Relief"?  (Doc. 223, 3d Am. Compl. at PageID 2660.)

**Note:**  in this paragraph C, Plaintiffs ask the Court for "An order directing Defendant, at its own expense, to investigate and account for the number of hours actually worked for each workweek, and the hourly rates for each hour worked, the amount(s) paid for overtime each workweek, and the rates of overtime pay."

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Granting the relief sought in Complaint paragraph C for each Plaintiff and Collective member could moot the finder of fact's need to answer many of the factual questions listed below. | Other than to the extent the Court may make such an Order as to payments or time worked on or after January 1, 2021 paragraph C is now moot. |

## FACTS RELATING TO PLAINTIFFS' "ROUNDING" CLAIMS

**OTK's Preliminary Statement Regarding "Rounding":**  Plaintiffs allege that OTK engaged in improper "rounding" practices for time clocked before and after the end of Plaintiffs' and Collective members' scheduled shifts. Although OTK has used the term "rounding" to describe the on-the-clock time before and after the end of a shift, this is not a classic FLSA "rounding" situation. Rather, OTK sees the question as whether or not Plaintiffs and Collective members performed work which was not compensated. The FLSA does not require payment for time that is not worked, and OTK maintains that, in many instances, its employees were not

performing work before the start of their scheduled shifts or after the end of their scheduled shifts. When work was performed before the start of a shift or after the end of a shift, OTK's supervisors had the ability to ensure that employees were paid for such work.

**Plaintiffs' Preliminary Statement Regarding "Rounding":** The "rounding" issue has been accurately described in Plaintiffs' summary judgment submission.[4]  OTK's preliminary statement immediately above describes a position about which OTK has failed to submit evidence sufficient to create an issue of genuine fact.  Plaintiffs proved they performed work for which they were improperly compensated and provided sufficient evidence to show the amount and extent of that work through OK's time stamp records, the testimony and declarations of assorted Plaintiffs, and Melissa Pledger's 30(b)(6) testimony.  OTK has been unable to meet its burden(s) to bring forth evidence of the precise amount of work performed or to negate the reasonableness of inferences drawn from the Plaintiffs' evidence.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946); Allen v. Bd. Of Pub. Educ for Bibb Cty, 495 F. 3d 1306, 1315-1316 (11th Cir. 2007); Tyson Foods v. Bouaphakeo, __ U.S. __; 136 S. Ct. 1036, 1047(2016); October 26, 2020 R & R 1 (Doc. 261 Page Id. 3276)


2.    **OTK's Fact Question**:  Before May 6, 2018, did each Plaintiff and each Collective member perform work after clocking in but before the scheduled start of his or her assigned shift?

**Note:**  as alleged in Plaintiffs' Third Amended Complaint, before May 6, 2018, OTK employees could clock in up to 30 minutes before the scheduled start of their shifts. Plaintiffs

---

[4] OTK's suggestion that this is not a "rounding" issue is at odds with its August 2018 Team Member Handbook which explicitly discusses "rounding" (Doc. 244-4, PageID.2849), and its various communications with its attorneys which explicitly discuss "rounding."(Docs. 189-11, 189-12, 189-13, 189-14).

allege that OTK's time records show the exact time each employee clocks in and that this time before the start of each shift was rounded down "unless [OTK's] supervisory personnel manually over-rode the automated rounding." (Doc. 223, 3d Am. Compl. ¶¶ 11, 13, 16.2, 19.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Answering this question will require individualized proof for each Plaintiff and each Collective member. When pre-shift work was actually performed, OTK's supervisors had the ability to approve pay for such work.<br><br>Further, one reason that OTK provided a "grace period" that allowed its employees to clock in up to the 30 minutes before the start of a scheduled shift was because of where the parking lot and time clocks were located. Many employees would have to walk significant distances from the time clock to their respective work stations. OTK added parking lots closer to where employee worked, but even so, before May 2018, there were only a dozen or so time clocks in the entire facility. (Pledger Dep. 205:22-207:8.)[5] Plaintiff Hornady testified that, before 2016, the distance between the time clock and his work station was nine-tenths of a mile and that after 2016 the distance was more like 40, 50, or 60 yards. (Hornady Dep. 26:13-28:23.)[6] As a result placing time clocks closer to the various work stations, in May 2018, OTK reduced the "grace period" during which employees could clock in before the start of a shift from 30 minutes to 7 minutes. | This issue has been accurately presented and fully developed in summary judgment submissions. OTK's stated position is inconsistent with the record before the Court for summary judgment. The proper phrasing of any of these issues encompasses work which OTK "suffers or permits." 29 U.S.C.§ 203(g).<br><br>The decisions the Court is to make are:<br><br>1. Did / does OTK's rounding practice average out so that employees are fully compensated for the time worked.<br><br>2. Have Plaintiffs provided sufficient evidence to show the amount and extent of time worked and / or suffered to work?<br><br>3. If the answer to 2 is "yes" then has OTK met the burden placed upon it by <u>Anderson</u>, etc.<br><br>4. Are the answers to 1, 2, or 3 impacted by OTK's failure to produce or obtain records of what time was authorized for pay and what was not (see Stipulated Order Doc. 212, and R & R 1) |

---

[5] Portions of the Melissa Pledger transcript were placed in the record at Doc. 187-1, though this does not appear to have included the cited lines.

[6] Portions of Plaintiff Hornady's transcript were placed in the record at Docs. 258-5 and 263-2. A portion of cited pages can be found at Doc. 258-5, PageID 3211-3212.

| | |
|---|---|
| Time spent walking to one's work station is not compensable time under the FLSA. | |

3.    **OTK's Fact Question**:  Before May 6, 2018, did each Plaintiff and each Collective member perform work after the scheduled end of his or her assigned shift but before clocking out?

**Note:**  as alleged in Plaintiffs' Third Amended Complaint, before May 6, 2018, OTK employees could clock out up to 14 minutes after the scheduled end of their shift.  Plaintiffs allege that OTK's time records show the exact time each employee clocks out and that this time after the end of each shift was rounded down "unless [OTK's] supervisory personnel manually over-rode the automated rounding." (Doc. 223, 3d Am. Compl. ¶¶ 11, 16.2, 19.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Answering this question will require individualized proof for each Plaintiff and each Collective member. When post-shift work was actually performed, OTK's supervisors had the ability to approve pay for such work.<br><br>Further, one reason that OTK provided a "grace period" that allowed its employees to clock out after the end of a scheduled shift was because of where the time clocks were located. Many employees would have to walk significant distances from their respective work stations to the time clocks. OTK added parking lots closer to where employee worked, but even so, before May 2018, there were only a dozen or so time clocks in the entire facility. (Pledger Dep. 205:22-207:8.) Plaintiff Hornady testified that, before 2016, the distance between the time clock and his work station was nine-tenths of a mile and that after 2016 the distance was more like 40, 50, or 60 yards. (Hornady Dep. 26:13-28:23.) As a result of placing time clocks closer to the various work stations, in May 2018, OTK reduced | Plaintiffs incorporate their statement about Question 2.<br><br>OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date. |

| | |
|---|---|
| the "grace period" during which employees could employees clock out after the end of scheduled shift down to 7 minutes.<br><br>Time spent walking from one's work station is not compensable time under the FLSA. | |

4.    **OTK's Fact Question**:  After May 6, 2018, did each Plaintiff and each Collective member perform work after clocking in but before the scheduled start of his or her assigned shift?

**Note:**  as alleged in Plaintiffs' Third Amended Complaint, after May 6, 2018, OTK employees could clock in up to 7 minutes before the scheduled start of their shift.  Plaintiffs allege that OTK's time records show the exact time each employee clocks in and that this time before the start of each shift was rounded down "unless [OTK's] supervisory personnel manually over-rode the automated rounding." (*See* Doc. 223, 3d Am. Compl. ¶¶ 12, 14, 16.2, 19.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Answering this question will require individualized proof for each Plaintiff and each Collective member. When pre-shift work was actually performed, OTK's supervisors had the ability to approve pay for such work.<br><br>In May 2018, OTK brought the total number of time clocks in its entire facility up from a dozen or so time clocks to 34 time clocks. (Pledger Dep. 205:22-207:8.) Having 34 time clocks enabled OTK to place time clocks closer to each employees' respective work station, which reduced, but did not entirely eliminate, the time employees spent walking from the time clocks to their respective work stations. As result of placing time clocks closer to the work stations, OTK reduced the "grace period" during which employees could clock in before the start of | Plaintiffs incorporate their statement about Question 2.<br><br>OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date. |

| | |
|---|---|
| a scheduled shift from 30 minutes down to 7 minutes.<br><br>Time spent walking to one's work station is not compensable time under the FLSA.<br><br>Since the start of the COVID-19 pandemic, OTK has also allowed employees to clock in using an app on their phones. (Belcher Dep. 23:15-21.)[7] | |

5.   **OTK's Fact Question**:  After May 6, 2018, did each Plaintiff and each Collective member perform work after the scheduled end of his or her assigned shift but before clocking out?

**Note:**  as alleged in Plaintiffs' Third Amended Complaint, after May 6, 2018, OTK employees could clock out up to 7 minutes after the scheduled end of their shift.  Plaintiffs allege that OTK's time records show the exact time each employee clocks out and that this time before the start of each shift was rounded down "unless [OTK's] supervisory personnel manually over-rode the automated rounding." (*See* Doc. 223, Compl. ¶¶ 12, 16.2, 19.)

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| Answering this question will require individualized proof for each Plaintiff and each Collective member. When post-shift work was actually performed, OTK's supervisors had the ability to approve pay for such work.<br><br>In May 2018, OTK brought the total number of time clocks in its entire facility up from a dozen or so time clocks to 34 time clocks. (Pledger Dep. 205:22-207:8.) Having 34 time clocks enabled OTK to place time clocks closer to each employees' respective work station, which reduced, but did not | | Plaintiffs incorporate their statement about Question 2.<br><br>OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date. |

---

[7] Portions of Emily Belcher's transcript were placed in the record at Doc. 258-3, though this does not appear to have included the cited pages.

| | |
|---|---|
| entirely eliminate, the time employees spent walking from the time clocks to their respective work stations. As result of placing time clocks closer to the work stations, OTK reduced the "grace period" during which employees could clock out after the end of a scheduled shift down to 7 minutes.<br><br>Time spent walking from one's work station is not compensable time under the FLSA.<br><br>Since the start of the COVID-19 pandemic, OTK has also allowed employees to clock out using an app on their phones. (Belcher Dep. 23:15-21.) | |

6.   **OTK's Fact Question**:  Did OTK do anything to keep track of when arriving employees make "relief"?  (Doc. 223, 3d Am. Compl. ¶ 16.3.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The supervisors had the ability to approve pay for work performed pre-shift. Where such an approval is indicated in OTK's records, that could indicate that "relief" work was being performed. | Plaintiffs incorporate their statement about Question 2.  Specifically, this fact question is subsumed within the <u>Anderson</u> burden shifting framework.<br><br>OTK's production does not include what time was and was not approved, even as supplemented by the ADP production. OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date. |

7.   **OTK's Fact Question**:  Did each Plaintiff and each Collective member perform any work that was not compensated?

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Answering this question will require individualized proof for each Plaintiff and each Collective member. However, to give | Plaintiffs incorporate their statement about Question 2.  Specifically, this fact question is |

| | |
|---|---|
| one example, Plaintiffs and Collective members will testify that some lines stopped operating during "lunch" on each shift (usually for 30 minutes) and that no work was performed during this "lunch." (*See, e.g.,* Stokes Dep. 59:16-60:1.)[8] | subsumed within the <u>Anderson</u> burden shifting framework.<br><br>This is not a fact question because OTK has not asserted any position based on 29 CFR § 785.19.<br><br>OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date. |

      8.    <u>**OTK's Fact Question**</u>:  Did OTK seek advice of counsel regarding its "time clock" practices?  (*See, e.g.,* Doc. 189-10 at PageID 1824-25.)

| <u>**OTK's Position**</u> | <u>**Plaintiffs' Position**</u> |
|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK changed to 7-minute "rounding" (after installing additional time clocks) following the advice of counsel. (Scheid Dep. 173:11-175:18; 236:23-237:5.)[9] | The proper phrasing that encompasses this question and the avoidance of what are otherwise mandatory liquidated damages is: "Has OTK carried its burden of showing 'good faith'" <u>Joiner v. City of Macon</u>, 814 F.2d 1537, 1539 (11th Cir. 1987) (emphasis added); <u>see also Morgan v. Family Dollar Stores, Inc.</u>, 551 F. 3d 1233, 1282 (11th Cir. 2008)<br><br>The properly phrased sub-issue is:<br><br>"Has OTK carried its burden of showing both subjective and objective good faith"?  Those terms have been explained in the authorities cited in Plaintiffs' summary judgment motion.<br><br>OTK's stated position is inconsistent with the testimony of its witnesses and unsupported by any evidentiary showing to date.  OTK's |

      [8] Portions of Martin Stokes's transcript were placed in the record at Docs. 258-2 and 263-4, though this does not appear to have included the cited lines.

      [9] Portions of the David Scheid transcript were placed in the record at Doc. 187-2. A portion of cited pages can be found at Doc. 187-2, PageID 1417-1419.

|  | counsel's actual advice about rounding is fully presented in the summary judgment submissions. |
|---|---|

9. **OTK's Fact Question**:  Did OTK follow advice of counsel regarding its "time clock" practices?  (*See, e.g.,* Doc. 189-10 at PageID 1824-25; Doc. 245 at PageID 3053.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK changed to 7-minute "rounding" (after installing additional time clocks) following the advice of counsel. (Scheid Dep. 173:11-175:18; 236:23-237:5.) | Plaintiffs incorporate their statement about Question 8. |

10. **OTK's Fact Question**:  Did OTK seek advice of counsel regarding its "rounding" practices?  (*See, e.g.,* Doc. 189-10 at PageID 1824-25.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| OTK does not view the issues relating to the location of its time clocks as a classic "rounding" issue. Rather, OTK sees the question as whether Plaintiffs and Collective members performed work which was not compensated. Nevertheless, the finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK changed to 7-minute "rounding" (after installing additional time clocks) following the advice of counsel. (Scheid Dep. 173:11-175:18; 236:23-237:5.) | Plaintiffs incorporate their statement about Question 8.<br><br>Plaintiffs view the locations of time clocks as irrelevant.  Additionally, OTK has made no evidentiary showing about time clock location since July 2015 that would create a fact issue within the Anderson burden shifting framework. |

11.   **OTK's Fact Question**:   Did OTK follow advice of counsel regarding its

"rounding" practices?  (*See, e.g.,* Doc. 189-10 at PageID 1824-25; Doc. 245 at PageID 3053.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| As noted above, OTK does not view the issues relating to the location of its time clocks as a classic "rounding" issue. Rather, OTK sees the question as whether Plaintiffs and Collective members performed work which was not compensated. Nevertheless, the finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK changed to 7-minute "rounding" (after installing additional time clocks) following the advice of counsel. (Scheid Dep. 173:11-175:18; 236:23-237:5.) | Plaintiffs incorporate their statements about Question 8 and 10.<br><br>OTK has not provided evidence in summary judgment filings to support its stated position.<br><br>OTK's counsel's actual advice about rounding is fully presented in the summary judgment submissions. |

## FACTS RELATING TO PLAINTIFFS' "WORKWEEK" CLAIMS

**OTK's Preliminary Statement Regarding the "Workweek":**   Plaintiffs' Third

Amended Complaint claims confusion on when OTK's 168-hour workweek began and ended.

With two possible exceptions, however, OTK's payroll records reflect that OTK consistently pays

its employees using a 168-hour workweek that begins at 6:00 am Sunday and ends at 5:59 am on

the following Sunday.[10] This is also what employees are told in their offer letters, is what most

---

[10] The two possible exceptions (discussed below) are for (1) work performed on a shift starting before 6:00 am Sunday, when work continued after 6:00 am Sunday or (2) pre-shift work performed before 6:00 am Sunday on a shift that started at or after 6:00 am Sunday. Regarding the first exception, some employees are assigned a 12-hour shift starting at 7:00 pm on Saturday. The last hour of this shift may have been paid as part of the first workweek, based on the fact that the shift began before 6:00 am on Sunday.

employees (including Plaintiffs and Collective members) understood, and is what OTK's handbook says.

**Plaintiffs' Preliminary Statement Regarding the "Workweek":** Plaintiffs' position as to what the record evidence establishes as to a Workweek for pay purposes (which is not the same as a work schedule)[11] is set out in its summary judgment filings, including (a) the inadmissibility / irrelevance of the August, 2018 Handbook and any offer letters, and (b) the authorities binding OTK to the statements made as to its workweek in this civil action.  There is no record evidence basis for the statements in OTK's preliminary statement immediately above.

12.   **OTK's Fact Question:**  Did OTK pay Plaintiffs and other Collective members based on a 168-hour workweek starting at 6:00 am on Sunday and ending at 5:59 am on Sunday? (*See, e.g.,* Doc. 189-9 at PageID 1818.)

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| The payroll records and the math speak for themselves.<br><br>Melissa Pledger testified that the workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes | | OTK's stated position is inconsistent with the record before the Court for summary judgment. Melissa Pledger's binding Rule 30(b)(6) representative contradicts OTK's stated position.  OTK has put no evidence before the Court that would provide a basis for a "yes" answer as it states in its position on Question 12.<br><br>The proper phrasing of questions that encompasses this issue are:<br><br>(1) Is a fixed and regularly recurring 168 hour workweek of Monday – Sunday until January 27, 2019 and Sunday – Saturday beginning January 27, 2019 established by OTK's 30(b)(6) testimony, its representations to the |

---

[11] See Doc. 264 PageID. 3346-3347.

| | |
|---|---|
| Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.)[12]<br><br>OTK's handbook and its offer letters also identify the workweek as running from 6:00 am Sunday to 5:59 am the following Sunday. (Doc. 202-2 at PageID 2099, 2124-2133.)<br><br>Therefore, the finder of fact can find, based on the evidence, that the answer to this question is "yes." | Court, its contemporaneous business records showing start and end dates of pay periods, OTK's 2019 and 2020 calendars, and 29 CFR Section 516.2(a)(5) and (12);<br><br>(2) If the answer to 1 is "no," then has OTK proffered sufficient evidence that it actually used any different fixed, recurring 168 hour period to establish a fact issue for trial? |

13. **OTK's Fact Question**:  Did OTK change its 168-hour workweek used to pay Plaintiffs and other Collective members as of January 27, 2019?  (Doc. 223, 3d Am. Compl. ¶¶ 18.2, 18.3, & 18.4.)

| <div align="center">**OTK's Position**</div> | <div align="center">**Plaintiffs' Position**</div> |
|---|---|
| The payroll records and the math speak for themselves.<br><br>Melissa Pledger testified that workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.) | Plaintiffs incorporate their statement about Question 12. |

---

[12] Portions of the William Wicker's transcript were placed in the record at Doc. 258-4 and 263-3, and the cited pages can be found at Doc. 258-4, PageID 3200.

| | |
|---|---|
| Therefore, the finder of fact can find, based on the evidence, that the answer to this question is "no." | |

14.  **OTK's Fact Question**:  Did OTK's internal listing of its "Pay Period Beginning Dates" as Monday and its "Pay Period End Dates" as Sunday in its internal "Pay Summaries" before January 27, 2019 change OTK's payments to Plaintiffs and other Collective members based on a 168-hour workweek starting at 6:00 am on Sunday and ending at 5:59 am on Sunday?  (Doc. 223, 3d Am. Compl. ¶¶ 18.2 & 18.4.)

| <div align="center">**OTK's Position**</div> | <div align="center">**Plaintiffs' Position**</div> |
|---|---|
| The payroll records and the math speak for themselves.<br><br>Melissa Pledger testified that workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.)<br><br>OTK's handbook and its offer letters also identify the workweek as running from 6:00 am Sunday to 5:59 am the following Sunday. (Doc. 202-2 at PageID 2099, 2124-2133.)<br><br>Therefore, the finder of fact can find, based on the evidence, that the answer to this question is "no." | Plaintiffs incorporate their statement about Question 12. |

15.   **OTK's Fact Question**:  Did OTK's internal listing of its "Pay Period Beginning Dates" as Sunday and its "Pay Period End Dates" as Saturday in its internal "Pay Summaries" after January 27, 2019 change OTK's payments to Plaintiffs and other Collective members based on a 168-hour workweek starting at 6:00 am on Sunday and ending at 5:59 am on Sunday?  (Doc. 223, 3d Am. Compl. ¶¶ 18.3 & 18.4.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The payroll records and the math speak for themselves.<br><br>Melissa Pledger testified that workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.) | Plaintiffs incorporate their statement about Question 12. |

16.   **OTK's Fact Question**:  Did OTK's "Earnings Statements" listing "Pay Period End Dates" on Sundays before January 27, 2019 change OTK's payments to Plaintiffs and other Collective members based on a 168-hour workweek starting at 6:00 am on Sunday and ending at 5:59 am on Sunday?  (Doc. 223, 3d Am. Compl. ¶ 18.5.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The payroll records and the math speak for themselves. | Plaintiffs incorporate their statement about Question 12. |

| | |
|---|---|
| Melissa Pledger testified that workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.)<br><br>OTK's handbook and its offer letters also identify the workweek as running from 6:00 am Sunday to 5:59 am the following Sunday. (Doc. 202-2 at PageID 2099, 2124-2133.)<br><br>Therefore, the finder of fact can find, based on the evidence, that the answer to this question is "no." | |

17.   **OTK's Fact Question**: Did OTK's "Earnings Statements" listing "Pay Period End Dates" on Saturdays after January 27, 2019 change OTK's payments to Plaintiffs and other Collective members based on a 168-hour workweek starting at 6:00 am on Sunday and ending at until 5:59 am on Sunday?  (Doc. 223, 3d Am. Compl. ¶¶ 18.3 & 18.4.)

| OTK's Position | Plaintiffs' Position |
|---|---|
| The payroll records and the math speak for themselves.<br><br>Melissa Pledger testified that workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday. (Pledger Dep. 123:1-19.) To the extent that Plaintiffs rely on other portions of Ms. Pledger's Rule 30(b)(6) testimony, they are cherry-picking | Plaintiffs incorporate their statement about Question 12. |

| | |
|---|---|
| and taking her testimony out of its proper context.<br><br>Plaintiff Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Hornady Dep. 91:11-22.) Other hourly employees agreed. (Stokes Dep. 72:10-21; 75:5:-13; Wicker Dep. 38:11-15.) | |

18.   **OTK's Fact Question:**  If Plaintiffs prevail on their workweek claims, can OTK claim any offset or credit for pre-paying overtime in weeks in which Plaintiffs and Collective members worked no overtime? (Doc. 228, Answer, 13th Defense at PageID 2692.)

**Note:**  OTK typically assigned work schedules consisting of one week of three 12-hour shifts (a 36-hour week) and one week of four 12-hour shifts (a 48-hour week). If Plaintiffs can show that OTK misdesignated its 168-hour workweek (such that the 168-hour workweek cannot be deemed to begin at 6:00 am on Sunday), then, for employees assigned a Sunday shift, that could mean that OTK paid employees for 48 hours of work in their three-day week and for 36-hours of work in their four-day week.

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The FLSA is not supposed to create a game of "gotcha," and employees are permitted to pre-pay overtime.<br><br>Plaintiffs now say that OTK has not claimed that it intended to "pre-pay" overtime, but that is because OTK paid overtime using a 168-hour workweek starting at 6:00 am on Sunday. The "pre-payment" only becomes an issue if Plaintiffs are permitted to run their damage calculations starting OTK's 168-hour workweek at some time other than 6:00 am Sunday. | OTK has not previously claimed that it intended to "pre-pay" overtime.<br><br>OTK's newly stated position is inconsistent with the record before the Court for summary judgment. Melissa Pledger's binding Rule 30(b)(6) representative contradicts OTK's stated position.<br><br>The entirety of any issue about credits or offsets related to OTK's 13th Defense has been concisely addressed by the parties at Doc. 233 PageId.2709, Doc. 236 PageId.2725, and Doc. 237 PageId.2734. |

| | |
|---|---|
| | Note: OTK's statement suggesting that a mis-designation of a workweek would mean that it simply flipped what weeks it paid overtime for is (a) just lawyers making unsupported arguments, (b) totally wrong as illustrated by the damages calculations filed in support of Plaintiffs' summary judgment motions which give OTK the full benefit of any overtime payments OTK attributed to either week of a two week pay period.  See Doc. 246, PageID.3082-3083.    Those calculations remain uncontroverted. |

19.  **OTK's Fact Question**: For any time a Plaintiff or Collective member worked before a shift starting at 6:00 am Sunday or after a shift ending on 5:59 am on Sunday,[13] is such Plaintiff or Collective member owed any additional overtime pay based on OTK's "not allocating between different pay periods no matter what time the employee started working or stopped working"?  (Doc. 223, 3d Am. Compl. ¶¶ 18.8, 18.9.)

| <div align="center">**OTK's Position**</div> | <div align="center">**Plaintiffs' Position**</div> |
|---|---|
| The answer to this question would require an individualized calculation for each Plaintiff and Collective member. | The properly phrased question encompassing this issue is:<br><br>"Whatever the fixed, recurring 168 hour workweek is determined to be for pay purposes, were Plaintiffs compensated for all the compensable time during that 168 hour workweek, and were they compensated at proper overtime rates for all compensable time in excess of 40 hours during that 168 hour workweek?"<br><br>There is no evidence before the Court that supports OTK's stated position. |

---

[13] Whether or not 6:00 am on Sunday is, in fact, the start of OTK's workweek will depend on the factfinder's answers to questions above.

|  | The Plaintiffs routinely worked or were suffered or permitted to work (without getting paid for rounded time) before / after shifts that started at both 6:00 and 7:00.  They are entitled to be paid for rounded time whether workweeks are Monday – Sunday, Sunday – Saturday, or Sunday 6:00 a.m. – Sunday 6:00 a.m.  They are also entitled to be paid for compensable time over 40 hours calculated over a fixed, recurring 168 hour workweek. The scheduled shift time is irrelevant to (a) how much compensable time was worked by a Plaintiff on a given shift,  (b) when the workweek starts / ends, and (c) how much each Plaintiff was entitled to be paid in any given workweek. |
| --- | --- |

20.   **OTK's Fact Question**: For any time a Plaintiff or Collective member who worked a shift ending at 6:59 am on Sunday or starting at 7:00 am on Sunday (*e.g.*, when the 12-hour shift in the Melt Shop started at 7:00 am/pm, and not at 6:00 am/pm as in other departments),[14] is such Plaintiff or Collective member owed any additional overtime pay based on OTK's "not allocating between different pay periods no matter what time the employee started working or stopped working"?  (Doc. 223, 3d Am. Compl. ¶¶  18.8, 18.9.)

| **OTK's Position** | **Plaintiffs' Position** |
| --- | --- |
| The answer to this question would require an individualized calculation for each Plaintiff and Collective member. | Plaintiffs incorporate their statement about Question 12. |

21.   **Plaintiffs' Question:**  With regard to any failure to utilize a fixed, recurring 168 hour week for pay purposes and / or a failure to pay Plaintiffs for time worked and overtime worked

---

[14] This question will only need to asked if it is determined that 6:00 am on Sunday is, in fact, the start of OTK's workweek.

within that fixed, recurring 168 hour week has OTK carried its burden of showing "good faith" or

are liquidated damages mandatory? <u>Joiner v. City of Macon</u>, 814 F.2d 1537, 1539 (11th Cir. 1987)

(emphasis added); <u>see also</u> <u>Morgan v. Family Dollar Stores, Inc.</u>, 551 F. 3d 1233, 1282 (11th Cir.

2008).

     The correctly phrased sub-issue is:   "Has OTK carried its burden of showing both

subjective and objective good faith"? Those terms have been explained in the authorities cited in

Plaintiffs' summary judgment motion.

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| Plaintiffs have phrased this in the form of a mixed question of fact and law.<br><br>On the question of fact, the evidence shows that, with two possible exceptions not relevant to "good faith," OTK pays its employees using a 168-hour workweek that begins at 6:00 am Sunday and ends at 5:59 am the following Sunday. This practice complies with the FLSA, and OTK can satisfy both subjective and objective "good faith" as to its 168-hour workweek starting at 6:00 am on Sunday. | | This is a decision point before the Court with regard to FLSA all liability issues and is before the Court for summary judgment consideration.   Compare   also   OTK's Questions 8 -11 above.<br><br>OTK's current assertion about what the evidence shows is inconsistent with the record evidence before the Court, inconsistent with Melissa Pledger's testimony, and inconsistent with the pay rime records OTK produced. The Court's decision, however, is governed by the summary judgment submissions. |

## FACTS RELATING TO PLAINTIFFS' "TRUING UP" CLAIMS

     **OTK's Preliminary Statement Regarding "Truing Up":**   As OTK explained  in its

November 9, 2020 court filing (Doc. 267), ADP's document production has revealed that no "true

up" payments were paid to employees at a later date.

     **Plaintiffs' Preliminary Statement Regarding "Truing Up":** Melissa Pledger's verified

30(b)(6) testimony about what she referred to as "trued up" payments is accurately, concisely, and

completely described in Plaintiffs' summary judgment submission. (Doc.  246 Page.ID  3076-

3077) She described a calculation performed every month to add amounts for overtime which were

not timely paid in earlier pay periods. OTK's lawyers' explanations and unsupported assertions are not evidence.  The only record evidence on this issue is Melissa Pledger's 30(b)(6) testimony and it is undisputed and  binding on OTK. Somewhat redundantly, OTK's non-compliance with the June 2, 2020 Stipulated Order about supplemental deposition testimony (Doc. 212, PageID.2439) precludes OTK's explanations, as does R & R 1 (Doc. 261, PageID.3272 ("As the Plaintiffs explain the process, the accuracy of which the Defendant does not challenge . . . ")). Separate and apart from the summary judgment submission, and the R & R 1 sanctions, OTK's current assertions about this issue are intertwined with the events after Plaintiffs' renewed motion for sanctions was filed, and after the parties' filed objections to R & R 1.  The Court is already reviewing the interactions between OTK and ADP about the subpoena to ADP, and OTK's representations about those interactions.   While transcripts of the 2021 District Court proceedings have been prepared an official transcript of the October 8, 2020 hearing before Magistrate Judge Nelson has not been released.

22.   **OTK's Fact Question:**  Considering "[n]either the Earnings Statements nor the Pay Summary records identify amounts paid pursuant to 'true up calculations,'" were any Plaintiffs or Collective Members actually paid "true up" payments on the "first payment made … during the following month"?  (*See* Doc. 223, 3d Am. Compl. ¶ 18.15, 18.19.)

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| The answer to this question is "no."  The pay records and the math speak for themselves and show no alleged "trued up" payments in subsequent paychecks. | | The properly phrased questions are: <br><br> 1.  "Does the summary judgment record leave any issue of material fact about whether on the first paycheck released each calendar month OTK calculated overtime payments that it had not paid on the regular payment date and |

<table>
<tr><td></td><td>

added the amounts to the first paycheck of the calendar month?" See <u>Arroyave v. Rossi</u>, 296 Fed. Appx. 835, 836-837 (11th Cir. 2008); <u>Benavides v. Miami Atlanta Airfreight, Inc.</u>, 322 Fed. Appx. 746, 747 (11th Cir. 2009)

2. If the answer to 1 is "yes," then has OTK produced records quantifying the amount of those payments as required by 29 CFR § 516(a)(10)?

3. If the answer to 1 is "yes" and the answer to 2 is "no" has OTK produced records quantifying the amount it did pay for overtime for each workweek that is included in the first paycheck of each calendar month to Plaintiffs? See <u>Anderson</u>, etc.

4. Are the answers to 1, 2, or 3 affected by OTK's failure to comply with the June 2, 2020 Stipulated Order paras. 1(b), 2, and 3 (Doc. 212, see also R & R 1, Doc. 261)

Additional comment: The failure to record and preserve the information required by 29 CFR §§ 516.2(a)(6),(10) and 516(b)(1) establishes liability rather than allowing the Court to find that inaccurate and incomplete records "speak for themselves." See <u>Anderson</u> burden shifting principles.

</td></tr>
</table>

23.    **OTK's Fact Question:**  Did OTK make any "trued up" payments "late"?  (Doc. 223, 3d Am. Compl. ¶ 39.1.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|

| | |
|---|---|
| The answer to this question is "no." The pay records speak for themselves and show no alleged "trued up" payments that were "late." | Plaintiffs incorporate their statement about Question 22.<br><br>OTK's stated position is inconsistent with the record before the Court for summary judgment, inconsistent with the testimony of its witnesses and unsupported by any evidentiary submission to date. |

24.   **Plaintiffs' Question:**  With regard to making payments for overtime pay due in one pay period in a later pay period as testified to by Melissa Pledger has OTK carried its burden of showing "good faith" or are liquidated damages mandatory? Joiner v. City of Macon, 814 F.2d 1537, 1539 (11th Cir. 1987) (emphasis added); see also Morgan v. Family Dollar Stores, Inc., 551 F. 3d 1233, 1282 (11th Cir. 2008)

The correctly phrased sub-issue is:   "Has OTK carried its burden of showing both subjective and objective good faith"? Those terms have been explained in the authorities cited in Plaintiffs' summary judgment motion.

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Plaintiffs have phrased this in the form of a mixed question of fact and law.<br><br>On the question of fact, the evidence shows that OTK did not make any "late" or "true-up" payments. If OTK did not make such payments, then the issue of OTK's "good faith" for non-existent payments is not reached.<br><br>More generally, OTK's practices comply with the FLSA, and OTK can satisfy both subjective and objective "good faith" as to its overtime payments. | This is a decision point before the Court with regard to FLSA all liability issues and is before the Court for summary judgment consideration.   Compare also OTK's Questions 8 -11 above.<br><br>OTK's current assertion about what the evidence shows is inconsistent with the record evidence before the Court, inconsistent with Melissa Pledger's testimony, and inconsistent with the pay rime records OTK produced. The Court's decision, however, is governed by the summary judgment submissions. |

## FACTS RELATING TO PLAINTIFFS' "BONUS" CLAIMS

**OTK's Preliminary Statement Regarding Bonuses:**  As set forth most recently in OTK's Motion for Reconsideration (Doc. 316), OTK maintains that Plaintiffs have shown no material disputed issues of fact regarding OTK's bonus practices. OTK maintains that, as a matter of law and based on the undisputed facts, OTK's bonus practices complied with 29 C.F.R. § 778.210.

**Plaintiffs' Preliminary Statement Regarding Bonuses:**  The material facts established in the parties' summary judgment submissions demonstrate that summary judgment is due Plaintiffs.

25.     **OTK's Fact Question:**  Has OTK paid Plaintiffs and Collective members a bonus based on a percentage (determined each month) of the past month's gross earnings minus any bonus paid that past month?  (*See, e.g.,* Doc. 189-15 at PageID 1845.)

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>Applying these facts, the Court can find, as a matter of law, that OTK's bonus practices complied with 29 C.F.R. § 778.210. | | The correctly phrased questions are:<br><br>1.  Has Defendant waived any defense based on 29 CFR §§778.209 and 778.210?<br><br>2.  Did OTK apportion the bonuses it paid at the end of calendar months "back over the workweeks of the period during which it was earned"? 29 CRF § 778.209<br><br>3.  Does the summary judgment record leave any issue of material fact about whether bonuses are earned over a calendar month?<br><br>4.  Does OTK's non-compliance with paragraph 7 of the June 2, 2020 Stipulated Order (Doc. 212, PageID.2440) lead to a different |

answer to 3 than the answer based on the summary judgment submissions?

5. The amount of the bonus was a percentage of four or six weeks of pay <u>received</u> during the calendar month in which the bonus was earned and not pay <u>for</u> <u>work performed</u> in the calendar month in which the bonus as earned. Do the bonuses paid by OTK result in exactly the same payments to Plaintiffs as if the bonuses were recomputed into the employee's regular rates from the first to the last day of the month in which the bonus was earned, and then overtime payments based on those recomputed rates were made for each week falling wholly or partially within the calendar month in which they were earned?

6. Is it impossible to allocate a bonus earned over a 28, 29, 30 or 31 day calendar month to the full and partial workweeks making up that 28 – 31 day month? 29 CFR § 778.209(b)

7. It is undisputed that OTK's bonus amounts are a percentage of pay previously received for four or six weeks of work and that part of four or six weeks worked in the month before the calendar month in which the bonus was earned. It is undisputed that four or six week period does not include pay for some days worked in the calendar month in which the bonus was earned. If the answer to 6 is "yes" (or cannot be dispositively answered "no" by the Court) are OTK's bonuses "reasonably and equitably" allocated to the workweeks of the period in which the bonus was earned, with overtime pay then recalculated and paid?

| | 8. Does the method described by Plaintiffs in their summary judgment submission of dividing the bonus amount by the hours worked in the month during which the bonus was earned, and then incorporating that allocated hourly amount into the daily regular pay (and then into the weekly regular pay) properly allocate the bonus to the workweeks in which it is earned? |
|---|---|

26.   **OTK's Fact Question**:   Alternatively, has OTK been applying the bonus percentage "to earnings from part of the month for which the criteria were considered, and also part of the month before that"?  (Doc. 223, 3d Am. Compl. ¶ 21.5.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| Plaintiffs' attempts to question the workweeks in which monthly gross earnings were earned is immaterial in light of 29 C.F.R. § 778.210. The bonus percentage was applied to straight-time and overtime earnings alike.

Moreover, if the finder of act is not able to determine how OTK's bonus is allocated over workweeks and finds that it is "impossible" to allocate the bonus over workweeks, then OTK's bonus structure would still in compliance with the FLSA, as set forth in 29 C.F.R. § 778.209(b).

Specifically, the finder of fact could determine that certain key performance indicators (KPIs) used in determining the bonus cannot be allocated to specific workweeks. In such case, OTK's bonus plan will, as a matter of law, comply with the FLSA provided OTK followed a reasonable and equitable method of allocation. As a matter of both fact and law, OTK's bonus | See Plaintiffs' position on Question 25.

OTK's stated position is inconsistent with the record before the Court for summary judgment. |

| | |
|---|---|
| allocations (based on a percentage of earnings) were reasonable and equitable. | |

27.   **Agreed-Upon Fact Question:**   Did OTK seek advice of counsel regarding its "bonus" practices?  (*See*, *e.g.,* Doc. 189-10 at PageID 1825.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK received advice from counsel and concluded that OTK's bonus practices were in compliance with the law. (Scheid Dep. 165:15-166:1.)[15] | OTK's stated position is inconsistent with the record before the Court for summary judgment. |

28.   **Agreed-Upon Fact Question:**   Was OTK already in compliance with the advice of counsel regarding its "bonus" practices?  (*See*, *e.g.,* Doc. 189-10 at PageID 1825.)

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes."<br><br>David Scheid testified that OTK received advice from counsel and concluded that OTK's bonus practices were in compliance with the law. (Scheid Dep. 165:15-166:1.) | OTK's stated position is inconsistent with the record before the Court for summary judgment as OTK produced no evidence of any advice on this issue. |

29.   **Plaintiffs' Question:**   With regard to the method of OTK's bonuses, has OTK carried its burden of showing 'good faith' or are liquidated damages mandatory? Joiner v. City of

---

[15] Portions of the David Scheid transcript were placed in the record at Doc. 187-2. A portion of cited lines can be found at Doc. 187-2, PageID 1409.

Macon, 814 F.2d 1537, 1539 (11th Cir. 1987) (emphasis added); see also Morgan v. Family Dollar

Stores, Inc., 551 F. 3d 1233, 1282 (11th Cir. 2008)

The correctly phrased sub-issue is: "Has OTK carried its burden of showing both subjective

and objective good faith" as those terms have been explained in the authorities cited in Plaintiffs'

summary judgment motion.

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| Plaintiffs have phrased this in the form of a mixed question of fact and law.<br><br>On the question of fact, the evidence shows that OTK paid its bonuses based on a percentage of total earnings (including overtime). OTK's practices comply with the FLSA, and OTK can satisfy both subjective and objective "good faith" as to its overtime payments. | | This is a decision point before the Court in Plaintiffs' summary judgment motion with regard to all liability issues, compare also OTK's Questions 8 -11, 27 and 28 above. |

## FACTS RELATING TO PLAINTIFFS' "MINIMUM WAGE" AND ALTERNATIVE COMMON LAW CLAIMS

30.   **Plaintiffs' Question**:  For fixed, recurring 168-hour workweeks that Plaintiffs

worked less than 40 hours of compensable time, does the FLSA allow for recovery of time that

was compensable but not paid for ("gap time") at either minimum wage or regular rates even if

the amount they were paid totaled more than $7.25 for compensable work?

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| Plaintiffs were almost always paid at least $7.25 an hour, and Plaintiffs have stated that they are not seeking a recovery on the basis that they were paid less than $7.25 an hour. Therefore, Plaintiffs are entitled to no relief under the FLSA for these claims. | | Plaintiffs have not included as part of the claims in this collective action a claim, for example, that any of them worked compensable time (including rounded time) totaling 25.5 hours and were paid for 24 hours but were paid less than $183.60 ($25.5 X $7.25).   Instead, the issue is whether the FLSA allows Plaintiffs to recover at either $7.25 an hour, or regular rates, if they worked, |

| | for example, 25.5 hours of compensable time but were paid for 24 hours at regular rates. Plaintiffs have acknowledged authorities on both sides of the issue to the Court. |
|---|---|

31.   **Plaintiffs' Question**:   If the answer to 30 is "yes" with regard to not paying for rounded compensable time in weeks in which 40 hours are not worked, has OTK carried its burden of showing 'good faith' or are liquidated damages mandatory? <u>Joiner v. City of Macon</u>, 814 F.2d 1537, 1539 (11th Cir. 1987) (emphasis added); <u>see also</u> <u>Morgan v. Family Dollar Stores, Inc.</u>, 551 F. 3d 1233, 1282 (11th Cir. 2008)

The correctly phrased sub-issue is:   "Has OTK carried its burden of showing both subjective and objective good faith"? Those terms have been explained in the authorities cited in Plaintiffs' summary judgment motion.

| <div align="center">**OTK's Position**</div> | | <div align="center">**Plaintiffs' Position**</div> |
|---|---|---|
| Plaintiffs have phrased this in the form of a mixed question of fact and law.<br><br>As set forth in response to Question 30 above, the answer to the legal question is "no." On the question of fact, the evidence shows that OTK paid its employees for the hours they worked. OTK's practices comply with the FLSA, and OTK can satisfy both subjective and objective "good faith" as to its overtime payments. | | This is a decision point before the Court in Plaintiffs' summary judgment motion with regard to all liability issues, compare also OTK's Questions 8 -11, 27 and 28 above. |

32.   **Plaintiffs' Question**:   If the answer to 30 is "no" then: "Did OTK knowingly accept the services rendered by the Plaintiffs during time worked, rounded, and not paid for and the benefit thereof"?

| <div align="center">**OTK's Position**</div> | | <div align="center">**Plaintiffs' Position**</div> |
|---|---|---|

| | |
|---|---|
| As stated above, the answer to Question 30 is "no," so there is no FLSA claim. Regarding alternative state law claims, the evidence does not show any services rendered by Plaintiffs that were not compensated.<br><br>As a matter of law, Collective members have no state-law claims, insofar as state-law claims have not been certified for class treatment in accordance with Fed. R. Civ. P. 23. | This issue is set out in Plaintiffs' summary judgment submission at Doc. 245, PageID.3049.<br><br>As to OTK's position regarding Rule 23 certification, Plaintiffs respond that Rule 23 is not the relevant provision. Instead, as set out in the Second Amended Complaint, joinder in the state-law claims is governed by Rules 18 and 20. See Doc. 223, 3d Am. Compl. ¶ 46.1. |

33.  **Plaintiffs' Question**:   If the answer to 32 is "yes" then is the reasonable value of those services measured by the time worked and not paid for multiplied by the employee's regular pay rate for that day / night exclusive of any allocated bonus?

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| OTK believes that the evidence shows that it paid Plaintiffs and Collective members for all hours they worked. However, if Plaintiffs were to succeed in proving otherwise, the only FLSA requirement here is payment of minimum wage, and Plaintiffs do not contend that the payments for any 168-hour workweeks ever averaged out to less than $7.25 an hour.<br><br>As a matter of law, Collective members have no state-law claims, insofar as state-law claims have not been certified for class treatment in accordance with Fed. R. Civ. P. 23. | This issue is set out in Plaintiffs' summary judgment submission at Doc. 245, PageID.3050.<br><br>As to OTK's position regarding Rule 23 certification, Plaintiffs respond that Rule 23 is not the relevant provision. Instead, as set out in the Second Amended Complaint, joinder in the state-law claims is governed by Rules 18 and 20. See Doc. 223, 3d Am. Compl. ¶ 46.1. |

34.  **Agreed-Upon Fact Question:**  Did Plaintiffs perform any work (under 40 hours in a workweek) for which they were not paid at the hourly rate they were paid for other work in the same week?

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| Answering this question will require individualized proof from each Plaintiff. OTK maintains that the evidence will show that no Plaintiff performed work that was not compensated.<br><br>As a matter of law, Collective members have no state-law claims, insofar as state-law claims have not been certified for class treatment in accordance with Fed. R. Civ. P. 23. | | This question is encompassed by OTK's Question 7, as well as 2-6.<br><br>As to OTK's position regarding Rule 23 certification, Plaintiffs respond that Rule 23 is not the relevant provision. Instead, as set out in the Second Amended Complaint, joinder in the state-law claims is governed by Rules 18 and 20. See Doc. 223, 3d Am. Compl. ¶ 46.1. |

35.   **Plaintiffs' Question:**   Except for approximately 11 Plaintiffs, neither OTK's production, nor ADP's production identifies when recorded time increments that varied from 12.0 hours was authorized for pay, and when it was not.[16]  The Court has to decide how the absence of that authorization information effects consideration of the elements of the alternative FLSA gap time / common law claims.

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| Comparing the hours shown on the time clock records with the hours shown in the pay records may not necessarily be as difficult as Plaintiffs make out. Time shown on the time clock records but not shown in the pay records is pre-shift and post-shift time clocked in that was not approved for overtime.<br><br>As a matter of law, Collective members have no state-law claims insofar as state-law claims have not been certified for class treatment in accordance with Fed. R. Civ. P. 23. | | Although judgment for Plaintiffs is due on other grounds, OTK's failure to produce this information should require the Court to assume that Plaintiffs were paid only for the round number of hours less than they were clocked-in for. (i.e. 12:07 clocked in = 12.0 paid, 11:37 clocked in = 11:00 paid, 8:58 clocked in = 8.0 hours paid.)<br><br>Ultimately, this assumption would only impact damages for the alternative FLSA gap time / common law claims.<br><br>As Plaintiffs have previously stated, whenever a Plaintiff was clocked in for less |

---

[16]  For the 11 Plaintiffs, that information is shown in red and green entries on records produced by OTK for the period after August 13, 2017 only.

|  | than 4 hours, Plaintiffs assume they were paid for 4 hours, and Plaintiffs remain willing to make that assumption that favors OTK.<br><br>As to OTK's position regarding Rule 23 certification, Plaintiffs respond that Rule 23 is not the relevant provision. Instead, as set out in the Second Amended Complaint, joinder in the state-law claims is governed by Rules 18 and 20. See Doc. 223, 3d Am. Compl. ¶ 46.1 |
| --- | --- |

36.   **Plaintiffs' Question:** Whether or not judgment for liability or summary judgment is granted to Plaintiffs on the alternative FLSA gap time / common law claims, how does the absence of the authorization information affect how Plaintiffs quantify damages, and how OTK is permitted to respond?

| **OTK's Position** | **Plaintiffs' Position** |
| --- | --- |
| Comparing the hours shown on the time clock records with the hours shown in the pay records may not be as difficult as Plaintiffs make out. Time shown on the time clock records but not shown in the pay records is pre-shift and post-shift time clocked in that was not approved for overtime.<br><br>As a matter of law, Collective members have no state-law claims insofar as state-law claims have not been certified for class treatment in accordance with Fed. R. Civ. P. 23. | Plaintiffs would suggest that the Court allow the parties a brief period of time to determine if they can reach a stipulation on this issue and, if not, to more precisely frame for the Court what evidence is available. Plaintiffs believe it only affects damages for the alternative FLSA gap time / common law claims. Alternatively, see Plaintiffs' position regarding 35.<br><br>As to OTK's position regarding Rule 23 certification, Plaintiffs respond that Rule 23 is not the relevant provision. Instead, as set out in the Second Amended Complaint, joinder in the state-law claims is governed by Rules 18 and 20. See Doc. 223, 3d Am. Compl. ¶ 46.1. |

## FACTS RELATING TO ALL OF PLAINTIFFS' CLAIMS

37.   **Agreed-Upon Fact Question:**  What is the "Regular Rate of Pay" for each Plaintiff and Collective member each workweek worked at OTK?  *See* 29 U.S.C. § 207(e).

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The answer to the question will require individualized calculations for each Plaintiff and each Collective member for each workweek. | A regular rate of pay for each week has to be calculated. That necessarily encompasses an hourly rate, or multiple hourly rates of pay each day. Plaintiffs submit that after August 13, 2017 the question is entirely answered by a combination of OTK's and ADP's records of pay. |
| | Before August 13, 2017, because step-up rate information has not been produced, calculations that would provide a regular rate of pay for a <u>two</u> week period can be performed in a manner similar to that generically described by OTK's prior counsel to the Magistrate Judge on October 8, 2020 (transcript not available yet). |
| | Resolution of this issue would also involve <u>Anderson</u> considerations. |
| | Plaintiffs also acknowledge, however, that between the representations of OTK's former counsel about formulaic calculations, and also OTK's late-March production of hard copy Earnings Statements, they can more precisely estimate pre August 13, 207 weekly regular rates of pay than they could at the time of their filing about R & R 1. (Doc. 266 PageID. 3503-3504) Plaintiffs suggest that if this very narrow issue cannot be promptly resolved by stipulation, the Court permit updated submissions on methodologies to calculate the weekly regular rates of pay before August 13, 2017 based on what OTK's records do (and do not) document. |

38. **OTK's Fact Question**: If OTK is held to have violated the FLSA, was each such violation "willful"?  (Doc. 223, 3d Am. Compl. ¶ 40.)

**Note:** this question is needed to determine whether the damages go back **two years** from the date each Plaintiff or Collective member filed his or her opt-in notice with the Court or whether

the damages go back **three years** from the date each Plaintiff or Collective member filed his or her opt-in notice. *See* 29 U.S.C. §§ 255(a) & 256(b).

| **OTK's Position** | **Plaintiffs' Position** |
|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "no."<br><br>Regarding Plaintiffs' position, the striking of defenses (even if the Report and Recommendation were adopted) will not alter Plaintiffs' burden to prove willfulness. Moreover, even if this were not Plaintiffs' burden to prove, as OTK has already explained in its Objection (Doc. 286) to Report and Recommendation (Doc. 277), OTK's Second Defense should be revived. | Except for the "truing up" violations, the defenses related to OTK's stated position have already been stricken. (See Doc. 108, Doc. 277 PageID.3570-3571)<br><br>Even were these issues not entirely resolved by Magistrate Judge Nelson's prior Orders, they would be resolved on the same basis as the "good faith" questions set out above in Questions 8-11, 21, 24, 29, 31.   (See Plaintiffs' summary judgment submission, Doc. 245 PageID.3051)<br><br>With regard to the "trued-up" issue, the mirror-image "willful" / "good faith" considerations are resolved by the undisputed fact that OTK did not even know what calculations it used. (See Doc. 245 PageID. 3051, 3053)<br><br>If that residual issue was not resolved solely based on OTK's ignorance at the time Plaintiffs' summary judgment motion was filed, an issue for the Court would be whether the issue is also resolved based on either the sanctions in R & R 1, or the issues that have arisen since then about the subpoena to ADP. |

39.     **OTK's Fact Question**:  If OTK is held to have made an act and/or omission that violated the FLSA, did OTK act in good faith as to each such act and/or omission?  (Doc. 228, Answer, 3d Defense at PageID 2690.)

**Note:**  this question is needed to determine whether the Court wishes to exercise its discretion not to award liquidated damages to Plaintiffs and Collective members.  *See* 29 U.S.C. § 260.

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes." As OTK has already explained in its Objection (Doc. 286) to Report and Recommendation (Doc. 277), OTK's Third and Fourth Defenses should be revived. In addition, OTK's similar Fifteenth Defense has not been stricken. | | See Plaintiffs' statements on Questions 38. |

40. **OTK's Fact Question**: If OTK is held to have made an act and/or omission that violated the FLSA, did OTK have a reasonable grounds for believing that each such act and/or omission was not a violation of FLSA?  (Doc. 228, Answer, 3d Defense at PageID 2690.)

**Note:**   this question is needed to determine whether the Court wishes to exercise its discretion not to award liquidated damages to Plaintiffs and Collective members. See 29 U.S.C. § 260.

| OTK's Position | | Plaintiffs' Position |
|---|---|---|
| The finder of fact can find, based on the evidence, that the answer to this question is "yes." As OTK has already explained in its Objection (Doc. 286) to Report and Recommendation (Doc. 277), OTK's Third and Fourth Defenses should be revived. In addition, OTK's similar Fifteenth Defense has not been stricken. | | See Plaintiffs' statements on Question 38. |

41. **Plaintiffs' Question:**  If the Court enters a judgment as to liability as a sanction, that ruling presumably moots any issue as to OTK's stated defenses.  If not, then the remaining questions for the Court include whether OTK has any defenses as set out in pending motions.

| OTK's Position | | Plaintiffs' Position |
|---|---|---|

| This is a statement, not a question.<br><br>Moreover, a default ruling as to liability does not obviate the need to rely on the pay records. | Plaintiffs' position is that the grounds to strike or grant summary judgment as to each defense are very concisely stated at Doc. 233 to the extent Magistrate Judge Nelson referred issues back to the District Court (Doc. 277, PageID. 3573) for summary judgment consideration, and Doc. 245, PageID. 3051-3055. |

42. **Plaintiffs' Question:** To the extent that the Court may determine that there remains any issue for trial by a trier of fact, how does the sanction stated in the October 26, 2020 R & R 1 "prohibiting the Defendant under Rule 37(b)(2)(A)(ii) from introducing any evidence to challenge the Plaintiffs' case that has not already been produced in this action" specifically apply, if not otherwise modified by the District Court?

| **OTK's Position** | **Plaintiffs' Position** |
| --- | --- |
| This appears to be a question of law, not fact, and can be addressed via motions in limine at trial. | Plaintiffs' core position is that there are no issues for a trier of fact. However, if the Court disagrees, then the sanction stated in R & R 1 would preclude OTK from (a) any use of documents or data it had not produced before October 8, 2020, (b) attacking the accuracy of the documents and data it did produce, (c) profering testimony contrary to, or in addition to, what its 30(b)(6) deponents stated on any 30(b)(6) subjects including the "trued-up" payment, and (d) seeking testimony that contradicts the records OTK did produce, and the testimony OTK did provide, in this case. |

## **FACTS RELATING TO INJUNCTIVE RELIEF**

43. **Plaintiffs' Questions:** The evidence of record in this case establishes that OTK has continued its rounding practices, bonus practices, workweek designations, and "trued up"

payment practices.  To the extent that the Court determines such practices are unlawful, the Court

can assess the propriety of injunctive relief as to currently employed Plaintiffs.

| **OTK's Position** | | **Plaintiffs' Position** |
|---|---|---|
| OTK disagrees with Plaintiffs' statement about what the evidence of record shows, and OTK reserves argument regarding injunctive relief. | | To facilitate some level of finality as to damages for currently employed Plaintiffs, those practices of OTK which are unlawful cannot simply continue leading to a never-ending string of follow-up lawsuits. |

[*SIGNATURES ON THE FOLLOWING PAGE*]

Respectfully submitted,

*s/ Ian D. Rosenthal (by DCD with*
    *permission)*
Ian D. Rosenthal (ROSEI6905)

Attorney for Plaintiffs

**OF COUNSEL:**

HOLSTON, VAUGHN & ROSENTHAL, LLC
P.O. Box 195
Mobile, AL 36601
(251) 432-8883
idr@holstonvaughan.com

Patrick H. Sims (SIMSP8145)
SIMS LAW FIRM, LLC
P.O. Box 7112
Mobile, AL 36670
(251) 725-1316
patrick@simslawfirm.com

Respectfully submitted,

*s/ Devin C. Dolive*
Devin C. Dolive (DOLID4671)

Attorney for Defendant
OUTOKUMPU STAINLESS USA, LLC

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th St., Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile:  205-458-5100
ddolive@burr.com

45475604 v5

39