**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM HEATH HORNADY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:18-00317-JB-N** |
| | ) | |
| **OUTOKUMPU STAINLESS USA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

I.   **INTRODUCTION**
    A.   Background and Recent Procedural History
        1.   The Report and Recommendation
        2.   The Court's Review of the Record
        3.   February 2021 Hearing, Show Cause Orders
    B.   The Collective Action
        1.   The Parties
        2.   Plaintiffs' Claims
        3.   Defendant's Pay and Timekeeping Practices
            a.   The Significance of the Regular Rate of Pay and Defendant's Pay Rates
            b.   The Parameters of Defendant's Workweek
            c.   Rounding Principles under the FLSA and Defendant's Rounding Policies
            d.   Regulations Applicable to Bonuses and Defendant's Incentive Plan
            e.   Defendant's Duty to Maintain Records
    C.   Summary of Opinion

II.   **DISCUSSION**
    A.   Legal Standards
        1.   Finding of Bad Faith Required
        2.   The Nature of the Misconduct
        3.   Rule 37 of the Federal Rules of Civil Procedure
    B.   Evidence of Bad Faith: Defendant's Response to Numerous Discovery Orders
        1.   September 4, 2018: The Initial FLSA Scheduling Order
        2.   October 9, 2018: Initial Scheduling Conference

3. October 25, 2018: Superseding Preliminary Scheduling Order
4. Companion Case and Discovery Therein
5. First Quarter 2019: First Settlement Conference and Phase I Discovery Order
6. June 12, 2019:  Plaintiffs' First Motion to Compel and Defendant's First Sanction
7. August 19, 2019: Scheduling Conference and Amended Phase I Scheduling Order
   a. September 13, 2019: Plaintiffs Second Motion to Compel
   b. November 5, 2019: Hearing on Second Motion to Compel
8. December 9, 2019: Hearing on Third Motion to Compel
9. January 17, 2020: Discovery Conference and January 21, 2020 Order
   a. March Deposition of the Corporate Representative
10. May 2020: Discovery Conference and June 2, 2020 Stipulated Order
11. Orders Requiring the Production of Incentive Plan Data
12. June 15, 2020: Plaintiffs' Initial Motion for Sanctions

C. Evidence of Bad Faith: Defendant's Misrepresentation and Manipulations
   1. July, 2020: Context within which ADP Records were Subpoenaed
   2. February 5, 2021: Informal Conference
   3. February 17, 2021: Status Hearing
   4. Defendant's failure to tell ADP about March 5, 2021 Hearing
   5. March 12, 2021: The Show Cause Hearing

D. Other Considerations and Factors
   1. Format of Document Production
   2. Defendant's Other Scapegoat
   3. Spoliation of Time and Pay Records
   4. Defendant's Familiarity with Complex Litigation
   5. The Efficacy of Lesser Sanctions
   6. Prejudice to the Efficient Administration of Justice and Plaintiffs
   7. Deterrence to other Employers

III.    **Conclusion**

I.      **Introduction**

This case is lamentable.  Mercifully, it is rare.  Here, the Court is compelled to protect not only plaintiffs but the Court itself from a defendant's pervasive bad faith.  Plaintiffs[1] in this FLSA action seek to be paid for all time they worked for Outokumpu Stainless USA, LLC ("Defendant") as reflected in Defendant's time and pay records.  (Doc. 223).  Time and pay records are of primary importance in FLSA actions.  Defendant refused to produce complete and accurate records and misrepresented to the Court and Plaintiffs material facts surrounding its refusals. The Magistrate Judge entered orders and imposed sanctions against Defendant through the course of discovery, but Defendant was undeterred.  Defendant persisted in its misconduct through the date set for final pre-trial conference, at which point Defendant still had not produced basic time and pay records.  As a consequence, the Court was left with no choice but to cancel the pre-trial conference and, instead, conduct a general status conference.  This was followed by show cause hearings to address Defendant's failures.  For the reasons set out below, the Court determines default judgment is the only remaining sanction sufficient to address Defendant's bad faith and the damage wrought by it.

A.      **Background and Recent Procedural History**

This matter is before the Court on the Report and Recommendation of United States Magistrate Judge Nelson ("Magistrate Judge") (Doc. 261), as well as briefing and evidentiary support submitted in response to the undersigned's Show Cause Orders.  (Docs. 288, 298, 300, 302).  Plaintiffs William Heath Hornady, Christopher Miller, Colin Hartery, and Takendric Stewart

---

[1] Plaintiffs include named plaintiffs William Heath Hornady, Christopher Miller, Colin Hartery, and Takendric Stewart, as well as members of the Collective, or all other similarly-situated hourly employees who opted-into this Action.

brought this collective wage and hour action under Section 216(b) of the Fair Labor Standards Act, 29 USC § 201 et seq. ("FLSA") against Defendant employer, Outokumpu Stainless USA, LLC ("Defendant").  (Doc. 223).  The Report and Recommendation addressed Plaintiffs' "Renewed Motion for Sanctions and/or Related Motion to Compel," filed on September 3, 2020.  (Doc. 238).

Defendant's discovery obligations in this action were not novel.  Defendant's discovery failures, though, were extraordinary resulting in a long train of discovery and sanction motions against it.  Plaintiffs filed their initial "Motion for Sanctions and/or Related Motion to Compel" on June 15, 2020 ("Initial Motion").  (Doc. 216).  In response to the Initial Motion, Defendant represented to the Magistrate Judge that its third-party payroll processor, Automatic Data Processing, Inc. ("ADP") was being uncooperative, impeding Defendant's ability to meet its discovery obligations to produce its time and pay records for Plaintiffs.  (Doc. 220).  Defendant further represented to the Magistrate Judge it needed ADP's data, in order to accurately respond to the production requests for Defendant's time and pay records.  (Doc. 332).  Based on those representations, and in lieu of recommending additional sanctions, the Magistrate Judge ordered Defendant to serve ADP with a subpoena.  (Doc. 229).  Defendant served ADP with a subpoena as ordered, but, thereafter, misrepresented that ADP failed to comply with it.  (Docs. 242, 299 and 333).  Defendant produced no records to Plaintiffs as a result of the subpoena.  Defendant's continued refusal to produce its records resulted in Plaintiffs' Renewed Motion for Sanctions, seeking, again, a default judgment ("Renewed Motion").  (Doc. 238).

In both the Initial and Renewed Motions, Plaintiffs cataloged Defendant's violations of numerous discovery orders, resulting in Defendant's failure to produce complete and accurate time and pay records, records which are the linchpin in this FLSA action.  Plaintiffs correctly

argued Defendant's production of complete and accurate discovery was essential to analyzing the underlying claims, calculating whether all time had been paid, overtime had been paid at the correct rate of pay, and overtime had been paid timely. (*See* Docs. 216 and 238). In addition, Plaintiffs' argued Defendant's obstruction was fatal to their ability to calculate damages. (*Id*.).

### 1.  The Report and Recommendation

The Report and Recommendation, as well as related filings, were forwarded to the Court on October 26, 2020. (Doc. 261).[2] The Magistrate Judge recommended sanctions lesser than default, because the record at the time did not demonstrate the full extent of Defendant's bad faith. (*Id.*). Moreover, the Magistrate Judge observed, even if the record arguably supported a finding of bad faith, lesser sanctions were available, by amending the remedial, and "burden shifting," procedure set out in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). (*Id.*).

In *Mt. Clemens*, the Supreme Court acknowledged, under the FLSA, the employee bears the burden of proving he performed work for which he was not properly compensated. *Anderson,* 328 U.S. at 687. "Because of 'the remedial nature of [the FLSA] and the great public policy which it embodies,' courts are careful to construe the statute so as not to create impossible hurdles for employees*." Rafferty v. Denny's, Inc.*, 2021 U.S. App. LEXIS 27680 (11th Cir. September 15, 2021) (citing *Anderson*, 328 U.S. at 686-87, *superseded by statute on other*

---

[2] In response to the Report and Recommendation, Plaintiffs filed an Objection. (Doc. 266). The Defendant filed both an Objection to the Report and Recommendation (Doc. 267), as well as an Objection to the Plaintiffs' Objection (Doc. 270). Plaintiffs also filed a Consolidated Motion to Strike (Doc. 269) a potential affidavit Defendant said it would be submitting as support for its objection to the Report and Recommendation. Defendant filed a response in opposition. (Doc. 271). The Report and Recommendation (Doc. 261), as well as the related filings, including Defendant's Objections (Doc. 267), Plaintiffs' Objections (Doc. 266), Defendant's Response to Plaintiffs' Objections (Doc. 270), Plaintiffs' Consolidated Motion to Strike (Doc. 269), and Defendant's Response in Opposition (Doc. 271) were referred to the District Judge in November, 2020.

*grounds*, Portal-to-Portal Act of 1947; quoting *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007)).

The Eleventh Circuit has "emphasized that it is the duty of the employer—not the employee—to keep track of the employee's 'wages, hours, and other conditions of employment.'"  *Rafferty*, 2021 U.S. App. LEXIS 27680, at *57 (quoting *Allen*, 495 F.3d at 1315.) "That is so because the employer enjoys a better position to be aware of and create records of the most probative facts about the nature and amount of work performed.  And denying a claim simply because the employee cannot produce records of her time worked would reward an employer's failure to comply with its statutory duty to maintain proper records."  *Id*.

To remedy this situation, the Supreme Court in *Mt. Clemens* authorized a burden-shifting scheme:  an employee "satisfies her burden if she 'proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"  *Rafferty*, 2021 U.S. App. LEXIS 27680, at *57 (quoting *Anderson*, 382 U.S. at 687).  In *Rafferty*, the Eleventh Circuit determined plaintiff met her burden, through her deposition testimony, and demonstrated there were weeks where her untipped work exceeded twenty percent of the hours she worked as a tipped employee, resulting in her performing work for which she was not paid. *Rafferty*, 2021 U.S. App. LEXIS 27680, at *60.  Reversing summary judgment in favor of the defendant, the Eleventh Circuit, in accordance with *Mt. Clemens*, determined defendant must come forward with evidence to negate the inferences from plaintiff's testimony that she worked more than twenty percent of her time on untipped related duties.  *Id.*  (*See Anderson*, 382 U.S. at 687 ("The burden then shifts to the employer to produce either evidence of the specific amount

of work the employee performed or evidence that tends to refute the reasonableness of the inference the employee seeks for the factfinder to draw from her evidence.")).

Applying the *Mt. Clemens* burden-shifting approach to this case, the Magistrate Judge determined an appropriate sanction would permit Plaintiffs to prove the amount and extent of the work for which they were allegedly improperly compensated, while prohibiting the Defendant under Rule 37(b)(2)(A)(ii) from introducing any evidence to challenge the Plaintiffs' calculations. (*Id.*). Effectively, the Magistrate Judge recommended Plaintiffs calculate their damages based on their knowledge of when they performed work for which they were not accurately or correctly compensated. The record before the Magistrate Judge did not yet reveal Defendant's material misrepresentations about its records and ADP.

Both parties objected to the Report and Recommendation. Plaintiffs argued it would be impossible to calculate damages without Defendant's time and pay records. (Doc. 266). Defendant contended the recommendations were "no longer applicable" and the records produced to date were reliable and accurate. (Doc. 267). Defendant then reversed course on blaming ADP, instead representing the subpoena to ADP and its records were not needed in order to produce reliable pay records. (*Id.*). Defendant represented ADP's records had been sought based on mistaken testimony of its 30(b)(6) corporate representative, Melissa Pledger ("Corporate Representative") concerning the timeliness of overtime and "true up" payments, stemming from her confusion as to the "regular rate of pay" process. (*Id.*). As proof, Defendant assured the Court it was "working on an affidavit" to correct the record in that respect. (*Id.*). The Defendant never submitted an affidavit.

Once a "party objects to any portion of the magistrate judge's report and recommendation, the district court judge must 'make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made,' before adopting or rejecting the report and recommendation." *Doye v. Colvin*, 378 Fed. Appx. 926, 927 (11th Cir. May 7, 2010) (citing 28 U.S.C. § 636(b)(1)). Defendant advocated, in its Response to Plaintiffs' Objections, the "Court should find it unnecessary to address the additional sanctions sought by Plaintiffs, like [the Magistrate Judge]." (Doc. 270). However, the Court has a duty to undertake an "independent consideration of factual issues based on the record" when reviewing a Report and Recommendation. *See Diaz v. United States*, 930 F.2d 832, 836 (11th Cir. 1991). The Court rejected Defendant's attempt to avoid deeper scrutiny and undertook an exhaustive review of the record.

### 2.  The Court's Review of the Record

Here is what the Court found. The record is littered with discovery orders, discovery conferences, motions to compel, and motions for sanctions, all designed to deter Defendant from its continuing obstinate refusal to produce its time and pay records. Indeed, Plaintiffs' Renewed Motion was their fifth motion to compel and second motion for sanctions against Defendant. Plaintiffs' chief complaint in the Renewed Motion, as in most every discovery motion against Defendant preceding it, was Defendant's failure to produce complete and accurate sets of its own data. Three (3) discrete categories of data production[3] are at issue:

---

[3] Various terms are used throughout the record to denote these documents; the Court will identify the requested documents herein as pay records, time records, and incentive plan data.

1.  Pay records, demonstrating "the regular rate of pay," as well as any shift derivations, and an itemized amount of any "true up" pay for each paycheck per collective action plaintiff (hereinafter "pay records");

2.  Time records, whether all time clocked in was rounded up or down, and whether the rounded time was paid, for each shift per collective action plaintiff (hereinafter "time records"); and,

3.  Incentive plan data, and the time period during which it was gathered, in order to calculate the monthly incentive plan payment (hereinafter "incentive plan data").

By this Court's count, twelve (12) orders were entered requiring Defendant to produce these records. *See* Appendix I. In addition, the Magistrate Judge held eleven (11) discovery conferences and motion hearings with the parties focused, for the most part, on the production of these records. Significant judicial resources have been expended, and continue to be expended, to address Defendant's failures to produce its time and pay records. These are records Defendant presumably relied on, and continues to rely on, in the usual course of its business, to pay its employees, every two weeks.[4]

Since October 2018, Defendant repeatedly represented to the Magistrate Judge and to Plaintiffs that it would cooperate with discovery requests and comply with court orders. When Defendant failed to cooperate or comply as represented, it offered a variety of excuses, and then made more representations. Defendant then dishonored those representations. Then, Defendant commenced the whole sorry pattern over again. This pattern of Defendant's

---

[4] As recently as September 10, 2021, the parties sought the Court's intervention, yet again. Plaintiffs filed a motion, asking this Court "to allow them to issue a non-party subpoena to ADP to update the same sort of time records, and pay records, ADP previously provided through December 31, 2020 (time) and January 31, 2021 (pay records)." (Doc. 339). In support of the motion, Plaintiffs represented Defendant had been consulted and had no opposition to seeking a Court-ordered subpoena to produce its own time and pay records. The Court denied the motion and suggested Defendant work with ADP, its own payroll contractor, to provide the records to the Plaintiffs.

misconduct poisoned the entirety of this case.  As set out below, it is now clear that Defendant's misconduct was deliberate and in bad faith.

### 3.   February 2021 Hearing and Show Cause Orders

The pre-trial conference was set for February 17, 2021.  However, recognizing the number of unresolved discovery disputes, the Court determined that this action was not ready for pre-trial and asked Plaintiffs to file a list of Defendant's remaining discovery deficiencies.[5]  Plaintiffs filed their list on February 10, 2021.  (Doc. 279).  On February 17, the Court conducted a hearing and again questioned Defendant about ADP's noncompliance with the subpoena and Defendant's shifting rationales for its discovery failures.[6]  (Doc. 299).  Defendant responded by reasserting its previous representations that ADP was being uncooperative, had failed to respond to the subpoena, and had not provided records.  (*Id.*).

Based on those representations, on February 19, 2021, the Court issued a show cause order to ADP, requiring it to appear on March 5, 2021, and explain its failure to comply with a subpoena. (Doc. 288).  ADP was also ordered to "provide a detailed chronology of its efforts to comply (if any) and all communications with Defendant, through the date of the hearing, concerning the Subpoena."  (*Id.*).  The Court ordered Defendant to serve ADP with the show cause order. Defendant failed to do so until ten days later, which gave ADP only four days notice of the hearing.  Defendant also sent ADP an email stating, contrary to the Court's order, ADP may not

---

[5] Plaintiffs had previously provided a chronological account of their effort to obtain certain discovery, and recounted Defendant's repeated stonewalling and procrastinations, in its "Miscellaneous Submission in advance of January 17, 2020 Conference."  (Doc. 170).  Many of the issues addressed in January 2020 remained unresolved and had to be re-addressed in a February 2021 Submission. (Doc. 279).

[6] In its objection to the Report and Recommendation (Doc. 267), Defendant asserted it did not need ADP to produce the records, that the whole point of the subpoena was irrelevant because Pledger's testimony was inaccurate.

have to attend the hearing if the records were produced beforehand. (Doc. 300). When a corporate representative of ADP failed to appear at the scheduled hearing, the Court entered a second show cause order and ordered a second hearing to take place on March 12, 2021. (Doc. 298).

Prior to the second hearing, ADP filed a brief addressing the show cause orders and its compliance with the subpoena. (Docs. 300 and 302). The second hearing was attended by Plaintiffs' counsel, Defendant's Corporate Representative and its counsel, an ADP corporate representative and ADP's counsel. ADP presented evidence establishing it had provided or attempted to provide to Defendant the data requested five (5) days after the Subpoena was served, some seven months prior to the hearing. (Doc. 300). ADP's evidence squarely belied Defendant's repeated representations to the Magistrate Judge, Plaintiffs, and this Court that ADP had failed to respond to the subpoena and been otherwise uncooperative for some seven months.

      **B.**      **The Collective Action**

           **1.**      **The Parties**

Plaintiffs are employed at Defendant's manufacturing facility in Calvert, Alabama ("Mill"). Named Plaintiffs William Heath Hornady, Christopher Miller, Colin Hartery, and Takendric Stewart filed this action on July 16, 2018. Two weeks later, they amended the complaint to assert a collective action under Section 216(b). (Doc. 5). The collective action includes named Plaintiffs and "all other similarly situated employees, former and present, who worked for Defendant at [the Mill], who were paid on an hourly basis and who were/are affected by Defendant's acts,

omissions, timekeeping and wage payment practices described in this Amended Complaint ('The Collective')."  (Doc. 223).  All Plaintiffs in the Collective are or were hourly employees.

Defendant is a subsidiary of Outokumpu Oyj, a Finnish international steel fabricator and manufacturer.  (Doc. 25).  Defendant purchased the Mill from ThyssenKrupp AG in 2012.  (Doc. 22-1).  Defendant holds itself out as "the global leader in sustainable stainless steel." (https://www.outokumpu.com/en; *see also*, "Outokumpu boasts the widest product portfolio in the market, state-of-the-art and modern mills, our own unique source of chrome and 100 years of expertise in metals, technology and mining.").  Outokumpu's Mill in Calvert is described as "America's most technically advanced stainless steel mill" which "offers a comprehensive product portfolio combined with industry-leading technical support and services."  (*Id.*).  The Mill portfolio includes black coils, white hot rolled coils, strips, sheets and plates, cold rolled coils, strips, sheets and plates, and slag products.  (*Id.*).  Defendant supplies stainless steel in national and international markets, for use in a variety of industries, including building and infrastructure, automotive and transportation, appliances, energy, and heavy industry.  (*Id.*).

The Eleventh Circuit recognizes Defendant as a "sophisticated employer."  *See Outokumpu Stainless USA, LLC v. NLRB*, 773 Fed. Appx. 531, 535 (11th Cir. 2019) (affirming default judgment against this Defendant for undermining a NLRB settlement agreement).  Defendant operates the Mill 365 days a year, 24 hours a day, and employs approximately 1000 people.  (Doc. 268-1).  It runs, in general, two twelve-hour shifts, with the first shift beginning at 6 am and the second shift, the night shift, beginning at 6 pm.  (Docs. 258-5 and 206-2).  There are also twelve-

hour shifts that begin at 7 am and 7 pm, respectively, in the Melt Shop.  (Docs. 206-2 and 263-1).[7]

### 2.  **Plaintiffs' Claims**

Plaintiffs asserts three counts against Defendant.[8]  (Doc. 223).  In Count I, Plaintiffs claim Defendant violated the FLSA by failing to properly pay regular wages, overtime wages, and bonuses.  (*Id.*).  Specifically, Plaintiffs allege Defendant (i) failed to pay wages for all time they were clocked in, working, or available to work, (ii) failed to pay overtime at 1.5 times an hourly rate that included monthly bonuses and for all hours worked in excess of 40 hours in a workweek, and (iii) incorrectly paid overtime as "trued up" wages calculated after regular payment dates.

---

[7] Defendant concedes "some of its employees are subject to the regulations of the FLSA."  (Doc. 228).  Indeed, Defendant is precisely the type of employer the FLSA was intended to regulate.  Congress enacted the FLSA in 1938 to "guarantee either regular or overtime compensation for all actual work or employment."  *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698, 703, 88 L. Ed. 949 (1944).  The Supreme Court explained:

> The Fair Labor Standards Act set up a comprehensive legislative scheme for preventing the shipment in interstate commerce of certain products and commodities produced in the United States under labor conditions as respects wages and hours which fail to conform to standards set up by the Act. Its purpose. . . is to exclude from interstate commerce goods produced for the commerce and to prevent their production for interstate commerce, under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being; and to prevent the use of interstate  commerce as the means of competition in the distribution of goods so produced, and as the means of spreading and perpetuating such substandard labor conditions among the workers of the several states.

*United States v. Darby*, 312 U.S. 100, 109-110 (1941).  The Supreme Court has explained the "primary purpose of the Act [FLSA] is not so much to regulate interstate commerce as such, as it is, through the exercise of legislative power, to prohibit the shipment of goods in interstate commerce if they are produced under substandard labor conditions." *Roland Electrical Co. v. Walling*, 326 U.S. 657, 669-670 (1946) (citing *United States* v. *Darby*, 312 U.S. 100, 115; *United States* v. *Carolene Products Co.*, 304 U.S. 144, 147 (1938).  "Savings resulting from substandard labor conditions would be reflected directly into competitive costs*." Roland Electrical Co. v. Walling*, 326 U.S. 657, 668 (1964).  In summary, the FLSA regulations are intended to foreclose the ability of manufacturers to gain any market advantage, and/or increased profits, through the manipulation of pay practices resulting in artificially lowered labor costs.

[8] The Third Amended Complaint ("TAC") is the operative complaint.  (Doc. 223).  Plaintiffs also assert alternative state law claims for quantum merit and/or unjust enrichment based on Defendant's failure to pay for all time worked. (*Id.*).

(*Id.*).   Count II alleges alternative common law claims for quantum merit and/or unjust enrichment.   Count III asserts similar claims for the Collective.   (*Id.*).   Plaintiffs seek compensation for all time worked, and "all unpaid and/or underpaid and/or late time paid overtime," as reflected in Defendant's "time and pay records."   (*Id.*).   On May 2, 2019, the Court conditionally certified the Collective Action under 29 U.S.C. § 216(b).   (*See* Doc. 93, "Order for Conditional Class Certification").   Though the number is somewhat in dispute, the current collective size stands somewhere around 280 employees.

### 3.   Defendant's Pay and Timekeeping Practices

Plaintiffs' FLSA claims are standard, but Defendant's pay and timekeeping practices are not.   They are complicated, if not convoluted.   Essentially, Plaintiffs claim Defendant's pay practices violate the FLSA by failing to properly and timely pay overtime at 1.5 times the "regular rate of pay." (Doc. 223).   Two factors, both regulated by the FLSA, can impact the determination of an employee's "regular rate of pay" for the purposes of calculating the overtime rate of pay. The first factor is how the employer calculates the employee's regular rate of pay.   The second factor is whether the employer pays a nondiscretionary bonus, which requires the regular rate of pay to be recalculated.

Next, Plaintiffs claim Defendant's timekeeping practices violate the FLSA by failing to pay Plaintiffs for all hours worked.   (*Id.*).   Similarly, two factors, also regulated by the FLSA, impact how much time an employee is paid for overtime versus straight time.   The amount of overtime due depends on the temporal relationship between an employee's work schedule and the employer-determined work week, which shall remain fixed.   Second, an employer's "rounding

policy" may create a discrepancy between the time employees are clocked in and time for which wages are paid, affecting the amount of straight and overtime paid.

At the Mill, all four factors are in play: Defendant uses varying pay rates which can change by shift, a time clock rounding policy and monthly incentive plan. Plaintiffs question whether, based on the varying rate of pay, overtime is paid correctly. This question depends on the parameters of Defendant's workweek and whether it is fixed or not; application of Defendant's time clock rounding policy and whether it results in employees not being paid for all time worked; and, Defendant's incentive plan and whether Defendant properly calculates overtime inclusive of the monthly payment. Defendant's complicated pay practices heightened the need for good faith compliance with its discovery obligations, as ordered by this Court. The record establishes by clear and convincing evidence that Defendant refused to comply with these obligations and did so in bad faith.

### a.  The Significance of the Regular Rate of Pay and Defendant's Pay Rates

The significance of Defendant's refusal to produce complete and accurate pay records is best understood in the context of the FLSA and corresponding regulations. Section 7(a)(1) of the FLSA requires that employers compensate their employees for hours worked in any workweek in excess of forty "at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C. § 207(a)(1). Overtime compensation, therefore, depends on an employee's "regular rate" of pay and the employee's work schedule in relation to the employer-determined "workweek." In order to determine whether overtime has been paid correctly, the analysis commences with the identification of the employee-plaintiff's "regular rate of pay." An employee-plaintiff's "regular rate" of pay is the "keystone" of Section 7(a) claims. *Walling v.*

*Youngerman-Reynolds Hardwood Co*., 325 U.S. 419, 424 (1945); *Childress v. Grady Mem. Hosp. Cop.*, 2016 U.S. Dist. LEXIS 199051, *77 - 79 (N.D. Ga. May 12, 2016); *see also Urnikis-Negro v. Am. Family Property Servs*., 616 F.3d 665, 673 (7th Cir. 2010) ("The employee's 'regular rate' of pay is thus the 'keystone' of section 7(a).") (quoting *Walling*, 325 U.S. at 424).  In *Walling*, the Supreme Court declared "the amount of overtime payments which are necessary to effectuate the statutory purposes" depends on the "regular rate," and "[t]he proper determination of that rate is therefore of prime importance."  325 U.S. at 424.

The "regular rate" of pay is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  *Boylve v. City of Pell City,* 866 F.3d 1280, 1286 (11th Cir. 2017) (citing *Walling*, 325 U.S. at 424).  "The 'regular rate' of pay under the Act is the amount of compensation an employee receives per hour."  *Martin v. Southern Premier Contrs., Inc.,* 2013 U.S. Dist. LEXIS 30017, *26 (N.D. Ga. March 6, 2013) (citing 29 C.F.R. § 778.109 ("The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.")).  "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments."  *Id.*  (citing *Walling,* 325 U.S. at 424).

Defendant's varying pay rates are assigned to its employees according to the type of position and level of skill required to perform the work.  (Doc. 220).  An employee is assigned a pay rate upon hire; however, thereafter, a number of factors may result in an adjustment to an employee's regular rate of pay, effectively resulting in a new or revised regular rate of pay.  For

example, any employee who works the night shift receives 50 cents more an hour per night shift, above his assigned rate.[9] (Doc. 206-2). Employees also receive holiday pay. (*Id*.).[10] Finally, on occasion an employee may be asked to work in a higher job classification for a particular shift. When this occurs the employee receives a step-up rate of pay for that work.[11] (*Id*.). Step-up rates can be layered on top of the night shift and holiday shift differentials. Overtime rates are, then, calculated by multiplying the adjusted regular rate of pay, by one and a half times. (*Id*.).

A paycheck for any given pay period might have multiple rates of pay: a regular rate, a night shift rate, a step-up rate, a single overtime rate or multiple overtime rates.[12] (*Id*.). Despite this, Plaintiffs receive pay stubs that do not itemize hours and the applicable rates. The pay stubs do categorize total straight time, overtime pay, or holiday pay. Step-up rates are not identified on the employees' pay stubs.[13] (*Id*.). Defendant's Senior Payroll Specialist and 30(b)(6) Corporate

---

[9] Defendant assigns pay rates based on position and the required skill level to perform that position.

[10] Defendant's 30(b)(6) deponent could not articulate how holiday pay is paid when it is combined with overtime or the nightshift premium. (Doc. 206-2).

[11] Step-up pay rates are paid when an employee works in a position with a rate of pay higher than his regular rate. His time for that shift is coded at the higher pay rate. This is referred to as the step-up rate.

[12] The Court observes, in order for an employee to be assured he is being paid overtime correctly, he would need to maintain his own log of daily pay rates, clock-in and clock-out times.

[13] The C.F.R. addresses how the regular rate of pay is calculated when an employee works one or more pay rates within a workweek:

> Where an employee in a single workweek works at two or more different types of work for which different nonovertime rates of pay (of not less than the applicable minimum wage) have been established, his regular rate for that week is the weighted average of such rates. That is, his total earnings (except statutory exclusions) are computed to include his compensation during the workweek from all such rates, and are then divided by the total number of hours worked at all jobs. Certain statutory exceptions permitting alternative methods of computing overtime pay in such cases are discussed in §§ 778.400 and 778.415 through 778.421.

*See* 29 C.F.R. § 778.115. Therefore, hours and rates worked per shift are needed in order to understand if the "regular rate of pay" is arrived at correctly.

Representative, Melissa Pledger (hereinafter "Corporate Representative" or "Pledger"), explained employees' paychecks are "trued up" by ADP at least once a month.  (Doc. 206-2).  Generally, "true ups" occur when an employee works a step-up rate or earns holiday pay, and overtime is recalculated accordingly.  (*Id*.).  Rather than itemizing "true up" payments on employees' pay stubs, Defendant blends these payments into the overtime pay for the current pay period.  (*Id*.).  Given the many derivations, and adjustments, Defendant's pay records are indispensable to accurately assess Plaintiffs' claims concerning whether overtime was paid at the correct rate of pay and, in compliance, with the FLSA.

### b.  The Parameters of Defendant's Workweek

Understanding the parameters of Defendant's "workweek" is also essential to determining "regular rate of pay" and Plaintiffs' overtime claims.  Overtime required under the FLSA cannot be calculated without determining "workweek."  *See Tenn. C. v. Muscoda*, 321 U.S. 590, 597-598 (1944) ("It is vital, of course, to determine first the extent of the actual workweek. Only after this is done can the minimum wage and maximum hour requirements of the Act be effectively applied.").  "Under the Fair Labor Standards Act, overtime is calculated on a workweek basis."  *Jenkins v. Anton,* 922 F.3d 1257, 1269 (11th Cir. 2019) (citing 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.103).  The FLSA "maximum hours" provision (29 U.S.C. § 207(a)(1)) states "the unit of time . . . within which to distinguish regular from overtime [work] is the week."  *Abshire v. Redland Energy Servs., LLC*, 695 F.3d 792, 794 (11th Cir. 2019) (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 579 (1942)).  "An employee's workweek is a fixed and regularly recurring period of . . . seven consecutive 24-hour periods" that "need not coincide with the calendar week but may begin on any day and at any hour of the day."  *Jenkins,* 922 F.3d at 1269

(citing 29 C.F.R. § 778.105).  Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked.  *Abshire, LLC*, 695 F.3d at 794 (citing 29 C.F.R. § 778.105).

The amount of overtime an employee earns, then, depends on how his schedule aligns with the workweek.  Defendant's workweek has been in dispute for a portion of the time encompassed by this suit.  Prior to January 27, 2019, the Pay Summaries (and/or Earning Statements) produced by Defendant reflected a Monday to Sunday workweek, while Defendant's operation schedule reflected a Saturday to Sunday workweek.  (Doc. 206-2).  With the pay period beginning January 27, 2019, Defendant changed its pay period ending dates, on the spreadsheets it produced, to reflect a Sunday to Saturday workweek which was consistent with its operation, or time and attendance, schedule.  (*Id*.).  Further, while Defendant pays its employees biweekly, Defendant's Corporate Representative testified the duration of the workweek changes according to an employee's schedule.  For example, the workweek either ends at 6:00 am Sunday morning, or if an employee is nearing the end of a shift at that time, the workweek ends when the employee clocks out of the overnight Saturday night shift. (*Id*.).  Therefore, the workweek is dictated by the shift and is not a fixed, 168-hour period. (*Id*.).  Defendant's time records, together with pay records detailing the pay period ending date and the work week within which the clocked in time was attributed, were necessary in order to assess whether overtime was paid properly.

   c.   **Rounding Principles under the FLSA and Defendant's Rounding Policies**

Defendant's time records are also essential to determine whether its Time-Clock Policy ("Rounding Policy") complies with the FLSA by compensating Plaintiffs for all time worked.  (Doc.

244-4).  The Code of Federal Regulations accompanying the FLSA generally permit rounding practices.  29 C.F.R. § 785.48.  The regulation provides, where time clocks are used, employees do not have to be paid for arriving before their regular starting time or remaining after their closing time if the employees do not engage in any work.  (*Id*. at § 785.48(a) ("Their early or late clock punching may be disregarded.")).  Likewise, an employer may round time "to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour."  29 C.F.R. § 785.48(b) ("Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.").  Rounding is an acceptable method to compute time "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."  *Id.*

Plaintiffs allege Defendant's policy violates this regulation and results in Plaintiffs not being paid for all time worked.  (Doc. 223).  Defendant employed two rounding policies during the time encompassed by this suit.  Defendant's first rounding policy, in place prior to August 1, 2018, automatically rounded employees' clock-ins and -outs, up and down, by thirty minutes. (Doc. 189-6).  For example, if an employee clocked-in at 5:30 am, the time record is automatically rounded up to 6:00 am.  Similarly, if an employee clocked-out at 6:30 pm, the time was rounded down to 6:00 pm.  (*Id.*).

On August 31, 2018, shortly after this action was filed, Defendant amended its policy to round by seven minutes rather than thirty.  Defendant's amended policy provided, "Team members may clock in up to 7 minutes prior to scheduled shift start time, without penalty.  Pay will begin at the scheduled shift time."  (Doc. 244-4).  Clock-ins more than seven minutes prior to scheduled shift time required approval, or would constitute "unapproved, unpaid time and just

be adjusted to reflect such." *(Id.*).  As explained by Defendant's Corporate Representative, any clock-out seven minutes after the scheduled shift end time is rounded back.  (Doc. 206-2).  An employee who clocked-out more than seven minutes after the scheduled shift end time is subject to discipline and/or the time must be approved.  *Id.*  Defendant's Corporate Representative testified employees may be approved for more than a 12 hour shift.  Approvals occur after the fact, and are maintained in a separate "electronic time card" system.  Employees [including Plaintiffs] had no access to these electronic time cards.  (*Id*.).

Although there is no Eleventh Circuit precedent establishing how FLSA "rounding" rules should be interpreted, the Tenth Circuit, relying on the Ninth Circuit opinion in *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1075 (9th Cir. 2016), explained:

> Federal regulation permits rounding as long as "it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *Id.*; *see also Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1075 (9th Cir. 2016) (noting that federal regulation has endorsed use of rounding for over 50 years). Stated differently, a valid rounding policy must be "neutral, both facially and as applied." *Corbin*, 821 F.3d at 1076 (quoting *See's Candy Shops, Inc. v. Superior Court*, 210 Cal.App.4th 889, 148 Cal. Rptr. 3d 690, 701 (2012)).

*Aguilar v. Mgmt. & Training Corp.,* 948 F.3d 1270, 1287 - 88 (10th Cir. 2020).  In *Aguilar*, the court reversed summary judgment for the employer based on evidence that the rounding favored the employer approximately 94% percent of the time.  *Aguilar*, 948 F.3d at 1288.

Other courts rely on time clock records to evaluate "rounding claims."  *See Boone v. Primeflight Aviation Servs.,* 2018 U.S. Dist. LEXIS 28000 (E.D.N.Y. Feb. 20, 2018) (court had the benefit of 111,450 clock entries of 138 employees to determine whether an employer's rounding policy was neutral); *see also Wey v. City of St. Petersburg*, 2020 U.S. Dist. LEXIS 230115, *7-11

(M.D. Fla. Dec. 8, 2020) (summary judgment denied where employer's "rounding policy appears to have worked against the employees – and in the [employer's] favor – 96% of the time, resulting in thousands of dollars of backpay owed to Plaintiff and his colleagues."). An employer's time clock records are essential to determine whether its rounding policy is both facially neutral and neutral as-applied for purposes of the FLSA.

### d.   Regulations Applicable to Bonuses and Defendant's Incentive Plan

Finally, Defendant's Incentive Plan also affects Plaintiffs' regular rate of pay. The Incentive Plan provides for a nondiscretionary bonus payment once a month totaling up to 25% of an employee's monthly earned wage. (Docs. 181-1 and 181-2). These incentives constitute "renumeration" under FLSA, and therefore must be included in calculating an employee's regular rate of pay. 29 C.F.R. 778.209(a); *see also Opinion Letter Fair Labor Standards Act (FLSA)*, 2019 WL 2914103, at *1–2 (July 1, 2019) ("The FLSA defines 'regular rate of pay' to include 'all remuneration for employment paid to, or on behalf of, the employee,' excluding certain types of compensation provided in 29 U.S.C. § 207(e)."). Once the regular rate of pay has been revised to include the bonus amount, any overtime pay must be recalculated at the revised regular rate. 29 C.F.R. § 778.209(a).

The regulations provide an alternative:  an employer, however, is not required to retrospectively recalculate the regular rate if the employer pays a fixed percentage bonus that simultaneously pays overtime compensation due on the bonus. *See* 29 C.F.R. § 778.210; *Brock v. Two R Drilling Co.*, 789 F.2d 1177, 1179-81 (5th Cir. 1986).

From a mathematical perspective, a percentage bonus under Section 778.210 achieves the same result as recomputation. Thus, percentage bonuses are

permissible not because they have some independent legal justification, but because they achieve the same ultimate result for the employee.

*Weninger v. Gen. Mills Operations LLC*, 344 F. Supp. 3d 1005, 1009 (E.D. Wis. 2018).

Defendant's Incentive Plan payment is made at the beginning of each calendar month. The amount of the incentive payment is determined by applying a bonus percentage, based on considerations such as safety and production during the bonus period, to earnings from the prior two pay periods. (Docs. 187-2, 265-1 and 268-1). Therefore, the period of performance on which the bonus percentage is based is generally different from the pay period to which the percentage is applied. (*Id*.). Plaintiffs argue this "temporal" disconnect results in an incorrect calculation of the overtime rate of pay during the bonus period. (Doc. 223). For this reason, Plaintiffs sought, and the Court ordered, Defendant to produce information on the time period over which the different performance goals were measured in order to establish the monthly incentive percentage.

### e.  Defendant's Duty to Maintain Records

As an employer subject to the FLSA, Defendant is required to "keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment . . . ." 29 U.S.C. § 211(c). The Eleventh Circuit has established: "It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment. The employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and employees seldom keep such records themselves." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d at 1315 (citation and quotation omitted).

Defendant does not dispute its duty to maintain the records.  To the contrary, as Plaintiffs correctly note in their Renewed Motion, "Defendant has made promise after promise that it will produce the records."  (Doc. 238).  Defendant, though, also misrepresented that its production was thwarted by ADP.  (Doc. 242).  Defendant's misrepresentation notwithstanding, the record retention obligations are Defendant's alone, absolute and non-delegable.  "The employer at its peril, had to keep track of the amount of overtime worked by those of its employees in fact within the Act."  *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959) (quotation omitted).  *Accord Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363 (2d Cir. 2011) ("[A]n employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable.").

## C.    Summary of Opinion

Twice, Plaintiffs moved for sanctions pursuant to Rules 37 and 26 of the Federal Rules of Civil Procedure, as well as the Court's inherent power to sanction.  (Docs. 216 and 238).  As grounds, Plaintiffs argued "Defendant's personnel [David Scheid and Pledger] have repeatedly violated this Court's discovery orders and that those violations justify significant sanctions." (Doc. 216).   More specifically, Plaintiffs alleged Defendant doctored spreadsheets and propounded false and inaccurate pay records, twice; produced partially responsive time records; and, failed to produce the incentive plan data, at all, after being ordered to do so multiple times. (Docs. 216, 238 and 247).  Plaintiffs allege Defendant frustrated, manipulated and delayed the discovery process in order to reduce its own liability, concluding that the information it refused to produce will "quantify more in damages than Plaintiffs can otherwise guess at." (Doc. 247).

Defendant did not rebut the substantive, and substantial accusations, it had doctored and produced false records.  Likewise, Defendant did not explain, at all, why it had refused to produce

records it had previously agreed to provide.  Rather, Defendant argued its "production issues" were due to the Plaintiffs' unreasonable requests and an uncooperative third-party payroll provider, ADP, maintaining there was no evidence to support Defendant's actions were in bad faith. (Docs. 220 and 246).  To be clear, in response to sanctions, twice, Defendant abdicated, dodged and misconstrued its responsibility for its own failures.

The March 12, 2021 show cause hearing before this Court marked the culmination of a two-and-a-half-year endeavor to have Defendant produce accurate and complete pay and time records.  At this hearing, Defendant's misrepresentations regarding ADP's participation in its discovery failures were revealed, leading to the Court's ultimate understanding of the depth of Defendant's misconduct.  When the procedural history is reviewed in the context of the facts now known to this Court, the extent of Defendant's bad faith becomes all too apparent.  At every turn, Defendant delayed, obfuscated, violated or outright ignored the Court's orders, resulting in inefficiencies and confusion, and ultimately delayed resolution of a case Defendant represented as one that would be fairly simply to resolve.  (Doc. 91).  Throughout, the alleged violative pay practices continue, a potential boon to Defendant.  A clear picture of willful and prejudicial discovery abuse, requiring imposition of the strictest of sanctions, emerges.

The Court cannot ignore Defendant's calculated sabotage of the judicial process.  The issue squarely before the Court, at this juncture, is what sanction is appropriate.  The Court has attempted to describe each incident of Defendant's bad faith refusals to produce its records and intentional misrepresentations to the Court and Plaintiffs.  First, the Court finds clear and convincing evidence Defendant acted in bad faith when it violated numerous discovery orders and failed its obligations in every respect to produce accurate and complete time and pay

records.  Second, the Court finds clear and convincing evidence Defendant acted in bad faith when it attempted to foist responsibility for its failures on ADP, an attempt based on misrepresentations Defendant continued for ten months.

Based on the testimony and evidence submitted at the March 12, 2021 show cause hearing, related filings, and a complete review of the record, the Magistrate's Report and Recommendation granting sanctions is adopted in part and modified in part.  The Court finds Defendant's bad faith, stalling, inconsistent answers, falsehoods, and all-around subversive approach to discovery undermined this case and the ability to decide it on the merits.  For the reasons set out herein, the Court determines default judgment is the sole remaining sanction sufficient to address Defendant's bad faith.  All pending motions are mooted by this opinion.

II.    **Discussion**

A.    **Legal Standards**

"The district court has broad discretion to control discovery." *Jenkins v. Sec. Eng'rs, Inc.*, 798 Fed. Appx. 362, 369 (11th Cir. 2019) (citing *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993)).  "This power includes the ability to impose sanctions on litigants who do not comply with court ordered discovery deadlines." *Id.*  A district court possesses the authority to sanction a party for violating discovery obligations under either its inherent power, Rule 26(g), Rule 37(b), or any combination thereof.

A district court may impose case-ending sanctions for litigation misconduct under its inherent power.  *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.,* 561 F.3d 1298, 1307 (11th Cir. 2009) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991); *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006)).  The Court's inherent power to sanction is

"governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962); *see also Mingo v. Sugar Cane Growers Co-op. of Flori*da, 864 F.2d 101, 102 (11th Cir. 1989) ("The district court possesses the inherent power to police its docket . . .. Incident to this power, the judge may impose formal sanctions upon dilatory litigants. The sanctions imposed can range from a simple reprimand to an order dismissing the action with or without prejudice."). A court possesses "an inherent power to sanction errant parties before it" within the confines of restraint and discretion. *Malautea v. Suzuki Motor Corp.*, 148 F.R.D. 362, 370 (S.D. Ga. 1991) (*aff'd Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) ("These inherent powers, however, 'must be exercised with restraint and discretion.'")).

While Rule 37 governs sanctions for discovery-related misconduct only, a court may exercise its inherent sanctioning power to punish all types of contumacious conduct. *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2020 U.S. Dist. LEXIS 81449, *9 (N.D. Ala. May 8, 2020) (citing *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993)). The Supreme Court has determined that "the inherent power of a court [to sanction] can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). In *Chambers,* the Supreme Court stated, "[w]e discern no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for the bad-faith conduct described above . . . [and] neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Chambers,* 501 U.S. at 50. Courts should

ordinarily rely on procedural rules "when these black-letter provisions clearly apply to the sanctionable conduct at issue." *Id.*  However, when the bad-faith conduct is "beyond the reach of the Rules," and the "conduct sanctionable under the Rules [is] intertwined within conduct that only the inherent power could address," courts may exercise their inherent powers.  *Roche Diagnostics Corp.*, 2020 U.S. Dist. LEXIS 81449, at *9 (citing *Chambers*, 501 U.S. at 51); *see also Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010).  A district judge may rely on "informed discretion" to employ the court's inherent power to sanction a party before it.  *Chambers,* 501 U.S. at 50.

### 1.   Finding of Bad Faith Required

A finding of bad faith is essential to the Court's inherent power to sanction.  *See Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power [to sanction] is a finding of bad faith.").  In the Eleventh Circuit, courts apply the "subjective bad faith standard" when determining whether a party should be sanctioned pursuant to inherent powers.  *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th 2017) ("As a starting point, the inherent-powers standard is a subjective bad-faith standard.").

"A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order."  *Eagle Hosp.,* 561 F.3d at 1306 (determining a physician intercepting confidential emails and privileged information acted in bad faith). Recklessness, with nothing more, does not amount to bad faith.  *Id.* ("The standard is a subjective standard with a narrow exception for conduct tantamount to bad faith. Furthermore, recklessness alone does not constitute conduct tantamount to bad faith.").  Bad faith "exists when the court finds that a fraud has been practiced upon it, or that 'the very temple of justice

has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument." *Allapattah Servs. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (citing *Chambers*, 501 U.S. at 46).

A fundamental inquiry is whether the conduct "abused the judicial process." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Chambers*, 501 U.S. at 45). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Purchasing Power, LLC,* 851 F.3d at 1223-1225.

### 2.   The Nature of the Misconduct

In addition to a finding of bad faith conduct, "several federal courts have held that the need for sanctions is heightened when the misconduct relates to the pivotal or linchpin issue in the case." *People For The Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, 2020 U.S. Dist. LEXIS 31853, *13-14 (M.D. Fla. Feb. 25, 2020) (issuing sanction against defendant who removed 22 tigers prior to a court-ordered site inspection where the housing and care of the endangered species was the issue in the case) (citing *Qantum Commc'ns. Corp. v. Star Broad, Inc.,* 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007)). The court in *Roche Diagnostics Corp.* concluded its inherent sanctioning power, rather than Rule 37, applied to a defendant's bad-faith behavior which included doctoring "linchpin" evidence and committing perjury. *Roche Diagnostics Corp.*, 2020 U.S. Dist. LEXIS 81449, at *9-10 (citing *Qantum Commc'ns. Corp.*, 473 F. Supp. 2d at 1269).

Just as tigers and cubs went missing in *People for the Ethical Treatment of Animals*, Defendant's "keystone" time and pay records have been missing for the duration of this action; an action that has languished for more than three years. Defendant's pay and time records are

"linchpin" records and Defendant's withholding of them may warrant a terminal sanction. *Githieya v. Global Tel*Link Corp.*, 2020 U.S. Dist. LEXIS 222628, *89-91 (N.D. Ga. Nov. 30, 2020) (entering severe sanctions against defendant for withholding a "call script" because it was "the lynchpin of this case.").

Defendant withheld and failed to produce "linchpin" evidence.  Defendant engaged in flagrant bad faith designed to derail the orderly resolution of Plaintiffs' lawsuit.  Therefore, the Court will rely on its inherent power to sanction Defendant's bad faith conduct, in addition to Rule 37, to be discussed in further detail below.  *See Roche Diagnostics Corp.*, 2020 U.S. Dist. LEXIS 81449, at *9-10 (citing *Qantum Commc'ns. Corp.*, 473 F. Supp. 2d at 1269).

### 3.   Rule 37 of the Federal Rules of Civil Procedure

The Court's reliance on its inherent power does not preclude a finding that Rule 37 sanctions are also due to be granted.  As discussed, Plaintiffs have sought relief under the Federal Rules as well.[14] Most relevant here, Rule 37(b) of Federal Rules of Civil Procedure empowers the Court to impose "just" sanctions against a party that violates a discovery order.  Fed. R. Civ. P. 37(b)(2).  "Federal courts have authority to impose a variety of sanctions under Federal Rule of

---

[14] "Failure to comply with discovery obligations constitutes a violation of the Federal Rules and triggers the Court's authority to impose sanctions under, either or both, Rules 26(g) and 37(b)."  B-*K Cypress Log Homes v. Auto-Owners Ins. Co.*, 2011 U.S. Dist. LEXIS 168794, *5-6 (N.D. Fla. May 13, 2011).  Though both Rule 26(g) and Rule 37(b) contemplate discovery violations as a prerequisite to a sanction, the rules contemplate separate grievances.  Rule 26(g) addresses situations where the quality, completeness, and authenticity of the discovery is not acceptable or has been improperly certified by the counsel of record.  "Failure to properly certify or to erroneously certify the discovery calls for 'an appropriate sanction' Fed. R. Civ. P. 26(g)(3)."  B-*K Cypress Log Homes*, 2011 U.S. Dist. LEXIS 168794, at *5-6 (finding Auto-Owners and its attorneys deserve severe sanctions for extensive discovery violations where they failed to respond to several discovery orders and offered no rationale for its failure to comply with its discovery obligations).  Though Plaintiffs moved for Rule 26(g) sanctions, the opinion herein contemplates sanctions pursuant to Rule 37 and the Court's inherent power.  The evidence in the record reveals the discovery responses were signed by a Corporate Representative.  (*See* Doc. 206-2).

Civil Procedure 37(b)." *People For The Ethical Treatment of Animals, Inc.,* 2020 U.S. Dist. LEXIS

31853, at *11-12.  Under Rule 37, a court may sanction a party who "fails to obey an order to

provide or permit discovery" by:

> (i) directing that the matters embraced in the order or other
> designated facts be taken as established for purposes of the action,
> as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing
> designated claims or defenses, or from introducing designated
> matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order
> except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

"The Supreme Court has interpreted the Rule 37 requirement of a 'just' sanction to

represent 'general due process restrictions on the court's discretion.'" *Malautea v. Suzuki Motor

Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (quoting *Insurance Corp. of Ireland, Ltd. v. Campagnie

des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).  Beyond the due process constraint, courts are

given broad discretion in fashioning appropriate sanctions for violation of discovery orders.  *Id.*

A default judgment entered as a sanction for violation of Rule 37 is only appropriate when

there has been a violation of discovery order or motion to compel.  *United States v. Certain Real

Property Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317-18 (11th Cir. 1997).  The Court's

authority to enter a default judgment against the disobedient party is the harshest sanction, of

the seven options, granted only as a "last resort when less drastic sanctions would not ensure

compliance with the court's order."  *Malautea*, 987 F.2d at 1542 (citing *Navarro. v. Cohan*, 856 F.2d 141, 142 (11th Cir. 1988)).

As with inherent power, a default judgment entered as a sanction to address a violation of Rule 37 "requires a finding by the court that there was a willful or bad faith failure to obey a discovery order."  *Malautea*, 987 F.2d at 1542 (finding bad faith where defendants failed to produce documents following three clear orders by the district judge to do so); *see also Aztec Steel Co.*, 691 F.2d at 481 (finding defendant "willfully flouted court ordered discovery").  A delay, caused by negligence, is not enough to warrant the imposition of a default judgment:  "Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal."  *Malautea,* 987 F.2d at 1542.  In addition to finding a "party exhibited a willful or bad faith failure to obey a discovery order," the district court must find that "the moving party was prejudiced by that violation; and that a lesser sanction would fail to punish the violation adequately and would not ensure future compliance with court orders."  *Inmuno Vital, Inc. v. Telemundo Group, Inc.*, 203 F.R.D. 561, 571 (S.D. Fla. 2001) (citing *Malautea*, 987 F.2d at 1542).

Finally, to impose a sanction under Rule 37, the district court must "clearly state its reasons so that meaningful review may be had on appeal."  *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (citing *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 505 (4th Cir. 1977)).  "Permissible purposes of a sanction include:  (1) compensating the court and other parties for the added expense caused by the abusive conduct; (2) compelling discovery; (3) deterring others from engaging in similar conduct; and (4) penalizing the guilty party or attorney."  *Carlucci*, 775 F.2d at 1453.

Several other courts have considered the issue of sanctions in an FLSA collective action where egregious and dilatory misconduct involved withholding time and pay records or the fraudulent production of such records in discovery.  In most every instance, a default judgment was entered against a defendant who had been given fewer opportunities to comply with the court's discovery orders than this Defendant.  *See*, *e.g.*, *Sec'y of Labor v. Caring First, Inc.*, 2018 U.S. Dist. LEXIS 13957, *6, 9-10 (M.D. Fla. Jan. 19, 2018) (finding default judgment to be the only suitable sanction in light of defendant's repeated and willful actions, "blatant disregard" of the court's orders, and the filing of three motions for sanctions ); *Zavala-Alvarez v. Darbar Mgmt.*, 2021 U.S. Dist. LEXIS 88212, *28-29 (N.D. Ill. Jan. 25, 2002) (finding defendant "unquestionably prejudiced plaintiff and obstructed discovery" by giving false evidence on plaintiff's work hour and wages, a "central issue" in the FLSA action); *Aristidou v. Aviation Port Servs.*, 2021 U.S. Dist. LEXIS 113899 (E.D.N.Y. June 27, 2021) (adopting recommendation that default be entered where defendants instigated a pattern of delay and repeatedly failed to comply with court orders to provide discovery basic to a wage and hour case).

Similarly, the Eleventh Circuit recently affirmed the dismissal of FLSA cases where the plaintiffs failed to engage in discovery and violated discovery orders.  *See Jenkins v. Sec. Eng'rs, Inc.*, 798 Fed. Appx. 362, 363 (11th Cir. 2019) (affirming dismissal based on plaintiff's "clear record of willful delay and failure to follow the district court's orders to produce complete discovery responses in a lawsuit pending for nearly a year."); *see also Williams v. Bank of Am. Corp.*, 824 Fed. Appx. 790, 791 (11th Cir. 2020) (affirming dismissal of FLSA and § 1981 claims based on plaintiff's failure to appear for his deposition).

**B.**     **Evidence of Bad Faith: Defendant's Response to Numerous Discovery Orders**

In this case, the Court finds clear and convincing evidence of specific misconduct on the part of the Defendant in response to various discovery orders which establishes its bad faith and the justification for case-ending sanctions.[15] "In assessing whether a party should be sanctioned, a court examines the wrongdoing in the context of the case, including the culpability of other parties." *Purchasing Power,* 851 F.3d at 1225 (citing *Chambers*, 501 U.S. at 50 (reviewing sanctions "in the circumstances of this case.")).   A detailed review of the record reveals the pay and time records, along with the incentive plan production, were ordered to be produced on twelve (12) separate occasions spanning almost three years.  *See* Appendix I.  These orders were entered on various motions to compel, motions for sanctions and even stipulated agreements between the parties.  On numerous occasions, Defendant represented, on the record, that it would produce its records.  Despite these orders and Defendant's representations, Defendant never provided complete and accurate pay records, time records or the documents related to the incentive plan.

In response to the Initial Motion for Sanctions (Doc. 216), and later the Renewed Motion (Doc. 238), Defendant did not dispute it had failed its discovery obligations to provide the time and pay records long sought by the Plaintiffs.  (Docs. 220 and 242).  Anticipating sanctions,

---

[15] The evidentiary standard in the Eleventh Circuit, when determining whether to exercise its inherent power to order case-ending sanctions for a party's misconduct is not settled.  *See Roche Diagnostics Corp.,* 2020 U.S. Dist. LEXIS 81449, *10-12.  Though some district courts apply a clear and convincing standard to determine whether bad faith conduct occurred, the Eleventh Circuit recently stated there "is no binding precedent for that proposition . . .." *Zeltser v. Little Rest Twelve, Inc.*, 662 Fed. Appx. 887, 889 (11th Cir. 2016) (citing *Porto*, 645 F.3d at 1304 (internal quotation omitted)).  Nevertheless, "a court must do more than conclude that a party acted in bad faith; it should make specific findings as to the party's conduct that warrants sanctions." *Id.*  In *Zeltser*, the Eleventh Circuit affirmed a bankruptcy court's determination of bad faith based on specific findings of delay, forum shopping, and knowledge. (*Id.*).

Defendant claimed there was "absolutely no evidence to suggest that Defendant is acting in bad faith or willfully refusing to participate in discovery or comply with a discovery order." (Doc. 220).

The record belies Defendant's claim.  As discussed further below, Defendant's material misrepresentations were intentional, as were its violations of the Federal Rules of Civil Procedure and numerous Court Orders that disrupted the litigation process and, ultimately, deferred the proper administration of justice.  *See Stimson v. Stryker Sales Corp.*, 835 Fed. Appx. 993, 998 (11th Cir. 2020) (citing *Chambers,* 501 U.S. at 46).  Defendant succeeded in its endeavor by employing various techniques intended to thwart its obligations to produce complete and accurate discovery essential to this case.

### 1.   September 4, 2018:  The Initial FLSA Scheduling Order

Given the "linchpin" importance of pay records in FLSA cases, the Court, at the outset of every FLSA case, orders the employer-defendant to produce a "Verified Summary of all hours worked by the Plaintiff(s) during each relevant pay period, the rate of pay and wages paid, including overtime pay, if any . . ." and to serve the employee-plaintiff with a "copy of all time sheets and payroll records that support or relate to the time periods in the Verified Summary." (Doc. 24).  As in all FLSA cases, that order was entered in this case.  (*Id*.).  The order required Defendant to produce its pay and time records by October 16, 2018.  (*Id*.).

The FLSA Scheduling Order directs a number of interrogatories to each plaintiff.  The interrogatories query each plaintiff's work history with the company, pay rates and position. After entry of the Court's standard FLSA scheduling order, however, the parties proposed a different order with discovery requirements directed to Defendant and more narrowly tailored to Plaintiffs' claims.  On September 21, 2018, the parties filed a joint motion to set aside the

standard FLSA Scheduling Order and requested a teleconference with the Magistrate Judge to discuss their proposed order. (Doc. 47). The parties agreed that the interrogatories in the standard FLSA scheduling order were not best suited to Plaintiffs' claims. The parties explained "the most important of the interrogatories [in the standard FLSA order required] an accounting of claims . . . [but] **none of the Plaintiffs have a complete set of either time records or Earnings Statements** and, therefore, none of them could provide a complete answer." (*Id*. (emphasis added)). Therefore, Defendant and Plaintiffs agreed that "Defendant should produce a copy of all time sheets and payroll records as the first part of discovery." (*Id.*). Defendant further agreed to "produce that information [all time sheets and payroll records] in a reasonable format intended for efficient use for all Plaintiffs who have so far opted in by October 18, 2018." (*Id.*).

### 2.   October 9, 2018:  Initial Scheduling Conference

At the Initial Scheduling Conference, Plaintiffs explained the three alleged wage and hour violations and the corresponding set of data it would need Defendant to produce. First, to evaluate the rounding claim, Plaintiffs needed time clock records; second, to understand how Defendant paid overtime, Plaintiffs needed detailed, daily pay records; and, finally, to understand how and when Defendant calculated bonuses, Plaintiffs needed data pertaining to Defendant's monthly incentive calculations. (Doc. 336). Defendant represented to the Magistrate Judge it would not be helpful to put the parties in the "current box," meaning the standard FLSA scheduling order. (*Id.*). Then, while acknowledging the "Court isn't crazy about parties. . . taking off on their own flight," Defendant assured the Magistrate Judge the parties had been working together and would continue to do so "effectively." (*Id.*).

Thus, from the initiation of this case, Plaintiffs made clear Defendant would need to produce records of when its employees clocked in and out, their earnings, and Defendant's incentive plan. Defendant immediately acquiesced and represented its willingness and ability to comply. (Doc. 336) ("We should be able to get those numbers. . . fairly soon."). Defendant further acknowledged the data was critical to early settlement discussions. (*Id.*). Defendant represented there was no point in issuing a notice to the collective, because once the Plaintiffs' counsel "gets that data" from Defendant the parties would be able to figure out "what the track is on this thing." (*Id.*). Defendant represented there would be "further discussions made to try to get this thing resolved." (*Id.*). Unfortunately, Defendant immediately dishonored its representations. Plaintiffs never "get[] that data." (*Id.*). Instead, as the Court will now detail, Defendant spent the next several years violating discovery orders and misrepresenting its efforts to produce "linchpin" documents.

### 3.   October 25, 2018:  Superseding Preliminary Scheduling Order

The Magistrate Judge indulged the parties' request to shelve the FLSA Scheduling Order and ordered the parties to file a joint proposal. On October 12, 2018, Plaintiffs unilaterally filed a Proposed Amended Scheduling Order. (Doc. 58). Plaintiffs explained, scheduling conflicts on the part of defense counsel prevented the Plaintiffs from conferring with Defendant prior to filing. Defendant responded with red line comments to the document. Of particular interest, Defendant struck through the reference to provide the pay and time records in Excel format. (Doc. 59-1). In the comment to the redline, Defendant represented: "The ADP pay records in question are not in Excel format, and it would be extremely burdensome to recreate an exceptional number of ADP payroll documents in an Excel format." (*Id.*). Nevertheless, the final

"Superseding Preliminary Scheduling Order" retained the requirement that Defendant produce the data in an Excel file, unless the parties agreed that the information could be provided in a different format. (Doc. 64). Among other things, the Court directed Defendant to produce the pay records, **including multiple regular shift hourly rates if applicable**, pay date, pay period ending date, gross pay and overtime pay, daily clock-in and clock-out records, and the amount of the monthly bonus by pay date. (*Id*. (emphasis added)).[16] Defendant was required to produce these **verified** records by October 31. (*Id. (*emphasis added)).

Given the terms of this order, Defendant knew, from the outset, it had to produce pay records in Excel format that included multiple hourly rates and ADP's participation in discovery would be crucial to providing its time and pay records. Likewise, from the initiation of this case, Defendant telegraphed its willingness to blame ADP for its future failures to provide these records. In spite of Defendant's assertion, there is no evidence in the record that Defendant, in 2018 or 2019 sought records from ADP. The evidence in the record reveals Defendant did not engage ADP until Summer 2020. At that time, Defendant was ordered to subpoena ADP for the very same records Defendant agreed, and was ordered, to produce in October, 2018.

---

[16] *See* Doc. 64, paragraph 3: "No later than Wednesday, October 31, 2018, the Defendant shall produce the following information for each Plaintiff. If additional Plaintiffs choose to join this litigation prior to Tuesday, January 1, 2019, the Defendant shall provide the same information in a reasonable time: . . .

    a) A **separate Excel Data file** for each Plaintiff showing daily clock-in/ clock-out time records from July 1, 2015 – present (or employment termination date). This information shall be verified by the Defendant.

    b) A separate Excel Data file for each Plaintiff reflecting the following information as set out in the "Earnings Statements" provided to each employee every two weeks: pay date; pay period ending date; gross pay; total overtime earnings; **regular shift hourly rate(s), including multiple regular shift hourly rates if applicable.** . . This data shall be for July 1, 2015 – present (or employment termination date). This information shall be verified by the Defendant."

(Emphasis added).

### 4. **Companion Case and Discovery Therein**

The verified pay and time records Defendant agreed to produce, and required by the Superseding Scheduling Order, were based on discovery Defendant submitted in a companion case, *Hartery v. Outokumpu Stainless USA, LLC* (1:18-cv-00291-KD-B), moving through the Southern District at that time.[17]  On October 3, 2018, Defendant sent Plaintiffs a sample "verified pay summary of hours worked" from that case.  (Doc. 216-1).  This document, in Excel, contained a column entitled "pay rate."  (Doc. 216-2).  Defendant represented to Plaintiffs these verified summaries were accurate, complete and would be propounded for the *Hornady* Plaintiffs.  (*See* Doc. 216 ("Plaintiffs emphasize that at the time they jointly proposed the Amended Scheduling Order on October 19, 2018 they had been (mis)led to believe that what Defendant had produced in the *Hartery* case for exactly the same sort of information was legitimately and truthfully verified.")).  Plaintiffs had no reason to disbelieve Defendant's representation.

On October 31, 2018, Defendant produced verified pay records for the first 32 *Hornady* Plaintiffs in an Excel data file and in substantially the same form as the *Hartery* Documents.  (Doc. 216-4).  The production included a pay rate column, which indicated that each Plaintiff had the same pay rate per pay period.  Turning to the time records, Defendant provided several spreadsheets of daily clock-in and clock-out records (some in PDF and some in Excel), as required by the Superseding Scheduling Order.  (Docs. 170 and 279).  All of these records were produced in black and white.  (*See*, *e.g.*, Doc. 216-10).

---

[17] *Hartery v. Outokumpu Stainless USA, LLC* (1:18-cv-00291-KD-B).  The *Hartery* action, also a wage and hour action, was dismissed on November 19, 2018, so that the Plaintiff could opt-in to this action.

**5.  First Quarter 2019:  First Settlement Conference and Phase I Discovery Order**

After Defendant produced its first batch of verified time and pay records, which at that time Plaintiffs continued to believe to be accurate and helpful, discovery paused.  The first settlement conference was held on January 31, 2019.  The inaccurate verified time and pay records were used to compile damages for that settlement negotiation.  A settlement was not reached.  Defendant's bad faith conduct, though not yet apparent, continued.

The parties filed a "Report of Parties' Planning Meeting" pursuant to Fed. R. Civ. P. 26(f) on March 18, 2019.  (Doc. 83).  The Parties proposed a bifurcated approach to discovery, so that the initial phase could be concluded, prior to a second settlement conference, to be scheduled after the deadline for opt-in Plaintiffs.  The bifurcated approach to discovery was intended to tease out the information necessary to reach a settlement, as well as to "avoid addressing very time-consuming alternative damages calculations on issues that turn out to be simplified by partial summary judgment rulings."  (Doc. 83).  Defendant agreed Phase I discovery would include:

- What day and time of the week defendant designated as the workweek.
- Bonus methodology.
- Time and pay methodology.
- Statute of limitations period and liquidated damages.
- Waiver, estoppel, unclean hands and/or laches defenses.
- Maintenance of time and pay records.
- Exemplar Plaintiffs', and their supervisors', knowledge/belief about pay practices and working hours (as affects them individually).

(*Id.*).

The parties' approach was discussed, again, at a scheduling conference held on March 28. During that conference, the Magistrate Judge sought assurances that the "parties agree" that

Phase I discovery would commence right away.  On behalf of the Defendant, defense counsel indicated yes, and further "I don't have a problem in general.  What I think we both don't want to do right now is to overdo discovery.  But I understand why the plaintiffs need it [discovery]." (Doc. 334).

Satisfied, the Magistrate Judge entered the Phase I Scheduling Order on April 8, 2019. (Doc. 91).  The next day, Plaintiffs served their First Set of Interrogatories and Request for Production.  (Doc. 92).  In these discovery requests, Plaintiffs sought time and pay records for all Opt-in Plaintiffs, and to the extent not previously produced, for six Exemplar Plaintiffs (RFP# 1, 6, 10, and 11).  (*Id*.).  Plaintiffs also sought production / bonus incentive data (RFP# 3, 4, 5).  (*Id*.). Plaintiffs requested assurance that records were not maintained in any other formats, and if they were, they too were to be produced. (RFP# 11).  (*Id*.).  The "Phase I Scheduling Order" also required Defendant to respond to Interrogatories and Requests for Production on the workweek and bonus methodology.  (Doc. 91).  Defendant's responses and production were due on or around May 9, 2019.

Defendant failed to produce initial disclosures, discovery responses or document production by the deadline.  Defendant's failures occurred despite its representations regarding the need for discovery to expedite settlement.

### 6.  June 12, 2019: Plaintiffs' First Motion to Compel and Defendant's First Sanction

As a consequence of Defendant's failures, Plaintiffs filed a Motion to Compel on June 12, 2019.  (Doc. 96).  As Plaintiffs advised the Court, Defendant explained "it had not intentionally failed to respond to discovery and had not intentionally decided not to provide the required disclosures."  (*Id*.).  Rather, as Defendant represented, "there had been some sort of mistake,

confusion, or misunderstanding." (*Id*.).  Defendant assured Plaintiffs it would "put together a plan to provide responses as soon as reasonably possible. . ." (*Id*.).  It did not.

Plaintiffs shared "the only progress" was a meeting with one of Defendant's employees about Defendant's pay and timekeeping records. (Doc. 96). Plaintiffs explained: "[b]y agreement of the parties, the meeting was not formal discovery.  The information provided orally was not recorded, it was not intended as the equivalent of sworn testimony . . ..  The purpose of the conference was purely to exchange information in a non-formal way to try and streamline future discovery . . ..  That conference, however, does not eliminate Plaintiffs' need for discovery responses and disclosures it can use. . ." (*Id*.).

Defendant, on the other hand, characterized the meeting quite differently.  In its motion for an extension of time to reply to the motion to compel, Defendant claimed this meeting "led to considerable information being provided to Plaintiffs' counsel."  (Doc. 102).  Defendant indicated both parties had conferred "in an effort to avoid having to trouble the Court with a discovery dispute." (*Id*.) As justification for its request, Defendant reasoned, with additional time and added clarification from Plaintiffs' counsel, "it seems unlikely that Court assistance will be needed related to the current discovery matters." (*Id.*).  And further, "in light of the above…the discovery matters and perhaps the affirmative defense issues can be resolved without the assistance of the Court." (*Id.*).

Though the Magistrate Judge granted Defendant's motion, the Defendant never replied to the Plaintiffs' Motion to Compel.  (Doc. 97).  On July 12, 2019, the Magistrate Judge granted Plaintiffs' Motion to Compel and struck five of Defendant's affirmative defenses as a sanction.  In doing so, the Magistrate Judge observed Defendant had been given 28 days to reply and did not.

(Doc. 108).  Defendant was ordered "to serve the Plaintiffs with (1) the information required by Section 3 of the Phase I Scheduling Order (Doc. 91), and (2) complete responses to the Plaintiffs' First Set of Interrogatories and Requests for Production (Doc. 96-1) . . .."  (Doc. 108).  By this Court's count, this was the fourth order requiring Defendant to produce its time and pay records.

This episode marks the initiation of new pattern concerning Defendant's misconduct which persisted in this case until March, 2021.  First, Defendant would claim there was confusion over the discovery requests, and Defendant offered to "meet and confer."  (*See, e.g.,* Doc. 102) ("The discussion lead [sic] to clarification and agreement on most, if not all issues, including avoiding Defendant having to send several thousand documents regarding pay data.").  Next, at the meeting, Defendant promised to produce, but generally did not.  Or, Defendant would provide some information at the meeting, but would not put it in the record.  Defendant claimed the information should not be put in the record to "avoid having to trouble the Court with a discovery dispute" and "can be resolved without the assistance of the Court."  (Doc. 102).  Defendant's offers to hold meetings or provide "voluntary information" may have seemed in good faith, at the time.  However, when the pattern is viewed in the context of the entire case, it is clear Defendant's tactics were subversive and its behavior manipulative, intentionally designed to undermine the Court's orders and authority over the discovery process.

   7.  **August 19, 2019:  Scheduling Conference and Amended Phase I Scheduling Order**

Notwithstanding continuing orders from the Magistrate Judge, Defendant persisted in its discovery abuses.  Defendant served objections and responses to the First Set of Interrogatories and Requests for Production on the same day the Magistrate Judge granted Plaintiffs' first motion to compel.  Thirty days later, the parties were back before the Magistrate Judge.  At this

conference, Plaintiffs explained there were still concerns with Defendant's discovery responses, which were largely objections to producing the linchpin documents. (Doc. 335). Defense counsel indicated he still needed to consult with his client, presumably regarding the discovery, and would be further supplementing. (*Id.*). Again, defense counsel stated he was optimistic the case would settle through mediation: "The mediation is -- I am relatively optimistic." (*Id.*). Defendant represented to the Magistrate Judge it had produced enough data for the parties to figure out a settlement formula. (Doc. 335). Plaintiffs agreed to give Defendant more time to supplement its discovery responses and extend the Phase I deadline.

The Magistrate Judge, therefore, issued an Amended Phase I Scheduling Order, which ordered Defendant to supplement its discovery by September 6, 2019. (Doc. 137). The Order extended the Phase I Discovery Deadline to December 31, 2019, after the second settlement conference. Further, the Order included a timeline for resolution of current discovery disputes and ordered Defendant to supplement all discovery on or before September 6, 2019. (*Id*.) This Order marked the fifth time Defendant was told to produce the pay and time records for all of the Plaintiffs. Plaintiffs were instructed to "file any motion to compel on or before September 13, 2019 . . .." (Doc. 137).

### a. September 13, 2019: Plaintiffs' Second Motion to Compel

In keeping with the Amended Scheduling Order, Defendant supplemented its responses on September 6, 2019. After receiving these supplemental responses, Plaintiffs filed a second motion to compel pursuant to the Order on September 13, 2019. (Doc. 146). Plaintiffs identified numerous deficiencies. Specifically, of the six interrogatories and eight requests for production,

Defendant either objected, provided partial or incomplete responses, or lacked sufficient detail. (*Id.*).  In addition, the Court notes the responses were not verified.[18]

While the Second Motion to Compel raised a number of disputes, the Court is most concerned with the Defendant's response to the requests for additional pay and time records where Defendant represented it only agreed to provide pay and time records for the eleven exemplar Plaintiffs. [19]   (Doc. 146-1, RFP#10).   Plaintiffs agreed, but noted "[t]here are now approximately 290 Plaintiffs, and it would not be feasible (nor necessary) to have all of their pay/time records before mediation.  However, Plaintiffs will need all the time and pay records for all Plaintiffs over the next couple of months so individuals can make informed decisions about any potential settlement."  (Doc. 146).  With this, Defendant retreated from its previous position and agreed to "provide such records [pay records for each opt-in Plaintiff] within a reasonable time period…" (Doc. 148).  Defendant acknowledged Plaintiffs would ultimately need this data. (*Id.*).  Defendant, once again, assured the Magistrate Judge her intervention was not needed because "[i]f this case is not resolved at mediation [scheduled for September 2019] it would provide the records within a reasonable time period." (*Id.*).

In reply, Plaintiffs, again, identified Defendant's dilatory and defiant tactics to avoid discovery:  "Defendant attempts to substitute what it has done on a limited, voluntary basis. . .

---

[18] Defendant claimed this was an oversight.  (Doc. 148).  The submission of unverified discovery responses is but another example of Defendant's pattern of misconduct in this case.  The supplemental responses were not submitted and verified until January 27, 2020.  At that time, Defendant materially changed the responses. In her deposition, Pledger admitted that the January 2020 responses were known in January 2019, establishing that Defendant's first responses were false.  (Doc. 206-2).

[19] This request can be found at RFP No.10, which reads as follows: "Produce time and pay records for each opt-in Plaintiff in the same manner as previously produced within 28 days of the filing of each opt-in and update such records for all Plaintiffs within 14 days of the close of the opt-in period (and including the next bonus payments)." (Doc. 146-1).

for what it is required to do under the Court's scheduling orders and the federal discovery rules (which is to respond to discovery)."  (Doc. 149).  In short, Plaintiffs accused (correctly as the Court now knows) Defendant of flaunting Court orders and the Federal Rules of Civil Procedure.

### b.  November 5, 2019:  Hearing on Plaintiffs' Second Motion to Compel

The mediation, which was held on October 3, 2019, did not resolve the case.  The Magistrate Judge conducted a hearing on November 5, 2019 to address Plaintiffs' Second Motion to Compel.  At the hearing, Defendant, again, agreed to provide the pay and time records ("we've agreed to do [RFP Number] Ten").  (Doc. 337).  Defendant, however, moved the target delivery date, once again, and said it would provide the records prior to the second settlement conference, which was scheduled for December 9.  Lending credence to Plaintiffs' concern, and foreshadowing Defendant's future behavior, defense counsel grumbled "that is an awful lot of information for 290 people . . . It's going to take some time . . .."  (Doc. 337).  At that point, the case had been pending for eighteen months.

At the end of the hearing, the Magistrate Judge instructed the parties to prepare a joint order memorializing the various agreements reached during the hearing.  Although Plaintiffs and Defendant traded drafts, a final order was never prepared or entered because Defendant failed to respond to the Plaintiffs' edits.  (Doc. 270).

### 8.  December 9, 2019:  Hearing on Third Motion to Compel

Defendant neither complied with the Magistrate Judge's directives nor honored its own representations.  Defendant failed to produce the records prior to the settlement conference scheduled for December 9.  This failure was not Defendant's only discovery abuse in December 2019.  Three weeks earlier, Plaintiffs had filed their third motion to compel to "require Defendant

to provide responses or supplemental responses to certain discovery items in Plaintiffs' Second Set of Interrogatories and Requests for Production served September 5, 2019." (Doc. 160). As Plaintiffs noted, "Defendant objected to almost every request as being overly broad, or simply did not respond at all." (*Id*).

The Magistrate Judge conducted yet another hearing on December 9, prior to the settlement conference. The Magistrate Judge commented on how ineffective the settlement conference would be with the cloud of discovery disputes looming. (Doc. 338). In an attempt to facilitate matters, the Magistrate Judge spent an hour and a half reviewing each disputed interrogatory and request for production with the parties. (*Id.*). Plaintiffs, again, complained Defendant's answers were vague and incomplete.[20] Meanwhile, Defendant's counsel asserted, incredibly, he did not "want to look like I'm holding up the ship. I frankly detest fights over discovery. It just increases the cost and makes it harder to settle." (Doc. 338). Plaintiffs' counsel was understandably pessimistic and suspected they would be "ambushed" down the road. (*Id*.). The Magistrate Judge entered an order, which granted in part, denied in part, and mooted in part, Plaintiffs Third Motion to Compel, "consistent with the rulings made on the record at the December 9, 2019 motion hearing." (Doc. 166). At this hearing, Defendant agreed to supplement its responses to discovery and initial disclosures. (*See* Doc. 338) ("If that's what we're doing, that helps"; "I don't have a problem with that."; "If it's 2015, I think we can handle that.").

---

[20] "They're not telling me who said what. They're barely saying when. And if that's all they got, the point of interrogatories isn't so that you can say, why don't you spend a couple of hours deposing somebody while we make it up on the fly." (Doc. 338).

47

9.  **January 17, 2020:  Discovery Conference and January 21, 2020 Order**

Plaintiffs' pessimism was well founded.  Contrary to previous representations, Defendant continued to "hold up the ship."  Defendant failed, yet again, to produce.  The Magistrate Judge ordered the parties to participate in yet another scheduling conference, to be held on January 17, 2020.[21]  (Doc. 169).

The order noted "[a]ll deadlines in the amended Federal Rule of Civil Procedure 16(b) scheduling order (Doc. 137) have expired, and the two settlement conferences held with the [Magistrate Judge] have not resulted in settlement." (*Id.*).  The parties were ordered to:

> [B]e prepared to discuss the status of (1) the Plaintiffs' motion to compel filed September 13, 2019 (Doc. 146), on which a hearing was held November 5, 2019, and for which the parties agreed to prepare a joint proposed order consistent with the rulings made on the record at the hearing, and (2) the Defendant's compliance with the Court's order dated and entered December 16, 2019 (Doc. 166), granting in part, denying in part, and mooting in part the Plaintiffs' Motion to Compel Concerning Second Set of Discovery to Defendant (Doc. 160).

(*Id.*).

---

[21] By the time of this January 2020 discovery conference, Plaintiffs' First Set of Interrogatories and Request for Production had been pending for seven months.  (Doc. 92).  The critical items Plaintiffs were seeking in this discovery were the time and pay records of the Plaintiffs, since 2015 (or the date of employment) forward.  (Doc. 92, RFP #10). To recap, in April, when discovery was first propounded, Defendant did not respond at all.  Plaintiffs filed a Motion to Compel sixty days later.  Defendant did not respond to the Motion to Compel.  The Court sanctioned Defendant by striking its Affirmative Responses.  Defendant then asserted, for the most part, objections and incomplete responses on the day the order granting the motion to compel was granted (July 12) – four months after the discovery was first propounded.  Plaintiffs raised this issue at yet another scheduling conference on August 8.  The Magistrate Judge addressed the deficiencies in her order amending the scheduling order, issued on August 28, and gave the Defendant until September 6th to supplement its July 12 responses (now, five months since discovery was first propounded).  The Defendant supplemented on September 6.  Plaintiffs then filed another motion to compel, in compliance with the Amended Scheduling Order.  In response, Defendant acknowledged Plaintiffs needed the pay records and promised to provide such records if mediation was unsuccessful. Mediation was unsuccessful.  A hearing was held on the motion to compel; and, there, Defendant promised, yet again, to provide the records by "the settlement conference."  The settlement conference was held in early December.  Records were not provided or supplemented.

The scheduling conference immediately turned into a discovery conference.  Prior to this conference, Plaintiffs filed a document entitled "Plaintiffs' Miscellaneous Submission in Advance of January 17, 2020 Teleconference Scheduling Conference."  (Doc. 170).  Plaintiffs noted:  "Since November 5, 2019, Defendant has not supplemented any of the discovery responses that were the subject of the [Second Motion to Compel filed September 13, 2019]" and had filed nothing in response to the Third Motion to Compel.  (Doc. 170).  Plaintiffs informed the Magistrate Judge that Defendant still refused to produce complete time and pay records for all Plaintiffs.  (*Id.*).  When queried about electronically stored information, and the data formats in which Defendant could make it available, Plaintiffs informed the Magistrate Judge Defendant had made "no substantive response to any of these inquires."  (Doc. 170).

During the conference, Plaintiffs' counsel pointed out, again, that without the time and pay records, which Defendant had been repeatedly ordered to produce, it was impossible for them to ascertain a settlement amount and engage in productive settlement discussions.[22]  (Doc. 325).  Of course, Plaintiffs simply could not go forward with their case.  Plaintiffs also recalled Defendant's representation to the Magistrate Judge, made during the first settlement conference in December 2018, that it "couldn't know anything or do anything until they knew who all the plaintiffs were."  (Doc. 325).  Thereafter, at the mediation in Fall of 2019, when Defendant knew "who all the plaintiffs were," Defendant retreated to the position that it

---

[22] "But the other thing . . . I also mentioned at our last settlement conference and at the first settlement conference is that every time anybody asks me for numbers for these people and how much money is at stake, I say the same thing which is I can't guesstimate it with any precision that anybody should rely on without the data for time and pay."  (Doc. 325).

"couldn't have any real discussion about what amounts were at stake because now that we knew all the people, we still didn't have the data." (*Id.*).

Six months later, after having been informed of the identify of all collective plaintiffs, Defendant still had not compiled the time and pay records.  Defendant then resorted to yet another position.  For the first time, after nineteen months of litigation, Defendant represented that it was too burdensome on its staff to produce the linchpin time and pay records and sought, once again, additional time.  (Doc. 325).  Defendant claimed it only had one employee who was responsible for producing the time and pay records, stating "we literally got nobody else that can do it other than her [Pledger]." (*Id.*).  Plaintiffs' counsel, once again, was incredulous:  "But the idea that at the end of April they are going to give me all this data that we've been chasing now for a year . . .." (*Id.*).

To accommodate Defendant's "too burdensome" claim, the Magistrate Judge asked Defendant if it could produce the time and pay records in one-third increments, beginning almost immediately.  Defense counsel responded: "[I] think that's doable." (Doc. 325).  The Magistrate Judge admonished Defendant it was time for the deadlines "to start meaning something," (*id.*) and ordered Defendant to "provide time and pay records for all of the Plaintiffs, in Microsoft Excel spreadsheet format, and in 1/3 increments, said increments to be served no later than Friday, February 28, 2020, Tuesday, March 31, 2020, and Thursday, April 30, 2020, respectively." (Doc. 172).  Defendant was also ordered to produce the incentive plan data.  (*Id.)*.  Defendant was granted an extension to respond to Phase I Discovery until March 31, 2020, six months beyond its original deadline.

a.  **March 11, 2020:  Deposition of the Corporate Representative**

Defendant's pattern of delay and misconduct had become apparent by January 2020; by March, its obfuscations became patently obvious.  Plaintiffs' counsel long suspected the 2018 Excel pay records Defendant propounded as "verified pay summaries" were inaccurate for the first 32 plaintiffs.  (*See* Doc. 170 ("The Excel pay records previously produced did not appear to have any information about days when an employee's usual pay rate was changed on a temporary basis…")).  These suspicions were sound. The verified pay summaries Defendant produced indicated Plaintiffs worked the same rate of pay throughout the pay period.

The explanation for the omissions and inaccuracies in Defendant's pay records came to light during the deposition of Pledger, Defendant's Corporate Representative/Payroll Specialist, on March 11, 2020.  Pledger explained employees sometimes worked different rates, during a single pay period, and those pay rates were not on the spreadsheet she created for the first 32 plaintiffs.  (Docs. 216-11, 280 and 206-2).  Pledger also revealed Defendant occasionally made a "true up" payment by recalculating overtime that had been previously configured at the wrong rate of pay, *i.e.,* the "true up."  (*Id*.).  This "true up" amount is added to the "overtime payment" for the current check, rather than for the pay period in which it was earned.  (Doc. 206-2).

In her position as payroll specialist, Pledger created, exclusively for this litigation, the "verified pay summaries" (*i.e.,* pay records) produced in spreadsheet form for the first 32 Plaintiffs.  (Docs. 216-5, 216-11 and 206-2).  Defendant's verified pay summaries indicated there was a single pay rate per pay period for each Plaintiff, but that is inconsistent with Defendant's pay practices.  (*See, e.g.,* Doc. 216-2).  The verified pay summaries failed to account for true up

payments, step-up rates, holiday pay; they even failed to suggest that any of these rates existed.[23] Pledger's testimony revealed Defendant created and produced inaccurate pay records, leaving Plaintiffs to discover these inaccuracies months after the records were produced.[24]

At Pledger's deposition, Plaintiffs also learned the time records, produced by the Defendant in black and white, were meaningless. (*See, e.g.*, Doc. 188-8). Defendant produced spreadsheets of daily clock-in and clock-out records (some in PDF and some in Excel), as required by the Superseding Scheduling Order. (Docs. 216 and 279). All of these records were in black and white. (*See*, e.g., Doc. 216-10). The sample record reveals that what appears to be the "Total Time" (for example, 12) often varies from the sum of the clock-in and clock-out time (for example, the amount of time clocked in on July 30, 2015 was 12 hours and 23 minutes). In their Miscellaneous Submission, Plaintiffs noted: "The "time records [produced] since mid-2017 sometimes shows total shift time in excess of 12 . . . from what we understand, that does not necessarily mean the employee might have been paid for additional time. We assume there is data that is electronically transmitted to the payroll company to inform them whether the employee is actually paid for 12.0 hours or 12.25 (or some other amount)." (Doc. 170).

To be clear, the spreadsheets produced did not reveal what time was paid or unpaid. When questioned about this issue, the Defendant's Corporate Representative explained in order

---

[23] With one exception, Plaintiffs were instructed to add $.50 to each day rate to achieve the nighttime rate of pay.

[24] In their Initial Motion for Sanctions, Plaintiffs contend: "Over about 17 months, Defendant never disclosed that the Pay Summaries, Earnings Statements, Excel spreadsheets, and purportedly supporting documents it had produced and verified for *Hartery*, and then for the other *Hornady* Plaintiffs (a) showed inaccurate and incomplete pay rates, (b) included amounts of overtime pay from earlier pay periods, at various rates, that had been "trued up," or (c) had overtime pay rates and hours that were inaccurate. This was only substantively admitted by Defendant's deposition representative in March 2020." (Doc. 216). Defendant claimed its errors were inadvertent and, proposed, as a remedy, it retrieve its own time and pay records from its third-party payroll provider, ADP. (Doc. 220).

to understand whether the "rounded time" was paid, the Plaintiffs would need a color-coded version of the same spreadsheet and / or the "time card." (Doc. 206-2). In sum, Defendant produced black and white time records which it knew was meaningless. Not until Plaintiffs deposed Defendant's Corporate Representative did they learn these verified records were inaccurate and incomplete. This deposition occurred contemporaneously with Defendant's production of records in response to the January 21, 2020 Order. (Doc. 172).

### 10. May 2020: Discovery Conference and June 2, 2020 Stipulated Order

Defendant's misconduct and obfuscations continued.

The Magistrate Judge conducted yet another discovery conference on May 6, 2020, this time to discuss trial dates. There, Plaintiffs advised that, though they received columns of Excel data per employee per pay period, in response to the Magistrate Judge's January 2020 order, the pay rate information was not included. (Docs. 216 and 327). Defendant produced Excel spreadsheets in three batches throughout March, April and May of 2020.[25] These spreadsheets, also created by Defendant's Corporate Representative, contained 123 columns of data per employee per pay period. However, the spreadsheets did not contain a rate of pay column, much less columns for step-up rates, holiday, overtime or nighttime pay rates. (Docs. 216, 206-2, and 327). The spreadsheets contained no pay rates at all. (*See*, *e.g.*, 216-8). Plaintiffs argued the removal of the pay rates was in bad faith: "It's not an accident that [Defendant] is called upon to produce 270 sets of records in the same format as before and [Defendant] changes the format and takes out the pay rate data. . . it's not inadvertent that [Defendant] deleted the one column that matters a lot." (Doc. 327). In response, Defendant contended it was acting in good faith.

---

[25] Sample pages of the spreadsheets can be found at Doc. 216-8.

First, Defendant indicated this was the first it heard of the missing pay rates.  In the alternative, Defendant represented it did not know, based on the language in the most recent Order requiring "time and pay records" (Doc. 172), that it was supposed to produce verified pay summaries, including pay rates.  (Doc. 327).  Defendant represented it produced "check details" as opposed to "verified pay summaries" which led to an inadvertent omission of the pay rates.  (*Id.*).

Shifting its position once again, Defendant acknowledged this may be an ESI ("Electronically-Stored Information") issue that would take some time to resolve:  "That's going take a little bit of time.  We're going to have to work our way through what the search terms would be.  **That's going to take a little time, as well, because it always does**."  (Doc. 327 (emphasis added)).   In response, Plaintiffs reviewed the chronology at length, reminding everyone that they had been seeking verified summaries since 2018, and that Defendant could not feign ignorance.  (*Id.*).

When asked about the trial schedule, Plaintiffs pointed out once again that Defendant's failure to produce accurate time and pay rate data undermined their ability to assess damages and prepare for trial: "And that's easy and I should already have done it except they didn't give us the accurate time data and they didn't give us pay rate data." (Doc. 327).  Once again, Plaintiffs explained, because of the variations in pay rates, the quantification of damages, could not be reversed engineered.  (*Id.*).  Defendant did not concede the pay rates were always required by the discovery order (Doc. 172), "but for things like that, don't have a problem with responding with [pay data] in a reasonable period of time."  (Doc. 327).  Defendant continued to ask for even more time and another settlement conference:  "Its going to take more time;" and, "This case I think still needs time to ripen and resolve."  (*Id*.).  Plaintiffs' counsel, once again, was incredulous:

> It has been a year and a half. Their story over and over is wait until after mediation. Wait until after a settlement conference. We have had two of them and a mediation. Zero offers have been made. . . . They can do whatever they want to try and settle this case any time they want. . .  The other thing is in a wage-and-hour case, nothing happens to a defendant if it drags on for two years, five years, ten years. The plaintiffs don't get prejudgment interest. It just delays how long it is before they get paid money that they were entitled to in 2015. And to say now, well, you know, it's going to be four months before we can get you wage and time data . . .

(*Id*.).  The Court agrees.  At this point, this FLSA action had been pending for twenty-two months.

At the conclusion of the May 6 discovery conference, a new scheduling order was entered. Discovery cutoff was set for September 11, 2020.  (Doc. 201).  Defendant was ordered to supplement initial disclosures not later than June 1, 2020.  The Order included the following warning:  "SANCTIONS. The unjustified failure of a party or a party's attorney to timely comply with the requirements of this scheduling order shall be deemed a failure to obey the scheduling order and shall subject said party or party's attorney to one or more of the sanctions authorized by Fed. R. Civ. P. 16(f)."  (*Id*.).

Confronted with Defendant's pervasive discovery deficiencies, a stipulated discovery order was proposed which established more detailed production requirements.[26]  (Docs. 207, 208 and 212).  The order was entered by the Magistrate Judge on June 2, 2020, and imposed on the parties' the following agreed upon timeline and production requirements:

1. With regard to 11 Plaintiffs, in order to ensure the accuracy of the time and pay records, Defendant would submit

   a) On or before May 29, 2020 Defendant will produce in separate (for each employee) native and excel formats

---

[26] The jointly Stipulated Order was also immediately preceded by an affidavit, filed by defense counsel on May 12, 2021, as an exhibit to a Rule 56(d) motion in opposition to summary judgment.  Defense counsel, in the affidavit, represented to the Court Defendant needed more time to complete discovery, which would have, potentially, demonstrated the existence of disputed facts.  (Doc. 202-1).  Defendant never conducted that discovery.

data files reflecting pay rates, start date and time, for each shift worked from June 15, 2015 – present as shown on the electronic time cards described by Pledger at pages 133, 136-1367, 22-225 of her deposition. If that data cannot include pay rates in dollars and cents, then Defendant will also provide information showing the monetary amounts that correspond to each pay rate code;" for the "11 Exemplar" plaintiffs by May 29, 2020;

b) On or before June 5, 2020, Defendant will produce all documents and data reflecting the amounts, and underlying calculations of any "trued up" payments from July 1, 2015 – present as described by Pledger at pages 38-46, 58-60, 138 of her deposition, including but not limited to the "payroll register" referred to at page 61 of her deposition;

c) On or before May 29, 2020 Defendant will produce in separate (for each employee) native and excel formats data files reflecting the colorized data that Defendant uses to show whether time is, or is not, authorized for payment, along with any comments as described by Pledger at pages 76-80 of her deposition;

2. On or before June 2, 2020 the parties would confer on when Defendant will produce the same data for all other Plaintiffs, and will advise the Court of any agreement or disagreement;

3. On or before May 29, 2020 Defendant will provide dates on or before June 15, 2020 that a 30(b)(6) deponent is available to testify who can provide informed and accurate testimony on "Time and Pay Methodology" as it applies to the "trued up" calculations and payments Melissa Pledger referred to, but could not provide detailed testimony about, in her deposition. If Defendant does not have a 30(b)(6) deponent due to the "trued up" calculations being done within the ADP pay process and outside the payroll process role of Outokumpu, the Parties agree to confer regarding how to obtain such information from ADP on or before June 2, 2020.

4. Assuming it still exists, on or before June 5, 2020 Defendant will produce the SOP from 2015 referred to by Ms. Pledger at page 16 of her deposition. Defendant agrees to make every reasonable effort to locate the document in question.

5. Assuming it still exists, on or before June 5, 2020 Defendant will produce the written policy or SOP describing Defendant's rounding practices before 2018 described by Ms. Pledger at page 93-94 of her deposition. Defendant agrees to make every reasonable effort to locate the document in question.

6. Assuming they still exist, on or before June 5, 2020, Defendant will produce all emails containing the text prepared by Melissa Pledger reflected in Exhibit 3 of her deposition which Ms. Pledger testified was sent to "all of my time managers." (Pledger 119-120). Defendant agrees to make every reasonable effort to locate the documents in question.

7. Assuming they still exist, on or before June 5, 2020, Defendant will produce the pre-approval and post-approval Monthly Bonus Incentive documents, and accompanying emails circulated by email to David Scheid and any other recipients from July, 2015 – present as described by Mr. Scheid at pages 78-84 of his deposition. . .Defendant agrees to make every reasonable effort to locate the documents in question.[27]

(Doc. 208). As is apparent from the text in the Order, it was designed to cure Defendant's outstanding discovery deficiencies and to provide clarity to issues raised in both David Scheid (Defendant's Vice President of Human Resources) and Pledger's depositions. (*See*, *e.g.*, paragraphs 1 and 3-7).

---

[27] To be discussed further in section II(B)(11), below.

This jointly stipulated order was the tenth order seeking discovery related to Defendant's pay and timekeeping practices.  This was the tenth time the Defendant agreed to comply.

### 11. Orders Requiring the Production of Incentive Plan Data

Defendant's discovery violations were not limited to its failures to produce pay and time records.  As part of the First Set of Discovery served on Defendant, it was required to produce data relating to the calculation of its incentive plan payment on a monthly basis.  Specifically, Defendant was to identify the "time frame" during which the various categories of data were collected, counted and /or measured.[28]  (Doc. 92, RFP#5).

Defendant objected to the "overbroad nature of the request."  (Doc. 216-7).

Defendant's response was identified as one of the subjects at issue in both Plaintiffs' Second and Third Motion to Compel (Docs. 146 and 160).  The parties participated in a lengthy discussion on this topic before the Magistrate Judge as part of the hearing conducted on Plaintiffs' Third Motion to Compel (November 5, 2019).  Plaintiffs established they were prejudiced by Defendant's failure to produce this data:  "One of the issues that we think just as a matter of law matters a great deal . . . how they pay production bonuses . . . whether or not the period that the bonus is earned is different from the period that they're paying it on, the percentage they're paying it on . . . which is why [what] I'm trying to get nailed down here . . ."

---

[28] Request for Production No. 5 reads as follows:  "5. Produce the underlying data (and make available such programs which will enable review of that data) which was used to evaluate whether bonuses were awarded each month, and in what amounts.  As non-exclusive examples, (i) if Defendant contends that production numbers were a criteria, then the documents and data showing the time frame (start date and time to end date and time) of production that was counted; (ii) if Defendant contends that safety incidents were a criteria, then the documents and data showing the time frame (start date and time to end date and time) that counted; (iii) if Defendant contends that quality control was a criteria, then the documents and data showing the time frame that was measured, and what was measured.  Note, to the extent this information can be fully and accurately provided through documents, printouts, or images of electronic data, production of those items may be an acceptable substitute for production electronic data files so long as the underlying electronic data files are preserved and available to substantiate the completeness and accuracy of the produced documents."  (Doc. 92).

(Doc. 337).  Plaintiffs again requested the time frame during which the data was collected and used to form the basis of the incentive percentage.  (*Id.*).  This time, Defendant represented "as part of the mediation, we've agreed . . . to try and pull up data on 20 people.  That data I think is going to provide the information about the timing.  And I think that will solve the problem." (*Id.*).  Defendant represented, "[w]e should have that back to him by no later than tomorrow." (*Id.*).  The Magistrate Judge sought clarity as to whether this data Defendant represented it would produce would be responsive to the request for production.  (*Id*.).  Defendant responded, "I think it's going to be answered for 20 people." (*Id*.).

Defendant produced a spreadsheet demonstrating the monthly bonus payment for certain employees in 2015 and 2016.  As the Magistrate Judge suspected, this data was simply not responsive to the RFP.  (*See* Doc. 180-1 at Ex. 1).  Defendant also produced its "Monthly Incentive Spreadsheets" for 2017, 2018 and 2019. (Doc. 180-1 at Ex. 2).  At the January discovery conference, Defendant represented it would produce data demonstrating how the incentive plan percentages were calculated for two independent six-month periods.  (Doc. 325).  The parties agreed they would assess the need for the production of additional data once Defendant produced the data for the agreed six-month periods.  (*Id*.).  Plaintiffs pointed out Defendant had represented it had information in November and would produce it then.  (*Id*.).

Defendant did not produce the data.

The Magistrate Judge conducted another hearing on March 6, 2020.  This time she attempted to address Defendant's failures by ordering briefs concerning Plaintiffs' Request for Production No. 5.  (Docs. 180 and 181).  Plaintiffs argued this briefing was superfluous:

> Defendant's employees know exactly the information the Plaintiffs have asked for because Defendant's employees look at, and use, that data every month.

> Sometime in the last 9 days, Defendant calculated "results" for the current Production Incentive, just like Defendant has done every month since July, 2015. It is preposterous that Defendant opposes Plaintiffs' discovery and, as pertinently, Defendant has submitted nothing that would provide the Court with any basis to let Defendant persist in stonewalling.

(Doc. 181).  Defendant argued, again, the request was overbroad.  Relying on the use of the word "monthly" in the title of the "Monthly Production Incentive" spreadsheets, Defendant argued they need not produce how precisely the underlying data is tallied to demonstrate that it is done so on a monthly basis.  (*Id*.).  Plaintiff argued the substance of the "Monthly Incentive Spreadsheets" did not provide detail necessary to ascertain the time frame from which the data was compiled.  (Doc. 180).

The Magistrate Judge agreed with Plaintiffs' position.  Upon review of the briefs, on March 10, 2020, the Magistrate Judge ordered Defendant to produce "information from which they can reasonably ascertain the timeframe from which the criteria underlying each incentive bonus award was drawn, so that it can be 'apportioned back over the workweeks of the period during which it may be said to have been earned' within 21 days of the date of the order."  (Doc. 182, citing 29 C.F.R. § 778.209(a)).  The Magistrate Judge explained "that information concerning the timeframe from which the criteria that determined each bonus payment were drawn is relevant and, considering the potential amount of damages at stake, not disproportional to the needs of the case."  (*Id.*).  Defendant was ordered to produce the documents by March 31, 2020.  (*Id*.).

The Defendant did not produce the documents.

On March 11, 2020, Defendant's Vice President, David Scheid was deposed.  When asked about the monthly data used to calculate the incentives, Scheid explained that he received a spreadsheet, via email, each month, which compiled data from various departments.  (Doc. 265-

2).  Scheid explained the monthly incentive was arrived at by tabulating an aggregate of these data points.  As Vice President of Human Resources, Scheid reviewed the final tabulation and incentive percentage prior to authorizing payroll to calculate the incentive payment for each employee.  (*Id*.).  Examples of the final spreadsheets were included as exhibits to the deposition.

On May, 28, 2020, Defendant represented to the Magistrate Judge it would produce the incentive plan documents which Scheid had testified was in his email account, by June 15, 2020.  (Doc. 208).

The Defendant did not produce the data.

At the time of the March 12, 2021 Show Cause hearing before this Court, some six months after discovery had closed and nine months after the last order had been entered to produce these records, Defendant had still not produced the data.  Defendant has never offered an explanation for its serial violations of Court's orders.

### 12. June 15, 2020:  Plaintiffs' Initial Motion for Sanctions

In June, Plaintiffs filed their Initial Motion for Sanctions and Related Motion to Compel. (Doc. 216).  By this time, Defendant had violated repetitive orders to produce three discrete data sets:  pay records, time records, and incentive plan data.  First, Defendant produced fabricated and inaccurate pay rates on the spreadsheets it represented as "verified" pay records.  (Doc. 216-5).  Within these same "verified" records, Defendant's Corporate Representative admitted she altered the pay period ending date, so that it no longer corresponded with the Plaintiffs' Earning Statements, for a portion of the records.  (Doc. 206-2).  Thereafter, Defendant shifted from the production of "verified pay records" in Excel format to the production of spreadsheets containing "check details" in PDF format.  (Doc. 216-8).  The check details did not include pay rate

information, per shift, for each employee.  (*Id*).  To be clear, neither data set included the fundamental pay rate data Defendant was ordered to produce.  Regarding its time records, Defendant produced spreadsheets of Plaintiffs' clock in and clock out time per shift, but did not include the color-coded version of the same data necessary to decipher and analyze whether the time was paid as clocked in, or rounded up or down.  (Doc. 216-9-10).  Despite being ordered to do so on multiple occasions, Defendant never produced the incentive plan data.

Without these data sets, Plaintiffs could not put on their case.  Indeed, all three data sets are indispensable to determine whether Defendant's pay and timekeeping practices comply with the FLSA.  To that end, Plaintiffs and Defendant crafted, and the Magistrate Judge entered, a Stipulated Discovery Order (Docs. 208) intended to remedy Defendant's various failures, obfuscations and delays.  The Defendant flouted that order as well.  Regarding pay records, Defendant violated this aspect of the order, produced nothing, and, eventually, blamed ADP (to be discussed further in subsection II(C)).  (Doc. 216).  Regarding time records, the order addressed Defendant's earlier production of meaningless black and white time clock records.  Defendant violated this aspect of the order, persisting in its refusal to produce meaningful color-coded time records.  (*Id.*).  Finally, the order required Defendant, once again, to produce data relating to its incentive plan.  Defendant violated this aspect of the order; it never produced its incentive plan data.  (*Id.*).

In response to Plaintiffs' Initial Motion for Sanction, Defendant maintained there were "issues with production" and "inadvertent errors or oversight" but not evidence of "any willful or bad faith conduct."  (Doc. 220).  The Court finds otherwise.  For all of the reasons above, the Court finds all of Defendant's violations, and its pattern of pervasive discovery abuses, to be

evidence of Defendant's bad faith and willful disregard of the justice system.  *See Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr.*, Inc., 88 F. Supp. 3d 250, 264 ("In other words, we gave an order and defendants had the ability to comply, but they purposefully chose not to do so for reasons all their own and without first asking permission from this court.  Without our resorting to the dictionary, this seems as good a definition of 'willful' as any.").  At this point, the case had been pending for almost two years.

**C.**      **Evidence of Bad Faith:  Defendant's Misrepresentations and Manipulations**

While addressing this Motion, the Court learned of an even more troubling aspect of Defendant's bad faith.  Incredibly, the full magnitude of Defendant's misconduct was not reached by its serial violations of discovery orders.  Defendant's bad faith culminated in its deceitful attempt to blame ADP for its failure to produce subpoenaed records.  The Court finds clear and convincing evidence of intentional misrepresentations surrounding ADP and its efforts to comply with the subpoena.  Those misrepresentations facilitated an attempt to avoid sanctions for protracted discovery violations.  Further, Defendant manipulated the Court's Show Cause Orders in an attempt to conceal its misrepresentations.

**1.**      **July, 2020:  Context within which ADP Records were Subpoenaed**

Additional context reveals the true nature and gravity of Defendant's misconduct.  By the time the ADP subpoena was served, and the Show Cause Order entered, Defendant had repeatedly represented (to both this Court and the Magistrate Judge) it needed assistance from ADP to produce its own pay and time records accurately and completely.  Simultaneous with these representations, Defendant misrepresented to this Court and the Magistrate Judge that ADP was not being cooperative.

Defendant first raised the need for ADP's data in October 2018, in response to the draft superseding scheduling order proposed by Plaintiffs.  (Doc. 59-1).  In its comments to the draft, Defendant referred to the requested time and pay records as "ADP pay records" and "ADP payroll documents."  (Doc. 59-1).  At that time, Defendant also represented it would be "burdensome" to produce the documents in Excel format.  (Doc. 59-1).  Despite Defendant's concerns, the requirement that Defendant produce its time and pay records in Excel format remained in the final Superseding Scheduling Order.  (Doc. 64: "A separate Excel data file for each Plaintiff . . .").  In April 2019, Plaintiffs sought specific information about all individuals (whether employees of Defendant or not) responsible for creating, revising, modifying and/or reviewing data fields for the Pay Statements.  (Doc. 146-1).  In its Supplemental Response to this interrogatory, dated September 6, 2019, Defendant represented ADP "would have to provide details of the operation of the systems for the data that has been provided to date."  (*Id.).*

Seven months later, on March 11, 2020, Defendant's Corporate Representative revealed ADP's help was necessary to produce accurate pay records, admitting the records Defendant previously produced were inaccurate.  (Doc. 206-2).  Finally, on May 6, 2020, when it came to light the pay records Defendant had produced in response to the January 21 order (Doc. 172) were missing pay rates, Defendant said it would need to "chase down" the information from ADP.  (Doc. 327).

In June, in response to Plaintiffs' Initial Motion for Sanctions (Doc. 216), Defendant blamed ADP for its inability to produce complete and accurate pay records.  (Doc. 220).  Defendant explained ADP, not Defendant, created the pay practices resulting in the "true up" payments and represented it had "asked ADP to provide information to how and why its system

does the 'true up'." (*Id*.).  Defendant represented, however, "[t]hus far ADP has not been very helpful." (*Id*)  Two days later, on June 24, 2020, at a hearing before this Court on its Rule 56(d) motion (Doc. 202), Defendant argued the Court should defer consideration of Plaintiffs' Motion for Partial Summary Judgment (Doc. 191) until more discovery had been gathered.  At the hearing, as an example of why the summary judgment motions were premature, Defendant claimed, once again, it needed information from ADP on its "true up" process.  Defendant argued it "[doesn't] have anymore information than [Plaintiffs ]. . .."  Defense counsel also claimed he "was just as frustrated as [Plaintiffs' counsel] on this particular situation."  Further, "We need to be digging into that.  We need to find out.  [Plaintiffs' counsel] needs to find out. . .." (*Id.*).  Defendant suggested they may need to seek a subpoena.  The Court, over strident objections from Plaintiffs, granted Defendant's Motion in order "to allow completion of discovery referenced in said Motion."[29]  (Doc. 221).

There is no evidence in the record Defendant pursued, or even attempted to pursue this discovery.   Nevertheless, Defendant persisted in representing to the Magistrate Judge and Plaintiffs that ADP was to blame.  (Doc. 332).  On July 16, 2020, in a hearing on Plaintiffs' First Motion for Sanctions before the Magistrate Judge, Defendant again asked to subpoena ADP to retrieve the time and pay records. (*See id*:  "And your solution is to subpoena the records from ADP.").  The Magistrate Judge was now incredulous.  She wanted to know why Defendant needed a subpoena to retrieve its own records, and, why the need for a subpoena was just now coming

---

[29] Defendant attached a declaration of its defense counsel to its Rule 56(d) motion to defer Plaintiffs' Motion for Partial Summary Judgment.  (Doc. 202-1).  In this Declaration, filed May 12, 2020, Defendant outlined all the discovery it intended to take.

to light, two years after the case had been file.  (*Id.*).  ("Why -- I mean, if you've been using this third-party payroll service and this is information that [they] have, why didn't --why is it just now coming to light two years after the fact.")).  Defendant again represented "there has been some frustration" and they needed "help." (*Id.*).  Defendant represented it had sent two letters to ADP requesting assistance and intended to send a third that day.  (*Id.*).  The Magistrate Judge was dubious and questioned what sort of letter Defendant sent; was there was a deadline or was this merely Defendant "casting about to see" if ADP would help?  (*Id.*).[30]  The Magistrate Judge concluded by saying she would get an order out quickly.  Five days later, the Magistrate Judge denied Plaintiffs' Motion "at this time to allow the Defendant an opportunity to subpoena relevant information from third-party payroll timekeeping servicer ADP." (Doc. 229).  In agreeing to subpoena ADP's records, the Magistrate Judge observed the discovery disputes had been going on far too long and needed to be resolved.  (Doc. 332).

It must be emphasized that the subpoena was issued at Defendant's request, **in lieu of further sanctions against it**, and following its creation and production of inaccurate and incomplete pay and time records.  To be clear, Defendant presented the subpoena to ADP (its own payroll contractor) as a solution to its discovery deficiencies and omissions.  Defendant then undermined its own solution.

On September 3, 2020, Plaintiffs filed a Renewed Motion for Sanctions when the subpoena yielded nothing.  (Doc. 238).  In its Response to Plaintiffs' Renewed Motion for

---

[30] *See* Doc. 332 (THE COURT: "And tell me again for the record – so you've written them a please help us out letter because you don't want to sever a relationship with a client. But what exactly -- and not having seen the letter, is it one of those -- I mean, is it a letter where you have given them a deadline? What kind of letter is it? It's just a letter, casting about to see if you can get them to help you out without having to go through legal channels and subpoenas?").

Sanction, Defendant again expressed its frustration with ADP: "It is worth noting that Defendant, like Plaintiffs, has some frustration with ADP's response to the subpoena." (Doc. 242). At the hearing on the motion before the Magistrate Judge on October 8, 2020, Defendant continued to blame both ADP and Plaintiffs. (Doc. 333). Defendant represented to the Magistrate Judge that it needed more time for compliance because ADP could only provide PDF format documents. (*Id.*). Further, Defendant represented it could not meet its obligation to produce the records because Plaintiffs insisted they be produced in Excel. (*Id.*). This insistence, of course, was simply insistence on the terms of the subpoena Defendant requested and on many previous orders directed to Defendant. The Court now knows Defendant's assertion that ADP could only produce records in PDF format was a convenient half-truth, exploited to shift blame to ADP for its own failures. This was a "half-truth" because Defendant itself could have produced the records in Excel format.

## 2.   Informal Conference: February 5, 2021

This Court finds the following statement in *Dellums v. Powell* to be apropos:

> If parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

*Dellums v. Powell*, 566 F.2d 231, 235-236 (D.C. Cir. 1977).

With the benefit of a full review of the record to that point, the Court was troubled by ADP's apparent decision to the ignore the subpoena. Further, given Plaintiffs' Objection to the Report and Recommendation (Doc. 266), the Court recognized liability and damages could not be decided without Defendant's linchpin time and pay records. The Court held an informal conference call with the parties on February 5, 2021 to better understand this chronic discovery

dispute, as well as both parties' objections to the report and recommendation.  At this conference, the Court directed the parties' attention to an opinion from the District Court of New Mexico, in which an FLSA employer, also represented by Defendant's counsel's firm, was directed to produce ADP-maintained records in Excel format.[31]  Defendant was instructed to confer with ADP in an effort to illicit a response (*i.e.*, time and pay records) prior to another hearing set for February 17, 2021.  The Court also directed Plaintiffs to provide a summary of outstanding discovery issues.  (*See* Doc. 279).

### 3. February 17, 2021: Status Hearing

The Court now knows Defendant's misconduct manifested itself in a number of ways.

The Court conducted the hearing on February 17 as scheduled.  When queried as to whether there had been any follow-up with ADP, Defendant represented "**We did reach out** . . . and we advised ADP that there was a case out there that indicated that ADP records in an excel format . . . **and we have not gotten a response yet.**  But we did raise that point."  (Doc. 299 (emphasis added)).  While Defendant's response was technically true, the Court now knows, based on responses to its Show Cause order, Defendant reached out to ADP at 11:00 am on the morning of February 17, just three hours before the hearing.  (*See* Doc. 302-1).  Defendant waited until 12 days after the February 5 conference with this Court to engage ADP.  Once contacted, ADP responded in a timely manner, two hours after the conclusion of the hearing and five hours after receiving the email from Defendant.[32]  (*Id.*).

---

[31] *See Landry v. Swire Oilfield Servs.,* 2017 U.S. Dist. LEXIS 230606, *2-3 (D. N.M. Sept. 19, 2017).

[32] In its response, ADP offered to create a custom report, in Excel, if Defendant would identify the time period and fields.  (Doc. 302-1).

Defendant's attempts to misrepresent and manipulate ADP's involvement in the Court's inquiry did not end with the disingenuous assertion about having reached out to ADP.  At this same hearing, the Court, having been convinced by Defendant that ADP neither responded nor objected to the subpoena, discussed its intent to issue a Show Cause Order to ADP.  (Doc. 299).  When the Court pointed out Defendant subpoenaed ADP, and ADP neither responded nor objected, there was no correction from Defendant.  (*See* Doc. 299 (Mr. Appleby: "Yes")).  To the contrary, a few minutes later, defense counsel expressed his frustration at not having the time and pay records.  (*See* Doc. 299 ("It's – as you probably can tell, it would be nice if we had the information as well.")).  Alternatively, defense counsel repeated the false contention that ADP's data was no longer necessary because Defendant's Corporate Representative was mistaken about the "true up" process.  (Doc. 299).  The Court was told Defendant was working on "examples to clarify that issue." (*Id.*).  Defendant never produced such examples, just as it never produced a clarifying affidavit on the true-up process, as it represented it would do in its Objection to the Report and Recommendation.  (*See* Doc. 267).

### 4.  Defendant's Failure to tell ADP about March 5, 2021 Hearing

The Court entered a Show Cause Order on February 19, 2021, directing an ADP corporate representative to appear before it on March 5, 2021.  (Doc. 288).  The Court's requirement that ADP appear was not contingent on whether records were produced in advance of the hearing.  (*See* Doc. 288).  However, this did not stop Defendant from manipulating ADP's response.  First, Defendant waited until March 1 to notify ADP that it was ordered to appear in Mobile four days

later, on March 5.[33]  (Doc. 300).  Once Defendant served the order, it led ADP to believe "the Show Cause Hearing would likely be cancelled if [it] provided the Excel spreadsheet before March 5, 2021."  (Doc. 302-1).  Relying on this representation, ADP produced an Excel report to the Defendant on March 3, 2021.[34]  (*Id*.).  Just hours before the Show Cause hearing, Defendant filed a notice, informing the Court "ADP transmitted to Defendant a large Excel report of pay data for hourly employees, including the employee's hourly rate, regular hours, overtime hours, etc., for all hourly employees for every pay date from January 2018 to January 2021."  (Doc. 297).  This filing illuminated, first, how readily the pay records could have been produced, in Excel, prior to this point in time; and, second, ADP no longer possessed all the records required for Defendant to properly respond to the discovery requests.

Defendant continued its efforts to manipulate through the evening of March 4 when defense counsel called Chambers to determine whether the hearing was indeed moving forward and if they needed to appear in person.  Defense counsel then, for the first time, informed ADP, at 5:40 pm on March 4, it was required to participate in the hearing as ordered.  (Doc. 300).  Following up, ADP called Chambers the morning of the hearing seeking similar assurances they were to appear in person.  Counsel for ADP, retained only few hours before the hearing, appeared but was understandably unable to offer a response.  (Doc. 298).  The Court set a second Show

---

[33] This delay marks the third time Defendant waited until the very last minute to interact with ADP when ordered by the Court to do so.  First, as discussed, the Magistrate Judge ordered Defendant (on July 22, 2020) to serve ADP with a subpoena by July 29, 2020.  (Doc. 229).  Though Defendant sought this subpoena and the assistance of the Court, it waited until the deadline (July 29) to serve ADP with the subpoena.  (Docs. 230 and 302-1).  Next, it waited until the day of the hearing (February 17) to reach out to ADP.  Lastly, it delayed service of the show cause order for ten days.

[34] Just hours before the Show Cause Hearing, Defendant filed a notice, informing the Court, "ADP transmitted to Defendant a large Excel report of pay data for hourly employees, including the employee's hourly rate, regular hours, overtime hours, etc., for all hourly employees for every pay date from January 2018 to January 2021."  (Doc. 297).

Cause hearing for March 12, 2021, requiring both a Corporate Representative of Defendant and ADP to appear.  (*Id.*).

### 5.  <u>March 12, 2021:  Show Cause Hearing</u>

Defendant's motivation for preventing ADP's appearance before this Court, including the delayed service of the Show Cause Order and misleading statements interpreting it, became clear when ADP filed a brief, with related evidentiary support, addressing the Show Cause Order(s). (Docs. 300 and 302).   In this brief as well as a signed declaration from an ADP corporate representative, ADP documented its efforts to work with Defendant to provide payroll data dating back to August 2020.  (*Id.*).   Seven months after Defendant avoided additional sanctions by serving a subpoena, ADP explained to the Court that it believed it had fully complied with the subpoena shortly after it was issued.  (*Id.*).   The reason ADP believed it had fully complied is set out in its brief, evidentiary materials, and declaration.   ADP's submission put the lie to Defendant's misrepresentations about ADP to this Court and the Magistrate Judge.

For months, Defendant blamed ADP for its failure to produce linchpin time and pay records, both prior to and after the subpoena was issued to ADP at Defendant's request and in lieu of additional sanctions against it.[35]   The Show Cause Order was issued against ADP based on Defendant's misrepresentations that it received no response to the subpoena:  "By all accounts, **including the representations of the Defendant when pressed by the Court**, ADP has failed and/or refused to comply with this Court's Subpoena."  (Doc. 288 (emphasis added)).  Plaintiffs were similarly misled by Defendant:  "As it turns out, **ADP provided nothing** in response to the

---

[35] *See* Doc. 220 (Defendant's June 2020 Response to Motion for Sanctions); Doc. 242 (Defendant's September 2020 Response to Motion for Sanctions); Doc. 332 (July 16, 2020 Hearing); Doc. 333 (October 8, 2020 Hearing); Doc. 299 (February 17, 2021 Hearing).

inadequate subpoena [Defendant] issued." (Doc. 247 (emphasis added)). The Court now knows both it and Plaintiffs were misled.

In fact, ADP communicated with Defendant the day after the subpoena was served in order to coordinate its response. (Docs. 300 and 302-1). During a telephone conference on August 3, 2020, ADP explained it only produced PDF images, and does not create reports in response to non-party subpoenas. (*Id.*). On August 5, 2020, ADP provided Defendant with samples of the "standard output reports" produced in PDF format. (Docs. 300 and 302-1). Further ADP informed Defendant it could create its own Excel spreadsheets with the assistance of an identified ADP employee. (*Id.*). Specifically, ADP informed Defendant the "payroll contact for the Defendant should be able to create the requested report in Excel format, as its payroll software has a tool that allows [Defendant] to create reports." (Doc. 302-1). After several email exchanges, on August 17, 2020, ADP also provided Defendant's counsel with the contact information for the ADP payroll contact for Defendant. (Doc. 302-1).

Defendant persisted in its refusal to produce, and two weeks later, on September 3, 2020, Plaintiffs filed a renewed motion for sanctions. Even in the face of another sanctions motion, Defendant failed to reach back out to ADP. Indeed, "ADP never received any indication that there were problems with ADP's efforts or that there were significant discovery disputes in the case generally." (Doc. 300). Rather than working with ADP, Defendant misrepresented to the Court on multiple occasions it was "frustrated" with ADP's response. (*See* Docs. 220, 242, 332, 333, and 299).

Defendant did not contact ADP again until October 8, 2020, the date of the Magistrate Judge's hearing on Plaintiffs' renewed motion for sanctions. At that time, defense counsel

emailed ADP to request the reports produced in PDF: "Unfortunately our client has not been able to make progress with [payroll contact] on obtaining individualized reports [in Excel]. Despite the PDF format of the standard output report, I think we need ADP to run those . . .." (Doc. 302-1). ADP responded with the Standard Output Reports in PDF format on October 13, 2020. (Doc. 302-1). Defendant did not produce these documents to Plaintiffs, even though the Magistrate Judge "strongly encourage[d]" Defendant at the October 8 hearing to "continue to produce the information that was required under the Court's prior discovery orders." (Doc. 333). The fact that ADP produced these documents was not communicated to this Court or Plaintiffs.

Four more months passed. During this time the Report and Recommendation was issued, and this Court set the matter for hearing. As discussed, Defendant waited until February 17 to advise ADP that the Court required it to respond to the subpoena or be faced with a show cause order. As discussed, on February 17, Defendant misrepresented to the Court ADP had neither responded nor objected to the subpoena. The truth was revealed, finally, by ADP. It had heard nothing from Defendant regarding the subpoena from October 2020 to mid-February 2021, and therefore believed it had adequately complied with the subpoena. (Doc. 302-1).

At the Show Cause hearing, Defendant represented they were now working with ADP to ensure all the material ordered by the subpoena was in the process of being produced. (Doc. 303). Defense counsel encouraged the Court, and ADP, to move forward, and avoid "a blame game." (*Id*.). However, Defense counsel claimed his client, not him, had been involved in the efforts to procure information from ADP which was now seeing results. (Doc. 303). When asked whether Defendant had attempted to run its own reports in Excel, as ADP testified Defendant was able to do, Defendant could not provide a response. (*Id*.). Defendant offered no substantive

reason for its failures to coordinate with ADP prior to the Show Cause Hearing.  (Doc. 303).

Plaintiff argued it was "beyond disingenuous to pretend that we are here today because of back

and forth between them and ADP about their own records over the last three or four months."

(*Id.*).

The Court finds ADP's submission demonstrates Defendant's fraudulent and manipulative

tactics, constituting clear and convincing evidence of Defendant's bad faith.  Based on the

submission from ADP, it is now evident to this Court Defendant intentionally concealed ADP's

response to the subpoena in an attempt to divert blame, and sanctions, from itself to ADP.  ADP's

timely and continued production of the records in Excel format is additionally clear and

convincing evidence of Defendant's bad faith.  Defendant has offered no rebuttal or evidence to

contradict this conclusion.

      **D.**    **Other Considerations**

          **1.**  **Format of Document Production**

Defendant suggests ADP's practice of producing only PDF records as the "records kept in

the ordinary practice of business" justifies its discovery misconduct.  The Court takes a contrary

view:  Defendant exploited ADP's company policy to conceal and advance its discovery abuse.  A

primary point of contention between the parties was the format in which Defendant could

produce its data.  However, since the scheduling order in 2018, Defendant was required to

produce its linchpin time and pay records in Excel format.  Likewise, every subsequent order,

required Defendant to produce these records in Excel. (*See*, *e.g.,* Docs. 24, 64, 208 and 229).

At the October 8, 2020 hearing on ADP's supposed failure to comply with the subpoena,

Defendant contended ADP could only produce the data in PDF and that was why production had

stalled or been nonexistent.  (Doc. 333).  Indeed, Defendant insisted, on three separate occasions, ADP could have complied with the subpoena if the Plaintiffs would have allowed them to produce it in PDF format:  "But the problem here isn't quite so much do we have data . . . And we still think we can get it but we **think we can only get it in PDF format.  And we still have gone back**.";  "We really are trying.  **And if we can do it by PDF -- but I know that's really frustrating** . . .";  and, "I think if we can do it as a PDF, I believe they will work with us on that.  They effectively said that. **They don't seem to be willing to do it any other way.**"  (Doc. 333 (emphasis added)).

ADP told Defendant on August 3, 2020 it could produce its own reports in Excel format.[36]  Defendant never did so.  Defendant never mentioned this possibility during the October 8

---

[36]       Defendant's Response in Opposition to Plaintiffs' Renewed Motion for Sanctions (Doc. 242), filed on September 17, 2020, referenced "a copy of the communications between Defendant and ADP" (Exhibit B) concerning the subpoena and related information.  In its response, Defendant stated "ADP advised that it could not provide reports on an individualized basis which is unacceptable to Plaintiffs.  *See* Exhibit B."  (Doc. 242).  Defendant continued, "ADP did advise that Defendant could work directly with its assigned contact to seek individualized reports in an Excel format.  (*Id.*).  Defendant sought to do so, however, the contact has been unable to speak with Defendant without first coordinating with its managers and legal department (*Id.*)."  (*Id.*).  Defendant, once again, referenced Exhibit B.

Exhibit B, however, contains 29 pages, 13 pages of which are redundant or useless material.  (Doc. 242-2).  Removing these 13 pages, the Court is left to parse through 16 pages, which contain a mishmash of material, including emails between defense counsel and ADP (NJ Office), correspondence between Sid Johnson (Defendant's ADP Payroll Contact) and Defendant, and a two-page document entitled "Update."  It is unclear who authored the "Update" document.  The "Update" document as well as the correspondence between ADP and Sid Johnson focused entirely on the "Regular Rate of Pay" / "true-up" discussion. (Doc. 242-2).  The emails between ADP and defense counsel concerned the delivery of the subpoena and the request for excel, and later, PDF, payroll reports.  (*Id.*).

Page 28 of Exhibit B, 70 percent of which is redacted, contains an email from the ADP payroll contact, Johnson, to Pledger.  (Doc. 242-2).  In this email, Johnson wrote, "As this is a legal matter, unfortunately, I cannot exclusively provide direction or explanation without additional details for me to research. I need to provide that information with confirmation from the Legal Team."  (*Id.* at 28).  This email responded to a request from defense counsel, forwarded by Pledger to Johnson, for a call with Johnson.  (*Id.* at 29).

Though Defendant's Response (Doc. 242) implied ADP had hindered its efforts to create its own Excel spreadsheets, none of the emails between Defendant and ADP reference any request to Johnson to assist with the creation of reports in Excel format.  In the hearings, Defendant never discussed its own ability, to either this Court or the Magistrate Judge, to produce its data in Excel format.

hearing. (Doc. 333). In fact, Defendant insisted it could only produce PDF data. In sum, Defendant failed to produce its records in Excel format as it **was able and ordered** to do.

After the March 12, 2021 hearing on the Show Cause Order, ADP immediately began producing data in Excel format. ADP further confirmed that had Defendant advised them earlier the PDF documents ADP provided were not sufficient ADP would have then assisted in the production of Excel data. (Doc. 302-1). Of course, that would have required Defendant's good faith. Defendant had none.

### 2. Defendant's Other Scapegoat

ADP was not Defendant's only scapegoat. On July 16, 2020, Defendant complained its Corporate Representative and pay roll specialist was out of her depth when it came to responding to discovery requests. (Doc. 332). Defendant offered her failings and production of inaccurate spreadsheets as the reason it needed ADP's records:

> [The Corporate Representative] is one of the nicest people in Alabama. She will try and do anything for everybody. I have come around to the idea that, relative to some of this, she is in a little above her head.

(Doc. 332). Again, at the hearing on Plaintiffs' Renewed Motion for Sanctions, Defendant blamed Pledger for misunderstanding ADP's "true up" and/or "regular rate of pay" calculations:

> DEFENSE COUNSEL APPLEBY: [the] underlying issue that ended up being projected in her deposition was that there was something in the ADP system that sometimes modified pay. It would typically modify it by bringing something back from the previous pay week and putting it into this particular paycheck, the next one out. And there was nothing that explained that. And that's when Ms. Pledger used the term, true-up. Again, it's her term, not an ADP term. But we needed to find out how that worked and does that change the pay. . .
>
> DEFENSE COUNSEL DALY. . . And what she is describing or where she comes up with a formula is how ADP gets to a regular rate of pay if there is varying pay rates that happen in a workweek. And so what she kind of describes seeing on her payroll register is something that says RROP, which is standing for regular rate of

pay.  And then there's a number that's different than the base pay rate or the day pay rate. . .And how ADP gets that number -- she is not exactly sure how they do that. . . And I have since asked her if she has any records that relate to showing what this true-up that she describes -- and I will just preface, Your Honor, that, obviously, this was her description. I understand we put her up as someone to testify on this.  And I just -- it's her description of her understanding of it.  And I don't – I don't think -- I guess I don't think she fully probably understood or knew what she was -- what exact –

[Cross-talking.]

THE COURT: No. She knew there was a formula because she had had it written down. She knew there was some sort of special secret sauce formula that they used to come to this number.

MS. DALY: Right . . ..

(Doc. 333).[37]

In its Objection to the Report and Recommendation, Defendant again blamed its Corporate Representative for the confusion over the need for ADP's records and represented that its Corporate Representative's misunderstanding of the "regular rate of pay process" rendered ADP's records irrelevant.  (Doc. 267).  Specifically, Defendant argued "there was some inadvertent mistaken testimony from an employee, who also acknowledged she did not have a complete understanding of the process she testified to at the time of her testimony."  (Doc. 267). Defendant explained a corrective affidavit was forthcoming, with examples to assist the Court, and Plaintiffs, in understanding exactly how the process work.  (*Id*.).  As the Plaintiffs point out, "[The Corporate Representative] is not some random lay witness.  She has been the Senior Payroll Specialist for [Defendant] since May 2017.  [Defendant] selected her to testify about its 'Time

---

[37] The Court observes, had Defendant produced the pay records as ordered (pay rates per shift), many of the questions surrounding "true up" payments and the calculation of the regular rate of pay, as well as the accuracy of Pledger's testimony, would not be at issue.

and pay methodology for hourly, non-exempt, employees from July 2015 – present.' (Doc. 187-1, PageID.1177-1178)." (Doc. 247). Defendant never provided the affidavit, and examples, clarifying Pledger's testimony regarding "true up" payments.

Despite Defendant's criticisms of its Payroll Specialist, when Defendant was ordered to bring a Corporate Representative to the second show cause hearing (Doc. 298), Defendant selected her and represented her to the Court as a "high level manager" who was capable of adding clarification.[38] (Doc. 303). Further, Defendant explained she had been "authorized to deal with whatever we need to deal with." (*Id.*). The Court finds the exploitation of Defendant's own employee deeply troubling and additional evidence of its pervasive and intentional misconduct.

### 3. Spoliation of Time and Pay Records

The Eleventh Circuit defines spoliation as the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Ala. Aircraft Indus. v. Boeing Co*., 319 F.R.D. 730, 739 (S.D. Ala. 2017) (quoting *Graff v. Baja Marine Corp*., 310 Fed. App'x. 298, 301 (11th Cir. 2009) (internal quotation marks omitted)); *see also Green Leaf Nursery v. E.I. DuPont de Nemours & Co*., 341 F.3d 1292, 1308 (11th Cir. 2003) (spoliation is the destruction of evidence or the significant and meaningful alteration of a document or instrument).

---

[38] Even during this hearing, Defendant's scapegoating of its Corporate Representative continued. Defense counsel asserted, "[Pledger] was in charge of the process of gathering the data. She was having some difficulty with aspects of that process. And I was not involved with ADP at all that I can remember. I may have been on one call . . . But the real stuff that was going on was that Ms. Pledger was engaged with them to get a better understanding of what it is that was being asked and how to fulfill that response." (Doc. 303).

In some circumstances, a party's "spoliation of critical evidence may warrant the imposition of sanctions such as exclusion of certain evidence or outright dismissal of the case." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005).  Sanctions for spoliation of evidence are intended to "prevent unfair prejudice to litigants and to insure the integrity of the discovery process."  *Flury,* 427 F.3d at 944.  When deciding whether to impose sanctions, the Eleventh Circuit "borrowed a multi-factor test" from Georgia spoliation law:  "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.,* 881 F.3d 1293, 1307 (11th Cir. 2018) (citing *Flury*, 427 F.3d at 945).

In Plaintiffs' motion for sanctions, they do not accuse Defendant of spoliating time and pay records; however, Plaintiffs note they had queried Defendant, on multiple occasions, as to whether the problems with production were ESI issues.  (*See* Doc. 216) ("In addition to the much more recent efforts to get ESI information under the May 28, 2020 Stipulated Order, Plaintiffs' counsel also asked about ESI discussions on August 21, 2019, September 19, 2019, September 23, 2019, October 6, 2019, October 25, 2019, and December 12, 2019.  There was never a substantive response of any sort.").  The Court also inquired about the extent, as well as limitations, of Defendant's data at the March 12 Show Cause Hearing:

> THE COURT:  Okay. So, Mr. Appleby, my question for you, sir, is: Does OTK have that data that ADP – that you're trying to get from them? . . .
>
> MR. APPLEBY: OTK does not have all that information . . .

THE COURT : . . . it's all over [ADP's] correspondence and it's also in Ms. Quinn's declaration that ADP is not the records custodian for OTK.

MR. APPLEBY: Agreed. Yeah.

THE COURT: But you requested ADP to reconstitute, recreate records going back as far as they could. And I'm putting air quotes around that. As far as they could and asked for costs to do that and I presume paid the costs to do what ADP could, which was 2018, which was when the lawsuit was filed.

MR. APPLEBY:  Correct.  And certainly OTK did not have that data and needed to get it from ADP.

(Doc. 303).  When asked about Defendant's document retention policy for time and pay records, Defendant's long term employment law counsel responded: "I don't know the answer to that, Your Honor.  I would be guessing."  (Doc. 303).  The Court, once again, confirmed Defendant did not have all the data, which is why Defendant needed ADP's records.  (*Id.*).

There is also inconsistency over whether defense counsel issued a litigation hold letter when the lawsuit was filed in 2018 and, if so, whether Defendant abided by it.  When asked by the Court, defense counsel responded that a letter had been sent but stopped short of saying Defendant had preserved the data:  "I don't think we're looking at what do we have versus what do we have.  I really don't.  I think we're looking if we can understand what we have versus what we have."  (Doc. 300).  A month later, on April 13, 2021, defense counsel Powell stated he knew the Court asked and he knew what the response was, but "[I] will tell you that I have not gotten down that checklist."  (Doc. 318).

Defendant's various responses to exceedingly straightforward questions may have been murky; however, the law is not murky.  This case was filed on July 16, 2018.  Under the FLSA, an employer is required to retain its time and pay records for three years.  (*See* 29 C.F.R. § 516.5 "Each employer shall preserve for at least 3 years:  (a) Payroll records.").  Therefore, in July 2018,

when this case was filed, Defendant should have had on hand records dating back to July 2015. It either had not maintained these records or maintained inaccurate copies.

On March 19, 2021, ADP advised the Court on the status of its production of the time and pay records. As a result, the Court learned ADP does not have any data, responsive to the subpoena, prior to July 1, 2017, and in some instance, January 1, 2018. (*See* Doc. 304, "For the period since July 1, 2017 (and in some instances, January 1, 2018, as explained below), ADP only has some of the information that would otherwise be responsive to the subpoena previously served on ADP. ADP does not maintain other information described in the subpoena, nor does ADP have any responsive information for the period before July 1, 2017."). At a hearing held on April 13, 2021, Plaintiffs' counsel also explained: "And in slightly more detail, they have given us excel files for three different types of information. The first is a single pay file intended to cover all of the plaintiffs who have been employed during 2018, 2019, and 2020. Because that's the period they have . . . The information we do not have is because ADP doesn't maintain it." (Doc. 318).

At the least, the record establishes that ADP, which testified it is not a "record retentions firm" for Defendant, does not have payroll data prior to January 1, 2018 and time records prior to July 1, 2017. When asked how Defendant intended to rectify this situation, at that same hearing, defense counsel stated as follows:

> MR. POWELL: So the answer to your question about documentation, Your Honor, is in the payroll system, the plaintiffs themselves have had access to their what I would call pay stubs. In ADP's world they're called earning statements. They can get them on line. We have since -- since I got in the case, I have located all of those. We have produced them for what I would call the exemplary plaintiffs. There was a group of plaintiffs. Some were deposed. Some were identified earlier in the case between Mr. Appleby and Ian. The pay stubs for all of that group have already been produced. The pay stubs for the remainder of the opt-

in plaintiffs are -- should be produced before the end of the week if not by the
end of the day.

(Doc. 318).  Plaintiffs' counsel responded, "Mr. Powell says that the step-up rates are shown on

the earning statements.  I say this in the most literal way:  That's not the way I remember it, but

it is obviously either true or not. And you can look at an earning statement."  (*Id.*).  As discussed,

at section I(B)(4) herein, the pay stubs the employees receive do not itemize the various pay rates

per shift, including step-up rates, an employee may or may not work during a particular pay

period.

After three years of discovery, the posture of the case can be summed up as follows:

Defendant might possess time and pay records from 2015-2017, which ADP no longer retains;

Defendant might have produced these records in April 2021, eight months after the close of

discovery and numerous orders to do so; however, the Plaintiffs were fairly certain the records

Defendant was proposing to produce would be inaccurate and incomplete because they would

not contain all of the "step up rates."  The Court agrees and notes this is why ADP's records were

needed in the first place.

Defendant's "confusion" over what records it preserved, or no longer has access to, is

even more dubious given the records it failed to produce correspond to the time period during

which its exposure could be the greatest.  Shortly after the case was filed, Defendant amended

its rounding policy to reduce the time it rounds, potentially, an employee's clocked-in time from

30 minutes to seven minutes.  (Doc. 206-2).  Defendant's greatest exposure, then, for

underpayment may have occurred during the years 2015, 2016 and 2017, which were the three

years before the lawsuit was filed.  Defendant either no longer possesses or has access to

accurate and complete time and pay records from this time period.  The Court finds Defendant's

failure to maintain complete time and pay records for 2015-2017 constitutes spoliation.

### 4.  Defendant's Familiarity with Complex Litigation

Defendant is no stranger to complex federal litigation.  Contemporaneous with this FLSA

action, Defendant navigated a suit involving an international arbitration issue that was filed in

this Court, appealed to the Eleventh Circuit, and then to the United States Supreme Court.  The

appeal was heard by the Supreme Court on January 21, 2020.[39]

This is not the first time Defendant's subversive and undermining tactics resulted in a

default judgment entered against it.  In 2019, the Eleventh Circuit affirmed the decision of the

National Labor Relations Board (the "Board"), finding that the Board was correct to hold a "side

letter" constituted non-compliance with the terms of a settlement agreement.  In so finding, the

Eleventh Circuit described the side letter posted by the Defendant as follows:

> The Side Letter, posted and distributed before the Notice, blamed the union
> for delaying the election, emphasized that the Company did nothing wrong, and
> suggested that the Company had no other obligations under the Settlement
> Agreement. **The Side Letter thus subverted the purpose and effectiveness of the
> Notice, constituting non-compliance with the terms of the Settlement
> Agreement under _Gould_ and other precedent by undermining the negotiated
> resolution of the unfair practice charges lodged by the union.**  _See id._; _Gould_, 260
> N.L.R.B. at 57-58. In the face of decades of Board and circuit-level law, the
> Company's argument that "the terms of the Settlement Agreement" only included
> express terms spelled out in the Settlement Agreement is simply unavailing.

---

[39] _See GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC_, 140 S. Ct. 1637, 1642-1643 (2020)
("The question in this case is whether the Convention on the Recognition and Enforcement of Foreign Arbitral
Awards, June 10, 1958, 21 U. S. T. 2517, T. I. A. S. No. 6997, conflicts with domestic equitable estoppel doctrines that
permit the enforcement of arbitration agreements by non-signatories. We hold that it does not.").

*Outokumpu Stainless USA, LLC v. NLRB*, 773 Fed. Appx. 531, 535 (11th Cir. 2019) (emphasis added).

Several years earlier, Defendant's predecessor, Thyssenkrupp Steel USA, LLC ("TK"), was sanctioned for discovery violations in this Court.  The Court affirmed the Magistrate Judge's rulings on two separate motions for sanctions.  The Court found the Defendant's argument on appeal missed the context of the magistrate judge's ruling:

> The problem is that the Magistrate Judge did not award fees based on failure to appear at deposition on December 1 but on the defendant's protracted failure to cooperate with the plaintiff in the scheduling of depositions of witnesses employed by the defendant and vital to the plaintiff's case. . . The protestations of defendant's counsel about their willingness to cooperate with plaintiff with respect to the scheduling of his client's employees and Rule 30(b)(6) representative is not supported by the record . . . This is not an indictment of a failure to appear at deposition but the summation of an extensive history of non-cooperation, which the succeeding ten pages catalog in unflattering detail.

*White v. Thyssenkrupp Steel USA, LLC*, 2010 U.S. Dist. LEXIS 52237, *5 (S.D. Ala. May 20, 2010) (internal citations omitted).

In *White*, Defendant's Vice President David Scheid held the same position with TK, Defendant's predecessor.  (Doc. 265-1).  David Scheid remains Defendant's Vice President of Human Resources.  Mr. Scheid was Defendant's Vice President in 2012, when (as set out above) Defendant was sanctioned for breaching an NLRB settlement agreement.  Defendant's counsel in this case (through March 12, 2021) was counsel at the time as well.  Defendant has been involved in at least eight employment related cases in this Court.  In each of those cases, Defendant had the same Vice President (Mr. Scheid) and counsel as in this case.

Defendant has had a close and enduring relationship with its counsel.  Defendant is bound by the acts of its longstanding "freely-selected agent."  *Link v. Wabash R. Co.*, 370 U.S. 626, 633-

634 (1962) (citing *Smith* v. *Ayer*, 101 U.S. 320, 326 (1879)).  "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"  *Id.*  The Eleventh Circuit has clearly indicated "a party should not be punished for his attorney's mistake absent a clear record of delay or willful contempt and a finding that lesser sanctions would not suffice."  *Ford v. Fogarty Van Lines*, 780 F.2d 1582, 1583 (11th Cir. 1986) (citing *Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 181 (5th Cir. 1978)).  "The appellate decisions that have reversed dismissals based on failure of counsel have generally dealt with relatively short periods of delay and few violations of court orders that may understandably have escaped the attention of the clients."  *State Exchange Bank v. Hartline*, 693 F.2d 1350, 1353 (11th Cir. 1982) (finding where there was a large sum of money involved, a lengthy period during which the suit remained pending without going to trial, and changes of counsel suggested defendants must have acquiesced in the delays that their attorneys were improperly causing).  In this case, there is also a large sum of money involved; potential damages have been accruing for six years.  Plaintiffs' claims have the potential to impact how Defendant operates, 365-days-a-year. The case has been pending for three and a half years without trial.  As demonstrated, Defendant is a "sophisticated employer," familiar with complex litigation. Defendant's Vice President and its longtime counsel have been privy to similar misconduct and sanctions before. There has been willful contempt here.  The numerous orders and violations in the record cannot "understandably have escaped" Defendant's attention.  Defendant is responsible for the bad faith which permeates the entirety of this record.

## 5.  **The Efficacy of Lesser Sanctions**

Having found Defendant's bad faith based on clear and convincing evidence, this Court must next consider whether sanctions less severe than a default judgment will suffice or, conversely, whether the imposition of a default is commensurate to the Defendant's degree of misconduct.  *See Roche Diagnostics Corp.*, 2020 U.S. Dist. LEXIS 81449, *27 ("Because Roche has clearly and convincingly established that Defendants doctored hundreds of critical discovery documents, the court must next determine the appropriate sanction to reflect the relative gravity of Defendants' bad-faith behavior."); *see also Eagle Hosp.*, 561 F.3d at 1307 (concluding, on appeal, a default was "commensurate with the level of misconduct" where defendant had acquired privileged information which he could not unlearn and the extent of defendant's bad faith activities which disrupted the litigation process could not be known).

The "severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders."  *Malautea,* 987 F.2d at 1542.  However, Rule 37 does not require "the vain gesture of first imposing . . . ineffective lesser sanctions" before terminating the case when the district judge properly concludes sanctions less harsh than a default judgment would not have changed the defendant's behavior.  *Id.* at 1544 (concluding "defendants have failed to show that the harshness of the sanction rendered it unjust where the judge found the defendants and their attorneys engaged in an unrelenting campaign to obfuscate the truth; improperly objected to interrogatories; gave incomplete and unreasonably narrow answers; delayed, either deliberately or carelessly, compliance with orders to produce deposition transcripts; and never produced the information as ordered)."

The Court heeds the Eleventh Circuit's instruction here.  The Magistrate Judge recommended the Court, as a sanction, bar Defendant from submitting evidence to counter Plaintiffs' claims they were not paid overtime correctly or for all time worked.  The Magistrate Judge believed there was evidence of negligence, but not bad faith, on the part of the Defendant.  As set out herein, the report and recommendation was based on an incomplete understanding of the situation, manufactured by Defendant.  Now, though, with the benefit of a complete and truthful record, the Court finds there is clear and convincing evidence Defendant acted in pervasive bad faith throughout the discovery process of this entire case, pending since July 2018.  Accordingly, the Court declines to accept the Magistrate Judge's recommendation and finds no compelling reason to first impose even more sanctions less severe than a default judgment.

As demonstrated by the procedural history set forth above in unflattering detail, this case has been "marked by a pattern of delay and failure to comply" with the Orders of this Court.  *See Aristidou v. Aviation Port Servs., LLC*, 2020 U.S. Dist. LEXIS 31348, *37 (E.D.N.Y. February 21, 2020) (citing *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 88 F. Supp. 3d at 264.) (declining to consider misconduct in isolation when "[t]aken out of context, perhaps, any individual incident of discovery misconduct may appear forgivable—especially when framed by some post hoc excuse that rings of reasonableness")); *see also Bates v. Michelin N. Am., Inc.*, 2012 U.S. Dist. LEXIS 191007, *3-4 (N.D. Ga. January 13, 2012) ("Viewed in isolation, Michelin's failure to produce certain documents . . . could be seen as legitimate mistakes and misunderstandings.  However, Plaintiffs have demonstrated that Michelin has engaged in a pattern of subterfuge and withholding relevant and responsive documents until Plaintiffs are forced to seek the Court's intervention.  In light of this pattern of prejudicial discovery abuse by

Michelin throughout the course of the litigation, the Court finds that Michelin acted willfully in violating the Court's discovery Orders.").

When Defendant's conduct is considered throughout the entire course of this litigation, its proclivities for misconduct are not isolated mistakes, which can be remedied through the imposition of yet another lesser sanction. Here, the record makes clear sanctions less severe than a default judgment would be ineffective in compelling Defendant to comply with their discovery obligations. *See In re Sunshine Jr. Stores, Inc.*, 456 F.3d at 1306 (affirming default against defendant where its failure to participate in discovery amounted to bad faith and no other sanctions would have resulted in compliance). In *Sunshine,* the Eleventh Circuit observed the bank's failure to "provide the debtor with documents and witnesses as required constituted 'slacking off,' 'dawdling, putting up barriers and obfuscating'" resulted in the forfeiture of the bank's opportunity to dispute its liability. *Id.* at 1305-06. Here, Defendant not only willfully violated discovery orders, it attempted to shift blame for its failures onto a third party. "The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case." *Carlucci,* 102 F.R.D. at 486 (entering default judgment against the defendant aircraft manufacturer following Piper's willful destruction of test flight records which were potentially detrimental to its interests in the case). Though the Defendant in *Carlucci* was found to have "deliberately destroyed documents," Defendant's deceitful, subversive and manipulative conduct, though less obvious, has been no less detrimental. As with the defendant in *Sunshine*, given the Defendant's "clear history of bad faith stonewalling," the Court finds Defendant has forfeited its opportunity to dispute its liability. *Id*. at 1306.

6. **Prejudice to the Efficient Administration of Justice and to Plaintiffs**

Defendant's discovery abuses frustrated both the purposes of the FLSA collective action, and the efficient administration of justice.  The FLSA collective action mechanism was crafted to benefit the employer, the employee and the court.  Participation in a collective action "reduces the burden on low wage employees through the pooling of resources" and the judicial system benefits by efficient resolution in one proceeding "of common issues of law and fact that arise from the same illegal conduct." *Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 920 (11th Cir. 2014) (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264-65 (11th Cir. 2008)).  As a benefit to employers, and, in part, in response "to excessive litigation spawned by plaintiffs lacking a personal interest in the outcome," the Portal to Portal act amended the collective action procedure, disallowing participants in the action to be "representatives." *Hoffmann—La Roche*, 493 U.S. at 173).  The Eleventh Circuit has also observed "Congress passed the FLSA to protect workers from overbearing practices of employers who had greatly unequal bargaining power over their workers." *Billingsley*, 560 Fed. Appx. at 920 (citing *Roland Elec. Co. v. Walling*, 326 U.S. 657, 668 n.5 (1946)).  Defendant's corruption of the discovery process resulted in significant litigation delays, ensuring the loss of any efficiencies and the increase of burden on Plaintiffs and the Court.  The Court finds Defendant soundly defeated the goals of the collective action process through its discovery abuses.

In addition, the gravity of Defendant's misconduct, and the appropriate sanction, must be considered in light of the prejudice caused to Plaintiffs.  In 2018, Plaintiffs sought to ascertain whether they were being accurately and fully compensated for their work in accordance with the Fair Labor Standards Act.  Time and pay records speak directly to how and whether the FLSA

was violated.  Without time and pay records, the linchpin of most FLSA actions, it is impossible to fully comprehend the extent to which employees were, or were not, paid for all time worked, whether the regular rate of pay was calculated correctly, and, therefore, whether overtime was paid correctly.  Finally, without these records, it is impossible for Plaintiffs to comply with the Court's Orders and approximate damages prior to scheduled settlement conferences.

An employer who frustrates plaintiffs' ability to obtain the discovery necessary to prosecute their claims is no different than an FLSA employer who has failed to meet its record keeping requirements.  *See Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966) ("Failure to keep accurate records can obscure a multitude of minimum wage and overtime violations.");  *see, e.g.*, *Garcia v. Chirping Chicken NYC, Inc.*, 2016 U.S. Dist. LEXIS 32750, *27-28 (E.D.N.Y. March 11, 2016) (noting the Second Circuit allows a plaintiff to meet his burden by relying on memory, "[o]therwise, defendants in FLSA cases would stand to benefit from choosing not to cooperate with discovery or litigation efforts, and [o]ne should not be permitted to profit by its own wrongful act."  (internal citations omitted)).

The Court first ordered Defendant to produce its time and pay records in 2018.  *See* Appendix I.  The Defendant refused to do so.  As a result of Defendant's pervasive misconduct, the adjudication of Plaintiffs' claims on the merits has been delayed and ultimately thwarted. Whether Plaintiffs are being compensated fully for their work remains at issue today.  Defendant continues to operate its mill.  Plaintiffs continue to work.  Defendant's failures and manipulation of the discovery process frustrates "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others."  *Tenn. C. v. Muscoda*, 321 U.S. 590, 597 (1944) ("Those are the rights that Congress has specially legislated to protect.").

### 7.  **Deterrence to other Employers**

In addition, the Court cannot allow an FLSA employer to reap the benefits of its own misconduct.  Plaintiffs contend "[a]ll of the information the Defendant has mis-stated, concealed, or omitted" through the discovery proceedings "is information which would increase Defendant's liabilities to the Plaintiffs (as compared to the information which was disclosed). . ."  (Doc. 216).  Plaintiffs suggest, as motivation for its actions, Defendant recognized it is substantively liable and "made the informed decision that it can stall the inevitable outcome without triggering any worse result by simply not bothering to produce the information that will quantify its liability." (Doc. 247).  In the alternative, Plaintiffs submit Defendant "has concluded that the information it refuses to produce is so much worse in terms of quantifying its liability that - as a business proposition - it is against [it's] interest to spend time or money complying with Court Orders that will only quantify more in damages than the Plaintiffs can guess otherwise at."  (Doc. 247).

The Court finds both alternatives to be plausible.  However, no matter the explanation, Defendant is the only party who benefits.  Throughout the pendency of this suit, Defendant has not been hampered – it has continued to operate the Mill.  Defendant continues to hold and use potential damages, and, without a ruling on the merits, its questionable pay practices continue.  It is imperative the Court deter this sort of recalcitrance.  In the words of the Supreme Court:

> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*NHL v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976).

III.   **Conclusion**

A plaintiff is entitled to a default judgment only if the complaint states a claim for relief. *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005) (citing *Nishimatsu Construction Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)).   Allegations in a complaint "must present a sufficient basis to support the default judgment on the issue of liability." *Nishimatsu Constr.*, 515 F.2d at 1206.   "A default defendant may, on appeal, challenge the sufficiency of the complaint, even if he may not challenge the sufficiency of the proof."  *Eagle Hosp.*, 561 F.3d 1298 at 1307 (reviewing whether the well-pleaded facts stated a claim where the district court ordered a default judgment pursuant to its inherent powers to sanction litigants), (citing *Nishimatsu Constr.,* 515 F.2d at 1206).   "Regardless of the willfulness of a party's discovery violation, a default judgment cannot stand on a complaint that fails to state a claim."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 n.41 (11th Cir. 1997).   "A default judgment is unassailable on the merits, but only so far as it is supported by well-pleaded allegations." *Nishimatsu*, 515 F.2d at 1206.   Plaintiffs allege Defendant failed to pay for all time worked and incorrectly calculated overtime as required by the FLSA.   The Court finds Plaintiffs' Third Amended Complaint states a claim for relief and presents sufficient bases to support the entry of a default judgment. (Doc. 223.).   Therefore, the Court may and hereby does enter a DEFAULT JUDGMENT in favor of Plaintiffs as a sanction for Defendant's bad faith misconduct.

Accordingly, it **is ORDERED:**

1)   The Report and Recommendation of the Magistrate Judge, dated October 23, 2020 (Doc. 261), is ADOPTED IN PART, MODIFIED IN PART, as described above. It is made a part of this Order for all purposes including appellate review.

2)  Plaintiffs Renewed Motion for Sanctions (Doc. 238) is GRANTED as follows:

   a.  Default shall be entered against defendant and in favor of plaintiffs on liability.

   b.  Plaintiffs are entitled to reasonable attorneys' fees and expenses incurred as a result of Defendant's conduct. Plaintiffs' attorneys are directed to submit a detailed list of fees and expenses which they contend were incurred unnecessarily, including but not limited to the costs and fees expended in having to file and attend conferences and hearings held to adjudicate the numerous motions to compel and for sanctions. The parties are directed to confer in order to reach an agreement regarding the amount of the award of fees and expenses and to seek intervention from Magistrate Judge if they should be unable to resolve the total amount within fourteen days of the issuance of this Order.

3)  The Clerk of Court is directed to strike Defendant's Answer and to terminate the following pending motions:

   a.  Motion to Strike Defenses from Answer to Third Amended Complaint (Doc. 233);

   b.  Plaintiffs' Motion for Partial Summary Judgment (Doc. 245);

   c.  Consolidated Motions to Strike (and Alternative Requests for Leave to File Substantive Briefs) (Doc. 269);

   d.  Motion to Strike/Objection to Plaintiffs' Miscellaneous Submission about Discovery Chronology (Doc. 283);

    e.  Motion for Reconsideration Order on Defendant's Motion for Partial Summary Judgment (Doc. 316).

**4)** This matter is set for a hearing to discuss issues surrounding Plaintiffs' proof of damages.  This hearing will take place before the Court, December 15, 2021 at 10:00 a.m. in Courtroom 4A of the Courthouse in Mobile, Alabama.

**DONE and ORDERED** this 18th day of November, 2021.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE