**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **WILLIAM HEATH HORNADY, et al.,** | ) |
| | ) |
| Plaintiffs, | )   CASE NO. 1:18-cv-00317-JB-N |
| | ) |
| **v.** | ) |
| | ) |
| **OUTOKUMPU STAINLESS USA, LLC** | ) |
| | ) |
| Defendant. | ) |

**RESPONSES AND OBJECTIONS TO PLAINTIFFS' DAMAGE CALCULATIONS FOR
THE FIRST 30 PLAINTIFFS (SELECTED ALPHABETICALLY)**

Defendant Outokumpu Stainless USA, LLC ("OTK"), in accordance with the Court's
December 17, 2021 Order (Doc. 346), provides the following responses and objections to the
damage calculations for the first 30 Plaintiffs (selected alphabetically) that Plaintiffs served on
January 14, 2022:

**I. OVERVIEW OF OBJECTIONS AND OTK'S RESPONSE TO PLAINTIFFS'
CALCULATIONS**

In the calculations of alleged damages for the first 30 Plaintiffs, these 30 Plaintiffs appear
to have artificially inflated their figures through numerous devices, none of which is proper.

To begin, these 30 Plaintiffs give OTK **no credit whatsoever** for the overtime payments
that OTK made to them as part of the first paycheck of every month.  These Plaintiffs claim that
they are doing so based on testimony regarding alleged "truing up," but these 30 Plaintiffs now
have the ADP data showing that no such "truing up" occurred.  And these 30 Plaintiffs' arbitrary
decision to ignore the overtime paid to them in the first paycheck of every month matters.  For
example, looking at the calculations these first 30 Plaintiffs have provided for the year 2019,
OTK's actual payments of overtime for 2019 (as shown in ADP records) appears to be greater than
the amount of alleged damages that these Plaintiffs are claiming in damages for allegedly unpaid

overtime for that same year. Specifically, those 20 of the first 30 Plaintiffs who claim to have worked for OTK during the year 2019 appear to be claiming total overtime damages (before liquidation) in the combined amount of $114,290.30 for the year 2019, but the ADP records appear to show that OTK paid these same 20 Plaintiffs $119,148.89 for the overtime hours they worked in 2019. In other words, in 2019, OTK appears to have paid the 20 Plaintiffs more in overtime than they are claiming as unpaid overtime due to them. Thus, if OTK were given credit for the overtime payments these Plaintiffs actually received, their damages for allegedly unpaid overtime could go down to all the way to **zero**.

That is not the only problem in Plaintiffs' math. The first 30 Plaintiffs appear to have almost **doubled the amount of alleged overtime damages** they are claiming by arbitrarily starting each workweek at midnight and **not** at the shift start-times (6:00 am on a Sunday for the 23 Plaintiffs who worked outside the Melt Shop; 7:00 am on Sunday for the seven Plaintiffs who worked in the Melt Shop) that OTK actually used when starting its seven-day, 168-hour workweek used to pay each of the 30 Plaintiffs.

Contrary to this Court's previous rulings on "equitable tolling," the first 30 Plaintiffs seek damages for time periods outside of 29 U.S.C. § 255(a)'s three-year look-back period. This impacts the claims of 21 of the first 30 Plaintiffs. In fact, as Plaintiffs' own numbers show, two of the first 30 Plaintiffs—Raymond Batson and Austin Bishop—worked **no overtime hours** within this three-year look-back period and thus can claim no damages here. All told, out of the combined amount in damages the first 30 Plaintiffs are seeking, **at least 18.8% of their total claimed damages** are attributable to time periods outside of the three-year look-back period.

Further, **approximately 14.93%** of the first 30 Plaintiffs' claimed overtime damages can be attributed to these Plaintiffs' decision to treat OTK's monthly bonus payments as "lump sum"

payments and not as a percentage of monthly earnings.  Plaintiffs have made no attempt to calculate their alleged damages by applying the monthly bonus as a percentage of their earnings.

OTK also objects to the first 30 Plaintiffs' calculations computing any "sanctions" damages beyond April 15, 2021, by which time these 30 Plaintiffs already had the ADP data they asked for in Excel format in order to run calculations of their alleged damages.  These post-April 2021 damages appear to account for **approximately 6%** of the total damages Plaintiffs are claiming.

More generally, OTK objects that the first 30 Plaintiffs' calculations of their hours based on time-clock records does not account for OTK's paid "lunch" break every shift.  Further, the first 30 Plaintiffs give OTK no credit for any of the numerous payments OTK made them above and beyond what the FLSA requires, including, for example, overtime that OTK paid these Plaintiffs based on their vacation hours.

Finally, but not least, OTK objects to any claims Plaintiffs make for damages in weeks in which they worked under 40 hours, whether Plaintiffs premise such claims under the "common law" or under the FLSA.

## II. SUMMARY OF PLAINTIFFS' CALCULATIONS

### A.    The First 30 Plaintiffs' Calculations of FLSA Overtime Damages for Weeks in Which Plaintiffs Claimed to Have Worked More Than 40 Hours

The first 30 Plaintiffs (selected alphabetically) out of a total of 276 Plaintiffs are, according to Plaintiffs' calculations, due an alleged total of $1,376,022.43 in unpaid overtime (which works out to **$2,752,044.86** after liquidation).  Plaintiffs' calculations here are summarized in the attached "Exhibit A."  Of these 30 Plaintiffs, Timothy Bates is seeking **the highest amount** in damages for allegedly unpaid overtime:  $88,640.39 (before liquidation, which works out to **$177,280.78** after

liquidation).   And, of these 30 Plaintiffs, Brandon Averette is seeking **the lowest amount** of damages for allegedly unpaid overtime:   $3,118.92 (which works out to **$6,237.84** after liquidation).

Within this range of $3,118.92 to $88,640.39 for the first 30 Plaintiffs, Plaintiffs' numbers work out to **an average allegedly unpaid overtime amount** of $45,867.41 per Plaintiff (before liquidation, which works out to **$91,734.83** after liquidation).[1]   Needless to say, OTK objects to this calculation.

Assuming, for sake of argument only, that the first 30 Plaintiffs (selected alphabetically) were representative of the total of 276 Plaintiffs,[2] then if you multiply this average of $45,867.41 by the number of Plaintiffs currently in this action, that would mean that Plaintiffs could potentially be calculating the allegedly unpaid overtime total as being $12,659,406.36 (i.e., $45,867.41  times 276).  If you liquidate that amount, this comes to a total of **$25,318,812.72**.

The data that the first 30 Plaintiffs used to calculate damages consists of a total of 6,662 workweeks (or 3,331 two-week pay periods), which averages to 222.07 workweeks per Plaintiff (i.e., the 6,662 workweeks divided by the 30 Plaintiffs).   Thus, taking the total allegedly unpaid overtime amount of $1,376,022.43 for the 30 Plaintiffs, Plaintiffs are claiming to have been unpaid,

---

[1] The number comes out to $91,734.**83**, and not $91,734.82, because of rounding—taken to five decimal places, the per-Plaintiff average on the unliquidated amount is $45,867.41433, which doubled, comes to $91,734.82866 before rounding to the nearest cent.

[2] At the time of the Court's December 17, 2021 Order (Doc. 346), there were 278 Plaintiffs who had filed consents to opt-in to this action.  Since that time, Robert C. Davis has withdrawn (*see* Doc. 347), bringing the total number of Plaintiffs down to 277.  Further, OTK has pointed out to Plaintiffs' counsel that Brian Smith's consent (Doc. 123 at PageID #769) appears to be incorrect, insofar as Mr. Smith was **not** "last employed" at OTK "after July 30, 2015."  OTK has provided Plaintiffs' counsel with evidence that Mr. Smith, in fact, last worked at OTK **before** July 30, 2015. OTK understands that Plaintiffs' counsel is discussing this evidence with his client.  Presumably, Mr. Smith will agree to withdraw, which would bring the total number of Plaintiffs down to 276.

on average, overtime payments of $206.55 per workweek (i.e., the average per-Plaintiff claim of $45,867.41 divided by 222.07 workweeks). If this amount were liquidated, this would come to total alleged damages, for unpaid overtime, of **$413.10 per workweek**. Again, OTK objects to this calculation.

**B.    The First 30 Plaintiffs' Calculations of Damages for Weeks in Which Plaintiffs Admit to Working Less Than 40 Hours.**

In addition to claims for overtime for weeks in which Plaintiffs allegedly worked over 40 hours, the first 30 Plaintiffs claim they are entitled to recover additional damages in weeks in which Plaintiffs admit they did not work over 40 hours in the week. The first 30 Plaintiffs propose two alternative methodologies for calculating these damages.

The first assumes that the first 30 Plaintiffs should have received minimum wage (or $7.25 an hour, liquidated to $14.50 an hour) for the hours they worked for which they allegedly were not paid. Plaintiffs' calculations here are summarized in the attached "Exhibit B."

The second assumes that Plaintiffs should have received their "regular rate" (as computed by Plaintiffs) for the hours they worked for which they allegedly were not paid. Plaintiffs' calculations here are summarized in the attached "Exhibit C."

The first theory is, as explained in the Court's February 17, 2022 Order (Doc. 351), not cognizable under the FLSA, but in any event, in the calculations the Plaintiffs have provided for the first 30 Plaintiffs, the second calculation always leads to a larger number than the first calculation (because all 30 Plaintiffs' base hourly rates were, at all times, greater than a liquidated minimum wage of $14.50 an hour).

This second (and larger) calculation would lead to total damages of $43,958.35 for the first 30 Plaintiffs. Of these 30 Plaintiffs, Amy Boyd is seeking **the highest amount** in damages for allegedly unpaid time in weeks in which he worked under 40 hours: **$3,937.52**. And, of these 30

Plaintiffs, Brandon Averette is seeking **the lowest amount** in damages for allegedly unpaid time in weeks in which he worked under 40 hours:  **$54.65**.

Within this range of $54.56 to $3,937.52 for the first 30 Plaintiffs, Plaintiffs' numbers for the first 30 Plaintiffs work out to **an average allegedly unpaid non-overtime amount** of **$1,465.28** per Plaintiff in these weeks under 40 hours.

If you multiply this by average of $1,465.28 by the 276 Plaintiffs in this action, the alleged damages recoverable for weeks in which Plaintiffs worked fewer than 40 hours would add up to **$404,417.28** (i.e., $1,465.28 times 276) to the total damage Plaintiffs are seeking to recover. Needless to say, OTK objects to this calculation.

### C.    Overall Alleged Damages Claimed

This means that, if the first 30 Plaintiffs (selected alphabetically) were representative of the total of 276 Plaintiffs (OTK disputes this), Plaintiffs' best possible day in Court could bring in a combined total in damages up to **$25,723,230.00** (i.e., $25,318,812.72 on FLSA overtime claims for weeks over 40 hours, plus $404,417.28 on common law "unjust enrichment" claims for weeks under 40 hours), based on the numbers Plaintiffs have run through the end of September 2021. Once again, OTK objects to these calculations.

### III. OBJECTIONS TO FLSA OVERTIME CALCULATIONS (WEEKS OVER 40 HOURS)

**Objection No. 1:**  OTK objects that the first 30 Plaintiffs have not shown how they are computing their single "Adjusted Pay Rate with Bonus" for each alleged "Pay Week."  The first 30 Plaintiffs now have all the ADP data they were wanting in Excel format, and these Excels show how OTK paid each of the 30 Plaintiffs and provide the ability to calculate rates applied in each two-week pay period.  The first 30 Plaintiffs provided their damage calculations in .pdf format,

but without Excel spreadsheets to "show the math" and without the benefit of expert testimony to explain Plaintiffs' calculations.

That said, it appears that the first 30 Plaintiffs are calculating overtime pay using a single "blended" rate for each alleged "Pay Week" for each Plaintiff.  Putting aside the issue of "step ups" (more on this in Objection No. 2 below), OTK paid at least 29 of the Plaintiffs (i.e., the 29 out of the 30 who were assigned to work 12-hour rotating shifts—see Objection No. 3 below) using two different rates:  a "day" rate (the base rate) and a "night" rate that added a $0.50 premium to hours worked the "night" shift between 6:00 pm and 6:00 am (or between 7:00 pm and 7:00 am in the Melt Shop).  That also means that OTK paid these 29 Plaintiffs overtime at different rates— an "overtime" rate and a "shift overtime" rate.  It is unclear from Plaintiffs' .pdf documents how, if at all, these 29 Plaintiffs are accounting for the differences between the "overtime" rate and the "shift overtime" rate (for hours worked on the "night" shift).

**Objection No. 2**:  The first 30 Plaintiffs' methodology does not appear to give OTK any credit for overtime payments it made to Plaintiffs as part of the first paycheck of every month.  If OTK were given credit for the overtime payments it made as part of the first paycheck of every month, Plaintiffs' total damages for unpaid overtime could go down from numbers as high as $25,318,812.72 to all the way to **zero**.

In order to calculate their alleged overtime damages, Plaintiffs are discounting two weeks' worth of the overtime pay they actually received each month.  As grounds for such discounting, Plaintiffs' Third Amended Complaint (Doc. 223) says, paragraph 24.2, that "delayed 'trued up' payments may not be credited."  However, Plaintiffs now have the underlying ADP records which

confirm that "truing up" did not actually occur in the manner described in the Third Amended Complaint.

### Example (Calculations for 2019):

Taking just the calendar year 2019 as an example, 20 of the first 30 Plaintiffs claim that they received paychecks from OTK during this calendar year: (1) Rosa Adams; (2) Richard L. Ainsworth; (3) Melinda Alexander; (4) Garner Allen; (5) Kelley Anderson; (6) Jeffrey Scott Arnold; (7) Chase Averette; (8) Cory Averette; (9) David Shawn Bailey; (10) Jonathan Baker; (11) Timothy Barnes; (12) Timothy Bates; (13) Jeremy Beason; (14) LaRosa Beckham; (15) Emily Belcher; (16) Nathen Bennett; (17) Clifton Betts; (18) Douglas Bishop; (19) Shirley Blair; and (20) Amy Boyd.

For these 20 Plaintiffs on payroll during 2019, the ADP data appears to show that OTK paid them the gross amount of $213,759.96 for their overtime hours in 2019. However, for this 2019 calendar year, the 20 Plaintiffs are alleging that, without liquidation of alleged damages, they should have been paid overtime in the gross amount of $208,901.37 (which is less than the gross amount of $213,759.96 that OTK actually paid them for their overtime hours).

How, then, do Plaintiffs claim any damages for unpaid overtime in 2019? Plaintiffs arrive at their claimed damages by ignoring the overtime payments they actually received as part of the first paycheck every month. Plaintiffs' .pdf documents contain columns labelled "OT Paid – OTK Claims," "OT Due to Plaintiff," and "OT Underpayment." However, when the numbers are added up, the figure obtained by adding up the totals in "OT Due to Plaintiff" and subtracting from this total the totals shown in "OT Underpayment" does not appear to equate to the same totals shown in the column labeled "OT Paid – OTK Paid." Thus, for the 2019 calendar year, to figure out what "credit" the 20 Plaintiffs are assigning to OTK for the overtime it paid them, the following example

for 2019 takes the total of $208,901.37 obtained by adding up the 2019 numbers in the column labelled "OT Due to Plaintiff" and subtracts from this the total of $114,290.30 shown for 2019 numbers in the column labelled "OT Underpayment."  This yields the amount of $94,611.07 (i.e., $208,901.37 minus $114,290.30).

Thus, these 20 Plaintiffs appear to be claiming that, for the calendar year 2019, OTK is only entitled to credit for overtime payments of $94,611.07—i.e., the amounts paid in the second paycheck of the month and, in those months with three paychecks (i.e., in some months with five Fridays in the month), the third paycheck of the month as well.  That means that, out of OTK's total overtime payments to the 20 Plaintiffs in 2019 of $213,759.96, these 20 Plaintiffs are only crediting OTK with 44.26% (i.e., $94,611.07 divided by $213,759.96) of the overtime dollars OTK actually paid these Plaintiffs.

Stated somewhat differently, for the 2019 calendar year, these 20 Plaintiffs calculate the total overtime they worked at $208,901.37 and apparently give OTK credit for overtime payments in the total amount of $94,611.07.  Thus, these 20 Plaintiffs claim alleged damages for unpaid overtime in 2019 in the amount of $114,290.30 (i.e., $208,901.37 minus $94,611.07).  By denying OTK credit for any overtime paid as part of the first paycheck of every month, Plaintiffs' damage calculations are effectively denying OTK credit for **$119,148.89** (i.e., $213,759.96 minus $114,290.30) in overtime that OTK paid during 2019.

If this amount were applied to the 20 Plaintiffs' total damage calculations for allegedly unpaid overtime in 2019, that number would go down from $114,290.30 **to zero** (because the $119,148.89 in overtime payments not included in Plaintiffs' calculations are greater than the amount of alleged damages, before liquidation, that these 20 Plaintiffs are claiming for the 2019 calendar year).  If this example from 2019 for 20 Plaintiffs were representative of what the data

would show for all 276 Plaintiffs over the entire time period, Plaintiffs could be entitled to no damages at all—OTK may have already paid Plaintiffs all of the overtime that they claim they were owed.

.    **Additional Objection on the "Truing Up"**:

Also, to the degree that Plaintiffs are arguing that they are entitled to deny OTK credit for the overtime payments it made in the first paycheck of every month because of "truing up" and do so by arguing that "truing up" matters because of "step ups," the data Plaintiffs now have shows that "step ups" are not significant.

Specifically, the data the first 30 Plaintiffs have run appears to show that **only seven** of the first 30 Plaintiffs (or 23.33% of the them) ever worked "step ups":  (1) Christopher Allen; (2) Garner Allen; (3) Chase Averette; (4) David Shawn Bailey; (5) Raymond Batson; (6) Nathen Bennet; and (7) Steven Boyd.  Thus, even if Plaintiffs were correct in arguing that "step up" payments were somehow delayed by a "truing up" (the ADP data shows otherwise), if the first 30 Plaintiffs were representative of all 276 Plaintiffs, the "step ups" would not be an issue for approximately three-quarters of the Plaintiffs.


**Objection No. 3**:  Plaintiffs' methodology ignores that OTK consistently paid its employees using a seven-day, 168-hour workweek beginning at 6:00 am on Sunday (outside the Melt Shop, or at 7:00 am in the Melt Shop) and, if applied to all 276 Plaintiffs, risks artificially inflating Plaintiffs' damage calculations by approximately an additional **$12,536,159.76** after liquidation.  This is not appropriate.

Of the first 30 Plaintiffs (selected alphabetically), their schedules were as follows:

1.      **Rosa Adams**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

2.      **Richard L. Ainsworth**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

3.      **Melinda Alexander**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

4.      **Christopher Allen**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

5.      **Garner Allen**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

6.      **Joseph Amundson**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

7.      **Kelley Anderson**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

8.      **Jeffrey Scott Arnold**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

9.      **Brandon T. Averette**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

10.     **Chase Averette**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

11.     **Cory Averette**:  He was usually assigned **10-hour shifts**, starting at 6:00 am and ending at 4:00 pm, **Monday through Friday**.

12.     **David Shawn Bailey**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

13.     **Jonathan Baker**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

14.     **Johnnie Banks**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

15.     **Timothy Barnes**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

16.     **Michael Blane Barnett**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

17.     **James Bass**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

18.     **Timothy Bates**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

19.     **Raymond Batson**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

20.     **Jeremy Beason**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

21.    **LaRosa Beckham**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

22.    **Emily Belcher**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

23.    **Nathen Bennett**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

24.    **Clifton Betts**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

25.    **Austin Bishop**:  He was a **Melt Shop employee**, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

26.    **Douglas Bishop**:  He was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where his shift fell in the rotation.

27.    **Shirley Blair**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

28.    **Christopher Bloebaum**:  He was a **Melt Shop** employee, and he was usually assigned 12-hour rotating shifts, starting at either 7:00 am or 7:00 pm, depending on where his shift fell in the rotation.

29.    **Amy Boyd**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

30.    **Stephen Boyd**:  She was usually assigned 12-hour rotating shifts, starting at either 6:00 am or 6:00 pm, depending on where her shift fell in the rotation.

Instead of looking at the 7-day, 168-hour workweek that OTK actually paid its employees, Plaintiffs would arbitrarily have OTK's workweek start at either midnight on Monday morning (before January 27, 2019) or midnight on Sunday morning (after January 27, 2019).

Plaintiffs' improper and arbitrary selection of a midnight start time for the workweek risks improperly splitting a shift worked in a single workweek into two different workweeks.  Under Plaintiffs' methodology, this would happen for any employee working a 12-hour rotating shift if such employee were working an overnight shift (6:00 pm to 6:00 am for most employees, and 7:00 pm to 7:00 am for Melt Shop employees) on the weekend.

The effect of this is that, on an ordinary rotating shift schedule, Plaintiffs improperly allocate up to six hours of time to a different workweek than how OTK was paying its employees outside the Melt Shop (for an alleged Sunday-to-Monday workweek, the time between midnight and 6:00 am on Monday; for an alleged Saturday-to-Sunday workweek, the time between midnight and 6:00 am on Sunday).  Similarly, Plaintiffs allocate up to seven hours of time to a different workweek than how OTK was paying its Melt Shop employees (for an alleged Sunday-to-Monday workweek, the time between midnight and 7:00 am on Monday; for an alleged Saturday-to-Sunday workweek, the time between midnight and 7:00 am on Sunday).

Of the first 30 Plaintiffs, only one of them—Cory Averette—worked a Monday through Friday daytime schedule, and thus his calculations of alleged damages are not likely to be affected by Plaintiffs' arbitrary selection of a midnight start time (on either Monday or Sunday) for the workweek.  However, for other 29 of the first 30 Plaintiffs, they worked rotating 12-shifts, and therefore, under the rotation schedule (assuming they did not pick up any extra shifts), they would have been assigned to work the overnight shifts once every four weeks (which usually works out to once a month).

**Example (Calculations for 2019)**:

Taking just the calendar year 2019 as an example, 20 of the first 30 Plaintiffs received paychecks from OTK during this calendar year, and 18 of these 20 were on payroll for the entire calendar year (Garner Allen and Jeffrey Scott Arnold both terminated employment during 2019).

Of these 18 Plaintiffs on OTK's payroll for all of 2019, 16 Plaintiffs were assigned to 12-hour, rotating shift outside the Melt Shop:  (1) Rosa Adams; (2) Richard L. Ainsworth; (3) Melinda Alexander; (4) Kelley Anderson; (5) Chase Averette; (6) Jonathan Baker; (7) Timothy Barnes; (8) Timothy Bates; (9) Jeremy Beason; (10) LaRosa Beckham; (11) Emily Belcher; (12) Nathen Bennett; (13) Clifton Betts; (14) Douglas Bishop; (15) Shirley Blair; and (16) Amy Boyd.

Assuming these 16 Plaintiffs were assigned on average one overnight weekend shift every four weeks (and assuming they picked up no extra overnight weekend shifts), then each of them would worked approximately 13 overnight weekend shifts (i.e., 52 weeks divided by every 4 weeks) in the calendar year 2019.  These 13 overnight weekend shifts equate to a total of 78 hours (i.e., 6 hours between midnight and 6:00 am, for each of 13 overnight weekend shifts) in 2019 for which each of these 16 Plaintiff would be claiming they were not paid overtime in a workweek beginning at midnight on Monday (before January 27, 2019) or at midnight on Sunday (after January 27, 2019).  This potentially works out to a total of 1,248 hours (i.e., 78 hours times the 16 Plaintiffs) for which these 16 Plaintiffs may be claiming they were not paid overtime in 2019.

The average rate that OTK paid Plaintiffs in 2019 (before overtime) appears to be $27.19 an hour.  At time-and-a-half this "average paid" rate for 2019, 1,248 hours could contribute a total of **$50,899.68** (or $40.79 times 1,248 hours) to Plaintiffs' alleged overtime damages for the year 2019.

In addition, another of these 18 Plaintiffs, David Shawn Bailey, was assigned to work 12-hour rotating shifts in the Melt Shop in 2019.  Assuming that he was assigned on average one overnight weekend shift every four weeks (and he picked up no extra overnight weekend shifts), he would have worked approximately 13 overnight weekend shifts (i.e., 52 weeks divided by every 4 weeks) in 2019.  These 13 overnight weekend shifts equate to a total of 91 hours (i.e., 7 hours between midnight and 7:00 am, for each of 13 overnight weekend shifts) in 2019 for which Mr. Bailey may be claiming he was not paid overtime in a workweek beginning at midnight on Monday (before January 27, 2019) or at midnight on Sunday (after January 27, 2019).

At time-and-a-half the "average paid" rate for 2019 (see above), 91 hours could contribute a total of **$3,711.89** (or $40.79 times 91 hours) to Plaintiffs' alleged overtime damages for the year 2019.

Of the 18 Plaintiffs who worked in 2019, this then leaves Cory Averette, who worked the entire year of 2019 but who is not likely to have worked any overnight weekend shifts.

The total overtime damages that these 18 Plaintiffs are claiming in 2019 appears to come to $110,329.64 (i.e., the $114,290.30 listed in Objection No. 2 above, minus the $3,960.66 attributable to the 2019 overtime damage claims of Garner Allen and Jeffrey Scott Arnold, who worked only part of 2019).  Of this total of $110,329.64, a total of approximately **$54,611.57** (i.e., $50,899.68 for the 16 non-Melt Shop employees plus $3,711.89 for the one Melt Shop employee) may potentially be attributed to these 29 Plaintiffs' running their damage calculations using an arbitrary workweek starting at midnight (either on Monday or Sunday).

In other words, for the year 2019, 49.50% (i.e., $54,611.57 divided by $110,329.64) of the alleged overtime damages Plaintiffs are claiming appear to be attributable to Plaintiffs' decision to start the workweek at midnight when running their calculations.

Assuming Plaintiffs are claiming overnight weekend shift hours for other years equivalent to this 49.50% they appear to be claiming for 2019, correcting for this error would bring the total damages claimed by the first 30 Plaintiffs down from $1,376,022.43 to $694,709.33 (i.e., $1,376,022.43 minus $681,313.10). This, in turn, would bring the per-Plaintiff average down from $45,867.41 to $23,156.98 (i.e., $694,709.33 divided by 30).

Applying this percentage to all 276 Plaintiffs, this would bring the approximate calculations of allegedly unpaid overtime down from $12,659,406.36 to $6,391,326.48 (i.e., $23,156.98 times 276). On a liquidated basis, this would bring Plaintiffs' total damage claim for unpaid overtime down from $25,318,812.72 to $12,782,652.96 (i.e., two times $6,391,326.48).

In other words, by arbitrarily splitting overnight weekend shifts and starting each workweek at midnight, Plaintiffs appear to have artificially inflated their damage calculations by the equivalent of approximately **$12,536,159.76** (i.e., $25,318,812.72 minus $12,782,652.96).

**Objection No. 4**: Plaintiffs' damages calculations are inconsistent with the Court's prior ruling (Doc. 276) on Plaintiffs' arguments for "equitable tolling" of the statute of limitations for those claimants who were not among the original named Plaintiffs but who instead opted-in to the collective action after the original filing date of July 16, 2018 (*see* Doc. 1).

Specifically, Plaintiffs' ignoring each opt-in date artificially inflates Plaintiffs' total calculations of allegedly unpaid overtime by at least **$4,758,000.66**. This is not appropriate.

Under the FLSA, in the case of alleged "willful" violations, claims for unpaid overtime are "barred unless commenced within … three years after the cause of action accrued." 29 U.S.C. § 255(a). In this case, 21 out of the first 30 Plaintiffs are seeking damages for unpaid overtime for hours they claim to have worked more than three years before they joined this action:

1.      **Rosa Adams**:  She joined this lawsuit in August 2019, but she is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to her claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through August 13, 2016.

2.      **Richard L**. **Ainsworth**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to July 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of July 27, 2015 through July 31, 2016.

3.      **Melinda Alexander**:  She joined this lawsuit in August 2019, but she is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to her claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through August 27, 2016.

4.      **Christopher Allen**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through August 18, 2016.

5.      **Garner Allen**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through August 18, 2016.

6.      **Joseph Amundson**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through August 6, 2016.

7.      **Kelley Anderson**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through August 13, 2016.

8.      **Chase Averette**:  He joined this lawsuit in September 2019, but he is seeking damages for alleged unpaid overtime going back to October 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of October 12, 2015 through September 2, 2016.

9.      **Cory Averette**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through August 6, 2016.

10.     **Jonathan Baker**:   He joined this lawsuit in January 2020, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through January 22, 2017.

11.     **Johnnie Banks**:   He joined this lawsuit in July 2019, but he is seeking damages for alleged unpaid overtime going back to November 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of November 23, 2015 through July 3, 2016.

12.     **James Bass**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 24, 2015 through August 6, 2016.

13.     **Timothy Bates**:  He joined this lawsuit in September 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through September 2, 2016.

14.     **Raymond Batson**:  He joined this lawsuit in August 2019, but he last worked at OTK in July 2016 (**more than three years before he joined this lawsuit**) and is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 24, 2015 through June 27, 2016.

15.     **Jeremy Beason**:  He joined this lawsuit in September 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through September 2, 2016.

16.     **LaRosa Beckham**:   She joined this lawsuit in August 2019, but she is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to her claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through August 13, 2016.

17.     **Clifton Betts**:  He joined this lawsuit in August 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through August 7, 2016.

18.     **Austin Bishop**:   He joined this lawsuit in August 2019, but he last worked at OTK in June 2016 (**more than three years before he joined this lawsuit**) and is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 2, 2015 through June 26, 2016.

19.    **Douglas Bishop**:  He joined this lawsuit in September 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 3, 2015 through August 6, 2016.

20.    **Amy Boyd**:  She joined this lawsuit in September 2019, but she is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to her claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through September 9, 2016.

21.    **Stephen Boyd**:  He joined this lawsuit in September 2019, but he is seeking damages for alleged unpaid overtime going back to August 2015.  OTK objects to his claim for any damages for allegedly unpaid overtime pay for the time period of August 10, 2015 through September 9, 2016.

As noted above, two of the first 30 Plaintiffs (**Raymond Batson** and **Austin Bishop**) did not work any hours at OTK in the three years before they opted-in to this lawsuit.  Neither of these Plaintiffs is entitled to any damages under any FLSA theory.

The first 30 Plaintiffs appear to have run their calculations using a total 6,662 workweeks, but of these, 1,252 workweeks appear to be outside three-year look-back period prescribed by 29 U.S.C. § 255(a).[3]  Properly including only the 5,410 workweeks within this three-year period, the total damages (before liquidation) for the first 30 Plaintiffs would be reduced by $258,586.93, from $1,376,022.43 to $1,117,435.50 (i.e., $206.55 per week times 5,410 weeks).

---

[3] In fact, it appears that only nine of the first 30 Plaintiffs are **not** claiming damages outside the three years contemplated by 29 U.S.C. § 255(a) for "willful" violations: (1) Jeffrey Scott Arnold; (2) Brandon Averette; (3) David Shawn Bailey; (4) Timothy Barnes; (5) Michael Blane Barnett; (6) Emily Belcher; (7) Nathen Bennett; (8) Shirley Blair; and (9) Christopher Bloebaum.

On a per-Plaintiff basis, this would reduce the average total damages for each Plaintiff by $8,619.58, from $45,867.43 to $37,247.85 (i.e., $1,117,435.50 divided by 30).

Accordingly, the total alleged damages claimed by all 276 Plaintiffs would be reduced by approximately $2,379,000.33, from $12,659,406.93 to $10,280,406.60 (i.e., $37,247.85 times 276), and the liquidated total would be reduced by $4,758,000.66, from $25,318,812.72 to $20,560,813.20.  Thus, by going outside the FLSA's three-year look-back period, Plaintiffs have artificially inflated their total alleged damages by at least **$4,758,000.66**.

**Objection No. 5**:   Plaintiffs' methodology treats each month's percentage-based bonus payment as a "lump sum" payment and, if applied to all 276 Plaintiffs, risks artificially inflating Plaintiffs' damage calculations by an additional **$3,780,098.40** after liquidation.   This is not appropriate.

The Court's February 17, 2022 Order explains the basis for Plaintiffs' claims here as follows:  "Plaintiffs alleged overtime is not paid correctly either during the calendar month within which the metrics are gathered or on the more recent wages to which the percentage is applied.  In sum, Plaintiffs allege the math never works out and the overtime wages earned during the bonus period should be recalculated."  (Doc. 351 at PageID #4753.)  However, the first 30 Plaintiffs make no effort to "recalculate" the monthly bonus using the monthly percentages that OTK actually applied, nor have Plaintiffs shown the math "never works out" in way that led to any underpayment of overtime for these first 30 Plaintiffs.  Instead, Plaintiffs improperly treat every month's bonus as a "lump sum" payment and ignore OTK's bonus percentages entirely.

**Example (Calculations for 2019)**:

The 18 Plaintiffs who worked the entirety of the year 2019 (and received a monthly "bonus" payment) attributable each month of 2019 are (1) Rosa Adams; (2) Richard L. Ainsworth; (3) Melinda Alexander; (4) Kelley Anderson; (5) Chase Averette; (6) Cory Averette; (7) David Shawn Bailey; (8) Jonathan Baker; (9) Timothy Barnes; (10) Timothy Bates; (11) Jeremy Beason; (12) LaRosa Beckham; (13) Emily Belcher; (14) Nathen Bennett; (15) Clifton Betts; (16) Douglas Bishop; (17) Shirley Blair; and (18) Amy Boyd.

All told, these 18 Plaintiffs claims to have received a total of $182,975.01 in bonus payments attributable to the months they worked in 2019—this works out to an average monthly payment, per Plaintiff, of $847.11 (i.e., $182,975.01 divided by 18 Plaintiffs divided by 12 months). The highest payment any one of these Plaintiffs received based on a month in 2019 was Timothy Bates's bonus for November 2019 of **$1,752.96**, and the lowest payment any one of these Plaintiffs received based on a month in 2019 was Shirley Blair's bonus for May 2019 of **$395.18**.

Plaintiffs treat all of these bonuses as "lump sum" payments and therefore have purported to re-calculate each of these 18 Plaintiff's "regular rate" for each month applying the monthly bonus as a "lump sum" payment. This leads, on average, to inflating each Plaintiff's base hourly rate in the hourly rate by an additional **$4.78** an hour. (This total can be arrived at by dividing the total 2019 bonus payments of $182,975.01 by the 38,281-hours-and-19-minutes that the 18 Plaintiffs claim they were clocked in for during 2019.) The highest purported recalculation for any one of these 18 Plaintiffs was for Richard L. Ainsworth's bonus for July 2019, which Plaintiffs have alleged works out to an additional hourly rate of **$10.10** an hour. The lowest purported recalculation for any one of these 18 Plaintiffs was for Emily Belcher's bonus for July 2019, which Plaintiffs have alleged works out to an additional hourly rate of **$2.04** an hour.

As noted in Objection No. 3 above, these 18 Plaintiffs are claiming overtime damages for 2019 in the total amount of $110,329.64. Using the average paid rate for 2019 of $27.19 an hour and adding $4.78 an hour to this rate, that would make the average "hourly rate" (before overtime) come out to $31.97. Calculating overtime at one-and-a-half times $31.97 (i.e., at $47.95), Plaintiffs' claim for $110,329.64 in allegedly unpaid overtime in 2019 would equate to a claim of allegedly unpaid overtime hours of 2,300.93 hours (i.e., $110,329.64 divided by $47.95) for 2019. If the additional $4.78 an hour is not added in, the 18 Plaintiffs would, instead, be claiming only $93,854.93 (i.e., $40.79 an hour times 2,300.93 hours) in damages for allegedly unpaid overtime in 2019.

Thus, for these 18 Plaintiffs, they appear to be claiming additional overtime damages for 2019 in the amount of **$16,474.71** (i.e., $110,329.64 minus $93,854.93) through adding $4.78 an hour to their "regular rate" of pay. In other words, for the year 2019, 14.93% (i.e., $16,474.71 divided by $110,329.64) of the damages Plaintiffs are claiming appear to be attributable to Plaintiffs' decision to treat the monthly bonus payments for 2019 as "lump sum" payments.

Assuming all 30 of the first Plaintiffs are purporting to re-calculate their hourly rates by a percentage to similar to this 14.93% they are claiming for 2019, correcting for this error would bring the total damages claimed by the first 30 Plaintiffs down from $1,376,022.43 to $1,170,582.28 (i.e., $1,376,022.43 minus $205,440.15). This, in turn, would bring the per-Plaintiff average down from $45,867.41 to $39,019.41 (i.e., $1,170,582.28 divided by 30).

Applying this to all 276 Plaintiffs, this would bring the approximate calculations of unpaid overtime down from $12,659,406.36 to $10,769,357.16 (i.e., $39,019.41 times 276). On a liquidated basis, this would bring Plaintiffs' total damage claim for unpaid overtime down from $25,318,812.72 to $21,538,714.32 (i.e., two times $10,769,357.16). In other words, by treating

each month's percentage bonus as a "lump sum" payment, Plaintiffs appear to have artificially inflated their damage calculations by the equivalent of at least **$3,780,098.40** (i.e., $25,318,812.72 minus $21,538,714.32).

### Alternative Example (Calculations for 2019):

Even if Plaintiffs were permitted to treat the monthly bonus as "lump sum" payments (they should not be), Plaintiffs appear to have nevertheless further artificially inflated their damage calculations by understating the hours and minutes when converting the monthly bonuses for 2019 into an additional hourly rate of $4.78 an hour.  Plaintiffs arrive at their total by dividing their total 2019 bonus payments of $182,975.01 by the 38,281-hours-and-19-minutes they claim they were clocked in for during 2019.

However, OTK paid Plaintiffs their monthly percentage bonuses not using the hours they were clocked in for, but using the hours they were paid for.  And, in 2019, Plaintiffs were almost always paid for more hours they were clocked in for, because they were paid for holidays, vacation days, and the like.  Using the ADP data, the total hours OTK paid these 18 Plaintiffs for in 2019 appears to add up to 43,404 hours and 4 minutes.  If the total of total 2019 bonus payments of $182,975.01 is divided by 43,404-hours-and-4-minutes, this would equate to an additional hourly rate of $4.22 an hour, **not** Plaintiffs' number of $4.78 an hour.


**Objection No. 6:**    Because the damages here flow from the Court's sanction for OTK's discovery conduct and because there is no dispute that OTK had effectively cured the sanctionable conduct (via ADP's production of payroll records) around the time of the Court's April 15, 2021 hearing, OTK objects to Plaintiffs running any damage calculations past April 15, 2021.

Specifically, Plaintiffs' improper calculation of damages past April 15, 2021 artificially inflates Plaintiffs' total calculations of allegedly unpaid overtime by approximately **$1,519,956.52.** This is not appropriate.

It appears that Plaintiffs have run damage calculations for 16 of the first 30 Plaintiffs through September 30, 2021.  These 16 Plaintiffs are (1) Rosa Adams; (2) Richard L. Ainsworth; (3) Melinda Alexander; (4) Kelley Anderson; (5) Chase Averette; (6) Cory Averette; (7) David Shawn Bailey; (8) Jonathan Baker; (9) Timothy Barnes; (10) Jeremy Beason; (11) LaRosa Beckham; (12) Emily Belcher; (13) Nathen Bennett; (14) Clifton Betts; (15) Douglas Bishop; and (16) Amy Boyd.  Plaintiffs' inclusion of damage calculations just for these 16 Plaintiffs will account for 25 extra workweeks per Plaintiff, or a total 400 workweeks in the total count of 6,662 workweeks.

If these 400 workweeks were excluded from the calculation, that would reduce the total damages (before liquidation) for the first 30 Plaintiffs by $82,606.23, from $1,376,022.43 to $1,293,416.10 (i.e., $206.55 per week times 6,262 weeks).

On a per-Plaintiff basis, this would reduce the average total damages for each Plaintiff by $2,7523.54, from $45,867.41 to $43,113.87 (i.e., $1,293,416.10 divided by 30).

Accordingly, the total damages claimed by all 276 Plaintiffs would be reduced by approximately $759,978.26, from $12,659,406.36 to $11,899,428.10 (i.e., $43,113.87 times 276). In turn, this would reduce the liquidated total by $1,519,956.52, from $25,318,812.72 to $23,798,856.20.  By improperly adding four-and-a-half months of damages past the date on which OTK had already cured any alleged harm caused by any delay in producing Excel versions of ADP records and using the averages set forth above, Plaintiffs appear to inflated their total alleged damages by approximately **$1,519,956.52.**

**Objection No. 7**:  The first 30 Plaintiffs appear to be calculating their overtime hours from their clock-in time each shift until their clock-out time for that shift.  OTK objects to these calculations, not least because every Plaintiff would have had a paid "lunch" break lasting at least 30 minutes each shift in which no work was performed.  Further, as discussed in *Francis Callier v. Outokumpu Stainless USA, LLC*, Case No. 1:21-cv-00521, OTK has agreed to pay those Plaintiffs currently employed an amount that OTK believes represents the amount they would have received in additional overtime had OTK paid them on a minute-to-minute basis between November 2018 and November 2021, and the Court will need to determine whether OTK may be able to set-off some of all of these payments against the damages that the current-employee Plaintiffs are claiming here.

Of course, the payments that OTK has agreed to pay to current-employee Plaintiffs going back to November 2018 will not cover the entire time period at issue in the present case.  According to paragraph 11 of the Third Amended Complaint (Doc. 223), Plaintiffs maintain that, before May 2018, their clock-in times could occur up to 30 minutes before the start of their shift and would be "rounded" down to the shift start time.  Thus, a Plaintiff clocking in at 5:30 am for a shift starting at 6:00 am would be paid as if she had started work at 6:00 am (the shift start time) and not at 5:30 am (the clock-in time).  Likewise, Plaintiffs maintain that, before May 2018, their clock-out times could occur up to 15 minutes after the end of their shift and would also be "rounded" down to the shift end time.  Thus, a Plaintiff clocking out at 6:15 pm for a shift ending at 6:00 pm would be paid as if she had stopped work at 6:00 pm (the shift end time) and not at 6:15 pm (the clock-out time).  In other words, based on their clock-in and clock-out times, Plaintiffs could, before May 2018, have as many as 45 minutes (0.75 hours) for which they were not paid on each shift.  This

said, not all of the first 30 Plaintiffs were using OTK's time-clock practices to add an extra 45 minutes to each shift.

Likewise, according to paragraph 12 of the Third Amended Complaint (Doc. 223), Plaintiffs maintain that, after May 2018, their clock-in times could occur up to 7 minutes before the start of their shift and would be "rounded" down to the shift start time.  Thus, a Plaintiff clocking in at 5:53 am for shift starting at 6:00 am would be paid as if she had started work at 6:00 am (the shift start time) and not at 5:53 am (the clock-in time).  Likewise, Plaintiffs maintain that, after May 2018, their clock-out times could occur up to 7 minutes after the end of their shift and would also be "rounded" down to the shift end time.  Thus, a Plaintiff clocking out at 6:07 pm for a shift ending at 6:00 pm would be paid as if she had stopped work at 6:00 pm (the shift end time) and not at 6:07 pm (the clock-out time).  In other words, based on their clock-in and clock-out times, Plaintiffs could, before May 30, have as many as 14 minutes (0.2333 hours) for which they were not paid on each shift.  This said, not all of the first 30 Plaintiffs (alphabetically) were using OTK's time-clock practices to add an extra 14 minutes to each shift.

Notably, OTK's paid "lunch" break of at least 30 minutes each shift would have completely eliminated the potential extra maximum of 14 minutes of time shown on OTK's time-clocks after May 2018, and would have eliminated up to three-quarters of the potential extra maximum of 45 minutes shown on OTK's time-clocks before May 2018.

**Objection No. 8**:  OTK objects that the first 30 Plaintiffs' calculations appear to give OTK no credit for the overtime payments (at time-and-a-half) made for times when the FLSA did not require OTK to pay overtime.  For example, in determining whether each Plaintiff worked over 40 hours in OTK's workweek, OTK gave Plaintiffs credit for vacation hours when Plaintiffs

performed no work.  That is not required under the FLSA.  In fact, if a Plaintiff took an entire week off as vacation but had been scheduled to work overtime as part of OTK's 12-hour rotating shifts, OTK would pay that Plaintiff "vacation overtime" in a week when Plaintiff performed no work whatsoever.

## IV. OBJECTIONS TO ALABAMA "UNJUST ENRICHMENT" CLAIMS (WEEKS UNDER 40 HOURS)

OTK objects to the entirety of Plaintiffs' claim for what may correspond (for all 276 Plaintiffs) to a total of approximately **$404,417.28** in damages for weeks in which Plaintiffs worked under 40 hours.  Such damages are not recoverable under Alabama's common law of "unjust enrichment."  Further, OTK objects to Plaintiffs' calculations of their common law "unjust enrichment" damages to the extent that Plaintiffs have not credited OTK with all of the amounts OTK paid Plaintiffs for.  In this regard, in addition to the paid "lunch" breaks discussed in Objection No. 7 above, OTK also paid Plaintiffs for time not worked because of vacations, holidays, and the like.  Further, OTK paid Plaintiffs at a higher hourly rate when they worked holidays.

Notably, all of Objections Nos. 1, 3, 6, and 7 above would apply with equal force to Plaintiffs' calculations of their "regular rate" claims for hours under 40 hours.

For example, on Objection No. 7 above, it is worth noting that the 30 Plaintiffs are often claiming amounts less than their paid "lunch" break each shift.  For example, looking at just the first page of his "Weeks Under 40 Hours" calculations, Richard L. Ainsworth is claiming **29 minutes** for the alleged "pay week" of "07/27/2015 – 08/02/2015"; **14 minutes** for the alleged "pay week" of "08/31/2015 – 09/06/2015"; **9 minutes** each for the alleged "pay weeks" of "10/26/2015 – 11/01/2016," "11/09/2015 – 11/15/2015," and "12/07/2015 – 12/13/2015"; **22**

**minutes** for the alleged "pay week" of "01/04/2016 – 01/10/2016"; and **13 minutes** for the alleged "pay week" of "01/18/2016 – 01/24/2016."

OTK's Objection No. 4 above does not carry directly over to Plaintiffs' common law "unjust enrichment" claims.  Rather, Objection No. 4 relies on the three-year look-back is 29 U.S.C. § 255(a), and this federal statute does not purport to provide a look-back period on claims brought under Alabama common law of "unjust enrichment."  But, according to the Alabama Supreme Court, the question of what the limitations period is for "unjust enrichment" claims is still very much up in the air. *See Snider v. Morgan*, 113 So. 3d 643, 655 (Ala. 2012) (explaining: "Our research similarly confirms that there is a distinct absence of authority definitively stating the statute of limitations applicable to an unjust-enrichment claim. We need not, however, decide that issue here.").  What is clear is that Alabama statute expressly provides a two-year limitations period for wage claims: "All actions for the recovery of wages, overtime, damages, fees, or penalties accruing under laws respecting the payment of wages, overtime, damages, fees, and penalties must be brought within two years." Ala. Code § 6-2-38(m).  Thus, OTK objects to Plaintiffs' inclusion of any "unjust enrichment" damages going back than two years from when each Plaintiff became an actual party to this action and further notes that the Court's previous conditional certification of this matter as a collective action under the FLSA (*see* Doc. 93) does not apply to common law "unjust enrichment" claims.

Respectfully submitted,

*s/ Devin C. Dolive*
Devin C. Dolive (DOLID4671)
Ronald W. Flowers, Jr. (FLOWR3635)
H. William Wasden (WASDH4276)

Attorneys for Defendant
OUTOKUMPU STAINLESS USA, LLC

OF COUNSEL:

BURR & FORMAN LLP
11 North Water St., Suite 22200
Mobile, AL 36602
Telephone:  (251) 344-5151
Facsimile:  (251) 344-9696
bwasden@burr.com

BURR & FORMAN LLP
420 North 20th St., Suite 3400
Birmingham, Alabama 35203
Telephone:  205-251-3000
Facsimile:  205-458-5100
ddolive@burr.com
rflowers@burr.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on February 22, 2022, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Ian D. Rosenthal, Esq.
Holston Vaughan & Rosenthal LLC
211 South Cedar Street
Mobile, Alabama 36602
idr@holstonvaughan.com

Patrick H. Sims, Esq.
P. O. Box 2906
Mobile, Alabama 36652
patrick@simslawfirm.net


*s/ Devin C. Dolive*
OF COUNSEL