**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **WILLIAM HEATH HORNADY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 1:18-cv-00317-JB-N |
| | ) | |
| **v.** | ) | |
| | ) | |
| **OUTOKUMPU STAINLESS USA, LLC** | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MOTION TO RECONSIDER AND CLARIFY THE COURT'S NOVEMBER 18, 2021**</u>
<u>**AND FEBRUARY 17, 2022 ORDERS AND TO SET ASIDE DEFAULT AND**</u>
<u>**INCORPORATED MEMORANDUM OF LAW**</u>

H. William Wasden
Burr & Forman LLP
11 North Water St., Suite 22200
Mobile, AL 36602
Telephone: (251) 344-5151
Facsimile: (251) 344-9696
bwasden@burr.com

Devin C. Dolive
Ronald W. Flowers, Jr.
Burr & Forman LLP
420 North 20th St., Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100
ddolive@burr.com
rflowers@burr.com

Attorneys for Defendant Outokumpu Stainless USA, LLC

## Table of Contents

I. Facts and Procedural History ................................................................................................. 1

   A.   Introduction ..................................................................................................................... 1

   B.   Procedural background ................................................................................................... 3

   C.   OTK's good faith in the discovery process ................................................................... 4

II. Legal Standards ..................................................................................................................... 6

III. Argument .............................................................................................................................. 7

   A.   A default on liability does not permit the Court to find facts not alleged in the Third Amended Complaint and does not permit the Court to accept legal conclusions as true and to find "facts" inconsistent with the underlying pleadings and record. ...................... 7

      1.   OTK's "workweek" ................................................................................................ 8

      2.   OTK's "rounding" practices ................................................................................ 14

      3.   "Truing up" ........................................................................................................... 19

      4.   OTK's "production incentive" ............................................................................. 21

   B.   The Court's discovery sanctions here ignore the collective nature of this FLSA action and effectively convert this into an action with 276 individual Plaintiffs, notwithstanding that Plaintiffs' individual common-law claims should fail as a matter of law. ...................... 26

   C.   Default on liability and striking OTK's Answer is a draconian sanction that, on this record, exceeds discretion under both the Court's inherent authority and Rule 37. ......... 29

      1.   There was no "boon" to OTK on this record. .................................................... 32

      2.   "Death penalty" sanctions were inappropriate under Rule 37. ...................... 32

         a.   A review of the communications history demonstrates that any failure by OTK (as distinguished from Littler) to comply with the Court's Orders was because Littler did not adequately communicate with OTK. ........................................................... 32

         b.   OTK was not knowingly in violation of Court-ordered discovery obligation during the March 12, 2021 or April 13, 2021 hearings. ....................................................... 35

      3.   The Court should not justify "death penalty" sanctions under its inherent authority by imputing to OTK the apparent bad faith actions by Littler. ........................................... 40

         a.   OTK was unaware of Littler's multiple errors, omissions, and apparent falsehoods related to procuring documents from ADP. ...................................................... 41

         b.   Littler accurately characterized the need for ADP's help in producing documents in Excel format. ................................................................................................... 43

         c.   Littler's failure to pursue discovery needed to respond to summary judgment was prejudicial to OTK's interests. ................................................................................. 43

      4.   Lesser sanctions would have been sufficient. .................................................. 44

IV. Conclusion ........................................................................................................................... 47

Under Federal Rules of Civil Procedure 54(b) and 55(c), Defendant Outokumpu Stainless

USA, LLC ("OTK") moves the Court to reconsider and clarify its November 18, 2021 and

February 17, 2022 Orders (Docs. 344 & 351) and to vacate the entry of default as to the question

of liability and the striking of OTK's Answer (Doc. 228) to the Third Amended Complaint (Doc.

223).[1] In support of this Motion, OTK shows as follows:

## I. Facts and Procedural History

### A.   Introduction

Since the Court entered its November 18, 2021 Order, OTK has been rendered literally

defenseless to Plaintiffs' claims and has been left exposed to claims for catastrophic amounts of

damages.  OTK and its current counsel are acutely aware of the Court's concerns as reflected in

the November 18, 2021 Order, and it is with this in mind that OTK respectfully submits the

following arguments and authorities asking the Court to reconsider and clarify both its November

18, 2021 Order and the "additional guidance" the Court provided via its February 17, 2022 Order.

As a result of how Plaintiffs have positioned this case, the Court's Orders do not accurately

reflect (1) the facts that Plaintiffs now know were established through discovery; (2) Plaintiffs'

---

[1] The Court left undecided the amount of damages to award to Plaintiffs, so the Court's Order was not a final judgment. *See* 15A Wright & Miller, *Federal Practice & Procedure*, Jurisdiction § 3914.5 ("Entry of default also is not final, since it simply sets the stage for the further proceedings required to enter the judgment. … To be final, entry of a default judgment must not only determine liability but determine relief as well."). Further, at Court's hearing on December 15, 2021, OTK informed the Court and Plaintiffs' counsel of OTK's intent to seek reconsideration of the Court's November 18, 2021 Order. The parties originally discussed a briefing schedule based on a January 1, 2022 filing deadline, but the Court's December 17, 2021 provides: "The January 1, 2022, deadline discussed at the hearing for the filing of motions to reconsider the November 18, 2021 [Order], is suspended…. [T]he Court will enter a supplemental Order to attempt to further clarify for Defendant the scope and consequence of the default sanction entered against it. The parties will have twenty-one (21) days after the entry of that order to file any motions for reconsideration." (Doc. 346 at PageID #4726.) OTK considers the Court's February 17, 2022 Order to be the "supplemental Order" and is now filing the present Motion within 21 days of entry of that Order.

own factual allegations in the Third Amended Complaint (Doc. 223); or even (3) OTK's own efforts in responding to discovery. The Courts' Orders further fail to consider OTK's clean hands in relation to what the Court has found to be a mishandling of the ADP subpoena by OTK's former counsel operating under a conflict of interest.

OTK does not dispute that its previous counsel made false statements to the Court and that such conduct, in and of itself, is grave matter. But the Court has imposed the "death penalty" sanction of striking OTK's Answer, and the Court then goes beyond this already draconian sanction by making factual findings that cannot be supported by either (1) the factual allegations in the Third Amended Complaint or (2) the actual record evidence established through the discovery process and known to Plaintiff's counsel. Therefore, OTK asks the Court to reconsider and clarify its November 18, 2021 and February 17, 2022 Orders and to vacate the default entered against OTK accordingly.

Notably, OTK and its management personnel, in particular, Melissa Pledger and Dave Scheid, have not had an opportunity to state what actually transpired concerning discovery in this case. Instead, they have been at the mercy of allegations by Plaintiffs' counsel and ADP, with OTK's prior counsel (Littler Mendelson or "Littler") never adequately responding to those allegations. Littler's actions left OTK "in the dark" and undefended, which prejudiced the Court's findings, insofar as the Court heard only one side of the story.

The result is a failure of the adversarial process.  If the Court's Orders stand, OTK's employees risk losing beneficial pay policies—paid lunch breaks, incentive bonuses, night-shift premiums, vacation overtime pay, extra pay for holiday work, "step up" time, and more—because those policies could be rendered unworkable under Plaintiffs' complex and convoluted interpretations of the FLSA. One risk of the Court's default is that OTK cannot defend its pay

practices and therefore cannot reasonably maintain them in the future. The result could be the loss of OTK's ability to continue pay practices that result in wages (and more overtime pay) for its hourly manufacturing employees already much higher than anything the FLSA requires. Such a result would be contrary to the purposes of the FLSA. After hearing OTK's side of the story (from non-conflicted counsel), OTK respectfully submits that the Court should reconsider its Orders and vacate the default it entered based on Littler's conflicted conduct.

### B.      Procedural background

This case commenced in July 2018, first as individual action by three named Plaintiffs but later as a putative collective action under the FLSA. (*See* Docs. 1 & 16.) Discovery began in April 2019. (*See* Doc. 91.) In May 2019, the Court conditionally certified this matter as a collective action under the FLSA. (*See* Doc. 93.) The opt-in period ended in September 2019, but OTK accepted consents filed as late as January 2020. (*See* Doc. 173.) The Court's Order states that "the number is somewhat in dispute" (Doc. 344 at PageID # 4638), but the Court's record now shows that 276 individuals are currently part of this collective action. (*See* Doc. 363 at PageID #5626; *see also* Docs. 347 & 364 (withdrawals for Robert C. Davis & Brian S. Smith).)

The Court states that it counts five motions to compel discovery and two motions for sanctions by Plaintiffs. (Doc. 344 at PageID # 4632.) Plaintiffs filed their "Motion for Sanctions and/or Related Motion to Compel" (*see* Doc. 216) in June 2020, after approximately 13 months of discovery, and later purported to "renew" this same Motion in September 2020 a week before the close of discovery. (*See* Docs. 201 & 238.) The Court has further identified 12 Orders requiring OTK to produce information purportedly not produced (at least not in full) before the close of discovery. (*See* Doc. 344 at PageID # 4633.)

C.    <u>OTK's good faith in the discovery process</u>

Plaintiffs' counsel has been able to create the illusion that OTK's pay policies and records are in disarray because Littler failed to adequately respond to those allegations. The ideas promoted by Plaintiffs' counsel—such as that the "workweek" must correspond exactly to what is listed on a "Earnings Statement" and that every "day" and every "week" must start at midnight—are false and are incorrect as a matter of law.  Similarly false and incorrect as a matter of law is the fiction that OTK paid its employees their monthly production incentive as "lump sum" numbers that somehow failed to consider employees' overtime earnings. The Court only accepted the disastrous picture painted by the Plaintiffs' counsel following a lack of a substantive rebuttal by Littler.

OTK provides herewith declarations from Melissa Pledger and Dave Scheid, together with supporting documents, that establish that OTK diligently attempted to comply with Plaintiffs' counsel's endless requests for discovery in this case, producing pay records beyond those normally required in collective actions with representative discovery.[2] These declarations and the supporting documentation establish that pay and time records were, in fact, produced during discovery. At the end of the day, the primary "failing" was OTK's inability to meet the Plaintiffs unrebutted demands for documentation of adjustment to what ADP calls the "RROP" in Excel format, a commodity that OTK had no ability to provide. (*See* Ex. G, Pledger Decl. ¶¶ 37-38.) And, for that matter, Plaintiffs have now figured out how to address the "pay rates" as part of their damage calculations. (Doc. 362 at PageID #5594.)

---

[2] Soon after the Court had announced its intent to enter a default as to liability and OTK retained non-conflicted counsel, OTK sought leave to submit a brief on the sanctions issues. (*See* Doc. 328.) The Court denied OTK's request (*see* Doc. 329), meaning that OTK's side of the story (when represented by non-conflicted counsel) was never been heard before the Court entered its November 18, 2021 Order (Doc. 344).

While OTK freely admits that it is required to keep accurate records of pay, it is not required maintain or produce them in a non-native format preferred by Plaintiffs' counsel for easy use by him. Plaintiffs were never entitled to insist on this documentation only in Excel. Nevertheless, the declarations of Pledger and Scheid and the supporting documentation provided therewith demonstrate that OTK made every possible effort to obtain Excel spreadsheets from ADP. (*See* Ex. G, Pledger Decl. ¶¶ 17-40; Ex. H, Scheid Decl. ¶¶ 21-26.)

As ADP points out, Littler had a conflict of interest favoring ADP. (Doc. 300 at PageID #3793) Thus, Littler never put in this Court's record an explanation of OTK's efforts to obtain the Excel documents from ADP. Putting this in the record would have required contradicting ADP's court filings and crossing ADP. Further, OTK's conflicted counsel at Littler never even responded to ADP's briefing (*see* Doc. 317 at PageID # 4066 (noting the OTK never opposed ADP's motion for attorneys' fees)) and never pointed out to this Court that ADP had consistently taken the position that it could not provide the documents requested in Excel until it dramatically changed positions on the proverbial courthouse steps in March 2021. Only when ADP itself got non-Littler lawyers involved and was on the verge of being sanctioned itself did it find a way to offer up the requested documents in Excel.

Throughout all this, no one ever meaningfully defended OTK. Moreover, OTK was effectively kept "in the dark" as to what was actually occurring in this Court. Littler did not timely provide OTK with copies of ADP's court filings clearly addressing what ADP perceived as a conflict of interest and did not otherwise bring ADP's conflict arguments to OTK's attention. (*See* Ex. G, Scheid Decl. ¶ 34.) The record reflects that ADP alleged serious improprieties in the handling of the ADP subpoena, owing to a conflict of interest by Littler and Littler's unwillingness to cross ADP. (*See* Doc. 300 at PageID #3793.) If OTK had been informed of the conflict of

interest, OTK would have terminated its conflicted counsel sooner, and the Court may not have needed to enter any further sanctions.

## II. <u>Legal Standards</u>

Under Rule 54(b), district courts retain discretion to revisit any of their interlocutory decisions. *See* Fed. R. Civ. P. 54(b). The Eleventh Circuit does not appear to have issued a binding decision delineating the bounds of when a district court may exercise that discretion. But others have held that a district court's power to revisit an interlocutory decision is plenary—it is "free to 'reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)); *cf. also Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1327 (11th Cir. 2016) ("[T]he district court's change of heart between summary judgment and judgment as a matter of law is equally irrelevant. A 'prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict.'" (quoting *Gross v. S. Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971)). At minimum, a district court may do so for the same reasons it could grant relief under Rules 59 or 60(b). *See QBE Ins. Corp. v. Whispering Pines Cemetery, LLC*, No. CIV.A. 12-0054-KD-C, 2014 WL 2921908, at *3 (S.D. Ala. June 27, 2014). Thus, that includes at least clear error, manifest injustice, or "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

Under Rule 55(c), "the court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). "The Eleventh Circuit has explained that, in this context, '"good cause" is not susceptible to a precise formula.'" *Byrd v. City of Selma*, No. CV 21-0190-WS-B, 2021 WL 2870616, at *1 (S.D. Ala. July 8, 2021) (quoting *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1337 n.7 (11th Cir. 2014)). The "good cause" standard is "a 'mutable' standard that is intended to be 'liberal' but not

'devoid of substance.'" *Rodriguez v. Powell*, 853 F. App'x 613, 615 (11th Cir. 2021) (quoting

*Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948,

951 (11th Cir. 1996)). Relevant considerations include whether the default was the result of

culpable or willful conduct, prejudice to the adverse party, the existence of a meritorious defense,

and the strong policy in favor of determining cases on their merits. *See Rodriguez*, 853 F. App'x

at 615-16. Taken together, "the defaulting party … must offer a 'satisfactory reason' to set aside

the default." *Id.* at 616.

### III. <u>Argument</u>

A.   <u>A default on liability does not permit the Court to find facts not alleged in the Third Amended Complaint and does not permit the Court to accept legal conclusions as true and to find "facts" inconsistent with the underlying pleadings and record.</u>

"Federal law . . . requires a judicial determination of damages absent a factual basis in the

record." *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). "Although a

defaulted defendant admits well-pleaded allegations of liability, allegations related to the amount

of damages are not admitted by virtue of default. Rather, the Court determines the amount and

character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342

(M.D. Fla. 1999). "A court has an obligation to assure that there is a legitimate basis for any

damage award it enters." *Anheuser Busch, Inc.*, 317 F.3d at 1266.  "[A] court may award damages

'as long as the record contains evidence allowing the court to ascertain damages from

'mathematical calculations' and 'detailed affidavits.'" *Pastrana v. Level Up Fitness, LLC*, No. 21-

CV-21985, 2021 WL 5631776, at *3 (S.D. Fla. Dec. 1, 2021).

In pertinent part, the FLSA provides that a covered employer shall not:

> Employ any of his employees who in any workweek is engaged in commerce or in
> the production of goods for commerce ... for a workweek longer than forty hours
> unless such employee receives compensation for his employment in excess of the

> hours above specified at a rate not less than one and one-half times the regular rate
> at which he is employed.

29 U.S.C. § 207(a)(1). Accordingly, in order to state a claim for relief under the FLSA, Plaintiffs had simply to show "(1) [they were] employed by the defendant, (2) the defendant engaged in interstate commerce, and (3) the defendant failed to pay [them] minimum or overtime wages." *Freeman v. Key Largo Volunteer Fire Dept., Inc.*, 494 F. App'x 940, 942 (11th Cir. 2012).

Clearly, the element of injury—proof of actual uncompensated time worked—is a necessary element of Plaintiffs' burden of proof under the FLSA.  The Court cannot fill in these required elements for Plaintiffs and cannot go outside the record in doing so.

### 1.    OTK's "workweek"

Regarding Plaintiffs' workweek allegations, the Court lacks a legitimate basis for its determination that OTK's workweek should have begun at midnight on either a Sunday or a Monday. Objecting to the first 30 Plaintiffs' damage calculations here, OTK previously explained: "Plaintiffs' improper and arbitrary selection of a midnight start time for the workweek risks improperly splitting a shift worked in a single workweek into two different workweeks." (Doc. 363 at PageID#5636.) In overruling this objection, the Court has held that every "workweek" in this litigation must begin at midnight. (*See* Doc. 366 at PageID #5662, overruling OTK Objection No. 3.)

"A default judgment has the effect of establishing as fact the plaintiff's well-pleaded allegations of fact and bars the defendant from contesting those facts on appeal." *Alvarez v. Gregory HVAC LLC*, No. 8:19-CV-1826-CEH-JSS, 2021 WL 3857560, at *4 (M.D. Fla. Aug. 30, 2021) (quoting *De Lotta v. Dezeno's Italian Restaurant, Inc.*, No. 6:08-cv-2033-Orl-22KRS, 2009 WL 4349806, at *1 (M.D. Fla. Nov. 24, 2009)). In finding liability here, this Court first had to determine whether the Third Amended Complaint contained sufficient **well-pleaded** factual

allegations. Here, the Third Amended Complaint does **not** ever allege that OTK's workweek should have started **at midnight** on either a Monday or a Sunday. Thus, the Court's determination that workweek must begin at midnight is not supported by the allegations of any pleading.

Further, the Court's February 17, 2022 Order states: "[P]rior to January 28, 2019, the workweek began on a Monday and ended on a Sunday, according to Defendant's own records. Plaintiffs allege, in response to this action, Defendant changed the payroll data records so that the workweek began on Sunday and ended on Saturday." (Doc. 351 at PageID ##4746–4747 (citations omitted).) That, however, is **not** what the actual pay records show.

Pledger testified that the workweek started at 6:00 am on Sunday and ended at 6:00 am the following Sunday and that it had been that way since at least 2015. (Ex. A, Pledger Dep. 123:1–19.) To the extent that Plaintiffs rely on other portions of Pledger's Rule 30(b)(6) testimony, they are cherry-picking and taking her testimony out of its proper context. For example, Plaintiff William Heath Hornady testified that he also understood that the workweek started at 6:00 am on Sunday. (Ex. B, Hornady Dep. 91:11–22.) Other hourly employees agreed. (Ex. C, Stokes Dep. 72:10-21; 75:5-13; Ex. D, Wicker Dep. 38:11-15.) OTK's handbook and its offer letters to Plaintiffs also identify the workweek as running from 6:00 am Sunday to 5:59 am the following Sunday. (Doc. 202-2 at PageID ##2099, 2124-2133; *see also* Ex. H, Scheid Decl. ¶ 11.)

Plaintiffs' counsel—and, thus, this Court—would ignore the actual "pay-week" (workweek) that OTK used in calculating overtime payments and instead would blindly follow the dates listed on the internal "Pay Summaries" and the employees' own "Earning Statements." In this regard, in January 2019, it came to Pledger's attention through this litigation that the workweek was stated incorrectly on the "Administrative View" of OTK's ADP payroll software called "Workforce Now." (Ex. G, Pledger Decl. ¶¶ 41-42, 45, 49-52; Ex. H, Scheid Decl. ¶¶ 12-15.) The

date was changed in the ADP software to reflect the Sunday date for the payroll that started on Sunday, January 27, 2019 and ended on was Saturday, February 9, 2019. (Ex. G, Pledger Decl. ¶ 50.) This change did **not** change any days or any overtime paid to the employees, because those calculations are made in OTK's separate time-and-attendance software, "Enhanced Time." (*Id.*, Pledger Decl. ¶ 51.) Both of these programs are provided by ADP. (Ex. G, Scheid Decl. ¶¶ 5-6.) All calculations regarding the workweek are made in "Enhanced Time." The hours worked are then transferred to the payroll program, "Workforce Now," from "Enhanced Time." As Pledger testified: "The date change was on the payroll system, not the timekeeping system." (Ex. A, Pledger Dep. 215:9–16, 241:17–15.)

How this worked in practice can be seen by comparing Plaintiff Colin Hartery's May 11, 2018 ADP "Earnings Statement" placed in the record at Doc. 244–10 with his actual clock-in and clock-out data provided in Excel format by ADP as part of its March 2021 production of documents entitled "Time Detail – Excel Report." The "Earnings Statement" in the record purports to shows that, for the two-week "pay period" ending on "05/06/2018," OTK paid Hartery for 64 hours of "regular" time, 20 hours of "overtime," and 12 hours of "shift regular" time. (Doc. 244-10 at PageID # 2899.) The ADP "Time Detail" reports, in turn, shows Hartery's clock-ins and clock-outs as follows:

| First Workweek | | |
|---|---|---|
| **Date** | **In Punch** | **Out Punch** |
| Sunday, April 22, 2018 | -- | -- |
| Monday, April 23, 2018 | 5:30 AM | 6:01 PM |
| Tuesday, April 24, 2018 | 5:35 AM | 6:01 PM |
| Wednesday, April 25, 2018 | 5:41 PM | 6:01 AM |

| First Workweek | | |
|---|---|---|
| **Date** | **In Punch** | **Out Punch** |
| Thursday, April 26, 2018 | -- | -- |
| Friday, April 27, 2018 | 5:38 AM | 6:01 PM |
| Saturday, April 28, 2018 | 5:31 AM | 6:01 PM |

| Second Workweek | | |
|---|---|---|
| **Date** | **In Punch** | **Out Punch** |
| Sunday, April 29, 2018 | 5:35 AM | 6:01 PM |
| Monday, April 30, 2018 | -- | -- |
| Tuesday, May 1, 2018 | -- | -- |
| Wednesday, May 2, 2018 | 5:43 AM | 6:01 PM |
| Thursday, May 3, 2018 | 5:42 AM | 6:01 PM |
| Friday, May 4, 2018 | -- | -- |
| Saturday, May 5, 2018 | -- | -- |

(Ex. I, Amidon-Johannson Decl. ¶ 11.)[3]

For all of these days, OTK paid Hartery by "rounding" his time down as if he had punched both in and out at shift start and end times (i.e., either 6:00 am or 6:00 pm, depending on the shift)—this "rounding" is discussed in more detail the next section below.

---

[3] OTK is cognizant that the Court previously set a deadline of August 5, 2020 for OTK to disclose any experts. (Doc. 201 at PageID #2031.) OTK is offering Amidon-Johansson's declaration merely to assist the Court in understanding what OTK's records and ADP's records show.

After "rounding," this means that, in the first workweek reflected in the "Earnings Statement" at Doc. 244-10, PageID # 2899, OTK paid Hartery for 12 hours of "regular" time on both Monday, April 23 and Tuesday, April 24, as if he had worked from 6:00 am to 6:00 pm each of those days. Then, for the night "shift" that Hartery worked starting at 6:00 pm on Wednesday, April 25, 2022, OTK paid him for 12 hours of "shift" time (a $0.50 premium over his "base" pay). That brought the total hours Hartery worked for shifts starting on April 23 through April 25 to 36 hours (i.e., 12 + 12  + 12). The next shift he worked started at 6:00 am on Friday, April 27 and would bring him over 40 hours in the workweek, making him eligible for overtime. The first 4 hours he worked on this shift were "regular" time, but he then worked 8 hours of overtime that shift, plus another 12 hours of overtime starting at 6:00 am on Saturday, April 28. These two days account for the 20 hours of "overtime" showing on his "Earnings Statement."

In the second workweek, he worked only 36 hours, after "rounding" down to shift start and end times (i.e., 12 hours on Sunday, April 29; 12 hours on Wednesday, May 2; and 12 hours on Thursday, May 3).

How Hartery was paid for each of these workweeks is shown below:

| Date | "Regular" Hours | "Shift Regular" Hours | "Overtime" Hours |
|---|---|---|---|
| **First Workweek** | | | |
| Sunday, April 22, 2018 | -- | -- | -- |
| Monday, April 23, 2018 | 12 | -- | -- |
| Tuesday, April 24, 2018 | 12 | -- | -- |
| Wednesday, April 25, 2018 | -- | 12 | -- |
| Thursday, April 26, 2018 | -- | -- | -- |

| Date | "Regular" Hours | "Shift Regular" Hours | "Overtime" Hours |
|---|---|---|---|
| Friday, April 27, 2018 | 4 | -- | 8 |
| Saturday, April 28, 2018 | -- | -- | 12 |
| **Second Workweek** | | | |
| Sunday, April 29, 2018 | 12 | -- | -- |
| Monday, April 30, 2018 | -- | -- | -- |
| Tuesday, May 1, 2018 | -- | -- | -- |
| Wednesday, May 2, 2018 | 12 | -- | -- |
| Thursday, May 3, 2018 | 12 | -- | -- |
| Friday, May 4, 2018 | -- | -- | -- |
| Saturday, May 5, 2018 | -- | -- | -- |
| Sunday, May 6, 2018 | -- | -- | -- |
| **Pay Period Totals**: | **64** | **12** | **20** |

(Ex. I, Amidon-Johannson Decl. ¶ 13.)

Critically, none of this supports the Court's findings—based on Plaintiffs' misleading pleading—that "the workweek is dictated by the shift and is not a fixed, 168-hour period." (Doc. 344 at PageID #4643.) Pledger testified that "Pay is driven by shift start time and date," but she also was clear that OTK calculates its employees' overtime "based on a seven-day period …." (Ex. A, Pledger Dep. 122:18–23; 131:13–23.) OTK's choice to define its workweek based on the beginning on the first shift starting on a Sunday morning does **not** establish that OTK is using something other than a fixed 168-hour period, especially since, outside the Melt Shop, this first shift always starts at 6:00 am on Sunday. As Pledger testified regarding the two-week pay periods:

"Pay periods always started on Sunday and ended with the **night shift** on Saturday." (Ex. A, Pledger Dep. 149:14–20 (emphasis added).) The "night shift" on Saturday carries over until Sunday morning, when the new pay period (and workweeks) start at 6:00 am. Pledger testified that "Saturday ends the pay week" and that the "pay week" ends on "Sunday morning at 6 a.m. because the shift started on Saturday night at 6:00 p.m." (*Id.*, Pledger Dep. 217:13–218:2.)

OTK's record references to a "pay-week" beginning at 6:00 am on Sunday and ending at 5:59 am the following Sunday (*see* Doc. 202-2 at PageID ##2099, 2124–2133) are not mutually exclusive with Pledger's testimony that "Pay is driven by shift start time and date." The Court's Orders risk creating an artificial "either-or" dichotomy when it is really a "both-and" situation. Thus, for example, the Court's November 18, 2021 Order says, "[t]he workweek either ends at 6:00 am on Sunday morning, or if an employee is nearing the end of a shift at that time, the workweek ends when the employee clocks out of the overnight Saturday shift." (Doc. 344 at PageID #4643.) It will always be "nearing the end of a shift" as the clock approaches 6:00 am on a Sunday, and if an employee clocks out before 6:00 am, there will be no effect on the employees' pay. In those rare circumstance where an employee clocks out at 6:30 am, rather than 6:00 am, after working the 12-hour shift starting at 6:00 pm on a Saturday, the result of that would likely be a higher overtime payment. However one looks at OTK's 7-day, 168-hour workweek, OTK has not used its workweek to underpay overtime.

## 2.   OTK's "rounding" practices

The Court's February 17, 2022 Order explains, regarding OTK's "rounding" practices: "According to Plaintiffs, Defendant employed two rounding policies during the time period covered by this suit. The first rounding policy automatically rounded employees' clock-ins and outs, up and down, by thirty minutes." (Doc. 351 at PageID # 4744.) The Court's November 18,

2021 Order thereafter finds that OTK was "rounding down" by up to 30 minutes following both the beginning and end of each employee's shift.  (Doc. 344 at PageID # 4644.)

However, with regard to Plaintiffs' pleadings, the Court's Orders were only partially correct. Respectfully, the Court's Orders should be corrected and clarified accordingly.

In paragraph 11 of the Third Amended Complaint (Doc. 223), Plaintiffs maintain that, before May 2018, their clock-in times could occur up to 30 minutes before the start of their shift and would be "rounded" down to the shift start time. Thus, a Plaintiff clocking in at 5:30 am for a shift starting at 6:00 am would be paid as if she had started work at 6:00 am (the shift start time) and not at 5:30 am (the clock-in time). Likewise, Plaintiffs themselves maintain in Third Amended Complaint paragraph 11 that, before May 2018, their clock-out times could occur **up to 15 minutes after** the end of their shift and would also be "rounded" down to the shift end time. Thus, a Plaintiff clocking out at 6:15 pm for a shift ending at 6:00 pm would be paid as if she had stopped work at 6:00 pm (the shift end time) and not at 6:15 pm (the clock-out time).

In other words, based on their clock-in and clock-out times, Plaintiffs could, before May 2018, have as many as 45 minutes (0.75 hours) for which they were not paid on each shift. Remarkably, the Court's November 18, 2021 Order disregards the allegations in paragraph 11 of the Third Amended Complaint and instead finds that clock-outs times, like the clock-in times, were also subject to rounding down by up to 30 minutes, such that "if an employee clocked out at 6:30 pm, the time was rounded down to 6:00 pm." (Doc. 344 at PageID #4644.) Neither the allegations in the Third Amended Complaint nor the record would support such a finding. Instead, when Plaintiffs' counsel arguably tried to "trick" Pledger during her deposition into saying that there could be a 30-minute "rounding" after shift-end, Pledger quickly corrected him:

> Q.     And if the employee clocked out at 6:29, the system automatically rounded
> down to 6:00, correct?

> A.    There wasn't a 30 minute round on the punch-out. It was either a 10 or a 15 on the clock-out.

(Ex. A, Pledger Dep. 93:6–10.) The Court will therefore need to correct and clarify its November 18, 2021 Order in light of the record evidence (and pleading in the Third Amended Complaint) establishing that the "rounding" after clock-out did not exceed 15 minutes.

None of this was part of some coordinated and conscious effort by OTK to underpay its employees. Rather, one reason that OTK provided a "grace period" that allowed its employees to clock-in up to the 30 minutes before the start of a scheduled shift was due to the previous walking distance between the parking lot and the time clocks. Many employees would have to walk significant distances from the time clock to their respective work stations. Thereafter OTK added parking lots closer to where employee worked, but even so, before May 2018, there were only a dozen or so time clocks in the entire facility. (Ex. A, Pledger Dep. 205:22–207:8.) Plaintiff William Heath Hornady testified that, before 2016, the distance between the time clock and his work station was nine-tenths of a mile and that after 2016 the distance was more like 40, 50, or 60 yards. (Ex. B, Hornady Dep. 26:13–28:23.)[4]

In part as a result of placing time clocks closer to the various work stations, in May 2018, OTK reduced the "grace period" during which employees could clock in before the start of a shift from 30 minutes to 7 minutes and reduced the "grace period" during which employees could clock after the end of a shift from 15 minutes down to 7 minutes. Thus, according to paragraph 12 of the Third Amended Complaint (Doc. 223), Plaintiffs maintain that, after May 2018, their clock-in times could occur up to 7 minutes before the start of their shift and would be "rounded" down to the shift start time. Plaintiffs allege that a Plaintiff clocking in at 5:53 am for shift starting at 6:00

---

[4] Portions of Hornady's testimony were previously placed in the record at Docs. 258-5 and 263-2. A portion of the cited pages can be found at Doc. 258-5, PageID ## 3211-3212.

am would be paid as if she had started work at 6:00 am (the shift start time) and not at 5:53 am (the clock-in time).  Likewise, Plaintiffs maintain that, after May 2018, their clock-out times could occur up to 7 minutes after the end of their shift and would also be "rounded" down to the shift end time.  Thus, a Plaintiff clocking out at 6:07 pm for a shift ending at 6:00 pm would be paid as if she had stopped work at 6:00 pm (the shift end time) and not at 6:07 pm (the clock-out time).  In other words, based on their clock-in and clock-out times, Plaintiffs allege that, after May 2018, they could have as many as 14 minutes (0.2333 hours) for which they were not paid on each shift.

The Court addresses this in its February 17, 2022 Order by explaining: "During the pendency of this lawsuit, Defendant amended its policy to round down by seven minutes rather than thirty." (Doc. 351 at PageID #4744.) Scheid testified that OTK changed to 7-minute "rounding" (after installing additional time clocks) following the advice of counsel. (Ex. E, Scheid Dep. 173:11–175:18; 236:23–237:5.)[5] Moreover, since the start of the COVID-19 pandemic, OTK has also allowed employees to clock in using an "app" on their phones. (Ex. F, Belcher Dep. 23:15–21.)[6]

In any event, without the Court's default ruling, Plaintiffs cannot prove that they performed any work for which OTK did not pay them. For example, some lines stopped operating during "lunch" on each shift (usually for 30 minutes) and that no work was performed during this "lunch." (Ex. C, Stokes Dep. 59:16–60:1.)[7] The Court, however, has now overruled OTK's objections to

---

[5] Portions of the Scheid's transcript were placed in the record at Doc. 187-2. A portion of the cited pages can be found at Doc. 187-2 at PageID ## 1417-1419.

[6] Portions of Emily Belcher's transcript were placed in the record at Doc. 258-3, though this does not appear to have included the cited pages.

[7] Portions of Martin Stokes's transcript were placed in the record at Docs. 258-2 and 263-4, though this does not appear to have included the cited lines.

the first 30 Plaintiffs' damage calculations and has held that OTK cannot rely on its paid "lunch" in this litigation. (*See* Doc. 366 at PageID #5662, overruling OTK Objection No. 7.)

How this matters can be seen in the example of Plaintiff Colin Hartery's May 11, 2018 ADP "Earnings Statement" placed in the record at Doc. 244-10, PageID #2899, and discussed above in the context of the "workweek." This Earnings Statement was for a period just before OTK changed its maximum 45-minute "round" to a maximum seven-minute round in May 2018. This Earnings Statement shows that Hartery was paid for a total 96 hours in a two-week "pay period," with the 96 hours breaking down as follows: 64 "regular" hours; 12 "shift regular" hours; and 20 "overtime" hours. (Doc. 244-10 at PageID #2899.) Or, stated differently, Hartery, in this two-week period, worked eight 12-hour shifts (and eight times 12 hours equal 96 hours—which further breaks down to seven "day" shifts and one "night" shift). However, the document ADP produced in Excel format as part of its March 2021 production of documents and entitled "Time Detail – Excel Report" shows that Hartery had "Out Punch" time every day at 6:01 (which was "pm" for his seven "day" shifts and "am" for his one "night" shift). (Ex. I, Amidon-Johannson Decl. ¶ 11.) His "In Punch" time ranges from as early as 5:30 (on Monday, April 23, 2018) to as late as 5:43 (on Wednesday, May 2, 2018). (*Id.*, Amidon-Johannson Decl. ¶ 11.) All of this time, however, was "rounding" to an even 6:00 (am or pm) in paying Hartery. If measured minute-to-minute, during this two-week "pay period," Hartery was clocked in for 99.2167 hours, not the even 96 hours OTK paid him for. But, if Hartery's clocked-in time is considered in light of a 30-minute "lunch" break for each of his 12-hour shifts, this 99.2167 hours becomes 95.2167 hours. If "lunch" is considered, OTK actually paid Hartery **for more time** than he claims to have worked. (*Id.*, Amidon-Johannson Decl. ¶ 14.)

The Court's default ruling and decision not to consider Plaintiffs' paid "lunches" means that OTK has effectively been left "defenseless." At a minimum, though, even with the default and even without considering the paid "lunch" breaks, it is respectfully submitted that the Court should correct clarify its Orders (Doc. 344 at PageID # 4644; Doc. 351 at PageID # 4744) to make the clear that maximum "round" at the end of a shift before May 2018 was 15 minutes, not 30 minutes.

### 3.     "Truing up"

Much of the Court's decision to enter sanctions has to do with Pledger's testimony on the so-called "true up" and on Littler's apparent decision to "scapegoat" Pledger here. (*See* Doc. 344 at PageID ##4700–4702.) However, in light of the Court's subsequent ruling on OTK's objections to the first 30 Plaintiffs' damage calculations, it seems that the "true up" will not form part of Plaintiffs' damage calculations. (*See* Doc. 366 at PageID #5662, granting OTK Objection No. 2.)

The fact that the "true up" does not impact damage calculations makes sense. As OTK foreshadowed in its November 9, 2020 Court filing (*see* Doc. 267 at PageID #3513), ADP's document production has since revealed that no "true up" payments were paid to employees at a later date. Plaintiffs' counsel now has the ADP records himself and knows this.

The confusion on this issue arose from a miscommunication between Pledger and an ADP representative. Before her Rule 30(b)(6) deposition in this case, Pledger was involved in a 401(k) audit at OTK in which an ADP representative participated. (Ex. G, Pledger Decl. ¶ 13.) During that audit, the process for accounting for the "RROP" when employees received step-up pay was discussed. Pledger recalled that the ADP representative advise that there was a "true-up" process whereby ADP's software made adjustments to the RROP. (*Id.*, Pledger Decl. ¶ 14.) Thus, Pledger testified: "Our payroll system calculates a regular rate of pay the following month. Our look-back period is a month," and "[I]t's built into our payroll system that the payroll provider trues up the regular rate of pay, the first pay of the month for the previous month. And then it's divided across

that first pay of the next month." (Ex. A, Pledger Dep. 38:6–20.) She likewise testified: "It's done the month after we true up with what's called a regular rate of pay … is paid at the month end. So the first pay of the next month is when it's paid." (*Id.*, Pledger Dep. 45:5–16.)

Notwithstanding this testimony, Pledger was subsequently advised through conversations with ADP facilitated by Littler that adjustments to "RROP" for night shifts, step-up work and holidays is calculated into each workweek or pay period, not at the beginning of each month. (Ex. G, Pledger Decl. ¶ 15.) Further, as OTK has pointed out that, out of the first 30 Plaintiffs, only seven of them ever worked "step ups." (Doc. 363 at PageID #5632.) Assuming that these first 30 Plaintiffs are representative of the collective of 276 Plaintiffs, "step ups" are not a significant issue.

How this works in practice can be seen in the example of Plaintiff Colin Hartery's May 11, 2018 ADP "Earnings Statement" placed in the record at Doc. 244-10, PageID #2899, and discussed above in the context of the "workweek" and "rounding." Notably, this Earnings Statements is for the first paycheck of the month, so if "true ups" happened at the beginning of the month using the past month's numbers, that would have been reflected here. It was not—for the simple reason that adjustments to "RROP" for night shifts, step-up work and holidays is calculated into each workweek or pay period, not at the beginning of each month.

Like most of the Earnings Statements, there are no step-ups to consider in pay period shown on Hartery's May 11, 2018 Earnings Statement. This Earning Statement lists Hartery's "regular" rate as "32.3400" an hour and his "shift regular" rate as "32.8400" an hour—reflecting the $0.50 per hour premium that OTK paid the "night" shift. However, OTK paid Hartery's 20 "overtime" hours at the listed rate of "48.5415." This "overtime" rate is **neither** 1.5 times his "regular" rate (i.e., 1.5 times $32.34 equals $48.51) **nor** 1.5 times his "shift regular" rate (i.e, 1.5 times $32.84 equals $49.26). (Ex. I, Amidon-Johannson Decl. ¶ 16.) Instead, the paid rate for "overtime" of

$48.5415 is in between the "day" overtime rate of $48.51 and the "night" overtime rate of $49.26. Thus, it is the "true up" that might have explained how OTK had arrived at $48.5415 an hour for Hartery's "overtime" in that pay period, but if Plaintiffs think the rates were computed incorrectly, they already have what they need to run any damage calculations. So, at this stage of proceedings, the so-called "true up" should be a non-issue.

### 4.    OTK's "production incentive"

The Court's February 17, 2022 Order explains the basis for Plaintiffs' claims here as follows: "Plaintiffs alleged overtime is not paid correctly either during the calendar month within which the metrics are gathered or on the more recent wages to which the percentage is applied.  In sum, Plaintiffs allege the math never works out and the overtime wages earned during the bonus period should be recalculated."  (Doc. 351 at PageID #4753.)

However, as OTK previously explained in objecting to the first 30 Plaintiffs' damage calculations here (*see* Doc. 363 at PageID #5645), Plaintiffs have made no effort to "recalculate" the monthly bonus using the monthly percentages that OTK actually applied, nor have Plaintiffs shown the math "never works out" in way that led to any underpayment of overtime for any Plaintiff. Instead, Plaintiffs improperly seek to treat every month's bonus as a "lump sum" payment and ignore OTK's bonus percentages entirely. Plaintiffs now run computer programs in support of claims that, for example, use the production incentive to artificially increase Plaintiff Richard Ainsworth's base hourly rate in July 2019 from $27.43 to $37.53. (*See* Doc. 357-1 at PageID # 4905.)

The fact that Plaintiffs are running these computer programs to re-calculate their hourly rates, in, for example, 2019, by as little as $2.04 an hour or as much as $10.10 an hour (as in the case of Ainsworth, discussed above) shows that Plaintiffs are not missing any documentation they seek regarding the production incentive. (*See* Doc. 363 at PageID # 5646.) Nevertheless, the

Court's November 18, 2021 Order draws attention to the issue of "the incentive plan documents which Scheid had testified was in his email account." (Doc. 344 at PageID # 4685.) OTK does not know why Littler did not produce these e-mails in Scheid's account, but many of these e-mails have been produced as part of the separate FLSA litigation brought by an individual plaintiff in this Court and styled *Bradly Gibson v. Outokumpu Stainless USA, LLC*, No. 1:21-cv-00103-JB-N. Scheid's e-mails were, most recently, the subject of Sur-Reply that OTK filed that that case at ECF No. 44. The e-mails have been produced (for the time periods at issue in Gibson's FLSA claims). But, as OTK has previously argued in the present case, it is unclear why they matter. As OTK has already explained to this Court, the spreadsheets previously produced to Plaintiffs "**indicate the time for the Defendant's bonus in the title—'Monthly.'** Further, each spreadsheet identifies which *month* the results are for and the total payout percentage for the month, which is the only information that affects the team members' incentive pay/bonus." (Doc. 181 at PageID #1143.)

Moreover, the FLSA does not dictate the manner in which an employer awards a bonus. It only governs the requirement of paying overtime attributable to the bonus. OTK has decided to pay a production incentive based on the total wages paid each month. The bonus is calculated based on the percentage of both regular and overtime wages paid each month, and is paid each month, so every pay period is covered by the production incentive the month after the paycheck is issued for the pay period. As the bonus constitutes a percentage of regular and overtime pay received by the employee during the month, it complies squarely with 29 C.F.R. § 778.210.

Plaintiffs' argument essentially challenges OTK's business decision to pay a bonus as a percentage of regular and overtime pay received by the employee each month instead of the time worked each month. However, the FLSA does not regulate OTK's decision regarding the method of inclusion of pay periods within the bonus period. The FLSA requires only that, if the bonus is

calculated as a percentage of the employee's pay, an equal percentage of both regular and overtime pay must be included in the percentage calculation. *See* 29 C.F.R. § 778.210.

The cases the Court cites in its February 17, 2022 Order support OTK's position, not Plaintiffs' position. For example, the Court relies on *Russell v. Gov't Emps. Ins. Co.*, No. 17-CV-672 JLS (WVG), 2018 WL 1210763, at *3-4 (S.D. Cal. Mar. 8, 2018), *aff'd*, 787 F. App'x 953 (9th Cir. 2019). (*See* Doc. 351 at PageID #4752.) There, the court rejected an argument similar to Plaintiffs' allegations (and the Court's determination) here by finding that the plaintiff's "argument ignores the distinction between sections 778.209 and 778.210.  Section 778.210 is an alternative to section 778.209 and Defendant need only fit under one of the two sections." *Id.* "Alternatively, an employer can calculate overtime compensation without relying on the regular rate: § 778.210 permits employers to satisfy FLSA's overtime compensation requirements by calculating the bonus as a 'percentage of total earnings' by multiplying the employee's pay by the same fixed percentage of both the employee's straight-time earnings and overtime earnings." *Id.*, at *3.

Here, it is not disputed that OTK calculated bonuses for Plaintiffs based on the regular and overtime earnings that were actually paid to the employee in the previous month. As a result, under *Russell*, section 778.210, and not 778.209, applies. Nothing in section 778.210 requires that the percentage bonus be included in the regular rate or apportioned over the period it is "earned":

> In some instances the contract or plan for the payment of a bonus may also provide for the simultaneous payment of overtime compensation due on a bonus.  For example, a contract made prior to the performance of services may provide for the payment of additional compensation in the way of a bonus at the rate of 10 percent of the employee's straight-time earnings, and 10 percent of his overtime earnings. In such instances, of course, payments according to the contract will satisfy in full the overtime provisions of the Act and no recomputation will be required.

29 C.F.R. § 778.210.  Unlike section 778.209, section 778.210 does not require that the bonus be recalculated into the regular rate over the period it was earned. Instead, if the bonus constitutes a percentage of straight-time and overtime earnings from particular paychecks, it satisfies the

regulation. Neither Plaintiffs nor the Court have cited any authority which holds otherwise, contradicting the plain language of the regulation.

The other case relied on in the Court's February 17, 2022 Order is also inapposite. *Barragan v. Home Depot U.S.A., Inc.*, No. 3:19-cv-01766, 2021 WL 3634851 (S.D. Cal. Aug. 17, 2021), holds:

> [A]n employer is not liable for additional overtime pay when they offer 'percentage-based bonuses.' A 'percentage-based bonus' is one in which the employer will award a bonus calculated as a percentage of an employee's total wages (regular pay plus overtime pay). If an employer grants a bonus to an employee as a percentage of total pay, the employer increased both the regular rate of pay and the bonus pay by the same percentage. Under a 'percentage-based bonus,' there is no need for an employer to recalculate the regular rate on which overtime pay must be based, because the employer has already accounted for an increase in overtime pay.

(Doc. 351 at PageID #4751 (citing *Barragan*, 2021 WL 3634851, at *6–8).) Here, OTK's production incentives meet all the requirements of "percentage-based bonuses" described by the *Barragan* court. Nowhere does *Barragan* state that the percentage-based bonus must cover totalpay over the period of which it is earned, not which it is paid. Rather, to satisfy section 778.210, it must simply constitute the same percentage of both regular and overtime pay for the same period of time. Thus, *Barragan* found that Home Depot did not award a "percentage-based bonus" under section 778.210, not because the bonus did not cover all the time in which it was earned, but because it was a $100 payment and not a percentage of regular and overtime pay. *Id.*, at *6. A bonus cannot be "percentage-based" when it is a flat $100 payment.[8]

---

[8] The *Barragan* court makes this exact holding: "[t]he parties are in agreement that the bonuses that exceeded $100 were 'percentage-based' bonuses in which no overtime premium owed.… Therefore, Home Depot cannot be held liable for the bonus payments over $100 because they are properly calculated as a percentage of an employee's regular and overtime earnings, in accordance with 29 C.F.R. § 778.210." *Barragan*, 2021 WL 3634851, at *7.

The other cases cited by the Court do not support its conclusion that OTK's bonus payments are not compliant with 29 C.F.R. § 778.210. *Weninger v. General Mills Operations, LLC*, 344 F. Supp. 3d 1005 (E.D. Wisc. 2018), addresses whether an employer may comply with section 778.210 when it excludes certain bonus payments from the total regular pay on which the percentage-based incentive is calculated. *Weninger* does not hold that an employer is prohibited under section 778.210 from calculating a percentage bonus based on the pay received in the month rather than the pay "earned" during the month. *Weninger* does not even include specifics regarding the pay periods covered by the employer's semi-annual Wage Incentive Bonuses. *See id.* at 1008-09. *Brock v. Two R Drilling Co.*, 789 F.2d 1177 (5th Cir. 1986), holds that section 778.210 applies to conditional as well as unconditional bonuses and remands the case for the district court to determine whether the bonus paid by the employer was in fact a percentage-based bonus, when flat payments were made under some circumstances. *See id.* at 1080-81 ("A conditional bonus 'based on a percentage of total wages,' no less than an unconditional one, 'increases both straight time and overtime wages by the same percentage,' which is the rationale for the percentage bonus rule as stated in section 778.503."). Neither Plaintiffs nor the Court have cited any cases finding that a percentage-based bonus like that paid by OTK to all of the regular and overtime wages paid during the month does not comply with section 778.210.

The FLSA is not a "gotcha" mechanism. Plaintiffs cannot possibly allege that they lose overtime pay in the long run because OTK calculates its percentage-based bonus based on the regular and overtime pay received by the employee during the month rather than the regular and overtime pay worked by the employee during the month. During some months, employees will receive more pay under OTK's practices than if calculated based on the regular and overtime worked in the month, and some months they may receive less. The amounts should even out over

time. Plaintiffs seek a windfall from an employer that has paid a bonus that squarely complies with the language of section 778.210.

Scheid testified that OTK received advice from counsel and concluded that OTK's bonus practices were in compliance with the law. (Ex. E, Scheid Dep. 165:15–166:1.)[9]  Littler's advice there was consistent with the case law discussed above. Here, there is no dispute that OTK's bonus was a percentage of the regular and overtime pay received in the previous month and not a flat, "lump sum" payment. The Court's decision, in overruling OTK's objection here (*see* Doc. 366 at PageID #5662, overruling OTK Objection No. 5) is inconsistent with this case law and should be corrected and clarified.

**B.**    **The Court's discovery sanctions here ignore the collective nature of this FLSA action and effectively convert this into an action with 276 individual Plaintiffs, notwithstanding that Plaintiffs' individual common-law claims should fail as a matter of law.**

In FLSA collective actions, class discovery is typically conducted to a representative portion of the collective. Courts routinely limit discovery "to a representative sample of opt-in plaintiffs in FLSA actions." *Scott v. Bimbo Bakeries USA, Inc.*, No. CIV.A. 10-3154, 2012 WL 6151734, at *5 (E.D. Pa. Dec. 11, 2012); *accord Sandlin v. Grand Isle Shipyard, Inc.*, No. CV 17-10083, 2018 WL 2065595, at *10 (E.D. La. May 3, 2018) ("[R]epresentative discovery and testimony is frequently permitted in FLSA collection [*sic*] action[s]");  *Nelson v. Am. Standard, Inc.*, No. 208-CV-390-TJW-CE, 2009 WL 4730166, at *2–3 (E.D. Tex. Dec. 4, 2009) (limiting discovery to named plaintiffs and randomly selected seven percent of opt-in class of FLSA party plaintiffs). Limiting discovery from both plaintiffs and defendant to a representative sample of the opt-in class is proper and preferable, and it serves the purposes of the collective-action mechanism.

---

[9] Portions of Scheid's transcript were placed in the record at Doc. 187-2. A portion of the cited lines can be found at Doc. 187-2, PageID 1409.

*See, e.g., Sutton v. Diversity at Work Grp. Inc.*, No. 1:20-CV-00682, 2021 WL 2334488, at *3 (S.D. Ohio June 8, 2021) (finding that numerous courts have recognized the value of "statistically significant" samples in representative discovery" in FLSA cases).

On the other hand, courts typically hold that requiring full discovery production for all opt-in plaintiffs in a collective action class undermines the purpose and utility of collective actions. *See, e.g., Cranney v. Carriage Servs., Inc.*, No. 2:07-CV-01587-RLHPAL, 2008 WL 2457912, at *3 (D. Nev. June 16, 2008) (authorizing discovery of 10% of opt-in plaintiffs and observing that to permit the "full scope of discovery authorized by the Federal Rules of Civil Procedure would undermine the purpose of conditionally certifying a collective action and would be unreasonably burdensome and wasteful of the parties' and the court's resources."); *see also Wellens v. Daiichi Sankyo Inc*, No. C-13-00581-WHO (DMR), 2014 WL 7385990, at *3 (N.D. Cal. Dec. 29, 2014); *Goodman v. Burlington Coat Factory Warehouse Corp.*, 292 F.R.D. 230, 234 (D.N.J. 2013). In this case, requiring OTK to produce all its time and pay records undermines the utility and purpose of a collective action. If all Plaintiffs participate fully in discovery, why is the collective action mechanism needed?

Here, Plaintiffs never argued that OTK had failed to produce all time and pay documents for a statistically-significant representative sample at the time of the filing of their "Motion for Sanctions and/or Related Motion to Compel" (Doc. 216). If Plaintiffs had been running their damage calculations using a representative sample, the need for Excels (as opposed to the .pdf files OTK knew how to run in the ADP software) would not have been nearly as acute as in the case of Plaintiffs' attempt to run damage calculations 276 separate times.

The fact that this is now no longer an FLSA collective action but instead an action with 276 individual Plaintiffs is confirmed by the Court's February 17, 2022 Order addressing

Plaintiffs' "unjust enrichment" claims at common law. (Doc. 351 at PageID ##4757–4760.) Those non-FLSA claims were never certified for collective treatment, and Count II of the Third Amended Complaint purports to bring claims on behalf of "All Plaintiffs." (Doc. 223 at PageID ##2657–2658.) In fact, Plaintiffs plead, in paragraph 46.1 of their Third Amended Complaint, that "each of their state law claims is properly joined herein pursuant to Fed. R. Civ. P. 18 and 20." The Court's November 18, 2021 and February 17, 2022 Orders have effectively converted the case from an FLSA collective action into an action with 276 individual Plaintiffs.

Moreover, were it not for the striking of OTK's Answer (and, in particular, its Sixteenth Defense—*see* Doc. 228 at PageID # 2693), Plaintiffs' state-law claims for the "regular rate" hourly pay on minutes "rounded" in weeks in which they worked fewer than 40 hours would be preempted by the FLSA. *See Bujalski v. Kozy's Rest., Inc.*, No. 7:13-CV-01446-MHH, 2017 WL 57344, at *5 (N.D. Ala. Jan. 5, 2017). The *Bujalski* court noted that because each plaintiff's claim was "premised" on the defendant's "alleged failure to compensate the plaintiffs for their work at Kozy's—a requirement imposed by the FLSA—the FLSA preempts the plaintiffs' state law claims." *Id.* Without the FLSA, there is no requirement that OTK pay Plaintiffs on an hourly basis at all, and these Plaintiffs were all well-compensated, bringing in, on average, $78,396.15 per year by 2020. (Ex. H, Scheid Decl. ¶ 42.)

Further, although Plaintiffs plead in paragraph 16.3 of the Third Amended Complaint that would "make relief" before the start of shift, they do not plead that they were required to do so, and they do not plead factual matter sufficient to allow the Court to conclude that OTK was "unjustly enriched" by any "make relief" minutes. (*See* Doc. 223 at PageID #2644.) Therefore, the Court should reconsider its findings that OTK was "unjustly enriched" through "rounding" down Plaintiffs' time to the shift start and end times.

C.      **Default on liability and striking OTK's Answer is a draconian sanction that,
on this record, exceeds discretion under both the Court's inherent authority
and Rule 37.**

In its November 18, 2021 Order, the Court indicated that it relied on both its inherent

authority and Rule 37 to sanction OTK. (Doc. 344 at PageID #4654 & n.14.) To be sure, the Court

has power to impose sanctions under both its inherent authority and its Rules-based power to

control discovery. That power extends to case- or claim-terminating sanctions, under the

appropriate circumstances.

But courts have recognized that "death penalty" sanctions—default, dismissal, and the

striking of a defendant's answer—are categorically more severe sanctions than the other sanctions

a court may order. They are draconian sanctions of last resort. *See Chudasama v. Mazda Motor

Corp.*, 123 F.3d 1353, 1371–72 (11th Cir. 1997). Such sanctions are heavy punishment,

appropriate under only extreme circumstances. *See, e.g.*, *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380

(5th Cir. 1994); *Griffin v. Aluminum Co. of Am.*, 564 F.2d 1171, 1172 (5th Cir. 1977); *Feliciano

v. City of Miami Beach*, No. 10-23139-CIV, 2012 WL 13008756, at \*2 (S.D. Fla. Feb. 10, 2012),

*report and recommendation adopted,* No. 10-23139-CV, 2012 WL 13008757 (S.D. Fla. Mar. 7,

2012). In short, it "is the most awesome weapon" in the Court's arsenal of potential sanctions. *See

Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985).

And the power to use such an awesome power—to impose such harsh sanctions—has significant

due-process implications. *See Societe Internationale Pour Participations Industrielles Et

Commerciales, S. A. v. Rogers*, 357 U.S. 197, 208–12 (1958).

Because of those concerns, courts have recognized that case-ending sanctions—default and

dismissal—are different from other sanctions in at least three ways.

**First**, a default sanction requires more than just misconduct; it requires willfulness or bad

faith. Before a court can impose default as an inherent-authority sanction, it must (complying with

the mandates of due process) find the sanctioned party engaged in subjective bad faith. *See Hernandez v. Acosta Tractors Inc.*, 898 F.3d 1301, 1306 (11th Cir. 2018). The same is true for sanctions under Rule 37. Courts must generally enter an order compelling the discovery before entering sanctions, *see Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 638 (11th Cir. 2019), and the party must violate that order.

But, unlike for other sanctions, the violation itself is not enough. The Court must find the failure to comply with the order compelling discovery was willful or in bad faith before it can enter a default or dismissal. *See id.* (citing *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993)); *accord Chudasama*, 123 F.3d at 1371 ("Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default...." (citing *Malautea*, 987 F.2d at 1542)); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994) ("Our caselaw is clear that only in a case where the court imposes the most severe sanction—default or dismissal—is a finding of willfulness or bad faith failure to comply necessary.").

**Second**, courts cannot impose default as a sanction unless less draconian sanctions would be ineffective to ensure compliance and serve the interests of justice. If less severe sanctions would be effective, a district court sanctioning with a default judgment abuses its discretion. *See Chudasama*, 123 F.3d at 1371 (reasoning that a court abuses its direction if it enters a default when "less draconian but equally effective sanctions were available" (quoting *Adolph Coors Co.*, 777 F.2d at 1543).)[10]

---

[10] *See also Johnson v. New Destiny Christian Ctr. Church, Inc.*, 771 F. App'x 991, 994 (11th Cir. 2019); *Maus*, 513 F. App'x at 878.

**Third**, district courts have less discretion to impose "death penalty" sanctions than they do to impose other sanctions. "When, as here, a defendant's pleadings are stricken, an appellate court's review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits." *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976); *accord Chudasama*, 123 F.3d at 1366. Thus, a district court's imposition of "death penalty" sanctions does not receive the same deference on appellate review that other sanctions might.

Here, the imposition of "death penalty" sanctions is particularly harsh. For starters, the sanctions result in the imposition of significant liability on OTK that—due to the loss of the ability to defend against the "willfulness" allegations and the loss of its set-off defense—for which OTK might not be liable if the case were adjudicated on its merits. Given the scope of potential damages in this case, that is a "heavy punishment" indeed.

Nor does OTK's punishment necessarily stop at the end of this particular case. As the Court notes in its November 18, 2021 Order, the liability issues in the case deal with pay practices that remain in place. (*See* Doc. 344 at PageID ## 4649, 4714–4715.) A significant judgment in this case will almost certainly lead to copycat litigation—other OTK employees filing other FLSA putative collective actions. OTK expects that plaintiffs in those cases will argue that the default in this case could have a preclusive effect on issues to be decided in those future cases. Without conceding that preclusion would be proper in those cases, OTK notes the risk that the severe and harsh sanctions the Court has imposed here may extend beyond this case—continuing to punish OTK in other litigation in which OTK has done nothing wrong.

For the reasons that follow, the imposition of such harsh sanctions was unwarranted. Further, lesser sanctions would have been sufficient to remedy the effect of the misconduct here. For those reasons, the Court should reconsider its previous sanctions Order.

### 1.   There was no "boon" to OTK on this record.

In explaining why sanctions are appropriate here, the Court says: "At every turn, Defendant delayed, obfuscated, violated or outright ignored the Court's orders …. Throughout, the alleged violative pay practice continue, a potential boon to Defendant." (Doc. 344 at PageID #4649.) But Plaintiffs have shown no "boon." Plaintiffs have not proven that any of OTK's pay practices resulted in the **underpayment** of any overtime due to them under the FLSA.

### 2.   "Death penalty" sanctions were inappropriate under Rule 37.

#### a.   A review of the communications history demonstrates that any failure by OTK (as distinguished from Littler) to comply with the Court's Orders was because Littler did not adequately communicate with OTK.

The Court entered "death penalty" sanctions against OTK largely because Littler represented to the Court that (1) OTK had never produced time and pay records to Plaintiffs in discovery and (2) ADP had wholly failed to respond to the OTK subpoena. A review of the communications in this matter show that neither of Littler's representations was accurate.

Instead, those communications show that OTK produced pay records (albeit in a less-desirable format) to Littler back in 2019. (Ex. G, Pledger Decl. ¶¶ 6-11.) After Plaintiffs informed Littler that they preferred the format of ADP's reports, Littler apparently failed to produce to the Plaintiffs the pay records that OTK had provided or else Plaintiffs' counsel rejected those ADP documents. (*See* Doc. 300-1 at PageID #3807 (ADP's witness declaration that "On August 5, 2020, I sent the Littler Mendelson attorneys the Payroll Register reports from June 2020.").)  OTK does not know what happened here or why Littler did what it did. But OTK does know it was not a part

of the decision. OTK wanted to be forthcoming with information to Plaintiffs. Accordingly, it provided Littler with the requested information and pay records in the format OTK was capable of providing before Plaintiffs filed any motions to compel or for sanctions. (*See* Ex. G, Pledger Decl. ¶¶ 6-11.)

A review of the communications also show that, in the middle of 2020, Littler and Plaintiffs reached an impasse as to efforts to modify and reformat the pay record documentation. After a hearing on the issue, the Magistrate Judge declined to sanction OTK and suggested it subpoena the information from ADP. (*See* Doc. 229.)

As early as July 2020, ADP commented to Melissa Pledger, OTK's payroll specialist, that the gathering of the information was a priority for ADP's legal team. (Ex. G, Pledger Decl. ¶ 23.) OTK continued to try to work with ADP to obtain the information. OTK's personnel went on to e-mails with Littler and its ADP to facilitate the cumulative production to the Plaintiffs. (*Id.*, Pledger Decl. ¶¶ 24-33.) OTK personnel also participated in hours of meetings to understand and communicate the Plaintiffs' preferences to ADP. In the end, ADP took the position that OTK could generate the reports itself through its portal access to ADP's system. (*See* Doc. 300-1 at PageID #3807 (ADP's witness declaration that, on August 3, 2020, "I further explained that the payroll contact for Defendant should be able to create the requested report in Excel format ….").) But even with the help of Sid Johnson at ADP, OTK could not figure out how to produce Excel spreadsheets that would feature the information the Plaintiffs wanted. Here is what happened:

- On August 31, 2020, Pledger exchanged her last communication with Johnson requesting information responsive to the subpoena. Johnson commented that he would no longer be able to assist in transferring a .pdf to Excel in the system until after he had consulted with ADP legal. (Ex. G, Pledger Decl. ¶ 32.)

- ADP and OTK met in November 2020 to discuss these issues and how to generate Excel reports that included the RROP information. Again, ADP informed OTK that the

information the Plaintiffs sought could not be produced in Excel. (*Id.*, Pledger Decl. ¶¶ 34-35.)

- In December 2020 and January 2021, Littler attorney Gavin Appleby was not actively participating in the litigation due to a major medical issue under doctors' orders. (Ex. G, Scheid Decl. ¶ 50.)

In fact, Appleby did not meaningfully participate in the case again until a hearing on February 17, 2021, in which his co-counsel Sinead Daly misrepresented to the Court that ADP had not responded to the subpoena. Daly explained:

> We did reach out following -- due to the telephone conference with Your Honor and we advised ADP that there was a case out there that indicated that ADP -- [disrupted audio connection] -- records in an excel format. And we asked them to readdress the issue of whether or not that is something that can be done in our case given that there is caselaw out there that suggests it, and we have not gotten a response yet. But we did raise that point, Your Honor.

(*See* Doc. 299 at PageID ## 3701-3702.) Based on this statement, the Court scheduled two separate show-cause hearings.

On March 5, 2021, after the first "show cause" hearing related to the ADP subpoena, Littler finally informed OTK personnel (including Scheid) that the Court was curious about ADP's participation. Littler informed Scheid that the Court "finally got ADP's attention," again inferring that this production was ADP's responsibility and any failures were ADP's failures. (Ex. H, Scheid Decl. ¶ 30.)

Littler sent another e-mail to OTK stating "the Court is suddenly focused on ADP issues" requiring "ADP provide someone live even if they have to come from HQ in New Jersey. I'm curious as to whether you have a formal contract with ADP and whether that contract has any indemnification clauses." (*Id.*, Scheid Decl. ¶ 31.) Even this communication insinuates that ADP was the subject of judicial scrutiny because of ADP's production deficiencies.

Appleby sent another e-mail on March 8, 2021, striking a different but still less-than-ominous tone. He wrote: "[b]ased on my call today, we have a decent chance of getting ADP to

explain to the court what they can and can't do and that should help. Otherwise, the judge might hit us or ADP with some type of penalty. It wouldn't be justified...." (*Id.*, Scheid Decl. ¶ 32.)

Thus, until March 8, 2021, OTK was completely unaware that its production was unsatisfactory to the Plaintiffs or the Court. Instead, OTK understood any production problems to be ADP's problems. It is not readily apparent that Littler understood the precariousness of the issue going into the hearing. But, regardless, Littler had insulated OTK purposefully. Littler exclusively mediated the triangular communications between Plaintiffs, ADP, and OTK on the issue. As a result, OTK was "in the dark."

At the second show-cause hearing on March 12, 2021, ADP informed the Court that it would produce to the Plaintiffs records that Littler (and OTK) had believed ADP could not produce. From there, Plaintiffs and ADP accused Littler (justifiably) of violating the conflict of interest rule and making misrepresentations to the Court about ADP's activities. The Court concluded Littler had made misrepresentations, and the hearing became about Littler's conduct and not much more.

> **b.    OTK was not knowingly in violation of Court-ordered discovery obligation during the March 12, 2021 or April 13, 2021 hearings.**

The Court should not have issued "death penalty" sanctions under the discovery rules. Although Rule 37(b)(2)(C) authorizes courts to impose draconian "death penalty" sanctions, "death penalty" sanctions are highly disfavored and require violation of a discovery order. *See Malautea*, 987 F.2d at 1542; *Kipperman v. Onex Corp.*, 260 F.R.D. 682, 698 (N.D. Ga. 2009) ("A sanction of dismissal or default judgment requires a willful or bad faith failure to obey a discovery order.") *see also* Relation to Other Rules and Statutes, 8B *Fed. Prac. & Proc.*, Civ. § 2282 (3d ed.) ("When the discovery procedure is initially set in motion by the parties themselves without court order, the party seeking discovery must first obtain an order under Rule 37(a) requiring the

recalcitrant party or witness to make the discovery sought; it is only a violation of this order that is punishable under Rule 37(b)."); *id.* at § 2289 ("Rule 37(b) usually has no application if there has not been a court order.").

Although OTK has admittedly been the subject of this Court's Orders to produce documents, including pay records, the record now reflects its reasonable belief it had complied with those Orders or else was unable to comply.[11] It produced pay records in 2019, long before the close of discovery or the March 21, 2021 hearing. (Ex. G, Pledger Decl. ¶¶ 6-11.) The ADP issue resulted from pay records and information not being in the format the Plaintiffs wanted, not from an outright failure to produce the information.

The Court's frustration understandably boiled over at the show-cause hearing on March 12, 2021, but OTK understood (because of Littler) that that "show cause" was directed against ADP, not OTK. (Ex. G, Scheid Decl. ¶ 30.) Had OTK known that, because of Littler's conduct, OTK could have been subject to "death penalty" sanctions and the loss of its ability to defend Plaintiffs' claims on the merits, OTK would have conducted itself, prepared for, and participated in the hearing quite differently.

"Death penalty" sanctions require bad faith conduct in violation of a court order to avoid the unlawfully punitive scenario of a court taking away litigant's substantive rights when that litigant did not engage in intentional misconduct. Thus, "[v]iolation of a discovery order caused

---

[11] OTK does not dispute that Littler represented that OTK would produce certain pay records in Excel format. The record establishes, however, that this turned out to be an impossible for OTK to do (or at least that OTK in good faith believed it was impossible). Rule 37 does not authorize "death penalty" sanctions when "failure to comply [with a discovery order] has been due to inability, and not to willfulness, bad faith, or any fault of petitioner." *Societe Internationale*, 357 U.S. at 212. Thus, OTK's failure to provide Excel spread sheets does not warrant the sanctions the Court imposed.

by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal." *Malautea*, 987 F.2d at 1542.

The decision in *Malautea* is a good example of when case-terminating sanctions against a client for the actions of an attorney may be appropriate. There, the "Suzuki Defendants" were subject to multiple, specific court orders mandating they produce specific documents related to General Motors' "testing, design, and marketing" of a vehicle. *Id.* at 1539–1540. The Suzuki Defendants in *Malautea* represented to the Court that responsive documents did not exist, and wholly failed to produce the information. After it was ordered to do so, General Motors produced correspondence showing that it had refused to market the Suzuki Defendants' vehicle after its tests that showed the vehicle was prone to rollover. The district court determined that the Suzuki Defendants and their counsel possessed and knew of these correspondences, but willfully withheld them from the plaintiffs because the documents were damaging to their position in the litigation. On appeal, the Suzuki Defendants argued that they misunderstood the scope of the district court's orders. The Eleventh Circuit noted that the Suzuki Defendants' claims of confusion and misunderstanding related to the court orders was not credible. The Eleventh Circuit pointed out that neither defendant in *Malauteau* had asked the district court judge to clarify those orders and added that a genuinely confused litigant, twice-threatened with the sanction of a default judgment, would have asked the district judge to explain whether the orders covered the plaintiff's interrogatory that requested the General Motors information. *Id.* at 1543.

This *Malauteu* decision touches on the due process considerations against a litigant facing litigation-terminating sanctions. Contrast the *Malautea* conduct to hide and withhold unfavorable documents to OTK's conduct here. Here, OTK was held at arms-length by Littler, to the point it did not know that questions needed to be asked of the Court at all. There was no order specifying

the production of the "RROP" information in an Excel format. OTK had met with ADP and was told the information could not be produced in the Excel format Plaintiffs said they required. (Ex. G, Pledger Decl. ¶ 34.) OTK had been led by Littler to believe the show-cause hearing that led to its sanction was primarily a "show cause" against ADP. (Ex. G, Scheid Decl. ¶ 30.) OTK was never counseled by Littler regarding the true nature of this hearing, and in fact was affirmatively led to believe OTK was a non-participant. OTK had no way of knowing that the Court had any issue with its production.

OTK's scenario is precisely why the line of cases differentiating sanctionable lawyer conduct from their unwitting client exists. OTK was led honestly and reasonably believe it had long satisfied the Court's requirements and that fault in the eyes of the Court lied with ADP. With no order specifying conduct of OTK, this Court was without the authority to sanction OTK under Rule 37.

Stated differently, negligence, misunderstanding, and/or inability to comply are exactly what happened here. Indeed, the conduct the Court focuses on as sanctionable was the conduct of Littler, not OTK. None of it was deliberate conduct by OTK that violated clear directives in a court order. And OTK should not pay the price for Littler's unilateral misconduct. *See Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168-69 (9th Cir. 2002) (collecting authorities); *Pearce v. Apfel*, 205 F.3d 1341, 2000 WL 191841, at *3 (6th Cir. 2000) (table) (stating the court "has been extremely reluctant to uphold the dismissal of a case ... merely to discipline an errant attorney because such a sanction deprives the client of his day in court."); *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir. 1987) ("Where sanctions are concerned, ... we have cautioned

that '[i]f the fault lies with the attorneys, that is where the impact of the sanction should be lodged.'" (citation omitted)).[12]

The Eleventh Circuit's decision in *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001), is similarly instructive. There, a district court dismissed a lawsuit as a sanction because the counsel intentionally filed a frivolous claim. The Eleventh Circuit held the district court's sanctions award was an abuse of discretion because the client was unaware of the counsel's misconduct—the client was in the dark. *See id.* The Court reasoned: "[t]o support its findings of bad faith and otherwise sanctionable conduct, the court impermissibly relied solely on the actions of counsel.… Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party. *Id.* The attorney-client relationship is not like other principal-agent relationships, in that "most clients are not able to exercise perfect control over their lawyers." *Hutchinson v. Fla.*, 677 F.3d 1097, 1109 (11th Cir. 2012) (Barkett, J., concurring). Thus, it is generally not appropriate to sanction a party for their counsel's offenses. *Donaldson v. Clark*, 819 F.2d 1551, 1557 n.6 (11th Cir. 1987).

---

[12] Other courts have held likewise. *See Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 806 (3d Cir. 1986) (reversing denial of plaintiff's R. 60(b) motion based on plaintiff's counsel's "blatant disregard for explicit [court] orders"); *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 195 (6th Cir. 1986)("[a] default judgment deprives the client of his day in court, and should not be used as a vehicle for disciplining attorneys); *Carter v. City of Memphis, Tenn.*, 636 F.2d 159, 161 (6th Cir. 1980)("[D]ismissal is usually inappropriate where the neglect is solely the fault of the attorney."); *Dove v. CODESCO*, 569 F.2d 807, 810 (4th Cir. 1978) ("[T]he sanctions for attorney neglect should be borne if at all possible by the attorney himself rather than by his client."); *L. P. Steuart, Inc. v. Matthews*, 329 F.2d 234, 235 (D.C. Cir. 1964) (stating that Rule 60(b)(6) "is broad enough to permit relief when as in this case personal problems of counsel cause him grossly to neglect a diligent client's case and mislead the client"); *Primbs v. United States*, 4 Cl. Ct. 366, 370 (1984), *aff'd*, 765 F.2d 159 (Fed. Cir. 1985) (holding that normal attorney-client relationship does not bar Rule 60(b) relief when "the evidence is clear that the attorney and his client were not acting as one").

Here, Littler kept OTK "in the dark," leaving OTK unable to fully control Littler's conduct. Under these circumstances, the Court imposed "death penalty" sanctions on OTK for its counsel's conduct or, at most and at worst, for violating the Court's Orders out of negligence, misunderstanding, or because of a perceived inability to comply. Doing so exceeded the Court's discretion.

3.   **The Court should not justify "death penalty" sanctions under its inherent authority by imputing to OTK the apparent bad faith actions by Littler.**

Nor was there a basis for "death penalty" sanctions under the Court's inherent authority. Courts exercise their inherent powers "with restraint and discretion." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1251 (11th Cir. 2007). Inherent-power sanctions require a finding of subjective bad faith, with a narrow exception for conduct from which the court can determine the actors' bad faith. *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). A court may find attorney bad faith from an attorney's knowing or reckless assertion of a frivolous argument or of a meritorious argument for improper purpose. *Barnes*, 158 F.3d at 1214. But to find that a party acted in bad faith, a court must determine that the party delayed or disrupted litigation or hampered enforcement of the court's orders. *Id.* (citing *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997)).

The Court found several facts supporting its holding that OTK acted in bad faith. The Court noted that under agency principles, OTK is liable for its attorneys' actions. (Doc. 344 at PageID #4708 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962))). But Littler did not have either express or implied authority to misrepresent facts to the Court. To the contrary, Littler had a duty of candor to the Court. *See* Ala. R. Prof. Cond. 3.3(a) (setting forth duty of candor to a tribunal). And nothing suggests OTK authorized, ratified, or even knew of Littler's actions. *See*

*GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1309 (11th Cir. 2017) (noting that ratification can occur through manifesting assent or by conduct justifiable only by a reasonable assumption of consent). Instead, when OTK discovered the extent and nature of Littler's malfeasance now identified by the Court, it terminated its longstanding relationship with Littler.

### a. OTK was unaware of Littler's multiple errors, omissions, and apparent falsehoods related to procuring documents from ADP.

Most of the discovery disputes leading to the Court's imposition of sanctions arise from OTK's failure to produce documents showing how it calculated "true up" payments from "step up" rates. At various times, Littler told the Court that it needed assistance from ADP to produce these documents in Excel format; it had contacted ADP to procure these documents without response; ADP had not responded to a subpoena seeking these documents; and the Plaintiffs did not need those documents because certain testimony by OTK's corporate representative was mistaken. (*See* Doc. 344 at PageID ##4687, 4692–4696.) Meanwhile, Littler did not promptly serve the Court's show-cause Order on ADP as the Court ordered. Littler further misinformed ADP about the need to appear for a show-cause hearing if it produced documents, all in an apparent effort to keep ADP from telling the Court about Littler's malfeasance. (*Id.* at PageID #4693–4694.)

As the Court noted, Littler and OTK had a longstanding relationship. That longstanding relationship ended when OTK learned of Littler's actions. OTK trusted Littler to handle high-dollar employment disputes. Unfortunately, OTK misplaced that trust. Throughout this case, Littler abused OTK's trust to conceal its own lack of diligence in defending OTK against the Plaintiffs' allegations.

For example, the Court took OTK to task for Littler's representation that it had "reached out" to ADP for records with no response. (*Id.* at PageID #4692.) Littler made this representation during a status conference twelve days after the Court had ordered OTK to produce those records.

(*Id.*) What Littler failed to disclose to the Court—in apparent violation of its duty of candor—was that it "reached out" a mere three hours before the hearing. (*Id.*) But OTK did not know that Littler was so dilatory; OTK assumed that Littler was representing OTK's interests.

Similarly, Littler told the Court that the Plaintiffs no longer needed the records at issue because Ms. Pledger's testimony about the "true up" process was mistaken. (Doc. 344 at PageID #4693.) That representation as to Pledger's mistake was correct. She based her testimony on a misremembered conversation with an ADP representative. (Ex. G, Pledger Decl. ¶¶ 13-14.) But what Littler did not inform the Court at that time Littler also served as ADP's counsel. Worse, although Littler told the Court it would procure an affidavit and examples explaining the error, it failed to do so. (Doc. 344 at PageID #4693.) Ms. Pledger's declaration attached to this Motion fixes that issue. (*See* Ex. G, Pledger Decl. ¶ 15.)

Most troubling was Littler's conduct related to OTK's subpoena to ADP. Littler at least strongly implied that ADP had not cooperated with a subpoena, which was untrue. (Doc. 344 at PageID ##4690–4691.) After ADP produced .pdf versions of the needed documents, Littler did not tell ADP that OTK needed Excel versions until the day of a scheduled status hearing. (*Id.*at PageID # 4692.) And, when the Court ordered ADP to appear at a show-cause hearing, Littler waited ten days to serve ADP—until four days before ADP would have to appear. (*Id.* at PageID #4693–4694.) Even when Littler finally served ADP, it falsely told ADP that the hearing would likely be cancelled if ADP produced the missing documents. (*Id.* at PageID #4694.) Then, after ADP did produce documents in the requested format, Littler finally—at 5:40 pm—told it that it would need to be present for a show-cause hearing the next day. (*Id.*) Yet again, this was Littler's conduct. OTK had no idea Littler had acted in such an improper manner.

Nothing excuses a pattern of falsehoods. But OTK did not speak or know about Littler's false statements. OTK did not mislead ADP. And OTK did not instruct Littler to lie to the Court. OTK, like many corporate clients, trusted its Littler attorneys to perform their ethical duties and defend OTK in litigation. That Littler failed to do so shows that OTK's faith was misplaced, not bad. And misplaced faith will not support the Court's imposition of "death penalty" sanctions.

**b.      Littler accurately characterized the need for ADP's help in producing documents in Excel format.**

The Court took OTK to task for failing to provide certain records showing "true up" adjustments for step-rates in Excel. (Doc. 344 at PageID #4648–4649.) It then found that Littler's representation that it needed ADP's help to produce these records in a non-native, Excel format was false and used this as evidence of OTK's bad faith. Littler may have been less than honest about many things, but that representation was accurate. OTK could not produce those records in Excel format. (Ex. G, Pledger Decl. ¶ 38.)

What, of course, does not excuse counsel's dilatory efforts to get these documents from ADP or its failure to correct Ms. Pledger's mistaken testimony to obviate the need for them. But that failure and lack of effort were not OTK's. OTK was unaware that Littler had failed to confer with ADP about getting the documents in Excel format. OTK was unaware that Littler had failed to produce what documents ADP had produced. OTK was unaware that Littler went to this Court intending to cloak its own lack of diligence. Had OTK been aware of what was really going on, it would have terminated its relationship with Littler long before these issues came to a head.

**c.      Littler's failure to pursue discovery needed to respond to summary judgment was prejudicial to OTK's interests.**

The Court criticized OTK for seeking relief under Federal Rule of Civil Procedure 56(d), but failing to pursue the discovery it needed to oppose summary judgment. (Doc. 344 at PageID #4689). But that failure is more evidence of Littler's inappropriate behavior and bad faith, not

OTK's. As the Court pointed out, OTK had a longstanding relationship with Littler. It trusted Littler to represent it zealously and to defend its interests. It is hard to imagine anything less compatible with OTK's interests than failing to seek discovery in order to fend off summary judgment in a case with massive potential liability. That alone should give the Court pause in imputing Littler's delay to OTK, which had nothing to gain from Littler **not** seeking evidence that could eliminate or mitigate liability.

But the Court does not have to rely on logic alone to determine that Littler's failure to pursue other discovery was not bad faith on OTK's part. OTK did not know that Littler was not pursuing needed discovery. Once again, had OTK been aware that Littler had only staved off summary judgment temporarily by asserting a need for discovery that it then failed to pursue, OTK would have terminated its relationship with Littler sooner.

Attorneys must be fair and honest in their dealings with the Court, their clients, and adverse parties. *See* Ala. R. Prof. Cond. 1.1 (duty of competence in representation); 1.3 (duty of diligence in representation); 3.3 (duty of candor to tribunal); 3.4 (duty of fairness to opposing counsel and parties); 4.1 (duty of truthfulness to third parties). Clients, no matter how sophisticated, should be able to trust that their attorneys are representing their clients' interests, not their own. And it is not bad faith for OTK to do just that. Rather, it seems Littler did a disservice not only to the swift and accurate dispensation of justice, but also to its own client's interests. The Court should not compound that disservice by sanctioning OTK for Littler's acts.

### 4. Lesser sanctions would have been sufficient.

A district court exceeds its discretion when it imposes "death penalty" sanctions even though lesser sanctions would be sufficient. *See Chudasama*, 123 F.3d at 1371. Not only do the circumstances of this case not warrant the imposition of such sanctions, but lesser sanctions would have been sufficient to remedy the harm the Court identified in its order. Therefore, the Court

exceeded its discretion by imposing "death penalty" sanctions, and it should vacate its Orders imposing those sanctions.

Sanctions under Rule 37 have four purposes: (1) compensating the Court and parties for added expenses; (2) gaining compliance with discovery obligations; (3) deterring non-compliance by others; and (4) punishing the offending party or attorney. *Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 638 (11th Cir. 2019) (citing *Wouters v. Martin Cty., Fla.*, 9 F.3d 924, 933 (11th Cir. 1993). Lesser sanctions than default would have been sufficient to achieve those four purposes.

**First (and fourth)**, the Court has already required OTK to pay attorney's fees related to the discovery disputes. (Doc. 344 at PageID #4717; Doc. 345.) OTK (or Littler) could likewise remedy any additional expenses the Court has incurred through a monetary sanction. The FLSA allwos liquidation (doubling) of damages in place of prejudgment interest, and allows damages to go back three years in case of "willful" violations. Further, there is no indication that the delay has permanently prejudiced the Plaintiffs' ability to prepare their case, such as due to the loss of documents or other evidence. Thus, death penalty sanctions are not necessary to compensate the Court or the Plaintiffs for delay.

**Second**, there is the need to gain compliance with the Court's numerous Orders. This is the only area in which the Court held that lesser sanctions would be insufficient. It reasoned that lesser sanctions would be insufficient because they "would be ineffective in compelling [OTK] to comply with their discovery obligations." (Doc. 344 at PageID # 4712.) With respect, the record fails to bear that out.

Instead, the record demonstrates that the Court rooted out the source of the problem by suspending the *pro hac vice* admission of the lead counsel from Littler on March 13, 2021 (Doc.

303 at PageID # 3937), eventually leading OTK to replace Littler as counsel (Docs. 319 & 323). Indeed, every single incident the Court listed in its order as evidence of bad faith—spanning from September 4, 2018 to March 12, 2021—occurred before the disqualification of the Littler lawyer and Littler's replacement as counsel. (*Compare* Docs. 303, 319, & 323 *with* Doc. 344 at PageID ## 4659–4698.) Since current counsel replaced Littler and OTK became fully aware of the nature and extent of Littler's misconduct, OTK has provided Plaintiffs' counsel with documents he has requested relating to the discovery previously served in this case, and Plaintiffs' counsel now has complete pay information for all of his clients through the end of 2021.

The Court's November 18, 2021 Order says: "Defendant might possess time and pay records from 2015–2017, which ADP no longer retains; … however, the Plaintiffs were fairly certain the records Defendant was proposing to produce would be inaccurate and incomplete because they would not contain all of the 'step up' rates. The Court agrees and notes this is why ADP's records were needed in the first place." (Doc. 344 at PageID #4706.) But that is no longer an issue. As Plaintiffs explained to the Court on February 25, 2022, "Plaintiffs sent current defense counsel the pay rate information (including step-up rates and estimated step-up rates) culled from OTK's data and form ADP's data …." (Doc. 362 at PageID #5594.) OTK has never objected to the so-called "estimated" step-up rates. Instead, OTK has pointed out that, out of the first 30 Plaintiffs, only seven of them ever worked "step ups." (Doc. 363 at PageID #5632.) The "step ups" are not the issue.

**Third**, although the Court notes the need to deter other employers from refusing to comply with their discovery obligations in other cases, it never holds that lesser sanctions would not also achieve that goal. Nor, as to the fourth factor, does the Court hold that lesser sanctions would be insufficient to punish OTK or Littler. Both Rule 37 and the Court's inherent power provide it with

a panoply of sanctions to deter and punish misconduct. Another employer seeing the disqualification of counsel and the significant monetary sanction the Court has already imposed on OTK—perhaps coupled with additional monetary sanctions and the potential striking of affirmative defenses—is unlikely to allow its counsel to repeat the conduct that occurred here. And any such combination of sanctions would sufficiently punish OTK for its choice of Littler as counsel and would vindicate the Court's authority to ensure the efficient administration of justice to Plaintiffs in this case and other plaintiffs in other cases.

In sum, it is unnecessary to impose "death penalty" sanctions against OTK to achieve its compliance with the Court's order, to compensate the Plaintiffs' and the Court for any delay, to deter misconduct by employers in other cases, or to sufficiently punish OTK for its actions (or perhaps more accurately, its inaction through selection of Littler as its counsel). Lesser sanctions can achieve, and already have achieved, those goals. Because lesser sanctions are sufficient, the Court's entry of default and striking of OTK's Answer to the Third Amended Complaint exceed the Court's discretion.

## IV. Conclusion

For these reasons, OTK requests that the Court vacate its previous Order sanctioning OTK by striking its answer and entering a default.

Respectfully submitted,

_s/ Devin C. Dolive_
Devin C. Dolive (DOLID4671)
Ronald W. Flowers, Jr. (FLOWR3635)
H. William Wasden (WASDH4276)

Attorneys for Defendant
OUTOKUMPU STAINLESS USA, LLC

**OF COUNSEL**:

BURR & FORMAN LLP
11 North Water St., Suite 22200
Mobile, AL 36602
Telephone: (251) 344-5151
Facsimile: (251) 344-9696
bwasden@burr.com

BURR & FORMAN LLP
420 North 20th St., Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100
ddolive@burr.com
rflowers@burr.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have on March 10, 2022, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Ian D. Rosenthal, Esq.
Holston Vaughan & Rosenthal LLC
211 South Cedar Street
Mobile, Alabama 36602
idr@holstonvaughan.com

Patrick H. Sims, Esq.
P. O. Box 2906
Mobile, Alabama 36652
patrick@simslawfirm.net

*s/ Devin C. Dolive*
OF COUNSEL