**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **WILLIAM HEATH HORNADY**, et. al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | CASE NO.: 18-cv-317-JB-N |
| | ) | |
| | ) | |
| **OUTOKUMPU STAINLESS USA, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**PLAINTIFFS' OPPOSITION TO MOTION TO RECONSDER**

---

Table of Contents

Page

**Introduction**                                                                                    3

**I.**   **Merits-based Arguments and Damages Disputes Are Not Properly Before**   6
         **the Court at This Stage.**

    A.  OTK's Histrionic Language Is Not Grounds to Resuscitate Merits
        Issues.                                                                       7
    B.  Hypothetical Horrible Consequences Are  Not a Basis To Ignore
        the FLSA.                                                                     11
    C.  The Supreme Court and Eleventh Circuit Have Rejected OTK's
        Microscopic Approach to Contesting the Scope Default.                         13

**II.**  **OTK's Own Misconduct is Not Excused by the Misconduct of Its**          18
         **Former Counsel, or By The Court's Entry of Orders Requiring**
         **OTK to Produce Excel Data OTK said it Had.**

    A.  OTK's TODDI Defense Collapses Under a Fact Check.                           21
    B.  OTK's PDF/Excel Argument Fails Because OTK Demonstrated               23
        Repeatedly That It Could Provide The Excel Data It Was
        Repeatedly Ordered to Produce and So Could ADP

**III.**  **Declarations.**                                                       25

    A.  An Impending OTK Paradox?                                                   25
    B.  The Declarations Are Inadmissible.                                          27
        (i)  Pledger's Declarations and Scheid's Declaration                   27
        (ii) Declaration of Carole M. Amidon-Johansson, Ph.D.                  31
    C.  Mis-Statements in Declarations                                             33
        (i)  Pledger Declarations                                              33
        (ii) Dave Scheid Declaration                                           47

**IV.**  **Collective Actions and Individual Claims**                             51

**Conclusion**                                                                    52

<u>Introduction</u>

The Defendant Outokumpu Stainless USA, LLC ("OTK") filed a Motion to Reconsider the Court's Order dated November 18, 2021 entering judgment as a sanction for bad faith misconduct and its Order dated February 17, 2022 in which the Court provided "additional guidance" to OTK about the "scope and consequences of the default sanction entered against it." (See Doc. 344, Doc. 351, PageId. 4733, Doc. 346, PageId. 4726)  OTK's motion should be denied.

The motion begins with inaccurate hyperbole,[1] and ends with a baseless request that the Court vacate its Order sanctioning OTK. In between it says nothing that would merit reconsideration let alone a different result.  There is nonetheless one thing that OTK says that is very true.  This case is a dramatic example of "a failure of the adversarial process." (Doc. 369, PageId.5967)  That result was caused by OTK's misconduct over a period of years - not by the Plaintiffs, the Court, or even by the misrepresentation of OTK's former counsel about the extent of (non)cooperation of ADP, Inc. The victims of the failure of the adversarial process are the Plaintiffs who now, four years after suit was filed (and more than two years after they first filed for summary judgment) are still without a final adjudication.

The November 18, 2021 Order, of course, arose after Magistrate Judge Nelson assessed the record before her and entered a Report and Recommendation significantly sanctioning OTK for its myriad failings.  (Doc. 261) OTK then filed its objections to that R & R. (Doc. 267) In that

---

[1] The first sentence of OTK's Introduction says OTK has been left "exposed to claims for catastrophic amounts of damages." (Doc. 369 PageId.5966)  The financial statements Outokumpu released for 2021 show Adjusted Earnings Before Income Taxed Depreciation and Amortization of 297 million Euros (approximately $335 million on December 31, 2021) before what is shown as a 15 Million Euro litigation adjustment and OTK described the financial impact of this case as immaterial  (Doc. 390-1, PageId. 6265-6267) Those figures are just for the Americas and are a small part of Outokumpu's total business results.

submission OTK affirmatively represented that it was presenting information which Magistrate Judge Nelson had "not had the opportunity to consider" because, OTK implied, OTK did not have information from ADP that it would otherwise have presented to Magistrate Judge Nelson. (Doc. 267, PageId. 3511) It argued that the R & R was based on "mistaken testimony" (Doc. 267, PageId. 3513) and implied that Magistrate Judge Nelson had not considered the entire relevant history when she only "explained some of the history pertinent" to the sanctions motion.[2] (Doc. 261, PageId. 3511) None of these complaints are justified.

As it had to, the Court made an "exhaustive review" of the record and an independent consideration of factual issues.  (Doc. 344, PageId. 4632) During the same time period the Court set about determining what could be done to obtain information from ADP, Inc.  After an informal conference call with the parties, the subject of obtaining information from ADP was brought up again at a February 17, 2021 hearing. (Doc. 299, PageId. 3698)  That, in turn, led to show cause orders directed to ADP and the discovery of additional sanctionable conduct by OTK's counsel.  All of that, however, took place after discovery deadlines had passed, and while the Plaintiffs' summary judgment motion was before the Court.

The Court knows all of this.  This introduction is not foreshadowing a submission that merely tells the Court what it already knows.  OTKs motion requests such multifarious relief that it is senseless trying to respond to each discrete request in the jumbled order they are set out.

---

[2] Ironically OTK also declared that it was "working on" an affidavit for Melissa Pledger to "correct her prior testimony."  (Doc. 261, PageId. 3512)  It took 16 months for OTK to file such an affidavit in March, 2022 (followed by another one 72 hours before this brief was due from Plaintiffs).  As will be discussed *infra* those affidavits, and the one OTK filed from Dave Scheid, only exemplify the accuracy of the Court's assessment of the responsibility that OTK's personnel share for its sanctionable conduct in this case.

Instead Plaintiffs will treat OTK's motion in gross, with a rough division of subjects for organizational purposes.

Section I responds to OTK's asserted merits-like arguments about substantive liability / damages.[3]  These sorts of merits arguments are irrelevant when a judgment has been entered (as illustrated by the fact that the Court terminated the pending summary judgment motions when it entered default.) (Doc. 344, PageId. 4717) But the simple fact is that whether a party would win or lose absent a default judgment (or how much it would win or lose absent a default judgment) has nothing to do with reconsideration of whether default was properly entered which is what OTK asks the Court to reconsider.  OTK already had every opportunity to argue about purported facts or law in the parties' assorted summary judgment submissions, and this year OTK argued (sometimes successfully) its positions about damages and the Court ruled.  (Doc. 366)

Section II addresses gaping holes in OTK's carefully curated (inaccurate) self-serving Declarations of purity and / or cluelessness as it tries to place all blame on its former counsel.

Section III addresses in detail the defective Declarations OTK has filed and how they (a) are inadmissible, (b) contain affirmative mis-statements of fact, and (c) contain additional apparent mis-statements, and (d) now reveal that OTK's efforts to delay the progress of this case were even

---

[3] OTK filed nine exhibits with its Motion to Reconsider.  (Doc. 368, PageId.5665, Doc. 377, Doc. 378) Four are excerpts from depositions of certain Plaintiffs which, obviously, can have nothing to do with the misconduct of OTK and its lawyers and, instead, basically go to OTK's renewed / rehashed merits arguments.  Two others are excerpts from the depositions of Pledger and Scheid (who were also Rule 30(b)(6) representatives).  When the Court conducted its own review of the entire record it already had Pledger's entire deposition (because OTK disregarded the Court's instructions about dumping extraneous material into the record and filed all of it). (Doc. 206-2) Similarly, most of what OTK has filed from Scheid's deposition was already of record because Plaintiffs filed it with their summary judgment submission (Doc. 187-2) The other isolated page / partial pages of testimony OTK filed in connection with its merits arguments is material that OTK did not deem worth submitting in connection with the summary judgment submissions. (See Doc. 258) That leaves the inadmissible Declarations which are addressed in Section III.

worse than the Court already identified.

Section IV addresses a bewildering argument OTK makes about collective actions which seems to have nothing to do with the default judgment it wants the Court to reconsider.

Of course, OTK benefits from every delay, and though it has lost the war it continues to benefit from the delays associated with each battle it initiates.  This is America.  Litigants and witnesses have the freedom to make lots of choices – including bad ones.  When they choose to verify statements that are untrue, or alter documents they misrepresent as verified business records, or provide (and then verify) testimony that is demonstrably false, or to disregard Court Orders there are severe consequences - like those the Court has already imposed.

Ultimately, there is one simple question for the Court and it has one simple answer. The question is: Has what OTK filed demonstrated to the Court that its determination that "default judgment is the only remaining sanction sufficient to address Defendant's bad faith and the damage wrought by it" is clearly wrong and / or manifestly unjust.  (See Doc. 344, PageId. 4627) The answer is "No" or, perhaps given what OTK has filed: "No!!!!"

**I.      Merits-based arguments and damages disputes are not properly before the Court at this stage.**

Under binding precedent the only ruling OTK might be able to even ask for reconsideration (if it had any legitimate grounds to do so) is the decision to enter default judgment (as opposed to any merits issue or damages issue). Even then, reconsideration motions are not supposed to raise legal arguments which could and should have been made before a judgment is issued. Sanderlin v. Seminole Tribe of Fla., 243 F.3d 1282, 1292 (11th Cir. 2001); Lockard v. Equifax, Inc., 163 F.3d 1259, 1267 (11th Cir. 1998); O'Neal v. Kennamer, 958 F.2d 1044, 1047 (11th Cir.1992).

Within the narrow scope of permissible reconsideration motions, this Court has made very clear the extremely limited grounds for altering a determination. Reconsideration "is an

extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." (Doc. 292, PageId. 3666) (quoting  Fetterhoff v. Liberty Life Assur. Co., 2007 WL 1713349, at *1 (S.D. Ala. June 11, 2007) which cites Pennsylvania Ins. Guar. Ass'n v. Trabosh, 812 F. Supp. 522 (E.D. Pa. 1992) and Wendy's Int'l v. NuCape Construction, 169 F.R.D. 680, 684- 85 (M.D. Fla. 1996)).  Generally, reconsideration of an order is available only when the movant presents "evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice."  (Doc. 292, PageId. 3667) (quoting Scott v. City of Mobile, 2018 WL 1172948, at *2 (S.D. Ala. Mar. 6, 2018) (quoting Summit Medical Center of Alabama, Inc. v. Riley, 284 F.Supp. 2d 1350, 1355 (M.D. Ala. 2003)).

In its motion to reconsider, OTK does not point to any change in controlling law.  It does not detail any new evidence. Instead, it filed some stuff.  Some of it was already filed, and all of it was available to OTK before the 2021 show cause hearings in this case.  Its new (inadmissible) Declarations also, generally speaking, describe subject matter that was already put before the Court in the parties' summary judgment submissions and / or their submissions about Magistrate Judge Nelson's R & R, and / or the long list of discovery disputes that preceded the R & R.

OTK's submission falls far short of establishing that there is clear error or manifest injustice in the Court's detailed and well-reasoned orders.


A.  OTK's Histrionic Language Is Not Grounds to Resuscitate Merits Issues.

OTK frequently uses the term "death penalty" and "case-ending." It does so disingenuously. Those terms may be appropriate when, for example, a plaintiff's case is dismissed for his failure to comply with a court order.  That is a dismissal with prejudice that truly ends a case. See Fed. R. Civ. P 41(b).  In the present case though, OTK is still alive, and still fighting.

The case has not ended. Even after the entry of default, it was given a full opportunity to contest damages issues.  It took full advantage of that opportunity and it actually prevailed on some of its objections.   (Doc. 366)  Those simple facts set the stage for Plaintiffs to respond concisely to pages 8-25 of OTK's motion, and its first major argument which is best viewed as a legal-briefing application of the logical fallacy *dicto simpliciter.*

OTK begins with a legal premise that is indisputably true in a default judgment case and then makes a quantum leap to entirely different and wholly irrelevant arguments. That correct statement of law, grounded in Eleventh Circuit precedent, is that in a default judgment case a district court may not calculate a plaintiff's damages unless the amount is either a mathematical certainty or admitted to by the defendant.  OTK cites the cases that stand for that simple proposition as the first paragraph of Section III(A) of its argument. (Doc. 369, PageId. 5972) From that simple starting part, OTK fires off 20 pages of rehashed merits-based arguments about how it disputes that what Plaintffs alleged about its time and pay practices violates the FLSA.

OTK never attempts to explain, because it cannot explain, how requirements about calculating contested damages are connected to the reopening of all liability issues. The two Eleventh Circuit  cases that describe how a Court that enters a default judgment later addresses damages are <u>Anheuser -Busch, Inc. v. Philpot</u>, 317 F. 3d 1264 (11th Cir.2003) and <u>Adolph Coors Co. v. Movement Against Racism and the Klan</u>, 777 F.2d 1538 (11th Cir. 1985). Because the <u>Busch</u> case simply applies the reasoning of the <u>Coors</u> case it is simpler to look to <u>Coors</u> for the dispositive - and limited - holding. Adolph Coors Co. sued an organization for defamation in the Northern District on the premise that the organization had wrongly associated Coors with Ku Klux Klan activity. The original district judge recused after some troubled handling of the case.  The case was reassigned to Judge Robert Probst. Judge Propst quickly got the case back on track and

eventually entered default judgment against the organization for willful noncompliance with Court orders about discovery.  He then set damages at $10,001.

On appeal, the Eleventh Circuit affirmed in all respects (including the entry of default judgment) except the damages.  Id. at 1542-1543.

> Generally, imposition of Rule 37 sanctions is governed by an abuse of discretion standard. Emerick v. Fenick Industries, 539 F.2d 1379, 1381 (5th Cir.1976). But in United Artists Corp. v. Freeman, 605 F.2d 854 (5th Cir.1979) (per curiam ), the former Fifth Circuit held that judgment of default awarding cash damages could not properly be entered "without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation." Id. at 857. Damages may be awarded only if the record adequately reflects the basis for award via "a hearing or a demonstration by detailed affidavits establishing the necessary facts." Id.; accord, Carlucci, 775 F.2d at 1453–54.

777 F.2d 1538, 1543–44 (11th Cir. 1985) As to damages the Eleventh Circuit recognized the uncertain nature of defamation damages, and said this:

> It must be clear from the record that a hearing was held that meaningfully informed the judgment of the court below or the trial court utilized the "mathematical calculations" and "detailed affidavits" of which United Artists spoke. Here neither requirement was met.

Id., at 1544.  This language was relied on by the Court in Anheuser Busch. 317 F. 3d at 1267.

All of that is simple and clear, but it has nothing to do with OTK's situation, and in no way supports setting aside the default judgment entered against OTK.

Neither Coors nor Busch say anything about reopening the liability issues in a default judgment case. The holdings of both cases are plain and simple: In a default judgment case, the defendant is ordinarily entitled to contest plaintiff's damage claim unless it is a liquidated sum or based on mathematical calculations. The two Orders that OTK asks the Court to reconsider do not include damages determinations. Because these Plaintiffs' claims are quantifiable by mathematical calculations the Court could, perhaps, simply enter judgment without a hearing, but the Court has assiduously protected OTK's opportunity to contest the amount of damages. The Court began a

process of quantifying damages by obtaining preliminary information with exemplar calculations, considering objections, holding a hearing, and entering rulings which sustained, in part, OTK's objections. (Doc. 366) Eventually, there will be an "ultimate judgment" that is "meaningfully informed" using mathematical calculations.  The Court has given OTK what <u>Coors</u> and <u>Anheuser Busch</u> guarantee OTK (if not more).

Therefore, the simplest reason the Court can reject OTK's various contentions about the alleged merits of its substantive liability, or the measure of damages, is that the former cannot be relitigated under the guise of a motion to reconsider the propriety of default, and the latter has not been decided yet.

Similarly, once the scope and standard of review is identified, the entirety of Section C of OTK's submission (Doc. 369, PageId. 5994-6012) is refuted.  The Court found subjective bad faith, involving willful violations of multiple discovery Orders over several years. There was ample reason to make that finding.  OTK has not even bothered to say anything about some of the violations of Court Orders the Court detailed.  There is nothing that could be plausibly said about innocent ignorance when an experienced corporate litigant like OTK gets past the end of discovery, to the eve of a trial setting, after multiple settlement conferences and mediations, with its witnesses having described documents it will not produce, with summary judgment motions pending that recite sanctions orders, with a Sanctions R & R entered, and with objections to that R&R pending. There is no way that all of that can happen without the core witnesses and OTK's legal personnel knowing something about what is going on.

But the Court does not have to speculate about who at OTK knew what.  It simply has to recognize that OTK has said nothing, and filed nothing, about the bulk of the violations the Court detailed in its Order that happened from 2018 – early 2021.  For example, when OTK tells the

Court that Littler "did not adequately communicate with OTK" it focuses almost entirely on communications in 2021 and says <u>nothing</u> about, for example, all of the other aspects of non-compliance with the June 2, 2020 stipulated Order. (See Doc. 212)

B.  <u>Hypothetical Horrible Consequences Are Not a Basis To Ignore the FLSA.</u>

Substantively, this is really an argument that OTK makes about the merits of Plaintiffs' claims.  But it is contained within the Introduction to OTK's motion after self-serving, self-pitying, claims that Pledger and Scheid have been deprived of an opportunity to describe what actually happened (notwithstanding that a lot of what happened is largely set out in their deposition testimony, the discovery responses they prepared, and court proceedings Pledger attended). (Doc. 369, PageId. 5967-5968) OTK tells the Court that if its Orders stand its employees "risk losing" "paid lunch breaks, incentive bonuses, night shift premiums, vacation overtime pay, extra pay for holiday work, 'step up' time, and more" because of "Plaintiffs' complex and convoluted interpretations of the FLSA." (Doc. 369, PageId. 5967)

Plaintiffs' response is simple because the law is simple, and because in this respect the American workplace is a simple place. Plaintiffs' positions are based on what the FLSA says, what the CFR says, and what the applicable precedents and DOL opinions say.  OTK has operated for years in violation of the law and it got caught. This Court is obligated to apply the law without regard to the claimed consequences on the lawbreaker.  There are lots of reported FLSA cases, and there are only a handful in which bonus practices just like OTK's are litigated (and the employees always win).  In theory, maybe every other employer in the country which does not use OTK's bonus incentive plan is headed for financial catastrophe.  In reality, maybe every other employer in the country has adopted any one of the many, many ways of compensating employees for

working that does not violate the FLSA.  If OTK cannot figure out how to compensate its American employees in ways that comply with the FLSA and stay in business, there are lots of steel companies that have done both and can fill any void OTK chooses to leave behind.

Either way, the Court cannot concern itself with what OTK claims would be the catastrophic consequences of FLSA compliance.[4] Judge Ed Carnes addressed a similar argument by an employer last week. <u>Patterson v. Georgia Pacific LLC</u>, 2022 WL 2311665 (11th Cir. July 5, 2022) involved discrimination/retaliation Title VII claims brought by a former HR manager at Georgia Pacific ("GP"). The case presented a number of legal questions, most of which the Court resolved adversely to GP.  GP's arguments stressed "practical considerations" for a manager exception to the anti-retaliation provisions of Title VII (there is no exception in the statutory text). For the panel Judge Carnes responded:

> .  ,  , however "practical" the policy considerations might be, making pronouncements about the prudence of the parties' policy preferences is not within the proper purview of judges.  . . .
> . . . .
>
> [S]uch policy concerns cannot alter our interpretation and application of clear statutory language. . . . [I]t is up to Congress to make policy judgments about concerns such as these. Once Congress has expressed its resolution of concerns in a statute, it is the duty of the courts to give effect to that resolution by applying the statute according to its terms. . .

And that is a complete response to OTK's hypothesized parade of horribles if it is required to comply with the FLSA.

---

[4] In lieu of the entry of default, OTK ludicrously suggests that the monetary sanctions which have been imposed (approximately 0.75% of its imminent liability) and Mr. Appleby's loss of his pro hac vice admission would somehow deter other litigants considering misconduct.  OTK was not remotely deterred from its misconduct by any of the examples in American jurisprudence in which modest sanctions were entered, or even the examples in which default judgments were entered. And, frankly, any litigant facing an 8 digit (two comma) amount of liability can easily calculate that the risk of being penalized by a monetary sanction of less than 1% of its liability is a great trade for a multi-year delay in a final adjudication.

The same sort of analysis disposes of OTK's complaints that the sanctions are "harsh" because it cannot offer defenses.  That is always true of default judgments.  Again, all OTK is complaining about is that laws (or Court Orders) have consequences for it.  In the same way, it hypothesizes about copycat litigation and hypothetical arguments about the preclusive effect in other cases (without citing authority) but those are also not grounds for reconsideration.

C.  The Supreme Court and Eleventh Circuit Have Rejected OTK's Microscopic Approach to Contesting the Scope of The Entry of Default.

As part of its unfounded merits excursion OTK goes into extraordinary detail microscopically analyzing the Third Amended Complaint ("TAC") and then proceeds to declare that the details of the Court's default rulings do not match those of the TAC. It is wrong as a matter of both fact and law.

First, the analysis shown in the Court's Orders was exactly in accord with the law. In its second Order (Doc. 351) the Court explored at length the FLSA pleading burden, which can best be labeled as somewhere between featherweight and minimal. (Doc. 351, Page.ID 4738-4471)  At footnote 3 of its Order the Court reviewed the inter-circuit (and sometimes intra-circuit) split over whether an FLSA overtime plaintiff is required to allege in the complaint the weeks in which her pay was deficient.  Highlighting the light pleading burden an FLSA overtime plaintiff actually has shows exactly how outlandish OTK's assertions are that Plaintiffs' overtime claims are void, or otherwise vanish, because there was not perfect identity between the Court's phrasing of its default determinations and the allegations of the TAC.

In this Circuit, in the post-Iqbal universe, nothing resembling the precision OTK demands is required of a plaintiff or the Court. The published decision that probably gives the Eleventh Circuit's most thorough explication of what constitutes a "well-pleaded complaint" is Resnick v.

AvMed, Inc., 693 F.3d 1317 (11th Cir. 2012). That case involved claims of identity theft arising from the theft of laptops. The complaint asserted claims under federal and Florida law, and defendant AvMed attacked the sufficiency of how plaintiffs plead each claim. The District Court dismissed the amended Complaint because in its view it did not allege a cognizable injury. On appeal, the Eleventh Circuit reversed and reinstated Plaintiffs' case. AmVed tried to argue that the District Court was right based on same sort of granular analysis OTK argues for. The Eleventh Circuit's word choices apply equally here: "specious" and "hypertechnical."

> **AvMed contends that Plaintiffs' injuries are not cognizable under Florida law because the Complaint alleges only "losses," not "unreimbursed losses." This is a specious argument**. On a motion to dismiss, we review the pleadings and draw "reasonable inference [s]" from the facts alleged. [Ashcroft v.]Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937,1959, 173 L.Ed.2d 868, (2009). Under the notice-pleading standard, we no longer require the hyper-technical pleading of ages past [citing Iqbal, at 678-679]

693 F.3d at 1324 (emphasis added).[5]

As this Court recognized, what matters at the point that the Court enters a default judgment is whether the allegations of the TAC, accepted as true, state a *prima facie* liability case. (Doc. 351, PageId. 4737)  And even after Iqbal, notice pleading does not require hypertechnicality – especially in the context of the very basic elements required for a FLSA claim.  The content of pages 8-20 of OTK's Motion closely resemble AvMed's specious objections about hyper-technical "mismatches" between the Orders entering default and the allegations of the TAC.  When OTK says it finds a mismatch, it declares the affected portion of the Order to be void. The controlling

---

[5] Coincidentally, the argument that the Eleventh Circuit rejected that an allegation that says "losses" but not "unreimbursed losses" is not subject to attack is very similar to the obvious response to OTK's context-free criticism at Doc. 369, PageId.5997 that Plaintiffs did not show a "boon" which was a word the Court used when it recognized  the obvious proposition that if OTK goes years paying employees less than the FLSA requires, then it makes more money.

law, Iqbal from the Supreme Court and AvMed from the Circuit, flatly rejects this approach.  Nor

can OTK pretend to it is oblivious of the elements of a FLSA claim.  This Court laid them out:

> In the Eleventh Circuit, "[T]he requirements to state a claim of a FLSA violation
> are quite straightforward." Sec'y of Labor v. Labbe, 319 F. App'x 761, 763 (11th
> Cir. 2008). A plaintiff must demonstrate that (1) he is employed by the defendant,
> (2) the defendant engaged in interstate commerce, and (3) the defendant failed to
> pay him minimum or overtime wages." Freeman v. Key Largo Volunteer Fire &
> Rescue Dep't., Inc., 494 F. App'x. 940, 942 (11th Cir. 2012) (citing Morgan v.
> Family Dollar Stores, 551 F.3d 1233, 1285 n.68 (11th Cir. 1998))

(Doc. 351, PageId.4738) (also noting that notice can be a required element, as can an alleged failure

to keep payroll records in accord with the FLSA).

The TAC's factual allegations establish each of those elements, and nothing OTK

microscopically word-smiths erases the factual allegations that establish a basis for each element,

as the Court has already gone through in tremendous detail.  The common law claim is similarly

simple.  As the Court recognized, what has to be plead is: (1) OTK  knowingly accepted and

retained a benefit, (2) provided by Plaintiffs, (3) who have a reasonable expectation of

compensation, and that OTK was unjustly enriched. (Doc.351, PageId.4759)

The clear law, and the Court's existing detailed analysis enable Plaintiffs to concisely cut

through the rest of what OTK says.  About its workweek, OTK essentially disputes the factual

allegations (which it cannot do) and ultimately argues that, somehow, workweeks that start / end

at Midnight cannot be the basis for OTK's liability.[6] Paragraph 18 of the TAC (with

subparagraphs) alleges precisely how OTK designated Pay Periods beginning Mondays and ending

---

[6] All of this was previously addressed in summary judgment submissions.  OTK now points to
Declarations from Scheid, Pledger, and Carole Amidon-Johansson. As shown in Section III, none
of those Declarations which OTK relies on in its fact-based arguments are admissible.  Pledger's
new "supplemental" Declaration substantively admits that Plaintiffs' allegations (which were
based on her testimony) are accurate. And, also that what she, Scheid, and Amidon-Johansson said
in their Declarations is inaccurate.

Sundays until January 27, 2019 and beginning Sundays and ending Saturdays after that, along with explicit allegations that OTK did not pay its employees for overtime based on a fixed recurring 168 hour Monday – Sunday (and then Sunday – Saturday) period, or on any fixed, recurring 168 hour period.  (Doc. 223, PageId. 2646-2647)  OTK's quibble appears to be that Plaintiffs did not use the word "midnight" when they allege that a fixed, recurring, 168 hour period that runs Monday – Sunday (or Sunday – Saturday) was designated but not used.  Midnight is the only time that a 168 hour period that begins Monday can end Sunday (or one that begins Sunday can end Saturday).

About rounding, OTK complains that the Court (citing to an email from Pledger) "remarkably" "disregards" Plaintiffs' allegations when it finds that before May, 2018 clock-out times (not clock-in times) could be rounded by 30 minutes (rather than 15 minutes).  For the Court's current purposes, this is a distinction without a difference, but as OTK says Plaintiffs alleged that before May 6, 2018 when employees clocked out up to 14 minutes was rounded down. (Doc. 223, PageId. 2642)  That has nothing to do with whether Plaintiffs plead facts that describe an unlawful rounding practice – which they did for the rounding of 30 minutes before shifts before May 6, 2018, for the rounding of 7 minutes before and after shifts after May 6, 2018, and for rounding of up to 14 minutes after shifts before May 6, 2018.  The Court can certainly change that number (of minutes) in its Order, but it is a change that has no relationship to OTKs resulting liability.

With regard to "trued-up" payments OTK offers a strange litany of factual contentions, and purported explanations, but it does not lead anywhere in terms of any request to reconsider the Court's default orders.

Last, OTK sets out a rambling merits defense of OTK's Incentive Bonuses, fired from a variety of directions. (Doc. 369, PageId. 5986-5991)  None of it has anything to do with

reconsideration of the entry of default. None of it is even new. OTK filed a motion for partial summary judgment as to its contention that the bonuses were lawful. (Doc. 253) It was denied. (Doc. 291) In that Order, the Court referred to the reasons set out in Plaintiffs' opposition which, in turn, incorporated what Plaintiffs had filed in support of their own entitlement to summary judgment on the same issue. (Docs. 180, 191, 260) The only reason that OTK did not have the applicable statutory, regulatory, and precedential chapter and verse recited to it by the Court in a later Order is that its misconduct and the resulting default terminated Plaintiffs' own partial summary judgment motion. Even though there was no new evidence, or change in controlling law, OTK then filed a motion for the Court to reconsider the denial of summary judgment. (Doc. 316) That also got terminated by the default.

Now, OTK takes a third bite at this apple (or maybe fifth if we count OTK's responses to Plaintiffs' multiple summary judgment submissions). Frankly, it is absolutely ridiculous that OTK is still arguing about the merits of its unlawful policy, and OTK's submission seems to intertwine its "but we are not liable" arguments with some sort of complaint about the Court's damages rulings – even though it does not seek reconsideration of the Court's March 8, 2022 Order.

Long before entering default judgment, the Court rejected OTK's arguments (and accepted Plaintiffs' contentions) that the bonus plan is not saved by any limited regulatory safe-harbor. After entering default the Court set out, again, how the alleged facts (which are actually the undisputed facts OTK testified to) leave OTK's bonus plan without any path to regulatory salvation through the CFR. OTK is clearly proceeding in "willful ignorance." The Court's February 17, 2022 Order discussed in detail 29 CFR §§ 778.209, 778.210, related caselaw and the purpose of those regulations (which equate a plan's operative result with a long-form overtime re-computation). (Doc 351, Page ID.4751-52) And then, dispositively of OTK's wasted pages, the

17

Court set out, precisely, how Plaintiffs' had alleged that this purpose was not met by the actual operation of OTK's Plan:

> Accordingly, Plaintiffs allege Defendant's "percentage bonus" does not achieve the same result as a recalculation of overtime earned during the calendar month. Since the bonus is not applied to wages wholly earned during the calendar month, Plaintiffs allege . . . the math never works out and the overtime wages earned during the bonus period should be recalculated.

(Doc. 351, PageId.4753)

So OTK can stand on whatever mountaintop (or hilltop) it can find between here and Calvert and proclaim the theoretical glories of its bonus plan. All of that has nothing to do with Plaintiffs' claim, which is simply that what OTK does not comply with the FLSA and its accompanying regulations. The Court has already addressed and correctly disposed of this issue.

## II.   OTK's Own Misconduct is Not Excused by the Misconduct of Its Former Counsel, or By The Court's Entry of Orders Requiring it to Produce Excel Data OTK Said It Had.

Throughout its submission OTK blames its current situation on Plaintiffs, Littler, and perhaps the Court. For the most part these arguments are presented at pages 4-5, and 29-47, but they pop up throughout the motion.

Here are a few concise items that OTK ignores. From 2019 onwards it, and specifically Pledger, were absolutely aware OTK was required to produce Excel time and pay records for all Plaintiffs, with pay rates, and Pledger chose to omit pay rates from the Excel files she actually created. In April, May, and June, 2020 OTK was aware of a whole series of discovery items that arose in OTK's depositions, which were reflected in the April, 28, 2020 Parties' Planning Report, the transcript of the May 6, 2020 scheduling conference, and the June 2, 2020 Stipulated Order. (Docs. 196, 212, 327) OTK then proceeded to ignore almost all of those obligations. OTK has offered <u>nothing</u> to explain its rampant disregard for the Court's various orders. Its own personnel

(Scheid, Pledger, and in-house counsel Charlotte Brewer Cooper) were attending depositions and (in Pledger's case) hearings about ongoing discovery issues.

OTK's argument, in substance, is that the Court has to "believe" it that its personnel were personally unaware of the years of discovery orders and discovery violations. The Court absolutely does not have to believe that nonsense – especially when OTK carefully limits what it files temporally, subject-matter wise, and recipient wise. Corporations are not allowed to represent themselves pro-se, and OTK's position amounts to a get-out-of-jail-free card for every litigant (except pro se litigants). Any represented litigant can always claim to be unaware of some aspects of their lawyers' activities.

It is, indeed, lamentable that OTK's former counsel misrepresented to the Court the circumstances involving ADP's response to a non-party subpoena. That statement cannot be pinned on OTK. That representation came, however, after about two-and-a-half years of discovery violations by OTK. OTK's lawyers may well have assisted OTK in a misguided decision to delay, stall, and obfuscate, but it was not OTK's lawyers who committed the string of factual misrepresentations by OTK. It was not OTK's lawyers who could not perform the usually simple task of verifying time and pay and identifying supporting records. It was not OTK's lawyers who prepared what were represented to be OTK's unaltered business records - but which were not. It was not OTK's lawyers who failed to disclose that step-up rates were omitted from OTK's productions. It was not OTK's lawyers who changed the pay week settings in OTK's computer systems - or who prepared documents specifically for the lawsuit with inconsistent pay period dates. It was not OTK's lawyers who failed to identify or produce colorized time records when black and white records did not actually show what time was authorized and paid for. It was not OTK's lawyers who failed to mention anything about "RROP" in 2018 responses to Court-

19

mandated discovery, and it was not OTK's lawyers who failed to produce the emails Dave Scheid sent and received about bonuses.

OTK did all of that. In its motion OTK basically pretends, contrary to the evidence carefully considered by the Court, that none of it happened. Instead it tries to divert the Court's attention to a two week period surrounding the misrepresentation about ADP and the resulting proceedings hoping the Court will forget all that came before. The Court set out how OTK is a "sophisticated employer" and seasoned litigant in this federal Court and detailed the "sorry pattern" of misconduct that began shortly after suit was filed in 2019. (Doc. 344, PageId.4633) Throughout the period of misconduct OTK had in-house counsel (Charlotte Brewer-Cooper). Among other things, she personally attended Dave Scheid's deposition. (Doc. 187-2, PageId.1319) A year later, the very limited emails OTK has produced reflect that Brewer-Cooper was included in Scheid's emails to / from Littler. (Doc. 368-8; PageId. 5942 (Notably, OTK has produced nothing and said nothing about Brewer-Cooper's role or the role of any other non-Littler lawyer, throughout the chronology the Court described.) Then, of course, there is Scheid who the Court discusses specifically in its Order. Scheid actually attended Pledger's deposition (Doc. 206-2, PageId. 2177) at which so much of the information that OTK had not produced was described and the new information from Pledger about "trued up" "RROP" payments was revealed.

Put plainly, OTK was focused enough on this case that its in-house lawyer attended Scheid's deposition. Scheid was personally focused enough on this case that he attended Pledger's deposition. Presumably, OTK paid Littler Mendelson periodically as the case dragged on from 2018, to 2019, to 2020 and into 2021 while motions to compel were filed, discovery was answered, re-answered, and re-answered again, scheduling Orders got entered, Orders granting Motions to Compel got entered, summary judgment motions were filed and set for hearing, and eventually

sanctions were entered in a R&R. It sent representatives like Scheid and Pledger to multiple settlement conferences and mediations at which, supposedly, they should have been informed enough about the case to authorize settlement.  None of its claims of innocent ignorance are remotely plausible given the very basic and standard practices that large companies (especially those with in-house counsel) adopt to monitor the status of ongoing lawsuits.  OTK was directly involved throughout the whole process and the Court's Order recognizes that involvement. The Court should not allow OTK to avoid the consequences of its actions.

A.  OTK's TODDI Defense Collapses Under a Fact Check.

 For many decades criminal defense lawyers in this District (as they do throughout the country) have advanced for their clients a defense that has come to be known by the acronym SODDI. This represents the position that, though the crime charged in the indictment may well have occurred, the perpetrator was someone other than the indicted defendant; thus "Some Other Dude Did It."  A narrower version of that defense is called TODDI, which is largely the same except it depends on a specific alternative perpetrator: "That Other Dude Did It."

In its second major argument OTK makes the TODDI avoidance defense, asserting that it is not guilty of any of the "death penalty" offenses condemned in the Court's two Orders because that Other Dude – Littler - was solely at fault and OTK cannot be tainted by its long-time counsel's misconduct. The record completely rebuts this contention, and the Court's Order addresses OTK's own culpability. Part of that discussion is at Doc. 344, PageId. 4707-4709. There, after a lengthy summary of the litigation partnership between OTK Vice President Scheid and OTK's (and earlier Thyssenkrupp's) chosen counsel Littler, the Court concluded:

> Defendant has been involved in at least eight employment - related  cases  in  this
> Court. In each of those cases, Defendant had the same Vice-President (Mr. Scheid)

and counsel as in this case. Defendant has had a close and enduring relationship
with its counsel. Defendant is bound by the acts of its "freely-selected agent."

Those statements followed the Court's discussion of spoliation which described assorted types of data that OTK did not produce, claimed it could not produce, and that eventually ADP could not produce either.  As discussed in Section III, it is now even clearer that Pledger herself was taking data files which she represented to Plaintiffs were pristine, unaltered business records and adding, or deleting, or changing pay rates and pay period dates before production.

Now of course OTK and Scheid try to put light years between themselves and Littler as part of OTK's TODDI defense strategy.  Scheid does this by poorly executed sleight of hand, revealing "a range of" "select" emails, over a period covering a couple of weeks and ignoring completely the couple of years before Magistrate Judge Nelson's R & R. (Doc. 358, PageId. 5871-5873) By necessary inference, the reason Scheid and OTK are not revealing the rest of the emails over the entire period of OTK's misconduct is that complete disclosure would amount to a confession.   (Similar inferences can fairly be drawn from OTK's failure to produce communications between Littler and in-house counsel Brewer-Cooper, and OTK's failure to produce internal communications among Scheid, Pledger, Carlos Villacreces, Brewer-Cooper and anyone else involved in handling discovery obligations, or complying with Court Orders from summer 2018 – until discovery closed).

While Plaintiffs can point out these gaping holes, they cannot argue with the strategic benefits (to OTK) of its decision to conceal what (many years ago) Paul Harvey would call "the rest of the story" from the Court.  As illustrated in Section III, every time OTK tries to parcel out even the most limited disclosures of who did what it merely reveals additional malfeasance.

B.  OTK's PDF/Excel Argument Fails Because OTK Demonstrated Repeatedly That It

Could Provide The Excel Data It Was Repeatedly Ordered to Produce, and So Could ADP.

At page 5 of its Motion OTK starts with the premise that the FLSA does not require an employer to keep pay records in Excel. (Doc. 369, PageId. 5969-5970) It then turns this unimpressive shield into an equally defective sword and argues that since it was not required to keep records in Excel format there was no sanctionable conduct involved in its failure to produce time/pay records in that format, as opposed to the "native" PDF format. Later, OTK says that since it was "impossible" to produce non-PDF pay records as an argument against sanctions. (Doc. 369, PageId. 6001, fn. 11)

There are three critical flaws in this argument. First, as OTK grudgingly concedes, despite the "impossibility" of Excel production, its proxy ADP not-so-miraculously managed to produce a tremendous amount of OTK's time and pay data in Excel (for the periods ADP still had it) very quickly when it was called upon to do so by the Court.  The mundane nature of ADP's achievement is reflected in the fact that OTK had also produced its own records in Excel in 2018, and 2020. Third, and more important, even though the FLSA (which predates computers) does not require Excel records, OTK's records actually existed in Excel format.  From the very beginning of discovery the parties agreed and later the Court ordered that records be produced in Excel.  (Doc. 344, PageId. 4662, fn. 16; Doc. 64)

Despite all of this, OTK continues to argue about that its professed "inability" to produce Excel records (which is belied by its actual production of Excel records) immunizes it from default. (Doc. 369, Page ID.6001 n. 11)  OTK states in its Motion that "Plaintiffs were never entitled to insist on this documentation  only in Excel." (Doc. 369, Page ID.5970)  This statement displays that OTK's defiance of this Court's Orders continues to this day. First, the Plaintiffs were entitled to ask for Excel production. Second, once OTK agreed and / or the Court ordered Excel

productions the Plaintiffs were absolutely entitled to insist on compliance.[7] ESI issues are common which is why they are explicitly contemplated in Scheduling Orders.  As the Court recognized, Excel productions were discussed over and over again.  (Doc. 344, PageId. 4703; Doc. 216)  OTK agreed to make Excel based productions, and OTK was ordered to make Excel based productions.[8] All of this occurred while OTK ignored a series of requests to meet with Plaintiffs about ESI considerations.  OTK did not get sanctioned because it did not comply with Plaintiffs' requests for Excel files; it got sanctioned because it did not comply with Court Orders requiring Excel productions – including Orders it agreed to.


**III.        Declarations.**

---

[7] There were, of course, side-issues that involve the "Excel" name that also touch on OTK's misconduct.  Pledger represented that Excel spreadsheets she prepared were un-altered business data. (Doc. 206, PageId. 2207-2208) As discussed *infra* in fact she was adding and deleting content, including pay dates and pay rates, as she created them.  Separately, when Pledger's testimony about "RROP" led to inquiries between OTK and ADP about what RROP was, and where it was documented Pledger (apparently) insisted that all she could access were PDFs of what she calls Pay Registers that had RROP information - even though she receives by email every two weeks the pre-approval content in Excel format with overtime pay information.

[8] Strangely, OTK acts as if has not read the Court's default Orders, or any of the prior Orders relating to discovery.  It tells the Court that "At the end of the day, the primary 'failing' was OTK's inability to meet the Plaintiffs unrebutted demands" for Excel formatted adjustments to RROP that OTK could not provide.  (Doc. 369, PageId. 5969) There are several things OTK gets wrong in that one sentence.  A failure to provide RROP adjustment data in Excel was not part of the laundry list of Excel-formatted data OTK failed to produce described in the Order. (Doc. 344) The June 2, 2020 Stipulated Order's provisions about RROP called for OTK to produce "all documents and data" reflecting the amounts and underlying calculations of the trued-up payments Pledger had testified about.  (Doc. 208) It was OTK that in the summer of 2020 first suggested that a non-party data production by ADP was necessary and then did not pursue the sort of data from ADP (including linchpin Excel time and pay record data) that OTK had long been under Court Orders to produce.  The Plaintiffs never demanded RROP adjustment data in Excel format – and the Stipulated June 2, 2020 Order did not require Excel (although, apparently, that is the format any RROP data is kept) As it turns out, Pledger admits she actually receives preliminary Excel files which relate to RROP calculations of overtime pay but she has never bothered to look at them to determine what information they have.  (Doc. 390-4, PageId. 6329-6331)

A.  <u>An Impending OTK Paradox?</u>

Throughout part I of the Motion OTK attempts to throw some shade on plaintiffs' counsel by asserting that counsel "now know" through post-default discovery the true facts. OTK does not reveal what those recently discovered facts are.  Chasing down OTK's version of the "true facts" is hard because OTK's witnesses' stories "evolve" between discovery responses, deposition testimony, Declarations, emails, and now "supplemental" Declarations. Discussed at length here is the supplemental version of the Declaration of Pledger, setting out a different version of the "true facts" than her original Declaration, which sets out a different version of "true facts" from her 2020 deposition testimony, which sets out a different version of "true facts" from those shown in documents she prepared and the discovery responses she verified, all of which is further contradicted by deposition testimony she gave in May, 2022 which itself is contradicted by the limited emails to / from Pledger that OTK saw fit to produce after she was deposed in May, 2022.[9]

Before we dive into the ugly but excruciatingly mundane details of the Declarations, we will (briefly) look to the heroes of ancient Greece for an apt analogy. This ongoing metamorphosis in OTK's story calls to mind Theseus, whose voyage with an Athenian crew gave rise to what is called the Theseus Paradox.[10]  It seems that the planks on Theseus' wooden boat needed replacing from time to time, leading to the Paradox: When all of the planks were replaced, do we still call it Theseus' boat? That seems to be where OTK's story is headed, and perhaps it has already arrived

---

[9] Scheid's Declaration explicitly claims to have been prepared after he reviewed Pledger's deposition testimony, Pledger's communications, and assorted other documents. (Doc. 368-8, PageId. 5868-5870, ¶¶ 15, 23) It, therefore, shares all the same failings – except that OTK could not be bothered to "supplement" Scheid's Declaration with another one admitting any of the misstatements in the first one.

[10] There are alternate literary references. In *So Long, and Thanks for All the* Fish (the fourth of the six book *Hitchhikers Guide to the Galaxy* trilogy) Marvin the Paranoid Android eventually had all the parts of his body replaced – except the diodes down his left side, which hurt.

at the point where 100% of OTK's story will have been replaced with entirely different content.

On November 9, 2020 OTK declared that it was "working on" an affidavit for Melissa Pledger to "correct her prior testimony" . . . from March, 2020.  (Doc. 267, PageId. 3512)  It took 16 months, but on March 10, 2022 OTK filed a Declaration.  As will be detailed here within two months Pledger gave deposition testimony in the <u>Gibson v. Outokumpu Stainless USA, LLC</u> case and that testimony left no doubt that her Declaration contained untrue and inaccurate statements.  Plaintiffs immediately raised the issue with OTK's counsel and demanded that the motion to reconsider which is so heavily predicated on Pledger's Declaration be withdrawn.   (Doc. 389-1, PageId.  6329-6330, 6242-6244)   OTK has chosen, instead, to leave its motion, and the Declarations it depends on before the Court.  But at  4:36 p.m. on Friday July 8, 2022 OTK filed what it calls a "Supplemental Declaration of Melissa Pledger." (Doc. 389-1)  In that "supplement" Pledger affirmatively admits that the content of her first Declaration is inadmissible. (Doc. 389-1, PageId.6229 ₱ 6) She essentially admits that the content of her initial Declaration is inaccurate. (Doc. 389-1, PageId. 6230, ₱₱ 13, 14 15, 17, 18, 20, 23, 24, 25, 27, 28, 29)  In ₱₱ 33 and 34 of her new Declaration she acknowledges that OTK does <u>not</u> actually base its count of overtime hours on a week that begins Sunday at 6:00 a.m. and ends at 5:59 a.m. the following Sunday as she claimed was true in her March, 2020 Declaration.

And, of course, even Pledger's deposition testimony from March, 2020 included efforts to correct, clarify, and explain the documents Pledger had created for purposes of this litigation, and the discovery responses she and OTK had signed, verified and / or served.  But whether the analogy is a ship, or a nearly-eternal robot, this is where we now stand.  After OTK served discovery and documents that Pledger and OTK prepared and verified, Pledger testified in deposition about various ways those discovery responses were incomplete, inaccurate, etc.  Pledger then  "clarified"

her testimony by Declaration.  Pledger then controverted her Declaration by additional testimony.

Pledger then contradicted both her testimony and her first Declaration, through production of a

small set of emails, and her "supplemental" Declaration rewriting the first one.  There is nothing

left of OTK's litigation boat, and its complete piece-by-piece replacement is the result of the

conduct the Court properly identified as grounds for default judgment.


      B.    <u>The Declarations Are Inadmissible.</u>

OTK filed three Declarations with its motion. (Docs. 368-7, 368-9, 368-9) Then, it filed

what it calls Pledger's "Supplemental Declaration." (Doc. 389-1) Fed. R. Civ. P. Rule 56(c)(4)

requires that Declarations "must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters

stated."  Of course, the content is supposed to be true and accurate.  There are significant

substantive misstatements (discussed *infra*) but all four Declarations are inadmissible on their face.

> The Rules are clear: "Supporting and opposing affidavits *shall* be made on personal
> knowledge." Fed.R.Civ.P. 56(e) (emphasis added). Rule 56(e)'s personal
> knowledge requirement prevents statements in affidavits that are based, in part,
> "upon information and belief"—instead of only knowledge—from raising genuine
> issues of fact sufficient to defeat summary judgment.

<u>Pace v. Capobianco</u>, 283 F.3d 1275, 1278–79 (11th Cir. 2002)  Fed. R. Evid. 602 has the same

personal knowledge requirement. These Declarations are not based on personal knowledge and

should be exclude for that reason alone.

      (i)    <u>Pledger's Declarations and Scheid's Declaration.</u>

In ¶ 3 of her March 10, 2022 Declaration, Pledger asserted: "All of the information below

is based on my first-hand knowledge."  Then, she begins backing off saying: ". . . and from my

review of documents."  Then, she affirmatively admits that (unidentified) parts of her Declaration

are inadmissible by adding "except such facts that are made upon information and belief." (Doc. 368-7, PageId. 5719)

¶ 2 of Dave Scheid's Declaration is the same. (Doc. 368-8)

Pledger's July 8, 2022 Declaration omits any affirmative claim of personal knowledge. (Doc. 389-1) In ¶ 6 of that Declaration she affirmatively states that the claim of "personal knowledge" in the first Declaration should be read "in light of" the representation in her first Declaration that its statements were "based on 'my review of documents and data related to this matter maintained in the regular course of business, except such facts that are made upon information and belief.' (Doc. 389-1, PageId. 6229)

OTK is the proponent of these Declarations. In each the declarant describes how some of the content will be inadmissible without identifying what is, supposedly, admissible. Therefore, the entirety is inadmissible.

Pledger's Declarations illustrate exactly why admissible Declarations have to be based on personal knowledge. With bold emphasis added see ¶ 5 ("…the information recited in those paragraphs was accurate to the best of my knowledge **at that time**") ¶ 9 ("**I believe I was looking at** [a specific document] . . . I **have come to this belief** by reviewing the March 2020 testimony", ¶ 11 ("there was **apparently confusion between OTK's attorneys and me** when compiling [referenced exhibits]"), ¶ 13 ("**I now see there are differences** in the data showing in these two versions"), ¶ 14 ("Having reviewed my emails . . . **I now recall** [the supposed substance of communications with a Littler associate]"), ¶ 15 (since providing deposition testimony on May 10, 2022] "**I have refreshed my recollection** regarding the 'Check Detail' reports I ran before my March 11, 2020 deposition" "**I now recall** …that I had to go back and input" base rate information into Excel reports prepared in 2018), ¶ 16 ("**reviewing my e-mails . . . it appears**" that 32 Excel

reports prepared in 2018 "**would have included**" pay rates and this "was this the basis for my statement in my previous Declaration's paragraph 9, sub-paragraph 3(a) regarding 'baseline' rates of pay.") (Doc. 389-1, PageId. 6228-6231)

Plaintiffs interrupt this litany to emphasize that in ⁋ 9 of that March 10, 2022 Declaration Pledger (mis)represented that each of the spreadsheets for **225** employees she prepared before she was deposed included **"an ADP generated** payroll history which **included**" "(a) **'baseline' rate of pay** (without RROP calculations)" (Doc. 368-7, PageId. 5720)

In the rest of ⁋ 16 of Pledger's second Declaration the admissions of inadmissibility and inaccuracy continue. ("**having gone back and looked at other emails**" "it appears" that the spreadsheet created in 2020 "**most likely would not have included the same "Pay Rate" column. I did not notice this difference** when I reviewed my previous Declaration for accuracy . ." "**I mistakenly assumed**" "that all of the **ADP generated** payroll histories" also included baseline rates of pay.) In ⁋17 she confirms what the documents she supposedly reviewed before OTK filed her March 11, 2022 Declaration already demonstrated: ". . . **the spreadsheets I gathered before my March 2020 deposition did not include a 'Pay Rate"** column for all 225 team members." In ⁋18 she says that the precise date (February 2, 2021) she identified in her first Declaration "**may be imprecise, but it comes from the ADP portal entries . . ."** In ⁋ 21she says that while trying "to **refresh my recollection** about the timeline" to prepare her second Declaration she reviewed a copy of Governor Ivey's March 13, 2020 Proclamation. In ⁋ 23 she admits that "**In hindsight I do not recall** exactly when I first reached out to ADP to find out more information" about the true-up process. In ⁋ 25 she says that **it appears**" that the five month period stated in ⁋ 32 of her first Declaration are a time-frame from her March 11, 2020 deposition until an August 31, 2020 email. What she stated in that ⁋ 32 was that August 31, 2020 was <u>"five (5) months after my initial contact</u>

with ADP on the matter." (Doc. 368-7, PageId. 5726) (underling in original). In ⁋ 25 of the new Declaration she speculates: "**If my first post-deposition contact with ADP**" about the true-up process was on June 1, 2020 then the first Declaration "**should state**" three month rather than five months.  Notwithstanding her earlier assertions of personal knowledge and a review of documents she declares in ⁋ 26: "**Today, I cannot recall one way or the other whether or not I might have had any**" telephone communications with ADP about trued-up payments between March 11, 2020 and June 1, 2020. (Doc. 389-1, PageId. 6231-6234)

This is a good place to interrupt, again to note that OTK continues to stand by the Declaration of Dave Scheid it also submitted. He affirmatively represents: "**I also have reviewed and agree with the summary in Ms. Pledger's Declaration regarding her communications with ADP . . .**" after asserting his "good faith understanding from my team's attempts to obtain" RROP information. (Doc. 368-8, PageId. 5870, ⁋⁋ 21, 23)

Continuing on, Pledger states in ⁋ 27-29 of her new Declaration that she (now) "**believe[s]**" that her statement in ⁋ 34 of the first Declaration that Carlos Villacreces attended a Teams Meeting with ADP on November 5, 2020 was based on emails she "pulled to see who was invited" but that "**I have since learned that Mr. Villacreces recalls**" that he did not attend the meeting.  She disclaims any intent to provide inaccurate (sworn) statements and says she "**relied on my e-mail records**" and that she "**has no reason to dispute**" Mr. Villacreces's (hypothetical) "recollection **if he recalls receiving the invitation**" but not attending the meeting. (Doc. 389-1, PageId. 6234)

Again, we interrupt to note that Scheid's Declaration affirmatively states: "**In particular**, on November 5, 2020 Melissa Pledger, **Carlos Villacreces** and I attended a meeting with ADP . . ." (Doc. 368-8, PageId. 5871) This comes two paragraphs after he states that he has reviewed and agrees with Pledger's summary of communications with ADP. (Doc 368-8, PageId. 5870)

In ¶¶ 30 - 36 of her new Declaration Pledger waffles around about the unambiguous statement made in ¶ 43 of her first Declaration that OTK's Time and Attendance System "applies overtime to any hours over 40 during the **7 consecutive 24 hour period** [sic] between **6:00 am Sunday and 5:59 am** the following Sunday." She eventually, however, says: **"Perhaps I could add** to the statement in paragraph 43 of my Declaration that ADP's Enhanced Time calculates overtime hours by looking at whether or not a team member has worked over 40 hours at any time **between the team members clock in for the Sunday morning shift and the team member's clock-out for the Saturday night shift."** In ¶ 34 of her new Declaration she gives as an example, a timekeeping practice (also inaccurately described) for employees based on "**seven consecutive 24 hour periods** between the **7:00 am Sunday start of the shift and 6:59 a.m. end of the Saturday night shift the following Sunday**" and then in ¶ 35 of the new Declaration further qualifies (and still inaccurately describes) the assertions in ¶ 43 of her first Declaration. (Doc. 389-1, PageId. 6234-6236)

Scheid's Declaration contains similar statements reflecting a lack of personal knowledge throughout. (Doc. 368-8, See ¶¶ 2, 19-23, 27, 34-36, 42, 44-48)

It is beyond dispute that both of Pledger's Declarations and Scheid's Declaration set out exactly why they are inadmissible. One simple consequence is that it leaves OTK with absolutely nothing to point to as grounds for reconsideration of the propriety of the entry of default.

(ii)     Declaration of Carole M. Amidon-Johansson, Ph.D.

OTK also filed a Declaration of Carole M. Amidon-Johansson, Ph.D. (Doc. 368-9) She is a labor economist who works for a consulting firm that OTK hired. In the Gibson v. Outokumpu Stainless USA, LLC case, 1:21-00103-JB-N, OTK has presented a report from her as if she were

a qualified expert with admissible opinions.  In this case, it has just filed her Declaration and says it is "offering Amidon-Johansson's Declaration merely to assist the Court in understanding what OTK's and ADP's records show."[11] (Doc. 369, PageId.5976, n. 11)  As Plaintiffs have said, the only narrow issue on which OTK can even try to seek reconsideration is the entry of a default judgment as a sanction, and the merits / damages issues that flow from "what OTK's and ADP's records show" is unrelated to the misconduct that justified a default judgment.

Amidon-Johansson's Declaration simply demonstrates its inadmissibility. She does not claim to have any personal knowledge of the underlying time worked, or payments made.  She has no role in creating ADP's records or OTK's records.  So, she has no personal knowledge of anything relevant.  Nor is her Declaration admissible "to assist the Court" in understanding OTK's, or ADP's records.  That is what admissible expert testimony would be for – but this is not a subject that allows for expert testimony.  A proponent of  expert testimony bears the burden of showing admissibility. U.S. v. Frazier, 387 F. 3d 1244, 1260 (11th Cir. 2004)

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[11] Her actual Declaration is not remotely limited to some description of what either OTK's or ADP's records show.  She purports to describe how OTK calculates time (with qualifiers like "in most instances"). (Doc. 368-9, PageId.5955, ¶ 6) She purports to describe how "many employees" [possibly intended to say "employers"] schedule pay periods. (¶ 7) She opines about what "makes sense" and "makes less sense." (¶¶ 8, 9, 13)  And she describes (for one employee and one two week time-frame) her attempts to "map" data and "recalculate" numbers under assorted assumptions.  (¶¶ 11, 12, 14) None of this has anything to do with the entry of default, and none of it is intended to inform the Court about what OTK's (or ADP's) records "show."  What OTK's records show about the time anyone was clocked in for, and the time they were paid for, and how much they were paid for stands on its own and does not require "mapping" or "recalculation."

City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Frazier, at 1260. Nothing in Amidon-Johansson's Declaration sets out any relevant expertise (as opposed to an impressive string of academic qualifications and generalized consulting work).  Nothing describes any reliable methodology. Most clearly she says nothing about anything that requires any specialized expertise for the Court to understand.  All over America employers that are subject to the FLSA manage to designate fixed, recurring, 168 hour workweeks, and pay employees 1.5 X the regular rate of pay for hours worked in excess of 40 hours in those workweeks without the guidance of anyone with a doctoral degrees in Economics.  When a workweek is designated to start and end (and whether it is a 168 hour period) is within the understanding of laypersons (including the Court).  Calculating a regular rate of pay (that gets multiplied by 1.5) also does not require a Ph.D. in economics.  And, therefore, by definition, the factual statements (or mis-statements) in Amidon-Johansson's Declaration are not admissible under the guise of expert testimony because none of this is beyond the Court's lay understanding.  Frazier, at 1262.


C.     Mis-Statements in Declarations.

If the Court accepts Plaintiffs' contention that the Declarations are all inadmissible, the following discussion of the mis-statements in them is superfluous, but given how the parties got where we are, Plaintiffs believe it is important.

(i)     Pledger's Declarations.

OTK let Pledger play a major role in this litigation.  She was responsible for preparing (supposedly) verified statements about the wages of Plaintiffs backed (supposedly) by actual records.  She was responsible for (supposedly) verifying OTK's discovery responses. (Doc. 390-

8, PageId. 6403) She was responsible for preparing (supposedly) verified lists of employees and former employees to whom notice was sent. She was designated as OTK's representative at the Settlement Conference held with Magistrate Judge Nelson on December 9, 2019. (Doc. 338, transcript p. 53) And she was designated as its Rule 30(b)(6) deponent on various subjects.

The preceding discussion encompassed some of the mis-statements in Pledger's Declaration and those details will not be needlessly repeated. The core mis-statement is her assertion that her statements are based on her personal knowledge (or even a review of records). Much of what Pledger says about her supposed diligence and good faith might be verified (or shown to be false) if Plaintiffs and the Court had the complete record of OTK's internal communications to / from Pledger, Scheid, Brewer-Cooper, etc. along with a complete record of its external communications with the Littler firm. But, even the limited information OTK has disclosed, combined with what was already known, makes it clear that the factual assertions Pledger emphasizes the most are false.

Paragraph 9

As is described above, Pledger now admits that the statements in ¶ 9 of her first Declaration are not true. It is unsurprising that even now Pledger, and therefore OTK, try to minimize and obscure what she actually did in 2020, and how it directly and seriously delayed the case for no good reason. OTK (still) has not withdrawn Pledger's Declaration, but when Plaintiffs raised issues about it OTK did produce some emails. They only serve to illustrate Pledger's misconduct.

In ¶ 9 of her Declaration Pledger professed: "It was and continues to be my understanding from my interactions with Littler and Plaintiffs' counsel during my deposition that I had provided the information sought and then some." (Doc. 368-7, PageId. 6047) Notably absent from OTK's limited production of emails, etc. is anything showing what Pledger (or Scheid, or OTK's own in-

house counsel) were instructed to gather in 2018 to comply with OTK's Court-ordered discovery obligations – which set the stage for the misconduct that followed.

As Pledger now admits (having been caught) hundreds of spreadsheets she prepared in 2020 that did not include any pay rates. The limited emails OTK has now produced illustrate four additional problems. (1) Pledger absolutely knew that the spreadsheets were supposed to include pay rates, (2) Pledger's testimony in 2020 that the spreadsheets she prepared were un-doctored business records data is untrue, (3) Pledger falsely tried to shift the blame to Littler and did so ineptly enough that she merely established the falsity of her own testimony, and (4) that OTK stalled producing even the inadequate spreadsheets Pledger prepared in 2020 for several months.

From the start of this litigation Pledger was preparing Excel pay records that omitted even base pay rates. At the same time she was repeatedly instructed by Littler attorneys to include those pay rates. When she could be convinced to do so, she was **adding** that information as well as (inaccurate) pay period ending dates to what she was preparing.[12] On September 12, 2018 she emailed OTKs attorneys: "… the spreadsheet I sent for Hartery's pay detail did not have the hourly rate on it. Please see attached for the updated sheet." (Doc. 390-5, PageId. 6330) Two weeks later she prepared another pay detail that left out the pay rates and Littler attorneys had to ask her to add the pay rates. (Doc.390-5, PageId. 6336) Emails dated October 1, 2018 and October 24, 2018 reflect, again, the need for pay rates and that Pledger was adding them to the spreadsheets along with pay period ending dates. (Doc.390-5, PageId. 6341-6342)

On August 29, 2019 Littler referred Pledger explicitly to the Excel spreadsheets she had prepared in 2018 and asked whether the "check details / pay data" were "still readily available in

---

[12] In March, 2020 she testified that she did not make any changes to the data she compiled. (Doc. 206-2, PageId. 2207-2208)

Excel format. (Or did you have to create those to provide to Ryan previously)."   (Doc.390-6, PageId. 6345) Pledger's response does not answer the question about whether she had created the 2018 records, but she responded that Excel data was available. (Doc. 390-6, PageId. 6344) On October 7, 2019 Littler emailed Pledger again, accurately citing Plaintiffs' counsel's continued "griping" about the failure to produce data in Excel format.   At that point, Littler sent to Pledger an Excel spreadsheet (that included pay rates) that Pledger had prepared in 2018 as an example. (Doc. 390-6, PageId. 6348-6351)[13]   Pledger stated that she "could run those reports, they just do not clearly show hours worked and dollars paid. Let me know what I need to print." (Doc. 390-6, PageId.6352)

Pledger attended the December 9, 2019 Settlement Conference that turned into a discovery conference as OTK's representative.   At that hearing, there was explicit discussion of the fact that the Plaintiffs' first set of discovery was intended to make sure that everybody's time and pay records were the same as an initial set of exemplar Plaintiffs. (Doc. 338, Transcript  p. 66)  About five weeks later, on January 17, 2020 Magistrate Judge Nelson heard argument on Plaintiffs' Motion to Compel.   OTK has chosen not to produce to Plaintiffs (or file with the Court) any substantive communications between anyone from OTK and Littler from October 8, 2019 and January 15, 2020.  On January 15 – 16, 2020 Littler and Pledger were, again, emailing about the changes Pledger had made to pay period dates on spreadsheets.

A January 15, 2020 email is significantly redacted, but what remains includes counsel's comment to Pledger that "it may be time to start working on gathering" time and pay data for opt-in Plaintiffs.  (Doc. 390-7, PageId. 6367) Pledger was asked how long it would take to obtain time

---

[13] The spreadsheet excerpt filed at Doc. 390-6, PageId. 6350-6351 only contains a few excerpt rows because it is the column headers that are relevant.

and pay data in Excel formats. Pledger's response is also redacted, but what is left refers to an attached Excel report for time stamps.  (Doc. 390-7, PageId. 6368) On January 16, 2020 Pledger claimed it took one hour for her to process one Plaintiff's files. (Doc. 390-7, PageId.6364) The next day Littler attorneys reminded Pledger that they needed Excel sheets of pay data, not PDFs, and Littler sent back to Pledger a sample Excel attachment **which included pay rates**. (Doc. 390-7, PageId. 6363, 6369-6371)[14]

The morning of January 17, 2020 Pledger informed Littler that the Excel records were easier to process. (Doc. 390-7, PageId. 6355) This was after she had already been provided, yet again, with the sort of Excel sheets she prepared in 2018 **with base pay rates**. (Doc. 390-7, PageId. 6363, 6369-6370) In the same email exchange Littler attorneys asked Pledger if she had "any concerns about the [Excel] detail report being different from the [PDF] pay slips." (Doc. 390-7, PageId. 6355)

As the January 17, 2020 hearing later that day OTK's counsel told Magistrate Judge Nelson that Pledger said it would take an hour to generate each Plaintiff's Excel time and pay data. (Doc. 325, transcript pp. 50-51) That led to the discussion, and Order, that gave OTK through April, 2020 to produce the data in three sets. (Doc. 325, Transcript 51-57, Doc. 172, PageId. 1105)

By February 19, 2020 Pledger transmitted to Littler spreadsheets for 166 employees.  (Doc. 390-7, PageId. 6372) Over the rest of February, 2020 she transmitted dozens more and as best Plaintiffs can tell from what OTK has chosen to provide, Pledger sent the last of those files to Littler March 2, 2020. (Doc. 390-7, PageId. 6373-6400)[15]  None of the emails **from Pledger to**

---

[14] The Excel excerpts attached at Doc. 390-7, PageId. 6369-6371 also include just a few rows of data because it is the column headers that matter.
[15] OTK 64818 and 64820 are Excel time stamp files which are irrelevant to Plaintiffs' submission and would take up hundreds of pages so they are omitted.

**Littler** that OTK has produced include actual attachments.  On the other hand, the emails OTK produced **from Littler to Pledger** do sometimes include attached files. (Doc. 390-6, PageId. 6348-6351, 6417-6419, Doc. 390-7, PageId. 6387-6389)

Fortunately for Plaintiffs, on February 28, 2020 Littler sent Pledger an email that happened to attach a paycheck detail spreadsheet that Pledger had prepared for one employee. (Doc. 390-7, PageId. 6387-6389) It is formatted just like the hundreds that were produced to Plaintiffs at the end of February, March, and April, 2020. Plaintiffs have filed just the column headers and the first few rows from that spreadsheet because what is relevant for their purposes are the column headers. Unlike those Pledger prepared in 2018, there are no Pay Rates even though Littler had repeatedly reminded Pledger of the need to include pay rates.  Unlike the ones Pledger prepared in 2018 (which had 25 columns), the 2020 Excel spreadsheets she prepared included 138 columns of largely irrelevant data such as "Jury Duty" "Tuition Non-Tax" "Vision Only" "Health Care Benefit Value" (Compare Doc.390-6, PageId. 6350-6351 and Doc. 390-7, PageId. 6389-6397)

These emails show beyond any doubt that Pledger knew the Excel spreadsheets she was preparing had to have pay rates.  They show she knew that involving adding them.  Instead, in 2020 she added hundreds of columns of extraneous material and included no pay rates at all.

What these emails also show is that even though all those (inadequate) Excel files were ready to be produced by March 2, 2020 OTK produced them on the exact deadlines (March 31 and April 30) required by the Order OTK obtained under the pretense that it would take Pledger hundreds of hours to generate the spreadsheets. (Doc. 172, PageId. 1105) So, for example, the files Pledger sent to Littler February 25, 2020 (Doc. 390-7, PageId. 6375) did not get produced until April 30, 2020.

Plaintiffs have filed pages 36-71 of the deposition testimony Pledger gave in the <u>Gibson</u> case which began with a question about whether she even knew what a "pay rate" was. (Doc. 390-4, PageId. 6288-6323) Some of her new Declaration reflects some of the admissions she made in that deposition, but there was much more testimony that bears on the inaccuracies in her original Declaration, and now on the excuses she makes in her second Declaration. She testified that she could not recall if she created those spreadsheets before her <u>Hornady</u> deposition, could not recall if she had actually looked at anything to determine when she had prepared the spreadsheets or how many there were before signing her Declaration. (Doc. 390-4, PageId. 6289, 6291) She affirmatively claimed she counted the spreadsheets in an Excel folder that was created before she was deposed in March, 2020,[16] and then (after being shown examples of the spreadsheets that had been produced to Plaintiffs <u>without</u> pay rates) testified that before signing her Declaration: "**I looked at one of the spreadsheets.**" (She could not recall which one.) She could not say whether the spreadsheets attached to her Declaration included the one she reviewed. She could not recall if she reviewed more than one, more than 50, more than 100, more than 200, or 225. (Doc. 390-4, PageId. 6291, 6293. 6297-6298, 6301-6307)

A break was then taken at defense counsel's request. During that break Ms. Pledger met with both OTK's lawyers, and her boss Carlos Villacreces, and his boss Scheid. And then she testified:

> Q.      . . .  **At this point are you confident enough to swear under oath that before your deposition, you had prepared 225 approximately ADP generated payroll histories for team members that included baseline rates of pay**?
>
> Mr. Dolive:    Object to the form.
>
> A.      **Yes, I did**.

---

[16] No folder of spreadsheets was produced.

(Doc. 390-4, PageId. 6309-6310)

While that is all important, Plaintiffs submit that what comes next is more important. Pledger then (apparently inaccurately) tried to blame her own misconduct on Littler. She testified: "I've provided spreadsheets with it [pay rates] and without it [pay rates] **based on my instructions**" from Littler. (Doc. 390-4, PageId. 6310-6313) None of the communications OTK chose to produce from Littler instructed Pledger to prepare spreadsheets without pay rates. They show the opposite. Littler kept sending her samples she had prepared with pay rates, and Pledger apparently kept creating new spreadsheets without them. Pledger also affirmatively testified that she sent Littler alternate versions of spreadsheets (with and without pay rates) for some Plaintiffs, although she could not say who. (Doc. 390-4, PageId. 6310-6318) Nothing that OTK has produced shows that alternate spreadsheets of pay data were sent to Littler for any Plaintiff in 2020.

The other fact that all of this shows is that Pledger was changing spreadsheets and not just copying dates. At her March 2020 deposition, she testified that the way OTK maintained pay data was the same for all hourly employees, (Doc. 206-2 Page ID. 2206) and she was questioned about Exhibit 2A which she had prepared in 2018 about William Heath Hornady. (Doc. 189-1, PageId.1769) She testified that she was "personally responsible for compiling and providing that pay data in Excel format." (Doc. 206-2, PageId. 2206) But she also testified:

> Q. And so for Mr. Hornady and all the other employees, is the data or the numbers and the dates that are on 2A, data that is actually maintained in OTK's electronic business records in the usual course of business?
>
> A. Well, I can't say that this has been changed, but **if it's the exact file I downloaded, then it's what's in the system.**
>
> Q. Okay. If it's the same thing as what I got from OTK through its lawyers, is it also the same data that OTK maintains in the usual course of business --
>
> A. Yes.
>
> Q. -- in its electronic --

THE REPORTER: I'm sorry. What was that last part?

Q. If it is the same data that was provided to me, like an accurate printout of what was provided to me by OTK's lawyers, is it also all data that is maintained in OTK's electronic business records in the ordinary course of business?

A. Yes, it is.

Q. **On your end when you were compiling that data, you did not make any changes to what OTK had in its electronic business records?**

**A. No, I didn't**

(Doc. 206-2, PageId. 2206-2208) In that deposition, she confirmed that the Pay Rate column showed day shift rates (and testified that night shift rates were additional $.50). (Doc. 206-2, Page Id. 2209-2210) She claimed that she pulled all the same pay data for all the employees, and none of it included what she called trued-up pay rates. (Doc. 206-2, PageId. 2237-2238) Now, we know Pledger was either adding pay rates to the 2018 files, or deleting them from the 2020 files, as well as adding dates.

Paragraph 15

Pledger says in ¶ 15 of her first Declaration from March, 2022 that: "**The true nature of this RROP formula** was communicated to me on February 2, 2021..." (Doc.368-7, PageId. 5723) It is impossible for that statement to be true because two months later in May, 2022 she testified that she still did not know the actual RROP formula. (Doc. 390-4, PageId. 6325, 6327-6328) When Pledger was asked whether at any point since June, 2020 OTK has known how ADP calculates overtime for its employees she testified: "The RROP calculation has never been clearly explained." (Doc.391-1, PageId. 6415)

Even if Pledger's statement that she knew the true nature of the RROP formula on February 2, 2021 were true, it would just show that OTK's misconduct was worse than the Court could discern 8 months ago.  The June 2, 2020 Stipulated Order included provisions about "trued up" calculations. (Doc. 212, PageId. 2439)  After that Stipulated Order was entered and after the July

16, 2020 hearing on Plaintiffs' motion for sanctions OTK initiated the fiasco with its subpoena to ADP, Inc. (See Docs. 216, 332) But, if on February 2, 2021 Pledger and OTK knew the "true nature of RROP" they did nothing to reveal to Plaintiffs (or the Court) that OTK had this information (even as the Court entered Show Cause Orders targeting ADP, Inc.) Pledger was even present for the March 12, 2021 hearing at which Plaintiffs, again, brought up the ongoing lack of information about what RROP was. (Doc. 303, See transcript pp. 18-19, 39-41)

Paragraph 16

In ⁋ 16, Pledger says that it was her understanding that Littler would be responsible for pursuing the report breaking down calculations from ADP. (Doc.368-7, PageId. 5723) None of the communications OTK produced are consistent with that claim.

Paragraph 17

In ⁋ 17, Pledger declares that from March 11, 2020 – February 2, 2021 she made "numerous attempts" to obtain information about calculating RROP. (Doc. 368-7, PageId. 5723) Her new Declaration waffles about this some, but understates the inaccuracy of the first Declaration. She has admitted there were not "numerous attempts." As best Plaintiffs can determine the only "attempts" Pledger made to obtain information from ADP about how RROP was calculated are documented on June 1, 2020 (Doc. 378, PageId. 6166) (she got a response June 9, 2020 Doc. 378, PageId. 6167)) July 15, 2020 (Doc. 378, PageId. 6168-6169), July 20, 2020 (Doc. 378 PageId. 6152), August 4, 2020 when she asked a follow-up question, and got an answer (Doc. 378, PageId. 6151). Those appear to be all of the attempts.[17]

Paragraph 19

---

[17] In late January 2021 Pledger started asking about what reports could be run that showed RROP amounts. (Doc. 368-7, PageId. 6154)

In ⁋ 19 Pledger states that she was instructed not to email questions or concerns to ADP and, instead, had to use a Portal.  (Doc. 368-7, PageId.5724) She claims this meant she was "unable to speak directly to" an ADP representative.   The document attached as an exhibit to her Declaration, however, directly contradicts her sworn statement.[18]  (Doc. 368-7, PageId.5835) The text on the document is highlighted for emphasis.  It is not clear whether OTK highlighted it, or ADP highlighted it.  Either way, it says:

> We can still schedule calls utilizing email and you can still call into our support line to directly reach me, my back up, or an available Account Manager.

Pledger says in her Declaration that in late May or June, 2020 she was unable to reach Sid Johnson by email or telephone. (Doc. 368-7, PageId. 5724, ⁋ 20) Plaintiffs have no way to verify the part about phone calls, but OTK produced no emails from Pledger to Johnson in that time frame.

Paragraph 29

In ⁋ 29 Pledger claims that her understanding was that ADP only allowed customers to print or export an Excel spreadsheet for the existing pay period – even though at ⁋ 38 she acknowledges that she **can** print the Excel trial reports with overtime calculations she gets every two weeks which may have RROP numbers, but she simply never downloaded or printed any of them and never bothered to compare those preliminary Excel files she receives to the final version PDF.   (Doc. 390-4, PageId. 6326, 6329-6331)

Paragraphs 42, 43, 45, 51, 53

Plaintiffs have previously mentioned the discrepancies and / or admissions Pledger's new Declaration reflect about the unambiguous mis-statements regarding OTK's calculations of

---

[18] Pledger claims that she and Scheid reviewed her communications with Littler and ADP together. (Doc. 368-7, PageId. 5720 ⁋ 6) So every misstatement she makes about those communications implicated both of them.

weekly overtime in the first Declaration.  What stands out about both her Declarations are how boldly they contradict what appears to be truthful deposition testimony by Pledger in March, 2020 and May, 2022 about the simple fact that OTK does not use a fixed, recurring 168 hour period to calculate overtime for anybody; let alone one that always runs from Sunday 6:00 a.m. to Sunday 5:59 a.m.; let alone a second alternate week running from Sunday at 7:00 a.m. to Sunday 6:59 a.m.

Pledger's Declaration mis-statements are made against the backdrop of  her statement stating that "she greatly desire[s] to clarify the matter" of how she "adjusted" the workweek in OTK's Payroll System.  (Doc. 368-7, PageId. 5728)

The Court is already very familiar with the testimony Pledger actually gave in March, 2020 that because OTK lumps together all time associated with a shift as if it were in a single week, (a) different employees get paid for the same (overlapping) time as if it occurred in different weeks, (b) OTK starts counting time for a "week" at different times for different employees, and (c) stops counting time for a "week" for different employees at different times. (Doc. 187-1, PageId.1255-1261, 1312-1316) As Pledger concisely explained in March, 2020: "168 doesn't mean anything to me" (Doc. 187-1, PageId.1259)  The Court is not (yet) familiar with the testimony Pledger gave in May, 2022.  It is essentially the same.  Again, she testified that all the time OTK associates with a shift is always counted within what OTK considers a "week" without regard to when shifts start or end, or whether they cross over midnight, or cross over Sunday at 6:00 a.m. No matter what, and no matter when, OTK does not split the time employees work for a shift into two different weeks.  "It's the same day" because OTK includes all the time associated with a single shift in a single workweek based on clock-in time. (Doc. 390-4, PageId. 6332-6334)

One might legitimately wonder why her deposition testimony (which is consistent with OTK's records) varies so dramatically from her Declarations.  Perhaps a clue can be found at ℙ 45

of her first Declaration which shows that part of her process for preparing (or, maybe reading) her Declaration was to review Scheid's Declaration. (Doc. 368-7, PageId.5729) Scheid's Declaration contains the same sort of unambiguous mis-statements that OTK's "workweek **begins at 6 am** on Sunday morning and ends the following Sunday morning at the end of the Saturday evening shift (**5:59 am**)" (Doc. 368-8, PageId. 5867)  And also:

> . . . the workweek remained correctly set **for 6:00 am Sunday** until the Saturday evening shifts ended at **5:59 am the following Sunday**.  Overtime was and is paid for all time in excess of 40 hours during these **7 consecutive 24 hour periods**.

(Doc. 368-8, PageId. 5868, ⁋ 14) He makes the same sort of mis-statements at ⁋ 16. The problem for Pledger is that she demonstrated, twice, in deposition testimony that she knew that OTK does not calculate how much time people work for overtime purposes on any constant, recurring 168 hour week.

The other problem for OTK is that chooses to leave Scheid's Declaration before the Court, despite both sets of Pledger's contrary testimony, and her new Declaration which contradicts Scheid's.

All of this is against a backdrop in which Pledger changed the pay period settings in "Workforce Now" (which in turn end up on Earnings Statements) but simultaneously claims she did not "doctor" any records. (Doc. 368-7, PageId. 5730)  It is "vitally important" (she says) that the reader understand that "Date indicators on Workforce Now are merely a memo field" which she populates every year, and which she then claims are entirely unrelated to how employees are paid. (Doc. 368-7, PageId, 5729-5730) It is now clear, however, that the spreadsheets she prepared in 2018 have Pay Period Ending dates and the ones she prepared in 2020 do not. (Compare Doc. 378, PageId. 5733 to Doc. 390-7, PageId. 6388-6398) So, something got added or subtracted by Pledger.

Pledger suggests that there is a difference between the workweeks in Enhanced Time and those in "Workforce Now" which the employees get.  (Doc. 368-7, PageId.5730, ℙ 51) Nothing is attached to support this assertion.  Nothing is attached showing any week settings from "Enhanced Time."  But what matters more is that Pledger's Declarations about these other workweek settings in "Enhanced Time" are absolutely contrary to what OTK previously represented in discovery.  On July 12, 2019 OTK responded to a request for production that directly asked for any time and pay records for any Plaintiffs on a workweek basis in formats other than the Earnings Statements, Pay Statements, and Excel and PDF time stamp records OTK had already produced and OTK stated there were none.  (Doc. 391-2, PageId. 6148) This was the same set of discovery that asked about who created, revised, modified etc. the templates for Pay Statements beginning 60 days before they first listed "Period Beginning" dates as Mondays, and OTK identified Pledger. (Doc. 390-8, PageId. 6403-6404) OTK's response to Interrogatory 1 says the interrogatories are verified by Pledger. (Doc.390-8, PageId. 6403)

Pledger changed the dates in OTK's payroll system.  She added pay rates to check detail spreadsheets . . .  unless she deleted them.  She added pay period dates to check detail spreadsheets unless she deleted them.  She represented that the spreadsheets, and OTK's Earnings Statements and Pay Summaries were all unaltered business records of OTK. (Doc. 206-2, Page Id. 2207-2208) None of what she prepared for production in 2020 contains any pay rates, let alone multiple pay rates, even though OTK's discovery obligations tied back directly to what it produced and disclosed under the Court's Superseding Preliminary Scheduling Order in 2018. (Doc. 64)

At ℙ 53, Pledger then says she "went by the workweek methodology" in the Time and Attendance Program rather than the workweek periods from Workforce Now because, she says, if she had used the Workforce Now dates (which are on the Earnings Statements) then the

spreadsheets she prepared would have been incorrect.  (Doc. 368-7, PageId.5730) Again, Pledger's affirmative statements just compound the problem.  She prepared spreadsheets in 2018 (like Ex. 2A). (Doc. 189-1, PageId.1769; Doc. 206-2, PageId. 2207-2208)  Those were prepared <u>before</u> she claims to have been aware that the Earnings Statements / Pay Summaries showed Monday – Sunday weeks which she says led to her changing the dates.  Pledger previously testified that she manually added the Pay Period ending dates that are on spreadsheets like Ex. 2A. (Doc. 206-2, PageId. 2320-2323)

If Pledger truly did not know there was an issue with the dates on the Earnings Statements and Pay Summaries until January, 2019 then she certainly never considered anything about Workforce Now workweeks or Enhanced Time workweeks when she prepared spreadsheets in the fall of 2018.  Nor does her Declaration make any sense as an explanation for the dates she put on the spreadsheets she prepared in 2020 because those do not include any workweek periods!

We end, where we began., Pledger's efforts to explain what she changed, why, and when merely reinforce what the Court already determined about OTK's sanctionable conduct.


(ii) <u>Scheid Declaration</u>

Some of the mis-statements in Dave Scheid's deposition have already been covered, and to the extent he makes the same substantive statements as Pledger that are inaccurate, Plaintiffs will not repeat that discussion.  There are many statements about his interactions with OTK's attorneys and OTK's personnel which appears questionable, but Plaintiffs have neither the opportunity nor the means to explore those in full.  However, he testified in 2020 that his job duties have nothing to do with daily, weekly, or monthly payroll process, and that he does not interact with ADP about how time or pay is handled. (Scheid I, pp. 12-13, 15)

His various statements about what OTK's workweek supposedly is can be compared to the testimony Pledger gave (and her new Declaration) but also to Scheid's own testimony in May, 2022. He testified then that the Earnings Statements showing Saturday end dates are correct. (Scheid II, pp. 151-153) Then, within moments he testified that workweeks "always ended on Saturdays" but also "always ended on Sunday morning at 5:59 a.m." (Scheid II, pp. 153-155) Perhaps most important when considering the Declaration he proclaimed to be based on his personal knowledge (but also a review of documents, but also information and belief) when he was asked why all the 2020 Earnings Statements have period ending dates on Saturdays (after Pledger changed the system) his testimony was: "Yeah, I don't know." (Scheid II, pp. 153-155) This can be fairly contrasted to the statements in paragraphs 9, 10, 12, 13 of his Declaration. (Doc. 368-8, PageId.5867)

Supposedly, based on his personal knowledge (or maybe a review of documents, or maybe belief) Scheid declares that any allegation that OTK "doctored or otherwise provided documents that incorrectly reflect our workweek is absolutely false." As the Court noted, Pledger admitted to altering the pay period ending dates on the spreadsheets she prepared. (Doc. 344, PageId. 4685 citing Doc. 206-2, presumably PageId.2323-2324) Pledger's admissions about the computer system changes and the pay detail spreadsheets have been mostly discussed. But, there is also Ex. 4 to her 2020 deposition which shows Sunday - Saturday "workweeks" (Doc. 189-7, PageId. 1807-1808) She testified that those documents were prepared by her "for this case" She testified that information was taken from a different document that she sends annually to benefit providers, and that (in turn) the workweeks she sends to benefit providers is information she gets from ADP, which had (circularly) gotten the same information from OTK. (Doc. 206-2, PageId. 2316-2320) She was then asked why the work week ending periods were different from those on Ex. 2A (which

Pledger discusses in her new Declaration) and she admitted that she had "hand-keyed" dates onto documents like Ex. 2A for lots of employees. (Doc. 206-2, PageId.2319-2323) She specifically testified that she manually entered "the Saturday prior to the pay date" as the Pay Period end date for all employees "because that's the end of our pay period." (Doc. 206-2, PageId. 2323-2324) What makes all of this even more ridiculous is that the period ending dates shown on Ex. 2A are actually Sundays.  (Doc. 189-1, PageId.1769) But, what matters most is that Pledger affirmatively testified that she hand-prepared different documents, for this case, with different pay period ending dates.  Scheid indicates that he read Pledger's deposition (see Doc. 368-8, PageId, 5868) and yet he still asserts that "any allegation that OTK doctored or otherwise provided documents that incorrectly reflect our workweek is absolutely false."

In ₱ 19 of his Declaration Scheid asserts that he "can testify to the breadth and timeliness of the responses OTK provided to Littler's request for information or documents" (although he suggests this is based on a "review" of communications). (Doc.368-8, PageId.5869) And then, Scheid fails to say anything at all about, for example, the information OTK was required to provide that is described in paragraphs 1(b), 1(c), (3) and (7) of the June 2, 2020 Stipulated Order. (Doc. 212)  The last of those items was for production of emails that Scheid himself testified existed because he sent or received them, and that testimony by Scheid was offered at his deposition that was also attended by OTK's in-house counsel Charlotte Brewer-Cooper. (Doc. 187-2, PageId. 1319; Doc. 390-2, PageId. 6273-6278)[19]

---

[19] OTK now says it does not know why Littler did not produce the emails in Scheid's account. (Doc. 369, PageId.5987) Either do Plaintiffs, but Brewer-Cooper was at Scheid's deposition when he described the emails in detail which led to the June 2, 2020 Stipulated Order to produce them. Obviously, so was Scheid since he was describing his own emails.

¶ 20 – 26 of Scheid's Declaration deal solely with supposed efforts to obtain RROP information.  He says he has reviewed and agrees with Pledger's Declaration (Doc. 368-8, PageId. 5870) – and his own Declaration is inaccurate in all the same ways.  But, he goes further claiming that "to the best of his knowledge and understanding, the only issue with production of documents from OTK was in satisfying Plaintiffs' request to receive in Excel format the ADP "Payroll Registry" which shows various adjustment to the RROP." (Doc. 368-8, PageId. 5875) If that is true, Scheid was personally ignorant of the substance of numerous court filings.  But, that has nothing to do with what all OTK's other personnel, including lawyers, knew or should have known.

¶ 27 – 36 proclaim Scheid's supposed "beliefs" and "understanding" – but Scheid pointedly says he is only providing "select emails with our counsel" "in the two weeks surrounding the Court's multiple show cause hearings." (Doc.368-8, PageId.5871) What he says nothing about, and does not produce, are the communications to and from Littler (or internal within OTK) about OTK's discovery obligations during the first 26 or so months the case was pending about OTK's discovery obligations.[20]  He does not claim to have been the only person with whom Littler communicated and even assuming *arguendo* that  what he says is true about his own knowledge,

---

[20] Scheid attached nothing showing anything anyone did, or did not do, before June 1, 2020 about anything, and nothing about any of the items in the June 2, 2020 Stipulated Order that led to sanctions except the efforts to find out from ADP how RROP was calculated. (Doc. 368-8)  The April 28, 2020 Report of Parties Planning Meeting explicitly includes a list of "residual issues" that still had to be addressed.  (Doc. 196, PageId. 2014-2015) One was the need for step-up rate data that OTK said it had.  Another was the details of RROP calculations along with the amounts which was information OTK claimed to have.  Another was the failure of OTK to produce pay records with hourly pay rates.  Another was OTK's production of black and white time records rather than the electronic colorized records that showed whether time was actually both authorized and paid for. And another were the pre-approval and post-approval emails about monthly bonuses. Those sort of issues were all raised, again, in the May 6, 2020 Scheduling Conference (Doc. 327) And then some of those issues, including Scheid's emails, were supposed to have been dealt with through the June 2, 2020 Stipulated Order. (Doc. 212, PageId. 2440)

he is not saying anything that reflects the substance of communications with Brewer-Cooper, or. Pledger, or Villacreces, or anyone else.  By the time the Court was entering Show Cause Orders aimed at ADP, OTK had already been through multiple motions for sanctions, including Magistrate Judge Nelson's R & R which it was still objecting to.

When Scheid tells the Court that until March 13, 2020 it was his understanding that "OTK's conduct was not at issue in this case" he is either not telling the truth, or he is truthfully telling the Court that he was unaware of each and every item that led to the motions for sanctions, the R & R, as well as Plaintiffs' arguments for summary judgment based on his testimony, Pledger's testimony, and the recommended sanctions.  Which (if true) is quite an admission since Scheid, along with Pledger, along with Villacreces, all represented OTK in (yet another) substantive settlement conference with Magistrate Judge Nelson on February 25, 2021.


IV.     **Collective Actions and Individual Claims**

At pages 26 – 28 of its motion (Doc. 369, PageId. 5989-5991) OTK somehow combines a merits argument about Plaintiffs' common law claims with a complaint that it had to produce its records for all Plaintiffs, with a misguided argument about how claims are combined under the federal rules.[21] There are two dispositive responses.  The first is that OTK agreed to provide wage and time records for all Plaintiffs (Doc. 148, PageId.962-963) as well as affirmatively acknowledging to the Court that those records were a necessary predicate for damages calculations

---

[21] In very brief summary, what the assorted cases OTK cites illustrate is that sometimes (particularly when Plaintiffs seek to represent collectives on issues that are particularly likely to be individualized – like nationwide classes of allegedly misclassified independent contractors) it makes sense for discovery to the Plaintiffs to proceed on a representative basis until there is final certification because individualized discovery to Plaintiffs is particularly time consuming.  None of them stand for the proposition that an employer does not have to produce time and pay records for all Plaintiffs when a case proceeds without any sort of bifurcation.

which were (OTK claimed) necessary for it to consider settlement. The second is that the collective's conditional certification became final when OTK did not seek decertification.

With regard to the common law claim (plead in the alternative) Fed. R. Civ. P. 18 allows for joinder of contingent claims and Fed. R. Civ. P. 20 allows for joinder of Plaintiffs if they assert any right to relief arising out of the same series of transactions or occurrences, or there is any question of law or fact common to all Plaintiffs. Neither Rule 18 nor Rule 20 says, or even implies, that joinder pursuant to them requires any application of Rule 23, and the fact that Rules 18 and 20 provide for joinder of claims, and Plaintiffs, in one action is exactly the opposite of OTK's contention that it is a Defendant to an action "with 276 individual Plaintiffs." What this case is, and was, is a finally certified collective of 276 Plaintiffs with claims for 276 different amounts for the same FLSA violations, who also properly joined common law claims (for 276 different amounts) which were asserted in the alternative to gap time FLSA claims the Court decided were not actionable. None of that has anything to do with whether default was properly entered.

<u>Conclusion</u>

To sum up a long submission that responds to a long submission that offers a list of excuses for a much longer list of misdeeds, there is no basis for the Court to reconsider, let alone alter, amend, of vacate the default it has entered in this case which is now almost four years old.

Respectfully submitted,

**HOLSTON, VAUGHAN & ROSENTHAL, LLC.**

By: /s/ Ian D. Rosenthal
Ian D. Rosenthal – ROSEI6905
Attorney for Plaintiffs
P.O. Box 195
Mobile, AL 36601
(251) 432-8883 (office)
(251) 432-8884 (fax)
Email:  idr@holstonvaughan.com

**SIMS LAW FIRM, LLC.**

Patrick H. Sims – SIMSP8145
Attorney for Plaintiffs
P.O. Box 7112
Mobile, AL 36670
(251) 490-9424
Email: patrick@simslawfirm.net

**McDOWELL KNIGHT ROEDDER
   & SLEDGE, LLC**

Frederick G. Helmsing, Jr., Esq. – HEL014
11 North Water Street, Suite 13290
Mobile, Alabama 36602
(251) 432-5300 (office)
(251) 432-5303 (fac)
E-Mail:  fhelmsing@mcdowellknight.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 11th day of July, 2022, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**William H. Wasden, Esq**.
Burr & Forman, LLP
11 North Water Street – Suite 22200
Mobile, Alabama 36602
E-Mail: bwasden@burr.com

**Devin C. Dolive, Esq.**
Burr & Forman, LLP
420 North 20th Street – Suite 3400
Birmingham, Alabama 32503
E-Mail:  ddolive@burr.com

**Ronald W. Flowers, Jr., Esq.**
Burr & Forman, LLP
420 North 20th Street – Suite 3400
Birmingham, Alabama 32503
E-Mail:  rflowers@burr.com

**Cheri Turnage Gatlin, Esq.**
Burr & Forman, LLP
190 East Capitol Street, Ste M-100
Jackson, MS 39201
E-Mail: cgatlin@burr.com

/s/ Ian Rosenthal
OF COUNSEL