# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM HEATH HORNADY, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:18-CV-00317-JB-N** |
| | ) | |
| **OUTOKUMPU STAINLESS USA, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |


## REPLY IN SUPPORT OF MOTION TO RECONSIDER AND CLARIFY THE COURT'S NOVEMBER 18, 2021 AND FEBRUARY 17, 2022 ORDERS AND TO SET ASIDE DEFAULT

# Table of Contents

**Page**

I. Introduction & Procedural Background ................................................................... 1

II. Argument ..................................................................................................................... 4

  A.  Newly-Obtained Evidence from the *Gibson* Case Supports, Rather Than Refutes, OTK's Position, Including the Evidence Procured Through OTK's Subpoena of ADP in the *Gibson* Matter. ............................................................................................................ 4

   1.  The ADP Evidence Regarding "RROP" and the "Weighted Average" ........................... 5

   2.  ...The ADP Evidence and Ms. Pledger's Evidence Regarding the "Pre-Approval" Excel Spreadsheets ................................................................................................................ 8

   3.  The "Black and White" Records ........................................................................................ 9

  B.  Plaintiffs Do Not Dispute the Premises Behind OTK's Motion to Reconsider. ............ 10

   1.  Plaintiffs Do Not Dispute That, Today, OTK and ADP Have Long Since Cured Any Conduct That Gave Rise to the Default; Plaintiffs Now Have All the Documents They Need to Prove Up Any Damages. ..................................................................................... 10

   2.  Plaintiffs Do Not Dispute That Ms. Pledger Repeatedly Tried to Contact ADP to Find Out About "RROP" Before the Court's Show-Cause Hearings. ................................... 11

   3.  ..............Plaintiffs Do Not Dispute That Court's Orders Effectively Make Astronomical Damages a Foregone Conclusion. ................................................................................. 12

   4.  Plaintiffs Do No Dispute That Lesser Sanctions Would Have Been Appropriate. ......... 12

   5.  Plaintiffs Do Not Dispute That the Courts' Orders Found as "Fact" Matters Contrary to the Factual Allegations in the Third Amended Complaint and the Record Evidence. .. 14

    a.  OTK's Workweek .................................................................................................... 14

    b.  The Alleged January 27, 2019 Change in the "Workweek" ..................................... 17

    c.  OTK's Pre-May 2018 Rounding Practices ............................................................. 18

   6.  Plaintiffs Do Not Dispute That Former Counsel's Actions Effectively Left OTK Without a Meaningful Defense in Numerous Respects. .................................................. 18

    a.  Littler's Handling of the Case .................................................................................. 18

    b.  David Scheid's Production Incentive E-Mails ....................................................... 20

   7.  Plaintiffs Do Not Dispute Either OTK's Previous Counsel's Health Problems or the Global Pandemic. ............................................................................................................ 20

  C.  Plaintiffs Misconstrue the Appropriate Legal Standards for Defaults and Reconsideration of Same. ............................................................................................... 22

  D.  Plaintiffs Continually Construe the Evidence Out of Context and Find Inconsistencies and Malfeasance in Places Where None Exists. ............................................................. 22

   1.  The "True Nature of the RROP Formula" ...................................................................... 23

   2.  The "Omission" of Pay Rates from the Excels ............................................................. 23

3.   Carlos Villacreces's Attendance at a November 5, 2020 Teams Meeting ..................... 24

III. Conclusion ........................................................................................................................ 25

In light of the Opposition (Doc. 393) recently filed by Plaintiffs, Defendant Outokumpu Stainless USA, LLC ("OTK") submits the following Reply in Support of its pending Motion to Reconsider (Doc. 369),  :

## I. Introduction & Procedural Background

In opposing reconsideration of the Court's default sanctions and the Court's accompanying factual findings of severe wrongdoing by OTK, Plaintiffs argue that OTK's Motion to Reconsider "tries to divert the Court's attention to a two-week period surrounding the misrepresentation about ADP and the resulting proceedings hoping the Court will forget all that came before."  (Doc. 393, PageID # 6442.)  OTK is not asking the Court to "forget all that came before," and OTK's Motion to Reconsider also provides explanation rearding OTK's management employees' actions before February and March of 2020—indeed, many of Plaintiffs' present attacks on Melissa Pledger's Declaration (Doc. 378) concern actions she took in 2020 or earlier.  (*See, e.g.,* Doc. 393, PageID ## 6456-6463.)

Nevertheless, OTK is cognizant that (1) what happened in this two-week period prompted the most draconian of sanctions and that (2) this was at a time when OTK's then counsel may have been acting under a conflict of interest where ADP was concerned.  OTK's then counsel seemingly left OTK undefended in the face of allegations of egregious conduct.  When OTK thereafter retained non-conflicted counsel, the Court denied OTK leave to brief the issues before entering the sanctions Orders.  (*See* Doc. 329.)  Under the circumstances, OTK filed its Motion to Reconsider, in part, to set the record straight about what actually happened during those two weeks and also, in part, to give this Court fair opportunity to hear, in the first instance, arguments that OTK's new counsel would raise in an appeal of any judgment resulting from the Court's default sanctions.

Plaintiffs themselves previously told the Court, in the immediate run-up to those two weeks:  "The most pervasive problem involves pay rate information."  (Doc. 279, PageID # 3579.)

Having now received the desired pay rate information and then having ignored this pay rate information in the damages calculations prepared by their "expert" Jeff Mroz (*see* Ex. N, Mroz Dep. 10:12-16, 176:5-18),[1] Plaintiffs now want to make the Court's sanctions about matters that Plaintiffs themselves had not raised at the time. At the same time, Plaintiffs ask the Court to ignore the facts and explanation that OTK's new counsel now brings to the Court's attention.

Critically, OTK's former counsel never deposed ADP in the present case. The motives of OTK's former counsel in this regard may be unclear, but ADP itself has alleged that OTK's former counsel was operating under a "conflict of interest." (Doc. 300, PageID # 3793.) Importantly, as shown in the Declarations of David Scheid and Melissa Pledger (*see* Docs. 368-8, 378) supporting OTK's Motion to Reconsider, ADP would not voluntarily provide the information sought by Plaintiffs directly to OTK, because ADP had referred the requests to its legal department. Therefore, the information sought by Plaintiffs could only have been obtained through the use of subpoena and deposition. OTK's former counsel only issued a document subpoena to ADP when directed to do so by the Court, and former counsel never once sought to depose ADP about the subpoenaed documents.

From the separate *Gibson* case, it is now clear that, if either Plaintiffs or OTK's prior counsel had deposed ADP in the present case, ADP's testimony would have contradicted many of Plaintiffs' allegations of wrongdoing. The ADP testimony in *Gibson* makes clear that the information Plaintiffs wanted about rates and the proprietary formulas used in computing those rates are information that, apparently, **no ADP client** could provide in response to its employees' FLSA claims, at least not without subpoenas and/or other legal process. ADP's Rule 30(b)(6)

---

[1] Because OTK's opening brief supporting its Motion to Reconsider consisted of Exhibits A through I (see Doc. 368), OTK is lettering the Exhibits to this Reply starting at "Exhibit J."

designee testified that the formulas are contained within ADP's proprietary "back end" and that ADP does not typically give out "back end" information to its clients, **not** even in response to subpoenas.  (Ex. J, Raines Dep. (Vol. I) 38:18-39:8, 177:20-178:6.)

Otherwise, Plaintiffs' 52-page Opposition accuses OTK of "inaccurate hyperbole."  (Doc. 393, PageID # 6425.)  Seeming to miss the irony, Plaintiffs then engage in plenty of hyperbole of their own and describe the Declarations that OTK's witnesses submitted in support of the Motion to Reconsider as "carefully curated (inaccurate) self-serving Declarations of purity and / or cluelessness."  (Doc. 393, PageID # 6427.)  Ignoring the "big picture" evidence that, for example, as late as March 5, 2021, OTK's then counsel was telling OTK's business people that it was "good news" that "all this has finally gotten ADP's attention" (Doc. 368-8, PageID # 5940), Plaintiffs now accuse OTK of taking a "microscopic approach" to contesting the Court's default.  (Doc. 393, PageID # 6435.)

Plaintiffs are the ones who take the truly "microscopic approach"; in their Opposition, Plaintiffs attack OTK's witnesses, seeking to transform every potential inconsistency into an outright falsehood.  Plaintiffs seek to capitalize on this "narrative bias" at the risk of neglecting what the actual record shows.  No witness in any adversarial case could live up to Plaintiffs' nitpicking, as is made clear by the testimony of Plaintiffs' own "expert," Jeff Mroz."  (*See* Ex. N, Mroz Dep. 10:12-16, 44:16-45:2 (stating that, in support of his analysis of Mr. Gibson's damages that the Excel files he reviewed "contained data on many employees" when, in fact, they did not.) The Court need not accept the Plaintiffs' "narrative bias" here; an imperfect witness is not always a false or dishonest witness.

The Court should grant OTK's Motion to Reconsider because Plaintiffs—despite their continued *ad hominem* attacks on OTK's witnesses—do not dispute the fundamental premises behind the Motion.  Plaintiffs, for example, do not dispute that OTK and ADP, by providing

documents in Excel, have together long cured any sanctionable conduct that gave rise to the Court's default.  Instead, Plaintiffs freely concede that they have all the information they now need to attempt to prove any damages resulting from any allegedly unpaid overtime.  The Court could issue other, less draconian sanctions here—including ordering OTK to pay out approximately $2 million on Plaintiffs' "rounding" claims, a sum that includes liquidated damages and the three-year look-back.

For all these reasons and as set forth in OTK's Motion to Reconsider (Doc. 369) and below, the Court should vacate the default here and clarify its factual findings.

## II. <u>Argument</u>

### A.   <u>Newly-Obtained Evidence from the *Gibson* Case Supports, Rather Than Refutes, OTK's Position, Including the Evidence Procured Through OTK's Subpoena of ADP in the *Gibson* Matter.</u>

Opposing reconsideration of the Court's sanctions, Plaintiffs argue:  "[OTK] does not detail any new evidence."  (Doc. 393, PageID # 6429.)  Plaintiffs, however, themselves seek to offer plenty of "new evidence" in support of the Court's sanctions.  Plaintiffs' Opposition relies heavily on recent deposition testimony by two OTK witnesses in the separate *Gibson* case, S.D. Ala. No. 21-cv-00103.  (*See* Docs. 390-3, 390-4, & 391-1.)  Plaintiffs' counsel spent considerable time in the recent depositions in *Gibson* asking questions relating to Ms. Pledger's Declaration (Doc. 378) submitted in support of the Motion to Reconsider in the *Hornady* case.

For example, when Plaintiffs' counsel went into particulars about Ms. Pledger's Declaration statements about the Littler law firm (who never represented OTK in the *Gibson* case), Plaintiffs' counsel explained the relevance of this testimony as follows:  "I'm going to say it's as competence as a witness.  It goes to her prior sworn statements including that she said documents included a baseline rate of pay, which her job is supposed to involve using, and so far they don't."  Following this explanation, OTK allowed Ms. Pledger to answer the questions.  (Ex. L, Pledger

Dep. (Gibson) 52:10-53:10.)  The resulting deposition answers—and subsequent information OTK provided in response to Plaintiffs' counsel's follow-up requests—form the basis for eight pages of Plaintiffs' present Opposition.  (*See* Doc. 393, PageID ## 6456-6463.)

Having opened this particular door, however, Plaintiffs have failed to provide the Court a full picture of what this *Gibson* evidence actually shows.  This evidence shows that what Ms. Pledger and OTK have maintained throughout the *Hornady* litigation is accurate:  OTK does **not** have access to the proprietary "back end" formulas that ADP uses to ensure compliance with "FLSA guidelines" when paying OTK's employees, nor once payroll processes does OTK have access to any Excel spreadsheets that would show the "RROP" figure that ADP calculates using the proprietary formulas contained within this "back end."  All OTK (or any ADP client, for that matter) can do here is "reverse engineer" the process in order to "back into" what ADP's proprietary "back end" software is calculating.  (Ex. J, Raines Dep. (Vol. I) 188:12-190:1.)

### 1.    The ADP Evidence Regarding "RROP" and the "Weighted Average"

The document that Plaintiffs said they needed—and which underpinned the Court's sanctions—turns out to be data that **no employer** who uses ADP as a payroll vendor could provide without invoking the legal process against ADP.  Specifically ADP's Workforce Now package has built-in methods for calculating the "regular rate of pay," which ADP says is "a way of calculating our premium rate of pay for employees who are under the guidelines of FLSA overtime."  (Ex. J, Raines Dep. (Vol. I) 51:17-52:7.) The ADP system calculates this premium rate "based on FLSA guidelines."  (*Id.*, Raines Dep. (Vol. I.) 57:7-16.)  However, ADP's Rule 30(b)(6) designee testified that the ADP software calculates and uses an "RROP" even in weeks when the "Payroll Register" does not show an RROP.  (Ex. K, Raines Dep. (Vol. II) 22:18-24:6.)[2]

---

[2] With agreement from OTK's and Mr. Gibson's counsel, ADP's attorney cut off the June 30, 2022 deposition in order to make a flight.  OTK and Mr. Gibson completed the ADP deposition

ADP's Rule 30(b)(6) designee also testified that ADP's "back end" is proprietary and is not viewable or accessible to ADP clients like OTK.  (Ex. J, Raines Dep. (Vol. I) 38:18-39:8.)  This "back end" system ontains the FLSA guidelines.  (Ex. K, Raines Dep. (Vol. II) 97:3-6.)  ADP does not usually provide proprietary information in response to subpoenas.  (Ex. J, Raines Dep. (Vol. I) 177:20-178:6.)  Further, when an ADP client specifies to ADP how the client wants overtime rates calculated, ADP will not tell the client the formulas that ADP is actually using to perform the calculations.  Rather, the client would have to "reverse engineer" or "back into" the formulas in order to see how ADP is actually running the calculations.  (*Id.*, Raines Dep. (Vol. I) 188:12-190:1.)

ADP's Rule 30(b)(6) designee also testified that ADP employee Sid Johnson should have been able to answer Melissa Pledger's questions from the summer of 2020 about the parameters ADP had set up for OTK in order to calculate "RROP."  (*Id.*, Raines Dep. (Vol. I) 223:11-19.)  She conceded that Mr. Johnson, in August of 2020, had only provided Ms. Pledger with a "minimum" explanation of the "RROP" without ever explaining **what overtime premium** ADP was **actually** applying on OTK's behalf.  (*Id.*, Raines Dep. (Vol. I) 218:12-220:16.)

ADP's Rule 30(b)(6) deponent, in response to questions from Plaintiffs' counsel, also testified about how, after the "RROP" is calculated, this number is then fed into the complex formulas used to arrive at the actual "pay rates" through a "weighted average":

> Q.    Okay.   So, walk me through then what OTK -- sorry, how ADP's calculations get from those two possibilities to the actual overtime rates where overtime and shift overtime that are on the Earnings Statements?
>
> A.    Okay.  So, once you have that amount, then it goes back to the calculation that's set up for, for the shift overtime hours premium. So, it's going to first look

---

on July 15, 2022.  The July 15, 2022 transcript is presently available only in "rough" form, but OTK is prepared to supplement the record with the cited pages from the final transcript, when available, as the Court may direct.

at, as I said, it's going to go get that 25.64, add 50 cents and then hold it now now comes to 26.14. Once it calculates what the regular rate of pay is, which it's now going to take that and add 50 cents. So it's going to come with 26, I'll do my math, 26.7679, plus 50 cents, 679 plus 50 cents and come up with 26.2679.

Q.      Okay.

***

Q.      Okay.

A.      Okay. Once it has that, it's going to add, oh, I'm sorry. Once it has that, it's going to then only do the half time portion, because the system is believing that it did the full-time portion previously in our calculation to get to the RROP, so now we only need to take half. So, it's going to do, it is currently doing 50 cents, 50 percent of that, so 531 times .5, and it's going to give them $265.96 roughly. Once it has that, we have to add the two figures together.

***

Q.      The description you're using of having the $519 figure and then adding half of it is exactly the same thing as if you just multiplied $519 by 1.5, correct?

A.      No. Previously when we were doing the calculation, everything was happening in that straight time. So, we were taking 25.64 and multiplying it by 20.25.

***

Q.      You were telling us about how this section of the formula you take the $519 and change figure and then you add half of it –

A.      No.

Q.      -- to get, to get 785.17?

A.      Oh, I'm sorry. Yes, we add the half portion if that's what you're asking me.

Q.      Yeah?

A.      Oh, okay. I'm sorry. Yes. That's how we came up with 785.17, is 519.21 plus the half portion of the calculation we just went through.

Q.      Right. Which is also the same thing as $519 times 1.5?

A.      No.

Q.      You're adding half of $519 to get $785?

A.      No.

*\*\**

A.      Then the system is going through the calculation of which rate is higher.  Is it going to be 25.64 plus 50 cents or is it going to be 25.7679 increased by 50 cents?  So, what's happening is it's taking 26.2679, which is the higher, it's the RROP plus 50 cents, and it's multiplying it times 20.25 hours.  It comes up with an amount of 265.96.  It's not half of the 519.21, because the 519.21 was paid at 25.64.

*\*\**

Q.      Okay.  And that's how you get to the shift overtime amount of $785.17 for this pay stub, which also equates to an overtime rate of 38.77?

MR. DOLIVE:  Object to form.

THE WITNESS:  Correct.  So, we have 785.17 divided by the number of hours, because, again, at this point, we have to do a **weighted average** because the 519 was paid at one rate, the premium was paid at another rate.  Because the two rates aren't the same, that's when the weighted kicks in, so if you take the 785.17 you see on the stub, divided by the number of hours you see on the stub, it gives us a weighted rate of 38.7738.

(Ex. K, Raines Dep. (Vol. II) 43:4-48:16 (emphasis added).)   On re-direct, ADP's designee

testified that "ADP is always trying to follow the FLSA Guidelines."  (*Id.*, Raines Dep. (Vol. II)

97:3-101:3.)

All along, ADP had the "pay rate" information (and accompanying calculations) that

Plaintiffs have identified as the "most pervasive problem" in discovery in this case.  (*See* Doc. 279,

PageID # 3579.)  Remarkably, though, neither Plaintiffs' counsel nor OTK's then counsel bothered

to depose ADP to obtain this information while discovery in this matter was open.  Under the

circumstances, Plaintiffs can hardly blame Ms. Pledger for not being able to rattle off ADP's

complex "RROP" formula and subsequent use of a "weighted average" when asked about it in

deposition.  (*See*, *e.g.,* Ex. L, Pledger Dep. (Gibson) 138:22-141:2.)   .

> 2.      **The ADP Evidence and Ms. Pledger's Evidence Regarding the "Pre-Approval" Excel Spreadsheets**

Plaintiffs now selectively cite Ms. Pledger's deposition in the *Gibson* case to allege that

she received e-mails from ADP containing the "RROP" in Excel format.  (Doc. 393, PageID ##
6446 [fn. 7], 6465.)  The evidence, including the ADP testimony, does not support this argument.
ADP's "pre-approval" Excels do not arrive via e-mail.  Instead, they are viewed through ADP's
software.  And, ADP's software is designed to purge these Excel files once payroll is submitted.
After that, this historical information is only available to Ms. Pledger at OTK (and to any other
employer using ADP's software) in .pdf form.  The reason ADP makes only its .pdf records
available here is to avoid any allegation that the permanent records have been altered.  ADP's Rule
30(b)(6) designee explained the process at her deposition:

> Q.      Okay.  But once the client then submits the payroll, says run the payroll,
> this looks good, no further changes, after the payroll processes, can the client go
> back in, in Workforce Now and view the Excel?
>
> A.      To my knowledge, we do not file -- we -- to my knowledge, we do not offer
> the final output as Excel. … And it's the reason I've always been or the reason, the
> logic we've always been explained to me was because Excels can be altered and
> PDFs can't, and if that's final output, you don't want to allow for an alteration.
>
> Q.      So, basically, for that reason to, I guess, potentially protect both ADP and
> the client, once a payroll is processed, the data is archived  or stored in PDF format,
> correct?
>
> A.      PDF format only, correct.

(Ex. K, Raines Dep. (Vol. II) 101:2-20.)   Notwithstanding Plaintiff's selective citation of Ms.
Pledger's deposition testimony in *Gibson*, this was, in fact, covered in her *Gibson* deposition,
where she testified:  "[M]y Excel version is gone once payroll is processed."  (Ex. L, Pledger Dep.
(Gibson) 203:16-17.)

    In short, ADP prefers .pdf to Excel so as to avoid allegations, like those Plaintiffs now
bring here, that an employer is somehow "doctoring" its records after the payroll is run.

### 3.      The "Black and White" Records

    Plaintiffs argue that one of the items from the Court's June 2, 2020 Order that led to
sanctions "was OTK's production of black and white time records rather the electronic colorized

records that showed whether time was actually both authorized and paid for." (Doc. 393, PageID # 6472.) When questioned by Mr. Gibson's counsel in *Gibson* case, Ms. Pledger clarified that these "colorized" charts are not the critical evidence Plaintiffs' counsel thinks they are:

> Q.    And after the changeover in the software, whether the clocks are red or green merely indicates whether it's been reviewed or not -- whether it's been reviewed or not?
>
> A.    That's right.
>
> Q.    And what would you look at to determine at that point whether the time was actually approved or not by the supervisor?
>
> A.    You can determine that by the Daily hours on the timecard.

(Ex. L, Pledger Dep. (Gibson) 236:17-237:15.) If the Court, as Plaintiffs request, should consider Ms. Pledger's testimony from the *Gibson* case, the Court should consider this testimony, too. Plaintiffs could determine what hours were approved for payment simply by reviewing the "Totaled Amount" column on the "Punch Detail" records that Plaintiffs themselves put into the record in September 2020. (*See, e.g.*, Doc. 244-6, PageID ## 2853-2860.) No "colorized" records are required.

> **B.    Plaintiffs Do Not Dispute the Premises Behind OTK's Motion to Reconsider.**
>
> > **1.    Plaintiffs Do Not Dispute That, Today, OTK and ADP Have Long Since Cured Any Conduct That Gave Rise to the Default; Plaintiffs Now Have All the Documents They Need to Prove Up Any Damages.**

In its Motion to Reconsider, OTK explained: "Since current counsel replaced Littler and OTK became fully aware of the nature and extent of Littler's misconduct, OTK has provided Plaintiffs' counsel with documents he has requested relating to the discovery previously served in this case, and Plaintiffs' counsel now has complete pay information for all of his clients through the end of 2021." (Doc. 369, PageID # 6011.) Nowhere in their 52-page Opposition do Plaintiffs dispute this simple statement.

This case is now in a very different posture than when, for example, Plaintiffs filed their

"Miscellaneous Court-Ordered Submission About Remaining Discovery Deficiencies" (Doc. 279) over a year ago on February 10, 2021 (when Littler still represented OTK).  In that submission, Plaintiffs alleged that (1) they did not have any time or pay information for the last year (relevant to at least 100 Plaintiffs); (2) there were 26 Plaintiffs for whom OTK had no time or pay records; and (3) there were 20 Plaintiffs for which OTK had failed to produce some time or pay records. (Doc. 279, PageID ## 3578-3579.)  None of that is at issue now.  That has all been cured now that OTK has retained new counsel.

Indeed, since OTK filed its Motion to Reconsider, Plaintiffs have completed all of their damages calculations using the (Excel) data that OTK and ADP have provided.  On June 17, 2022, Plaintiffs informed the Court as follows:  "Calculations have been prepared for each of the 276 Plaintiffs (through November 13, 2021) in the manner described in their court-ordered Plaintiffs' Overview of Damages Methodology (Doc. 360) as modified to conform to the Court's Order dated March 8, 2022."  (Doc. 384, PageID # 629.)[3]

### 2. Plaintiffs Do Not Dispute That Ms. Pledger Repeatedly Tried to Contact ADP to Find Out About "RROP" Before the Court's Show-Cause Hearings.

By Plaintiffs' reckoning, Ms. Pledger tried to contact ADP about "RROP" issues on June 1, 2020, on July 15, 2020, on July 20, 2020, and on August 4, 2020.  (Doc. 393, PageID # 6464.)

---

[3] Ironically, however, despite previously telling the Court that "[t]he most pervasive problem involves pay rate information" *(see* Doc. 279, PageID # 3579), when Plaintiffs obtained the "RROP" in Excel form from ADP, Plaintiffs ignored this data when asking their "expert" to run damages calculations.  ADP Rule 30(b)(6)'s designee testified that ADP has provided Excel reports custom prepared for this litigation that contained a "paid rate" field.  (Ex. J, Raines Dep. (Vol. I) 53:20-55:6.)  She testified that this "paid rate" field was the same as what was showing on the .pdf copies of the Payroll Registers as the "RROP."  (*Id.*, Raines Dep. (Vol. I) 64:12-20.)  However, Plaintiffs' expert Jeff Mroz, when deposed in the Gibson case, testified (1) that he used the same damages methodology in the Gibson case that he had used in this Hornady case and (2) that Plaintiffs' counsel had stripped out ADP's "paid rate" column before providing Mr. Mroz with any of the underlying data.  (Ex. N, Mroz Dep. 10:12-16, 176:5-18.)

In opposing reconsideration, Plaintiffs never once articulate what about these four documented communications with ADP was sanctionable.  To the contrary, these written records demonstrate that OTK was attempting to obtain, through the only channels it had, the information that its then counsel had, at the time, failed or refused to procure from their other client, ADP.

### 3. Plaintiffs Do Not Dispute That Court's Orders Effectively Make Astronomical Damages a Foregone Conclusion.

Plaintiffs argue:  "The two Orders that OTK asks the Court to reconsider do not include damages determinations."  (Doc. 393, PageID # 6431.)  However, the effect of those Orders on damages is clear to Plaintiffs.  So clear, in fact, that Plaintiffs have completed their damage calculations and are now telling the Court:  "Plaintiffs' understanding is that Defendant does not contest the accuracy of the calculations while it reserves its objections to the methodology and the default judgment itself."  (Doc. 384, PageID # 6210.)  Rather, OTK's objections to the methodology and the default judgment itself are what underpins the Motion to Reconsider.

Plaintiffs make clear what they want:  they want to force OTK out of business.  They argue, without evidence:  "OTK has operated for years in violation of the law and got caught….  If OTK cannot figure out how to compensate its American employees in ways that comply with the FLSA and stay in business, there are lots of steel companies that have done both and can chose to fill any void that OTK chooses to leave behind."  (Doc. 393, PageID ## 6433-6434.)[4]

### 4. Plaintiffs Do No Dispute That Lesser Sanctions Would Have Been Appropriate.

As OTK's Motion to Reconsider explains:  "The FLSA allwos [*sic*] liquidation (doubling)

---

[4] In light of this comment, Plaintiffs then contradict themselves when purporting to analyze public financial statements so as to argue that OTK can somehow afford to pay an eight-figure judgment.  (*See* Doc. 393, PageID ## 6425 & 6434 [fns. 1 & 4].)  OTK disagrees with Plaintiffs' out-of-context analysis of the financial statements and would be prepared to brief these issues in the event the Court were to finds the financial statements identified by Plaintiffs to be material to the issues covered in the Court's November 18, 2021 and February 17, 2022 Orders.

of damages in place of prejudgment interest, and allows damages to go back three years in case of 'willful' violations."  (Doc. 368, PageID # 6010.)   Allowing Plaintiffs to go back three years for any damages and to double the amount of the damages are ample deterrent to other employers who might be tempted to adopt the strategy followed by OTK's former counsel in this case.

Moreover, in this case, OTK is prepared to pay out twice the amount that the Plaintiffs would have received in additional overtime had OTK been paying Plaintiffs, on a minute-to-minute basis, from clock-in to clock-out, going back three years from when each Plaintiff opted in to this lawsuit.  In fact, as Plaintiffs' counsel has already raised as part of the separate *Callier* action, S.D. Ala. Case No. 1:21-cv-00521-JB-N, OTK has already paid those *Hornady* Plaintiffs who were employed in January 2022 the total amount of $344,240.76, calculated based on the amount any additional overtime pay they would have received had they been paid minute-to-minute, with no "rounding," between November 2018 and November 2021.

The $2 million that OTK is prepared to pay is on top of this previous payment and would pay every *Hornady* Plaintiff the greater of $2,000 or the amount they would have received in additional overtime had each Plaintiff been paid minute-to-minute, with no "rounding," going back three years before each Plaintiff filed a consent to join the present collective.  Such payment— which would foreclose OTK from introducing, for example, any evidence that individual Plaintiffs were not working between clock-in and the start of the shift and any evidence that individual Plaintiffs were not working during their paid "lunch" break—would serve as a deterrent for any future misconduct.

Plaintiffs, however, have indicated they want more and, in particular, that they want to re-define OTK's workweek and to treat OTK's monthly percentage bonus as a lump sum, which would have the effect of multiplying this $2 million figure by a factor of five.  Multiplying the damages by five—without any evidence that OTK actually underpaid its employees by these

13

amounts—would prove catastrophic and is not proportional to OTK's conduct being sanctioned.

> **5.** **Plaintiffs Do Not Dispute That the Courts' Orders Found as "Fact" Matters Contrary to the Factual Allegations in the Third Amended Complaint and the Record Evidence.**
>
> **a.** **OTK's Workweek**

Insofar as the most common shift assignment for hourly employees was rotating six-to-six shift, it is no great leap to say that OTK consistently used a workweek that began at 6:00 am Sunday and ran to 5:59 am the following Sunday. That is what the Offer Letters in the record show. (Doc. 368-8, PageID ## 5923-5929.) That is what OTK's Team Member Handbook says. (Doc. 202-2, PageID # 2099.) That is what OTK's payroll data, as analyzed by labor economist Dr. Amidon-Johansson shows.

Describing the workweek as "Sunday to Saturday" does not change the workweek, as illustrated from one of the depositions in the *Gibson* case. (Ex. M, Villacreces Dep. 258:10-259:13.) Instead, for those employees working rotating six-to-six shifts, the workweek runs from the start of the Sunday morning shift (at 6:00 am on a Sunday) to the end of the Saturday night shift (at 5:59 am the following Sunday).

The relevant question is how ADP's Enhanced Time and Attendance applies this seven-day workweek within its proprietary software. Plaintiffs' counsel has expressed confusion on this point and have insisted that paragraph 43 of Ms. Pledger's March 10, 2022 Declaration (see Doc. 378, PageID # 6055) is "absolutely inconsistent" with deposition testimony. (Doc. 389-1, PageID # 6240.) It was this demand from Plaintiffs' counsel that prompted Ms. Pledger's July 8, 2022 Supplemental Declaration. (*See* Doc. 389-1, PageID # 6235 [Supp. Decl. ¶ 33].) The statement in previous Declaration paragraph 43 that ADP's Enhanced Time "applies overtime to any hours over 40 during the 7 consecutive 24 hour period[s] between 6:00 am Sunday and 5:59 am the following Sunday" is correct when a team member works rotating six-to-six shifts. (*Id.*, PageID # 6235

[Supp. Decl. ¶ 34].)  Further, the most common shift assignment for team members is the six-to-six shift assignment.  (*Id.*)

Dr. Amidon-Johansson even specifically mapped out what the ADP data showed in her Declaration.  She analyzed the data supporting Plaintiff Colin Hartery's ADP Earnings Statement dated May 11, 2018 (in the record at Doc. 244-10).  She started the seven-day workweek with the 6:00 am shift on Sunday morning.  With "rounding" to the 6:00 start and end of shifts (am or pm), these clock-in and clock-out times translated into the following pay for Mr. Hartery:

| Date | "Regular" Hours | "Shift Regular" Hours | "Overtime" Hours |
|------|------|------|------|
| **First Workweek** | | | |
| Sunday, April 22, 2018 | -- | -- | -- |
| Monday, April 23, 2018 | 12 | -- | -- |
| Tuesday, April 24, 2018 | 12 | -- | -- |
| Wednesday, April 25, 2018 | -- | 12 | -- |
| Thursday, April 26, 2018 | -- | -- | -- |
| Friday, April 27, 2018 | 4 | -- | 8 |
| Saturday, April 28, 2018 | -- | -- | 12 |
| **Second Workweek** | | | |
| Sunday, April 29, 2018 | 12 | -- | -- |
| Monday, April 30, 2018 | -- | -- | -- |
| Tuesday, May 1, 2018 | -- | -- | -- |
| Wednesday, May 2, 2018 | 12 | -- | -- |
| Thursday, May 3, 2018 | 12 | -- | -- |
| Friday, May 4, 2018 | -- | -- | -- |
| Saturday, May 5, 2018 | -- | -- | -- |
| **Pay Period Totals**: | **64** | **12** | **20** |

(Doc. 368-9, PageID # 5957; Ex. O, Amidon Johannson Supp. Decl. ¶ 5.)  These totals for the pay period correspond with what is shown in Plaintiffs' record previous submission as Doc. 244-10.

Tellingly, Plaintiffs do not want to engage with this actual evidence of how OTK calculated overtime in paying employees.  Instead, Plaintiffs attack Dr. Amidon-Johansson's Declaration by arguing:  "When a workweek is designated to start and end (and whether it is a 168 hour period)

is within the understanding of laypersons (including the Court)." (Doc. 393, PageID # 6455.) However, courts frequently rely on expert testimony in these types of circumstances.[5]

Ignoring both (1) Dr. Amidon-Johansson's observation that "Many employees [*sic*—employers] will start their work week and pay periods in a manner that does not split a single, routine shift assignment into different work weeks or pay periods" (Doc. 368-9, PageID ## 5955-5956 [Decl. ¶ 7]) and (2) OTK's actual shift assignments, Plaintiffs would have the Court require that every workweek start at midnight.[6]

---

[5] *See Monserrate v. Hartford Fire Ins. Co.*, No. 6:14-cv-149, 2016 WL 8669879, at *4 (M.D. Fla. Sept. 23, 2016) (approving an FLSA settlement after noting that the settlement had considered "the estimate of hours the plaintiff worked in any given work week based upon the plaintiff's estimate of hours as well as Defendant's records **and expert report** regarding the same") (emphasis added); *Tanner v. TPUSA, Inc.*, No. 1:12-CV-33, 2015 WL 6940118, at *6 (M.D. Ga. Nov. 9, 2015) ("After reviewing TPUSA's **expert report** (Docs. 198-1) together with the Court's Orders dismissing various opt-in Plaintiffs throughout the course of this litigation, the Court finds that twelve (of 231 total) remaining opt-in Plaintiffs never exceeded forty hours in a work week and were thus never eligible for overtime pay during their employment with TPUSA.") (emphasis added). Plaintiffs also argue: "Calculating a regular rate of pay (that gets multiplied by 1.5) also does not require a Ph.D. in economics." (Doc. 393, PageID # 6455.) However, as made clear by the ADP testimony, ADP was **not** multiplying the "RROP" by a factor of 1.5. (Ex. K, Raines Dep. (Vol. II) 43:4-48:16.) ADP's proprietary "back-end" formula, using both "RROP" and a "weighted average," was far more complex than this.

[6] Plaintiffs argue: "Midnight is the only time that a 168 hour period that begins on Monday can end on Sunday (or one that begins on Saturday can end Saturday)." (Doc. 393, PageID # 6438.) However, in the *Gibson* case, OTK deposed Plaintiffs' expert Jeff Mroz, who testified that he used the same application to run his damage calculations in the *Gibson* case that he had previously used in the *Hornady* case. (Ex. N, Mroz Dep. 44:16-47:12.) At no time did Mr. Mroz ever look at the underlying Excel data "to analyze how Outokumpu determined whether a team member had worked in excess of 40 hours in a work week," and he never "tried to determine what work week, for example, Outokumpu was using in determining the amount of overtime." (*Id.*, Mroz Dep. 97:14-24; 98:22-25 (emphasis added).) Instead, Mr. Mroz relied on Plaintiffs' counsel to "define[] what the work week was, and that's how the overtime was calculated." (*Id.*, Mroz Dep. 99:1-5.) Under the FLSA, Plaintiffs' counsel does not get to "define" the workweek. Plaintiffs cannot ignore the record evidence they have about the actual workweeks OTK used in paying it employees. If Plaintiffs want to argue that certain members of the collective who worked, say, a seven-to-seven shift were underpaid overtime on a six-to-six workweek because of how ADP's Enhanced Time and Attendance added up their hours, that is perhaps a claim they could bring, but that would go far beyond the Court's default requiring that all weeks start at midnight. Requiring all weeks to start at midnight is also a harsh result—even for employees **not** assigned a

**b.** **The Alleged January 27, 2019 Change in the "Workweek"**

Plaintiffs' Opposition repeats the allegation that OTK did something to change the workweek and pay periods from Monday-to-Sunday into Sunday-to-Saturday on or about January 27, 2019. For example, Plaintiffs still accuse OTK's personnel of "chang[ing] the payweek setting in OTK's computer systems." (Doc. 393, PageID # 6441.) Critically, Plaintiffs do not dispute that a change in period beginning dates and end dates in ADP's Workforce Now will not change how ADP's Enhanced Time and Attendance calculates the workweek for overtime purposes. (Doc. 368, PageID # 5868.)

Plaintiffs know that a change in Workforce Now did not impact how ADP's Enhanced Time and Attendance tracks hours. In fact, Mr. Mroz testified that no change in the time and pay data took place on or about January 27, 2019:

> Q.     In the Excel data files … did you see anything about the data that took place around January 27, 2019? Any change in the data that you received in Excel form?
>
> A.     No, I did not.
>
> ***
>
> A.     … The data that comes in didn't -- after the 27th of January does -- the raw data doesn't change.
>
> Q.     … [I]t wasn't like when you did your initial analysis in 2019 to see what was feasible, it wasn't like you looked at the data and said we're going to have to treat before January 27, 2019, differently than after January 27, 2019.
>
> A.     Correct.…

(Ex. N, Mroz. Dep. 58:16-61:11.)

---

six-to-six shift, ADP's Enhanced Time and Attendance still consistently measured their workweek from the beginning of the Sunday morning shift until the end of the Saturday night shift on the following Sunday.

### c.   OTK's Pre-May 2018 Rounding Practices

Plaintiffs do not dispute that the Court's November 18, 2021 Order found a fact contrary to both the record evidence and Plaintiffs' own allegations in paragraph 11 of the Third Amended Complaint.  OTK has explained:  "The Court will need to clarify its November 18, 2021 in light of the record evidence (and pleading in the Third Amended Complaint) establishing that the 'rounding' after clock-out did not exceed 15 minutes."   (Doc. 369, PageID # 5981.)

In Opposition, Plaintiffs now say that "this is a distinction without difference" and argue: "The Court can certainly change the number (of minutes) in its Order, but it is a change that has no relationship to OTK's resulting liability."  (Doc. 393, PageID # 6438.)

Whether or not following the record will change the dollar amount of OTK's "resulting liability," OTK has a reputational interest in having its pre-May 2018 "rounding" practices accurately described in the Court's record.  If it had to pick the lesser of two evils, OTK would rather have the Court's Order find that OTK potentially underpaid its employees after the end of their shifts by 15 minutes rather than by 30 minutes.  And, since Plaintiffs do not oppose that much, the Court should grant OTK's requested clarification here.

### 6.   Plaintiffs Do Not Dispute That Former Counsel's Actions Effectively Left OTK Without a Meaningful Defense in Numerous Respects.

### a.   Littler's Handling of the Case

As late as March 5, 2021, OTK's then counsel was telling OTK's business people that it was "good news" that "all this has finally gotten ADP's attention."  (Doc. 368-8, PageID # 5940.) The Court's sanctions Orders, however, paint a very different story about ADP, one that OTK's business people were not aware of at the time.  As set out in David Scheid's Declaration, OTK's then counsel at Littler did not inform OTK that they "also represented ADP."  (Doc. 368-8, PageID # 5873 [Decl. ¶ 34].)  ADP, in contrast, has stated to the Court that OTK's counsel at Littler was operating under a conflict of interest where ADP was concerned.  (Doc. 300, PageID # 3793.)

Further, in moving to reconsider, OTK pointed out that evidence on issues addressed in the Court's Orders had never made it into the record while Littler represented OTK.  This includes, for example, relevant deposition testimony of Plaintiffs Heath Hornady, Emily Belcher, and Martin Stokes, as well as OTK's management employee David Scheid.  (*See* Doc. 369, PageID ## 5981-5982 [fns. 4, 5, 6, & 7].)  Plaintiffs now dismiss this as "material that OTK did not deem worth submitting in connection with the summary judgment submissions" and argue:  "[OTK] does not detail any new evidence.  Instead, it filed some stuff.  Some of it was already filed, and all of it was available to OTK before the 2021 show cause hearings in this case."  (Doc. 393, PageID ## 6427 [fn. 3] & 6429.)  OTK does not know why Littler chose to withhold evidence before the show-cause hearings, but in light of the severity of the sanctions set forth in the Court's Orders, OTK wants to make sure that the record here is complete.

Indeed, OTK—after Ms. Pledger's May 10, 2022 deposition in the *Gibson* case—agreed to share with Plaintiffs' counsel copies of Ms. Pledger's cover e-mails to transmitting "Check Details" Excel spreadsheets to Littler in advance of her previous March 11, 2020 deposition. Plaintiffs have now reviewed those e-mails and argue:  "OTK stalled producing even the inadequate spreadsheets Pledger prepared in 2020 for several months."  (Doc. 393, PageID # 6457.)  Plaintiffs further argue: "[E]ven though all those (inadequate) Excel files were ready to be produced by March 2, 2020, OTK produced them on the exact deadline (March 31 and April 30) required by the Order OTK obtained under the pretense that it would take Pledger hundreds of hours to generate the spreadsheets."  (Doc. 393, PageID # 6460.)  However, any allegations that there was misconduct when OTK "delayed" production of the 225 spreadsheets Ms. Pledger provided to counsel on March 2, 2020 would appear to be an allegation directed at OTK's counsel at Littler, and not at Ms. Pledger.

It is further unclear how producing the spreadsheet on the March 31 and April 30, 2020

dates required by Order is sanctionable conduct, especially considering that Governor Ivey first declared a state of emergency on the COVID-19 pandemic on March 13, 2020. (Doc. 389-1, PageID ## 6257-6259.) Plaintiffs would have the Court sanction OTK based on delays that did not violate the Court's Orders and which took place at the outset of the pandemic, when OTK was navigating the challenges posed by the new pandemic. In this instance, Plaintiffs appear to fault OTK and its then counsel for meeting a deadline but not beating it.

### b.      David Scheid's Production Incentive E-Mails

Plaintiffs still fault OTK for not complying with the directive to produce David Scheid's e-mails on the production incentive. That was something that happened on Littler's watch. Plaintiffs do not dispute OTK's statement that these same e-mails have now been produced, by OTK's present counsel, as part of the separate *Gibson* case. (Doc. 369, PageID # 5987.) The Court's language in this other case denying that portion of Mr. Gibson's motion to compel addressing these very e-mails is instructive:

> In his surreply, Gibson does not address his alleged mischaracterization of OTK's document production, emphasizing instead that some responsive documents were produced only after he filed his reply brief. (Doc. 45, PageID.511). Gibson then claims that the late-produced documents show that bonuses are calculated on a monthly basis, again expressing frustration at OTK's alleged refusal to admit to this procedure. (Doc. 45, PageID.512).
>
> Despite the parties filing four more briefs on this discovery request, the Court cannot determine what exactly Gibson claims is deficient with OTK's response. Notably, Gibson's surreply does not acknowledge whether the documents allegedly missing from OTK's production at the time this motion to compel was filed are still missing, or if they have been produced as OTK claims.

*Gibson v. Outokumpu Stainless USA, LLC*, S.D. Ala. Case No. 1:21-cv-00103-JB-N at ECF No. 54, PageID ## 545-546. Once again, Plaintiffs are faulting OTK for events that took place years ago, regarding former counsel's delays in producing information that Plaintiffs' counsel now has.

### 7.      Plaintiffs Do Not Dispute Either OTK's Previous Counsel's Health

**Problems or the Global Pandemic.**

Plaintiffs complain that this case has been pending for "four years after suit was filed (and more than two years after they first filed for summary judgment)." (Doc. 393, PageID # 6425.) But, the discovery violations found in the Court's Orders are not the sole causes of delay. Plaintiffs' counsel, for example, does not dispute that OTK's previous lead counsel (Gavin Appleby at Littler) was experiencing serious health problems in January 2020, and Plaintiffs' counsel does not dispute that he even was aware of these health problems at the time. (Doc. 368-8, PageID # 5950 (e-mail from OTK's then counsel to Plaintiffs' counsel, noting serious vision problems and surgeries and adding, "I'm under doctor's orders to avoid undue stress ….").) Nor do Plaintiffs dispute that, two days after Ms. Pledger's March 11, 2022 deposition in *Hornady*, Governor Ivey declared a state of emergency relating to the COVID-19 pandemic. As Ms. Pledger has explained, the pandemic "caused as a stressful time for us at OTK." (Doc. 389-1, PageID ## 6232-6233 [Supp. Decl. ¶¶ 21-22].)

Even without considering these two major intervening events (previous counsel's health problems and the global pandemic), this case has not been pending for an exceptional amount of time in light of the collective claims brought by the 276 Plaintiffs here. As of September 30, 2021, 48.6% of all active FLSA cases nationwide had been pending for three years or more. *See* U.S. District Courts-Civil Cases Pending Three Years or More, by Basis of Jurisdiction and Nature of Suit, During the 12-Month Periods Ending September 30, 2020 and September 30, 2021 (available at https://www.uscourts.gov/statistics/table/c-12/judicial-business/2021/09/30) (last accessed July 18, 2022). Historically, of a survey of 42,663 FLSA cases pending in federal district courts nationwide between January 1, 2009 and July 14, 2022, 12% of the FLSA cases that went to trial took four or more years to reach trial. (Ex. P, Lex Machina Report.) By the time the Court announced, at its April 13, 2021 hearing, that the Court was planning on entering a default on

liability against OTK (Doc. 318, PageID # 4076), the case had not reached the three-year mark.

**C.**     **Plaintiffs Misconstrue the Appropriate Legal Standards for Defaults and Reconsideration of Same.**

Plaintiffs argue that "reconsideration motions are not supposed to raise legal arguments which could and should have been made before judgment issued." (Doc. 393, PageID # 6428.)  In support of this argument, Plaintiffs cite to *Sanderlin v. Seminole Tribe of Florida,* 243 F.3d 1282, 1292 (11th Cir. 2001), *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1267 (11th Cir. 1998), and *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992).  (*See* Doc. 393, PageID # 6428.)  All of these cases involving a final judgment issues on the merits, not as a default entered as a discovery sanction. Plaintiffs further argue:  "Generally, reconsideration of an order is available only when the movant presents 'evidence of an intervening change in the law, the availability of new evidence, or the need to correct clear error and manifest injustice.'"  (Doc. 393, PageID # 6429.)  Both "the availability of new evidence" and "the need to correct clear error or manifest injustice" are in play.  The new evidence—first developed through Ms. Pledger's and Mr. Scheid's Declarations on March 10, 2020 (*see* Doc. 368-8, 389-1) and then further developed by OTK's new (as of April 2021) non-conflicted counsel in the *Gibson* case is discussed in section III.A, *supra.*; a "clear error" is identified in section II.B.5., *supra.*, and "manifest injustices" are identified in sections III.B.3., B.4, and B.6., *supra*.

**D.**     **Plaintiffs Continually Construe the Evidence Out of Context and Find Inconsistencies and Malfeasance in Places Where None Exists.**

"An imperfect witness is not the same thing as a 'false' witness."  *Flowers v. City of Detroit*, 356 F. App'x 984, 988 (6th Cir. 2009).  Where OTK's witnesses are concerned, Plaintiffs insist on perfection, even though Plaintiffs do not apply the same standard for their own witnesses. For example, in his expert "report" in the *Gibson* case, Mr. Mroz testified that there was not anything "inaccurate" in his report, even though this *Gibson* report expressly stated, for example, that some of the Excel files he reviewed "contained data on many employees."  (Ex. N, Mroz Dep.

10:12-16, 44:16-45:2.)  He then, inconsistently, testified that "none" of the files he reviewed in preparing Mr. Gibson's report contained files on other employees.  (*Id.*, Mroz Dep. 44:16-45:2.)

"A party may impeach a witness with a prior inconsistent statement, but not by attempting to prove that a witness' statement with regard to a nonmaterial matter is not true through other evidence." *Thurmond v. Parker (In re Parker)*, 488 B.R. 794, 797–98 (Bankr. N.D. Ga. 2013). Here, applying a standard to OTK's witnesses that Plaintiffs do not apply to their own witnesses, Plaintiffs focus on nonmaterial material in an attempt to find any inconsistency that might support sanctions.  The result is to create a "narrative bias," which one commentator has described as follows:

> [N]arrative power stems from formal authenticity rather than substantive accuracy. … [Stories] are, to some extent, indifferent to truth (in the sense of historical facts) or falsehood; both "real" and "imaginary" stories compel. … [T]he structural adequacy of a story drives its appeal.  Journalist Janet Malcolm captures this when she writes that "truth is messy, incoherent, aimless, boring, absurd ... [it] does not make a good story; that's why we have art."

Lisa Kern Griffin, *Narrative, Truth, and Trial*, 101 Geo. L. J. 281, 302-03 (2013) (citations omitted).  Here, Plaintiffs would transform the "messy" and sometimes "incoherent" nature of true testimony into outright falsehoods and lies.

### 1.     The "True Nature of the RROP Formula"

Plaintiffs accuse Ms. Pledger of making a false statement when she said, in paragraph 15 of her previous Declaration, that the "true nature of the RROP formula was communicated to me on February 2, 2021 …."  (Doc. 393, Doc. # 6463.)  This "true nature" referenced in Ms. Pledger's Declaration paragraph 15 is the "static formula applied evenly to the hours worked each pay period …."  (Doc. 378, PageID # 6049.)  Plaintiffs do not dispute this Declaration paragraph 15 statement that ADP's proprietary "back end" software ran this "RROP" calculation for each pay period.

### 2.     The "Omission" of Pay Rates from the Excels

Plaintiffs now accuse Ms. Pledger of "[choosing] to omit pay rates from the Excel files she

actually created." (Doc. 393, PageID # 6440.) It is odd to say she "chose" to omit these, rather than simply "forgetting" to include them, for example. That is especially true because Plaintiffs acknowledge that Ms. Pledger included the (base) pay rates on the Excel files she created in 2018. (Doc. 393, PageID # 6457.) Further, the (base) pay rates always show on the .pdf files produced, as Plaintiffs already know. It seems an odd "choice" to intentionally "omit," from an Excel document, the same data that Plaintiffs already had in .pdf form. (*See*, *e.g.*, Doc. 216, PageID # 2466 (acknowledging that Plaintiffs had the pay rates in "Pay Summaries, Earnings Statements, Excel Spreadsheets," but alleging that, as these were the base pay rate, the rates Plaintiffs had were "inaccurate and incomplete"); Doc. 244-10, PageID ## 2286-2900 (showing the "Rate" field in the .pdf format, listing different rates for "Regular," "Shift Reg Hr," "Overtime," and "Shift Ot Hrs").)

Tellingly, in calculating their damages, Plaintiffs themselves do not rely on the "base" pay rates. The fact that the "base" rate and other final "pay rates" were included in the .pdf versions of the Earning Statements (*see* Doc. 244-10, PageID ## 2286-2900) makes Plaintiffs' present suggestion that Ms. Pledger was somehow actively concealing these rates ridiculous.

### 3. Carlos Villacreces's Attendance at a November 5, 2020 Teams Meeting

Before Plaintiffs filed their Opposition, Plaintiffs' counsel wrote to OTK's counsel and stated that paragraph 34 of Ms. Pledger's March 10, 2022 Declaration (*see* Doc. 378, PageID # 6052)—about a November 5, 2020 Teams meeting with ADP personnel—was "inconsistent" with testimony in the *Gibson* case. (Doc. 389-1, PageID # 6240.) Going back through the testimony, an inconsistency was identified, not with Ms. Pledger's testimony, but with Carlos Villacreces's testimony. In particular, the following exchange took place at his deposition:

Q.      … Same time frame, have you participated in any sort of Zoom calls, conference calls, phone calls, with anyone from ADP about anything?

A.      My recollection is that I was invited to one, but I did not attend.

(Ex. M, Villacreces Dep. 214:15-215:2.)

That testimony is what prompted Ms. Pledger to submit her Supplemental Declaration explaining that, in order to make the statement in paragraph 34 of her March 10, 2022 Declaration about Mr. Villacreces attending the meeting, she "pulled [her] e-mail to see who was invited to that particular Teams meeting."  (Doc. 389-1, PageID # 6234 [Supp. Decl. ¶ 27].)   In opposing reconsideration, Plaintiffs now point out that David Scheid said that the same thing in his own March 10, 2022 Declaration about Mr. Villacreces attending the Teams Meeting (along with Mr. Scheid and Ms. Pledger).  (See Doc. 393, PageID # 6452.)  However, it should go without saying that recollections about events taking place in November 2020 required both Ms. Pledger and Mr. Scheid to review the e-mail records.  There was no attempt to mislead the Court if, as it turned out, Mr. Villacreces did not make it to a Teams meeting he was invited to in November of 2020.

What Ms. Pledger and Mr. Scheid have done in their Declarations is what almost every declarant on behalf of a company does.  For example, in *Atlantic Marine Florida, LLC v. Evanston Insurance Co.*, No. 3:08-CV-538-J-20TEM, 2010 WL 1930977, at *2 (M.D. Fla. May 13, 2010), a litigant asked the court to strike a declaration, submitted on behalf a corporate entity by an authorized corporate representative, and argued that the declarant's review of the relevant corporate documents was insufficient to establish personal knowledge under the mandates of Rule 56.  *See id.*  The court denied the motion, noting that personal knowledge can be aided by the review of corporate records.  *See id.*  The same could be said of Plaintiffs' arguments here.

### III. Conclusion

Wherefore, OTK requests that the Court vacate its previous Orders sanctioning OTK by striking its answer and entering a default and grant the additional clarifications requested.

Respectfully submitted,

*s/ Devin C. Dolive*
Devin C. Dolive (DOLID4671)
Ronald W. Flowers, Jr. (FLOWR3635)
H. William Wasden (WASDH4276)
Cheri Turnage Gatlin (Appearing *Pro Hac Vice*)

Attorneys for Defendant
OUTOKUMPU STAINLESS USA, LLC

**OF COUNSEL:**

BURR & FORMAN LLP
11 North Water St., Suite 22200
Mobile, AL 36602
Telephone:  (251) 344-5151
Facsimile:  (251) 344-9696
bwasden@burr.com

BURR & FORMAN LLP
420 North 20th St., Suite 3400
Birmingham, Alabama 35203
Telephone:  205-251-3000
Facsimile:  205-458-5100
ddolive@burr.com
rflowers@burr.com

BURR & FORMAN LLP
190 East Capitol Street, Suite M-100
Jackson, Mississippi 39201
Telephone: (601) 355-3434
Facsimile: (601) 355-5150
cgatlin@burr.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on July 19, 2022, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Ian D. Rosenthal, Esq.
Holston Vaughan & Rosenthal LLC
211 South Cedar Street
Mobile, Alabama 36602
idr@holstonvaughan.com

Patrick H. Sims, Esq.
P. O. Box 2906
Mobile, Alabama 36652
patrick@simslawfirm.net

Frederick G. Helmsing, Jr., Esq.
McDowell Knight Roedder & Sledge, LLC
11 North Water Street, Suite 13290
Mobile, Alabama 36602
fhelmsing@mcdowellknight.com


*s/ Devin C. Dolive*
OF COUNSEL