IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA


WILLIAM HORNADY et al.,    *
      Plaintiffs,       *   1:18-CV-0317-JB-N
                    *   March 4th, 2022
vs.                        *   Mobile, Alabama
                    *   1:00 p.m.
OUTOKUMPU STAINLESS        *
USA, LLC,                  *
      Defendant.         *
*****************************


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE

*TATELYN NODA, CCR, RPR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-694-4674/tatelyn_noda@alsd.uscourts.gov

```
 1                    A P P E A R A N C E S

 2
         FOR THE PLAINTIFFS:
 3
         MR. IAN DAVID ROSENTHAL, ESQ.
 4       Holston Vaughan & Rosenthal
         211 South Cedar Street
 5       Mobile, AL 36602
         251-432-8883
 6
         MR. PATRICK H. SIMS, ESQ.
 7       Cabaniss, Johnston, Gardner
         Dumas & O'Neal
 8       P O Box 2906
         Mobile, AL 36652
 9       251-415-7300

10
         FOR THE DEFENDANT:
11
         MR. H. WILLIAM WASDEN, ESQ.
12       Burr Forman
         P O Box 2287
13       Mobile, AL 36652
         251-344-5151
14
         MR. DEVIN CLARKE DOLIVE, ESQ.
15       Burr & Forman
         420 North 20th Street
16       Suite 3400
         Birmingham, AL 35203
17       205-458-5100

18       MR. RONALD W. FLOWERS, ESQ.
         Burr & Forman
19       420 North 20th Street
         Suite 3400
20       Birmingham, AL 35203
         205-458-5100
21

22       COURTROOM DEPUTY: SHANNON DAVISON

23       COURT REPORTER: TATELYN NODA, CCR, RPR

24    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
25      and Procedures Vol. VI, Chapter III, D.2.  Transcript
                produced by computerized stenotype.
```

## **P R O C E E D I N G S**

(In open court.)

COURTROOM DEPUTY:  We're on the record for Civil Action Number 18-CV-317, Hornady et al. versus Outokumpu Stainless USA, LLC.

Counsel, please identify yourselves for the record.

MR. ROSENTHAL:  Ian Rosenthal for the plaintiffs.

MR. SIMS:  Patrick Sims for the plaintiffs.

MR. WASDEN:  Bill Wasden for the defendant.

MR. DOLIVE:  Devin Dolive for the defendant.

MR. FLOWERS:  Ron Flowers for the defendant.

THE COURT:  All right.  Well, thank you all for coming today.  So we're kind of at a place with this case where we need to -- we need to get to a judgment or, you know, otherwise figure out where you are with it.

And now, I have reviewed all of the filings, the plaintiffs' methodology, the objections, and then the responses, such as they are, or at least the methodology and trying to understand where all that is.

I'd like to just go through those.  And I have an idea of how I feel about all of them, but I want to give you an opportunity to make your record on them.  And then I will tell you where I am with it and I think that will -- that will make it very simple to calculate the amount of damages; simple, but not easy, I think is where I would say we are.

 1        That way, we can bring this case to a point where you

 2   could take it up or we can move forward in whatever way makes

 3   sense.  Okay.

 4        So Mr. Dolive, I've read your objections and that's

13:02:17  5   basically what I want to go through.  So why don't -- why

 6   don't we take them each in turn.  And I may have

 7   oversimplified some of the objections, so we'll figure --

 8   we'll figure that out as we go along.

 9        Okay.  So the first objection, by my assessment, regards

13:02:42  10   pay rate calculations.

11            MR. DOLIVE:  Yes, Your Honor.

12            THE COURT:  So why don't you tell me a little bit

13   about that.

14            MR. DOLIVE:  Okay.  And the objection number one was

13:02:54  15   kind of put there just as a starting point.  But if you look

16   at the overtime in the records and how overtime was actually

17   paid -- first of all, for non-overtime hours, you had the

18   regular rate or the base rate and then what's called the

19   shift rate, which is $0.50 more for hours worked on the night

13:03:13  20   shift.

21        And in paying overtime, if you look at OTK's earning

22   statements, pay statements, the payroll data that

23   Mr. Rosenthal processed, there's actually two columns:  One

24   for overtime and one for shift overtime, and they are paid at

13:03:29  25   slightly different rates, because the -- in terms of how the

1   calculations work.

2        So the first thing is Mr. Rosenthal -- and he did explain

3   it in his response -- but he has some methodology for doing

4   some blended rate to take into account days and nights and

13:03:51  5   everything else in one simple number for the calculations --

6            THE REPORTER:  I'm sorry, Counsel.  Can you slow

7   down?

8            THE COURT:  And I'll tell you what, Devin, would you

9   just pull the microphone closer to you?  Because that may

13:03:54  10   help.

11            MR. DOLIVE:  Sure.  He has one simple number that

12   calculates, you know, both day and night, what I think he

13   calls a blended rate.  And the objection number one, which I

14   would hope we can move on, because I don't think it's going

13:04:11  15   to be the major-dollar driver, but it's not the -- the way he

16   calculates it with one blended rate is not reflecting how

17   Outokumpu paid its overtime.

18        And the reason for stating the objections is when he

19   serves the damage calculations, he basically says here's the

13:04:30  20   blended rate without explaining where it came from.  And if

21   you look at his response, he says, well, look, we've had

22   plenty discussions among counsel, here's an e-mail that I

23   circulated in April of 2021 proposing how I would do that.

24            THE COURT:  Slow down.

13:04:46  25            MR. DOLIVE:  And you know, the objection is pretty

1  simple in that from just what he submitted in the damage

2  reports, none of that was clear.  In the normal process, you

3  would have an expert testify, this is how I'm blending the

4  rates.  So the first objection, we're simply saying you're

13:05:05  5  calculating it using rates different than how Outokumpu paid.

6       It may not affect the calculation that much, you know,

7  because you can blend day and night rates and it's probably

8  going to come out to a similar average.

9            THE COURT:  Okay.  And that's kind of how I

13:05:20  10  understood, from what Mr. Rosenthal submitted, is basically

11  what he's doing.  I get this isn't the biggest objection, but

12  we have to start somewhere.

13            MR. DOLIVE:  Right.

14            THE COURT:  And you started here, so I am, too.

13:05:37  15  Mr. Rosenthal, anything you want to add?

16            MR. ROSENTHAL:  Right.  So it can be their biggest

17  objection or their smallest objection.  We did it exactly

18  right.  The way this normally would work is not an expert

19  testifying as to what their rates are.  It would be their

13:05:56  20  verified statements about what their rates are.

21       And I think this may blend between objections, but when

22  you do it by the week, you take the money they paid and

23  divide it by the hours a person worked.

24       In a week in which a person only works day rates, there

13:06:16  25  would be nothing to adjust and nothing to blend.  In a week

in which a person worked only night rates, there'd be nothing

to adjust and nothing to blend.  Sometimes, you've got folks

working a day rate -- a day shift and a night shift, so we

blended them, which is what you're supposed to do.

And then -- I'm jumping a little bit -- but the other

thing that we plug in at that front end is dealing with the

apportioned bonuses, which is separate from the day rate and

night rate.

THE COURT:  And --

MR. ROSENTHAL:  But blending it is what you're

supposed to do when there's multiple rates paid over the

course of one 168-hour week.

THE COURT:  Okay.

MR. ROSENTHAL:  And that's what we did.

THE COURT:  So to kind of cut to the chase on

objection number one, that's really essentially a

communication issue.  I mean, you understand where they're

coming from now, Mr. Dolive, in terms of how they're

calculating it?

MR. DOLIVE:  I think so, Your Honor.  And again,

it's just saying when we start -- when we get to all the

other objections at first sums, well, what rate is being

inserted to start the process?  And so that was the purpose

of stating the objection.

And you know, as Mr. Rosenthal explained it, you know, I

can say that's different than how OTK kept its records of
payment.  But at the end of the day, that's probably not
going to skew the damage calculations too much one direction
or another.  It's the other objections that really change the
13:07:41  numbers.

THE COURT:  All right.  Well, let's move on to the
second objection, which is -- I guess I summarize as credit
for overtime paid.

It's Outokumpu's position that they should receive credit
13:07:56  for overtime payments that were made, and essentially,
plaintiffs' position that they should not receive credit for
that.  Am I oversimplifying?

MR. DOLIVE:  Your Honor, there is a slight
oversimplification because on the plaintiffs' charts, they do
13:08:12  try to give Outokumpu credit for some of the overtime paid.
But what -- what they do is based on his construction or
interpretation or whatever you want to call it on the list of
Pledger's testimony on the truing up, he said he's able to
disregard any overtime paid on the first paycheck of a month.
13:08:38  And so we have tried to quantify what effect that will be.

The other problem, he is discounting other overtime paid
if he said it was paid in the wrong workweek.  You know, he's
saying you can't carry credits forward or back.  But you
know, the original driver of the calculation that we object
13:08:55  to is saying that Outokumpu gets no credit for overtime paid

1    at the beginning of the month.

2         When he did his exhibits that he put in the record, he

3    did one at 356-3 [sic] and 356-4, which are PDFs of Excel

4    charts.  It would've been much more useful to have these in

13:09:18  5    Excel because then we could total it up very easily with one

6    simple click of a button and tell you what the effect is, but

7    he's done this -- he's provided this in PDFs.

8              THE COURT:  That's kind of like an annoying thing,

9    isn't it?

13:09:32 10              MR. DOLIVE:  Pardon?

11              THE COURT:  It's kind of an annoying thing, isn't

12    it?

13              MR. DOLIVE:  Well, it's been a theme in this case,

14    Your Honor.

13:09:35 15              THE COURT:  It has.  Okay.

16              MR. DOLIVE:  But basically, is -- if you compare,

17    you know, his 256-3 to 356-4, basically the 256-3 is the one

18    where he zeros out any overtime paid in the first paycheck of

19    the month, and so it makes a pretty big difference in the

13:10:04 20    calculations.

21              THE COURT:  So I'm with you.

22         Mr. Rosenthal, why don't they get credit for overtime

23    that they paid?  And we talked about this a little bit at the

24    last hearing.

13:10:19 25              MR. ROSENTHAL:  Sure.

1          THE COURT:  So you know that, fundamentally, I have

2     an issue with your position.

3          MR. ROSENTHAL:  There's been some discussion about

4     whether you're being sarcastic or sincere.

13:10:25 5          THE COURT:  Okay.  Well --

6          MR. ROSENTHAL:  So I'd think if you'd clarify --

7          THE COURT:  -- I like to keep people guessing a

8     little bit.

9          MR. ROSENTHAL:  -- but yes, I take your point and

13:10:34 10    the commonsense point that if money has been paid it would

11    seem like a pretty good starting point that maybe they should

12    get a credit for, right?

13         THE COURT:  Yeah.

14         MR. ROSENTHAL:  And you understand we're only

13:10:49 15    talking about the first paychecks of the month, and I don't

16    mean that to minimize it because we're still talking about

17    almost half the paychecks.

18         THE COURT:  Right.

19         MR. ROSENTHAL:  Okay.  So when I say "only," it's

13:11:01 20    not to make it nothing.  We have been talking about this

21    issue since June of 2020 or thereabouts.  And as I set out,

22    at least in our reply to objections, it is the issue that is

23    triggered by Melissa Pledger's deposition testimony, which

24    was off -- in one important part, it was not detailed, which

13:11:31 25    is she said she didn't know the formulas.  So there's no

1    details there.

2        But she talked about getting printouts of amounts.  And I

3    will not go through, again, a chronology that stems from

4    there.  But none of it has ever changed in the sense that

13:11:51  5    what she described is that a first paycheck of every month --

6    the way she described it -- includes amounts that are not

7    attributable to two weeks of pay that go with that.

8        And what we have been saying, and I say since June of

9    2020 -- let's call it the summer of 2020 -- is that the

13:12:17  10    obvious problem there is that if you were crediting payments

11    on a weekly basis -- this is how much is due versus this is

12    how much was paid for that week -- which I think we've

13    expressed repeatedly is what the FLSA requires, you have to

14    know how much was paid for overtime in that week.

13:12:38  15        And the gaping hole in all of this that we have tried to

16    fill -- that we tried to fill through discovery, that we

17    tried to fill through the motion to compel is:  What's that

18    number?  And what we have been saying since the summer of

19    2020, and we put it in our summary judgment submissions in

13:12:58  20    the fall of 2020, was there is a calculation you can run if

21    you knew how much they were paying for overtime,

22    contemporaneously earned and paid, but it's really on them to

23    show what the amount is.

24        We can calculate or estimate how much should have been

13:13:16  25    paid.  And we have calculated, as precisely as we could, and

1    when necessary, estimated things like pay rates, fixed and
2    elsewhere.  The amount that they paid, contemporaneously
3    earned, is up for grabs.  Now, you and I and they all know
4    the number is not zero.  Right?
13:13:36  5        What there isn't is -- what is missing is what the number
6    is.  And in our summary judgment submission, the point we
7    made was you could get to the result where they are credited
8    with nothing for those payments a bunch of different ways,
9    which would remain our position if we were arguing about
13:14:05 10   summary judgment now.
11       As we briefed, there are a string of cases, none of which
12   I will grant you is directly on point with this exact fact
13   pattern.
14            THE COURT:  Right.
13:14:21 15           MR. ROSENTHAL:  Right.
16            THE COURT:  We looked at them.  I don't think
17   they're on point.  I'll just say that.  I don't think they're
18   on point.
19            MR. ROSENTHAL:  They're clearly not this fact
13:14:30 20   pattern, because what we have here doesn't happen, right?
21            THE COURT:  Well, I don't think you can say it
22   doesn't happen because we're here.
23            MR. ROSENTHAL:  Okay.  There's not a lot of
24   precedence reflecting the fact pattern that we have before
13:14:44 25   you today.  We could not find any.  But you do have a

consistent theme, I would say -- and you can disagree -- that
when the employer has records that they are supposed to keep
and then the employer does not keep those records and the
employer then cannot establish the amounts that are being
13:15:06    entitled to credit for, the employer does not get some sort
of estimated, well, it appears to us that the dollars should
be this or that or in between or an equitable -- or make up a
number.

You see that -- I have the Donovan New Floridian case on
13:15:24    my mind, because I have a lodging case going on at the same
time.  But cases like Donovan, cases like Caro-Galvan --
which is C-A-R-O and then Galvan is G-A-L-V-A-N -- out of the
11th Circuit are cases in which there's no question that the
employers were providing lodging or meals.

13:15:42    There's no question that if the employers could establish
the amounts, pursuant to properly-kept records, they would
get a credit for those payments.

And the 11th Circuit's conclusion in cases like that is
because the employer cannot quantify the amounts it is
13:15:57    supposed to establish with its own records, it doesn't get
any sort of a credit for it.  I a hundred percent agree that
what it means is that the numbers we have put in could not
literally be accurate and true in the sense of we know they
made payments for overtime, but that's where we are
13:16:23    evidence-wise.

1          And I would add that, while I don't think anything the
2     statute requires equity in this respect, there is this
3     reality, which we've also briefed and talked about before.
4     OTK's submissions like to use the word "appears."  Like, it
13:16:49  5     appears that this is what's going on and it appears that this
6     is what's going on.

7          And I think in this context, it's accurate.  What it
8     appears, from the two sentences we had from ADP that were
9     obtained and produced fall of 2020 or early 2021, that the
13:17:08  10    thing they are doing that Melissa Pledger said affects the
11    first paycheck of every month actually affects all the
12    paychecks.

13         But in this case, we can't go down that road for a couple
14    of reasons:  One is, when it came up, we were past the
13:17:28  15    discovery deadline.  And then you and I had an exchange in
16    which I was not -- I said I was not inclined to start
17    discovery about it and you weren't going to let us amend the
18    complaint and we weren't on the same page.

19         But what Your Honor may or may not recall -- because God
13:17:44  20    knows the record is long enough -- is that what set us down
21    the road of asking what they're doing, what are the numbers,
22    are the earning statements themselves that they give to
23    employees.  The samples we've talked about with you
24    previously and filed are at Document 244-10, specifically
13:18:13  25    Page ID is 2887 through 2900.

1      Because those were the ones that, when we started looking

2   at them, we took the regular rate that's listed and

3   multiplied it by 1.5 and you don't get the overtime rate that

4   they listed.

13:18:36  5      And then you fast-forward two weeks, maybe there's a same

6   regular rate and there's a different overtime rate listed,

7   and it's still not 1.5 times the regular rate.  And that's

8   what set us down this road of asking what's going on, which

9   led to Ms. Pledger's testimony, which leads us to where we

13:18:55 10  are.

11      I think the result, while not -- while the result we

12   proposed does not accurately reflect overtime payments that

13   they made, it does accurately reflect the record they have

14   left you with.

13:19:16 15      THE COURT:  So -- but if you have identified what

16   you think is the correct amount they should've been paid, can

17   the records not be deconstructed to indicate what was paid?

18      MR. ROSENTHAL:  So your question, is that two

19   different kinds of apples?

13:19:34 20      THE COURT:  Okay.

21      MR. ROSENTHAL:  But here's the answer.  We can

22   construct how much should have been paid this way:  You take

23   the hours that they worked within the week we're talking

24   about, you have -- and so there's no question about that in

13:19:53 25  terms of timestamps of this document.

1    We take their -- as a starting point, their day rate at

2  that time.  This was a person who was making $24.31 in June

3  of 2017.  That's our starting point.  If the hours fall

4  between 6:00 p.m. and 6:00 a.m. that they worked, we tack on

13:20:17  5  $0.50 because we know that's what they were paid for night

6  shift.

7    When we have step-up rates from ADP, instead of $24.31 as

8  our starting point, we use $25.93 for that day or that week.

9  And before August 13th, 2017, we're necessarily estimating

13:20:38  10  it, again, based on payments, but you're starting with a

11  regular rate of pay and an amount of hours.  We're factoring

12  in the bonuses.

13    We know how many overtime hours there are in that

14  168-hour week.  And you multiply X, times Y, times Z, times

13:20:58  15  1.5 and you get the amount they should have been paid for the

16  weeks that are not the first paycheck of each month.

17    Even though it probably shades it a little bit in OTK's

18  favor, we take the amount that they say they paid for

19  overtime and we apply it.  And we apply it to each week in a

13:21:24  20  way that gives them the full benefit of those payments, even

21  though we cannot actually take those two weeks' worth of

22  payments and split them between week A and week B.

23    But to your question, that's why we can calculate exactly

24  what they're due.  In the weeks that are not covered by the

13:21:42  25  first paycheck of every month, we can calculate an amount to

1    attribute for payments that have been made, because that's

2    not the payments that are implicated by Ms. Pledger's

3    testimony.

4         And if Ms. Pledger -- let's pretend we're in a world

13:21:59  5    where Ms. Pledger said, and the documents all lined up so

6    that everything was just like the second paycheck of every

7    month, we would be doing the same thing for the first

8    paychecks that we do for the second paychecks.

9         We'd be taking the amounts that they say they paid and

13:22:25 10    figuring out what the shortfall is, and that's not where

11    we're at.

12         THE COURT:  Well, here's a concern that I have,

13    because under the FLSA, the damages that you're entitled to

14    recover when an employer violates the provisions of Section

13:22:47 15    206 or 207 shall be the amount of the unpaid minimum wages or

16    their unpaid overtime compensation and then, of course, you

17    know, the additional amount for the liquidated damages.

18         So I have a concern because the statute sets that out

19    that where there's an amount that the employer has paid and,

13:23:17 20    you know, we're having an argument about whether they get

21    credit for it or not; that's a problem.

22         And at the end of the day, you have to prove your damages

23    to me in a manner of which I am satisfied that your clients

24    are recovering what the statute says they can recover and not

13:23:40 25    some additional amount.

1        So I think that it's fair for me to say -- and

2   Mr. Dolive, I'm sorry.  I'm not going to give you an

3   opportunity to respond, because I agree with you that -- that

4   OTK has to be given credit for the amounts that they have

13:24:03  5   paid.

6        And while -- and it seems to me that it's a simple enough

7   thing, but it is definitely not an easy thing to figure out

8   exactly what that amount is, but that's where we find

9   ourselves, you, me, and OTK.  Because the judgment that the

13:24:26  10  Court ultimately enters has to -- has to meet the statute.

11       And as I read it, the notion of not giving them credit

12  for amounts that they paid would -- would be a significant

13  problem to any judgment the Court might enter.  And, you

14  know, there's plenty of reasons why either of you might

13:24:52  15  decide you want to appeal whatever judgment comes of this

16  case, but it's not going to be because I entered a judgment

17  that I think would be facially inconsistent with the statute

18  itself.

19       So for my answer as to number two, you know, I think OTK

13:25:12  20  needs to get credit for the amounts that they paid.

21            MR. SIMS:  Your Honor, may I take a brief shot at

22  convincing you that you're wrong about that?

23            THE COURT:  Sure.

24            MR. SIMS:  All right.  And this is global, not

13:25:28  25  talking about the specifics of this case, just globally what

1    the statute and the regulations say about credit and offset.

2         All right.  The statute -- and this is Section 207(h) of

3    the FLSA -- address the subject, the catch line is, "extra

4    compensation creditable toward compensation."  I wrote that

13:26:07  5    down and I can't read what I wrote.  But that's essentially

6    what it's talking about:  Extra compensation creditable

7    towards overtime compensation.

8         All right.  So we're talking about compensable,

9    creditable time would be the subject matter of this

13:26:30  10   discussion.  And then that Section 207(h) has two subparts.

11   The first of which is indecipherable and it addresses things

12   that are not creditable.  So we go to subpart two, that is

13   207(h)(2), and this is the statutory definition of payments

14   that are creditable and those are three.

13:27:06  15       It says -- and this is a statutory cross-reference -- it

16   says that extra compensation paid under parts (e) -- parts

17   (5), (6), and (7) of part (a)(2).  So you have to loop back

18   and forth around the statute.

19        And what those say, and I'll read them -- and I'll refer

13:27:39  20   to them in reverse order, because the first two are

21   irrelevant.

22        Section (7) refers to payments under a collective

23   bargaining agreement, which we don't have.  Part --

24   Section (6) refers to payments of work and of weekend and

13:28:01  25   holiday pay, which basically we're not dealing with.

1    What we are dealing with is Section (5), which is

2    premiums paid for any day of a workweek because of ordinary

3    overtime pay.  That's what we're talking about; that an

4    employer can get credit against overtime liability due for

13:28:39   5    payments of premiums paid in any workweek because of regular

6    overtime pay.  So that's the statutory definition of what

7    credits can be made.

8        All right.  And then you go to the regulation.  And this

9    is what's important, because 29 Code of Federal Regulation,

13:29:13   10    Section 778.202(c) -- and this is what the many cases

11    involved cite to -- say -- after going through a lot of

12    specific examples, say -- says that the employer may get a

13    credit against the overtime compensation, which is due under

14    the statute, for hours in excess of 40 hours in that

13:29:55   15    workweek.

16        Now, let's do a fanciful example for just a second.  You

17    and Mr. Rosenthal, the last time we were here or maybe the

18    time before, took up your point about credit and started

19    talking about 100 -- $100 due, but $25 paid and what about

13:30:23   20    the other $75.  I don't know if you recall that discussion.

21        Let's assume that OTK on -- last week or just a payday

22    last week, suppose there was one, paid to every employee at

23    the mill or plant or whatever they call it $50 and said that

24    the payment was made in recognition of the glorious

13:31:05   25    performance of the Finnish National Cross Country Ski Team in

the Olympics, five medals:  One gold, one silver, and four
bronze, or something like that.

Now, can they claim credit for that payment against their
overtime liability?  Of course not.  It's not a wage payment.
It's not an overtime payment.  It's not attributable to -- in
that workweek of 40 hours.  It's just a payment.  It's just a
gift.  It's just a handout.

So they can't simply make a payment and claim credit for
it against overtime.  It has to be in compliance with the
statutory Section 207(H)(5) and further in compliance with
the regulation applicable to that section.  It has to be a
payment made in that work for that workweek, and I'm largely
copying my argument.

Let me -- let me confess a shortcoming here.  My printer
broke, and so I'm having to work from my iPhone, which I
can't read.  So if I can have your indulgence here.  I'm
copying my argument in large measure in the 3rd Circuit
decision in the Smiley case, Smiley against DuPont, which is
839 F.3rd 325 from 2016, which reviews earlier cases and
recites essentially what I'm reciting.  So that's our point.

THE COURT:  Okay.  Well --

MR. SIMS:  They don't get the credit.  It has to be
credit under the statute for payments made for that workweek.

THE COURT:  Okay.  Well, and it was my understanding
that we're talking about overtime payments that the defendant

1    is claiming credit for.

2              MR. SIMS:  Right.  But they are not necessarily

3    payments for the same workweek period.  That's the critical

4    point.

13:33:38   5              THE COURT:  Okay.

6              MR. SIMS:  All right.  That's my --

7              MR. ROSENTHAL:  Because Ms. Pledger testified that

8    they include these trued-up belated payments and 29 CFR 516.2

9    subsection (a)(x) includes in its record-keeping requirements

13:34:03   10   that the employer is supposed to be able to document total

11   additions to or deductions from wages paid each pay period.

12       The thing that screws it up for them is Ms. Pledger's

13   testimony that the amounts they documented as overtime pay

14   includes additional payments from earlier pay periods.

13:34:22   15             THE COURT:  Okay.  Well, but -- so when you

16   deconstruct the first paycheck of the month to determine the

17   true-up amount, isn't the difference essentially the overtime

18   that was paid beyond the true-up?

19             MR. ROSENTHAL:  We have no idea how to deconstruct

13:34:46   20   the first paycheck of the month to determine how much came

21   from late payments due weeks earlier and how much was due for

22   the two weeks that go with that pay period.

23             THE COURT:  Okay.  Mr. Dolive?

24             MR. DOLIVE:  Yeah, I think it's fair to say that

13:35:08   25   that should be easy to, quote, deconstruct.

1          THE COURT:  I don't believe that there's anything

2    easy.

3          MR. DOLIVE:  Well, I think the fair --

4          THE COURT:  It might be simple.

13:35:17  5          MR. DOLIVE:  -- right, right.  The fair point is

6    that Mr. Rosenthal now has the ADP records that we can get

7    into on a motion to reconsider whether Ms. Pledger's

8    testimony was wrong or Mr. Rosenthal is misconstruing it on

9    the true-ups.  And I know that Your Honor has addressed that

13:35:33 10   in the order of the 17th, but the fact that he now has the

11   records that he can see how ADP was calculating the payments

12   made in the first paycheck of every month.

13          He referred to the Colin Hartery statements in the

14   records at 244-10, and I wanted to pull up to show what he's

13:35:52 15   doing.  And of course, he didn't run calculations for

16   Mr. Hartery because he wasn't the first alphabetically, but

17   I'm looking at a paycheck that was cut on January 8th of

18   2016.

19          So I'm just going through what is -- these -- these

13:36:09 20   earning statements that, you know, for January 8th, 2016, and

21   I'm looking at Mr. Hartery and it shows the number of hours

22   he worked.  He has regular hours, overtime hours,

23   holiday-worked hours, and then he's also paid for holiday

24   hours, which are not paid -- I mean, not-worked hours.

13:36:27 25          So you can total up the hours worked.  He has the

1    timeclock records.  He can compare those to see if they

2    match.  And then there's an overtime payment and the overtime

3    payment -- so he has 64 regular hours, 12 holiday work hours,

4    and 8 overtime hours.

13:36:43   5        And this is over a -- you know, this is a two-week pay

6    period, but the overtime is calculated by the 40-hour

7    workweek.  And it says the overtime hours are paid at a rate

8    of $48.16 in 8 hours and then that total overtime payment of

9    $385.29.

13:37:03  10        What Mr. Rosenthal was doing in his damages calculations

11   is just zeroing out that $385.29 because he says he doesn't

12   know what that is for.  Well, he can easily total up the

13   hours in each workweek during this two-week period, you know,

14   covered by this pay period and see if Mr. Hartery, in fact,

13:37:24  15   worked 8 overtime hours.

16        I submit he did.  That's why it's reflected in his

17   earning statement.  And then what comes up -- which I think

18   he calls the "true-up" -- is if you look at the earning

19   statement for that one, you have a regular rate of pay is

13:37:42  20   listed as $31.24 an hour.  The overtime is listed at $48.16

21   -- 1/3 -- it keeps going, but $48.16.

22        If you just did time and a half, the $31.24, that would

23   come out to $46.86.  So the overtime is being paid at a

24   slightly higher rate.  If he has issue and thinks we're

13:38:06  25   paying too much overtime, you know, he could deduct that.

But the fact is, that overtime was paid for 8 hours of time and he can run his calculations with his rates and determine it.

And in fact, when we looked at it -- and this was in the objections -- and I apologize, Your Honor, that we had to correct because when we ran Mr. Rosenthal's PDF, we admitted $9,000 of Chase Averett's earnings in 2019. But when we summed up what he had done in his damages calculations for 2019, Mr. Rosenthal calculated the total overtime that he thought his clients were due.

This is not damages. Just -- so before he gave any credits to anything, it's $224 -- not 224 -- $224,000, an important difference; an important difference. So $224,000 is what he thought his -- the first 30 clients were due in overtime in 2019.

And in fact, Outokumpu's records show that Outokumpu paid -- and this is through ADP -- paid $213,000. So his number is a little higher. That may be because of the rounding. It may be because of something else. But what Outokumpu paid -- you know, the calculations of what he's calculating overtime to and whatever OTK paid are basically the same.

And so the only way he gets such a disparity, then, when he claims that despite the fact that Outokumpu paid 213,000 of damages -- not damages -- 213,000 in total payments, that

what his 30 clients actually received in 2019, his math only

gives Outokumpu credit for $100,000 of that, which basically

leaves of $123,000, which he says is damages.  And most of

that number is coming through discounting the total amount,

not recalculating, but just any overtime that Outokumpu paid

in the first paycheck of the month he's talking about.

That's a two-week period.

     And each overtime paid of two weeks of every month is

just zeroed out.  And again, you can go to the earning

statements and see, like the one I did from 2016, that it

says there were 8 overtime hours.  And if Mr. Rosenthal shows

that 8 overtime hours were worked in one of those workweeks,

we should get credit for it.

          MR. WASDEN:  It's documentable, and it's not an

additional compensation paid under the --

          THE REPORTER:  I cannot hear you.

          MR. WASDEN:  It's documentable.  It has been

documented.  It's documentable.  It's not additional

compensation paid in characterizations as Pat described, but

it was actual overtime that was paid and our objection

stands.

          THE COURT:  Okay.  So --

          MR. FLOWERS:  One -- can I say one final thing,

Your Honor?

          THE COURT:  If you want to talk me out of agreeing

1    with your position, you're welcome to.

2         MR. FLOWERS:  I don't want to talk you out of that.

3         THE COURT:  Okay.  Well, here's where I am.  It's

4    really easy for me to make a sweeping pronouncement, which is

13:41:06  5    the defendant is to be credited for the overtime that they

6    have paid.  And the difficulty is in determining exactly how

7    much that is, but I mean, they're sitting here saying it's

8    documented and it can be determined.

9    So the judgment I'm going to enter is going to need to

13:41:30  10    take that into account, so that's -- I'm going to -- I'm

11    going to sustain that objection.  And I'm going to tell you,

12    Mr. Rosenthal, you need to figure out how to give them credit

13    for what they've paid for overtime.

14         MR. ROSENTHAL:  Can I ask you to clarify one thing

13:41:53  15    about that?

16         THE COURT:  Sure.

17         MR. ROSENTHAL:  So that I -- the first part, I think

18    I'm clear on, which is that you want the amounts they

19    documented as overtime pay associated with the first

13:42:06  20    paychecks of the month to be credited.

21         THE COURT:  Right.

22         MR. ROSENTHAL:  I got that part.  And frankly, that

23    is only a problem in the sense of rerunning numbers.  And

24    what we submitted to you with our partial summary judgment

13:42:26  25    motions, we had it both ways, so we can plug those amounts

1    back in and treat them exactly the same.

2           THE COURT:  Sure.

3           MR. ROSENTHAL:  What you heard Mr. Dolive just say

4    is, hey, we calculate over the course of a year.  We paid

13:42:42  5    this amount of overtime to people.  And it shouldn't surprise

6    anyone that if you get the weeks wrong, if you count from the

7    wrong starting point and the wrong ending point and you don't

8    factor in bonuses, but you still pay what is called overtime,

9    you're going to get differences.

13:43:09  10           THE COURT:  Sure.  Well, and we still have yet to

11    talk about starting points and ending points.

12           MR. ROSENTHAL:  Right.  And so that was my point of

13    clarification.  Is, at this point, at least -- as I

14    understand your ruling -- we're still dealing with it on a --

13:43:17  15    that we're going to take the amounts that they associated

16    with those two weeks and credit it with the amounts due for

17    those two weeks.

18           THE COURT:  I think that's what we have to do to be

19    faithful to the statute.

13:43:31  20           MR. ROSENTHAL:  Then I hear you.  We've made our

21    pitch.  We made our pitch.

22           THE COURT:  Okay.

23           MR. ROSENTHAL:  And I'm with you.

24           THE COURT:  And that's why I want everybody to have

13:43:37  25    a chance to make their record, so that when no one likes what

1    we do, you can be in a position to deal with it.

2            Okay.  Objection Number Three is essentially to the

3    workweek.

4            MR. DOLIVE:  That's correct, Your Honor.

13:43:52  5    THE COURT:  So this is kind of -- and we spent a lot

6    more time talking about one little piece of this than I -- I

7    think we're talking about overall, so I'm going to kind of

8    short-circuit this.

9            MR. DOLIVE:  Okay.

13:44:08 10    THE COURT:  This is a default.  I understand that

11   you're not happy with the way the workweek is -- is

12   calculated by the plaintiff, but it -- it is a default and

13   that's a fact that's alleged in the complaint.  So I think

14   that we're stuck with what's in the complaint, which is

13:44:27 15   Monday to Sunday until January 27th, 2019, and then Sunday to

16   Saturday.

17       And I also think that -- that the operative time needs to

18   be midnight.  And I realize that that creates a -- an issue

19   with calculations, because you have shifts that straddle that

13:44:51 20   but -- but that's where we are.  So that's my ruling on that.

21       Objection Number Four, equitable totalling.  I think that

22   this Court has already denied equitable totalling.  That was,

23   like, Document 276 way back in the dim, dark ages of the past

24   in this case.

13:45:22 25       And so I think that the damages need to be calculated

*TATELYN NODA, CCR, RPR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-694-4674/tatelyn_noda@alsd.uscourts.gov

1    from the date of the opted-in for each opted-in plaintiff and
2    the date of original filing for the four named plaintiffs.
3         Everybody understand where I am with that?  Does anyone
4    have a question?
5              MR. FLOWERS:  So it's going back three years from
6    the date that --
7              THE REPORTER:  I cannot hear you, Mr. Flowers.  I'm
8    sorry.
9              MR. FLOWERS:  I'm sorry.  I'm losing my voice.  So
10   you're saying that it should be calculated going back three
11   years from the date that they joint -- they filed a consent?
12             THE COURT:  When they opted in.
13             MR. FLOWERS:  Right.  Okay.
14             THE COURT:  Which I think is consistent with the
15   Collective Action procedure.
16             MR. FLOWERS:  I agree.
17             THE COURT:  Okay.
18             MR. ROSENTHAL:  Can I ask you to clarify one point
19   about that?
20             THE COURT:  You can ask.
21             MR. ROSENTHAL:  Right.  What's the worst you could
22   say?  No?
23             THE COURT:  Surely not the worst I can say.
24             MR. ROSENTHAL:  So as we briefly said in our
25   response, the bonus issue, in our view, is triggered by the

1    payment of the bonus at the end of the month.  And I can't

2    remember exactly which dates we would've used in our

3    hypothetical response, but the point being if somebody opted

4    in August 15 of 2019, you could count back three years and

13:46:46  5    figure out which Friday pay period happened to fall or

6    happened to be encompassed by that point.

7        But the bonus paycheck they get, August 30th -- yes,

8    August 30th of 2016, which is within three years of their

9    opt-in date, is a bonus paid for work performed from

13:47:22 10    July 1, 2016, through July 31, 2016?

11        On the other hand, the work they performed -- and I'm

12    making up a week -- but July 1 through July 8 of 2016 would

13    actually be time barred; if they worked six hours of

14    overtime, they wouldn't get that.  And then the bonus --

13:47:50 15    sorry.

16        And to circle back, the bonus is supposed to be

17    reallocated, at least in my view, does fall within the

18    three-week period.  So I say that to seek clarification of

19    whether when we rerun these numbers, what we're supposed to

13:48:16 20    try to do is segregate out the amount of the bonus issue from

21    the rest of it.

22            THE COURT:  So what's the -- the defendant say to

23    that?

24            MR. FLOWERS:  So I would say that it would be the --

13:48:40 25    it would go back to the time -- the pay -- the actual paying

1       of the time, so I don't think we're in disagreement on that

2       issue.

3                   THE COURT:  Okay.  Does that make sense to you,

4       Mr. Rosenthal?  What -- why I'm asking that is I'm trying to

13:48:56  5     set a condition where you can make some calculations, you can

6       be in a position to prove your damages for all of your

7       clients, the defense can understand what the Court is

8       expecting them to prove, but like, if there's, you know, a

9       problem  --

13:49:19  10                  MR. FLOWERS:  I think we're in agreement on that

11      issue.

12                  THE COURT:  Okay.

13                  MR. FLOWERS:  It would be when they were paid for

14      the time and not necessarily when the time was worked.

13:49:30  15                  THE COURT:  Okay.  Does that clarify for you?

16                  MR. ROSENTHAL:  Yes.  First -- I appreciate that,

17      but the point is we're trying to walk out of here with a

18      fixed target to shoot at, whether or not anybody likes the

19      target is up for grabs, but...

13:49:39  20                  THE COURT:  And I'm going to leave you with a couple

21      of options when we finish, but I want to get to the point

22      where you would be in a position to do that.

23                  MR. ROSENTHAL:  Right.  And so my thought is, I

24      think we're on the same page that we are not going to, in our

13:49:59  25     scenario, count the hours from July of 2016 in any given week

1    as being not paid overtime, because they're beyond three

2    years, but that we will take the bonus that was paid at the

3    end of August and figure out how much should've been

4    allocated in pay then.  Unless, frankly, the amounts turn out

13:50:22  5    to be so de minimis that we just write it off.

6             THE COURT:  And that may well be the case.  I mean,

7    it may very well be the case.

8             MR. ROSENTHAL:  I'm agreeing.  So I'm saying that

9    I'm torn, and I think that Mr. Dolive has the same problem,

13:50:34  10   with being just OCD enough to want the math to work out and

11   then to realize what a hassle it is to run it to make the

12   numbers work, only to find out it's a $11 difference.

13            THE COURT:  Right.  Which is why I'm going to

14   propose a couple of options at the end.

13:50:52  15      Okay.  Objection Number Five, treatment of the bonus.

16   Tell me what you would -- tell me about that, Mr. Dolive.

17            MR. DOLIVE:  Okay.  Well, this one -- this one is

18   very simple because, obviously, we have the benefit of the

19   Court's February 17th order that we're not going to, you

13:51:10  20   know, argue about today.  But as I understand it, the Court's

21   order and what it says was, quote, wrong -- which again,

22   we're reserving all arguments on -- but about the way

23   Outokumpu paid its bonus.

24      So a target was set and let's say a target is set for

13:51:27  25   February of this year -- although, we'll get the time periods

1    later, but I want a clean example.  So a target is set for

2    February of this year.  And if production targets are met and

3    everything else, let's say everyone gets a very generous

4    bonus of 25 percent for the month of February.

13:51:44  5        The way Outokumpu would pay that, so they would look at

6    the data in March and say, yes, you met every single target

7    that we set for you in February and you exceeded them,

8    therefore, you get a 25 percent bonus.

9        And you know that calculations are probably going to be

13:52:00 10   run about middle of March to make sure the targets are met,

11   that you receive a 25 percent bonus for February.

12       As I understand the issue with Mr. Rosenthal's claim and

13   now the effective default, is Mr. Rosenthal is saying that

14   the 25 percent applied to the payments, both straight time

13:52:20 15   and overtime payments in February, was incorrect, did not

16   meet the regulations.

17       Because what Outokumpu did is it looked at the paychecks

18   that the employees received in February and not at the hours

19   worked -- they worked in February.

13:52:35 20       And so, you know, you could do either calculation.  You

21   know, Outokumpu did the calculation based on the paychecks

22   received in February, but by the middle of March, you could

23   look all hours worked between February 1st and February 28th

24   and figure out what pay was due to them for those hours, what

13:52:50 25   overtime they worked, and apply 25 percent to the, quote,

1    hours worked in February.

2        So that is my understanding of the Court's order is that

3    the Court's interpretation of the regulation, at least by

4    basis of default, is that's how it should've been done.  But

13:53:07  5    then Mr. Rosenthal, in his calculation -- he has the numbers.

6    He could apply that.

7        So what would 25 percent of February hours worked -- you

8    know, the hours worked in February, the dollars earned based

9    on the hours worked in February, what would 25 percent of

13:53:23  10   that amount be and how does that compare to what Outokumpu

11   actually paid, which was 25 percent of the paychecks

12   employees received in February?

13       And I want to be clear: The paychecks that reflects both

14   regular hours and overtime.  They don't get a bonus on a

13:53:37  15   bonus.  But those are two dollar amounts you can measure and

16   you can compare.

17       And so like we were talking about with Objection Number

18   Two, the argument is is that to the degree the numbers are

19   approximately the same, Outokumpu should get a credit for

13:53:52  20   what it paid, you know, that percentage.

21       What Mr. Rosenthal says is, well, because something was

22   wrong, I'm going to pretend and engage in a fiction that

23   Outokumpu just paid lump-sum bonuses, even though every

24   employee will get a different amount every month.  It's not

13:54:11  25   like everyone gets a hundred dollars, you know, when we did

1    it, but we are going to treat that with a lump-sum bonus and

2    pay no attention to the fact that bonus was calculated on a

3    percentage basis.

4         And so just go from each employee, if employee X gets a

13:54:25    5    $50 check in March and employee Y gets a $300 check in March,

6    you go back and you look at the hours they worked and you add

7    that into their base rate of pay -- you know, the $300 or the

8    $50 or whatever it was in my example -- and add it to the

9    base rate of pay.

13:54:42   10         Is -- I looked at that -- when we looked at it just for

11    2019 on the data, you know, he was averaging -- based on the

12    bonus payments increasing everyone's pay on an average, you

13    know, $4.78, I think, is what we came out to.  And you know,

14    if you actually looked at what was set forth in the Court's

13:55:02   15    order and tried to say, well, what would this have been -- if

16    25 percent of the hours worked in February and not the

17    paychecks in February, would there be any difference?

18         Mr. Rosenthal hasn't run that calculation.  So again,

19    he's trying to get himself the maximum amount without

13:55:22   20    crediting how Outokumpu actually did things.

21              THE COURT:  Well, I think that's his job  --

22              MR. DOLIVE:  Right.

23              THE COURT:  -- certainly.  But Mr. Rosenthal?

24              MR. ROSENTHAL:  We are doing exactly what the

13:55:36   25    statute says and what the 11th Circuit said to do.  And what

they are pretending -- the fiction that Mr. Dolive is
suggesting to you is that we should pretend that they made
payments that were compliant with the bonus allocation
procedures of the Code of Federal Regulations.

13:55:58    They can say -- and it's probably true; I have not
checked their math -- that it averages out to a $4-an-hour
increase of a certain period.  That's because they choose to
make up to 25 percent of these guys' and women's wages, their
compensation, these bonuses.

13:56:16    So if you're paying people 20, 25, $30 an hour and you're
paying bonuses of 15, 20 percent as part of that
compensation, you're going to get numbers like $4 an hour, $5
an hour.

    The -- what they had to do -- what they have to do -- if
13:56:44    they started doing it legally tomorrow, what they would do is
take the amount each person got, whether it's $50 or --
sorry.  They would take -- there are a couple of ways they
could do it.  Sorry.

    One, is they could actually track 778.210 and pay the
13:57:08    bonuses based on how much money the person really did earn
from January 1st through January 31st, not how much they were
paid.  They choose not to do that.

    What lots of employers do is they split the year up into
13 full-week periods for all sorts of purposes.  But you
13:57:27    would think, if you wanted to do it, you can do that.  You

1    could run your bonus criteria over four weeks and it would

2    match exactly.

3         But I think you commented no telling how long ago, this

4    isn't about hypotheticals about what they could've done.

13:57:45  5    It's about what they actually did.  What they actually did

6    was pay people in a lump sum at the end of each month.

7         It is a lump sum that does not correspond to that month

8    of work.  And so what we have to do, because they didn't do

9    it, is allocate it back and that is exactly what we did.

13:58:10 10       And frankly, if we had done anything like what Mr. Dolive

11   was saying we should've done, what they would have is a

12   really clean appeal under cases like Freixa saying that we

13   completely screwed it up, if we did it that way and the Court

14   had entered an order that way.

13:58:32 15       Because among the things that Freixa stands for -- and I

16   suspect that I always pronounce it wrong, but it's spelled

17   F-R-E-I-X-A, which makes me certain that I'm pronouncing it

18   wrong.  Is in that case what we had was -- Judge Pryor looks

19   at it as the District Court is doing it, but I think it

13:58:56 20   probably comes from the parties doing it, taking a simplified

21   approach to trying to make it all work out in the end over

22   cross periods of weeks and saying you can't do that because

23   the Act takes the same workweek as the standard and so that's

24   exactly what we have done.

13:59:16 25       The other comment I would make is this:  The argument

1   Mr. Dolive is making now is a lot like the argument made by

2   former counsel, however cursorily back in 2020, which we

3   anticipated, which is let's pretend -- let's make the

4   plaintiffs run these numbers as if we did this a different,

13:59:45  5   legal way.  And the point is, this isn't a contract case.

6       If, for example, they told everybody you got a bonus of

7   17 percent this month and then miscalculated it and paid

8   7 percent, presumably, each person would have a claim for the

9   different amount.

14:00:08  10       I should've been paid X; I was paid Y.  That's a contract

11   claim.  That's just how the bonuses are supposed to work.

12   But that's not what we have because that's not what the FLSA

13   provides for.  That's where we're at.

14           THE COURT:  All right.  Well, I'm going to overrule

14:00:23  15   the objection.  I agree with the plaintiffs.  I think that

16   does have to -- that process has to be followed.  So that's

17   where I am with that.

18       Tatelyn, how are you doing?  We've been going about an

19   hour.  Do you need a break?

14:00:31  20           THE REPORTER:  Yes, sir, if you don't mind.

21           THE COURT:  Yeah.  All right.  We're going to take a

22   break for 10 minutes.  Is that all right?  All right.  And

23   then we'll pick back up.

24           (A break was taken.)

14:09:44  25           THE COURT:  All right.  Y'all ready to resume?

1        Okay.  The next objection, Mr. Dolive, Number Six, damages

2   should only be calculated through April 15th, 2021?

3              MR. DOLIVE:  Yes.

4              THE COURT:  Help me with that.  Tax day, 2021, was

14:10:06   5   like the day?

6              MR. DOLIVE:  I believe that was the day of

7   Mr. Powell's last hearing when you announced from the bench

8   that there would potentially be a default sanction in this

9   case.  But the point of that is, is to the degree these

14:10:21  10   calculations are being run as the discovery sanctions is why

11   some of the rulings are being made.  The simple issue on that

12   is around that time of the hearing, not only when that was --

13   the default was announced as a likely sanction in the case --

14   we'll phrase it as that.  I don't think you minced words at

14:10:42  15   the time.

16        It also was the time around that time that Mr. Rosenthal

17   received -- had received the complete ADP records that he

18   said he needed to run all these calculations he's run.  And

19   so now, we're in the question of, you know, based on what he

14:11:00  20   ran in January, he then had data from April to September.

21   He's since gotten it through the end of the year.  And the

22   question is simply -- there's -- another issue is that there

23   needs to be a cutoff at some point as to how many times

24   Mr. Rosenthal needs to keep running numbers for, I think it's

14:11:19  25   120-some-odd of the Hornady plaintiffs that are still working

1    at Outokumpu.

2        So yeah.  We would like April just because that seems

3    clear, based on the sanctions, and it's not a continuing

4    conduct.

14:11:31  5        THE COURT:  Okay.  Well, certainly, the sanctions is

6    not just for discovery violations.  I mean, it's the actual

7    misrepresentations of counsel.  There's certainly more to it

8    than a discovery sanction.

9        But I mean, I really don't see why a date, other than the

14:11:55 10   date the default was entered, would be the appropriate day to

11   run it through.

12       So Mr. Rosenthal, you want to tell me that I'm wrong

13   about that?

14           MR. ROSENTHAL:  No.

14:12:07 15           THE COURT:  Okay.  Well --

16           MR. ROSENTHAL:  Not for more than 10 days

17   difference.  The point I was going to make is there is a pay

18   period that coincides or overlaps with the date of your

19   order.

14:12:25 20           THE COURT:  Oh, okay.  So I'm making it more

21   complicated even than --

22           MR. ROSENTHAL:  Well, what I was thinking was

23   this -- and I'm looking through my response to see if I

24   actually had the date in here.  So if you'll give me a second

14:12:42 25   to stall --

 1          THE COURT:  Well, what if we just said the last pay

 2     period that's -- that is encompassed in the date of the

 3     default?

 4          MR. ROSENTHAL:  I'm sure that's fine.  I -- and the

14:13:16 5     reason is simply that for the next -- if these same

 6     plaintiffs who are still employed choose to pursue their

 7     claims going forward, it would really be convenient if their

 8     claims here ended on a pay date and their next round would

 9     land on the next one.

14:13:33 10          THE COURT:  Okay.  All right.

11          MR. DOLIVE:  Now, just to be clear, Ian, when you're

12     saying ending on a pay date -- because the problem is, we now

13     have this other issue of the pay date not being how Outokumpu

14     actually paid because of the midnight start times that you've

14:13:51 15     already ruled on.

16          THE COURT:  Okay.  Well, I think I'm talking about a

17     pay period.  And so I don't -- I think by the time that order

18     was entered, you were in Saturday to Sunday workweek, I

19     think, that starts at midnight, so -- or Sunday to Saturday.

14:14:09 20     Am I saying that wrong?  Okay.

21       So I feel confident that the order was entered during the

22     week.

23          MR. DOLIVE:  I believe it was a Thursday,

24     Your Honor, yes.

14:14:21 25          THE COURT:  Okay.  So I think then if we just say

that pay period that the order fell within would allow us to
have a termination, that makes sense.  And also, to the
extent that any of those plaintiffs are involved in the other
litigation, that would also provide a date that makes sense
14:14:43  for that.  Okay.  So that's my ruling on Number Six.

Number Seven, the paid lunch break issue.  I kind of
think that was ruled on already by the Court.

MR. DOLIVE:  You're asking for me to comment?

THE COURT:  Well, yeah.

14:15:09  MR. DOLIVE:  I mean, yeah.  The general point -- and
this -- when I gave that example previously for 2019 where,
you know, Mr. Rosenthal had calculated $224,000 in overtime
he thought his clients should've been paid or worked, you
know, not the damages because the damages were actually down
14:15:31  to 123 because of the credits he gave and we calculated 213.

I think that difference in 224 and 213 for the 2019 on
those plaintiffs may be due to this rounding.  And yes, I
mean, Objection Number Seven is in part to preserve the
objection, you know, because it's going to be individualized.

14:15:52  But I do think that perhaps the result of your
November 18th and February 17th order is there's going to
have to be assumption, for the default purposes, that
everyone worked every minute they were clocked in, including
through lunch, including before shift and including after
14:16:05  shift.

1      And if that's the result of the default, I mean, we're

2   preserving our objection.  But, you know, running the

3   calculations from clock-in to clock-out and giving no credit

4   for lunch and anything else, I -- you know, at least the math

14:16:21  5   can be run.

6           THE COURT:  Okay.  Well, then your objection is

7   noted and overruled.  That's Number Seven.

8      Number Eight, credit for overtime paid when OTK was not

9   required to pay overtime?

14:16:37  10          MR. FLOWERS:  I'll speak to this one, Your Honor.

11          THE COURT:  Just pull the microphone over, if you

12   would, Mr. Flowers.

13          MR. FLOWERS:  And this may be the same case as the

14   last objection.  But in commonplace in cases like this when

14:16:53  15   you have an employer that includes in its regular rate pay

16   for time that was not worked, such as holiday pay or vacation

17   pay or paid meal breaks like this, and that can -- it causes

18   a reduction in the overtime that's due based on the amount

19   that was paid for time not worked.

14:17:11  20      Now, the plaintiff -- and I don't know that you need to

21   -- if you're concluding that you've already ordered this in

22   the default judgment order, then I don't think we need to

23   reach this.

24      But plaintiffs have argued in their reply that 7(o)(h)(2)

14:17:29  25   would cause that pay not to set off the unpaid time work that

1   was attributable to overtime, but 7(o)(h)(2) says, except as

2   provided in paragraph two, sums excluded from the regular

3   rate pursuant to subsection (e) shall not be credible towards

4   wages required or under -- or overtime compensation required

14:17:54   5   under the section.

6        But the key issue there is sums excluded from the regular

7   rate of pay pursuant to subsection (e).  But because OTK

8   included the holiday and the vacation pay and the meal break

9   pay as a part of the regular rate, then it would not be

14:18:12   10   excludable under Section 7(h)(2).

11        And so we argue that in making the calculation, you would

12   need to attribute those times to make a reduction in the

13   unpaid overtime worked, unless it's already been something

14   that's been decided as part of your default judgment.

14:18:28   15             THE COURT:  Okay.

16             MR. FLOWERS:  And I apologize for my --

17             THE COURT:  No, you're fine.  And you're welcome to

18   keep drinking water if you want or if you have something else

19   you want to chew on, you're welcome to do that, too.

14:18:40   20        Mr. Rosenthal, like, did you not say that you haven't

21   counted any -- any time responsive to that?

22             MR. ROSENTHAL:  So half of that answer is yes, and

23   I'd re-characterize it as pay and not time.

24             THE COURT:  Okay.

14:18:58   25             MR. ROSENTHAL:  What I'm hesitating about is that

1    since none of it was really litigated, it is harder -- even

2    harder for me to put into words --

3         THE COURT:  Well, I'll tell you what.  That's a fair

4    point.  Because I think that is ultimately rolled up in the

14:19:20  5    default.  So you know, and like Mr. Flowers was saying, I

6    understand wanting to preserve your objection to it, but

7    that's kind of a merits thing, which is decided based on the

8    default.  So okay.

9         MR. FLOWERS:  Understood.

14:19:40  10        MR. ROSENTHAL:  What I would say is that we didn't

11   double count anything.  So for example, if the way their

12   records show that somebody works on July 4th ends up getting

13   12 hours of pay at their regular rate, $21.34, and also

14   showed 12 hours of pay at a higher rate, essentially as the

14:20:11  15   premium for coming in and working on a holiday, we didn't

16   count all that money into the regular rates from which we

17   then calculated overtime and we didn't credit that additional

18   payment against it; so it ought to be a wash.

19        On the bonus -- I'm sorry.  On the lunch break front,

14:20:30  20   we're just counting the time when they clocked in and when

21   they're clocked out and there's nothing separately aggregated

22   or allocated by them or anyone else to this lunch break

23   issue.

24        So it's not -- it's not the same in the sense that there

14:20:45  25   isn't an amount of money to be allocated towards it.  But --

1          MR. DOLIVE:  And this -- and one -- this is just to

2     clarify for Mr. Rosenthal how the calculations -- because the

3     other point is, in terms of one of the credit, is that

4     Outokumpu counted vacation time towards overtime.  So I'm

14:21:07  5     going to imagine generally they were 12-hour shifts.  Let's

6     do four 12-hour shifts Monday through Thursday.  That would

7     be 48 hours of which there would be, in a normal week,

8     8 hours of overtime paid at the last 8 hours or the last

9     12-hour shifts on Thursday.

14:21:26  10     So that, you know -- so if it was a Monday, Monday

11     through Thursday.  If the employee took all 12 hours Monday

12     off as a vacation day, they still received that 8 hours of

13     overtime at the end of the week.  I'm assuming Mr. Rosenthal

14     will look at that week and say, well, you paid overtime on a

14:21:39  15     week you didn't have to and it's a wash in the calculations,

16     so he's not computing that.

17          MR. ROSENTHAL:  I think I understand the comment, I

18     think.  First of all, if they took vacation for a day, we

19     didn't count that as time worked at all.

14:21:56  20          MR. DOLIVE:  Okay.  That's --

21          THE COURT:  Right.

22          MR. ROSENTHAL:  And second of all, we counted for

23     the second paychecks of every month and will count for the

24     first paychecks of every month the overtime pay that OTK

14:22:13  25     documented as both shift overtime pay and regular overtime

1    pay and not the overtime pay that they document or that they
2    talk about now as vacation overtime, because it wasn't
3    brought up along the way.  But we're not treating time that
4    they were on vacation as time worked.
14:22:31  5            THE COURT:  Right.
6            MR. DOLIVE:  Okay.
7            MR. FLOWERS:  Again, we just made that to preserve
8    the objection.  It wasn't litigated here but will be
9    litigated elsewhere.
14:22:40  10            THE COURT:  Sure.  I understand.  So for the record,
11    Objection Number Eight will be overruled.
12        Objection Number Nine, I sort of see as a statute of
13    limitations on unjust enrichments, essentially.
14            MR. DOLIVE:  I think that's -- Your Honor, that may
14:22:59  15    be what it breaks down to based on your February 17th order.
16            THE COURT:  Okay.
17            MR. DOLIVE:  I mean, again, we're not sure that
18    that's even a cognizable claim to get straight time at your
19    regular rate of pay for, you know, a week you worked.  You
14:23:10  20    were paid 36 hours.  You worked 37 hours based on the
21    clock-in times, that extra hour -- whether you get paid that
22    extra hour, but I think your February 17th order said that
23    that's the conclusion.  In which case, if that's the
24    conclusion, then what's the time period covered by it?
14:23:27  25            THE COURT:  Yeah.  Well, and that's ultimately the

```
 1   question, because statute of limitations would be an

 2   affirmative defense that I think -- actually, for the

 3   defendant, that affirmative defense was specifically barred

 4   by Judge Nelson or struck before the sanction that I entered.

 5       Mr. Rosenthal, what's your position?

 6           MR. ROSENTHAL:  Yes.  I agree the statute of

 7   limitations is an affirmative defense and Judge Nelson struck

 8   it twice.

 9           THE COURT:  Okay.

10           MR. ROSENTHAL:  So our take on it is that, first of

11   all, what that should mean is that the damages we ran for

12   common law damages would go back to -- we only ran them back

13   to 2015.  So whether -- so our take on it is that even if

14   there's a two-year statute of limitations -- normally, it

15   doesn't exist here, because there's no defense.

16       Had we anticipated three or four years ago where we would

17   be today, we would've run those damages back to 2012 or 2013,

18   but we didn't and we can't and now we're not going to.

19       So I believe that our position is that the damages should

20   run back to the middle of 2015, which is the number, the date

21   encompassed by our damages calculations, because that's the

22   date we got them.

23           THE COURT:  Okay.  Well, that's going to be the

24   ruling of the Court.  So I'm going to overrule Objection

25   Number Nine.  Okay.
```

Timestamps: 14:23:49 (line 5), 14:24:00 (line 10), 14:24:24 (line 15), 14:24:46 (line 20), 14:25:01 (line 25)

1          Are there objections that I missed, Mr. Dolive?

2               MR. DOLIVE:  Not in what we filed, Your Honor.

3               THE COURT:  Okay.

4               MR. DOLIVE:  I'd like to think of some more, but...

14:25:11  5     THE COURT:  Well, I'm sure, given time, that you

6     would do so.  I have no doubt.  Okay.

7          So at this point in this case, I mean, the next step is a

8     judgment.

9          Mr. Rosenthal, you need to prove your damages.

14:25:32 10     Now, I expect with ruling on the issues that are raised

11     now, I think that provides you with a framework that is

12     consistent with how a judgment I would intend to enter would

13     be based, but you have to put flesh on the bones.

14          Obviously, you have my ruling on the overtime.  Clearly,

14:26:02 15     the defendant's position is that that is a number that can be

16     demonstrated.  So it's -- the burden is on the plaintiff to

17     prove the damages, but if your proof shows otherwise, that is

18     what I expect to see when we have a show-damages hearing.

19          So how much time do you need to do this math?

14:26:30 20          MR. DOLIVE:  And Your Honor, may I ask a process

21     question related to that?

22               THE COURT:  Sure.

23               MR. DOLIVE:  Because the -- the process question

24     related to that is -- very simply is that, you know, we've

14:26:42 25     looked at 30 plaintiffs alphabetically to see how plaintiffs

1    were doing the methodology, you know, looking at potentially

2    the quirks that would relate -- you know, related to

3    individual plaintiffs.  We set out the differences on those

4    30 plaintiffs.

14:26:57 5       You know, we haven't looked at whether those 30

6    plaintiffs are, in fact, representative of the 276 or somehow

7    selecting them alphabetically skewed more than the random

8    sample would.  And I guess the question is -- is going

9    forward -- because it does have a cost difference, is do we

14:27:12 10   look at some sampling approach using these methodologies?

11       Or does Mr. Rosenthal just run these calculations

12   according the methodology, which is 276 times, and we run our

13   own calculations under the methodology and compare numbers?

14          THE COURT:  So that's an interesting question.  You

14:27:32 15  know, I think it's certainly -- Ian, I think one of your

16   partners once told me, you know, the plaintiff is master of

17   the complaint and can handle their case in whatever way they

18   want.  You can ask Greg about that.

19          MR. ROSENTHAL:  My partners, like me, are sometimes

14:27:47 20  wrong.

21          THE COURT:  Well, so --

22          MR. ROSENTHAL:  But I take your -- the question is a

23   real one, and here's my thought:  I do not think we have any

24   choice but to run calculations for all 276 people separately;

14:28:04 25  this same way but separately.

1    Among other reasons, at the end of the day, it makes no

2    difference to any of the five or six or seven people named

3    Williams how much Ms. Adams is entitled to.  A has nothing to

4    do with B.

14:28:23  5    Also, that deals with -- since Mr. Dolive is coming up

6    whether or not the first 30 are representative, it makes no

7    difference because Mr. Williams' amount, his specific amount,

8    is unrelated to Ms. Adams' specific amount, so we've got to

9    do it anyway.

14:28:44  10    Second of all, we -- now that we have parameters, a

11    target to shoot at, we have all the data.  We have all the

12    data.  We can cut out the data we got from ADP in November of

13    2021.

14    I believe it is accurate that everything, except for

14:29:11  15    maybe the last three months of ADP data for 2021, has already

16    been loaded into a database.

17    To your question of, well, how long will this take?  I

18    have half an answer, which is -- and an explanation for only

19    having half an answer.

14:29:29  20    Now that I know the targets, if you gave me 21 days, I

21    could definitely not give you 276 full reports.  But what I

22    could do is say:  This is how many we've got done and this is

23    a projection for when we can have the rest of them done.

24    The explanation for why it's uncertain is this:  It is

14:30:05  25    not as simple as taking Rosa Adams, figuring out how much

1    time it took to run it through the database and multiplying
2    it by 276.
3         When there are glitches in the data, which can be as
4    minute as there is a space after a date or the dollar sign
14:30:31  5    comes -- whatever, instead of the program that we have had
6    written running smoothly, it throws an error.
7         So what I can do in 21 days is run all of them and
8    identify how many did not throw an error.  The problem is
9    that when we identify that there are 30 or 40 or 50 or
14:30:53 10    there's a glitch, it's finding where the glitch is and making
11    it right.
12         And it honestly can be as simple as John Adams has a
13    space.  If there's something in John Adams, an extra space in
14    the name, and it's not syncing or it can be an actual data
14:31:08 15    problem.
16         So if you gave me 21 days, I could report back on:  This
17    is how many reports we have done; we've provided them to the
18    defendant; this is how many we have left to troubleshoot.
19    And at that point -- what makes me nervous is the idea of you
14:31:32 20    turning around and saying, great, you have 14 days to do the
21    rest of them or whatever.  But I'm trying to get this done as
22    fast as I can.  And that's where I'm at on it.
23         THE COURT:  Well, so, Mr. Dolive your concern was a
24    little different, I think, but that is certainly one
14:31:52 25    approach.

1          MR. DOLIVE:  Right.

2          THE COURT:  That would arguably yield the most

3     accurate number at the end of the day is to calculate each

4     individual plaintiff and their data, or once you start

14:32:08  5     looking at that, once you know where the Court's -- where the

6     bones are, essentially, for a judgment in this case -- you

7     know, I don't know if it would be helpful for you to talk

8     with -- I know you mediated I don't know how many times with

9     Judge Nelson or with other mediators.

14:32:33 10          I think Judge Nelson has enough history with this case

11     and your current issues in the other cases that I would not

12     propose her.  But you know, perhaps a neutral magistrate

13     judge who practiced as an employment lawyer before becoming a

14     magistrate judge might be helpful.

14:32:57 15          I know, from the defense side, there's a lot of other

16     issues that have absolutely nothing to do with the plaintiffs

17     that involve this particular case.

18          I mean, you have potential appellate issues, I suppose,

19     but you have other issues with previous representation.  You

14:33:12 20     know, there's a lot of things that are in play that might

21     make sense to resolve it, even at this point, in a faster

22     manner.

23          And I have -- I have spoken to Judge Bivins about whether

24     she'd be willing to serve as a -- or to host a settlement

14:33:35 25     conference.  Or I mean, you can argue about the numbers, if

1    you want.  I'm sure she'd be happy to listen to that.

2          MR. FLOWERS:  That's certainly something we would

3    consider.

4          THE COURT:  Well, and I'm not saying that I want you

14:33:47  5    to give me an answer now.  But I just -- I say that because,

6    you know, sometimes we need a permission structure to come

7    off of a position that we have fought for for a long time, or

8    you know, have a lot invested in and so I want to try to

9    offer that.

14:34:10  10          MR. FLOWERS:  Yeah.

11          THE COURT:  So consider that.

12          MR. FLOWERS:  Thank you.  And we sort of -- and we

13    disagree that there can't be representative samples at this

14    stage, because certainly we think that initially they would

14:34:19  15    -- the plaintiffs would not have been similarly situated.

16    But given the Court's orders, at this point, they are

17    similarly situated.

18          THE COURT:  Well, I mean, it was the position of the

19    defendant that there was no objection to the similar

14:34:35  20    situation, I mean --

21          MR. DOLIVE:  Except I will point out one small

22    issue, just a true technicality on that ruling on the last

23    objection that was overruled on the so-called unjust

24    enrichment claim, that's not a collective action under the

14:34:46  25    FLSA.  That's a 276-plaintiff case at this point.  So you

1    know, a minor detail, and I think that's how we're

2    effectively proceeding with damages.  But that is what it is.

3        I guess the other question, process-wise, you know, if we

4    do go forward this way -- and also just to make it abundantly

14:35:05  5    clear for the record, I think you entered your order on

6    February 17th.  The December order said all briefing on a

7    motion of reconsideration was stayed for, I think, 21 days

8    pending a clarifying order.

9        I'm assuming the February 17th was the clarifying order,

14:35:19 10    which will mean you'll be getting a motion to reconsider next

11    week.  I'm sure you're looking forward to that.

12            THE COURT:  Well, let me save you some time with

13    that, as well.  No, you're certainly welcome to file whatever

14    motion to reconsider you want, but if your motion to

14:35:34 15    reconsider somehow involves issues that have not previously

16    been raised, you know, just know that that's not a ground

17    that we consider.

18        So -- but no, you're absolutely right.  And I haven't set

19    a date for a show cause or prove damages hearing or anything.

14:35:55 20    I'm just telling you that -- that I would be happy to

21    facilitate a settlement conference with a neutral magistrate

22    judge who I think could possibly be helpful.

23            MR. DOLIVE:  And that is something we will certainly

24    consider, Your Honor.

14:36:16 25            THE COURT:  Okay.

1          MR. DOLIVE:  I think the other process point -- and

2     maybe now is not the time to raise it -- but now that we

3     have -- assuming that, you know, you don't reconsider the

4     default judgment, and you know, start all over again.  You

14:36:26  5     know, the question is now that we have --

6          THE COURT:  And just keep in mind the conduct

7     that --

8          MR. DOLIVE:  Right.

9          THE COURT:  -- produced your default judgment.

14:36:33  10          MR. DOLIVE:  I appreciate that, Judge.  Yes.  But

11     where I was trying to go is what the damages hearing will

12     look like, whether it's done on a sample or 276 is -- you

13     know, right now, I'm holding up, just for the record,

14     Document -- I think it's 356-1, you know, these printouts in

14:36:51  15     PDF that Mr. Rosenthal provided how he's running his damage

16     calculations.

17     I don't know how he gets an affidavit or something to

18     make this, you know, reducible to evidence form.  You know,

19     the question is, are we both just running calculations using

14:37:08  20     the same set of ADP data?  Does he hand this over in an Excel

21     form where we can actually run the math?

22     You know, there are a lot of mechanics to be worked out

23     before we would have a damages hearing.  Because the normal

24     way, you get this much data for 276 people -- and I would

14:37:24  25     submit it would be through expert testimony.  But again, that

1      ship may have sailed before I was involved in this case.

2              THE COURT:  Well --

3              MR. ROSENTHAL:  But either way, his point is a good

4      one of what does a hearing look like, right?  So here's what

14:37:42  5      I think we can consider.

6          First of all, what is obviously true is that in the

7      context of a settlement, the way you run numbers can be

8      somewhat slightly less precise than the way you have to run

9      numbers is with the expectation that on appeal it's going to

14:38:13 10      be attacked on all fronts.

11          Because if you're -- here's what I would suggest.  Is

12      that the way district courts look at settlements, if we came

13      in and said, look, everything under $100 we rounded, it would

14      still probably be good enough for most district court judges

14:38:38 15      in the context of the amounts we're talking about here, not

16      to sweat it to the penny.

17          On the other hand, if we submit a proposed damages in an

18      evidentiary hearing that said, well, look, a lot of these

19      numbers involve small dollar amounts and we're just rounding

14:38:54 20      to $100 increments, I don't think that would ever fly on

21      appeal.  So there's a cart and a horse issue to the

22      resolution.

23          Either way, though, what we did in this case is we had

24      Jeff Mroz who is, by all of our standards, a computer expert,

14:39:21 25      run calculations based on voluminous data.  And we identified

him and said explicitly -- we don't know that he has to be

identified as an expert, but he's the person that we're using

because he wrote this program.

And so whether the information he has about what the

program does in terms of taking the data inputs and turning

them into the final numbers is presented by affidavit or live

testimony, at least our take on it is that either way, it is

admissible.

This is subject to whatever Your Honor decided about how

we present it, but the substance of it would still be

Mr. Mroz -- which is M-R-O-Z -- and sometimes I pronounce it

Mroz, in which case it's still M-R-O-Z.

But the point being, that from the standpoint of

providing evidence about how voluminous data turns into

calculations, that's how we'd go about it.

The printouts, the damages reports -- which, first of

all, in terms of formatting, presentation, style, we can

clean it up now that we've got fewer columns that we need,

fewer alternatives, but that doesn't change the substance of

it.

The reason that they are currently PDFs is that they are

not Excel files to begin with.  They are called JSON files,

which is J-S-O-N.  I know enough about computers to know that

if you want them to work, you power it off, you power it on,

you cross your fingers and hope for the best.

1     But JSON files are essentially the programmatic results.

2    So it's not like we're hiding Excel files that had these

3    numbers and you can go and do it.  If you go to convert --

4    it's almost like if I took the docket off of PACER, clearly a

14:41:50 5    computer program creates it and there's columns and there's

6    entries.

7     I don't think you can convert it to Excel easily, because

8    that's not the program it's running in.  It's a computer

9    program that shows you a Windows format.  And in the -- but

14:42:10 10   these are result numbers.  The underlying data is all Excel

11    spreadsheets, which we can provide to them, which in large

12    part came from them -- sorry.  It came from data that came

13    from them.

14     What I have told Mr. Dolive repeatedly is that one of the

14:42:38 15   fun things we found out about Excel over the last couple of

16    years is that the sort of notifications that pop up when you

17    go to use it that you don't think about, like you are running

18    Excel in this version -- if you save it, it will format it in

19    this version that you or I or normal people running Excel

14:43:04 20   never think about, as far as we can tell, sometimes tweaks

21    the data a little bit.

22     And one example is the ADP data that we received most

23    recently seem to have embedded in it a setting that links the

24    times to the time that the person is viewing it in.  So if

14:43:31 25   you were viewing it in Atlanta, it would come off an hour

1    than what's reported as it is here because it's got a setting

2    for what time a person -- in what time zone are you running

3    the program.

4         Once we figured out why a bunch of the numbers were an

14:43:53  5    hour off, we can correct for it.  The concern that I have is

6    that depending on what Excel program you open it in and when

7    it says you're saving your settings, I think it's pretty easy

8    to mess up, and then you end up with a bunch of results that

9    are off by just enough to drive you insane.

14:44:10  10    I say that to say this:  From an evidentiary standpoint,

11    we anticipate that Mr. Mroz will say -- in some shape or form

12    say this is the program I created, it takes this type of

13    data, it runs this calculation, it tallies the minutes, it

14    tallies the pay, it credits this.

14:44:28  15    He is not providing testimony as to what an employee is

16    entitled to.  It's just a program that does math.  And if

17    these results can be converted into something more useful

18    than a Microsoft Notepad set of numbers, we are happy to give

19    them to you.

14:44:59  20    I will leave it -- I would suggest that if there are

21    settlement discussions, whether it's with Magistrate

22    Judge Bivins or anyone else, that the question of what does

23    an evidentiary hearing look like could be resolved after that

24    so that we would know are we presenting numbers for

14:45:24  25    settlement approval or are we presenting numbers for a

1     full-blown resolution?

2           That would include, if we have a hearing, whether

3     Mr. Mroz testifies live, submits an affidavit describing his

4     numbers, is deposed, whatever.  And then, of course, the

14:45:41  5   defendant gets to vote, too, you know, on these issues.

6           Mr. Mroz has happily moved off to Colorado last week.  So

7     he is not as available as he has been for the last three

8     years, but it's not the end of the Earth and it's a pretty

9     nice place to go.  That's kind of where we're at.  But I hope

14:45:58  10  I addressed at least some of the issues you brought up about

11    it.

12          MR. WASDEN:  Your Honor, the defendant agrees with

13    the referral of the damages, exchanges, and necessary reviews

14    and discussions that will go into that to assign it to the

14:46:20  15  Magistrate Judge of the Court's choice.  Judge Bivins is

16    perfectly acceptable to defense.  And then defer as far as

17    scheduling on the Court's recommendation from the magistrate.

18          THE COURT:  Okay.  Mr. Rosenthal, is that acceptable

19    to you?

14:46:33  20         MR. ROSENTHAL:  Yeah, it's fine.

21          THE COURT:  Okay.  Well, then that's what -- that's

22    what I'm going to do.  I'll enter an order just providing an

23    up or down ruling on the objections that we addressed during

24    this hearing, that'll just say as further discussed on the

14:46:56  25  record, and I will ask Judge Bivins to reach out to y'all and

1    see about facilitating a conference.

2        Okay.  Is there anything else that we need to take up at

3    this point?  And I'll defer setting any kind of schedule for

4    a show damages/prove damages hearing until after you've had

14:47:21  5  an opportunity to visit with Judge Bivins.

6            MR. DOLIVE:  One question.  So our clock is now

7    ticking on the motion to reconsider.  And I hate to ask this

8    on the record, but I will confer with Mr. Rosenthal, but we

9    have a 94-page order and then a subsequent February order.

14:47:41 10   And, you know, we're looking at the standard page limits

11   in the local rules and trying to figure out what's

12   manageable.  Obviously, we'll confer with Mr. Rosenthal, but

13   probably it's worth asking, since we're only a week away, if

14   we were to ask for a few extra pages how that might be

14:47:58 15  viewed, assuming we've conferred with Mr. Rosenthal.

16           MR. ROSENTHAL:  I certainly don't care and I don't

17   need to be conferred with.

18           THE COURT:  So how many additional pages would you

19   like, Mr. Dolive?

14:48:20 20          MR. DOLIVE:  We hate to ask this, but maybe

21   50 pages?

22           THE COURT:  50 additional pages or 50 total pages?

23           MR. DOLIVE:  50 total.

24           THE COURT:  Okay.

25           MR. DOLIVE:  Additional would be nice.  You know,

1    that would be --

2            MR. WASDEN:  No, it would not.

3            MR. DOLIVE:  Okay.  Bill does not want to read an

4    80-page brief.  I think that's clear for the record.

14:48:38  5            THE COURT:  All right.  You can -- you can have

6    50 pages.

7            MR. DOLIVE:  Okay.  Thank you.

8            THE COURT:  I want you to make your record.  So

9    that's fine.  Mr. Rosenthal, if you feel it necessary to

14:48:49 10   write that much, you may as well.  You don't have to respond.

11           MR. ROSENTHAL:  I will try not to.

12           THE COURT:  Okay.

13           MR. ROSENTHAL:  I do have sort of a practical

14   question.

14:48:57 15           THE COURT:  Okay.

16           MR. ROSENTHAL:  And of course, this only requires

17   you to predict the future.  But from time to time in this

18   case, you have entered orders on motions to reconsider

19   without reply briefs being filed and sometimes even faster

14:49:20 20   than the deadline that would've been necessary for one.

21       So all I'm asking you to do is predict the future in the

22   sense of if in 10 or 15 or whatever the dates are they file a

23   50-page brief and under the Court's standard scheduling

24   order, I have a couple of weeks to file a reply.

14:49:43 25       As much as I enjoy the thought of someday getting paid

1    for my work on this case, there is a part where I do not

2    really want to start writing and then seven days in get an

3    order mooting the entire thing because --

4              THE COURT:  So when you say the Court's standard

14:50:00  5    scheduling order, you mean the one that's provided for in the

6    local rules that says you should reply within a certain

7    period of time?

8              MR. ROSENTHAL:  Yes.

9              THE COURT:  Okay.  Well, I mean, I know that exists

14:50:10  10    but it's my practice, when there's a motion filed that I want

11    a response to, that -- that we enter a briefing order and

12    that's my practice in every case.

13         So I recognize there's a standard order in the local

14    rules, but it's my practice to tell you what I want.

14:50:34  15              MR. ROSENTHAL:  Well, and that makes it even easier

16    for you to predict the future because you know what you

17    already do, you know that I should've known you already do,

18    and I'll wait on marching orders before I file or write

19    anything.

14:50:46  20              THE COURT:  Okay.  Mr. Dolive, do you have anything

21    else?

22              MR. DOLIVE:  I don't believe so, Your Honor.

23              THE COURT:  All right.  Thank y'all for coming this

24    afternoon.

14:51:00  25              MR. ROSENTHAL:  Thank you, Your Honor.

1                THE COURT:  Have a good afternoon.

2           (Adjourned at 2:51 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4          I, the undersigned, hereby certify that the

5   foregoing pages contain a true and correct transcript of the

6   aforementioned proceedings as is hereinabove set out, as the

7   same was taken down by me in stenotype and later transcribed

8   utilizing computer-aided transcription.

9          This is the 8th day of December of 2022.

10

11                   _____

12                   Tatelyn P. Noda, CCR, RPR

13                   Certified Court Reporter, Alabama

14                   Registered Professional Reporter

15                   Official Federal Court Reporter

16

17

18

19

20

21

22

23

24

25

*TATELYN NODA, CCR, RPR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-694-4674/tatelyn_noda@alsd.uscourts.gov